## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RHONDA WILLIAMS,

      Plaintiff,

v.                              Case No. 8:14-cv-01748-MSS-TGW

MOSAIC FERTILIZER, LLC,

      Defendant.

_____/

## MOSAIC'S MOTION TO EXCLUDE PROFFERED TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT TOXICOLOGIST, DR. FRANKLIN MINK

Mosaic moves to exclude Dr. Franklin Mink's proffered expert testimony for failing to (a) comply with various Court orders governing expert disclosures,[1] or (b) satisfy Federal Rules of Evidence 104, 403, and 702, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296 (11th Cir. 2014).

As demonstrated by his expert report[2] and deposition testimony,[3] Dr. Mink's proffered testimony is replete with speculation and unsupportable assertions. His fatal flaw, however, is not that he applied an unreliable methodology. Instead, it is that he failed to apply any methodology at all—and certainly not that required by the U.S. Supreme Court, the Eleventh Circuit, or the Federal Judicial Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE.

---

[1]   Docs. 19, 40, 51, and 55.
[2]   <u>Exhibit A</u>, Dr. Mink's expert report.
[3]   <u>Exhibit B</u>, Dr. Mink's deposition testimony.

The decision to exclude Dr. Mink's proffered testimony does not require this Court to deconstruct the nuances of toxicology. That is because Dr. Mink **completely failed** to perform at least two fundamental and necessary tasks the Eleventh Circuit requires for such testimony to be admissible. *First*, he failed to perform **any** specific dose calculations for the Plaintiff. *Second*, he failed to enumerate and eliminate **any** alternative causes for Plaintiff's purported complaints. To be clear, it is not that Dr. Mink failed to perform these essential tasks with the requisite scientific rigor. To the contrary, he failed to perform them at all. Finally, in a misguided effort to compensate for his failure to perform any specific dose calculations, Dr. Mink attempts to rely on two studies that (a) directly contradict his opinions, and (b) further highlight his failure to eliminate potential alternative causes. His fundamental failures can be summarized as follows:

- Dr. Mink's report and deposition testimony establish that he failed to perform specific dose calculations for the Plaintiff. Incredibly, he testified, "it can't be done."[4] This failure alone requires exclusion as the Eleventh Circuit has held that the dose-response relationship is "*the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect.*"[5] "In toxic tort cases, '[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that plaintiff was exposed to such quantities are **minimal facts** necessary to sustain the plaintiff's burden.'"[6]

- Dr. Mink relied on two "trusted" studies that (a) directly contradict his opinions, (b) do not analyze air emissions in Plaintiff's neighborhood, and (c) highlight his failure to enumerate and eliminate alternative causes. The first "trusted" study concluded emissions from the Mosaic Riverview plant at issue in this case "*do not impose an elevated cancer risk or health effects to*

---

[4] Exhibit B, Mink Dep. Tr. at 26:9-27:3.

[5] *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1339 (11th Cir. 2010) (emphasis added).

[6] *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005) (emphasis added); *see also* Fed. Judicial Ctr., "Reference Guide on Toxicology," REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 622 (3d ed. 2011).

Greenberg Traurig, P.A.

*general population*."[7]  The second "trusted" study analyzed different constituents over a different area, thus making it inapplicable.  It nonetheless concluded that the cancer risks from major point sources in the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area are ***57-times lower than alternative sources***.[8]  Even if the "trusted" studies could be applied to the Plaintiff—which they cannot—they directly contradict Dr. Mink's opinions, rendering them unreliable and requiring their exclusion.[9]

- Despite these "trusted" sources having identified many potential alternative causes—having far greater impacts than Mosaic's Riverview plant—Dr. Mink failed to enumerate and eliminate ***any*** alternative causes, including (1) natural background, (2) other emission sources,[10] (3) Plaintiff's morbid obesity, allergies, and sedentary lifestyle, (4) her *three decades* of exposure to secondhand smoke, (5) idiopathic causes, and (6) psychological influences such as somaticism, which was identified by one of Plaintiff's experts.

It is known that "all scientific testimony or evidence admitted [must be] not only relevant, but reliable."[11]  To have offered relevant and reliable scientific testimony in this action, Dr. Mink was required to demonstrate with "scientifically valid" evidence (1) general causation, (2) specific causation, and (3) the enumeration and elimination of potential alternative causes.  He failed at each of these.  Dr. Mink's report and testimony failed to disclose any general causation opinions or methods.[12]  He failed to disclose any "reliable methodologies, including dose-response relationship, epidemiological evidence, background

---

[7]  Hsing-Wang Li, *et al*., "Impacts of hazardous air pollutants emitted from phosphate fertilizer production plants on their ambient concentration levels in the Tampa Bay area," AIR QUAL ATMOS HEATH 8:453-467 (2015).

[8]  Jayajit Chakraborty, *Cancer risk from exposure to hazardous air pollutants: spatial and social inequities in Tampa Bay, Florida*, INT'L JOURNAL OF ENVIRONMENTAL HEALTH RESEARCH, Vol. 22, No. 2, 165-183 (April 2012).

[9]  Opinions contradicted by underlying studies are unreliable.  *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 144-147 (1997) (affirming exclusion of plaintiff's experts where "the studies upon which the experts relied were not sufficient, whether individually or in combination, to support [the experts'] conclusions"); *Chapman*, 766 F.3d at 1307 (affirming exclusion of plaintiff's experts where the articles on which experts relied on did not support their causation conclusions); *McClain*, 401 F.3d at 1248 (admonishing expert who drew "unauthorized conclusions from limited data – conclusions the authors of the study d[id] not make").

[10]  This includes, as recognized by this Court, the TECO Big Bend facility.  *See* Doc. 74.

[11]  *Daubert*, 509 U.S. at 589; *General Elec. Co.*, 522 U.S. at 142; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

[12]  *See Chapman*, 766 F.3d at 1303.

Greenberg Traurig, P.A.

risk of the disease, physiological processes involved, [or] clinical studies."[13]  He failed to disclose any "secondary methodologies, including plausible explanations, generalized case reports, hypotheses, [or] animal studies[, all of which] are insufficient proof of general causation."[14]  He failed to disclose any specific causation opinions or methods, or any differential diagnosis or etiology.[15]  And he failed to enumerate and eliminate potential alternative causes.[16]

There is no single place in Dr. Mink's report or deposition testimony that he can legitimately point to and show this Court he performed the work required to offer an opinion on causation.  His proposed expert testimony must be excluded.

## BACKGROUND

Plaintiff alleges she has been made ill by exposure to certain chemicals emitted from Mosaic's Riverview plant more than three miles from her home and from fugitive dust emissions from a phosphogypsum stack more than a mile from her home.[17]  Plaintiff retained Dr. Mink, a toxicologist, to opine on causation, which he offered in a highly-conclusory expert report devoid of any of the scientific evidence or methodology necessary to satisfy the *Daubert* standard.[18]  These were Dr. Mink's opinions:

> 1) Rhonda Williams has been exposed to significant quantities of regulated pollutants and hazardous materials from both direct and fugitive sources as a result of Mosaic's operations including phosphogypsum mining, processing, storage,

---

[13]   *Id.* at 1306.
[14]   *Id.* at 1308.
[15]   *See id.*; *see also Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1195 (11th Cir. 2010).
[16]   *Chapman*, 766 F.3d at 1310-11.
[17]   *See* Docs. 24 (Second Am. Compl.) and 77 (Am. Answer and Affirmative Defenses).
[18]   Dr. Mink relies on another proffered expert, Mr. Leslie Ungers, to opine on exposure at Plaintiff's residence, which he too failed to perform.  Mr. Ungers's proffered testimony is the subject of a companion *Daubert* motion.

