**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RHONDA WILLIAMS,

      Plaintiff,

v.                                                                              Case No. 8:14-cv-01748-MSS-TGW

MOSAIC FERTILIZER, LLC,

      Defendant.

_____/

**MOSAIC'S MOTION TO EXCLUDE PROFFERED TESTIMONY OF**
**PLAINTIFF'S PROPOSED EXPERT EXPOSURE SCIENTIST, LESLIE UNGERS**

Mosaic moves to exclude Leslie Ungers proffered expert testimony for failing to (a) comply with various Court orders governing expert disclosures,[1] or (b) satisfy Federal Rules of Evidence 104, 403, and 702, *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296 (11th Cir. 2014).

Mr. Ungers's expert report[2] and deposition testimony[3] are replete with speculation and assumptions. The primary reasons his proffered testimony *must* be excluded, however, is that he (a) failed to perform the required tasks on an exposure scientist identified in the REFERENCE MANUAL ON SCIENTIFIC EVIDENCE'S "Reference Guide on Exposure Science," or (b) eliminate known potential alternative sources of the alleged air emissions as required by *Chapman*.

---

[1]  Docs. 19, 40, 51, and 55.
[2]  <u>Exhibit A</u>, Expert Report of Leslie J. Ungers, M.S., C.I.H.  <u>Exhibit B</u>, "Elemental and radiochemistry of settled dust and surface soil in residential communities of central Hillsborough County Florida" and Ungers Deposition exhibit 7.
[3]  <u>Exhibit C</u>, Deposition transcript of Leslie J. Ungers dated August 18, 2015

Specifically, Mr. Ungers's proffered testimony must be excluded because:

- Despite a duty to demonstrate how Plaintiff was exposed to the alleged air emissions, he failed to perform a fate and transport analysis.[4]

- Despite a duty to "quantify the exposures"[5] to the alleged air emissions, he failed to perform an exposure assessment.

- Despite a duty to enumerate and eliminate alternative sources of potential air emissions, he failed to identify and eliminate any such sources even though he knew they existed.

Adding to his failures, Mr. Ungers relied on dust and soil samples taken from Plaintiff's residence that directly contradict any assertions that Plaintiff was exposed to unsafe levels of $SO_2$ or $PM_{10}$ regardless of their source.

It is accepted that "all scientific testimony or evidence admitted [must be] not only relevant, but reliable."[6]  To offer relevant and reliable scientific testimony as an exposure scientist in a toxic tort case, Mr. Ungers was required to (a) demonstrate that Plaintiff was exposed to airborne constituents from the Mosaic Riverview plant more than three miles from her residence, (b) provide a quantitative exposure assessment from which a toxicologist could reconstruct dose as an input in a causation analysis, and (c) identify and eliminate all alternative sources of potential airborne constituents.

Mr. Ungers did none of this.  Consequently, his proposed expert testimony must be excluded.

---

[4]   *See* Glossary of Scientific and Technical Terms.  (Doc. 87.)
[5]   *Id*. at 512.
[6]   *Daubert*, 509 U.S. at 589; *General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Greenberg Traurig, P.A.

## BACKGROUND

Plaintiff alleges she has been made ill from exposure to certain chemicals emitted from Mosaic's Riverview plant more than three miles from her home and from fugitive dust emissions from a phosphogypsum stack more than a mile from her home.[7]  Mr. Ungers, an industrial hygienist, was retained to opine on "the historic impact of air quality on Ms. Williams in her . . . residence."[8]

Mr. Ungers offered the following basic opinions in his expert report:

- Mosaic operations are a major source of pollution.[9]

- Mosaic-generated pollution includes the emission of toxic substances and radioactive isotopes.

- Mosaic-generated emissions impact the surrounding air quality.

- Mosaic-generated airborne pollutants contaminate surrounding neighborhoods.[10]

These opinions are pure speculation as Mr. Ungers (a) applied no fate and transport mechanism to demonstrate whether Plaintiff was even exposed to air emissions from the Mosaic Riverview facility, (b) failed to perform any exposure calculations, and (c) failed to identify and eliminate known alternative sources of air emissions at Plaintiff's residence.

Mr. Ungers was required to provide exposure estimates on which Dr. Mink, Plaintiff's retained expert toxicologist, could prepare dose reconstructions to support his causation opinions.  Because Mr. Ungers failed perform the necessary work, collect the

---

[7]  *See* Docs. 24 (Second Am. Compl.) and 77 (Am. Answer and Affirmative Defenses).

[8]  Exhibit C, Ungers Dep. Tr. at 16:15-20.

[9]  "Major source" is a term of art and it should not be confused by Mr. Ungers use the term without reference to its technical definition.  *See* Glossary (Doc. 87).  A "major source" is a major stationary point source that requires a Clean Air Act permit to operate.

[10]  Exhibit A, Ungers Report at 2-3.

3

necessary data, and prepare the necessary calculations, he also failed to provide any valid exposure estimates on which Dr. Mink could determine biological dose or causation. Instead, all he offered were speculative opinions devoid of any of the scientific evidence or methods fundamental to exposure science, which are, thus, incapable of satisfying *Daubert*.[11]

### A.  Mr. Ungers's after-the-fact effort to correct his failures.

As a result of Mr. Ungers's failure to perform the basic work of an exposure scientist, one of Mosaic's experts, Robert C. James, Ph.D., criticized his report for "provid[ing] no fate and transport analysis to support [his] speculation."[12]

Fate and transport is the analysis and estimation of movement and chemical alteration of contaminants as they travel through environmental media (in this case, air).  Fate and transport basically refers to how a chemical constituent travels from point A to point B, what happens along the way, how much of the constituent reaches point B, the nature of its residency, if any, and how long it resides there.