Greenberg Traurig, P.A.

transportation and waste handling operations over her lifetime residence in Prospect [*sic*] Village, Florida primarily through inhalation and dermal exposures.

2) Rhonda Williams has developed significant adverse health effects as a result of these hazardous exposures including G6PD associated pulmonary hypertension and obstructive pulmonary disease resulting in a diminished quality of life and potentially reduced life span.

3) Rhonda Williams has developed significant adverse health effects as a result of secondary effects from therapeutic agents used to treat her diseases/symptoms resulting from these exposures further diminishing her quality of life and threatening her long-term physical and mental wellbeing.[19]

The specific illnesses Dr. Mink asserts Plaintiff suffered as a result of her alleged exposures are "G6PD associated pulmonary hypertension, asthma and obstructive pulmonary disease,"[20] and "exacerbated [] G6PD symptoms including hemolytic anemia and associated pulmonary hypertension significantly increasing her probability of deep lung tissue alteration/scarring."[21] The chemicals or constituents he alleged she was exposed to are undefined amounts of sulfur dioxide ($SO_2$), particulate matter ($PM_{10}$) in the form of fugitive dust, and certain purported elements and radioactive materials contained within the alleged fugitive dust.[22] Demonstrating the unreliability of his opinions, studies on which Dr. Mink relied directly refute his assertions, he related no single constituent to any particular illness,[23]

---

[19] Exhibit A, Mink Report at 2-3.
[20] Exhibit A, Mink Report at 7.
[21] Exhibit A, Mink Report at 15.
[22] Exhibit A, Mink Report at 14-15.
[23] Dr. Mink testified he tied no specific constituent to a specific condition and that he was incapable of opining that a combination of constituents could be tied to a specific condition: "The best I can tell you is that is certainly beyond my ability and I have not found anyone in the literature that looks at that complexity of interaction. The risk assessment of complex chemical mixtures is truly on the forefront of risk assessment science. We know it occurs, but to quantitate it is extremely difficult." Exhibit B, Mink Dep. Tr. 156:11-158:17.

Greenberg Traurig, P.A.

and he performed no dose calculations—the *sine qua non* of toxicology—stating "it can't be done."[24]

Undeterred, Dr. Mink asserts that Plaintiff "is a sensitive individual that has a more complicated biological/immunological response to all of these substances" due to a glucose-6-phosphate dehydrogenase (G6PD) deficiency.[25] G6PD is the most common genetic enzyme deficiency in humans affecting approximately 400 million people worldwide. The G6PD gene instructs cells to make the G6PD enzyme, which helps protect red blood cells from oxidative damage and premature destruction. Its symptomatic marker is hemolytic anemia. Betraying Dr. Mink's opinion, a number of Plaintiff's own treating hematologists—and her primary care physician—say **she has no documented hemolytic anemia events**. Further betraying his opinion, Dr. Mink admitted he could not determine how much more sensitive her condition makes her as neither "[he] nor no other published expert knows."[26]

The deadline for Dr. Mink's written report disclosing all opinions, facts, and analyses was May 1, 2015.[27] He failed, however, to disclose the facts, data, principles, or methods necessary to render admissible opinions in the field of toxicology. Consequently, his testimony cannot satisfy *Daubert* standards. Second, and more disturbing, however, both his report and deposition testimony demonstrate that he failed to make the requisite disclosures because he failed to perform a scientifically valid analysis of general or specific causation, or enumerate and eliminate potential alternative causes. Dr. Mink failed to perform the basic work a toxicologist would have been required to perform in a toxic tort case because he

---

[24] Exhibit B, Mink Dep. Tr. at 27:1-3.
[25] Exhibit A, Mink Report at 16.
[26] Exhibit B, Mink Dep. Tr. at 27:4-8.
[27] *See* Doc. 40. This Court also expressly limited expert trial testimony to the "opinions, bases, reasons, data, and other information disclosed in the[ir] written expert report[s]." Doc. 55.

Greenberg Traurig, P.A.

failed to gather the necessary facts and data and apply those facts and data to the appropriate principles and methods of toxicology.

The Federal Judicial Center, in the REFERENCE MANUAL'S "Reference Guide on Toxicology," states that the "discipline of toxicology is primarily concerned with identifying and understanding the adverse effects of external chemical and physical agents on biological systems."[28] The REFERENCE MANUAL recognizes that "[t]he interface of the evidence from toxicological science with toxic torts can be complex[.]"[29] Thus, "the role of toxicology in toxic tort cases often is to provide information that helps evaluate the causal probability that an adverse event with potentially many causes is caused by a specific agent."[30] The method for offering causation opinions in the field of toxicology is clear:

> An opinion on causation should be premised on three preliminary assessments. *First*, the expert should analyze whether the disease can be related to chemical exposure by a biologically plausible theory. *Second*, the expert should examine whether the plaintiff was exposed to the chemical in a manner that can lead to absorption into the body. *Third*, the expert should offer an opinion about whether the dose to which the plaintiff was exposed is sufficient to cause the disease.[31]

Given the complexity of the interaction between chemicals and biological systems and the many causes of illness, a toxicologist is required to methodically analyze causation.

In *Chapman v. Procter & Gamble Distributing*, the Eleventh Circuit restated the necessity of satisfying an exacting scientific standard. First, in a toxic tort there is "a two-part *Daubert* analysis, comprised of (1) general causation, 'whether the [substance] can cause

---

[28] REFERENCE MANUAL at 635.
[29] *Id*. at 635. It should also be noted that "[c]ausation questions have been particularly troubling in cases in which plaintiffs allege that the adverse health effects for which they seek damages are a result of exposure to the defendant's product." *Id*. at 22.
[30] *Id*. at 635. Hence, the required enumeration and elimination of alternative causes.
[31] *Id*. at 661 (emphasis added).

Greenberg Traurig, P.A.

the harm plaintiff alleges,' and (2) specific causation, whether experts' methodology determines the substance 'caused the plaintiff's specific injury[.]'"[32] Importantly the specific causation analysis requires the enumeration and elimination of potential alternative causes.[33] *Chapman's* requirements are consistent with REFERENCE MANUAL's elucidation of the methods and standards of toxicology, which also seeks evidence of general causation, specific causation, and the elimination of potential alternative causes.[34]

The first central tenet of toxicology is "the dose makes the poison."[35] Accordingly, toxicology places a particular "emphasis on understanding dose-response relationships."[36] In fact, it is accepted that "an expert toxicologist will consider the extent of a plaintiff's dose in making an opinion."[37] Dr. Mink, however, admits he failed to address dose in his report. Another central tenet is "each chemical or physical agent tends to produce a specific pattern of biological effects that can be used to establish disease causation."[38] Dr. Mink similarly failed to demonstrate what constituents caused what alleged illnesses in what ways.