The REFERENCE MANUAL ON SCIENTIFIC EVIDENCE'S "Reference Guide on Exposure Science" describes "fate and transport" the following way:

> Transport concerns the processes that cause chemicals to follow certain pathways from their sources through the environment, and fate concerns their ultimate disposition—that is, the medium in which they finally reside and the length of time that they might reside there.[13]

The fate and transport in an air exposure action requires the consideration and analysis of variables unique to air emissions:

---

[11]  Dr. Mink's proffered testimony is the subject of a companion *Daubert* motion.  (Doc. 89.)
[12]  Exhibit D, Expert Report of Robert C. James, Ph.D., at 7.
[13]  REFERENCE MANUAL at 521.

Greenberg Traurig, P.A.

> Perhaps the most widely used models are those that track the fate and transport pathways followed by substances emitted into the air. Knowledge of the amounts emitted per unit of time (usually obtainable by measurement) from a given location (a stack of a certain height, for example) provides the basic model input. Information on wind directions and velocities, the nature of the physical terrain surrounding the source, and other factors needs to be incorporated into the modeling. Some substances will remain in the vapor phase after emission, but chemical degradation (e.g., because of the action of sunlight) could affect media concentrations. Some models provide for estimating the distributions of soil concentrations for those substances (particulates of a certain size) that may fall during dispersion. Much effort has been put into developing and validating air dispersion models.[14]

Chemical degradation is a critical feature of fate and transport:

> The study of environmental persistence of different chemicals is a significant feature of exposure science; its goal is to understand the chemical nature of the degradation products and the duration of time the chemical and its degradation products persist in any given environmental medium.[15]

Contrary to these requirements, Mr. Ungers admits that he did not address fate and transport.[16] Instead he attempted to rely on soil and attic dust samples that (a) fail to show Plaintiff was exposed to constituents *from* Mosaic's Riverview plant, and (b) show she was not exposed to unsafe levels of the sampled elements.

Dr. James also criticized Mr. Ungers for failing to measure "the magnitude, accumulation, impact of the alleged air concentrations, or determined to what degree the alleged transport of materials to the plaintiff's residence via an accepted fate and transport model contributed to the elemental soil concentrations at the plaintiff's residence (or any

---

[14]   *Id.* at 532.
[15]   *Id.* at 521-22.
[16]   Exhibit C, Ungers Dep. Tr. at 37:9-11.

Greenberg Traurig, P.A.

other sampling location)."[17]  And "[b]ecause Mr. Ungers provides no quantitative exposure assessment for the air concentrations of any chemical of concern, there exists no exposure point concentration for the plaintiff that Dr. Mink can convert into a dose the plaintiff received."[18]

In response to the criticisms that he failed to perform a fate and transport analysis or calculate exposure point concentrations, Mr. Ungers undertook to perform Spearman Rank-Order Correlation Coefficients statistical analyses ("Spearman analyses") months after the disclosure deadline, which he disclosed the night before his deposition on August 18, 2015.[19] These analyses were never previously disclosed anywhere in Mr. Ungers's expert report, and in addition to being untimely, they were fundamentally flawed and unreliable.[20]

### B.    The role of exposure science in air emission toxic tort cases.

Mr. Ungers testified he was retained to opine on "the historic impact of air quality on Ms. Williams."[21]

The REFERENCE MANUAL emphasizes the importance of exposure in toxic tort actions:

---

[17]   Exhibit D, James Report at 7.
[18]   Id.
[19]   The deadline for Plaintiff's expert disclosures was May 1, 2015 (Doc. 40), and this Court expressly limited expert testimony to that in their written reports (Doc. 55).
[20]   Mr. Ungers's after-the-fact Spearman analyses are the subject of separate motion to exclude as untimely, or alternatively, for leave to serve a responsive disclosure.  (Doc. 76.)  In addition to being untimely—as will be shown if the Court (a) does not exclude the after-the-fact analyses as untimely, and (b) grants Mosaic leave to serve a responsive disclosure—Mr. Ungers's Spearman analyses were fundamentally flawed as one analysis failed to weigh and compare the concentrations of the constituent elements he was attempting to compare, and the other analysis failed to use sufficient data for the Vassar College tool to render statistically reliable results (a fact the tool points out to its users in writing).  Had Mr. Ungers performed the right statistical analyses using the right statistical tools the right way, he would have concluded that the statistical chance that the constituents in Plaintiff's attic were the same as the reference sample of central Florida phosphate district by-product trace elements was 0.00002% to 0.007%.
[21]   Exhibit C, Ungers Dep. Tr. at 16:15-20.