These are critical elements of general and specific causation. The first addresses whether the chemical can cause the alleged harm. The second addresses "whether there has been exposure to a sufficient dose to be a likely cause of this effect."[39] In order to offer an opinion on specific causation, a toxicologist must know whether the plaintiff was exposed,

---

[32] *Chapman*, 766 F.3d at 1303.

[33] *Id*. at 1310-11.

[34] REFERENCE MANUAL at 665.

[35] *Id*. at 636. This is denotes the fundamental importance of dose, which Dr. Mink never determined.

[36] *Id*. at 635.

[37] *Id*. at 638.

[38] *Id*. at 636-37. A third central tenet is "the toxic responses in laboratory animals are useful predictors of toxic responses in humans." *Id*. at 637.

[39] *Id*. at 638.

the dose of the exposure,[40] whether the exposure was sufficient to cause the alleged harm, and he must eliminate potential alternative causes of the alleged harm:

> The certainty of the expert's opinion depends on the strength of the research data demonstrating a relationship between exposure and the disease at the dose in question and the presence or absence of other disease-causing factors (also known as confounding factors).[41]

The U.S. EPA's approach in its EXPOSURE FACTORS HANDBOOK is similar:

> Some of the steps for performing an exposure assessment are (1) identifying the source of the environmental contamination and the media that transports the contaminant; (2) determining the contaminant concentration; (3) determining the exposure scenarios, and pathways and routes of exposure; (4) determining the exposure factors related to human behaviors that define time, frequency, and duration of exposure; and (5) identifying the exposed population.[42]

The failure to satisfy any one of these steps invalidates an opinion.

Dr. Mink failed to apply the generally-accepted methods necessary to offer a scientifically reliable opinion in the field of toxicology as elucidated in the REFERENCE MANUAL and EXPOSURE FACTORS HANDBOOK, and is thus unable to demonstrate causation in a way that satisfies *Daubert* as recently applied by the Eleventh Circuit in *Chapman*.

---

[40]    "Dose is a function of both concentration and duration." *Id*. at 638, n.12.

[41]    *Id*. at 665.

[42]    U.S. EPA, EXPOSURE FACTORS HANDBOOK 1-3 (2011 ed.). *See also* <u>Exhibit C</u>, figure 1-2 at 1-29, partly describing the exposure-dose-effect continuum as the "trajectory of an agent from its source to an effect. The agent can be transformed and transported through the environment via air, water, soil, dust . . . . Individuals can become in contact with the agent through inhalation, ingestion, or skin/eye contact. The individual's physiology, behavior, and activity patterns as well as the concentration of the agent will determine the magnitude, frequency, and duration of the exposure."

Greenberg Traurig, P.A.

# LEGAL STANDARD

The Federal Rules of Evidence govern the admissibility of expert testimony.[43] Expert testimony is admissible only *if*:

> (1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*"; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue.[44]

Under "*Daubert* the Court charge[s] trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony."[45] This is a rigorous standard that may not be lowered even though the exclusion of an expert may be outcome determinative in an action.[46]

## I. The gatekeeping function safeguards the jury from unreliable expert testimony.

"Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert *scientific* evidence."[47] This is "to insure that speculative and unreliable opinions do not reach the jury."[48] Expert testimony can be "both

---

[43] In a federal court sitting in diversity jurisdiction, the admissibility of expert testimony is a question of and controlled by federal law. *See Hendrix*, 609 F.3d at 1193; *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).

[44] Fed. R. Evid. 702; see also *Chapman*, 766 F.3d at 1304 (internal citation omitted).

[45] Fed. R. Evid. 702, advisory committee's note (2000 amends.).

[46] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also Hendrix*, 609 F.3d at 1187; *Rink v. Cheminova*, 400 F.3d 1286, 1291 (11th Cir. 2005); *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004).

[47] *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis in original). *See also Daubert*, 509 U.S. at 592-93 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").

[48] *McClain*, 401 F.3d at 1237; *see also Rink*, 400 F.3d at 1291; *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Greenberg Traurig, P.A.

powerful and quite misleading because of the difficulty in evaluating it."[49] Consequently,

the Rules of Evidence provide a stricter admissibility standard for expert testimony:

> [W]hile Rules 401 and 402 reflect the general policy of the Federal Rules for liberal admission of evidence, Rule 403, working in conjunction with Rules 702 and 703, militates against this general policy by giving courts discretion to preclude expert testimony unless it passes more stringent standards of reliability and relevance. These stricter standards are necessary because of the potential impact on the jury of expert testimony.[50]

The gatekeeping function must insulate the jury from irrelevant and unreliable

"scientific" evidence or unsupported speculation offered in the guise of science:

> Although making determinations of reliability may present a court with the difficult task of ruling on matters that are outside of its field of expertise, this is "less objectionable than dumping a barrage of scientific evidence on a jury, who would likely be less equipped than the judge to make reliability and relevance determinations."[51]

As such, the court's gatekeeping function is required to ensure scientific validity:

> A trial court . . . must therefore perform a "gatekeeping" function by conducting "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[52]

This assessment is not cursory: "Rulings on admissibility under *Daubert* inherently

require the trial court to conduct an *exacting* analysis of the proffered expert's

methodology."[53] Abdicating this duty is an abuse of discretion, as is admitting testimony

---

[49] *Allison*, 184 F.3d at 1310 (quoting *Daubert*, 509 U.S. at 595).
[50] *Id.*
[51] *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (quoting *Allison*, 184 F.3d at 1310).
[52] *Hendrix*, 609 F.3d at 1193 (quoting *Daubert*, 509 U.S. at 592-93).
[53] *McCorvey*, 298 F.3d at 1257 (emphasis added).

Greenberg Traurig, P.A.

that fails "to satisfy the standards of reliability required under *Daubert* and its progeny."[54] This Circuit is cautious regarding scientific testimony:

> Given time, information, and resources, courts may only admit the state of science as it is. Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles. "The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it."[55]

## II. The proponent of the expert testimony must establish admissibility under each prong of Rule 702 and *Daubert* by a preponderance of evidence.

"[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."[56] This burden applies to each part of the "rigorous three-part inquiry" into the expert's qualifications, the reliability of the expert's methodology, and the relevance or fit of the proffered testimony.[57]

## III. Irrelevant expert testimony is inadmissible.

Relevancy requires the Court to ensure that the expert's testimony "is relevant to the task at hand."[58] A court may exclude even reliable expert testimony if no logical relationship exists between the testimony and a fact or issue in the case.[59]

---

[54] *McClain*, 401 F.3d at 1238.

[55] *Hendrix*, 609 F.3d at 1194 (quoting *Rider*, 295 F.3d at 1202).

[56] Fed. R. Evid. 702, advisory committee's note (2000 amends.).

[57] *Hendrix*, 609 F.3d at 1194; *see also Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care*, 582 F.3d 1227, 1232 (11th Cir. 2009) (burden of establishing relevance and reliability).

[58] *Chapman*, 766 F.3d at 1306 (internal quotation marks and citation omitted); *see also U.S. v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) ("In evaluating the reliability of scientific expert testimony, a district court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue.") (internal quotation marks and citation omitted).

[59] *See Daubert*, 609 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *U.S. v. Wilk*, 572 F.3d 1229, 1235 (11th Cir.2009) (finding no error in district court's exclusion of irrelevant expert testimony).