> Understanding exposure is essential to understanding whether the toxic properties of chemicals have been or will be expressed. Thus, claims of toxic tort or product liability generally require expert testimony not only in medicine and in the sciences of epidemiology and toxicology, but also testimony concerning the nature and magnitude of the exposures incurred by those alleging harm.[22]

Because "[c]hemicals known to cause diseases under certain exposure conditions will not do so under all exposure conditions," exposure scientists must "quantify the exposures incurred."[23]

The EPA's EXPOSURE FACTORS HANDBOOK similarly provides, "an exposure does not necessarily lead to a dose."[24] Accordingly, it is necessary to estimate or measure "the magnitude, frequency, and duration of exposure to an agent."[25]

The REFERENCE MANUAL notes that "if the magnitude of exposure is an important component of the needed evidence, and if that magnitude is not a simple question of fact, then expert testimony will be important."[26]

It is recognized that air emissions can be particularly complex:

> In the realm of environmental contamination, pathways can multiply and the problem of exposure assessment can become even more complex. Sources of environmental contamination include air emissions from manufacturing facilities and from numerous sources associated with the combustion of fuels and other organic materials.[27]

Regardless of the complexity, however, exposure scientist must quantify the dose of any exposure:

---

[22] REFERENCE MANUAL at 505.
[23] Id. at 512.
[24] EPA, EXPOSURE FACTORS HANDBOOK at 1-13 (2011).
[25] Id.
[26] REFERENCE MANUAL at 506.
[27] Id. at 520-21.

7

> Exposure science is the study of how people can come into contact with (are exposed to) chemicals that may be present in various environmental media (air, water, food, soil, consumer products of all types) and of the amounts of those chemicals that enter the body as a result of these contacts. Exposure scientists also study whether and how those amounts change over time. The goal of exposure science is to quantify those amounts and time periods. The quantitative expression of those amounts is referred to as dose. Ultimately the dose incurred by populations or individuals is the measure needed by health experts to quantify risk of toxicity.[28]

The quantification of exposure must also be reconstructed for the period an individual was purportedly subject to any such exposure. Accordingly, an exposure scientist is required to adapt "methods of exposure assessment to reconstruct the past—that is, to produce a profile of individuals' past exposures."[29]

In addition to quantifying dose for the alleged period of exposure using scientifically valid methods, an exposure scientist is also required to carefully address confounding factors—*i.e.*, potential alternative sources and other causes of the alleged harm, which are acknowledged to be many in urban air emission scenarios.[30]

An exposure scientist should ask and answer the following questions:

- "Who has been, or could become exposed to a specific chemical(s) arising from one or more specific sources?

- "What specific chemicals comprise the exposures?"

- "What are the pathways from the source of the chemical to the exposed population?"

- "By what routes are people exposed?" (*E.g.*, ingestion, inhalation, and dermal contact.)

---

[28]   *Id*. at 507.
[29]   *Id*. at 512.
[30]   *Id*. at 512, n.22.

Greenberg Traurig, P.A.

- "What is the magnitude and duration of exposure incurred by the population of interest?"[31]

The answers to these questions are necessary to achieve "[t]he ultimate goal of exposure assessment [which] is to identify dose and duration."[32]  This is requisite data for a toxicologist to analyze causation:

> The completion of an exposure assessment provides the information needed (the dose and duration of exposure) by epidemiologists and toxicologists, who will have information on the adverse health effects of the chemicals involved and on the relationships between those effects and the dose and duration of exposure.[33]

Accordingly, the REFERENCE MANUAL states that an expert acting in the capacity of an exposure scientist will typically opine on the following matters:

> Exposure scientists may offer expert testimony regarding exposures to chemicals incurred by individuals or populations. Their assessments typically will include a description of how and when exposures have or could occur, the identities of the chemicals involved, the routes of exposure, the doses incurred, and the durations of exposure.[34]

Curiously, Mr. Ungers failed to perform any of the work required by an exposure scientist.  Accordingly, his proffered testimony must be excluded.

## LEGAL STANDARD

The Federal Rules of Evidence govern the admissibility of expert testimony.[35]  Expert testimony is admissible only *if*:

---

[31] *Id*. at 518.

[32] *Id*.

[33] *Id*. at 519.

[34] *Id*. at 537-38.

[35] In a federal court sitting in diversity jurisdiction, the admissibility of expert testimony is a question of and controlled by federal law.  *See Hendrix*, 609 F.3d at 1193; *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005).

Greenberg Traurig, P.A.

(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is "sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*"; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue.[36]

Under "*Daubert* the Court charge[s] trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony."[37]  This is a rigorous standard that may not be lowered even though the exclusion of an expert may be outcome determinative in an action.[38]

## I.     The gatekeeping function safeguards the jury from unreliable expert testimony.

"Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert *scientific* evidence."[39]  This is "to insure that speculative and unreliable opinions do not reach the jury."[40]  Expert testimony can be "both powerful and quite misleading because of the difficulty in evaluating it."[41]  Consequently, the Rules of Evidence provide a stricter admissibility standard for expert testimony:

> [W]hile Rules 401 and 402 reflect the general policy of the Federal Rules for liberal admission of evidence, Rule 403, working in conjunction with Rules 702 and 703, militates against this general policy by giving courts discretion to

---

[36]    Fed. R. Evid. 702; see also *Chapman*, 766 F.3d at 1304 (internal citation omitted).

[37]    Fed. R. Evid. 702, advisory committee's note (2000 amends.).

[38]    *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also Hendrix*, 609 F.3d at 1187; *Rink v. Cheminova*, 400 F.3d 1286, 1291 (11th Cir. 2005); *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004).

[39]    *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (emphasis in original).  See also *Daubert*, 509 U.S. at 592-93 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").

[40]    *McClain*, 401 F.3d at 1237; *see also Rink*, 400 F.3d at 1291; *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

[41]    *Allison*, 184 F.3d at 1310 (quoting *Daubert*, 509 U.S. at 595).

Greenberg Traurig, P.A.