Greenberg Traurig, P.A.

## IV.  Expert testimony based on unreliable methodology is inadmissible.

Expert testimony must be reliable.  Testimony that requires a "leap of faith" is inadmissible.[60]  Expert testimony "must derive from the scientific method; good grounds and appropriate validation must support it."[61]  For expert testimony to be reliable, "it must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning something more than subjective belief or unsupported assumptions."[62]  *Daubert's* reliability standard considers at least four guideposts:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.[63]

Other factors in determining reliability include whether: (1) the expert had adequately accounted for alternative explanations,[64] (2) "there is simply too great an analytical gap between the data and the opinion offered,"[65] (3) the testimony is "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known,"[66] (4) the testifying expert "developed [his] opinions expressly for the purposes of testifying,"[67] (5) the testifying expert

---

[60]   *Rider*, 295 F.3d at 1202.
[61]   *McClain*, 401 F.3d at 1237.
[62]   *McDowell*, 392 F.3d at 1298.
[63]   *Id.* (citing *Daubert*, 509 U.S. at 593-94); *see also Rink*, 400 F.3d at 1291-92; *McCorvey*, 298 F.3d at 1256.
[64]   *Chapman*, 706 F.3d at 1311.
[65]   *Joiner*, 522 U.S. at 146.
[66]   *Frazier*, 387 F.3d at 1261 (quoting *Daubert*, 509 U.S. at 590).
[67]   *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); *Allison*, 194 F.3d at 1321.

Greenberg Traurig, P.A.

reaches conclusions that other experts in the field would not reach,[68] and (6) the testimony is "imprecise and unspecific."[69]

## V. *Ipse dixit* is inadmissible; and when an expert relies on experience, he remains obligated to demonstrate reliability under *Daubert*.

Opinions must be based on "recognized scientific method."[70] "[N]othing in either *Daubert* or the [] Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[71] The fact "that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express."[72] As such, an expert must explain the relation between his experience and his conclusion:

> If the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, *why* the experience is a sufficient basis for the opinion, and *how* that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."[73]

## ARGUMENT

The Eleventh Circuit recognizes two categories of toxic tort cases: (1) those in which the medical community generally recognizes the toxicity of the chemical at issue; and (2)

---

[68] *Lust v. Merrell Dow Pharm., Inc.,* 89 F.3d 594, 598 (9th Cir. 1996).

[69] *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.,* 402 F.3d 1092, 1111 (11th Cir. 2005) (citing *Frazier*, 387 F.3d at 1266).

[70] *McDowell*, 392 F.3d at 1298 (citing *Clark v. Takata Corp*., 192 F.3d 750, 759 n.5 (7th Cir. 1999)); *see id*. at 1299 ("something doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive.") (citing *Daubert II*, 43 F.3d at 1315-16).

[71] *Hendrix*, 609 F.3d at 1194 (citing *Joiner*, 522 U.S. at 146); *Cook*, 402 F.3d at 1111.

[72] *Frazier*, 387 F.3d at 1261.

[73] Fed. R. Evid. 702, advisory committee's note (2000 amends.) (emphasis added); *Frazier*, 387 F.3d at 1261; *see also Daubert II*, 43 F.3d at 1319.

Greenberg Traurig, P.A.

those in which it does not.[74]  This case falls within the second category as Dr. Mink demonstrated no generally-accepted relationship between the toxicity of the constituents at issue and the myriad of Plaintiff's alleged illnesses.  Dr. Mink also testified that Plaintiff's G6PD-related sensitivities cannot be "quantitate[d] it because it's an extreme complex disease."[75]  Additionally, Dr. Mink testified that he either failed to apply a method or relied on studies that directly contradict his opinions, thus making his opinions unreliable for the purposes intended.  It is also clear from Dr. Mink's disclosures and his testimony that he lacked any of the data necessary to render a scientifically valid opinion.  Finally, Dr. Mink unquestionably failed to enumerate and eliminate any potential alternative causes in connection with a condition he describes as extremely complex.  Dr. Mink's opinions are pure speculation unsupported by any scientifically valid method or data.

## I.  Dr. Mink failed to perform any dose reconstruction for Plaintiff and relied on "trusted" studies that directly contradict and invalidate his opinions.

First, Dr. Mink testified that he failed to perform any dose calculations for Plaintiff.  Second, he relied almost exclusively on two papers for his opinions: one that directly contradicts his opinions and another that offers no support for his opinions—and neither of which he timely cited in his expert disclosures.[76]

Dr. Mink testified that he did not perform any dose calculations or reconstructions in order to offer an opinion because it was performed by Hsing-Wang Li, *et al*., in a paper,

---

[74] *Chapman*, 766 F.3d at 1303; *see also McClain*, 401 F.3d at 1239.
[75] <u>Exhibit B</u>, Mink Dep. Tr. at 28:10-12.  He also testified, "[y]ou can't quantify how much more sensitive." *Id*. at 28:15-16.
[76] This alone should demonstrate the unreliability of Dr. Mink's opinion—that he would fail to cite his primary sources in his report.  One, in fact, might conclude from this that his written disclosures lacked any reliable scientific basis.  As little as a cursory review of his written disclosures makes that obvious. Importantly, Dr. Mink testified that these two papers are "trusted" studies and that he "prefer[ed] to use those when they're available instead of re-inventing the wheel."  <u>Exhibit B</u>, Mink Dep. Tr. at 203:14-15.

Greenberg Traurig, P.A.

"Impacts of hazardous air pollutants emitted from phosphate fertilizer production plants on their ambient concentration levels in the Tampa Bay area":[77]

> Q. [S]o you did not perform any dose calculations for Miss Williams because you don't believe you needed to; is that right?
>
> A. We didn't need to, that's correct.
>
> Q. Okay.
>
> A. They've been done.
>
> Q. They had been done by whom?
>
> A. They had been done for the general population by IRIS, by US EPA, and by Li, which he applied them specifically to her neighborhood.
>
> Q. To her neighborhood. **How about to her, did anyone apply any of these calculations directly to her, Miss Williams?**
>
> A. **No one has and no one could**.
>
> Q. All right. And you did not of course?
>
> A. **No, I did not**.[78]

Dr. Mink's admitted failure to perform a dose calculation—as described in the REFERENCE MANUAL and EXPOSURE FACTORS HANDBOOK—is fatal. This Circuit has held that the dose-response relationship is "*the single most important factor* to consider in evaluating whether an alleged exposure caused a specific adverse effect."[79] "In toxic tort cases, *'[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge*

---

[77] AIR QUAL ATMOS HEALTH 8:453-467 (2015).

[78] Exhibit B, Mink Dep. Tr. 26:9-26:25 (emphasis added).

[79] *Kilpatrick*, 613 F.3d at 1339 (citing *McClain*, 401 F.3d at 1242) (emphasis added).

Greenberg Traurig, P.A.