> preclude expert testimony unless it passes more stringent standards of reliability and relevance.  These stricter standards are necessary because of the potential impact on the jury of expert testimony.[42]

The gatekeeping function must insulate the jury from irrelevant and unreliable "scientific" evidence or unsupported speculation offered in the guise of science:

> Although making determinations of reliability may present a court with the difficult task of ruling on matters that are outside of its field of expertise, this is "less objectionable than dumping a barrage of scientific evidence on a jury, who would likely be less equipped than the judge to make reliability and relevance determinations."[43]

As such, the court's gatekeeping function is required to ensure scientific validity:

> A trial court . . . must therefore perform a "gatekeeping" function by conducting "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[44]

This assessment is not cursory: "Rulings on admissibility under *Daubert* inherently require the trial court to conduct an *exacting* analysis of the proffered expert's methodology."[45]  Abdicating this duty is an abuse of discretion, as is admitting testimony that fails "to satisfy the standards of reliability required under *Daubert* and its progeny."[46]

This Circuit is cautious regarding scientific testimony:

> Given time, information, and resources, courts may only admit the state of science as it is.  Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles.  "The courtroom is not the place

---

[42] *Id.*

[43] *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (quoting *Allison*, 184 F.3d at 1310).

[44] *Hendrix*, 609 F.3d at 1193 (quoting *Daubert*, 509 U.S. at 592-93).

[45] *McCorvey*, 298 F.3d at 1257 (emphasis added).

[46] *McClain*, 401 F.3d at 1238.

Greenberg Traurig, P.A.

for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it."[47]

## II.   The proponent of the expert testimony must establish admissibility under each prong of Rule 702 and *Daubert* by a preponderance of evidence.

"[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."[48]  This burden applies to each part of the "rigorous three-part inquiry" into the expert's qualifications, the reliability of the expert's methodology, and the relevance or fit of the proffered testimony.[49]

## III.   Irrelevant expert testimony is inadmissible.

Relevancy requires the Court to ensure that the expert's testimony "is relevant to the task at hand."[50]  A court may exclude even reliable expert testimony if no logical relationship exists between the testimony and a fact or issue in the case.[51]

## IV.   Expert testimony based on unreliable methodology is inadmissible.

Expert testimony must be reliable.  Testimony that requires a "leap of faith" is inadmissible.[52]  Expert testimony "must derive from the scientific method; good grounds and appropriate validation must support it."[53]  For expert testimony to be reliable, "it must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute

---

[47]   *Hendrix*, 609 F.3d at 1194 (quoting *Rider*, 295 F.3d at 1202).

[48]   Fed. R. Evid. 702, advisory committee's note (2000 amends.).

[49]   *Hendrix*, 609 F.3d at 1194; *see also Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care*, 582 F.3d 1227, 1232 (11th Cir. 2009) (burden of establishing relevance and reliability).

[50]   *Chapman*, 766 F.3d at 1306 (internal quotation marks and citation omitted); *see also U.S. v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) ("In evaluating the reliability of scientific expert testimony, a district court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue.") (internal quotation marks and citation omitted).

[51]   *See Daubert*, 609 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *U.S. v. Wilk*, 572 F.3d 1229, 1235 (11th Cir.2009) (finding no error in district court's exclusion of irrelevant expert testimony).

[52]   *Rider*, 295 F.3d at 1202.

[53]   *McClain*, 401 F.3d at 1237.

Greenberg Traurig, P.A.

'knowledge,' meaning something more than subjective belief or unsupported assumptions."[54]

*Daubert's* reliability standard considers at least four guideposts:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.[55]

Other factors in determining reliability include whether: (1) the expert had adequately accounted for alternative explanations,[56] (2) "there is simply too great an analytical gap between the data and the opinion offered,"[57] (3) the testimony is "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known,"[58] (4) the testifying expert "ha[s] developed [his] opinions expressly for the purposes of testifying,"[59] (5) the testifying expert reaches conclusions that other experts in the field would not reach,[60] and (6) the testimony is "imprecise and unspecific."[61]

## V.   *Ipse dixit* is inadmissible; and when an expert relies on experience, he remains obligated to demonstrate reliability under *Daubert*.

Opinions must be based on "recognized scientific method."[62]   "[N]othing in either *Daubert* or the [] Rules of Evidence requires a district court to admit opinion evidence that is

---

[54]   *McDowell*, 392 F.3d at 1298.
[55]   *Id.* (citing *Daubert*, 509 U.S. at 593-94); *see also Rink*, 400 F.3d at 1291-92; *McCorvey*, 298 F.3d at 1256.
[56]   *Chapman*, 706 F.3d at 1311.
[57]   *Joiner*, 522 U.S. at 146.
[58]   *Frazier*, 387 F.3d at 1261 (quoting *Daubert*, 509 U.S. at 590).
[59]   *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); *Allison*, 194 F.3d at 1321.
[60]   *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).
[61]   *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (citing *Frazier*, 387 F.3d at 1266).
[62]   *McDowell*, 392 F.3d at 1298 (citing *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)); *see id.* at 1299 ("something doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an

13

connected to existing data only by the *ipse dixit* of the expert."[63]   The fact "that an expert

may be qualified by experience does not mean that experience, standing alone, is a sufficient

foundation rendering reliable any conceivable opinion the expert may express."[64]   As such,

an expert must explain the relation between his experience and his conclusion:

> If the witness is relying solely or primarily on experience, then
> the witness must explain *how* that experience leads to the
> conclusion reached, *why* the experience is a sufficient basis for
> the opinion, and *how* that experience is reliably applied to the
> facts.  The trial court's gatekeeping function requires more than
> simply "taking the expert's word for it."[65]