*that plaintiff was exposed to such quantities are **minimal facts** necessary to sustain the plaintiff's burden.'"[80]* In fact,

> [w]hen analyzing an expert's methodology in toxic tort cases, the court should pay careful attention to the expert's testimony about the dose-response relationship. The dose-response relationship is "[a] relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or decrease—in risk of disease." *The expert who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology.*[81]

Dr. Mink's assertion that "Li . . . applied [dose] specifically to [Plaintiff's] neighborhood" is nowhere found in Li's paper, and, if it were, Dr. Mink's assertion is still directly negated by Li's paper.[82] The Li paper investigated "[t]he concentrations and distribution of hazardous air pollutants (HAPs) metals emitted from four phosphate fertilizer plants in Central Florida, as well as their environmental and health impacts."[83] Indeed, Li's study included the Riverview Plant at issue in this case. Twenty-six elements were analyzed, of which four dominant HAP metals were identified: Manganese (Mn), Chromium (Cr), Nickel (Ni), and Selenium (Se).[84] Li calculated that the four studied phosphate fertilizer facilities were among the *lowest* environmental sources for the 26 elements:

> Source apportionment estimated by the chemical mass balance (CMB) model indicated that marine (45.5±17.1 %) and geological (17.3±10.6 %) were the top two contributors for 26

---

[80]  *McClain*, 401 F.3d at 1241 (quoting *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir.1996)) (emphases added).

[81]  *Id.* at 1241-42 (internal citations omitted) (emphasis added).

[82]  The Li paper is not an epidemiological study. Exhibit B, Mink Dep. Tr. at 84:14-23. In fact, Dr. Mink does not rely on any epidemiological studies. *See Kilpatri*ck, 613 F.3d at 1337 n. 8 (internal quotations omitted) (epidemiological evidence "is generally considered to be the best evidence of [general] causation in toxic tort actions.").

[83]  Air Qual Atmos Health 8 at 453.

[84]  *Id.*

Greenberg Traurig, P.A.

elements, while the phosphate fertilizer plants contributed only 1.14±0.55 %.[85]

In other words, two sources, marine and geological, accounted for approximately 63% of the analyzed HAP elements, whereas the phosphate facilities accounted for only about 1%.[86] Li noted: "phosphate fertilizer plants make minor contribution to the ambient levels of HAP metals compared to other sources for the general population in the Tampa Bay area . . . ."[87]

In analyzing the Mosaic Riverview plant's *de minimus* offsite contributions to HAPs, Li stated that the facility accounted for 1.14% contributions. These *de minimus* contributions are dwarfed by the *alternative sources* Li identified—*i.e.*, marine, geological, limestone, coal-fired power plant (presumably the TECO Big Bend facility), and vehicles—which account for 98.6% of offsite HAP contributions.[88]

Li's "exposure/risk assessment model" concluded as to the Mosaic Riverview plant, the combined hazard index for respiratory impact (a condition Dr. Mink opined Plaintiff is affected by) is *370-times below* the safe combined hazard index of 1.0.[89] As to the hematological hazard index (another condition Dr. Mink opined Plaintiff is affected by), that number is 0.00000065 of the safe exposure hazard index of 1.0 or *more than 1.5 million-times below* the safe exposure limit. In fact, Li noted that the single highest HAP risk, which is *de minimus*, was associated with chromium within 0.35 miles from the plant site (*i.e.*, *within* the plant fence line), whereas Plaintiff, for whom Dr. Mink opines, resides more than

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.* at 462. Plaintiff recognizes the contribution of the TECO facility. *See* Docs. 24 at ¶¶ 53-59 and 74 at 3.
[89] *Id.* at 464.

Greenberg Traurig, P.A.

3 miles away.[90]  Contrary to Dr. Mink's opinions, Li concluded that for these and other risk areas, including developmental, neurological, liver, and cancer risks, the Mosaic Riverview plant does not impose an elevated health risk to the general population: "***The above results suggest the HAPs emission from phosphate fertilizer plants do not impose an elevated cancer risk or health effects to general population***."[91]

Dr. Mink's opinions are directly contradicted by Li's "trusted" study concluding that the dose calculations on which Mink relied "do not impose an elevated cancer risk or health effects to general population."  In fact, Li's dose calculations were at least hundreds of times lower than safe exposure limits.  Not only did Dr. Mink fail to perform any dose reconstruction—which is fatal to his opinions—his reliance on Li's dose calculations to the general public can only support the conclusion that emissions from the Mosaic Riverview plant do not pose a health risk of any kind to the general population.  Accordingly, even if the Li paper could be applied to Plaintiff's neighborhood—which it cannot—it could only be used to conclude that the Mosaic Riverview plant is safe.

In addition to relying on a "trusted" study that the Mosaic Riverview facility does "not impose an elevated cancer risk or health effects to general population," Dr. Mink's assertion that dose was calculated by EPA is also unreliable for causation purposes.  EPA's Integrated Risk Information System (IRIS) is the public depository of toxicity information used by EPA, its dose-response assessments for these data, and their characterization of the quantitative relationship between chemical exposure and each credible health hazard for

---

[90]    *Id.*
[91]    *Id.*

Greenberg Traurig, P.A.

certain chemicals, groups of related chemicals, or complex mixtures.[92]  IRIS, however, does not provide a dose or a dose-response relationship for $SO_2$ or $PM_{10}$.  There are no IRIS summary data for $SO_2$ or $PM_{10}$.  Dr. Mink's assertion that Li could somehow apply IRIS dose data on these constituents is folly.

Also contrary to Dr. Mink's testimony, EPA's risk assessment system only provides the primary and secondary standards for $SO_2$ (a primary 1-hour standard of 75 ppb and a secondary 3-hour standard of 0.5 ppm) and $PM_{10}$ (primary and secondary 24-hour standards of 150 $\mu g/m^3$).  These standards are orders of magnitude lower than the no observable effect limits for these constituents, which were, in fact, developed to protect the most sensitive members of the population.  Not only does Dr. Mink's reliance on Li eviscerate his opinions, his methodology is devoid of the necessary data on which he can offer an opinion that a toxic dose ever existed.

The other "trusted" study Dr. Mink relied on was Jayajit Chakraborty, "Cancer risk from exposure to hazardous air pollutants: spatial and social inequities in Tampa Bay, Florida."[93]  Unlike Li, Chakraborty did not study phosphate facilities and he did not identify any specific emission source.  Unlike Li, Chakraborty analyzed a much more diffuse area: the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area.  And unlike Li, Chakraborty identified different cancer-related HAPs than those identified by either Li or Dr. Mink: benzene, ethylene dibromide, carbon tetrachloride, butadiene, and acetaldehyde— none of which are at issue in this case.  Accordingly, the Chakraborty paper offered Dr. Mink

---

[92]  *See* http://www2.epa.gov/iris/basic-information-about-integrated-risk-information-system (last visited Dec. 11, 2015).

[93]  Jayajit Chakraborty, *Cancer risk from exposure to hazardous air pollutants: spatial and social inequities in Tampa Bay, Florida*, Int'l Journal of Envtl. Health Research, Vol. 22, No. 2, 165-183 (April 2012).

Greenberg Traurig, P.A.

nothing on which he could speculate a link between Mosaic Riverview plant emissions and alleged health impacts on the Plaintiff.