## ARGUMENT

I.   **Despite a duty to demonstrate how Plaintiff was exposed to the alleged air
emissions, Mr. Ungers failed to perform a fate and transport analysis.**

The REFERENCE MANUAL requires an exposure scientist to demonstrate how

constituents travelled from point A to point B.  "Exposure science is the study of how people

can come into contact with (are exposed to) chemicals that may be present in various

environmental media."[66]   In this action, Plaintiff alleges that she was exposed to $SO_2$ and

$PM_{10}$.  Mr. Ungers was required to offer an opinion as to these alleged exposures, which he

cavalierly provided without any scientifically valid method for demonstrating that the

constituents were from Mosaic.  Confounding his opinions, Mr. Ungers knew that Mosaic is

not the only source of these constituents in Hillsborough County:

---

expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed
conclusive.") (citing *Daubert II*, 43 F.3d at 1315-16).
[63]   *Hendrix*, 609 F.3d at 1194 (citing *Joiner*, 522 U.S. at 146); *Cook*, 402 F.3d at 1111.
[64]   *Frazier*, 387 F.3d at 1261.
[65]   Fed. R. Evid. 702, advisory committee's note (2000 amends.) (emphasis added); *Frazier*, 387 F.3d at 1261;
*see also Daubert II*, 43 F.3d at 1319.
[66]   REFERENCE MANUAL at 507.

Greenberg Traurig, P.A.

Q. Is [Mosaic] the only source for particulate in Hillsborough County?

A. No, I think you can safely say they're not.

Q. Is it the only source for respirable particulate in the county?

A. No.

Q. Is it the only source for sulfur dioxide in the county?

A. From the -- from the information, no.[67]

Despite this knowledge, Mr. Ungers never attempted to determine how the alleged constituents travelled from the Riverview plant more than three miles to Plaintiff's residence and he employed no air dispersion modeling in an effort to make such a determination:

Q. Okay.  So in this case you did no dispersion modeling whatsoever not for particulates, correct?

A. No.

Q. Not for fugitive dust, correct?

A. No.

Q. And not for sulfur dioxide, correct?

A. Correct.[68]

Mr. Ungers lacked a fate and transport analysis necessary to answer the question: "What are the pathways from the source of the chemical to the exposed population?"[69]   In fact, he never asked the question, he just assumed a convenient answer:

Q. What did you do to, in your report, to establish fate and transport of any of the constituents you sampled?

---

[67]   Exhibit C, Ungers Dep. Tr. at 68:3-12.
[68]   Exhibit C, *id*. at 44:4-11.
[69]   REFERENCE MANUAL at 518.

A. Well, Counselor, that -- the -- again, we've talked on other references that I cite in my written opinion, and then of course the statistical analysis, it shows the association, and indirectly the technical -- the TSD document, the Technical Support Document, your own experts and Li inform it, but I didn't do any modeling where I would calculate transport.[70]

None of these, however, demonstrate fate and transport of any constituents at unsafe levels.

The TSD, or Technical Support Document, was the Florida Department of Environmental Protection's summary of its AERMOD[71] modeling of $SO_2$ emissions in Hillsborough County, which resulted in a modeled $SO_2$ nonattainment area boundary—this is a modeled area where an exceedance of $SO_2$ emissions may have theoretically occurred. The TSD states, this is an area that "based upon air dispersion modeling, *may* be experiencing violations of the standard caused by an identified source."[72] Mr. Ungers cannot rely on the TSD, not only because it does not demonstrate fate and transport from the Mosaic Riverview plant to Plaintiff's residence,[73] but because Mr. Ungers admits that Plaintiff does not reside within the nonattainment area boundary.[74]

Mr. Unger's reliance on Li is also unavailing. Although Li applies an AERMOD air dispersion model, he does not analyze air emissions in Plaintiff's neighborhood and

---

[70]   Exhibit C, Ungers Dep. Tr. at 119:20-120:5. The statistical analysis Mr. Ungers was referring to was his after-the-fact and unreliable Spearman analyses which are the subject of a separate motion to exclude as late disclosed. *See* Doc. 76.

[71]   The American Meteorological Society-Environmental Protection Agency Regulatory Model.

[72]   Exhibit E, Florida Department of Environmental Protection, TECHNICAL SUPPORT DOCUMENT FOR FLORIDA AREA DESIGNATIONS FOR THE 2010 $SO_2$ PRIMARY NATIONAL AMBIENT AIR QUALITY STANDARD at 4 (TSD) (emphasis added). It is important to note that being within the modeled $SO_2$ nonattainment boundary does not prove exposure as the boundary is modeled based on the possibility of an exceedance of the primary standard. What modeling does, however, provide are the areas where an exposure of the modeled constituent will not occur based on the model and its inputs. The nonattainment boundary was determined by using the AERMOD model, which is the accepted model used by the EPA and the Florida Department of Environmental Protection. Mr. Ungers notes that Plaintiff does not reside within the nonattainment boundary, but even if she did, he still failed to perform an exposure assessment.

[73]   Moreover, the TSD also only analyzed $SO_2$. It did not analyze any other constituents.