Like Li, however, Chakraborty recognized that major point sources (*e.g.*, an industrial facility) are far lower contributors to cancer risks than other regional environmental sources. Chakraborty noted that correlation coefficients representing statistical associations for lifetime cancer risk in persons per million for the generalized HAP sources he reviewed were: (1) on-road mobile (10.388), (2) area and other point sources (7.461), (3) non-road mobile sources (2.213), and (4) major point sources (0.349) (the exposure category into which the Mosaic facility falls).[94] By Chakraborty's estimations, the correlation coefficient representing a statistical association for lifetime cancer risk for major point sources is 57-times lower than all other sources. Had Dr. Mink relied on Chakraborty instead of offering an unreliable *ipse dixit* opinion, Plaintiff would be suing a different defendant if she were ever capable of demonstrating causation at all.

Finally, in addition to relying on Li's and Chakraborty's "trusted" studies to perform his work for him so as not to "re-invent[] the wheel," the literature cited in Dr. Mink's report (which does not include Li or Chakraborty) also fail to support his opinions.[95]

---

[94]  *Id*. at 173.

[95]  *See* <u>Exhibit D</u>, Report of Robert C. James, Ph.D., at § 4.3.2 for a detailed discussion of Dr. Mink's literature review. *See also Hendrix*, 609 F.3d at 1201 ("the district court did not abuse its discretion in concluding, based on the literature [the proffered expert] himself provided, that there is no reliable support for [the expert's] assertion . . . ."). A "causation opinion" devoid of methodological foundation or reliability is incapable of assisting a trier of fact, and, therefore, lacks "fit." *See Frazier*, 387 F.3d at 1266; *see also Evans v. Matrixx Initiatives, Inc.*, No. 3:07-cv-357-J-34, 2009 WL 2914252, at *10 (M.D. Fla. Feb. 18, 2009) (explaining experts' opinions would not assist the trier of fact where experts based their opinions on faulty methodology and failed to adequately rule out obvious alternative causes). *See* <u>Exhibit E</u>, Plaintiff's Interrogatory Answers at 3, disclosing for the first time the "trusted" Li and Chakraborty studies, which was almost two months after Plaintiff's expert disclosure deadline.

Greenberg Traurig, P.A.

## II. Dr. Mink failed to enumerate and eliminate potential alternative causes.

Despite his reliance on the "trusted" studies concluding that (a) in the case of Li, the Mosaic Riverview facility accounts for 1.14% of offsite HAP contributions, whereas the alternative sources account for 98.6% of offsite HAP contributions, and (b) in the case of Chakraborty, the combined correlation coefficient for all alternative sources is 57-times higher than for major point sources, Dr. Mink never considers background risks in his opinions. Background risk "is the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges *without* exposure to the . . . chemical in question. The background risks include all those causes of a disease, whether known or unknown, excluding the . . . chemical in question."[96]

This Circuit makes clear that "[a] reliable methodology should take into account the background risk."[97] The failure to offer evidence of additional risk above background requires the court to "assume that [the additional risk] does not exist."[98] Accordingly, the failure to eliminate for background risk is fatal to a proffered causation opinion.

Yet, even though the "trusted" studies identified background as greater potential causes of higher risk and health significance, Dr. Mink failed to address those potential alternative causes and eliminate them—an analysis that should have taken precedence given the data presented to him by Li and Chakraborty. Absent eliminating a myriad of alternative causes, this Court must assume that any alleged exposure to Mosaic Riverview emissions are *not* "more likely than not" possible causes of Plaintiff's alleged conditions when the

---

[96] *McClain*, 401 F.3d at 1243.
[97] *Id.*
[98] *Id.* at 1244.

Greenberg Traurig, P.A.

"trusted" studies identified other much more likely potential causes in Plaintiff's environment.

In addition to ignoring background risk from the alternative sources specified in Li's and Chakraborty's papers, Dr. Mink fails to enumerate and eliminate other alternative causes such as (a) the $SO_2$ contributions from the TECO Big Bend facility, which generates three times as much $SO_2$ as Mosaic,[99] (b) Plaintiff's morbid obesity, allergies, and sedentary lifestyle, (c) her three decades of exposure to secondhand smoke,[100] (d) general background risk, including "idiopathic causes,"[101] or (e) psychological influences such as somaticism.[102] It is common knowledge that inferring causation from a temporal relationship is "inherently

---

[99] Exhibit F, Florida Department of Environmental Protection, Technical Support Document at 6. *See also*, Dr. Mink's acknowledgment regarding his experience regarding alternative causes:
   Q.   Are there any other potential sources for exposure to the constituents you assert Miss Williams was exposed to outside of Mosaic?
   A.   I would have to answer that in all my years of experience, I've never seen an instance where there was only one source.
Exhibit B, Mink Dep. Tr. at 147:14-19. He also admits that while other potential sources exist, he never quantified them. *See id*. at 150:15-17.

[100] Exhibit G, excerpts of Williams Dep. Tr. at 29:8-9, 29:12-15, 30:7-10, 44:10-15, 44:19-45:10 for her admissions regarding exposure; *see also* Doc. 78; 2006 Surgeon General's Report: The Health Consequences of Involuntary Exposure to Tobacco Smoke; and 2014 Surgeon General's Report: The Health Consequences of Smoking – 50 Years of Progress. Dr. Mink was unaware of Plaintiff's 34-years of exposure to second hand smoke. *See* Exhibit B, Mink Dep. Tr. 181:12-19. Dr. Mink also recognized, but did not account for alternative causes for Plaintiff's pulmonary hypertension (*id*. at 207:24-208:11); asthma (*id*. at 36:15-37:19; 208:22-209:1); obstructive pulmonary disease (*id*. at 38:5-8; 159:24-160:19).

[101] *Kilpatrick*, 613 F. 3d at 1342.

[102] Plaintiff's retained expert life care planner testified that Plaintiff's somaticism creates a "pain cycle":
   "She is very likely to be preoccupied with poor health," largely because she's so focused on somatic or bodily concerns, "and to complaint of sleep disturbance, fatigue, low energy, not coping well with stress, and to experience difficulties in concentration."
   She's so focused on disability, frankly, she wakes up in the middle of the night thinking about disability. She's created disability as the center of her universe. And so at any time she wakes up, she experiences that same stress, that same focus. And all decisions are made surrounding her belief in her disability; and she shouldn't be making that the center of her universe because it's only going to create more of a pain cycle.
Exhibit H, excerpts of Deutsch Dep. Tr. Vol. I at 81:3-15.

Greenberg Traurig, P.A.

unreliable" because such an inference suffers from the *post hoc ergo propter hoc* fallacy—it assumes what it must prove.[103]

### III. Dr. Mink did not apply EPA methodologies or rely on any data that Plaintiff was exposed to an unsafe level of $SO_2$ or $PM_{10}$.