[74]   Exhibit C, Ungers Dep. Tr. at 106:3-5.

concludes in his study that the Mosaic Riverview facility does not "impose an elevated cancer risk or health effects to general population."[75]

Mr. Ungers effort to rely on Mosaic's air expert and his AERMOD modeling is equally unavailing. Mr. Ken Kosky, a professional engineer with at least 40 years of experience performing emissions assessments, opined regarding Mr. Ungers's report:

> Plaintiff's expert reports provide no relevant or technically acceptable air quality information regarding the air concentrations from Mosaic operations at the Plaintiff's residence or neighborhood. The Plaintiff's expert, Mr. Ungers, relied on a report that not only provides no relevant information on air quality in the Plaintiff's neighborhood but actually suggests that compounds and phosphorus (Mosaic's main product) were higher at a location much farther from the Mosaic operations than the Plaintiff's neighborhood. That report does not support Mr. Ungers' opinions but actually refutes them.[76]

In other words, Mr. Ungers "presents neither technical information on the magnitude or duration of such concentrations in the neighborhoods nor any link to Mosaic operations."[77]

Mr. Kosky also criticized Mr. Ungers's soil and attic dust samples as confounding any possible theory of air deposition from the Mosaic Riverview plant:

> These results are entirely inconsistent with air deposition from the Mosaic facility. If Mosaic operations were a dominate source of settable particulate matter containing phosphorus to the Progress Village neighborhood in the vicinity as Mr. Unger implies, than it seems that higher phosphorus concentrations would be expected closer to the Mosaic operations. The exact opposite was observed in Mr. Ungers' report.[78]

---

[75]  Hsing-Wang Li, *et al.*, "Impacts of hazardous air pollutants emitted from phosphate fertilizer production plants on their ambient concentration levels in the Tampa Bay area," AIR QUAL ATMOS HEALTH (2015) 8:453-467 at 464. *See* Doc. 89 at Argument I for an extensive discussion of Li.

[76]  Exhibit F, Expert Report of Kennard F. Kosky, M.S., P.E., at 4.

[77]  *Id.* at 9.

[78]  *Id.* at 10-11.

Mr. Kosky does not help Mr. Ungers, he only shows what Mr. Ungers was required, but failed to do.

Mr. Ungers never performed a fate and transport analysis demonstrating that Plaintiff was ever exposed to constituents from the Mosaic Riverview plant or demonstrating an exceedance at Plaintiff's residence for a constituent from Mosaic.

## II.   Despite a duty to "quantify the exposures" to the alleged air emissions, Mr. Ungers failed to quantify either exposure or duration.

Mr. Ungers was also required to "quantify the exposures incurred."[79]  He admitted that he was retained in this capacity.[80]  He repeatedly testified at deposition, however, that he failed to perform the work necessary "to identify dose and duration":[81]

> Q.  Are you familiar with the EPA Exposure Factors Handbook?
>
> A.  I've seen it, yes.
>
> Q.  Did you use it at all in preparing your report?
>
> A.  *I didn't conduct an exposure assessment, so no.*[82]

He also testified that neither he nor anyone else measured any constituents at Plaintiff's residence that purportedly came from the Mosaic Riverview plant.  He did not calculate or measure $SO_2$ at Plaintiff's residence:

> Q.  Do you see the border that says non-attainment area?
>
> A.  Yes.
>
> Q.  Does Miss Williams live inside or outside that border?
>
> A.  Her residence is outside that border.

---

[79]   REFERENCE MANUAL at 512.
[80]   Exhibit C, Ungers Dep. Tr. at 16:15-20.
[81]   REFERENCE MANUAL at 518.
[82]   Exhibit C, Ungers Dep. Tr. at 65:3-9 (emphasis added).

Greenberg Traurig, P.A.

Q. Okay.  And absent this modeling, do you have any data regarding the SO2 levels at Miss Williams' home?

A. Only the information that's provided either -- well, at exactly?

Q. Yes.

A. What type of data, Counselor?

Q. The SO2 level at her home.

A. *I don't think that's ever been measured at her home.*

Q. Okay.  Never been measured?

A. *No.*

Q. Okay.  Did you try?

A. *No.*[83]

Not only did Mr. Ungers admit to having no knowledge of any SO$_2$ measurements or

estimates at Plaintiff's home, he had no idea what the Riverview plant's contribution was to

SO$_2$ in Hillsborough County:

Do you -- did you calculate what Mosaic's contribution is to the SO2 non-attainment in Hillsborough County?

A. No, the -- I did not independently, no.

Q. Do you know what period of time Mosaic contributed to -- Mosaic was a likely major contributor to SO2 non-attainment?

A. Given the nature of the operation and the data we have on emissions going back to 2003, it's a  significant source, it's a major source,[84] but --

Q. But you don't know how much?

---

[83]   Exhibit C, *Id*. at 105:25-106:19 (emphasis added).

[84]   *See* Glossary "major source" (Doc. 87).  As of September 2005, there were at least 33 Title V permitted facilities in Hillsborough County.  *See* Exhibit G.

Greenberg Traurig, P.A.

A. Proportionally, no.[85]

He admitted he did not calculate or measure $PM_{10}$ at Plaintiff's residence:

Q. Did you calculate Mosaic's contribution to particulate matter at Miss Williams' residence?

A. *No.* The only reference I'm aware of is the Li study that determines ground level concentrations of particulate.

Q. Did you perform any calculations to determine what Mosaic's contribution is to PM10 at Miss Williams' residence?

A. *No*, same answer.

Q. Okay. How about Mosaic's contribution of PM to Progress Village, did you calculate that?

A. *No.*

Q. And how about Mosaic's contribution to PM10 at Progress Village, did you calculate that?

A. *Same answer*, all four.[86]

He admitted that he did not collect or analyze data relating to radioactivity:

Q. Do you have any data related to Mosaic's emitting radioactive elements?

A. Only in that that would be an expected emission from those types of operations.

Q. But do you have any data?

A. Any actual data from Mosaic?

Q. Correct.

A. *I don't recall any, no.*[87]

---

[85] Exhibit C, Ungers Dep. Tr. at 104:1-12.
[86] *Id.* at 108:9-23 (emphasis added).
[87] *Id.* at 66:8-15 (emphasis added).