Dr. Mink's assertion that he relied on the EPA methodologies is false. Had he done so, he would have complied with the EPA EXPOSURE FACTORS HANDBOOK, particularly as to inhalation since he admits that dermal exposure was a "minor route" of possible exposure.[104] Again fatally admitting that he performed no dose calculations on the primary chemical Plaintiff alleges caused her harm ($SO_2$), Dr. Mink attempts to assert that an exposure estimate was prepared as part of the $SO_2$ primary standards when no such thing is true:

> Q. How much -- did you perform any calculations on how much SO2 Miss Williams has inhaled?
>
> A. Over her lifetime?
>
> Q. Over any time.
>
> A. *No*.
>
> Q. Have you performed any calculations relating to any dermal exposure that you allege Miss Williams suffered?
>
> A. No, because that, as I said, is a minor component. The inhalation is the major component and those assumptions are already made in the health-based non-attainment levels, so they've already been done. I'm not re-inventing the wheel here.[105]

Had Dr. Mink applied the EPA EXPOSURE FACTORS HANDBOOK, he would have addressed factors such as spatial variability (differences due to location), temporal variability

---

[103] *See Kilpatrick*, 613 F.3d at 1342; *Hendrix*, 609 F.3d at 1197; *McClain*, 401 F.3d at 1254.
[104] Exhibit B, Mink Dep. Tr. at 80:7.
[105] *Id.* at 80:8-22 (emphasis added).

Greenberg Traurig, P.A.

(variations over time), intra-individual variability (fluctuations in an individual's physiologic and behavioral characteristics), and inter-individual variability ("individual characteristics such as sex, age, race, height, or body weight (including any obesity), phenotypic genetic expression, and pathophysiological conditions; [] individual behaviors such as activity patterns, and ingestion rates; and [] susceptibilities due to such things as life stage or genetic predispositions.").[106]  But Dr. Mink did not analyze any variability with respect to the Plaintiff.  And despite giving lip service to the EXPOSURE FACTORS HANDBOOK'S "different exposure factors, weight, you know, for the standard person, activity level, ingestion, inhalation rates," he simply "assumed[d] she's a standard person" at the same time he asserts she is unique because of her G6PD deficiency.[107]

Had Dr. Mink applied the EXPOSURE FACTORS HANDBOOK he would have methodically analyzed Plaintiff's exposure to the purportedly offending constituents of $SO_2$ and $PM_{10}$, which he did not.  He would have considered time indoors, time outdoors, volume of residence, building characteristics, air exchange rates, and inhalation rate, which he did not.[108]

Instead of doing any of this, Dr. Mink simply assumed some undefined and unquantified exceedance of the primary standards for $SO_2$ and $PM_{10}$ from which he speculatively assumes causation.  This, however, is a presumptively flawed approach because in addition to having no actual dose data for Plaintiff, Dr. Mink provided no quantifiable evidence that Plaintiff was ever exposed to exceedances of either $SO_2$ or $PM_{10}$, or that

---

[106]  EPA, EXPOSURE FACTORS HANDBOOK at 2-2.
[107]  Exhibit B, Mink Dep. Tr. at 91:3-15.
[108]  EPA, EXPOSURE FACTORS HANDBOOK at 1-30.

Greenberg Traurig, P.A.

exposure to some theoretical exceedance could even cause the harm he asserts.  Exposure to a constituent in excess of a primary standard (an EPA standard intended to protect "sensitive" populations such as asthmatics, children, and the elderly) does not prove causation.  To the contrary, exposures to levels below primary standards, which are orders of magnitude lower than no observable effect levels (NOEL) cannot demonstrate causation: "If the level of exposure was below this no observable effect, or threshold, level, a relationship between the exposure and disease cannot be established."[109]

Dr. Mink's failure to rely on a dose other than the primary standards for $SO_2$ (75 ppb) and $PM_{10}$ (150 $\mu g/m^3$) invalidates his causation opinions.  This was a direct result of his not wanting to "re-invent[] the wheel."  Worse, Plaintiff resides outside of the Hillsborough County $SO_2$ nonattainment area and, consequently, Dr. Mink offered no evidence that she has ever been exposed to an exceedance of the $SO_2$ primary standard, let alone a NOEL.[110]  It is also clear, based on air monitoring station data, that Dr. Mink has no evidence Plaintiff was ever exposed to an exceedance of the $PM_{10}$ primary standard,[111] which is something he admits:

> Q. What are the particulate matter levels in the ambient air downwind of the Mosaic facility that you reference on page 14 of your report?
>
> A. I don't recall right now.

---

[109]  REFERENCE MANUAL at 669.  This is, for practical purposes, consistent with the fact that the Clean Air Act provides that attainment can be achieved up to "5 years from the date of nonattainment designation."  42 U.S.C. § 7514a.

[110]  Exhibit I, Report of Kennard F. Kosky, M.S., P.E., figure 1.  Further, being within the modeled $SO_2$ nonattainment boundary does not prove exposure as the boundary is modeled based on the *possibility* of an exceedance of the primary standard.  What modeling does, however, elucidate are the areas where an exposure of the modeled constituent will not occur based on the model and its inputs.  The nonattainment boundary was determined by the Florida Department of Environmental Protection (FDEP) using the AERMOD model.

[111]  Exhibit I, Kosky Report, figures 5 and 6.

Greenberg Traurig, P.A.

Q. You don't know what the concentration of PM is at Miss Williams' home, correct?

A. PM10, no. Same answer, I don't recall.

Q. Okay. And do you know what her exposure was to PM10?

A. Again, I didn't calculate it and I don't remember seeing it calculated. I don't recall that.[112]

Contrary to his assertions, Dr. Mink did not apply EPA methodologies, he never gathered the data necessary to apply EPA methodologies, and he failed to recognize that EPA primary standards cannot be relied on for a causation opinion. There is nothing Dr. Mink can rely on to remedy his failure to perform the most basic task of a toxicologist—determining and calculating a reliable dose and performing a risk estimate.

## IV. Dr. Mink never developed nor applied a causation methodology relating to the interaction between Plaintiff's G6PD, the alleged exposures, and the purportedly related illnesses he asserts were caused by Mosaic.

While Plaintiff reports a multitude of illnesses, Dr. Mink has focused his efforts on an unquantifiable G6PD-related sensitivity in the absence of any methodology.[113] He testified:

> Well, we made an effort. We looked through all the literature and tried to find if there was anything to base that on. I can't – I can't make things up, so if I don't have a methods or standards or peer-reviewed literature to rely on, then we know by that literature she's much more sensitive, but I nor no one

---

[112] <u>Exhibit B</u>, Mink Dep. Tr. at 222:19-223:4.

[113] As one physician noted: "She does have a booklet that she pulled off the Internet with a list of medications to avoid for G6PD deficiency and that certainly is quite valid, but otherwise I do not see any active issues that suggest active clinical problem and G6PD deficiency at the present time. She does complain of [omitted] has numerous somatic complaints, none of which I can clearly relate to active G6PD deficiency at the present time [omitted] *and somewhere along the line, she has been convinced or sold on the possibility that all these symptoms are explainable on the basis of a G6PD deficiency.*" Plaintiff medical record, Brandon Hosp_000957-959 (emphasis added). Plaintiff's medical records are not being filed with the Court, but will be made available for *in camera* review should it become necessary.

Greenberg Traurig, P.A.

> else that has published knows how much more sensitive, so it
> would be a futile effort.[114]

Dr. Mink admits that neither he nor anyone else has a methodology for determining the interplay between Plaintiff's G6PD—a condition that is *the primary focus* of his expert report—and the alleged exposures and purportedly related illnesses he asserts were caused by Mosaic. Opinions based on the absence of a methodology must be excluded.