20

Yet, despite his obligation to (a) identify transport between the Riverview plant and Plaintiff's residence, and (b) measure and quantify exposure from which Dr. Mink was required to reconstruct Plaintiff's dose of the alleged constituents, Mr. Ungers admits that he not only failed to perform such work, he was never asked to:

> Q. Is there a reason you did not?
>
> A. Again, **I wasn't asked to do an exposure assessment or dose reconstruction** . . . .
>
> Q. Are you aware of anyone doing an exposure assessment or dose reconstruction?
>
> A. **I'm not, no.**[88]

It is incontrovertible that Mr. Ungers did not perform any exposure assessments:

> Q. And, in fact, you didn't calculate a contribution for any of the constituents, did you?
>
> A. **No, I did not.**[89]

In addition to his repeated admissions that he did not perform the requisite exposure assessment, he also admitted he was not qualified to perform one:

> Q. Do you believe you collected data from which an exposure assessment can be made?
>
> A. Yes. **I don't know the error around that assessment, what it would be**, but I suppose there is a way to back it out. **I'm unfamiliar with the technique that's established for that.**
>
> Q. Did you say the air or the error?
>
> A. Error.
>
> Q. Error?

---

[88] *Id.* at 210:19-211:1.
[89] *Id.* at 103:15-17 (emphasis added).

Greenberg Traurig, P.A.

A.  Both methods have variability, so I'm unfamiliar with that. *I don't do a lot of that exposure assessment.*[90]

**III.    Despite a duty to enumerate and eliminate potential alternative sources of air emissions, Mr. Ungers failed to identify and eliminate any such sources even though he knew they existed.**

Mr. Ungers was aware there were many alternative sources for Plaintiff's exposure, yet he failed to consider and eliminate them.  It is common knowledge that:

> in addition to PM, many chemicals are produced when fuels or other organic materials are burned.  Organic chemicals take on oxygen atoms during combustion and yield large numbers of substances not present in the materials that are burned. Combustion also produces simple inorganic oxides of carbon, nitrogen, and sulfur, which are major air pollutants.[91]

Mr. Ungers knew this from the Li study, which concluded, among other things, that the Mosaic Riverview plant contributed 1.14% to offsite hazardous air pollutants whereas other known sources accounted for 98.6% of offsite contributions.[92]  He knew this from the TSD, which identified the TECO Big Bend facility as a regional producer of more than three times as much $SO_2$ as Mosaic.[93]  He knew this from preparing a list of certain point source emissions in Hillsborough County showing the Riverview plant contributing 7.6809% and the other point sources contributing 92.3193%.[94]  And he testified that he was aware that the Mosaic Riverview plant was not the only source of $SO_2$ and $PM_{10}$ in Hillsborough County:

Q.  Is it the only source for particulate in Hillsborough County?

A.  No, I think you can safely say they're not.

Q.  Is it the only source for respirable particulate in the county?

---

[90]  *Id.* at 65:10-21.
[91]  REFERENCE MANUAL at 515.
[92]  Li, *et al.*, Air Qual Atmos Health at 462.  *See* Doc. 89 at Argument I for an extensive discussion of Li.
[93]  Exhibit E, TSD at 6.  And as this Court acknowledged: "In fact, Plaintiff identified TECO in her Second Amended Complaint as a possible alternative source of emissions.  (See Doc. 24, ¶¶ 53-59)[.]" (Doc. 74 at 3.)
[94]  Exhibit C, Unger Dep. Tr. at Exhibit 23.

Greenberg Traurig, P.A.

    A.  No.

    Q.  Is it the only source for sulfur dioxide in the county?

    A.  From the -- from the information, no.[95]

Mr. Ungers testified that there are many other sources of $PM_{10}$ and $SO_2$ in Hillsborough County, including common combustion sources:

    Q.  And what other sources are there for particulate?

    A.  There's quite a few.  Most industrial sources emit some form of particulate.

    Q.  And --

    A.  And of course there are natural sources of particulate.

    Q.  And what other sources are there for respirable particulate in the county?

    A.  They tend to be combustion sources, but there are other combustion sources.

    Q.  And what other sources for sulfur dioxide emissions are there in the county?

    A.  Any type of combustion source that uses a fossil fuel, they usually have some sulfur dioxide in them, emissions, yeah.[96]

Despite knowing about these sources, Mr. Ungers made no effort to account for them:

    Q.  And what did you do to determine what alternative sources contributed to those concentrations?

    A.  It would be the same answer as previously.

    Q.  Nothing, right?

    A.  ***We didn't do an assessment on other sources.***[97]

---

[95]  *Id*. at 68:3-12.
[96]  *Id*. at 71:1-16.

Greenberg Traurig, P.A.

He performed no assessment regarding alternative sources because he performed no assessments:

> Q. Did you calculate emission contributions from any of the facilities other than Mosaic Fertilizer?
>
> A. ***I didn't calculate emission contributions for anything.***[98]

### IV. Mr. Ungers relied on dust and soil samples taken from Plaintiff's residence that directly contradict any assertions that Plaintiff was exposed to unsafe levels of sampled constituents regardless of their source.