Worse, however, Dr. Mink, a toxicologist, tries to emphasize Plaintiff's G6PD deficiency and offer a diagnosis or opinion that the alleged, undefined exposures have "exacerbated [Plaintiff's] G6PD symptoms including hemolytic anemia."[115] This is, however, directly contradicted by a number of treating hematologists, as well as Plaintiff's primary care physician.[116] Dr. Mink's proffered diagnosis—which he is not qualified to give because he is not a medical doctor—is directly contradicted by Plaintiff's own position that her medical records are the "best evidence" that her illnesses were caused by Mosaic.[117]

While Mosaic does not challenge Plaintiff's G6PD deficiency, it is clear that her deficiency is "very mild to almost normal enzyme activity (greater than 60 percent normal activity with no clinical consequences)."[118] An April 22, 2015 laboratory analysis of Plaintiff's G6PD enzyme activity also showed very mild results within 80% of normal enzyme activity.[119]

---

[114]   Exhibit B, Mink Dep. Tr. at 28:20-29:3.
[115]   Exhibit A, Mink Report at 15.
[116]   Plaintiff's primary care physician testified: "symptomatic G6PD was not revealed. So symptomatic G6PD is hemolysis. There's no one documentation of hemolysis." Again, "for G6PD to have symptoms, hemolysis have to happen to whatever degree. So we don't have any documentation of the hemolysis." Exhibit J, excerpts of Saprounova-Hopf Dep. Tr. at 114:12-14 and 123:16-18.
[117]   Exhibit E, Plaintiff's interrogatory answers at 4. Plaintiff's medical records are not being filed with the Court, but will be made available for in camera review should it become necessary.
[118]   Plaintiff medical record, Williams_001854-55.
[119]   Plaintiff medical record, Williams_001873.

Greenberg Traurig, P.A.

On May 12, 2014, Plaintiff was examined at the Georgia Regents University Sickle

Cell Center. The examining physician noted that her G6PD enzyme activity was greater than

85% of normal activity. He also,

> explained to her that the common variants of G6PD deficiency
> were associated with episodic hemolysis especially on
> exposure to excessive oxidants such as with certain drugs like
> sulfa, or infections. We have no example of such documented
> episodes. I also pointed out that the multiple problems she has
> and especially the pain were hard to relate to her G6PD
> deficiency.[120]

In addition, Plaintiff's prescription medication records show that Plaintiff was using

high-risk contraindicated drugs for G6PD deficient patients for years without side effects:[121]

> She has some macrocytosis with a wide red cell distribution
> width without any signs of anemia with mildly elevated
> reticulocyte count perhaps suggestive of subclinical G6PD
> deficiency. . . . However, she has tolerated various
> medications that probably would be contraindicated under
> conditions of G6PD including furosemide without any obvious
> side effects . . . .[122]

Had Dr. Mink actually intended to offer a scientifically valid opinion on the cause of

Plaintiff's harm, he would have had to show how a purported exposure to presumptively safe

emissions from the Mosaic Riverview facility could have caused Plaintiff's G6PD-influenced

illnesses as opposed to something like high-risk contraindicated prescription medications she

was ingesting directly into her body. He would also have to explain how his diagnosis

(which he is not qualified to give because he is not a medical doctor) could be different from

---

[120]   Plaintiff medical record, Georgia Regents University-Sickle Cell Center, 000005. For other examples, *see* Amit Shah, M.D. – Florida Cancer Specialists 99-100; Amit Shah, M.D. – Florida Cancer Specialists 88-89; Brandon Hosp_957-959; SAPDEP001827-1828; Brandon Hosp_000663-665.

[121]   *See* Amit 000017-18, G6PD list for contraindicated substances; Plaintiff's prescription medication history CVS 000001-36.

[122]   *See* Brandon Hosp_000663-665.

Greenberg Traurig, P.A.

a number of medical doctors, including Plaintiff's primary care physician, who concluded that Plaintiff's G6PD symptomology was subclinical.

## CONCLUSION

Dr. Mink never performed the tasks necessary to offer an expert opinion on causation. This is obvious when applying the Federal Judicial Center's REFERENCE MANUAL's "Reference Guide on Toxicology," the EPA's EXPOSURE FACTORS HANDBOOK, and *Daubert* and its progeny, including *Chapman*. Dr. Mink failed to demonstrate general causation when he relied on papers contradicting his opinions and concluding that the Mosaic Riverview plant does "not impose an elevated cancer risk or health effects to general population." He failed to demonstrate specific causation when he failed to quantify exposure, reconstruct dose, or show what quantities of what constituents caused what illnesses. He failed to enumerate, consider, and eliminate potential alternative causes for a Plaintiff with a large number of illnesses with many potential alternative causes. Given Dr. Mink's abject failure to perform any of the essential tasks of a toxicologist as evidenced by the complete absence of any supportive data of methods, his proffered opinions must be excluded under Rules of Evidence 104, 403, and 702, *Daubert*, and *Chapman*.

**(Attorney's Signature Appears on the Following Page)**

Date: December 11, 2015

Respectfully submitted,

/s/ Christopher Torres
David B. Weinstein (FBN 604410)
weinsteind@gtlaw.com
Christopher Torres (FBN 0716731)
torresch@gtlaw.com
Ryan T. Hopper (FBN 0107347)
hopperr@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Blvd., Ste. 1900
Tampa, Florida 33602
Telephone: (813) 318-5700
Facsimile: (813) 318-5900
Secondary Email: dunnla@gtlaw.com;
FLService@gtlaw.com
*Counsel for Defendant, Mosaic Fertilizer, LLC*

## REQUEST FOR ORAL ARGUMENT

Mosaic requests oral argument on this motion in a manner deemed appropriate by this Court. Mosaic estimates that an evidentiary hearing will require four hours and a non-evidentiary will require two.

## CERTIFICATE OF SERVICE

I certify that on December 11, 2015, I electronically filed the foregoing with the Clerk of the Court through the CM/ECF system, which will provide notice to counsel of record.

/s/ Christopher Torres
Attorney

Greenberg Traurig, P.A.

**Exhibit Index**

| Ex. | Title |
|---|---|
| A | Expert Report of Franklin L. Mink, Ph.D. (Plaintiff's expert toxicologist). |
| B | Deposition Transcript of Franklin L. Mink, Ph.D. dated August 19, 2015. |
| C | Figure 1-2 at 1-29, U.S. EPA, EXPOSURE FACTORS HANDBOOK 1-3 (2011 ed.). |
| D | Expert Report of Robert C. James, Ph.D. (Defendant's expert toxicologist). |
| E | Plaintiff's July 21, 2015 Interrogatory Answers. |
| F | Florida Department of Environmental Protection, TECHNICAL SUPPORT DOCUMENT FOR FLORIDA AREA DESIGNATIONS FOR THE 2010 SO$_2$ PRIMARY NATIONAL AMBIENT AIR QUALITY STANDARD. |
| G | Excerpts of Deposition Transcript of Rhonda Williams dated September 11, 2015. |
| H | Excerpt of Deposition Transcript of Paul M. Deutsch, Ph.D. (Plaintiff's life care planning expert). |
| I | Expert Report of Kennard F. Kosky, M.S., P.E. (Defendant's air modeler expert). |
| J | Excerpt of Deposition Transcript of Vera Saprounova-Hopf, M.D. dated November 18, 2015 (Plaintiff's primary care physician). |

Greenberg Traurig, P.A.