Mr. Ungers attempted to rely on dust and soil samples to compensate for his failure to analyze fate and transport or quantify exposure. This is not a remedy. Nonetheless, he compared dust and soil samples taken from Plaintiff's home and yard to Florida Department of Environmental Protection soil cleanup target levels—even though he admits he has no way of distinguishing them because he performed no fate and transport analysis, performed no exposure calculations, and failed to consider alternative sources.

Soil cleanup target levels, like other cleanup target levels, are designed to protect the most sensitive individuals against a lifetime of exposure:

> All non-cancer health effects are assumed to have a dose threshold. That is, it is assumed that below some dose, the effect does not occur. A chemical can often produce many different types of adverse health effects, each with its own threshold. If the threshold for the most sensitive health effect can be identified—the effect that occurs at the lowest dose—limiting exposure to produce doses below that threshold should protect against all of the effects of the chemical. This concept is the basis for the USEPA reference dose (RfD). The USEPA examines toxicity data for a chemical, identifies the most sensitive effect, and then determines a dose sufficiently low enough to prevent that effect from occurring in the most sensitive individuals. Because environmental exposures can be

---

[97] *Id*. at 121:1-7 (emphasis added).
[98] *Id*. at 173:22-174:1 (emphasis added).

Greenberg Traurig, P.A.

> long term, the dose is actually a dosing rate (amount of chemical per day), and it is intended to protect against toxicity for exposures that range up to a lifetime.  Reference doses are specific to the route of exposure (ingestion, dermal contact, or inhalation).
>
> \* \* \*
>
> It is important to point out that the toxicity values developed by the USEPA—the reference doses and cancer slope factors—are developed conservatively.  That is, in view of uncertainties in the risk assessment process, they typically have a "safety buffer" built in.  As a result, it is more accurate to state, for example, that a CTL corresponds to a risk "that is less than one in a million" rather than to state that it poses a risk "equal to one in a million."[99]

The dust and soil samples Mr. Unger's compared to the soil cleanup target levels for 42 elements showed no exceedances at Plaintiff's residence for soil and one exceedance for arsenic in kitchen cabinet and attic samples.   Mr. Ungers can neither demonstrate exceedances nor a relationship to what Plaintiff was allegedly exposed to.

## CONCLUSION

Mr. Ungers was required to (a) demonstrate Plaintiff was exposed to airborne constituents from the Mosaic Riverview plant more than three miles from her residence, (b) provide a quantitative exposure assessment from which a toxicologist could reconstruct dose as an input in a causation analysis, and (c) identify and eliminate alternative sources of potential airborne constituents.   Not only did he fail to do these things, he repeatedly admitted he did not even try.  His failure to apply any methodologies, collect and analyze any data, and enumerate and eliminate alternative sources requires that his proposed expert testimony be excluded.

---

[99]   Center for Environmental & Human Toxicology, TECHNICAL REPORT: DEVELOPMENT OF CLEANUP TARGET LEVELS (CTLs) FOR CHAPTER 62-777, F.A.C. at 9 (2005).

Greenberg Traurig, P.A.

Date: December 11, 2015                    Respectfully submitted,

                                          /s/ Christopher Torres
                                          David B. Weinstein (FBN 604410)
                                          weinsteind@gtlaw.com
                                          Christopher Torres (FBN 0716731)
                                          torresch@gtlaw.com
                                          Ryan T. Hopper (FBN 0107347)
                                          hopperr@gtlaw.com
                                          **GREENBERG TRAURIG, P.A.**
                                          101 E. Kennedy Blvd., Ste. 1900
                                          Tampa, Florida 33602
                                          Telephone:  (813) 318-5700
                                          Facsimile:  (813) 318-5900
                                          Secondary Email: dunnla@gtlaw.com;
                                          FLService@gtlaw.com
                                          *Counsel for Defendant, Mosaic Fertilizer, LLC*

## REQUEST FOR ORAL ARGUMENT

Mosaic requests oral argument on this motion in the manner deemed appropriate by this Court.  Mosaic estimates that an evidentiary hearing will require two hours and a non-evidentiary will require one.

## CERTIFICATE OF SERVICE

I certify that on December 11, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

                                          /s/ Christopher Torres
                                          Attorney

**Exhibit Index**

| Ex. | Title |
|-----|-------|
| A | Expert Report of Leslie J. Ungers, M.S., C.I.H. and Appendix B (reliance materials) (Plaintiff's exposure scientist). |
| B | Leslie J. Ungers, M.S., C.I.H. - Elemental and radiochemistry of settled dust and surface soil in residential communities of central Hillsborough County Florida and Ungers Deposition exhibit 7. |
| C | Deposition Transcript of Leslie Joseph Ungers dated August 18, 2015. |
| D | Expert Report of Robert C. James, Ph.D. (Defendant's expert toxicologist). |
| E | Florida Department of Environmental Protection, TECHNICAL SUPPORT DOCUMENT FOR FLORIDA AREA DESIGNATIONS FOR THE 2010 SO$_2$ PRIMARY NATIONAL AMBIENT AIR QUALITY STANDARD. |
| F | Expert Report of Kennard F. Kosky, M.S., P.E. (Defendant's air modeling expert). |
| G | Map of Title V permitted facilities in Hillsborough County. |

*TPA 512094888*

Greenberg Traurig, P.A.