Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION          EXHIBIT C

\*   \*   \*

RHONDA WILLIAMS, A SINGLE
PERSON,

         PLAINTIFF,
   vs.                          Case No.
                     8:14-CV-01748-MSS-TGW

MOSAIC FERTILIZER, LLC, A
DELAWARE CORPORATION DOING
BUSINESS IN FLORIDA,

         DEFENDANT.

\*   \*   \*

       Videotaped deposition of LESLIE JOSEPH
UNGERS, Witness herein, called by the Defendant for
cross-examination pursuant to the Rules of Civil
Procedure, taken before me, Connie Sumner, RPR, a
Notary Public in and for the State of Ohio, at the
offices of Statman, Harris & Eyrich, LLC, 441 Vine
Street, Suite 3700, Cincinnati, Ohio on Tuesday,
August 18, 2015, at 9:12 o'clock a.m.

\*   \*   \*

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 2

1                 EXAMINATION CONDUCTED              PAGE

2    BY MR. TORRES:...............................    8

3                    EXHIBITS MARKED

4    (Thereupon, Ungers Exhibit No. 1, expert opinion of

5    Leslie J. Ungers, was marked for purposes of

6    identification.)............................   30

7    (Thereupon, Ungers Exhibit No. 2, elemental and

8    radiochemistry of settled dust and surface soil

9    study dated September 2014, was marked for purposes

10   of identification.)........................   31

11   (Thereupon, Ungers Exhibit No. 3, elemental and

12   radiochemistry of settled dust and surface soil

13   study dated March 2015, was marked for purposes of

14   identification.)............................   33

15   (Thereupon, Ungers Exhibit No. 4, expert opinion of

16   Leslie J. Ungers, was marked for purposes of

17   identification.)............................   52

18   (Thereupon, Ungers Exhibit No. 5, set of tables, was

19   marked for purposes of identification.)......   75

20   (Thereupon, Ungers Exhibit No. 6, Riverview receptor

21   grid from FDEP, was marked for purposes of

22   identification.)............................   105

23   (Thereupon, Ungers Exhibit No. 7, set of graphs, was

24   marked for purposes of identification.)......   143

25   (Thereupon, Ungers Exhibit No. 8, Baseline

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 3

1    Concentrations of 15 Trace Elements in Florida

2    Surface Soils article, was marked for purposes of

3    identification.).............................   150

4    (Thereupon, Ungers Exhibit No. 9, Table 2, Technical

5    Report, Soil Cleanup Target Levels, was marked

6    for purposes of identification.).............   152

7    (Thereupon, Ungers Exhibit No. 10, Soil Cleanup

8    Target Levels comparison table, was marked

9    for purposes of identification.).............   153

10   (Thereupon, Ungers Exhibit No. 11, dust and soil

11   summary table for 4810 S. 87th St. attic, was marked

12   for purposes of identification.).............   161

13   (Thereupon, Ungers Exhibit No. 12, dust and soil

14   summary table for 5914 S. 78th St. attic, was marked

15   for purposes of identification.).............   163

16   (Thereupon, Ungers Exhibit No. 13, dust and soil

17   summary table for 5914 S. 78th St. soil, was marked

18   for purposes of identification.).............   164

19   (Thereupon, Ungers Exhibit No. 14, dust and soil

20   summary table for 8616 Progress Blvd. attic, was

21   marked for purposes of identification.)......   164

22   (Thereupon, Ungers Exhibit No. 15, dust and soil

23   summary table for 8616 Progress Blvd. soil, was

24   marked for purposes of identification.)......   165

25   (Thereupon, Ungers Exhibit No. 16, dust and soil

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 4

1    summary table for 5202 S. 86th St. attic, was marked

2    for purposes of identification.)............  166

3    (Thereupon, Ungers Exhibit No. 17, dust and soil

4    summary table for 5202 S. 86th St. attic, was marked

5    for purposes of identification.)............  167

6    (Thereupon, Ungers Exhibit No. 18, dust and soil

7    summary table for 1906 S. Lenna Ave. attic, was

8    marked for purposes of identification.)......  167

9    (Thereupon, Ungers Exhibit No. 19, dust and soil

10   summary table for 1906 S. Lenna Ave. attic, was

11   marked for purposes of identification.)......  169

12   (Thereupon, Ungers Exhibit No. 20, dust and soil

13   summary table for 4810 S. 87th St. soil, was marked

14   for purposes of identification.)............  170

15   (Thereupon, Ungers Exhibit No. 21, Technical Support

16   Document, was marked for purposes of

17   identification.)...........................  172

18   (Thereupon, Ungers Exhibit No. 21, summary of air

19   monitoring data, was marked for purposes of

20   identification.)...........................  176

21   (Thereupon, Ungers Exhibit No. 22, handwritten

22   document, was marked for purposes of

23   identification.)...........................  178

24   (Thereupon, Ungers Exhibit No. 23, summary of point

25   source emissions for sulfur dioxide, was marked

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 5

1    for purposes of identification.)............   179

2    (Thereupon, Ungers Exhibit No. 24, a set of tables,

3    was marked for purposes of identification.)..   180

4    (Thereupon, Ungers Exhibit No. 25, letter from

5    Ungers & Associates, was marked for purposes of

6    identification.)...........................   181

7    (Thereupon, Ungers Exhibit No. 26, soil maps, was

8    marked for purposes of identification.)......   183

9    (Thereupon, Ungers Exhibit No. 27, aerial

10   photographs, was marked for purposes of

11   identification.)...........................   185

12   (Thereupon, Ungers Exhibit No. 28, Spearman

13   Rank-Order Correlation Coefficient article, was

14   marked for purposes of identification.)......   188

15   (Thereupon, Ungers Exhibit No. 29, Final Technical

16   Report:  Development of Cleanup Target Levels for

17   Chapter 62-777, F.A.C., was marked for purposes of

18   identification.)...........................   209

19

20

21

22

23

24

25

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 6

```
 1   APPEARANCES:

 2        On behalf of the Plaintiff:

 3            The Green Counselor, PLLC

 4        By:  Mary Ellen Hogan
               Laureen Galeoto (via teleconference)
 5             Attorneys at Law
               100 South Ashley Drive
 6             Suite 600
               Tampa, Florida  33602
 7
               Walker, Morgan LLC
 8
          By:  William P. Walker (via teleconference)
 9             Attorney at Law
               135 East Main Street
10             Lexington, South Carolina  29072

11        On behalf of the Defendant:

12            Greenberg Traurig PA

13        By:  Christopher Torres
               Attorney at Law
14             Courthouse Plaza
               625 East Twiggs Street
15             Suite 100
               Tampa, Florida  33602
16
          Also present:
17
               Franklin L. Mink, Ph.D.
18             Richard Stevens, Videographer

19
                         *    *    *
20

21

22

23

24

25
```

Page 7

1          VIDEOGRAPHER:  We're on the record.

2          (Witness sworn.)

3          MR. TORRES:  Thank you.  And for the

4      record, we have here Mr. Ungers, who is

5      being deposed, his counsel, Mary Ellen

6      Hogan -- Hogan representing him, Dr. Frank

7      Mink, plaintiff's expert -- an additional

8      plaintiff's expert in the case, and on the

9      phone Mr. Billy Walker and Miss Laureen

10     Galeoto.

11          So let me introduce myself first, Mr.

12     Ungers, my name is Christopher Torres.

13     Chris is sufficient.  I represent Mosaic

14     Fertilizer, LLC.  You are being deposed

15     today.  I'm going to need you to answer

16     your questions verbally.

17          THE WITNESS:  (Nodding head.)

18          MR. TORRES:  Yes?

19          THE WITNESS:  Yes.

20          MR. TORRES:  Thank you.

21               LESLIE JOSEPH UNGERS

22  of lawful age, Witness herein, having been first

23  duly cautioned and sworn, as hereinafter certified,

24  was examined and said as follows:

25               CROSS-EXAMINATION

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 8

1    BY MR. TORRES:

2        Q.   Could you please give your name and

3    address on the record once more, please?

4        A.   Sure.  It's Leslie Joseph Ungers.  My

5    business address is 1136 St. Gregory Street,

6    Cincinnati, Ohio.

7        Q.   Thank you.  And you are competent to

8    answer my questions today, meaning that there's no

9    condition or any drugs or medications that are

10   affecting your memory?

11       A.   Yes.

12       Q.   Thank you.  If I ask a question that you

13   don't understand, you can say that to me and I will

14   try to clarify it as best I can.

15       A.   Okay.

16       Q.   You understand that a court reporter is

17   preparing a transcript and at the end of this

18   deposition you will have an opportunity to read it

19   at some point in the future.

20       A.   I do.

21       Q.   Thank you.  If you need to take a break,

22   let me know and we will take one.  The only thing I

23   will ask is that you answer any pending questions

24   before we break; is that fair?

25       A.   That's fair.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 9

1       Q.    Thank you, sir.  And your attorney may

2   make objections, but unless she instructs you not to

3   answer, you're required to answer.  Do you

4   understand that, sir?

5       A.    I understand.

6       Q.    Thank you.  Mr. Ungers, can you tell me

7   how you prepared for today's deposition?

8       A.    Yes, sir.  I reviewed both my written

9   opinion and the references associated with that.

10      Q.    When you say the references associated

11  with that, do you mean the references that are

12  listed in the written opinion?

13      A.    Yes.

14      Q.    Thank you.  Did you speak with anyone?

15      A.    Yes.

16      Q.    Who did you speak with?

17      A.    I spoke with -- yesterday with Mary Ellen.

18      Q.    Okay.  Anyone else?

19      A.    Well, Dr. Mink was present.

20      Q.    Did you speak with Dr. Mink alone?

21      A.    No.

22      Q.    Your lawyers produced to me yesterday some

23  additional documents, which I'm going to hand you.

24  I'm not going to mark them yet.  I'm just going to

25  hand them to you in these colored folders.

Page 10

1          A.    Okay.

2          **Q.    Would you take a look at those and tell me**

3    **what they are.**

4          A.    Sure.  This is the blue folder.  There's

5    two stapled documents -- well, I take that back.

6    There are --

7          **Q.    They're just copies?**

8          A.    They're just copies.  Okay, I see.  These

9    are copies of the results of my attic dust sampling,

10   which has been given previously, and the regional

11   soil samples from Chen, which is one of my

12   references.  And I believe also here there are the

13   actual site soil samples.  So it's the same

14   information that was provided in my report.  The

15   only difference is we've added a column that

16   describes the enrichment factor.

17         **Q.    Okay.  And the red folder?**

18               MS. HOGAN:  Chris, before we go to

19          the red folder, let me just add the Bates

20          on that.

21               MR. TORRES:  Go ahead, please.

22               MS. HOGAN:  So we have that clear.

23               MR. TORRES:  Thank you.

24               MS. HOGAN:  The documents that have

25          been referred to as being in the blue

Page 11

1          folder that Mr. Ungers just discussed are

2          Bates numbered Ungers 010924 through 0927.

3               MR. TORRES:  Thank you, Mary.

4               MS. HOGAN:  Mary Ellen.

5               MR. TORRES:  Thank you.

6     BY MR. TORRES:

7          **Q.   Okay.  The red folder, sir?**

8          A.   Yes, sir.  This is a copy of the EPA

9     website that describes the toxic release inventory

10    for the Mosaic Fertilizer operations at Riverview

11    from 1987 to 19 -- to 2013.

12         **Q.   Okay.  What are those Bates labeled, sir?**

13         A.   Bates label on this is Ungers under slash

14    010943 to 944.

15         **Q.   Thank you.  And the green folder, sir?**

16         A.   Yes.  These are copies of the field data

17    sheets that were collected along with the surface

18    and soil samples that are reported in my opinion.

19         **Q.   What are they labeled?**

20         A.   Yes.  The Bates labels Ungers under slash

21    010928 through 933.

22         **Q.   And finally, the yellow folder, sir?**

23    **Thank you.**

24         A.   Yes.  These -- again, this is the same

25    data provided in my written opinion, but it's a

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 12

1   comparison between attic dust and -- at one of the

2   sites and the constituents in phosphogypsum from

3   Central Florida.

4        Q.   And what are they labeled, sir?

5        A.   They're labeled underscore 010938 through

6   underscore 010942.

7        Q.   Thank you.  And were these documents

8   created around the same time?

9        A.   As -- yes, they were all created around

10  about the same time.

11       Q.   Okay.  And when is that, sir?

12       A.   I think with the exception of perhaps the

13  TRA, which may have been a little earlier, I don't

14  recall the exact date, a month or so ago.

15       Q.   Okay.  And what compelled you to create

16  these documents?

17       A.   Well, they support the -- my written

18  opinion and they were answering questions raised by

19  your experts.

20       Q.   Mr. Ungers, do you know why you were

21  retained in this case?

22       A.   Initially was to conduct the environmental

23  sampling that -- that is in my written report and

24  then to render an opinion on the results, whatever

25  they were.

Page 13

1      Q.    Now, you said it was initially to perform

2    environmental sampling and render an opinion, is

3    there something else you will be doing?

4      A.    As I sit here now, no, not to my

5    knowledge.

6      Q.    So as far as you know, you are done with

7    your work?

8      A.    Well, of course I reserve the right to

9    update my information if something new becomes

10   available, but, yes, essentially that's where we

11   stand right now.

12     Q.    When were you retained, sir, do you know?

13     A.    I don't -- I don't remember the exact date

14   of retention, but I think it was about approximately

15   two years ago, in March or somewhere shortly after

16   that.

17     Q.    March of 2013?

18     A.    If memory serves me correct, yeah, that

19   sounds right.

20     Q.    And who retained you?

21     A.    I think Mr. Walker did.

22     Q.    Have you worked with Mr. Walker before?

23     A.    No, I have not.

24     Q.    How did Mr. Walker find you?

25           MS. HOGAN:  Objection, calls for

Page 14

1          speculation.

2                  THE WITNESS:  Yeah, I don't -- I

3          don't really know how he found me.

4     BY MR. TORRES:

5          Q.    How did you meet Mr. Walker?

6          A.    I met Mr. Walker for the first time in

7     Florida in a meeting with the other attorneys.

8          Q.    Okay.  How did you meet him?

9          A.    Face-to-face.  We met at a conference

10    room.

11         Q.    How were you introduced to him?

12         A.    I don't actually recall.  Just normal

13    introduction handshake.

14         Q.    Who introduced you to him?

15         A.    I think Mary Ellen and Laureen did at the

16    time.

17         Q.    Was Dr. Mink involved in introducing you

18    to Mr. Walker?

19         A.    I don't know for sure, but that's my -- my

20    understanding.

21         Q.    Have you worked with Dr. Mink in the past?

22         A.    I have.

23         Q.    As an expert?

24         A.    No.

25         Q.    In what --

Page 15

1    A.   Well, you mean in a case, no.

2    **Q.   I understand.  Thank you.  In what**

3    **capacity have you worked with Dr. Mink in the past?**

4    A.   We've collaborated on some reviews of

5    regulatory documents.

6    **Q.   How far back does your working**

7    **relationship go?**

8    A.   Well, it's been on and off.  I've known

9    Frank for, I would say, at least ten years.

10   **Q.   And this is the first case that you are**

11   **working as an expert with Dr. Mink, correct?**

12   A.   That's correct, yes, sir.

13        MS. HOGAN:  Just wait until he

14      finishes the question, please.

15        THE WITNESS:  Sure.

16   BY MR. TORRES:

17   **Q.   Are you familiar with the term exposure?**

18   A.   As an industrial hygienist, yes.

19   **Q.   Are you acting as an exposure expert in**

20   **this case?**

21   A.   Well, I guess that would depend on the

22   definition.  Industrial hygienists view exposure as

23   the impact from the environment, whether it's work

24   or ambient.

25   **Q.   Work or ambient?**

Page 16

1      A.   Yes.

2         Q.   **Are you familiar with the Manual on**

3   **Scientific Evidence?**

4      A.   I've seen it, yes.

5         Q.   **Are you familiar with the reference guide**

6   **on exposure science in that book?**

7      A.   I've seen it, yes.

8         Q.   **Is that the type of opinion you are**

9   **rendering that would fall into the meanings within**

10   **that reference guide?**

11              MS. HOGAN:  Objection, lack of

12         foundation.

13              THE WITNESS:  The -- I don't -- I

14         can't say I'm familiar with all the

15         references in that -- in that document.  My

16         participation here was to glean some -- an

17         idea, if you will, with regards to the

18         historic impact of air quality on

19         Mrs. Williams in her -- in her residence

20         basically.

21   BY MR. TORRES:

22         Q.   **You used the word glean, what do you mean**

23   **by glean?**

24      A.   Probably poor choice of words.  To take a

25   measurement or any environmental measurements that

Page 17

1    would provide, if you will, an archiveable view of

2    past exposure.

3         **Q.   How far does that archiveable view go**

4    **back?**

5         A.   Well, in the case -- in the case of the

6    five locations we sampled, I think, if I remember

7    correctly, approximately 62 years.

8         **Q.   And is that based on the age of the**

9    **buildings?**

10        A.   Of the attics, yes.

11        **Q.   Is it based on anything else?**

12        A.   That's the reference for age that we have.

13        **Q.   No other reference?**

14        A.   No.

15        **Q.   Mr. Ungers, have you been deposed before?**

16        A.   Yes, sir.

17        **Q.   How long ago was the first time?**

18        A.   I'm going to say approximately 20 years

19    ago.

20        **Q.   Okay.  When was the last time before this**

21    **deposition?**

22        A.   If I remember correctly, two years ago.

23        **Q.   Do you remember what case that was?**

24        A.   It was an asbestos case in New Orleans.

25        **Q.   Have you testified at trial before?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 18

 1          A.    Yes, sir.

 2          Q.    **When was the last time you testified at**

 3    **trial?**

 4          A.    If memory serves me, 2008.

 5          Q.    **Were you testifying as a plaintiff or --**

 6    **for the plaintiff or for the defendant?**

 7          A.    In that case for the defendant.

 8          Q.    **The asbestos case two years ago, was that**

 9    **for the plaintiff or for the defendant?**

10          A.    That was for the defendant.

11          Q.    **When was the last time you testified as an**

12    **expert for a plaintiff?**

13          A.    I think it's been approximately ten years,

14    maybe a little longer.

15          Q.    **Have you ever been excluded as an expert?**

16          A.    No, sir, not to my knowledge.

17          Q.    **Have you ever met the plaintiff in this**

18    **case?**

19          A.    Yes, I have.

20          Q.    **When was that?**

21          A.    On the occasion we visited her home.  I

22    don't remember the exact date.

23          Q.    **Was it a year ago, two years ago?**

24          A.    Approximately a year ago.

25          Q.    **Do you remember it being summer, what**

Page 19

1    season it was?

2        A.   It's Florida.  No, sir, I don't.  It was

3    warm.  I don't remember.

4        Q.   How about when you left here, you flew

5    from here to there?

6        A.   I don't.  Yeah, I did, but I don't

7    remember.

8        Q.   And did someone introduce you to the

9    plaintiff?

10       A.   Yes, I believe either Laureen or Mary

11   Ellen were present.

12       Q.   What is the plaintiff's name?

13       A.   Rhonda Williams.

14       Q.   And can you describe her?

15       A.   She's an African-American lady.  I'm

16   terrible at judging height, so under six foot for

17   sure, and middle-aged.

18       Q.   Have you ever communicated with her

19   outside of that meeting?

20       A.   No, sir, that's the only time.

21       Q.   You met her once.  How long did that

22   meeting last?

23       A.   Under a half hour.

24       Q.   And you said you met her in her home,

25   correct?

Page 20

1      A.    Yes.

2      Q.    **Did you inspect the house at that time?**

3      A.    No, I did not.

4      Q.    **Did you ever inspect the house?**

5      A.    Yes.

6      Q.    **When was that?**

7      A.    I had a visit prior to that where we

8  toured the sites in the -- in the study.

9      Q.    **What do you mean by toured the sites in**

10 **the study?**

11     A.    Well, it was necessary for my sampling to

12 identify potential sites where we could collect both

13 the soil and dust, so I toured the neighborhood at

14 that time looking and we stopped at her residence

15 too.

16     Q.    **Did you go inside the house at that time?**

17     A.    I did not, no.

18     Q.    **Have you ever been in her attic?**

19     A.    No, I have not, no.

20     Q.    **Have you ever been in any of the attics of**

21 **the sample sites?**

22     A.    No.

23     Q.    **Why not?**

24     A.    I -- I employed Rob Lands, who is also a

25 board certified industrial hygienist, conducted the

Page 21

1    sampling.

2         Q.   Could you please spell his name?

3         A.   Sure.  R O B S (sic) and last name is

4    Lands, L A N D S.

5         Q.   What is Mr. Lands' phone number?

6         A.   It would be the same phone number as my

7    business address, it's (513)579-9899.

8         Q.   When did Mr. Lands inspect Miss Williams'

9    home?

10        A.   Counselor, that will be on my field notes.

11   As I sit here, I don't recall the date.  I should

12   say in Rob's field notes, our field notes.

13        Q.   Were Mr. Lands' field notes produced?

14        A.   Yes, sir.

15        Q.   Was it Mr. Lands who collected the

16   samples?

17        A.   Yes.  He collected at four of the sites

18   and Ben Mink collected them at the last site.

19        Q.   Is Ben Mink Dr. Mink?

20        A.   No.

21        Q.   Okay.  Who is Ben Mink?

22        A.   He's a consultant in the Tampa area.

23        Q.   What sites did Mr. Mink -- did Ben Mink

24   collect?

25        A.   I -- I don't recall as we sit here.

Page 22

1      Q.   Did Mr. Lands collect the sample at

2  Miss Williams' home?

3      A.   Yes.

4      Q.   Mr. Ungers, did you ever assist with any

5  discovery responses in this case?

6      A.   I'm not sure.  Can you explain that,

7  Counselor?  I'm not sure what you mean.

8      Q.   Did you assist in answering

9  interrogatories in this case?

10     A.   I think I provided information.  I didn't

11  directly answer them.

12     Q.   Do you know what information you provided?

13     A.   As we sit here, I don't recall.

14     Q.   Do you recall who asked you to provide

15  information?

16     A.   Not specific.  It would have been either

17  Laureen or Mary Ellen.

18     Q.   Outside of them, did you confer with

19  anyone regarding the information you provided?

20     A.   No.

21     Q.   Do you recall keeping any notes regarding

22  the information you provided?

23     A.   I don't believe I did, no.

24     Q.   How did you provide the information?

25     A.   It would have been references.

Page 23

1       Q.      Anything else?

2       A.      As I sit here, I might have developed a

3   summary of my -- my opinion on things, but I'm not

4   really sure.

5       Q.      In working in this case, Mr. Unger -- Mr.

6   Ungers, excuse me.

7       A.      That's okay.

8       Q.      -- is there any way you recorded your

9   observations or thoughts outside of the report?

10      A.      No.

11      Q.      Did you take any notes in preparation of

12  your report?

13      A.      No.

14      Q.      Have you destroyed or discarded any items

15  used in connection with the preparation of your

16  report?

17      A.      No.

18      Q.      Outside of the attorneys, Miss Hogan,

19  Miss Galeoto and Mr. Walker, have you communicated

20  with anyone about the work you've done in this case?

21      A.      Only my employees.

22      Q.      And who are those?

23      A.      That would be Rob Lands and Chris

24  Thompson.

25      Q.      Chris Thompson?

Page 24

1      A.   Thompson, yes, sir.

2      Q.   **What is Mr. Lands' position in your**

3  **company?**

4      A.   He's manager of industrial hygiene.

5      Q.   **And Mr. Thompson?**

6      A.   He's just an industrial hygienist.

7      Q.   **What was the form of your communications**

8  **with Mr. Lands?**

9      A.   Primarily directions in taking the

10 samples.

11     Q.   **How did you provide those directions?**

12     A.   Verbally.

13     Q.   **And your communications with Mr. Thompson?**

14     A.   Would have been the same.

15     Q.   **Verbal?**

16     A.   Yes, sir.

17     Q.   **Do you ever email with Mr. Lands?**

18     A.   Yes.

19     Q.   **Did you email with him in this case?**

20     A.   Not to my recollection, no.

21     Q.   **And did you ever email -- do you email**

22 **with Mr. Thompson?**

23     A.   I do.

24     Q.   **And did you ever email in connection with**

25 **this case?**

Page 25

```
 1        A.   Not to my recollection, no.

 2        Q.   Were any facts or data that you considered

 3   in your report provided to you by counsel?

 4        A.   Yes.

 5        Q.   What -- what facts or data did they

 6   provide?

 7                  MS. HOGAN:  Wait.

 8                  MR. TORRES:  It's Rule 26.

 9                  MS. HOGAN:  I understand.  I'm just

10            thinking about the question though.

11                  MR. TORRES:  Okay.

12                  MS. HOGAN:  We'll -- we'll go piece

13            by piece with that, Mr. Ungers.

14                  THE WITNESS:  I don't know if I

15            characterize them as facts or data.

16            Information from documents were provided.

17   BY MR. TORRES:

18        Q.   Documents were provided.  What documents

19   were provided?

20        A.   I don't know if I can recall them all.

21   They would be listed in my references to my opinion.

22        Q.   So the references listed in your opinion

23   is the universe of what you considered to render

24   your opinion, correct?

25        A.   Well, no, I mean, I rely on my education
```

Page 26

1    and background, experience, yeah.

2         Q.   Of course.  Of course.  But in terms of --

3    in terms of tangible data or information.

4         A.   As I sit here, that's the basis for my

5    opinion.

6         Q.   Were there any assumptions that counsel

7    provided you that you relied on in forming your

8    opinions?

9         A.   No.

10        Q.   Have you worked in any other cases that

11   you would consider to be similar to the one you're

12   working on now?

13             MS. HOGAN:  Objection, vague.

14             THE WITNESS:  Yes.

15   BY MR. TORRES:

16        Q.   What -- what cases are those, sir?

17        A.   Two come to mind.  It was a fugitive dust

18   case in Ohio.

19        Q.   Do you remember the name of that action?

20        A.   No, I don't.  It was a very long time ago.

21        Q.   How long ago?

22        A.   Probably around 20 years ago.

23        Q.   Okay.  Any others?

24        A.   Yes, a case for an industrial source in

25   Louisiana.

Page 27

1    Q.    What is the name of that case?

2    A.    Again, it's been a long time, Counselor, I

3    don't remember.  It was over ten years ago.

4    Q.    How is the fugitive dust case similar?

5    A.    There were emissions from a commercial

6    source impacting the local community.

7    Q.    And what type of opinions did you render

8    in that case?

9    A.    We took monitoring data during the

10   operations and we rendered opinions based on that.

11   Q.    Where was the monitoring data collected?

12   A.    Geographically?

13   Q.    In relationship to the facility.

14   A.    It was downwind of the facility.

15   Q.    Do you remember how far?

16   A.    There were several locations from, I would

17   say, what would be considered fence line to maybe a

18   quarter mile away.

19   Q.    And in the industrial source in the

20   Louisiana case, what -- what did you do there?

21   A.    I worked for the defense and we reviewed

22   documents provided by the plaintiff's side.

23   Q.    Did you render an opinion in that case?

24   A.    No.

25   Q.    Were you asked to?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                              Page 28

1        A.    Didn't get that far.

2        Q.    Did you form an opinion in reviewing those

3   documents?

4        A.    Yes.

5        Q.    What was that?

6        A.    It was based on methodology.  I found the

7   other side's methodology to be weak in the -- excuse

8   me -- the implementation of the methodology.

9        Q.    Was the -- I'm not sure I heard the

10  answer.  Was the methodology an issue?

11       A.    No.

12       Q.    It was the implementation of the

13  methodology?

14       A.    Yes.

15       Q.    What methodology did they -- plaintiffs

16  use in that case?

17       A.    They did indoor dust sampling.

18       Q.    And what was the problem with the

19  implementation?

20       A.    Wrong equipment, inadequate sample sizes.

21       Q.    How many samples?

22       A.    Collectively I don't remember.

23       Q.    Do you know what constituents were

24  sampled?

25       A.    They were organics.

Page 29

1      Q.    You don't remember the specific
2   constituents?
3      A.    No, sir, I don't.
4      Q.    Okay.  In the -- how did you conclude that
5   the sample size wasn't adequate?
6      A.    It was in -- one.  They only took one
7   sample to characterize anything.
8      Q.    And what was the issue with the collection
9   in that case?
10     A.    They used improper equipment.  There's --
11  it wasn't the standardized equipment used for the
12  sample collection.
13     Q.    Do you remember what they used?
14     A.    I think there were several of them.  They
15  used a vacuum cleaner.  I think they used some
16  surface wipes.  May have been another one, but I
17  can't -- I don't recall right now.
18     Q.    And from both the vacuum cleaner and the
19  surface wipes, they were only able to take one
20  sample?
21     A.    Yes, able.  They could have taken more.
22  They only took one sample.
23     Q.    The fugitive dust case in Ohio, did you
24  render an opinion in that case?
25     A.    Yes.

Page 30

1      Q.    And what was that opinion?

2      A.    That the source impacted the receptor and

3  basically the community.

4      Q.    Were you working for -- were you retained

5  by the plaintiff or the defendant in that case?

6      A.    I was retained by the plaintiff and then

7  it was given to the county prosecutor.

8      Q.    Do you remember the -- the operator in

9  that case?

10     A.    I don't, no, sir.

11           (Thereupon, Ungers Exhibit No. 1,

12  expert opinion of Leslie J. Ungers, was marked for

13  purposes of identification.)

14           MR. TORRES:  Mary Ellen.

15           MS. HOGAN:  Thank you.

16  BY MR. TORRES:

17     Q.    Mr. Ungers, I'm handing you Exhibit No. 1.

18  Do you recognize it?

19     A.    This appears to be my written opinion.

20     Q.    Did you author Exhibit 1?

21     A.    Yes.

22           MS. HOGAN:  For the record, Chris, do

23        you want me to put the Bates number in or

24        do you?

25           MR. TORRES:  This is -- for the

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 31

1            record Exhibit 1 is Ungers_010902 through

2            Ungers_010923.

3                    MS. HOGAN:   Thank you.

4                    (Thereupon, Ungers Exhibit No. 2,

5      elemental and radiochemistry of settled dust and

6      surface soil study dated September 2014, was marked

7      for purposes of identification.)

8      BY MR. TORRES:

9            Q.   Mr. Ungers, I also just handed you Exhibit

10     No. 2, Bates labeled Williams_001734 through

11     Williams_001766.  Do you recognize that document?

12           A.   Yes.

13           Q.   And what is it?

14           A.   It's a draft of my sampling report.

15           Q.   Did you author it?

16           A.   Yes.

17           Q.   Did anyone assist you in writing your

18     report, Exhibit 1?

19           A.   No.

20           Q.   Did anyone assist you in writing the soil

21     study, Exhibit No. 2?

22           A.   No.

23           Q.   Can you explain the process by which you

24     prepared Exhibit 1?

25           A.   This would be my written report?

Page 32

1    Q.    Yes.

2    A.    My process is to present my credentials

3    and then an outline and summary of my opinion in the

4    case and end it with the references that form that

5    opinion.

6    Q.    Did you type it yourself?

7    A.    Yes.

8    Q.    Straight type or dictate?

9    A.    Straight.

10   Q.    And what was the process by which you

11   prepared Exhibit 2, the soil study?

12   A.    Sure.  In this case we had actual

13   measurements, so the measurements were tabulated,

14   and I drafted a description of the process that took

15   place, the methods that were employed.

16   Q.    Who provided the measurements?

17   A.    I'm not sure I understand, Counselor.

18   Q.    Where did you get the measurements from?

19   A.    These are the results of the sampling that

20   was -- that were conducted at Mrs. Williams'

21   residence and four other locations in Hillsborough.

22   Q.    And was that Mr. Lands who prepared the

23   sampling results?

24   A.    Yes.

25   Q.    Anyone else?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 33

1       A.    Again, Mr. Mink would have had a hand in

2  one of them.

3       Q.    **And who prepared the tables in the soil**

4  **study?**

5       A.    Sure.   The -- that settled dust and soil

6  study were primarily prepared by Mr. Thompson and

7  Mr. Lands.

8       Q.    **Are Mr. Thompson and Mr. Lands still**

9  **employed by you?**

10      A.    Yes, sir.

11      Q.    **Mr. Ungers, when did you prepare Exhibit**

12  **1?**

13      A.    I need to look at the date it was signed,

14  just prior to April 15th, 2015.

15      Q.    **And when did you prepare Exhibit No. 2?**

16      A.    Again, that would have been prior and

17  during September 2014.

18      Q.    **How long did it take you to prepare**

19  **Exhibit 1?**

20      A.    Oh, Counselor, I don't recall.

21      Q.    **How long did it take you to prepare**

22  **Exhibit 2?**

23      A.    Well, if you take it from the point of

24  conducting the surveys, approximately a year.

25                    (Thereupon, Ungers Exhibit No. 3,

Page 34

1   elemental and radiochemistry of settled dust and

2   surface soil study dated March 2015, was marked for

3   purposes of identification.)

4   BY MR. TORRES:

5       Q.   Mr. Ungers, I'm handing you Exhibit No. 3,

6   Bates labeled Ungers_010887 through Ungers_010901.

7   Do you recognize Exhibit 3?

8       A.   I do.

9       Q.   And what is it?

10      A.   This is a partial -- first 15 pages of the

11  final report and that would be the settled dust and

12  the surface soil report.

13      Q.   And when was this Exhibit 3 prepared?

14      A.   Again, I'll have to look at the cover

15  sheet.  It was prior to or during March of 2015.

16      Q.   And what compelled you to create Exhibit

17  3?

18      A.   I didn't -- it wasn't created, per se.  It

19  was the corrections of typos in transcriptions from

20  Exhibit 2.

21      Q.   Now, Mr. Ungers, Exhibit 3 was prepared --

22  was at least produced to me without Appendix A or

23  Appendix B.  Do you know why?

24      A.   No.

25      Q.   Was there an Appendix A and Appendix B?

Page 35

1     A.    As I recall, yes, and they were different

2  pages, yes.

3     **Q.    Were they revised as well?**

4     A.    These were the tables where there had been

5  transcription errors.

6     **Q.    Appendix A and Appendix B contained**

7  **transcription errors?**

8     A.    From the draft, yes.

9     **Q.    Were they only transcription errors?**

10    A.    Yes.

11    **Q.    There were no arithmetic errors?**

12    A.    Oh, there might have been a couple

13  arithmetic errors, yes.

14    **Q.    A couple?**

15    A.    I don't know the exact count, Counselor.

16    **Q.    And with respect to the tables, Tables 1**

17  **through Table 7, were there any corrections in the**

18  **tables that were made between Exhibit 2 and Exhibit**

19  **3?**

20    A.    As I recall, there were changes in the

21  transcription of data, which may have affected some

22  of the averages.

23    **Q.    Are those the only things that needed to**

24  **be corrected?**

25    A.    I would have to make a direct comparison

Page 36

1    of the two, Counselor, but that's -- substantially

2    that's my memory, that's what we needed to correct.

3    We had some decisions as to whether to report the

4    detection limits specifically using imputed values

5    or whether we went with the asterisks.  That

6    information is all available.  It's -- it's in my

7    references, but I think that was the only change

8    that I recall right now.  It made the tables easier

9    to read.

10        Q.   Take a look at Exhibit 1.

11        A.   Okay.

12        Q.   And we're looking at the first page,

13   Ungers_010902.

14        A.   Yes.

15        Q.   And this is all accurate, you worked as a

16   consultant and expert to NIOSH?

17        A.   Yes.

18        Q.   N I O S H.  And to OSHA?

19        A.   Yes.

20        Q.   O S H A.  And to the Department of the

21   Army?

22        A.   Yes.

23        Q.   And to the EPA?

24        A.   Yes.

25        Q.   The Environmental Protection Agency,

Page 37

1    correct?

2         A.    Correct.

3         Q.    Okay.  At the bottom of that page you

4    write specifically my experience also includes

5    source characterization, emission inventories, and

6    dispersion modeling of criteria airborne pollutants,

7    fugitive dust, and heavy metals; is that correct?

8         A.    That's correct, yes.

9         Q.    Did you do any dispersion modeling in this

10   case?

11        A.    No, I did not.

12        Q.    Why not?

13        A.    It wasn't appropriate for the information

14   we needed.  We needed to characterize the impact

15   historically.  At the time we didn't have the

16   information from Mosaic.  I don't know that we had

17   it in discovery.

18        Q.    What information did you need?

19        A.    Would I have needed?

20        Q.    Um-hmm.

21        A.    I would not have done the dispersion

22   modeling myself, I probably would have subbed that

23   out, but we would have needed historical data back

24   to the early part of Mrs. Williams' life, which I

25   believe is the mid '60s.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 38

1      Q.    What data would you have needed?

2      A.    Oh, there's quite a bit.  Emissions data

3   for both point area sources, the wind rose

4   information across those -- I think she's 49, 49

5   years, stack heights, the type of pollution control

6   that was present at the time, the amount of

7   phosphogypsum that was being handled and stockpiled,

8   the type of equipment used, type of conveyance on --

9   on the plant, number of fugitive dust sources.

10  There's probably more, but that's what comes to

11  mind.

12     Q.    Now, are you suggesting that none of that

13  information was available to you?

14     A.    Not to my knowledge, no.  When you say

15  none, I know some was available through permitting,

16  but not -- not that far back and I've not seen

17  anything on fugitive emissions.

18     Q.    How far back does the permitting data go?

19     A.    In general or specific for Mosaic?

20     Q.    Specific for Mosaic in this case.

21     A.    I don't recall exactly.

22     Q.    Did you look?

23     A.    Yes.

24     Q.    Okay.  And you don't remember?

25     A.    I don't remember as I sit here today, no.

Page 39

1    Q.   **When you looked for data regarding Mosaic,**
2  **what type of data did you find?**

3    A.   Well, I think it's identified in the

4  references in my report.  As I recall, the

5  permitting was pretty much the current Title V or

6  recent Title V permit summaries.  There might have

7  been some earlier ones.  I didn't see anything on

8  fugitive dust emissions.  I saw the normal

9  compliance data for point sources.

10    Q.   **So you saw point source emission data,**
11  **correct?**

12    A.   I did see some, yes.

13    Q.   **Did you ever see wind rose data?**

14    A.   Yes, I did see wind rose data, not in the

15  permits.

16    Q.   **Of course.  But it's publicly available**
17  **data, correct?**

18    A.   It is publicly available data, yes.

19         MR. TORRES:  Can we go back a few

20      lines?

21  BY MR. TORRES:

22    Q.   **And why did you determine that -- on what**
23  **grounds did you determine that air dispersion**
24  **modeling was inappropriate in this case?**

25         MS. HOGAN:  Objection, lacks

Page 40

1              foundation, ambiguous.

2    BY MR. TORRES:

3         **Q.    You can answer.**

4         A.    Well, modeling certainly has its place,

5    but it is in essence an estimate.  And we were

6    interested in the long-term conditions of the air

7    quality in central Hillsborough County.  The

8    technique that sample -- individuals that do

9    sampling characterize that as use of attic dust

10   as -- as a historical archive of the impact of air

11   quality.  So I wouldn't choose normally to even use

12   dispersion modeling because it's an estimate.  So we

13   chose to do the area -- or the attic sampling.

14        **Q.    When you say central Hillsborough, what**

15   **area do you mean?**

16        A.    Well, I think I used that as a general

17   term.  We were of course interested in Mrs. Williams

18   and her neighborhood, but I would consider central

19   Hillsborough as described, not the northern end and

20   not the southern end, but the central part of it.

21   Around the location of Mosaic.

22        **Q.    Around the location of the Riverview**

23   **facility, correct?**

24        A.    Of the Riverview facility, yeah, that

25   would be fair.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 41

1        Q.    And how far a radius around the Riverview

2   facility did you consider?

3        A.    I don't know if I put a limit on it.

4        Q.    It wasn't infinite?

5        A.    No, it was definitely Hillsborough County,

6   yeah.

7        Q.    On page two of your report, Ungers_010903,

8   you write in the first paragraph I participated in

9   air quality modeling and the determination of

10  compliance with air quality standards for Atlanta,

11  Chattanooga, Tampa, New Orleans and Miami

12  metropolitan areas, correct?

13       A.    That's correct, yes.

14       Q.    What type of air quality modeling did you

15  perform -- or did you participate in?  Forgive me.

16       A.    Sure.  We used the regional air quality

17  modeling that EPA prescribed, this is not current,

18  but in previous documents, for determining air

19  quality in the -- during their development of state

20  implementation programs that would be submitted to

21  Region IV.

22       Q.    Why was air quality -- quality modeling

23  appropriate for determining compliance with air

24  quality standards for those cities?

25                  MS. HOGAN:  Let me hear the question

Page 42

1          again, please.

2                    MR. TORRES:  You can read it back.

3                    (Thereupon, the record was read back

4     by the court reporter.)

5                    MS. HOGAN:  Objection, lacks

6               foundation.

7     BY MR. TORRES:

8          Q.    **You can answer.**

9          A.    Early on, and this would have been done in

10    the '70s and '80s, the federal EPA set out the

11    requirements for the states in development of their

12    implementation programs and I was a contractor to

13    that effort through Region IV, so this was

14    prescribed by the US EPA at that time.

15         Q.    **Was -- was it an appropriate prescription**

16    **to determine air quality standards for those cities?**

17                    MS. HOGAN:  Objection, lacks

18               foundation.

19                    THE WITNESS:  It was the one that was

20               required.  There was at that time great

21               debate between whether they were going to

22               set up air monitoring to characterize all

23               of the metropolitan or source points and/or

24               modeling.

25    BY MR. TORRES:

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 43

1      Q.   Do you know what modeling -- what model

2  they used?

3      A.   The RAM model was used for several of

4  these.  The industrial source complex model may have

5  been used for some of the later ones.

6      Q.   In the next sentence you write this work

7  included site inspections, emissions calculations,

8  emissions inventories, and dispersion modeling of

9  process-related particulates, fugitive dust, and

10  sulfur dioxide.  You see that?

11      A.   Yes.  Correct.

12      Q.   Is there a difference -- is dispersion

13  modeling inappropriate for determining air

14  concentrations of sulfur dioxide?

15      A.   Well, it estimates.  It doesn't determine.

16  The only thing that determines this is air

17  monitoring.  Again, the modeling is an algorithm.

18  It's an estimate of what might be.  The air

19  monitoring is what it is.

20      Q.   Are you familiar with AERMOD?

21      A.   I am, yes.

22      Q.   And AERMOD is a generally accepted model,

23  correct?

24      A.   It is the current prescribed model by EPA

25  for use in some situations, yes.

Page 44

1      Q.    EPA says use it?

2      A.    That's my under -- that's my reading of

3   the documents, yes.

4      Q.    Okay.  So in this case you did no

5   dispersion modeling whatsoever not for particulates,

6   correct?

7      A.    No.

8      Q.    Not for fugitive dust, correct?

9      A.    No.

10      Q.    And not for sulfur dioxide, correct?

11      A.    Correct.

12      Q.    Okay.  Are you familiar with the document

13   called the Technical Support Document?

14      A.    I am.

15      Q.    Did you review that document?

16      A.    It's been a while, but I have seen it,

17   yes.

18      Q.    Page three of your report, Mr. Ungers --

19      A.    Yes.

20      Q.    -- marked Ungers_010904.  Are any of the

21   cases that are listed on this list similar to the

22   case that you are working on now?

23      A.    Let me just review these a second.

24      Q.    Take your time.

25      A.    No.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 45

1      Q.    And this is accurate you have not

2    testified on the plaintiff's side for the last ten

3    years outside of this case, correct?

4      A.    To the best of my records, yes.

5      Q.    Let's turn to page four of your report,

6    please, marked Ungers_010905.  Let's look at the

7    paragraph entitled Basis for Opinions first.

8      A.    Sure.

9      Q.    You write my opinions are based in part on

10   my inspection of the plaintiff's home and

11   neighborhood, along with surface and soil sampling

12   conducted at properties in central Hillsborough

13   County; is that right?

14     A.    That's correct, yes.

15     Q.    Can you describe your inspection of the

16   plaintiff's home?

17     A.    Yeah, my inspection of the plaintiff's

18   home was -- was constrained or limited, if you will,

19   to the location and the construction and the nature

20   of the -- of the community, if you will, of the

21   surrounding area.

22     Q.    So what did you actually do when you

23   inspected her home?

24     A.    Well, it was my -- I was in the process of

25   selecting the locations for our sampling for my

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 46

1   associates to go in and conduct the actual samples.

2        **Q.    So all you did was select her home as one**

3   **of the sampling locations, correct?**

4        A.    Well, no.  I mean, I selected the sampling

5   methods.  I prescribed the analytical approach to be

6   used.  I gave my employees, as I said, direction on

7   how to collect them.  I just did not physically

8   collect them.

9        **Q.    Was there anything else you did with**

10  **respect to the inspection of her home?**

11       A.    Well, my focus on the inspection was to

12  try and characterize a like population of homes for

13  the attic sampling effort and that's what I

14  achieved -- that's what my purpose was and that's

15  what I did.

16       **Q.    How did you make that determination of**

17  **what was a like sampling?**

18       A.    Well, the construction of the homes, the

19  type of roofs that were present and roughly the ages

20  of the homes.

21       **Q.    So did you look at her home from the**

22  **outside and say -- did you inspect her home from the**

23  **outside or did you inspect her home from the inside?**

24       A.    From the inside -- or excuse me, from the

25  outside.

Page 47

1    **Q.    You did not inspect the home from the**
2    **inside?**

3        A.    No.

4    **Q.    Have you ever been in Miss Williams'**
5    **kitchen?**

6        A.    No, I have not.

7    **Q.    You've certainly never been in her attic,**
8    **correct?**

9        A.    No, I have not been in her attic, no.

10   **Q.    You stood in her yard?**

11       A.    I walked -- I walked her yard, yes.

12   **Q.    Okay.   And what else did you inspect in**
13   **the neighborhood?**

14       A.    We had identified through Google Earth
15   early on structures of a similar nature to Mrs.
16   Williams' home.   Again, we wanted to make sure that
17   we had as best we could structures of similar age,
18   similar construction design.   And then from the
19   survey of what we felt would be available structures
20   to us, we -- I then toured to inspect externally, if
21   you will, each one of them.   From that, that formed
22   the basis of our pool of prospective locations to
23   sample.

24   **Q.    In the second sentence, last clause reads**
25   **my understanding and analysis of peer-reviewed**

Page 48

1    scientific literature, government publications, air

2    sampling data, standards, and guidelines.  Do you

3    see that?

4         A.   Yes.

5         Q.   Are all the air sampling data you relied

6    on listed in your appendix of --

7                   MR. WALKER:  Chris, what page are you

8         referring to, please?

9                   MR. TORRES:  -- reliance materials --

10        010920 -- Appendix B of your report?

11                  THE WITNESS:  Yes.

12   BY MR. TORRES:

13        Q.   And all the standards you referenced are

14   listed in Appendix B of your report?

15        A.   Well, again, Counselor, they are.  Of

16   course I'm going to -- on specific issues that your

17   expert may bring up or that may inform my report,

18   I'm going to rely on my -- on my memory, but I tried

19   to be all inclusive in that -- that and the

20   submittal of documents to your office.

21        Q.   I understand, sir.  My question is whether

22   all the standards you relied on are listed in

23   Appendix B of your report?

24        A.   Or the website where you can achieve them,

25   yes.

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Leslie Joseph Ungers

Page 49

1        Q.    Understood.  Fair enough.  And are all the

2    guidelines you relied on listed in Appendix B of

3    your report?

4        A.    I think there would be some basic

5    guidelines in air pollution and -- and hygiene that

6    would be part of my knowledge, I can elaborate on

7    it, but I think most of them specific in this case

8    would be there or the websites.

9        Q.    Now, is it -- am I correct when I read

10   your report that you provide four basic opinions,

11   which are Mosaic operations are a major source of

12   pollution, Mosaic-generated pollution includes the

13   emission of toxic substances and radioactive

14   isotopes, Mosaic-generated emissions impact --

15   Mosaic -- excuse me, Mosaic-generated emissions

16   impact the surrounding air quality, and

17   Mosaic-generated airborne pollutants contaminate

18   surrounding neighborhoods; is that accurate?

19       A.    Well, each of those summarize or are

20   informed by the paragraphs below, but yes.

21       Q.    Of course.  But those are the basic --

22   those are the basic categories of opinion you

23   rendered?

24       A.    Yes.

25       Q.    Basic opinions you rendered?

Page 50

1      A.    Yes.

2      **Q.    Okay.**

3            MS. HOGAN:  For the record his report

4      speaks for itself on precisely what his

5      opinions are.

6            MR. TORRES:  That's fine.

7            THE WITNESS:  Counselor, before we

8      get started, could we do a break?

9            MR. TORRES:  We absolutely can.

10           THE WITNESS:  I'm on a diuretic.

11           MR. TORRES:  Absolutely.

12           VIDEOGRAPHER:  Off the record.

13           (Off the record.)

14           VIDEOGRAPHER:  We're on the record.

15  BY MR. TORRES:

16      **Q.    Mr. Ungers, under the general category**

17  **Mosaic's operations are a major source of pollution**

18  **on page four of your report.  Do you see that?**

19      A.    Yes.

20      **Q.    You write Mosaic's operations are the**

21  **source of both particulate and gaseous pollutants**

22  **regulated under the National Ambient Air Quality**

23  **Standards, including carbon monoxide, oxides of**

24  **nitrogen, particulate, respirable particulate PM10,**

25  **sulfur dioxide.  Additionally, the operations at**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 51

1    Mosaic emit ammonia, sulfates and volatile organic

2    compounds.  Do you see that?

3         A.   Yes.

4         Q.   Where in your report are data relating to

5    carbon monoxide?

6         A.   The -- that statement is informed by

7    several sources here.  If you look at the first two

8    and possibly the fourth reference under Appendix B,

9    which is EPA's air pollution manual that generally

10   describes emissions from processes.  One's entitled

11   Inorganic Chemical Industry, Ammonia Phosphate.

12        Q.   That's the first one?

13        A.   That's the first one, yeah.  Inorganic

14   Chemical Industry, Sulfuric Acid, and then Mineral

15   Products Industry, Phosphate Rock Processing.

16        Q.   Okay.

17        A.   Okay.  The other one that comes to mind is

18   the second from the bottom, which is the 2003 Point

19   Source Emissions provided by the Environmental

20   Protection Commission of Hillsboro County.  And I

21   believe one of the documents you received today, The

22   Toxic Release Inventory would also expand on that.

23        Q.   Is The Toxic Release Inventory listed in

24   your list of references?

25        A.   I don't -- it would be one of the computer

Page 52

1   sites for the EPA, but it's not specifically broken

2   out, no.

3       Q.   **Which computer site, can you show me?**

4       A.   Let me see.  I don't see Appendix -- maybe

5   they're all in here.  Counselor, I just realize the

6   copy -- oh, I see.  Okay.  The copy I have is

7   incomplete.  Appendix A, I believe, if I'm recalling

8   right, is my resume, so we're missing page seven to

9   page 18.

10      Q.   **Yes, Appendix -- Appendix A --**

11      A.   Okay.

12      Q.   **-- I just separated it out.**

13      A.   That's fine.

14      Q.   **Now --**

15      A.   Yeah, I just couldn't remember if Appendix

16  A was further references or --

17      Q.   **I will hand you Appendix A and I will mark**

18  **it Ungers 4.**

19      A.   Okay.

20           (Thereupon, Ungers Exhibit No. 4,

21  expert opinion of Leslie J. Ungers, was marked for

22  purposes of identification.)

23           MR. WALKER:  Did any of the documents

24       you just handed him have a Bates stamp?

25           MR. TORRES:  Ungers_010908 through

Page 53

1           919.  Do you have that, Mary Ellen?

2                MS. HOGAN:   Thank you.

3      BY MR. TORRES:

4           Q.   Now, is the TRI anywhere in Appendix B?

5           A.   Well, Counselor, it would have been

6      available from these public information from the EPA

7      website, but I didn't spell it out specifically

8      here.

9           Q.   So the shorter answer is no, correct?

10          A.   Well, I said not specifically.

11          Q.   So it's not there?

12          A.   It's public information from the EPA

13     website.

14          Q.   I understand that.  But it's not listed,

15     correct?

16          A.   It's not specifically listed, no.

17          Q.   Thank you.  Is it listed in Exhibit 4,

18     your Appendix A?

19          A.   No, I don't believe so.

20          Q.   Is background data for carbon monoxide

21     identified anywhere in your report?

22          A.   Counselor, if memory serves me, I'm only

23     working from memory, I would like -- if we have

24     those references I would like to see them.  They're

25     either in AP-42 or in the 2003, again if memory

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 54

1    serves me right.

2         Q.   Well, you can look at Appendix B of your

3    report, which is your reliance materials?

4         A.   Yes.  As I said, as I sit here, I don't

5    recall if emission factors for that are provided in

6    AP-42.  As I sit here, I don't recall.  And I

7    believe that there was some carbon monoxide

8    emissions in 2003 if I'm correct.

9         Q.   Can you tell me which references in your

10   Appendix B you're referring to?

11        A.   It would have been the same that we just

12   mentioned earlier, the first --

13        Q.   The first two?

14        A.   The first two, the fourth, and the 2003

15   Point Source Emissions, if memory serves me right.

16        Q.   And are there any -- do you have any data

17   that you're referring to for any health-based

18   standards for carbon monoxide?

19        A.   I'm not sure I understand the question.

20        Q.   For oxides of nitrogen, what data are

21   provided in your report?

22        A.   For the -- for the criteria pollutants

23   described in the paragraph that we -- that you cited

24   under Bates stamp number 905.  These would be the --

25   with -- except for specific documents, like

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 55

1    technical support documents and ISO 2, I think it
2    would be the same three.
3          Q.    All of these documents --
4          A.    Or same four.
5          Q.    The same four documents for oxides of
6    nitrogen, correct?
7          A.    That's my recollection, yes, Counselor.
8          Q.    And for particulate matter?
9          A.    I believe that would be the same
10   documents.  I believe also though were informed by a
11   couple other documents, one of which is the Title V
12   permitting, which would inform us in some other ones
13   too, but Title V permitting record and that would
14   be --
15         Q.    What page is that on?
16         A.    Let me see here.  If memory serves me, it
17   would be on page 921.  It would be one, two, three,
18   four, five, six -- sixth reference down, Permit
19   Summary for Facility Identification.
20         Q.    Okay.
21         A.    Number -- and then going through this,
22   Counselor, I would generally add the Air Pollution
23   Engineering Manual, which is the last reference on
24   page 923.  And that would also be for any of the
25   other criteria, the pollutants.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 56

1        Q.   So that would -- the same would be true

2   for PM10?

3        A.   Yes.  I think though here I spelled only

4   particulate matter, but I do recall PM10 being

5   discussed in one or more of those.

6        Q.   Well, after particulate matter in your

7   report you also mention respirable particulate,

8   PM10?

9        A.   Yes, but I would like -- if you could show

10  me where you're of interest because it may entail a

11  different reference.

12       Q.   I'm asking you where the data is for

13  Mosaic's -- the respirable particulate or the PM10

14  you attribute to Mosaic?

15       A.   Okay.  That's fine.  Again, I would give

16  all those other references.  Let me look.  Yeah,

17  that would be the same references we mentioned

18  previously.

19       Q.   And what references do you list that

20  provide data with respect to Mosaic's sulfur dioxide

21  emissions?

22       A.   Again, it would be those if they address

23  it.  There would be the Technical Support Document,

24  TSD.  It's my --

25       Q.   I see it.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 57

1      A.    -- ninth one down.

2      Q.    **Thank you.**

3      A.    It would be the letter from Mr. Vinyard to

4   Mr. and Mrs. Fleming, I think.

5      Q.    **Yes.**

6            THE WITNESS:  Can I have the question

7         back, please?  I'm just not remembering it.

8            (Thereupon, the record was read back

9   by the court reporter.)

10            THE WITNESS:  As I sit here, I

11         remember it would be the second to the last

12         reference on Bates stamp number 923.

13            MR. TORRES:  Thank you.

14            THE WITNESS:  The letter from

15         Jellerson to Koerner -- Koerner, if I say

16         that right.  As I sit here, that's what

17         comes to mind.

18   BY MR. TORRES:

19      Q.    **And which references do you rely on for**

20   **data regarding ammonia?**

21      A.    Again, Counselor, if you want it, the

22   previous mentioned ones.

23      Q.    **Same, Inorganic Chemical Industry?**

24      A.    Yes.

25      Q.    **So the first one on page 20, the second**

Page 58

1    one on page 20?

2        A.    If it addresses the issue, yes.

3        Q.    Okay.  So you're not sure if it addresses

4    the issue?

5        A.    I would have to look at them and see where

6    the information came from.  That's my recollection.

7        Q.    The Mineral Products Industry reference?

8        A.    I don't know that that would have ammonia

9    in it.

10       Q.    Well, why don't you tell me which ones you

11   think will have ammonia in it?

12       A.    Well, Counselor, if I can see them because

13   I can't -- some of them are large documents.  I

14   don't recall specifically what they address in each

15   one.

16       Q.    And which documents in your list of

17   references address sulfate data?

18       A.    Again, I would have to take a look at them

19   if you want to say what specific ones.  As I sit

20   here, those are the ones that I believe would

21   include some comments or either emission factors or

22   emission rates or data.

23       Q.    Which ones?

24       A.    The ones we've mentioned, if they apply.

25   I would have to look at the documents, Counselor.

Page 59

1      Q.    So you're not certain?

2      A.    Excuse me?

3      Q.    You're not certain?

4      A.    As I sit here, no, I would have to look at

5   them.

6      Q.    And how about volatile organic compounds?

7      A.    Same thing.  I believe they would be in

8   one or more of those, but I can't tell you which one

9   with certainty.

10      Q.    Which documents listed in your reference

11   materials provide arsenic data?

12      A.    In terms -- there's several.  The primary

13   one that I relied on is the Phosphate Deposits of

14   the World, which would be five -- which would be the

15   fifth reference down.

16      Q.    I see that.  What others?

17      A.    I think that's it, Counselor.

18      Q.    Which references discuss cadmium, provide

19   cadmium data?

20      A.    Now, just as a point of clarification.

21   This is emissions or data from Mosaic?

22      Q.    Yes.

23      A.    Okay.  Again, that -- my -- my primary

24   reference there, if it's not identified in the AP-42

25   issue would be the central -- the phosphate chips in

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 60

1   Central Florida -- the Phosphate Deposits of the

2   World, excuse me.

3       Q.    And for the record which document here is

4   AP-42?

5       A.    AP-42 consists of the first reference on

6   921, the second and the fourth.  I believe those are

7   the only sections of AP-42 that I've cited here.

8       Q.    And what documents provide data on

9   chromium?

10      A.    Again, it would be that collection if they

11  address it and the Phosphate Deposits of the World.

12      Q.    Would the same be true for lead?

13      A.    The same group, yes.

14      Q.    And would the same be true for manganese?

15      A.    Yes.

16      Q.    And nickel?

17      A.    Yes.

18      Q.    And phosphorus?

19      A.    I think there may be additional references

20  on phosphorus.  Let me go through them.  Well,

21  there's a -- there's a newspaper article by Pitman,

22  but I think it just addresses the phosphate plant.

23  I don't think it addresses phosphorus if I remember.

24  All of the Chen articles on the end of 922 would --

25  would provide me information with regards to soils

Page 61

1    and arsenic.  And I don't know if that's what you

2    mean in your question or not.

3            The third from -- I can't pronounce the

4    gentleman's/the person's last name, the arsenic

5    distribution in Florida urban soils, which is third

6    from the bottom.

7        **Q.    I see it on page 21.**

8        A.    Right.  On page 923, the Ma study for

9    arsenic, the soil cleanup -- cleanup target levels.

10   These would apply to all of the elements that we

11   sampled in the attic dust or soil.  At least the

12   Rutherford articles on environmental impact of

13   phosphogypsum as far as that goes, and the Acrocena

14   on again trace elements and phosphogypsum, the

15   Kassir article, again I think that was primarily

16   interest with phosphate, but there were heavy metals

17   there, different metals there.  So all of those

18   actually would apply to any of the toxic elements

19   or, if you will, heavy metals that we're looking at.

20   I think the Tye article is an example of use of

21   attic dust around smelters, but it's informative at

22   least in the process.

23       **Q.    Which references provide background data**

24   **for these metals, arsenic, cadmium, chromium, lead,**

25   **manganese, nickel, phosphorus and zinc?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                        Page 62

 1        A.    Background in the sense in what media,
 2    Counselor?
 3        Q.    **Background in Florida soils.**
 4        A.    In Florida soils, all three of the Chen
 5    articles, which again are fourth from the bottom,
 6    third from the bottom -- excuse me, fourth from the
 7    bottom, second and first from the bottom on 922.
 8    Indirectly the soil cleanup target levels by the
 9    Florida Department of Environmental Quality on 923.
10    The Ma study on 923, the Acrocena study I believe
11    may deal with some of that.
12              MR. WALKER:  What page is that on,
13          Les?
14              THE WITNESS:  That would be on 923,
15          Bates stamped 010923.  As I'm going through
16          this, I think that's all of them.  Of
17          course, the soil sampling data we collected
18          on-site at the various locations.
19    BY MR. TORRES:
20        Q.    **Is there any -- are there any references**
21    **for background of attic dust for these constituents?**
22        A.    Not to my knowledge, no.
23        Q.    **Is there any reference -- are there any**
24    **references for background for any indoor dust for**
25    **these elements?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 63

1        A.   I mean, the -- the various articles, I

2   think, the Davis article, maybe the Ilacqua article

3   discuss the use of background, but the background

4   for -- in our case all the members that we sampled

5   in the attic were wood, the background for wood

6   would be zero, basically uncontaminated material

7   that's used to construct the attics.  Now, is it

8   absolute zero, no, I don't think so, but it's

9   essentially zero, certainly below our detection

10  limits.

11        **Q.   But there's no background for you to**

12  **compare against, correct?**

13             MS. HOGAN:  Objection,

14        mischaracterizes his prior answer.

15             THE WITNESS:  Yeah, I mean, there is.

16        The background would be a nondetect because

17        these are all building materials and they

18        don't appear in -- in commerce with this

19        level -- with this type of contamination.

20  BY MR. TORRES:

21        **Q.   So do you compare all of these metals that**

22  **are listed on page four of your report to zero?**

23        A.   No, you -- the -- the issue here is not

24  background, Counselor.  It's you don't have a

25  control, I think is what you really want to say, and

Page 64

1    we don't have that.  The protocol with attic -- the

2    attic dust methodology is to, if you will, take

3    out -- consider the local soil or regional soil

4    concentrations.  That's based on the belief that had

5    you had no human activity in the area, the only

6    contamination you would see on members in the attic

7    would be from the local soil, if you don't have

8    local soil samples, regional soil, and so that

9    establishes your background levels.

10        Q.    And what references do you cite to support

11   this proposition?

12        A.    Sure.  They were -- they were cited and

13   then tested in Ilacqua, in Davis, I believe they

14   developed it to the use of enrichment factors.

15   Ilacqua's on Bates stamp 010922.  It's the one, two,

16   three, four --

17        Q.    I see it.

18        A.    -- seventh one down.  Davis is the eighth.

19   And there are -- again, there are numerous

20   references that have established that technique in

21   determining background that would be sub-references

22   of these articles.  They go back a ways.

23        Q.    So the ones that I would look at are

24   Ilacqua and Davis, correct?

25        A.    That -- those two would discuss it.  Some

Page 65

 1  of the other ones may well have.  As I sit here, I

 2  don't recall.  I would have to look at the article.

 3      Q.   Are you familiar with the EPA Exposure

 4  Factors Handbook?

 5      A.   I've seen it, yes.

 6      Q.   Did you use it at all in preparing your

 7  report?

 8      A.   I didn't conduct an exposure assessment,

 9  so no.

10      Q.   Do you believe you collected data from

11  which an exposure assessment can be made?

12      A.   Yes.  I don't know the error around that

13  assessment, what it would be, but I suppose there is

14  a way to back it out.  I'm unfamiliar with the

15  technique that's established for that.

16      Q.   Did you say the air or the error?

17      A.   Error.

18      Q.   Error?

19      A.   Both methods have variability, so I'm

20  unfamiliar with that.  I don't do a lot of that

21  exposure assessment.

22      Q.   What references in your report tell us or

23  provide data on Mosaic being a major source of

24  pollution for the radioactive elements you list

25  here, lead, polonium, radium, thorium and uranium?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                              Page 66

1        A.    I believe item -- you say Mosaic?

2        Q.    **Um-hmm.**

3        A.    My use of that would be related to their

4    industry.  I don't know if I have any actual data

5    that Mosaic has provided to the regulatory agencies

6    or otherwise that indicates the levels of those

7    materials in there.

8        Q.    **Do you have any data related to Mosaic's**

9    **emitting radioactive elements?**

10       A.    Only in that that would be an expected

11   emission from those types of operations.

12       Q.    **But do you have any data?**

13       A.    Any actual data from Mosaic?

14       Q.    **Correct.**

15       A.    I don't recall any, no.

16       Q.    **If you had, would you have used it in your**

17   **calculations at all?**

18             MS. HOGAN:  Wait.  Let's hear the

19         question again, please.

20             (Thereupon, the record was read back

21   by the court reporter.)

22             THE WITNESS:  My calculations were

23         designed around the receptor, in this case

24         the attics and the soil, so it wouldn't be

25         used in my calculations.  There's no place

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Leslie Joseph Ungers

Page 67

1           for it.

2     BY MR. TORRES:

3           Q.    How do you know they came from Mosaic?

4           A.    The -- well, the -- you're talking about

5     the radioactivity in the soil?

6           Q.    Yes.

7           A.    Well, certainly there is some residual,

8     but Mosaic is the primary source of phosphogypsum in

9     my opinion exposure in the area.  It's one of the

10    major sources for particulate and the radioactive

11    constituents would be found in those types of

12    material.

13          Q.    Are there other sources for those

14    constituents or elements?

15          A.    Some of them, yes.  But they're associated

16    with certain decayed products of uranium and

17    sometimes radium.  And to my knowledge the biggest

18    source of that is the phosphate fertilizer

19    industry --

20          Q.    Is --

21          A.    -- in the county.

22          Q.    -- is -- is Mosaic the only source of

23    carbon monoxide emissions in Hillsborough County?

24          A.    No.

25          Q.    Is it the only source for oxides of

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

```
                                                      Page 68
 1   nitrogen emissions in the county?

 2        A.   Probably not, no.

 3        Q.   Is it the only source for particulate in

 4   Hillsborough County?

 5        A.   No, I think you can safely say they're

 6   not.

 7        Q.   Is it the only source for respirable

 8   particulate in the county?

 9        A.   No.

10        Q.   Is it the only source for sulfur dioxide

11   in the county?

12        A.   From the -- from the information, no.

13        Q.   Is it the only source for ammonia in the

14   county?

15        A.   That I'm not sure of.

16        Q.   Is it the only source for sulfates in the

17   county?

18        A.   No.

19        Q.   Is it the only source for volatile organic

20   compounds in the county?

21        A.   Probably not, no.

22        Q.   Is it the only source for arsenic in the

23   county?

24        A.   Probably not, no.

25        Q.   Is it the only source for cadmium in the
```

Page 69

1    county?

2         A.   Probably not.

3         **Q.   Is it the only source for chromium in the**

4    **county?**

5         A.   When you get down to some of the rarer

6    metals they could be.

7         **Q.   Is it the only source for lead in the**

8    **county?**

9         A.   They're the largest source for lead in the

10   county.

11        **Q.   Let me ask the question again.  Is it the**

12   **only source?**

13        A.   Only source, no.

14        **Q.   Is it the only source for manganese in the**

15   **county?**

16        A.   Probably not.

17        **Q.   The only source for nickel in the county?**

18        A.   Probably not.

19        **Q.   The only source for phosphorus in the**

20   **county?**

21        A.   Industrial source, probably.

22        **Q.   The only source for phosphorus in the**

23   **county?**

24        A.   Well, except other entities in their

25   industry.

Page 70

1      Q.   Is it the only source for zinc in the

2   county?

3      A.   Probably not.

4      Q.   Is it the only source for polonium in the

5   county?

6      A.   Again, Counselor, we're getting into rare

7   and it could well be, but I don't know.

8      Q.   Is it the only source for radium in the

9   county?

10      A.   No, probably not.

11      Q.   Is it the only source for thorium in the

12   county?

13      A.   Probably not.

14      Q.   Is it the only source for uranium in the

15   county?

16      A.   Probably not.

17      Q.   Okay.  What other sources are there for

18   carbon monoxide in the county?

19      A.   Well, I think it's fair to say that any

20   combustion source that's not properly operated is

21   going to provides CO, carbon monoxide.

22      Q.   And how about oxides of nitrogen, what

23   other sources are there for oxides of nitrogen?

24      A.   Off the top of my head power plants would

25   be one.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 71

1        Q.    And what other sources are there for
2    particulate?
3        A.    There's quite a few.  Most industrial
4    sources emit some form of particulate.
5        Q.    And --
6        A.    And of course there are natural sources of
7    particulate.
8        Q.    And what other sources are there for
9    respirable particulate in the county?
10       A.    They tend to be combustion sources, but
11   there are other combustion sources.
12       Q.    And what other sources for sulfur dioxide
13   emissions are there in the county?
14       A.    Any type of combustion source that uses a
15   fossil fuel, they usually have some sulfur dioxide
16   in them, emissions, yeah.
17       Q.    Thank you.  And what other sources for
18   ammonia in the county?
19       A.    I'm -- that I don't know that there are
20   other than Mosaic, but I can't say for sure.
21       Q.    And what other sources are there for
22   sulfates in the county?
23       A.    Again, probably combustion sources that
24   use fossil fuels.
25       Q.    And what other sources are there for

Page 72

1    volatile organic compounds in the county?

2         A.    Probably several industrial sources.

3         Q.    And what other sources are there for

4    arsenic in the county?

5         A.    Possibly some metal working operations.

6         Q.    And what other sources are there for

7    cadmium in the county?

8         A.    Again, that would probably be limited to

9    some type of metal working operations or -- or other

10   mining of phosphate.

11        Q.    And what other sources are there for

12   chromium in the county?

13        A.    I would say again the same answer.

14        Q.    And what other sources are there for lead

15   in the county?

16        A.    Probably there are a few again in that

17   industry or automotive in the past anyway.

18        Q.    And what other sources are there for

19   manganese in the county?

20        A.    Again, metals industry would be the likely

21   source.

22        Q.    And what other sources are there for

23   nickel in the county?

24        A.    Again, the same answer.

25        Q.    What other sources for phosphorus in the

Page 73

1    county?

2         A.   Of industrial sources, I'm not aware of

3    any, but there may be some.

4         Q.   And what other sources are there for zinc

5    in the county?

6         A.   Again, probably the metal operations.

7         Q.   And what other sources are there for

8    polonium in the county?

9         A.   That I don't know, Counselor.

10        Q.   And what other sources are there for

11   radium in the county?

12        A.   Again, I'm not sure about that.

13        Q.   And what other sources are there for

14   thorium in the county?

15        A.   I guess the radium and thorium would be

16   related to the same industry.

17        Q.   And what other sources are there for

18   uranium in the county?

19        A.   Again, the same industry.

20        Q.   And how did you determine that these

21   constituents that we just listed are Mosaic's

22   constituents?

23        A.   Well, we took the ingredients in the

24   phosphogypsum for Central Florida as referenced in

25   the fourth -- one, two, three, four, five -- fifth

                                                    Page 74

1    reference down on page 20.  And we did both a

2    parametric and nonparametric test comparison of

3    correlation with the results in the attic dust in

4    Mrs. Williams' attic and some of the other ones.

5    And -- and we have a -- a -- I won't say near

6    perfect, a very high correlation and a very high

7    confidence level.

8         Q.    **How high a correlation?**

9         A.    I believe it was around .8.

10        Q.    **And where is that data?**

11        A.    That was in one of the items we went

12   through this morning.

13        Q.    **I'm going to hand you what you gave me**

14   **this morning.**

15        A.    Yes.  Sure.  These are -- I take it these

16   are copies of all the same?  Okay.

17             MS. HOGAN:  Is there a question

18        pending?

19             MR. WALKER:  Can we identify the

20        document handed to the witness, if we have

21        not already?  Thank you.

22             MS. HOGAN:  For the record what was

23        handed to the witness is a series of

24        folders that we produced this morning.  He

25        is specifically looking at document Bates

Page 75

1          stamped Ungers 010938 through 010942.

2                    MR. WALKER:  Thank you.

3                    THE WITNESS:  I'm looking at -- let

4          me make sure I've got the right one,

5          Counselor.  This is Mrs. Williams' attic at

6          4810 South 87th Street.

7                    MR. TORRES:  All right.

8                    THE WITNESS:  It's Bates stamp number

9          010941.

10                   (Thereupon, Ungers Exhibit No. 5, set

11   of tables, was marked for purposes of

12   identification.)

13   BY MR. TORRES:

14        Q.   All right.  Let's hold on one second.  Let

15   me do this:  Why don't you hand me your pages and

16   I'm going to hand you the same pages, which I marked

17   as Exhibit 5.

18        A.   Okay.

19        Q.   So we'll just trade.

20        A.   Okay.

21        Q.   Thank you, sir.  Okay.  Now, you are

22   looking at Ungers_010941, I believe?

23        A.   Yes.

24        Q.   Is that right?

25        A.   Yes, it is, sir.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 76

1          Q.    Okay.

2               MS. HOGAN:   Let me grab one of the

3          other copies.

4               MR. TORRES:   I handed it to you.

5               MS. HOGAN:   Okay.  Thank you.

6               MR. TORRES:   You're welcome.

7    BY MR. TORRES:

8          Q.    And when did you prepare this document?

9          A.    This was prepared, I said earlier this

10   morning, I estimated about a month ago.  It may have

11   been a little sooner, but approximately a month ago.

12         Q.    Do you remember exactly when you prepared

13   it?

14         A.    No, sir, I don't.

15         Q.    If you went back to your office, is there

16   any way you would be able to determine when you

17   prepared it?

18         A.    I could probably ask one of my employees

19   who assisted me on it.  He may have a recollection,

20   but I think you would probably get the same answer,

21   but they may be helpful.

22         Q.    I assume you have this in an electronic

23   file, correct?

24         A.    I do on my computer, yes.

25         Q.    Would the electronic file have a creation

Page 77

1  date?

2      A.   It could, yes.  I only say could because

3  this is a software package provided by Vassar

4  College, and I don't know what the output is on the

5  product.

6      **Q.   Can you describe to me what the first**

7  **column of numbers is?**

8      A.   Yes, this is a -- the rank order of the

9  constituents for Spearman correlation coefficient

10  test.

11      **Q.   So number one is what?**

12      A.   That would be the -- the first rank order

13  in each of the X and Y.  X being the constituents in

14  phosphogypsum and Y being the constituents in the

15  attic of Mrs. Williams' home.

16      **Q.   And what is number two?**

17      A.   That would be the second rank.

18      **Q.   Second rank of which constituent?**

19      A.   We would have to go back and take a look

20  at that.  I don't -- I would have to go back and --

21  it would be indexed by the result in X and Y.  X

22  would be the -- the element in the phosphogypsum

23  reference in my report.  And the Y element would be

24  from Mrs. Williams' attic.  As I sit here today, the

25  software package sorts them based on rank, so I

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 78

1    would have to go back and look at those numbers to

2    tell you what's what.

3         **Q.   You have the numbers in your soil sample,**

4    **right?**

5         A.   Yes.

6         **Q.   So why don't you tell me -- why don't you**

7    **take a look at Miss Williams' and tell me what**

8    **constituent one is?**

9         A.   Constituent one?

10        **Q.   Uh-huh.**

11        A.   Sure.  Let me grab it.  The Y is -- in

12   Mrs. Williams' attic sample is aluminum.

13        **Q.   Which -- which documents are you looking**

14   **at in your soil study?**

15        A.   Oh, I'm sorry, Counselor.  Sure.  It's in

16   my final report, not my draft, although it's

17   probably in the draft.  It is Bates stamped 001751.

18             MR. WALKER:  Les, can you repeat that

19        last number, please?

20             THE WITNESS:  Sure.  It is Bates

21        stamped Williams_001751.

22   BY MR. TORRES:

23        **Q.   Okay.  So that is aluminum, correct?**

24        A.   Yes.

25             MS. HOGAN:  Wait, one moment though.

Page 79

1              Just to correct the record, we may be

2              looking at -- the first page of the

3              document correlates with this address?

4                   THE WITNESS:  No.  Mrs. Williams'

5              address, which is 4810 South 87th.

6                   MS. HOGAN:  Okay.

7    BY MR. TORRES:

8         Q.   **All right.  We are comparing, for the**

9    **record, document Ungers_010941 with document**

10   **Williams_001751; is that right?**

11        A.   Yes.

12        Q.   **Okay.  So constituent one in rank order on**

13   **Ungers_010941 is --**

14        A.   It's constituent one.  The rank order in X

15   is 25.  The rank order in Y is 27.  That's the way

16   it's presented.  So that's just the first -- first

17   row, I think, sir.

18        Q.   **First row, thank you.**

19        A.   Yeah.

20        Q.   **What -- what constituent is that?**

21        A.   That is aluminum.

22        Q.   **Aluminum?**

23        A.   Yes.

24        Q.   **Okay.  What constituent is row number two?**

25        A.   Let me look at -- can I have the reference

Page 80

1    for the phosphogypsum because we'll be able to find

2    it from there?

3         Q.    **You have to be more clear.**

4         A.    I'm sorry.  The -- yes, I do.  It's the

5    phosphogypsums of Central Florida reference in my --

6    you'll be able to determine it from -- should be

7    able to determine it from there.  Phosphate Deposits

8    of the World, Phosphate Rock Resources, it's a table

9    and it's part of my exhibit or --

10        Q.    **Is that document going to provide the data**

11   **point -- the -- the Figure 41.21?**

12        A.    No, it's going to provide the data point

13   111.  The 41 is probably an imputed value because if

14   we get below the text we use computed values in the

15   calculation.

16        Q.    **Well, how did you come up with an imputed**

17   **value?**

18        A.    It's in -- it's as referenced in my soil

19   report.  We use a convention dividing the textual

20   limit by two.

21        Q.    **So for all of the numbers on your**

22   **Williams_001751 --**

23        A.    Excuse me, Counselor, okay.

24        Q.    **-- that are not reportable?**

25        A.    Right.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

1      Q.    -- you created imputed values for on

2    document Ungers_010941?

3      A.    Yes, that's protocol to use for this

4    method, yes.

5      Q.    Is the same true for the not analyzed

6    constituents?

7      A.    No, if it wasn't analyzed, we would not

8    have considered it.

9      Q.    If it's not analyzed, it would not be on

10   Ungers_010941, correct?

11     A.    That's correct, yeah.

12     Q.    So explain to me the results of

13   Ungers_010941?

14     A.    Yeah, the -- in the Spearman nonparametric

15   correlation, the software package basically takes

16   the input data from the two sources, X and Y, which

17   we've identified here, and compares them and asks if

18   the rank order is similar or not.  And if you look

19   on the second column on page 941, you'll see a line

20   there, and this is a number of characteristics we've

21   entered, attributes, if you will, there are 29, the

22   Spearman R value is 0.67 -- and I misspoke, I said

23   .8, but you can round to .7 if you want.  And then

24   either a one tail test or two.  The P values are far

25   below .001.

Page 82

1          MR. TORRES:  Okay.  Let's stop for a

2      moment so we can change the tape.

3          VIDEOGRAPHER:  We're off the record.

4          (Off the record.)

5          VIDEOGRAPHER:  We're on the record.

6   BY MR. TORRES:

7      **Q.   Mr. Ungers, looking at Exhibit 5 again,**

8   **Bates page Ungers_010941.**

9      A.   Okay.

10     **Q.   The analysis for Miss Williams' residence.**

11     A.   Just out of order I think.  Yeah.  Okay.

12  Yes.

13     **Q.   Okay.**

14     A.   Yes, I've got it.

15     **Q.   Okay.  It's -- it's hard to read the**

16  **column headings, but I'm looking at the second**

17  **column, which looks like result for X; is that**

18  **right?**

19     A.   Let's see if I can.  I don't recall

20  offhand, Counselor.  I think it's ranking for.

21     **Q.   Ranking for X?**

22     A.   Let me see if I can see it on -- yes, I

23  believe it's ranking for, but you're right, I don't

24  see any of the other ones where that comes in

25  clearly.  I think it is -- I'm fairly certain it is

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Leslie Joseph Ungers

Page 83

1    ranking for or ranking.

2                MS. HOGAN:  Okay.  If it's of any

3           assistance, those copies were made from an

4           original.

5                MR. TORRES:  Um-hmm.

6                MS. HOGAN:  And the original you can

7           see.  I'm happy to show you that.  You can

8           show him that and have him -- we're just

9           talking about it.

10                MR. TORRES:  Oh, that's much better.

11                THE WITNESS:  Ranks for, there we go.

12                MR. TORRES:  Okay.  Thank you, sir.

13   BY MR. TORRES:

14        Q.   So it ranks for X and ranks for Y,

15   correct?

16        A.   Correct.

17        Q.   And the next set of columns, the ones that

18   begin with 740 and 4648.76, does that say raw data

19   for?

20        A.   Yes.

21        Q.   Okay.  And where do the numbers -- what is

22   the source of the numbers in the column raw data for

23   X?

24        A.   That is the reference for Central Florida

25   phosphogypsum in my report.

Page 84

1      Q.    And is that the case for the entire row?

2      A.    Of X for raw data?

3      Q.    Yes.

4      A.    Yes, it would be.  Except, and I

5   believe -- no, I believe it's all from that, that

6   source, Counselor.

7      Q.    Can you -- can you look at your -- or our

8   Exhibit 1, your report, and identify which --

9   exactly which reference, please, for this?

10      A.    Sure.

11      Q.    Thank you.

12      A.    It would be on Bates stamp number 010921,

13   the fifth reference down, Phosphate Deposits of the

14   World.

15      Q.    Okay.  Thank you.  And as we said before,

16   the raw data column for Y are either geometric means

17   for sampled constituents at this address from the

18   attic samples or imputed data for nonreportable

19   constituents?

20      A.    Yes.  And I would add, Counselor, they

21   would be the mean of those computed values, so we

22   did things equitably in both cases.

23      Q.    So the geometric -- the geometric mean for

24   the sample data and how do you do that for the

25   imputed data, what is the methodology?

Page 85

1        A.    Sure.   In terms of determining an imputed

2    value?

3        Q.    Yes.

4        A.    Sure.   You -- all of our methods have an

5    ability to look down fairly far, but they can't look

6    to zero, so each method has a detection limit.   And,

7    in fact, each method probably has a separate

8    detection limit for each constituent, in fact I know

9    they do.   And so the established protocol is to

10   divide by two the -- the detection limit that's

11   reported by the authority that produced the

12   analytical method.   And the philosophy behind that

13   is you don't know if it's zero and you don't know if

14   it's detection limits.   And then we would treat

15   those that way, each one of them.

16       Q.    So in the column raw data for Y, what

17   were -- where in your report on the dust and soil

18   sample study would I find the data necessary to

19   determine the imputed values for the constituents

20   that we had to come up with --

21       A.    Right.

22       Q.    -- imputed values for?

23       A.    That would be in the documents that were

24   provided to you after my report prior to this

25   deposition, the -- the materials submitted.

Page 86

1       Q.   Okay.

2       A.   And, Counselor, I just don't recall since

3   it's been removed, it actually may be in the

4   appendices from my final report because I'm looking

5   at the draft report.  I thought I had the final

6   report.  If we could get those final tables that

7   would be better than me referring to the draft which

8   I know there are typos in.

9       Q.   Well, I would have used them if I had

10  them, but I don't.

11      A.   They came with that report, so --

12      Q.   Is that data in any of the data that was

13  provided to me this morning?

14      A.   No.

15      Q.   Now, after the column raw data for Y, it

16  says data import.  Do you see that?

17      A.   Yes.

18      Q.   And what is that data import?

19      A.   If memory serves me correctly, that would

20  be what is the -- the means you use this software is

21  you manually import it, meaning you take phosphorus

22  for source X and phosphorus for receptor Y, you

23  manually input it and it then displays on this

24  import table or you can put it in a spreadsheet,

25  like Excel, and then just import the data.  I

Page 87

1    don't -- this is sort of, if I recall correctly,

2    this is a little window and it's probably not going

3    to be complete, but it should agree with column X

4    and Y in the raw data.  It essentially allows you to

5    input it, input the pairs any order you want and

6    then the software ranks it for you.  You don't have

7    to rank them yourself.

8         Q.   So when I look at the data here, and for

9    example, I look at data -- and I'm looking at data

10   import, the first column, 16 and right next to that

11   7.03?

12        A.   Yes.

13        Q.   And that matches with the row 16 in the

14   first column; is that right?

15        A.   Well, it matches with row 16 referenced

16   across the X value and Y value under raw data; is

17   that --

18        Q.   Right.

19        A.   Yes.

20        Q.   Yes.  Now, there is in the data import

21   columns, there's less data there than there are in

22   the raw data for X and Y columns; is that right?

23        A.   Well, the data's there, that's a window.

24   I think in the software, if I'm remembering

25   correctly, you can scroll up and down.

Page 88

1      Q.    So that's what we're not seeing here --

2      A.    Yes.

3      Q.    -- is -- is --

4      A.    Right.

5      Q.    -- there should be -- theoretically there

6   should be additional data here?

7      A.    Well, I mean, there is, we're just not

8   seeing it.

9      Q.    We just don't see it.  And to the right

10  there is the column 29, reset?

11     A.    Yes.

12     Q.    What is that?

13     A.    I think reset is a software button to

14  control everything to zero and put in new data, if I

15  remember correctly.  And the 29 refers to the number

16  of rows that are available, the entries, if you

17  will.

18     Q.    Understood.  And this calculate from

19  ranks --

20     A.    Yes.

21     Q.    -- what is the 13.5?

22     A.    Oh, that's the last row from the data

23  entry, it just scrolled over to the second column.

24  So that would be --

25     Q.    I understand, sir.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                                Page 89

    1        A.    Okay.

    2        Q.    That would be 28, 29?

    3        A.    Yes, sir.

    4        Q.    Okay.  And the 0.6787 you say is the R

    5    coefficient?

    6        A.    Yes.

    7        Q.    And the 4.8 is?

    8        A.    That's a Student T value, I think, for

    9    those numbers --

   10        Q.    Okay.

   11        A.    -- if I remember correctly.

   12        Q.    And the 27?

   13        A.    That would be the degrees of freedom, I

   14    believe.

   15              MS. HOGAN:  For the record on the

   16         original that I showed you, there is a DF

   17         on top of the 27.  If -- with your

   18         permission, I'll hand it to the witness for

   19         him to --

   20              MR. TORRES:  You can.

   21              THE WITNESS:  Yeah, and that -- my

   22         understanding is that would stand for

   23         degrees of freedom.

   24    BY MR. TORRES:

   25        Q.    Okay.  And the 4.8 is T?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 90

1        A.    That's my recollection, yes, T value.

2        **Q.    Does it say T value or does it say --**

3        A.    It says T.

4        **Q.    T, okay.  And you did not originally**

5    **prepare this with your report, but you prepared it**

6    **instead in response to the defense expert reports?**

7        A.    Well, yeah, all the data was available in

8    my report, but, yes, I prepared it afterwards.

9        **Q.    Do you remember specifically which --**

10   **which defense expert report you prepared this in**

11   **response to?**

12       A.    No, I don't, I would have to look.

13             MS. HOGAN:  Off the record for a

14        moment, please.

15             MR. TORRES:  Yes.

16             VIDEOGRAPHER:  We're off the record.

17             (Off the record.)

18             VIDEOGRAPHER:  We're on the record.

19             MR. TORRES:  Thank you.

20   BY MR. TORRES:

21       **Q.    Mr. Ungers, going back to Exhibit 1, your**

22   **report on page four.**

23       A.    This is 904 or four on the report number?

24       **Q.    Page four, Ungers_1 -- 010905?**

25       A.    Yes, I've got it.

Page 91

1        Q.    Okay.  At the bottom of the section Mosaic

2   operations are a major source of pollution.

3        A.    Yes.

4        Q.    You write Mosaic operations at Riverview

5   are identified by the US EPA as a major source of

6   particulate matter, sulfur dioxide, nitrogen oxides,

7   and hazardous air pollutants.  Do you see that?

8        A.    Yes.

9        Q.    What do you mean by major source?

10       A.    They're classified under both the Clean

11  Air Act and I think under EPCRA, the toxic -- I

12  can't -- I don't remember -- the Environmental

13  Planning and Community Right-To-Know Act as major

14  sources.

15       Q.    Let's look at the next opinion that you

16  rendered, Mosaic-generated pollution includes the

17  emission of toxic substances and radioactive

18  isotopes.  Do you see that?

19       A.    Yes.

20       Q.    And you write in the first sentence

21  Mosaic-generated pollution includes the emission or

22  release of both toxic substances and radioactive

23  isotopes as a direct result of wholly owned

24  operations, and indirectly as a result of the

25  handling of Mosaic raw materials and products by

Page 92

1    other companies.  You see that?

2         A.   Yes.

3         Q.   When is a -- when you say both toxic

4    substances, when is a substance toxic?

5         A.   My -- my interest there was the hazardous

6    air pollutants as toxic substances.  I mean,

7    theoretically you need to talk to a toxicologist on

8    that, but you can go back to Paracelsus says, you

9    know, all substances are toxic, it's only the dose

10   that determines the poison from the remedy.  So that

11   was a general term, but I think in the context of

12   this it would be the hazardous air pollutants.  I

13   would also probably include any chemical that is

14   known to be toxic in the environment or in work

15   environments where we have data on.

16        Q.   At the end of this sentence you write

17   indirectly as a result of the handling of Mosaic raw

18   materials and products by other companies.  You see

19   that?

20        A.   Yes.

21        Q.   What other companies?

22        A.   That's -- that's a typo.  It should be

23   other products by the company, that's just --

24        Q.   So that should change?

25        A.   Yes.  And is this -- is this my final or

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 93

1   my draft?

2        **Q.   This is your signed report.**

3        A.   Okay.  Well, but it's my draft.

4             MS. HOGAN:  Well, we had a discussion

5        about that off the record.  We can revisit

6        that when you find the exhibit with the

7        Bates numbers I gave you.

8             THE WITNESS:  Okay.  Let me see,

9        Counselor, what's going on here.

10            MR. TORRES:  So Mr. Ungers' final,

11       final report is -- is what?

12            THE WITNESS:  Yes, Counselor, no, I'm

13       mistaken.  I only said that because I knew

14       there's a draft version of my soil

15       sampling.  I confused it with that.

16            MR. TORRES:  Okay.

17            THE WITNESS:  This is my final

18       report.

19   BY MR. TORRES:

20       **Q.   This is the final report?**

21       A.   And that is a typo, yes.

22       **Q.   Thank you.  Now, is companies also a typo,**

23   **should that be raw materials and products by the**

24   **company?**

25       A.   Well, Counselor, what I was trying to

Page 94

1    convey there was the fact that Mosaic has owned

2    operations where they handle their own products,

3    their own raw materials.  And from reference number

4    three -- no, excuse me.  Oh, one, two, three, four,

5    five, six, seven, the eighth reference down,

6    Mosaic's Advantages and Challenges of Transportation

7    Modes, Tampa Bay applications on Bates stamp 010921,

8    the company distinguished between those operations

9    where they produce and handle their own raw

10   materials and products, and those operations where

11   their raw materials or products go to someone else

12   and they're handled by a terminal or transportation

13   service or something like that, that's what I was

14   trying to get to.

15       **Q.   The first bullet on page five of your**

16   **report, Ungers_010906, you write direct releases**

17   **from Mosaic operations include emissions from both**

18   **industrial point sources and fugitive sources?**

19       A.   Yes.

20       **Q.   Do you know what -- what emissions are**

21   **coming from industrial point sources?**

22       A.   As -- as those previous references to

23   Mosaic as a source inform us and as -- within their

24   industry as -- as informed in AP-42, yes.

25       **Q.   What are the industrial point sources that**

Page 95

1    you're referring to here?

2         A.   Well, the industrial point sources are

3    the, if you will, the process sources that are

4    identified both in their permits and some of the

5    literature, like the Li study, I think, and from

6    AP-42 where they identify what processes emit what

7    and at what levels.  And I think it's also specified

8    in the National Emissions Standard for hazardous air

9    pollutants for your industry.

10        Q.   How far is Miss Williams' residence from

11   these industrial -- these Mosaic industrial point

12   sources?

13        A.   If all the point sources are confined to

14   the plant area that I know south of the oldest

15   stack, I'm going to take a guess at between two and

16   three miles.

17        Q.   Did you ever measure it?

18        A.   I did, and I just don't recall what it is

19   right now.

20        Q.   Do you know what percentage of the samples

21   that you took at her house can be attributed to

22   industrial point sources?

23        A.   I can't.

24        Q.   Do you know what percentage of the

25   constituents of the samples that you took at Miss

Page 96

1    **Williams' house can be attributed to the fugitive**

2    **sources?**

3         A.   As opposed to point sources?

4         **Q.   Yes.**

5         A.   I don't think we can distinguish between

6    those two, no.

7         **Q.   Do you know what portion of the**

8    **constituents sampled at Miss Williams' home come**

9    **from mining operations?**

10        A.   No.

11        **Q.   Do you know which portion comes from**

12   **chemical processing?**

13        A.   I don't know that any does, but no.

14        **Q.   Do you know what portion comes from**

15   **transport of the product?**

16        A.   No.

17        **Q.   Do you know what portion comes from**

18   **disposal of waste phosphogypsum?**

19        A.   It would be my opinion that the vast

20   majority does given the association we've developed

21   with our statistical tests.

22        **Q.   That's the only one that you have some**

23   **basis for asserting what you just asserted?**

24        A.   No.  There are other bases based on some

25   of Mosaic's own emissions and the wind direction,

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

1    but based on the statistical analysis I would say

2    that it's my opinion that more likely than not

3    that's an impact from phosphogypsum, but I can't

4    exclude the fact that a Mosaic point source didn't

5    contribute to that.

6         **Q.    Can you exclude the fact that another**

7    **point source contributed to the constituents sampled**

8    **at Miss Williams' home?**

9         A.    No, I can't.

10        **Q.    Not for any single constituent, correct?**

11        A.    Not for any single one, no.

12        **Q.    And not in the aggregate either, correct?**

13        A.    Well, I think the statistics provides us

14   that.  This was highly correlated, had great

15   significance, and it was very remote that we're

16   looking at anything other than a massive impact from

17   phosphogypsum.

18        **Q.    Can you eliminate other sources?**

19        A.    No, but I believe they would be a minor

20   constituent or a minor contributor.

21        **Q.    Have you eliminated other sources?**

22        A.    I don't need to.  It's the reverse issue

23   here.  We've identified the -- the prominent source

24   and that's the phosphogypsum.

25        **Q.    Did you try to eliminate other sources?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 98

1      A.    I don't have any information on other

2  sources.

3      Q.    Is the answer no?

4      A.    No -- yes, the answer is no.  Yeah, I did

5  not try and eliminate other sources.

6      Q.    In the second bullet, you write indirect

7  releases include fugitive emissions from those local

8  transport and terminal facilities, not owned by

9  Mosaic, but contracted to handle phosphate rock

10  products and concentrates.  Do you see that?

11      A.    Yes.

12      Q.    Do you know what percentage of fugitive

13  emissions come from those facilities not owned by

14  Mosaic?

15      A.    No, I do not.

16      Q.    Is that consistent -- is the -- when --

17  when you look at that bullet, do you still hold on

18  page four that the sentence should end as and

19  indirectly as a result of the handling of Mosaic raw

20  materials and products by the company or is it by

21  other companies, does that change anything?

22      A.    Yes, that refreshed me.  Yeah, perhaps we

23  don't need to correct that.  As I mentioned in my

24  previous testimony, what I was trying to get --

25  impart in this is Mosaic's operations influenced

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 99

 1   other things other than their own physical plant.

 2        Q.   Okay.  Do you know what percentage

 3   contribution from these other companies contributed

 4   to the constituents that you sampled at

 5   Miss Williams' home?

 6        A.   No.

 7             MR. TORRES:  It's 11:55.  Why don't

 8        we break for lunch?

 9             VIDEOGRAPHER:  We're off the record.

10             (Brief luncheon recess.)

11             VIDEOGRAPHER:  We're on the record.

12   BY MR. TORRES:

13        Q.   Okay.  Mr. Ungers, I have a few more

14   questions about Exhibit 5 to just wrap up with.  You

15   said you prepared Exhibit 5 in response to the

16   defense expert reports, correct?

17        A.   Yes, essentially, yes.

18        Q.   Okay.  And did you run these statistical

19   models to test the hypothesis?

20        A.   I'm not sure what you mean, Counselor.

21        Q.   Did you run these to test the theory that

22   you had?

23        A.   I ran them to -- to -- to -- yeah, to test

24   the hypothesis if -- if there was a ranking of -- of

25   this that would match the phosphogypsum.

Page 100

1    Q.   At what value is the R coefficient

2    determinative here in your mind?

3    A.   Well, with a Spearman rank correlation,

4    you look at anything above five is a strong

5    association -- .5, excuse me, Counselor.  If it's

6    positive, it's a positive relationship.  If it's

7    negative, it's negative.  So this would be

8    considered very strong.

9    Q.   You didn't know the r2 when you first

10   prepared your report for any of these sites, did

11   you?

12   A.   No, we hadn't done the calculation.

13   Q.   You hadn't done the calculation, right.

14   And did you run any types of statistical analyses

15   for any potential alternative sources for the

16   constituent contributions at any of the sampled

17   locations?

18        MS. HOGAN:  Let me hear the question

19        again, please.

20        THE WITNESS:  Yeah, I'm not sure.

21        There's two questions there.  I think we

22        answered the first one early on that we

23        didn't run it for any other -- any other

24        sources --

25        MS. HOGAN:  Okay.

Page 101

 1                    THE WITNESS:  -- other than

 2          phosphogypsum.

 3                    MS. HOGAN:  Okay.  I still want to

 4          hear the question again, please.

 5                    THE WITNESS:  Okay.  I'm sorry.

 6                    (Thereupon, the record was read back

 7     by the court reporter.)

 8                    THE WITNESS:  Right, and the answer

 9          is no.

10     BY MR. TORRES:

11          Q.   So you have no idea what the association

12     or the R coefficient would be for any other sources

13     at any of the sampled locations, correct?

14          A.   That's correct.

15          Q.   Okay.  I would like to go -- return to

16     your report, Exhibit 1.

17          A.   Okay.

18          Q.   And turn to page five of your report,

19     which I think is where we left off, Ungers_010906.

20          A.   Yes.

21          Q.   Okay.  And we are now looking at the third

22     basic opinion you rendered, Mosaic-generated

23     emissions impact the surrounding air quality.

24          A.   Yes.

25          Q.   In the first sentence you write

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 102

1    **Mosaic-generated emissions have a degrading and**

2    **negative impact on the air quality in the**

3    **surrounding communities, including the plaintiff's**

4    **neighborhood?**

5           A.    Correct, yes.

6           **Q.    Did you make a determination as to what**

7    **the degree of the negative impact is?**

8           A.    Well, with regards to specific compounds,

9    the item that I relied on for SO2, of course, was

10   the technical document and the letters associated

11   with identifying the non-attainment area.  The -- as

12   for the other ones --

13                THE WITNESS:  Can I have the question

14         again?

15                MR. TORRES:  You can read it back,

16         please.

17                (Thereupon, the record was read back

18   by the court reporter.)

19                THE WITNESS:  I see.  So with regards

20         to SO2, I relied on that.  Later, of

21         course, I think your own experts informed

22         us on what they predicted would go for

23         those neighborhoods.  The -- but as to

24         degree or percentage, no.

25   BY MR. TORRES:

Page 103

1      Q.   Okay.  So no calculations regarding

2  Mosaic's contribution to any single constituent at

3  any of the sampled locations, correct?

4      A.   Only other than what the statistical

5  analysis informs us.

6      Q.   All right.  So you have no idea, for

7  example, what Mosaic contributed to arsenic at

8  Miss Williams' home, correct?

9      A.   Well, it's unfair to say no idea, but my

10  same answer for that comparison, the contribution is

11  going to be primarily from the phosphogypsum.

12      Q.   You did not calculate a contribution; is

13  that right?

14      A.   A percent contribution, no.

15      Q.   Okay.  And, in fact, you didn't calculate

16  a contribution for any of the constituents, did you?

17      A.   No, I did not.

18      Q.   In the first bullet under the same

19  opinion, Mosaic-generated emissions impact the

20  surrounding air quality, the second bullet reads the

21  air in central Hillsborough County is in violation

22  of the National Ambient Air Quality Standard, NAAQS,

23  for SO2, i.e., it is a non-attainment for SO2.  The

24  State of Florida has identified Mosaic as the likely

25  major contributor to the violation.

Page 104

1         Do you -- did you calculate what Mosaic's

2    contribution is to the SO2 non-attainment in

3    Hillsborough County?

4         A.   No, the -- I did not independently, no.

5         Q.   Do you know what period of time Mosaic

6    contributed to -- Mosaic was a likely major

7    contributor to SO2 non-attainment?

8         A.   Given the nature of the operation and the

9    data we have on emissions going back to 2003, it's a

10   significant source, it's a major source, but --

11        Q.   But you don't know how much?

12        A.   Proportionally, no.

13        Q.   You write residential neighborhoods

14   downwind of the Mosaic operations, including but not

15   limited to Progress Village, are part of this

16   non-attainment area; is that correct?

17        A.   Yes, that's the non-attainment area

18   discussed in the TSD.

19        Q.   Does Miss Williams live within the

20   non-attainment boundary in the TSD?

21        A.   I say she lives within it.  Her residence

22   isn't there.  She certainly lives within the

23   non-attainment.

24        Q.   Her house is not within the non-attainment

25   boundary, correct?

Page 105

1        A.   Her house is just north of the

2   non-attainment boundary set by -- I think proposed

3   by the state.

4        Q.   It's outside of the non-attainment

5   boundary that was determined using air modeling,

6   correct?

7        A.   No on both accounts, because I don't --

8   the last document I had, the non-attainment

9   monitoring hadn't been established.  And my reading

10  of the -- one of the appendices, I believe, the TSD

11  is that the EPA was not relying on the modeling to

12  make their initial determination.

13               (Thereupon, Ungers Exhibit No. 6,

14  Riverview receptor grid from FDEP, was marked for

15  purposes of identification.)

16  BY MR. TORRES:

17       Q.   I'm handing you Exhibit No. 6.  Do you

18  recognize Exhibit No. 6?

19       A.   Yes, I have seen this before.

20       Q.   What is it?

21       A.   I think this is -- if appreciated

22  probably, this is a model run that Mosaic would have

23  done using AERMOD and provided to the state for

24  their assessment of non-attainment.

25       Q.   Do you see the border that says

Page 106

1    non-attainment area?

2         A.   Yes.

3         Q.   **Does Miss Williams live inside or outside**

4    **that border?**

5         A.   Her residence is outside that border.

6         Q.   **Okay.  And absent this modeling, do you**

7    **have any data regarding the SO2 levels at**

8    **Miss Williams' home?**

9         A.   Only the information that's provided

10   either -- well, at exactly?

11        Q.   **Yes.**

12        A.   What type of data, Counselor?

13        Q.   **The SO2 level at her home.**

14        A.   I don't think that's ever been measured at

15   her home.

16        Q.   **Okay.  Never been measured?**

17        A.   No.

18        Q.   **Okay.  Did you try?**

19        A.   No.

20        Q.   **Why not?**

21        A.   It wasn't helpful for us because her

22   exposure extends over 49 years.  And unfortunately

23   it's difficult to find sulfur in the attic dust,

24   otherwise we would have had that included.

25        Q.   **So are you saying you could not?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

```
                                              Page 107
 1       A.    Using an attic dust evaluation as an
 2   archive, not with the analytical methods available,
 3   no.
 4       Q.    Okay.  Do you know when Hillsborough
 5   County was first declared to be a non-attainment for
 6   SO2?
 7       A.    I don't have that data in my memory,
 8   Counselor.
 9       Q.    Let's go to the next bullet, which reads
10   although Hillsborough -- excuse me.  I'm sorry.
11   Although Hillsborough County is not in violation of
12   the NAAQS, N A A Q S, for particulate or respirable
13   particulate, Mosaic operations contribute to the
14   airborne concentration of respirable particulate
15   matter in neighborhoods downwind of its operations
16   including Progress Village.  Do you see that?
17       A.    Yes.
18       Q.    Was Hillsborough County ever in violation
19   of the NAAQS for PM?
20       A.    As I sit here, today, Counselor, I don't
21   know historically, but I didn't find anything.
22       Q.    Was it ever in violation of the NAAQS for
23   particulate matter PM10?
24       A.    Not to my knowledge.
25       Q.    Do you know what percentage Mosaic
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 108

1    contributes to particulate matter in the Progress

2    Village neighborhood?

3         A.   Well, based on the references we've cited

4    prior and some studies in the literature on

5    phosphogypsum operations or disposal, and of course

6    the fact that it's my opinion that the major

7    contributor is that phosphogypsum dust, that's the

8    basis for that.

9         Q.   Did you calculate Mosaic's contribution to

10   particulate matter at Miss Williams' residence?

11        A.   No.  The only reference I'm aware of is

12   the Li study that determines ground level

13   concentrations of particulate.

14        Q.   Did you perform any calculations to

15   determine what Mosaic's contribution is to PM10 at

16   Miss Williams' residence?

17        A.   No, same answer.

18        Q.   Okay.  How about Mosaic's contribution of

19   PM to Progress Village, did you calculate that?

20        A.   No.

21        Q.   And how about Mosaic's contribution to

22   PM10 at Progress Village, did you calculate that?

23        A.   Same answer, all four.

24        Q.   Third bullet, toxic substances common to

25   phosphate rock and phosphogypsum are found in

Page 109

1    concentrations in the air surrounding Mosaic and the

2    vicinity of several residential neighborhoods,

3    including Progress Village.  The substances

4    sulfates, PM10, and the toxic metals As, Cd, Cr, Pb,

5    Mn, and Ni, are all present in the ambient air north

6    of the Mosaic operations and in the vicinity of

7    Progress Village.  Did you measure ambient air?

8         A.   No, I'm relying on the air data that

9    the -- the state collected at their NAAM and SLAM

10   sites, National Ambient Air Quality Monitoring

11   sites, and SLAM, State and Local Air Quality

12   Monitoring sites, that are a part of the public

13   record.

14        Q.   So the answer is you did not measure air

15   concentrations, correct?

16        A.   I did not measure, no, sir.

17        Q.   Do you know what period of time -- do you

18   know over what period of time Mosaic contributed to

19   these ambient -- to the ambient air north of its

20   operations?

21        A.   Well, given the nature of the operations,

22   as long as those operations were there.

23        Q.   And did you figure that out?  Did you

24   calculate that anywhere?

25        A.   I didn't calculate what the concentrations

Page 110

1   were.  I thought the question was if, they -- they

2   can't operate without releasing emissions and those

3   emissions would go downwind of the point source area

4   source involved.

5        **Q.   Do you know if ambient air conditions have**

6   **changed for sulfates, PM10 and the toxic metals**

7   **listed in this third bullet?**

8        A.   By virtue of our -- excuse me, by virtue

9   of our attic sampling, it indicates that they had

10  been worse in the past than they are now.

11       **Q.   And how did you determine that?**

12       A.   Well, the basis for using attic sampling

13  as a metric of historic impact of air quality is

14  that unlike your experts, it's not related to

15  distance, although distance always plays a factor,

16  but rather to the age of the attic.  And as is clear

17  from several studies, they're in the references,

18  Ilacqua is one, they've determined and tested the

19  fact, validated it, the greater the concentrations

20  of elements in the attic dust, the older the attic

21  or vice versa, the older the attic, the greater the

22  concentrations.  Indeed that's the reason why one of

23  the attic -- the oldest attic, which coincidentally

24  happened to be furthest away of the set we did, had

25  the highest concentrations.  And so that indicates

Page 111

1    that there were a greater impact in the past than in

2    the younger attics which displayed lesser

3    concentrations.

4         **Q.   And when were ambient air conditions**

5    **worse?**

6         A.   Well, in the literature, the validation of

7    the attic dust method generally prescribes changes

8    on a decade basis.  I think that's -- that's fair,

9    because they recognize the strength and limitations

10   of the data.  And so based on this, we would have

11   seen higher contributions back in the '60s, and then

12   a little bit better perhaps in the '70s and '80s.

13   And you can glean that from the concentrations in

14   the attic dust.

15        **Q.   Okay.  So higher -- higher contributions**

16   **in the '60s, lesser contributions in the '70s and**

17   **'80s, correct?**

18        A.   Yes.

19        **Q.   Lesser in the '90s?**

20        A.   I would have to look at it again, but,

21   yeah, I think the trend is down, yes.

22        **Q.   Okay.  Lesser in the 2000s?**

23        A.   I don't know if we can distinguish that

24   because we didn't have that young of an attic.  I

25   think our -- our -- I think 32 years was the

Page 112

1    youngest attic that we had.

2        Q.   So you didn't have anything to test

3    against over the last three decades?

4        A.   Well, they're all in existence so we're

5    able to test against all three -- all five of them.

6    They all reflect the most recent because they're

7    still in existence.  And the oldest reflect, of

8    course, the contributions from the earlier time

9    periods.

10        Q.   Did you calculate any contributions by

11    decade?

12        A.   No, it could easily be done by comparison,

13    but, no, I didn't.

14        Q.   And you didn't -- you didn't calculate any

15    contributions by time at all; is that right?

16        A.   Other than we present what the results

17    were.

18        Q.   At the bottom of page five, you write

19    historical rose (sic) assessments indicate

20    neighborhoods north and east of the Mosaic

21    operations, including Progress Village, are downwind

22    as much as 16 to 20 percent of the time?

23        A.   Yes.

24        Q.   Where is the basis for that statement in

25    your report?

Page 113

1      A.   Yes, that's referenced in -- on Bates

2   stamp number 010922, second item, wind rose plots,

3   MacDill Air Force Base, Tampa.  And I think you have

4   bad copies of those too.

5      **Q.   And how did you perform the calculation to**

6   **come up with downwind as much as 16 to 20 percent of**

7   **the time?**

8      A.   Sure.  I mean, the time frame we're

9   interested, Counselor, is roughly the 49 years of

10   Mrs. Williams' living in and around her

11   neighborhood.  And not just five or six years for

12   compliance modeling estimates.  So we went back to

13   1970, that's everything that was available.  And the

14   website that I cite, which is publicly available,

15   will allow you to generate that information in the

16   wind rose for a 10-, 20-, 30-year average.  And

17   that's the source of this information.

18      **Q.   What is the predominant direction of the**

19   **winds in the Progress Village neighborhood?**

20      A.   It depends on time frame.

21      **Q.   Well, you came up with 16 to 20 percent**

22   **going that way?**

23      A.   So the 20 -- the 16 percent is the wind

24   directions from the southwest quadrant to the

25   northeast quadrant as averaged over the last 30

Page 114

1    years -- well, since 1970.  It's more than 30 years.

2    The 20 percent is that -- and it's plus or minus one

3    percent here.  We round up.  The 20 percent comes

4    from the worst season which tends to be the first

5    quarter of each year.

6         **Q.   And conversely, the 80 to 84 percent**

7    **that's not blowing in that direction, which way is**

8    **the wind blowing?**

9         A.   You would have to look at the wind rose.

10        **Q.   Did you?**

11        A.   Oh, yes, it's blowing -- although

12   there's -- you know, weather predominantly comes

13   from the west in North America.  It's all over the

14   sectors.  You can calculate it for any particular

15   direction you want.

16        **Q.   Do you -- if you don't remember, you can**

17   **tell me I don't remember.**

18        A.   I don't remember the exact number, no.

19        **Q.   But do you remember what the predominant**

20   **direction of the wind is?**

21        A.   Again, Counselor, it depends on the time

22   frame.  Some days, some months it's primarily in the

23   direction to Mrs. Williams' neighborhood.  Other

24   times it isn't.

25        **Q.   Let's turn to page six of your report,**

Page 115

1    please.

2        A.   Okay.

3        Q.   And your fourth opinion, fourth general

4    opinion, Mosaic-generated airborne pollutants

5    contaminate surrounding neighborhoods.  Do you see

6    that?

7        A.   Point it out, Counselor -- I'm just -- I

8    mean --

9        Q.   Page six of your report.

10       A.   Page six, yes, that's the introductory --

11       Q.   Yes.

12       A.   -- sentence, yes, sir, or title, yeah.

13       Q.   And you write once emitted portions of the

14   particulate pollutants in air can settle out or

15   deposit on surfaces downwind of an emitting source?

16       A.   Correct.

17       Q.   And you contend that that, in fact,

18   happened, right?

19       A.   Yes.

20       Q.   And right now your contention is that the

21   only way you know is by Exhibit 5; is that right?

22       A.   No, we know that from several of the

23   references that are present in my written opinion.

24   I mean, it's a very well-established fact.  It's the

25   reason we get dust deposition specific to that area

Page 116

1   in addition to what you've cited, Counselor, which

2   does support it.  I think your own experts provide

3   estimates of particulate level in the air, which

4   eventually settles out somewhere reaching her

5   residence.  And then, of course, I know that the

6   industry association, Li study, determined ground

7   level concentrations, which of course are eventually

8   going to fall out.

9        Q.   Did you rely on the Technical Support

10   Document to make this conclusion?

11             MS. HOGAN:  For the record, what

12        document?

13             MR. TORRES:  Technical Support

14        Document.

15             THE WITNESS:  Regarding the SO2?

16             MR. TORRES:  Yes.

17             THE WITNESS:  Well, it informs it

18        because it obviously shows that the weather

19        does move in a direction that will impact

20        her neighborhood.  The S -- the borderline

21        that's available for the non-attainment, of

22        course, is for a gas and that wouldn't

23        apply to a particulate.

24   BY MR. TORRES:

25        Q.   How far downwind do these particulate

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 117

1    **pollutants travel?**

2               MS. HOGAN:   Objection as to form,

3          vague.

4               MR. TORRES:   That's his opinion, it's

5          a statement, once emitted, portions of the

6          particulate pollutants in air can settle

7          out or deposit on surfaces downwind of an

8          emitting source.

9    BY MR. TORRES:

10        **Q.   How far?**

11        A.   Right.  That depends -- on any given day

12   that depends on the wind speed, depends on the size

13   of the particulate.  We know from the literature

14   that deposition downwind of phosphate plants occurs,

15   and, in fact, the fugitive emissions do from the

16   Kassir article, which I cite.  And, of course, we

17   know that particles that become airborne in the

18   Sierra actually make it over to Florida and the East

19   Coast.  So it's going to depend on the wind speed

20   and the direction and the particle size.  It's

21   called the mean aerodynamic diameter of the particle

22   as to where it falls out.

23        **Q.   What else contributes to how far**

24   **particulate pollutants settle out downwind?**

25        A.   Well, those are the major factors.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 118

1        Q.    What --

2        A.    Those are the major variables.

3        Q.    What others are there though?

4        A.    Let's see, I've said the overwhelming one

5   is the mass mean aerodynamic diameter and direction

6   of wind speed -- in fact, we can take out because

7   we're assuming there's a direction involved, so it's

8   going to be wind speed.  If it's a fugitive dust a

9   plume of air may not be of importance.  If it's a

10  point source, the transport downwind is going to be

11  related to stack heights, operating temperatures,

12  exit velocities, mixing height, other things

13  associated with -- I mean, they are part of models,

14  but there actually are measurements of reality out

15  there too, so those would have an influence on it.

16       Q.    Is topography an influence?

17       A.    It can be, yes.  If -- are you talking in

18  a practical sense or modeling sense?

19       Q.    I'm talking both.

20       A.    Both.  In a practical sense, certainly.

21  It's only in a modeling sense if you include that in

22  the model, of course.

23       Q.    Did you calculate air deposition for -- or

24  did you determine air deposition for any specific

25  constituents?

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Leslie Joseph Ungers

Page 119

1        A.    All of the compounds we reported -- excuse

2   me, all of the elements we reported in the attic

3   dust, yes.

4        **Q.    All of the elements you reported in the**

5   **attic dust?**

6        A.    Yeah.

7        **Q.    And how far do those particulates travel?**

8        A.    Well, given the association with

9   phosphogypsum, those particulates traveled at least

10   the distance from the phosphate stacks to

11   Mrs. Williams' residence and the other locations

12   that we took samples at.

13        **Q.    And how far did they go?**

14        A.    In that case, like I said, I don't

15   remember the distances, but I think it ranges

16   around -- I think the center of the most northern

17   stack is 1.8 miles away.

18        **Q.    From Miss Williams' residence?**

19        A.    From Miss Williams' residence, yeah.

20        **Q.    What did you do to, in your report, to**

21   **establish fate and transport of any of the**

22   **constituents you sampled?**

23        A.    Well, Counselor, that -- the -- again,

24   we've talked on other references that I cite in my

25   written opinion, and then of course the statistical

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 120

1   analysis, it shows the association, and indirectly

2   the technical -- the TSD document, the Technical

3   Support Document, your own experts and Li inform it,

4   but I didn't do any modeling where I would calculate

5   transport.

6        Q.   **The first bullet you write surface soils**

7   **in residential areas north of the Mosaic operations,**

8   **including Progress Village, contain concentrations**

9   **of toxic substances higher than levels typical of**

10  **Florida soils.**

11       A.   Yes.

12       Q.   **These elevated metals, include but are not**

13  **limited to, As, Cd, Cr, Mn, and Zn.**

14       A.   Correct.

15       Q.   **What is the basis for that statement?**

16       A.   If you do a comparison between the

17  geometric means of our samples, and the geometric

18  mean of Florida soils, these values are higher.  And

19  in some cases, specific samples -- well, at least

20  one in all cases specific samples are higher.

21       Q.   **And what did you do to determine that**

22  **those concentrations were from Mosaic emissions?**

23       A.   Again, it would be my previous answers in

24  association with the statistical tests of

25  phosphogypsum.

Page 121

1      Q.   And what did you do to determine what

2  alternative sources contributed to those

3  concentrations?

4      A.   It would be the same answer as previously.

5      Q.   Nothing, right?

6      A.   We didn't do an assessment on other

7  sources.

8      Q.   In your conclusion, the last sentence, you

9  write the degraded air quality, a problem in itself,

10  also contributes to the pollutant, toxic metal, and

11  radioactive burden to soil and surfaces in

12  neighborhoods surrounding Mosaic, including those of

13  the plaintiff.  Do you see that?

14      A.   Yes.

15      Q.   Again, you never made a determination of

16  Mosaic's contribution to any of these elements,

17  correct?

18      A.   Other than what we've just spoken about.

19      Q.   So no, you don't know what percentage

20  Mosaic contributes to any of these, correct?

21      A.   Counselor, as I stated before, I believe

22  because of the association -- statistical

23  association and the amount of phosphogypsum

24  available, that this would apply to the toxic metals

25  and pollutants and radioactive material at Mosaic

Page 122

1    being the major source contributing.

2        **Q.   But you can't say Mosaic contributed five**

3    **percent, ten percent?**

4        A.   I can say more likely than -- more likely

5    than not it's over half.

6        **Q.   Do you know?**

7        A.   That's what the data indicates in its

8    totality, I believe.  That's my opinion.

9        **Q.   And you certainly don't know where the**

10   **other half is from?**

11       A.   Well, I didn't say other half.  I said

12   more than half, but given the nature of the

13   operations, it may be much more than half.

14       **Q.   Which is it, is it more than half, is it**

15   **much more than half?**

16       A.   Much more than half, Counselor.  It's very

17   difficult to get this strong of association and

18   discard it, to do so would be, you know, error rate

19   on something like that is less than one in 10,000.

20       **Q.   So what's the number?**

21       A.   I can't -- I did not put a number on, I

22   mentioned that before.

23       **Q.   Okay.  Let's move on to Exhibit 2, which**

24   **is the Elemental and Radiochemistry of Settled Dust**

25   **and Surface Soil in Residential Communities of**

Page 123

1    **Central Hillsborough County, Florida,**

2    **Williams_001734 through 1766.  Do you have that?**

3         A.    1734, 1766, yes.  This is the draft

4    document we're talking about.

5         **Q.    Why did you prepare this report as a**

6    **draft?**

7         A.    Well, I prepare all reports as a draft.

8         **Q.    Why did you prepare this report as a**

9    **draft?**

10        A.    I issued the draft because the attorneys

11   wanted to talk to it -- speak to it, find out what

12   had occurred as a result of our sampling.

13        **Q.    And you just recently updated this draft**

14   **in March 2015, correct, Exhibit 3?**

15        A.    Right, it was what, six months later, I

16   guess.

17        **Q.    I would like to turn to page three of**

18   **Exhibit 2, the soil study, dust and soil study.  And**

19   **I'm looking at structure and roof attic**

20   **characteristics, that paragraph.**

21        A.    Um-hmm.

22        **Q.    And you say you studied five sites?**

23        A.    Yes.

24        **Q.    And they were selected because they were**

25   **similar construction using similar materials, peak**

Page 124

1    roofs of various pitches, wooden rafters, battens,

2    ceiling joists and trusses.  You say they were

3    passively ventilated.  And you say although of

4    similar construction, were of varying heights,

5    volumes and ages.  Do you see that?

6          A.    Yes.

7          Q.    Okay.  So these -- what you're suggesting

8    is that these structures are largely the same except

9    for height, volume and age, correct?

10         A.    That's fair, yes.

11         Q.    Okay.  How about use, are they similar

12   for -- in terms of use?

13         A.    As an attic, yes.

14         Q.    And what are these attics used for?

15         A.    Nothing.

16         Q.    In sampling locations, a little further

17   down on the page --

18         A.    Um-hmm.

19         Q.    -- you say three types of locations were

20   sampled during the study.  Household?

21         A.    Um-hmm -- correct.

22         Q.    Horizontal surface within the living

23   quarters at the one residential study site.  Why did

24   you only sample households at Miss Williams' home?

25         A.    Two reasons, we wanted to see what the

Page 125

1    dust level was on an undisturbed surface in her home

2    because she after all is the plaintiff.  The second

3    reason is we weren't allowed entrance into the other

4    ones to do that.

5         **Q.    Did you ask?**

6         A.    We discussed it.  I don't know if we

7    formally asked it, but given the nature of the use

8    of those rooms below the attics, I didn't think

9    there would be any comparison.  In fact, I know

10   there wouldn't be any valid comparison.

11        **Q.    And why is that?**

12        A.    One was used as a church meeting room.

13   One is a daycare.  I think one is a school, maybe

14   a -- I can't remember.  I think that's in the table.

15   And, of course, the horizontal surface available to

16   us at Mrs. Williams' was the kitchen.

17        **Q.    The second sampling locations are roof**

18   **attics?**

19        A.    Yes.

20        **Q.    You say you chose horizontal surfaces of**

21   **exposed ceiling joists in the roof attics of**

22   **buildings at all five of the study sites.**

23        A.    That's correct, yes.

24        **Q.    Where -- where in the ceilings were these**

25   **taken, were they all in sort of similar locations?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 126

1      A.   They were all taken within three -- if I'm

2   remembering correctly -- and it may state it here

3   elsewhere, Counselor, rather than misstate it.

4   Yeah, they were -- well, they were taken anywhere

5   from a half a foot to a foot apart in an undisturbed

6   joist that could be reached without disturbing the

7   attic.

8      **Q.   And for soil, you write the locations you**

9   **sampled were surface soil samples from sparsely**

10  **grassed yards at all five of the study sites.   What**

11  **do you mean by sparsely grassed yards?**

12     A.   Yeah, that's probably both a

13  characterization of the quality of the landscaping

14  and the fact that we didn't want to pull a sample

15  with organic material in it because plants will

16  concentrate various heavy metals and you might get a

17  high or low reading that would be unrepresentative

18  of the soil itself.  So we looked for -- I wouldn't

19  call them barren spots, but as barren as we could

20  get them.

21     **Q.   Are there cleanup guidelines for soil**

22  **promulgated by Florida Department of Environmental**

23  **Protection; is that right?**

24     A.   That's my understanding, yes.

25     **Q.   Are there cleanup guidelines for indoor**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 127

1    dust promulgated by the Florida Department of

2    Environmental Protection?

3         A.    That, I don't know.  There is one for lead

4    for the US EPA and I imagine Florida complies with

5    that, yeah.

6         Q.    Is that the only one you're aware of?

7         A.    That's sort of universally recognized,

8    yes, I think so.

9         Q.    Do you know why that is?

10        A.    Well, a couple of reasons.  The

11   pervasiveness of lead in the western society, it's

12   emitted by large point sources, one of which is the

13   industry here in question here, automotive.  So I

14   think regulations were written around collecting

15   attic dust as a representative sample for potential

16   exposure assessments for lead.

17        Q.    Do you know why there are no cleanup

18   guidelines for indoor dust promulgated by the

19   Florida Department of Environmental Protection or

20   the EPA for other constituents?

21        A.    Well, I mean, I think there are based on

22   health effects.  There may not be regulations

23   written for it.

24        Q.    Can we turn to Table 1, page nine of the

25   dust and soil study, Williams_001742?

Page 128

1      A.   Yes.

2                MR. WALKER:  Repeat that Bates

3          number, please.

4                MR. TORRES:  Sure.  It's Williams --

5          Billy, it's Williams_001742.

6                MR. WALKER:  Thank you.

7                MR. TORRES:  You're welcome.

8    BY MR. TORRES:

9      **Q.   Table 1 is identification of study --**

10   **study sites.**

11     A.   Yes.

12     **Q.   How did you select these five sites?**

13     A.   Well, as I went -- discussed earlier it's

14   really a three-step process.  We did Google search

15   for similar structures -- we did a Google search for

16   similar structures.

17               MR. WALKER:  All here?  All records?

18               MS. HOGAN:  Billy, you're on the

19          phone.

20               MR. TORRES:  Mute the phone.

21               MR. WALKER:  Sorry.

22               MR. TORRES:  It's okay.

23   BY MR. TORRES:

24     **Q.   Google search?**

25     A.   Yes, we did a Google search.  We did a

Page 129

1   visual inspection based on results of the Google

2   search.  And then we inquired at those locations

3   that basically fit the criteria for similar

4   structure.

5       **Q.   Did you have any other options, any other**

6   **sites you could have sampled outside of these five?**

7       A.   Yes.

8       **Q.   And why did you not sample those sites?**

9       A.   Well, we -- we could have.  I suppose you

10  could sample every home, but it was -- the problem

11  was getting access to them.  I think we pursued

12  roughly 22 sites, if memory serves me right, and we

13  were able to get access to these five.

14      **Q.   So these are the only five that allowed**

15  **you to sample?**

16      A.   Some of them didn't return phone calls.

17  These were the five that agreed to it, yes.

18      **Q.   Which of these sites on Table 1 is closest**

19  **to the facility?**

20              MS. HOGAN:  I take it the facility is

21          Mosaic Riverview?

22              MR. TORRES:  The -- yes, the Mosaic

23          Riverview facility.

24              MS. HOGAN:  Are you talking about the

25          stacks or the operations?

Page 130

1          MR. TORRES:  It would be the same for

2      both, but let's pick the stacks, let's pick

3      the emissions stacks.

4  BY MR. TORRES:

5      **Q.   The point source emission stacks, which is**

6  **closest?**

7      A.   Well, the distance would not be the same

8  for both because you've got two stacks and then a

9  production operation, so I'm not sure how you meant

10  to characterize that.  But if you're looking at the

11  stacks, I believe, if memory serves me right, the

12  closest one, I think, is 78th Street, the St. Joseph

13  Missionary Baptist Church, if memory serves me

14  properly.

15      **Q.   And the next closest one?**

16      A.   I think those are the two churches, the

17  First Baptist and the St. James Church.

18      **Q.   Okay.  And after that comes Miss Williams'**

19  **home, correct?**

20      A.   That's fair, yes.  I think she's about the

21  third furthest, yes.

22      **Q.   And the furthest is the Presbyterian**

23  **Church of Seffner, correct?**

24      A.   That's -- that's my recollection, yes.

25      **Q.   Do you know what the distance of these**

Page 131

1    **locations are from the SO2 monitor?**

2              MS. HOGAN:  Which one?

3              MR. TORRES:  The one southeast of the

4         Mosaic Riverview facility.

5              THE WITNESS:  Are you referring to

6         the one cited as the violating monitor?

7    BY MR. TORRES:

8    **Q.    Yes.**

9    A.    Depending on how much error you want,

10   roughly about the same as the point sources

11   themselves.

12   **Q.    Did you measure?**

13   A.    I think I did at one time, yes.

14   **Q.    Were churches the only structures that**

15   **were similar to -- in your opinion were similar to**

16   **Miss Williams' home?**

17   A.    No, I wouldn't say that.  I think there's

18   other residential structures obviously.  And I

19   don't -- we didn't want to include structures whose

20   activities would suggest a source of contamination,

21   so we would eliminate most commercial buildings

22   because either we suspected they might have done

23   something there that could have affected the attic

24   dust or -- but we didn't know for sure.

25   **Q.    Let's turn to Table 2, page ten.  In**

Page 132

1    looking at your description of the roof attics,

2    which of -- which of these five attics are the most

3    similar in your opinion?

4         A.   Well, they're all similar, Counselor.

5    They're virtually identical in construction, but the

6    one difference being the Lenna Avenue, which has a

7    metal exterior roof.  They're all passively

8    ventilated.  There's different approaches to that

9    passive ventilation.  And then of course the roof

10   height and volume and ages are different.  I don't

11   think there's -- well, I guess there's two identical

12   roof heights, but either the roof -- the height of

13   the roof or the volume has ever been associated in

14   being predictive in any way.

15        Q.   It's your opinion that the most

16   predicative quality of these roof attics are the

17   age; is that right?

18        A.   It's not just mine.  It's in the published

19   literature.

20        Q.   Yes?

21        A.   Mine and the published literature.

22        Q.   Can you grab Exhibit 3?

23        A.   Sure.

24        Q.   And if you compare Exhibit 2 and Exhibit

25   3, the corrections that you made in Exhibit 3 are

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                              Page 133

1    all from Table 4; is that correct?

2         A.   Exhibit 3, Counselor, is my final report,

3    right?  Correct?

4         Q.   Yes.

5         A.   Okay.  Exhibit 2 is the draft.  And

6    which -- which table are we talking about?  I'm

7    sorry.

8         Q.   Table 4.

9         A.   Table 4, okay.  Okay.  I'm sorry.  Go

10   ahead.  The question again?

11        Q.   What constituent data changed between

12   draft Table 4 and the final Table 4?

13        A.   Again, Counselor, my recollection was, and

14   I -- I can't point to specific ones, we had a couple

15   transcription errors.  And we, I think, had some

16   averaging of values if there were means involved.

17   That's my best recollection -- best recollection.

18   Those were the only two things we saw.

19        Q.   So the arsenic numbers changed, correct?

20        A.   The arsenic number changed slightly.  It

21   actually lowered in the final report, yes.

22        Q.   And the cobalt number -- or the cobalt

23   number changed, correct?

24        A.   That's correct, yes.

25        Q.   And the Yttrium number changed?

Page 134

1        A.   And the Yttrium number changed, yes.

2        Q.   **All right.  I counted three changes on**

3   **that page?**

4        A.   Well, actually the Yttrium number is the

5   same -- well, let me -- it's very difficult.  Do we

6   have a piece of paper I can use?  Let me look at

7   Yttrium.  Yes, the Yttrium number changed.

8        Q.   **I would hang on to that piece of paper.**

9        A.   Oh, okay.

10       Q.   **Now, let's turn the pages of both Exhibit**

11   **2 and Exhibit 3 to Table 5.**

12       A.   Table 5?

13       Q.   **Um-hmm.**

14       A.   Okay.  Okay.

15       Q.   **Table 5, the -- again, the closest**

16   **sampling location to the Mosaic emission stacks is**

17   **South 78th Street, correct?**

18       A.   That's my recollection, yes.

19       Q.   **Followed by 8616 Progress Boulevard,**

20   **correct?**

21       A.   Yeah, it's the two -- they're very close

22   together, the two churches in Progress Village.

23       Q.   **8616 and 5202 are very close together?**

24       A.   Very close together, yes.

25       Q.   **Okay.  And then comes Miss Williams'**

Page 135

1    residence, 4810 South 87th Street, correct?

2        A.   Yes.

3        Q.   And then finally the 1906 South Lenna

4    Avenue in Seffner, right?

5        A.   Yes.

6        Q.   Okay.  When I look at revised Table 5.

7        A.   Yes.

8        Q.   And I'm looking at the column for

9    Miss Williams.

10       A.   Yes.

11       Q.   I see arsenic has changed; is that right?

12       A.   Yes, it's gone down.

13       Q.   Lead has changed; is that right?

14       A.   Yes.

15       Q.   Nickel has changed; is that right?

16       A.   Yes.

17       Q.   Zirconium has changed; is that right?

18       A.   Yes.

19       Q.   When I look at the column for 5914 South

20   78th Street, I see aluminum has changed; is that

21   right?

22       A.   Again, which location, Counselor?

23       Q.   5914 South 78th Street, the second column.

24       A.   Yes, it is lower.

25       Q.   It's changed.  Barium has changed,

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 136

 1   correct?

 2        A.   It's lower, yes.

 3        Q.   Copper has changed, correct?

 4        A.   It's lower, yes.

 5        Q.   Iron has changed, correct?

 6        A.   Yes.

 7        Q.   Sodium has changed, correct?

 8        A.   Yes, it's lower, yes.

 9        Q.   Tungsten has changed; is that right?

10        A.   Yes.

11        Q.   Vanadium has changed?

12        A.   Vanadium is lower, yes.

13        Q.   Okay.  The next column, 8616 Progress

14   Boulevard, aluminum has changed, correct?

15        A.   Yes.

16        Q.   And barium has changed, correct?

17        A.   Yes.

18        Q.   Boron has changed?

19        A.   Yes.

20        Q.   Calcium has changed?

21        A.   Calcium, yes, calcium has changed.

22        Q.   Copper has changed?

23        A.   Copper has changed, yes.

24        Q.   Iron has changed?

25        A.   Yes.

Page 137

```
 1        Q.   Lead has changed?

 2        A.   Lead, yes, lead has changed.

 3        Q.   Magnesium has changed?

 4        A.   Yes.

 5        Q.   Manganese has changed?

 6        A.   Yes.

 7        Q.   Nickel has changed?

 8        A.   Yes.

 9        Q.   Phosphorus has changed?

10        A.   Yes.

11        Q.   Potassium has changed?

12        A.   Yes.

13        Q.   Silicone has changed?

14        A.   Yes.

15        Q.   Sodium has changed?

16        A.   Yes.

17        Q.   Strontium has changed?

18        A.   Yes.

19        Q.   Titanium has changed?

20        A.   Yes.

21        Q.   Tungsten has changed?

22        A.   Yes.

23        Q.   Vanadium has changed?

24        A.   Yes.

25        Q.   Yttrium has changed?
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 138

1        A.    Yttrium has changed, yes, sir.

2        Q.    **Zinc has changed, correct?**

3        A.    Yes, correct.

4        Q.    **For 5202 South 86th Street, beryllium has**

5   **changed, correct?**

6        A.    Beryllium has lowered, yes, changed, yes.

7        Q.    **Boron has changed?**

8        A.    Boron has changed, yes.

9        Q.    **Chromium has changed?**

10       A.    Chromium has changed, yes.

11       Q.    **Copper has changed?**

12       A.    Copper has changed, yes.

13       Q.    **Lithium has changed?**

14       A.    Lithium -- I'm sorry, we're in the third

15   one, lithium -- fourth one, right?

16       Q.    **Fourth one.**

17       A.    Yes, it's changed, lowered, yeah.

18       Q.    **Nickel has changed, correct?**

19       A.    Nickel has changed, yes.

20       Q.    **Phosphorus has changed?**

21       A.    Phosphorus has changed, yes.

22       Q.    **Potassium has changed?**

23       A.    Potassium has changed, yes.

24       Q.    **Vanadium has changed?**

25             MR. WALKER:  Quick question -- never

Page 139

1          mind.  Go ahead.  Go ahead.

2                    THE WITNESS:  Vanadium has changed,

3          yes.

4     BY MR. TORRES:

5          Q.    Yttrium has changed?

6          A.    Yttrium has changed, yes.

7          Q.    Zirconium has changed, correct?

8          A.    Yes, correct.

9          Q.    Let's do the last column.  I know where

10    Billy is going, but let's do the last column.  We've

11    got some others to look at.  1906 South Lenna

12    Avenue.

13         A.    Yes.

14         Q.    Beryllium has changed?

15         A.    Yes.

16         Q.    Boron has changed?

17         A.    Yes.

18         Q.    Cadmium has changed?

19         A.    Cadmium has changed, yes.

20         Q.    Chromium has changed?

21         A.    Chromium has changed, yes.

22         Q.    Cobalt has changed?

23         A.    Cobalt has changed, yes.

24         Q.    Copper has changed?

25         A.    Yes.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 140

1       Q.    Nickel has changed?

2       A.    Nickel has changed, yes.

3       Q.    Potassium has changed?

4       A.    Potassium has changed, yes.

5       Q.    Strontium has changed?

6       A.    Strontium has changed.

7       Q.    Vanadium has changed?

8       A.    Yes.

9       Q.    Yttrium has changed?

10      A.    Yes.

11      Q.    Okay.  And you don't have to double check

12  my math, but I count 53 changes between draft Table

13  5 and final Table 5?

14      A.    You're probably close.

15      Q.    Okay.  Is that all transcription error?

16      A.    A large portion was transcription.  You'll

17  notice that for the 5914 78th Street -- excuse me,

18  wait a minute, 59 point -- 5914 South 78th and 86

19  16th Street (sic), what happened was -- is the data

20  field for each of these was the same, and my

21  associate had mistakenly put in one for both

22  basically.

23      Q.    Did anyone perform any quality control on

24  these tables?

25      A.    Well, sure, eventually, that's why this is

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

```
                                                      Page 141
 1    a draft and the other one is a final.

 2                MS. HOGAN:  Les, per the videographer

 3           we're going to have to shift you just a

 4           little more center on the table.

 5                THE WITNESS:  Okay.  Is that good?

 6                MR. TORRES:  Thank you.

 7    BY MR. TORRES:

 8        Q.    Table 6 in both reports, Exhibit 2 and

 9    Exhibit 3, there were a few changes, of course the

10    correction from arithmetic means to geometric means.

11    Do you see that?

12        A.    Yes, that was a typo.

13        Q.    And I found -- I'm sorry, yes, four

14    changes in the summary table in column one.

15        A.    This is on Table 6?

16        Q.    On Table 6.

17        A.    And the column one being for 4810 for

18    Mrs. Williams' residence.

19        Q.    Correct.  I saw a change in sodium?

20        A.    Yes.

21        Q.    But there was nothing I saw in column two,

22    5914 South 78th Street?

23        A.    Okay.

24        Q.    And 8616 Progress Boulevard I saw changes

25    to beryllium?
```

Page 142

1      A.   Progress Boulevard, beryllium, yes.

2      Q.   Lithium?

3      A.   Lithium, yes.

4      Q.   And potassium?

5      A.   Potassium, yes.

6      Q.   And then in the fourth column, 5202 South

7   86th Street, I saw one change to sodium?

8      A.   Yes.

9      Q.   And I added that up and those were four

10  changes to the numbers.  And then if we flip both

11  pages to page 77 -- I'm sorry, page 77.  Page 15.

12     A.   Okay.

13     Q.   Williams_1748 and Ungers_10 -- 010901.

14     A.   Yes.

15     Q.   I saw changes to the 5914 South 78th

16  Street for alpha, beta and gamma.  Do you see that?

17     A.   Yes, that's correct.

18     Q.   Okay.  So that added up to a little more

19  than 60 changes between the draft and the final.

20  Were the changes on Table 7 also transcription

21  errors?

22     A.   I would have to ask Mr. Thompson because

23  he did it, but they're either transcription errors

24  or just typos.

25     Q.   Would you agree with me that that's a

Page 143

1    **significant number of errors?**

2         A.   Shows you how good my quality control is.

3              MR. TORRES:  Okay.  Can we go off the

4         record for one moment?

5              MS. HOGAN:  Sure.

6              VIDEOGRAPHER:  Off the record.

7              (Off the record.)

8              (Thereupon, Ungers Exhibit No. 7, set

9    of graphs, was marked for purposes of

10   identification.)

11             VIDEOGRAPHER:  We're on the record.

12   BY MR. TORRES:

13        **Q.   Mr. Ungers, I just handed you what is --**

14   **what I marked as Exhibit No. 7, but I think I handed**

15   **you two copies.  One would be for --**

16        A.   Okay.  I'll let you take them.

17        **Q.   Okay.**

18             MS. HOGAN:  Thank you.

19   BY MR. TORRES:

20        **Q.   And this is documents Bates labeled**

21   **Ungers_003172 through 003177.  Do you recognize this**

22   **document?**

23        A.   Yes, Counselor, and this may help us out,

24   this -- these are -- herein lie -- are the missing

25   tables.  The support tables for this -- or the

Page 144

1    tables that would have been in the final report

2    included, if you will, look -- the bold is where we

3    actually got a sampling result.  The nonbold would

4    be where we got a below detection, but this would

5    have been the imputed value that we used in our

6    calculations.  So although the tables that present

7    the -- not the comparisons, but rather the results

8    are the tables that would have been in -- or are in

9    the final report.

10        **Q.    Okay.  So the bold -- the bold in Exhibit**

11   **No. -- is that 7?**

12        A.    This is Exhibit 7.

13        **Q.    Exhibit 7 would match the bold in Exhibit**

14   **2?**

15        A.    We can check, but I believe so.  If we had

16   either a data point that was above the detection

17   limit or we calculated a geometric mean above the

18   detection limit that would be indicated -- the

19   resulting number would be indicated by bold.  If an

20   individual sample was below the detection limit,

21   this reported the imputed value, which is a

22   detection limit divided by two.

23        **Q.    And -- and if we look at -- for example,**

24   **when I compare Exhibit 7, document Ungers_003172**

25   **with document page Williams_001750.**

Page 145

 1      A.   Okay.  Counselor, you're going to have to

 2  give that to me again.  You lost me in the numbers

 3  here.

 4      **Q.   In Exhibit -- grab Exhibit 2.**

 5      A.   That's the draft?

 6      **Q.   Yes.  And we're going to compare these**

 7  **tables that I'm going to hand you to the draft.**

 8      A.   Okay.

 9      **Q.   So now we are looking at the kitchen cab**

10  **RL?**

11      A.   Yes.

12      **Q.   Williams_001750?**

13      A.   Yes.

14      **Q.   And comparing it to Ungers_003172?**

15           MS. HOGAN:  What's the question?

16           THE WITNESS:  Yes.  And I'm sorry.

17      What's the question, Counselor?

18  BY MR. TORRES:

19      **Q.   Well, I needed to make sure we had the**

20  **right documents before I got there.**

21      A.   Yeah.  Sure.

22      **Q.   What -- what does RL stand for?**

23      A.   That's -- we designated that because

24  that's what the lab usually calls a reporting limit.

25      **Q.   Okay.  Now, between Williams_001750 and**

Page 146

1    Ungers_003172, I counted 39 changes between the

2    columns listed arithmetic mean, geometric mean and

3    geometric standard deviation.

4        A.   And changes how, Counselor?

5        Q.   For example, in the draft report --

6        A.   Yes.

7        Q.   -- antimony shows nonreportable and, of

8    course, you came up with an imputed value in the

9    revised table, Exhibit 7; is that right?

10       A.   Yes.

11       Q.   And the same is true for beryllium, right?

12       A.   Oh, I'm sorry.  Beryllium, yes.

13       Q.   And for bismuth?

14       A.   Yes.

15       Q.   And for lithium?

16       A.   Lithium, yes.

17       Q.   And for molybdenum?

18       A.   Yes.

19       Q.   And for platinum?

20       A.   Yes.

21       Q.   And selenium?

22       A.   Yes.

23       Q.   And silver?

24       A.   Yes.

25       Q.   And tellurium?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 147

```
 1        A.    Yes.

 2        Q.    Thallium?

 3        A.    Yes.

 4        Q.    Tin?

 5        A.    Yes.

 6        Q.    Tungsten?

 7        A.    Yes.

 8        Q.    And uranium?

 9        A.    Yes.

10        Q.    Okay.  Those were the 39 changes that I

11   counted in those three columns?

12        A.    Counselor, they weren't changes.  What we

13   did is in order to make it easy to read in the draft

14   and in the final on the -- the summary table, we had

15   convention of -- of looking at -- of using these

16   footnotes.  Now, we use the term not reportable, but

17   basically they're below the reporting limit of the

18   method, which means there may be something there,

19   may not.  But to inform anyone reading this in the

20   final documents, we put in the actual imputed value;

21   or in the case of a mean calculation, it would have

22   been the mean of the imputed values.

23        Q.    Did you use any of these imputed values

24   when you did your statistical analysis that was

25   Exhibit 5?
```

Page 148

1      A.   Exhibit 5 being, just so -- I don't

2  remember.  That's the phosphogypsum, that one.  Yes,

3  there were a minority of them, only a handful, but

4  yes.

5      Q.   Would that affect the r2, the R

6  coefficient?

7      A.   No, it shouldn't because it's indicative

8  of their rank still.  I mean, we just -- you can in

9  the broad sense say we were unable to detect

10  anything, but we know at the limits where we

11  can't -- we have a detection limit, and obviously in

12  ranking an element that has a very low detection

13  limit, we don't find it is by definition lower than

14  another element for which the detection limit is

15  higher and can be used in a -- in a Spearman rank.

16      Q.   So they go into the calculation, they're

17  just lower in the rank?

18      A.   That's the basis for Spearman's rank --

19  rank orientation.

20      Q.   Can you turn the page in Exhibit 7?

21      A.   Yes.

22      Q.   To Ungers_003173?

23      A.   Yes.

24      Q.   And you have some of the numbers here in

25  red, what do they signify?

Page 149

1        A.   Yes, the red number indicates that the --

2   let me describe the column first.  We've got the

3   element and the symbol for it.

4        **Q.   Um-hmm.**

5        A.   The geometric mean is the geometric mean

6   for the samples taken at 4810 and should be

7   identical to the geometric mean in the final draft,

8   okay.  If it was red, for instance, in the first

9   column, that's a Chen study, that was Chen's

10  geometric mean for all the soils in Florida.  So we

11  colored it red, it was an easy visual indication for

12  us that our sample population was higher than the

13  population -- our sample geometric mean was higher

14  than the geometric mean of the samples in Chen's

15  report.  If it wasn't colored red, then it wasn't

16  higher.

17       **Q.   I understand.  I appreciate that.  Is Chen**

18  **1990 -- the column that is Chen 1999 geometric mean**

19  **in Ungers 003173, is that listed in your list of**

20  **references in your report?**

21       A.   The Chen 1999, yes.

22       **Q.   Yes.  And which one is it?  Can you go**

23  **to -- that would be Exhibit 1.**

24       A.   There was several Chen documents, as I

25  recall.  If memory serves me right, we can look at

Page 150

1    the document if we have it.  It would have been one,

2    two, three -- the fourth from the bottom, Chen, M.

3    et al., baseline concentrations of 15 trace elements

4    in Florida surface soils, 1999.

5          **Q.    I'm going to hand you that article, which**

6    **I will mark as Exhibit 8.**

7                  **(Thereupon, Ungers Exhibit No. 8,**

8    **Baseline Concentrations of 15 Trace Elements in**

9    **Florida Surface Soils article, was marked for**

10   **purposes of identification.)**

11   BY MR. TORRES:

12         **Q.    Is the article that I just handed you**

13   **marked as Exhibit A (sic) the same reference as in**

14   **Exhibit 1, your report?**

15         A.    Yes, I believe so.

16         **Q.    Okay.  Can you show me where in this**

17   **article the geometric mean is provided for aluminum?**

18         A.    Yeah, Counselor, some of the other --

19   some -- if they were missing an analysis, it was

20   informed by one of our other articles because I know

21   we had to -- we had to determine a few.  And I'm not

22   saying it's not in here somewhere.  There were -- as

23   I recall the presentations on these, there was --

24   they did the 15 -- let me see a second here.  Yeah,

25   here we go.  If you will turn to -- there's a table

Page 151

1    of the 15, which was the focus of our study, if you

2    go to Table 1, statistical -- this is on Ungers

3    004850.

4         Q.   I have it.

5         A.   If you will go to the second -- it's Table

6    1, statistical summary of selected properties of the

7    samples in the study, if you go to the second row

8    and over you'll see total aluminum, and that should

9    be the value that was used, and I believe it is.  It

10   would be the mean of 1.41, but I think these were

11   parts per -- well, I think we -- we had to convert

12   them, I'm sorry, to the values here, grams per

13   kilogram is 1.41, milligrams per kilogram is 1,410,

14   so that's where we got the aluminum.

15        Q.   Okay.  And the next column, Chen 1999 --

16   Chen 1999 calculated baseline.

17        A.   Yes.

18        Q.   Parts per million.

19        A.   Yes.

20        Q.   That is -- that would be Table 3 in

21   Exhibit 8, correct?

22        A.   Table 3 --

23        Q.   Ungers_004852.

24        A.   I believe that that's true unless we

25   informed it with -- we had additional baselines it

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                        Page 152

1    might have been calculated by Chen, you know, like

2    this table.

3         Q.   Understood.

4         A.   Yeah.

5         Q.   Okay.  And Chen 2001, calculated baseline

6    per disturbed soil, is that the last reference on

7    Ungers -- same -- same place where the first Chen

8    article was, page 21 of Exhibit 1?

9         A.   I believe so, yes.

10        Q.   Okay.  So that would be Chen taxonomic and

11   geographic distribution of total phosphorus in

12   Florida surface soils, correct?

13        A.   That's correct yes.

14        Q.   Okay.  And the last column in Exhibit 7,

15   Florida residential soil target cleanup levels, what

16   is that?

17        A.   That is reference number -- that's the

18   second reference on page Ungers 010923, soil cleanup

19   target levels Florida Department of Environmental

20   Quality, February 2005.

21             (Thereupon, Ungers Exhibit No. 9,

22   Table 2, Technical Report, Soil Cleanup Target

23   Levels, was marked for purposes of identification.)

24   BY MR. TORRES:

25        Q.   I'm going to hand you Exhibit 9, which is

Page 153

1   Bates labeled Ungers_004887 through Ungers_004916.

2   Do you see that?

3        A.    4887 to 4915, I've got it.

4        Q.    4916.

5        A.    You're right, 4916, yes.

6        Q.    Okay.  Those are the soil target cleanup

7   notes, correct?

8        A.    Yes, this is what came off the Florida

9   website.

10             (Thereupon, Ungers Exhibit No. 10,

11  Soil Cleanup Target Levels comparison table, was

12  marked for purposes of identification.)

13  BY MR. TORRES:

14       Q.    All right.  And I'm going to hand you

15  Exhibit 10, which is Ungers_004917 through -- my

16  assistant may have added an additional page at the

17  end, you can just tear that off.  Can you just tear

18  off the last page?

19       A.    Last page?

20       Q.    Yes.  Thank you.  And these are -- Exhibit

21  10 is also soil cleanup target levels showing the

22  changes between 1999 and 2005; is that right?

23       A.    That's what it says, yes.

24       Q.    All right.  And in Exhibit 7, why did you

25  include the column Chen calculated baseline?

Page 154

1      A.    The Chen article -- this is the Chen 1999

2   calculated baseline?

3      **Q.    Yes.**

4      A.    Yes, the Chen article wanted to establish

5   baseline concentrations for use in determining

6   background levels on average across the state.  And

7   as she states in her article that, you know, the --

8   historically, I think, they've used different

9   parameters, different qualities of data, but she

10  selected the 99 percent level, the two standard

11  deviations, as a guide for determining soil that's

12  contaminated and soil that isn't contaminated.

13     **Q.    So Chen 1999 calculated baseline,**

14  **basically provides background for Florida soils?**

15     A.    That was the -- that was her attempt, yes.

16     **Q.    Okay.**

17     A.    To define a background.

18     **Q.    Okay.  And you also added the column**

19  **Florida residential soil target cleanup levels?**

20     A.    Yes.

21     **Q.    Why did you add that column?**

22     A.    I just wanted to compare it.

23     **Q.    Okay.  And with this page, Ungers_003173,**

24  **why wasn't this analysis included with the draft**

25  **soil study?**

Page 155

1      A.   Well, the -- I don't know.  The draft was

2   created at a certain point in time and we hadn't

3   finished it.

4      **Q.   Okay.  So when you had created the draft,**

5   **had you compared geometric means of the constituents**

6   **you sampled to the Chen 1999 calculated baseline?**

7      A.   I actually don't remember when we did

8   this.  I don't -- if recollection serves me

9   properly, Counselor, we were trying to get our

10  samplings out in draft form out to the attorneys,

11  and my -- I don't think we did it by then, we might

12  have started on it, but it wasn't complete.

13     **Q.   Well, the sampling was complete because in**

14  **your draft you include sampling?**

15     A.   Well, Counselor, it's true we had

16  collected all our samples, but my reports aren't

17  complete until I issue the final, and, of course

18  like you said, we had to do our quality control and

19  we were in the process of analyzing the data.

20     **Q.   Were you aware of any deadline by which**

21  **you needed to provide your reports?**

22     A.   Only that they were interested in seeing

23  it even if it was in draft form.

24     **Q.   So you hadn't been advised of it -- well,**

25  **I won't ask that.**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                          Page 156
 1                    MS. HOGAN:   Good choice.
 2    BY MR. TORRES:
 3         Q.    The Florida residential soil target
 4    cleanup levels, when I look at the kitchen cabinet
 5    sample results --
 6         A.    Yes.
 7         Q.    -- there is only one -- one exceedance; is
 8    that right?
 9         A.    Yes, there was one value -- well, the
10    arsenic value was -- exceeded Chen -- the baseline
11    Chen for the surface soil.  And if you feel the
12    comparison appropriate had it been soil, it would
13    have exceeded that 2.1, yes.
14         Q.    And did you feel the comparison
15    appropriate in this case?
16         A.    Yes, I think -- well, I think it's
17    informative to the extent that if this had been soil
18    one would be wondering whether or not we need to
19    clean it up.
20         Q.    All right.  Okay.  And there's clearly no
21    dispute based on this record that only one of the
22    geometric means for one of these constituents
23    exceeds the residential soil target cleanup level;
24    is that right?
25         A.    Well, no, the -- what you're looking at,

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 157

1    Counselor, is the fact that the -- we're comparing

2    geometric means of sample populations, both mine,

3    Chen's results are baseline to these different

4    levels.  And we did in order -- obviously if the

5    means is higher we had at least one -- sometimes we

6    had more samples that exceeded this value, actual

7    physical samples, but again we took the geometric

8    average.

9        Q.   And my question is this is the only

10   geometric mean that exceeds the Florida residential

11   soil target cleanup level, correct?

12       A.   If memory serves me right, that's correct,

13   yes.

14       Q.   Okay.  Is there a method for comparing

15   indoor dust to outdoor soil?

16       A.   Well, there is in the scheme of using

17   attic dust, and that is you use two backgrounds to

18   make a comparison, a regional soil report or soil

19   characterization, and then the actual local

20   background.  And we wanted to do both just to be as

21   comprehensive as we could.

22       Q.   Does the EPA Exposure Factors Handbook

23   address this?

24       A.   I don't know, Counselor, as I sit here.

25       Q.   All right.  Let's turn the page to -- in

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 158

1    **Exhibit 7 to Ungers_003174.**

2         A.    Okay.

3         **Q.    And compare it to Williams_001751.**

4         A.    Okay.

5         **Q.    In Exhibit 1.**

6         A.    Counselor, will I need Exhibit 8 again?

7         **Q.    I don't think so.**

8         A.    Okay.  Let me get it out of my way.

9         **Q.    Thank you.**

10        A.    Okay.  So we're comparing the draft

11   document 11 -- 001751?  I'm sorry.

12        **Q.    Yes, 001751.**

13        A.    Right.

14        **Q.    To 003174, yes.**

15        A.    Yes.

16        **Q.    And these are basically the similar types**

17   **of changes, correct, similar types of differences**

18   **where you had to provide imputed values for what**

19   **would be nonreports in the draft; is that right?**

20        A.    Well, the nonreports are the nonreports.

21   We basically put in in place of the asterisks.

22        **Q.    Okay.  And here I counted 42 differences**

23   **where you might have had an asterisk before, but now**

24   **you put in a value, correct?**

25        A.    Yes, we supplied the value on this.

Williams, Rhonda v. Mosaic Fertilizer, LLC                Leslie Joseph Ungers

Page 159

1        Q.   And let me ask you a question, why are

2    some of the values for the imputed values identical?

3        A.   Because the detection limits would have

4    been identical.

5        Q.   The same?

6        A.   The reporting allowance would have been

7    the same.

8        Q.   Got you.  And if I turn in Exhibit 7 to

9    Ungers_3175.

10       A.   Okay.

11       Q.   Again, I see one geometric mean exceeding

12   the Florida residential soil target cleanup level,

13   correct?

14       A.   That's correct, yes, Counselor.

15       Q.   And the kitchen cabinet data for arsenic

16   appears to be -- is -- forgive me, my error.  I'm

17   looking at too many numbers.

18       A.   I understand completely.

19       Q.   Let's flip the page on page seven to

20   Ungers_003176.  And these are the soil samples?

21       A.   Yes.

22       Q.   And I saw no changes between the draft

23   Williams_001752 and this page Ungers_003176?

24       A.   That's probably true, yes.

25       Q.   And when I flip the page on Exhibit 7 to

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 160

1    the last page, Ungers_003177.

2         A.   Yes.

3         Q.   **There are no exceedances of Chen 1999**

4    **calculated baseline for geometric means or for**

5    **Florida residential soil target cleanup levels,**

6    **correct?**

7         A.   Well, as you're comparing means we

8    actually got samples above the Chen level and, I

9    believe, I would have to go back and look whether

10   they were above the Florida cleanup, but these again

11   were averages.  We did get, I think, actual samples.

12        Q.   **All right.  No -- no average exceeds a**

13   **Chen baseline or a Florida S -- STCL, correct?**

14        A.   That's correct, yes.

15             MR. TORRES:  Okay.  Let's break.

16             VIDEOGRAPHER:  We're off the record.

17             (Off the record.)

18             (Thereupon, Mr. Mink left the room.)

19             (Thereupon, Mr. Walker left the

20   videoconference.)

21             (Thereupon, Ms. Galeoto left the

22   videoconference.)

23             VIDEOGRAPHER:  We are on the record.

24             MR. TORRES:  Okay.  We are back on

25        the record after spending some time

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 161

1           discussing Exhibit No. 2 and trying to make

2           a determination whether it was

3           inadvertently produced or not.  We have not

4           come to any definitive conclusion.  What we

5           are going to do is we are going to continue

6           the deposition.

7                We'll all go back to our respective

8           offices at the end of the week and we'll

9           try to figure this issue out and what the

10          outcome may be and whatever the parties'

11          position might be regarding that.  In the

12          interim, I will not be referring to Exhibit

13          2 and we will continue the deposition as

14          best we can with the idea that there's a

15          possibility that it might be reconvened in

16          the future depending on the outcome when we

17          return home.  Is that a fair recitation?

18               MS. HOGAN:  Yes, I agree.

19               MR. TORRES:  Thank you.

20               MS. HOGAN:  So we will leave it open

21          by agreement at the end of the day today

22          pending resolution of the issues

23          surrounding Exhibit 2.

24               MR. TORRES:  Okay.  Thank you.

25               (Thereupon, Ungers Exhibit No. 11,

Page 162

1    dust and soil summary table for 4810 S. 87th St.

2    attic, was marked for purposes of identification.)

3    BY MR. TORRES:

4         **Q.   Mr. Ungers, I'm going to hand you Exhibit**

5    **11.  Do you recognize Exhibit 11?**

6         A.   Yes.

7         **Q.   And Exhibit 11 would be part of your final**

8    **dust and soil summary, correct?**

9         A.   I mean, yes, the table -- this would have

10   been the table in the final report.

11              MR. TORRES:  Okay.  And one more --

12              one more note for the record, we do not

13              have a Exhibit A to what is -- what we

14              believe is the current final dust and soil

15              study yet, and that will be one of the

16              other -- that will be part of what we

17              address when we get home, but for the

18              meanwhile the current documents that we are

19              looking at we believe are those -- are

20              those records.

21   BY MR. TORRES:

22        **Q.   Okay.  Mr. Ungers, going back to Exhibit**

23   **11, please.**

24        A.   Yes.

25        **Q.   On the second page, Ungers_003160.**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                              Page 163

1        A.   Yes, sir.

2        **Q.   We see a few geometric means above the**

3   **Chen 1999 calculated baseline and we see one**

4   **exceedance of the Florida residential soil target**

5   **cleanup levels, correct?**

6        A.   Yes, if you're comparing the means, yes.

7             (Thereupon, Ungers Exhibit No. 12,

8   dust and soil summary table for 5914 S. 78th St.

9   attic, was marked for purposes of identification.)

10  BY MR. TORRES:

11       **Q.   Yes.  Thank you.  Sir, I am going to hand**

12  **you Exhibit 12.  If you can please review Exhibit 12**

13  **and tell me whether you recognize it?**

14             MS. HOGAN:  For the record, it's

15        Bates page Ungers 003182 through 003185.

16             MR. TORRES:  Thank you.

17             THE WITNESS:  Yes.

18  BY MR. TORRES:

19       **Q.   And turning to page 003183.**

20       A.   Yes.

21       **Q.   For this property there is only one**

22  **geometric mean exceedance of the Chen 1999**

23  **calculated baseline; is that correct?**

24       A.   No, there are two, copper and zinc.

25       **Q.   Thank you.  I didn't look down.  And there**

Page 164

1    are no exceedances for the Florida residential soil

2    target cleanup correct?

3        A.    For the ones they set, no.

4        Q.    And as we turn to the last page, 003185.

5        A.    Yes.

6        Q.    There is one exceedance -- one geometric

7    mean exceedance for soil above the Chen 1999

8    calculated baseline, correct?

9        A.    Correct.

10        Q.    And none -- and no exceedances of the

11    Florida residential soil target cleanup levels,

12    correct?

13        A.    Correct.

14              (Thereupon, Ungers Exhibit No. 13,

15    dust and soil summary table for 5914 S. 78th St.

16    soil, was marked for purposes of identification.)

17    BY MR. TORRES:

18        Q.    Thank you.  Handing you, sir, Exhibit 13.

19    And do you recognize Exhibit 13?

20        A.    Yeah, I think this is a repeat of the

21    previous exhibit.

22        Q.    That's possible.

23        A.    Yeah, this is, I think, a repeat of the

24    last two pages of the previous exhibit.

25        Q.    It appears to be a duplicate -- it appears

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                        Page 165

1    to be a duplicate.  Thank you.

2         A.    Okay.

3                (Thereupon, Ungers Exhibit No. 14,

4    dust and soil summary table for 8616 Progress Blvd.

5    attic, was marked for purposes of identification.)

6    BY MR. TORRES:

7         Q.    Handing you Exhibit 14, would you please

8    review it and tell me whether you recognize it?

9         A.    I do.

10        Q.    And as we turn to page 003187.

11        A.    Yes.

12        Q.    There are three geometric mean exceedances

13   the Chen 1999 calculated baseline, correct?

14        A.    I believe there are four.

15        Q.    There are four.  I did not look down

16   again.  And there are two of the Florida residential

17   soil target cleanup levels, correct?

18        A.    That's correct sir.

19        Q.    And as we turn to 003189, there are no

20   geometric mean exceedances of Chen 1999 calculated

21   baseline; is that correct?

22        A.    Correct.

23        Q.    And there are none above the soil target

24   cleanup level, correct?

25        A.    Correct.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                      Page 166

 1            MS. HOGAN:  Just for the record,

 2       Exhibit 14 Bates range is Ungers 003186

 3       through 3189?

 4            MR. TORRES:  My apologies.

 5            (Thereupon, Ungers Exhibit No. 15,

 6  dust and soil summary table for 8616 Progress Blvd.

 7  soil, was marked for purposes of identification.)

 8  BY MR. TORRES:

 9       Q.  Mr. Ungers, I'm handing you Exhibit 15,

10  Bates label Ungers_003165 through 3166.  Do you

11  recognize that document?

12       A.  Yes, sir.  I think this is also a

13  duplicate of the soil from the previous exhibit.

14            (Thereupon, Ungers Exhibit No. 16,

15  dust and soil summary table for 5202 S. 86th St.

16  attic, was marked for purposes of identification.)

17  BY MR. TORRES:

18       Q.  Thank you.  Handing you document Exhibit

19  16, which is Bates labeled Ungers_003178 through

20  3181.  Do you recognize it, sir?

21       A.  Yes, sir.

22       Q.  As we turn to page 003179, there are four

23  geometric mean exceedances of Chen 1999 calculated

24  baseline, correct?

25       A.  Correct.

Williams, Rhonda v. Mosaic Fertilizer, LLC                Leslie Joseph Ungers

Page 167

1       Q.   And one geometric mean exceedance of the

2    Florida residence soil target cleanup level,

3    correct?

4       A.   Correct.

5       Q.   And as we turn to the last page, 003181,

6    for the soil samples there are no geometric mean

7    exceedances of the Chen 1999 calculated baseline,

8    correct?

9       A.   Correct.

10       Q.   And no exceedances of the Florida

11    residential soil target cleanup level, correct?

12       A.   Correct.

13            (Thereupon, Ungers Exhibit No. 17,

14    dust and soil summary table for 5202 S. 86th St.

15    attic, was marked for purposes of identification.)

16    BY MR. TORRES:

17       Q.   Thank you.  I'm going to hand you document

18    17, which I suspect is a duplicate.  Will you please

19    look at that and confirm?

20       A.   Yes, this is a duplicate of the attic --

21    the first two pages of the previous deposition --

22       Q.   Now, there's no dispute, Mr. Ungers, that

23    these -- that your office prepared these documents

24    and as far as you know you believe they are complete

25    and accurate?

Page 168

1       A.   Yes, sir.

2            (Thereupon, Ungers Exhibit No. 18,

3    dust and soil summary table for 1906 S. Lenna Ave.

4    attic, was marked for purposes of identification.)

5    BY MR. TORRES:

6       Q.   Okay.  I'm handing you Exhibit 18.  Do you

7    recognize Exhibit 18?

8       A.   I do, yes.

9       Q.   And as we turn to page -- I'm sorry, the

10   Bates range for Exhibit 18, Ungers_003168 through

11   3171?

12      A.   Yes.

13      Q.   And as we turn to page 3169.

14      A.   Yes.

15      Q.   I see seven geometric means above the Chen

16   1999 calculated baseline, correct?

17      A.   That's correct, yes, sir.

18      Q.   And I see three geometric means above the

19   Florida residential soil and target cleanup levels,

20   correct?

21      A.   That's correct, yes.

22      Q.   Mr. Ungers, a lot of these have under the

23   Florida residential soil target cleanup levels for

24   barium, 120 and parentheses S?

25      A.   Yes.

Page 169

1        Q.    What does that parentheses signify?

2        A.    If I remember correctly, it's soluble.

3        Q.    Okay.  Do -- are the -- are the

4   calculations for the geometric mean for barium, were

5   those based on solubles or do you know?

6        A.    I would have to go back and look at the

7   analytical method that Florida specifies and we use

8   for barium.  I don't know as I sit here today.

9        Q.    And this 1906 South Lenna Avenue, this is

10  the furthest location from the Riverview facility?

11       A.    Yes, I think that's correct.

12       Q.    And can we turn to the last page, 3171,

13  and here I see two geometric mean exceedances of the

14  Chen 1999 calculated baseline, correct?

15       A.    Correct.

16       Q.    And none above the Florida residential

17  soil target cleanup levels, correct?

18       A.    That's correct, yes.

19             (Thereupon, Ungers Exhibit No. 19,

20  dust and soil summary table for 1906 S. Lenna Ave.

21  attic, was marked for purposes of identification.)

22  BY MR. TORRES:

23       Q.    Handing you Exhibit -- oops, handing you

24  Exhibit 19, which I believe is a duplicate, can you

25  just confirm?  And this is Ungers_003157 through

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 170

1    **3158.**

2         A.    This -- Counselor, I believe it is -- I

3    believe it is a duplicate.  However, the first two

4    pages are different.  One is the -- one is the table

5    with the asterisks.  And this second one is the --

6    or, I guess, Exhibit 19 is with the asterisks,

7    Exhibit 18 isn't.

8         **Q.    Okay.  Perhaps that is the case for the**

9    **other documents.  And it looks like that appears to**

10   **be the case for the other documents that we called**

11   **duplicate, so it looks like --**

12        A.    Oh, no -- yes, I think -- I don't know

13   about the other documents --

14        **Q.    Right.**

15        A.    -- I would have to look at them, but

16   that's true for this one.

17        **Q.    Right.  Well, it looks -- appears to be**

18   **the case for Exhibit 11?**

19        A.    I would have to look at 11 again to see.

20   Exhibit 14, Exhibit 11, Exhibit 11 was compared

21   to -- yes, I think that's the case.

22        **Q.    Okay.**

23        A.    As I look at the second page, they're

24   all -- they're duplicates, but the first page is the

25   old format.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 171

1                    (Thereupon, Ungers Exhibit No. 20,

2      dust and soil summary table for 4810 S. 87th St.

3      soil, was marked for purposes of identification.)

4      BY MR. TORRES:

5          Q.    Understood.  I'm handing you Exhibit 20 --

6          A.    Yes.

7          Q.    -- which is Bates labeled Ungers_003190

8      through 3194?

9          A.    Correct.

10         Q.    Do you recognize this document?

11         A.    I do.

12         Q.    And what is it?

13         A.    These would be a summary of the laboratory

14     results for the radionuclides at each -- of the

15     soils at each of the properties.

16         Q.    Is there a reason they're not -- the

17     results aren't compared to anything the way you

18     compared the other constituents we just looked at to

19     the Chen baselines or the residential soil target

20     cleanup level?

21         A.    Yeah, the -- my -- the format of this

22     presented both the three energy levels, if you will,

23     the three emissions, as totals.  And then the

24     laboratory was capable under the gamma to identify

25     those radioactive isotopes and their -- and their

Williams, Rhonda v. Mosaic Fertilizer, LLC                Leslie Joseph Ungers

1    atomic numbers.  The -- I didn't have anything that

2    I felt was comparable that you could compare it to

3    and so this identified the presence in the soils,

4    but -- yeah, I didn't have anything really to

5    compare my means to at that time at that point.

6         Q.   And -- and as opposed to the other

7    constituents we examined when we were reviewing

8    geometric means --

9         A.   Yes.

10        Q.   -- the -- the radiations that you looked

11   at are calculated in arithmetic means?

12        A.   That's correct.

13        Q.   Why is that?

14        A.   There are a couple of reasons -- well,

15   there's a primary reason.  Typically particulate

16   emissions exposures tend towards being geometrically

17   distributed.  I can't say the same for results that

18   are based on a combination of emitting materials.

19   In other words, there are several isotopes that make

20   up the response for alpha, several for beta and

21   several for gamma.  And I'm not certain -- in fact,

22   I've never seen a statement that says that these are

23   lognormally distributed, given that I chose

24   arithmetic.

25        Q.   Do you know whether they are higher than

Page 173

1    any background levels?

2         A.   No, I don't.

3              (Thereupon, Ungers Exhibit No. 21,

4    Technical Support Document, was marked for purposes

5    of identification.)

6    BY MR. TORRES:

7         Q.   I'm going to hand you Exhibit 21, which is

8    Bates -- it's not Bates labeled, but this is the

9    Technical Support Document.  It's pages one through

10   30.

11        A.   Yes, let me take a look.

12        Q.   Sure.  If you could just review it and let

13   me know whether you recognize it?

14        A.   I do recognize it, yes, sir.

15        Q.   Okay.  If you turn to page six, please,

16   Table 3 reads Annual SO2 Emissions, and it lists

17   Tampa Electric Company, CF Industries, Inc., Plant

18   City Phos, Mosaic Fertilizer, LLC, Envirofocus

19   Technologies, LLC, Tampa International Airport.  Do

20   you see those?

21        A.   I do.

22        Q.   Did you calculate emission contributions

23   from any of the facilities other than Mosaic

24   Fertilizer?

25        A.   I didn't calculate emission contributions

Page 174

1    for anything.

2         Q.   Can you turn to page seven?

3         A.   Sure.

4         Q.   And there is a heading Meteorology

5    weather/transport patterns?

6         A.   Yes.

7         Q.   How do you account for meteorology in your

8    opinions?

9         A.   I'm not sure I understand the question,

10   Counselor.

11        Q.   Did you consider meteorology at all in

12   drawing your opinions?

13        A.   Yes.

14        Q.   And in what way?

15        A.   Again, the -- in the direction of the

16   potential for releases from Mosaic facilities,

17   including stacks, in the direction of Mrs. Williams'

18   residence and those neighborhoods.

19        Q.   Can you turn to page eight?

20        A.   Sure.

21        Q.   And do you see Figure 3?

22        A.   I do, yes.

23        Q.   And what is Figure 3?

24        A.   It's a wind rose of -- for the years 2009

25   to 2011, that would be four -- five, five years, I

Page 175

1   believe, exceeding the one hour SO2 National Ambient

2   Air Quality Standard at the violating monitor.

3       **Q.   Okay.  And the --**

4       A.   It's not a clear description because wind

5   rose don't show violations, but I take it to mean

6   they're -- they're showing the wind direction.

7       **Q.   And in Figure 3, at least for these -- at**

8   **least in Figure 3 the predominant wind direction is**

9   **to the southeast, correct?**

10      A.   The curious thing I have here, Counselor,

11  is the display in three is definitely coming from

12  the -- from the northwest to the southeast.  And I

13  know the title says 2009 to 2011, but the date on

14  the production for that run of the display -- okay,

15  that may be the date of the run, 2009.  Yes, that's

16  what that's showing.  I'm sorry.  I'm just trying to

17  put them together.

18      **Q.   I understand.  Thank you.  Can we turn to**

19  **page nine?**

20      A.   Yes.

21      **Q.   And did you consider geography or**

22  **topography in -- in any way in your opinions?**

23      A.   Well, certainly geography because we're

24  locating the sources and the receptors.  In terms of

25  topography, it's certainly important for a waste

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 176

1    stack that is over 200 feet in the air, but that

2    didn't have -- it's not a variable that -- that

3    would have an impact on my results.  It might on

4    modeling results, but not -- not on sampling.

5        Q.   Can you turn to page ten?

6        A.   Yes.

7        Q.   And the top of page ten, the second

8    sentence says the AERMOD model results were used to

9    determine that aerial extent to which the Mosaic

10   Riverview facility would be potentially violating

11   the standard.  Do you see that?

12       A.   Yes.

13       Q.   Did you review the AERMOD model results?

14       A.   As presented here, yes.

15       Q.   I'm pretty sure I asked this before, so

16   forgive me if I have, Figure 4, the aerial photo

17   with the non-attainment area boundary.

18       A.   Yes, that would be the white line.

19       Q.   Yes.  Miss Williams is outside of that

20   boundary, correct?

21       A.   Her residence is just to the north of one

22   of the boundaries, yes.

23       Q.   Okay.

24            MS. HOGAN:  For the record, this

25         document entitled Technical Support

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

```
                                                    Page 177
   1            Document was produced with Bates numbers in

   2            the Ungers production.

   3                    MR. TORRES:  Thank you.

   4                    (Thereupon, Ungers Exhibit No. 21,

   5    summary of air monitoring data, was marked for

   6    purposes of identification.)

   7    BY MR. TORRES:

   8        Q.   Sir, I'm going to hand you Exhibit 21,

   9    which is Bates labeled Ungers_006525.

  10        A.   Yes.

  11        Q.   Do you recognize that document?

  12        A.   Yes.

  13        Q.   And what is it?

  14        A.   This is a summary of the air quality

  15    data -- air monitoring data, excuse me.  And this is

  16    going back a little ways, Counselor.  I believe it

  17    was available through the state.  I could be wrong.

  18    It could be the federal EPA.  And it was an attempt

  19    on my part to summarize the site locations of

  20    monitors.  What they looked for, their coverage and

  21    locations.

  22        Q.   And is it right that the -- the only

  23    sulfur dioxide monitoring location that showed an

  24    exceedance of SO2 is the 9851 Highway 41 South?

  25        A.   You can't tell from this, Counselor, but
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Leslie Joseph Ungers

Page 178

1    in one of my references the letter from the

2    commission to the state identified their SO2

3    monitors, and although this was -- one of them

4    was -- only exceeded it in the last five or six

5    years, all of them exceeded it previous to that.

6         **Q.   And where is that data?**

7         A.   That would be in my reference letter.

8    Let's see, I don't have my opinion in front of me

9    here.  That's A.  Well -- yes, in Exhibit 1,

10   Counselor, on -- I believe the correct reference is

11   on Bates stamp 010923, the second from the bottom,

12   letter from D. Jellerson, I guess that's the

13   pronunciation, to the Florida Department of

14   Protection regarding Mosaic Riverview SO2 emissions.

15        **Q.   And at any of these monitoring locations**

16   **were there exceedances of PM10?**

17        A.   Not to my recollection.

18             (Thereupon, Ungers Exhibit No. 22,

19   handwritten document, was marked for purposes of

20   identification.)

21   BY MR. TORRES:

22        **Q.   Handing you Exhibit 22, which is**

23   **Ungers_004471.**

24        A.   Yes.

25             MS. HOGAN:  22 or 23?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

```
                                                    Page 179
 1                    MR. TORRES:   22.

 2   BY MR. TORRES:

 3        Q.   Sir, do you recognize Exhibit 22?

 4        A.   I do, yes.

 5        Q.   And whose handwriting is that?

 6        A.   This is mine.

 7        Q.   And what were you doing?

 8        A.   This was very early on.  I suppose I was

 9   just scoping the issues of the -- of the --

10   Mrs. Williams' case with regard to Mosaic.

11        Q.   And as we look at the sources, Roman II --

12        A.   Yes.

13        Q.   -- you listed a number of sources.  Did

14   you -- were you able to eliminate all the sources

15   other than Mosaic Fertilizer in terms of their

16   contribution to any emissions at Miss Williams'

17   home?

18        A.   No, the purpose of this was basically

19   trying to understand ownership and movement of

20   product at the different facilities.  I believe the

21   source of this -- of the item two, the first few

22   lines, ten lines or so, was from the Mosaic document

23   that I referred to previously.

24        Q.   Did -- did you make any determination of

25   contribution -- Mosaic's contributions to
```

Page 180

1   **constituents at Miss Williams' home from a chemical**

2   **processing operations?**

3       A.   Well, inasmuch that the chemical

4   processing material handling and waste disposal were

5   part of the point sources or the operations on the

6   stacks, it would be a similar answer, yes, it's

7   evident through the statistical test of the sample

8   data.

9       Q.   **But you have yet to draw a conclusion that**

10  **it is X percent?**

11      A.   I have not put a number on the percentage,

12  no, sir.

13      Q.   **And that is for all sources at all**

14  **constituents, correct?**

15      A.   Yeah, I have not put a number on it.

16              (Thereupon, Ungers Exhibit No. 23,

17  summary of point source emissions for sulfur

18  dioxide, was marked for purposes of identification.)

19  BY MR. TORRES:

20      Q.   **I am handing you Exhibit 23, which is**

21  **Bates labeled Ungers_004526.  Do you recognize that**

22  **document, sir?**

23      A.   I do, yes.

24      Q.   **And what is it, sir?**

25      A.   This is a summary of emissions information

Page 181

1    provided, I believe, if memory serves me correct,

2    Counselor, this is a reference -- a summary of

3    reference of emissions for 2003 by major sources in

4    Hillsborough County.

5         Q.   And where did this information come from?

6         A.   I think it's the 2003 emissions inventory

7    from the commission, if I remember correctly.

8         Q.   And have you ever made any determinations

9    of Teco's contributions to any constituents at

10   Miss Williams' residence?

11        A.   No.

12             (Thereupon, Ungers Exhibit No. 24, a

13   set of tables, was marked for purposes of

14   identification.)

15   BY MR. TORRES:

16        Q.   Handing you Exhibit 24, which is Bates

17   labeled Ungers_004636 through 4638.  Do you

18   recognize this document?

19        A.   Yes.

20        Q.   Can you tell me what it is?

21        A.   Yes, this was -- this is a -- a Word

22   document that I worked off of while we were

23   reviewing and selecting different -- the different

24   sites for the sampling.

25        Q.   And what does -- what does it mean Group A

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 182

1   asterisk?

2       A.   Oh, boy.  Counselor, I honestly don't

3   remember what we were -- it was definitely a

4   designation to break it down.  I think these were

5   potentially co-located, so -- but I think they're

6   based on location, but as I sit here, I don't

7   remember.  This again, was very -- this was before

8   we even did the sampling, so it's quite a while ago.

9       Q.   Was there any of these churches that

10   agreed to allow sampling that you did not sample?

11      A.   No.  We sampled everything at everyone

12   that agreed.

13              (Thereupon, Ungers Exhibit No. 25,

14   letter from Ungers & Associates, was marked for

15   purposes of identification.)

16      Q.   Handing you Exhibit 25, which is

17   Ungers_004634 --

18      A.   Yes.

19      Q.   -- through 35.  Do you recognize this

20   document?

21      A.   I do, yes.

22      Q.   And what is it?

23      A.   This is the format we used to request

24   permission to include their -- their structure in

25   the attic dust sampling.

Page 183

1      Q.   And you wrote in the first paragraph I'm

2   writing to solicit your participation in the

3   scientific study where I am the lead investigator.

4      A.   Yes.

5      Q.   Was the other investigator Mr. -- I can't

6   remember your colleague?

7      A.   Oh, my colleague is Rob Lands.

8      Q.   Rob Lands?

9      A.   Right.

10     Q.   Was there -- when you say lead

11  investigator, who else are you referring to?

12     A.   Well, I just wanted to identify myself as

13  the person to contact, but as I said, we had Mr.

14  Lands and Mr. Mink that participated in the actual

15  sampling.

16     Q.   And I know you refer to this as a

17  scientific study.  Was the purpose of this letter to

18  obtain data for this lawsuit?

19     A.   The purpose was to obtain a sampling site

20  for my study, but I was working for the --

21  Mrs. Williams in this case, yes.

22     Q.   All right.  You didn't disclose to the

23  churches that this was -- you were going to do this

24  in connection with a lawsuit, correct?

25     A.   I don't think so, no.

Page 184

1      Q.   Have you told them since that time?

2      A.   No.

3      Q.   Did any of the churches ask you for the

4  results?

5      A.   No, they didn't.

6           (Thereupon, Ungers Exhibit No. 26,

7  soil maps, was marked for purposes of

8  identification.)

9  BY MR. TORRES:

10     Q.   I'm going to hand you a composite Exhibit

11  26, which includes the documents Ungers_003109

12  through 3111, Ungers_003115, Ungers_003112 through

13  3114, Ungers_003117, 3116 and 3118.

14     A.   Sure.

15          THE WITNESS:  Counselor, if I may,

16          and I'm happy to stay here, I probably

17          should make a phone call and let -- do you

18          have any idea how much longer we'll run?

19          It doesn't have to be exact, just a guess.

20          MR. TORRES:  I think an hour.

21          THE WITNESS:  So we would be, say,

22          6:30 then?

23          MR. TORRES:  Yes.

24          THE WITNESS:  Okay.  If I can excuse

25          myself, I can make a phone call.

Page 185

1          MR. TORRES:  Absolutely.  Let's go

2      off the record.

3          VIDEOGRAPHER:  We're off the record.

4          (Off the record.)

5          VIDEOGRAPHER:  We're on the record.

6  BY MR. TORRES:

7      **Q.   Mr. Ungers, I just handed you Exhibit 26.**

8      A.   Yes.

9      **Q.   Do you recognize it?**

10     A.   I do.

11     **Q.   What is it?**

12     A.   These are aerial photos of the

13  neighborhood and property, buildings of the various

14  sites that we sampled at that designate the soil

15  type for that property.

16     **Q.   Is that all these maps were used for?**

17     A.   Well, we wanted to be informed and,

18  Counselor, I want to add to a previous response.  I

19  had found this -- this was done by Wayde Hartwick

20  who is another employee of mine, and he's a

21  geologist and I frankly had forgotten that he had

22  gone through this.  These were used to identify the

23  soil types, so that we could better interpret any of

24  the background choices we made regarding local soil

25  type or regional.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                              Page 186

 1          Q.    And, Mr. Ungers, if I wanted to follow up

 2    with your staff regarding preparation of the

 3    collection of data, preparation of the calculations

 4    conducted, site visits and things like this mapping,

 5    I believe there are three people at your office I

 6    would speak with; is that correct?

 7          A.    Yeah, and in the capacities that they

 8    work, those would be the three people, yes.

 9          Q.    And could you just state their names for

10    the record one last time?

11          A.    Again, the three individuals that worked

12    on this were Chris Thompson, Rob Lands, with an S, L

13    A N D S, and Wayde, W A Y D E, Hartwick and that's H

14    A R T W I C K.

15                  (Thereupon, Ungers Exhibit No. 27,

16    aerial photographs, was marked for purposes of

17    identification.)

18    BY MR. TORRES:

19          Q.    Thank you.  Mr. Ungers, I'm handing you

20    Exhibit 27 --

21          A.    Sure.

22          Q.    -- which have no Bates numbers, but are

23    clearly some type of photographs taken from the air.

24    Do you recognize these photos?

25          A.    I do.

Page 187

1        Q.    And do you know who took them?

2        A.    It was a videographer.  I don't recall his

3    name.

4        Q.    Do you know who retained him?

5        A.    I believe the -- Mr. Walker did, but I

6    don't know for sure.

7        Q.    Do you know who the videographer is?

8        A.    I met him briefly, but no, I don't -- I

9    don't remember his name.

10       Q.    Did you rely on these photos for any

11   reasons?

12       A.    I mean, they -- they inform quite a few

13   things about the stack operations and the locations

14   of various things, but beyond that, that would be

15   about it.

16             MS. HOGAN:  For the record there is a

17         Bates number on it.  It's extremely small

18         in the lower right-hand corner.  I can

19         provide those to you.

20             MR. TORRES:  Oh, my.

21             MS. HOGAN:  If that would be of

22         assistance to you.

23             MR. TORRES:  Thank you.

24             THE WITNESS:  Counselor, are we done

25         with 26 and 27?

Page 188

1              MR. TORRES:  Yes, we are.  Thank you.

2    BY MR. TORRES:

3         Q.   **Mr. Ungers, when we look at Exhibit 3 --**

4         A.   Yes.

5         Q.   **-- and we look at Table 6?**

6         A.   Table 6, yes.

7         Q.   **Yes.  What is the -- is there a -- an**

8    **equation or a formula that you use to demonstrate**

9    **the relationship between the age of a roof and the**

10   **soil samples?**

11        A.   Yes.

12        Q.   **And where is that?**

13        A.   That was a -- a statistical analysis that

14   I did where we compared the phosphorus levels at

15   the -- in the attics to the phosphorus level in the

16   phosphogypsum.

17        Q.   **And where -- where is that in -- in your**

18   **report?**

19        A.   That's not in the report.  That was done

20   later at the same time that I did the statistical

21   comparison of the phosphogypsum and her attic dust,

22   the actual numerical ones.

23        Q.   **Was that produced to us, do you know?**

24        A.   That was in the stuff that I -- yes, I

25   mean I gave it to the attorneys.

Page 189

1       Q.   **Was that in this morning's documents?**

2       A.   I would have to look again.  I don't

3   recall it, but --

4       Q.   **I'll hand you what I have left.**

5       A.   Yeah.  Okay.  These are all copies again,

6   right, Counselor?

7       Q.   **Yes.  Yes.**

8       A.   Okay.  So assuming I don't need to go

9   through -- okay.  Put that there.  Put that there.

10  Blue one, I don't see it here.

11              MS. HOGAN:  Off the record.

12          That's probably my --

13              VIDEOGRAPHER:  Off the record.

14              (Off the record.)

15              (Thereupon, Ungers Exhibit No. 28,

16  Spearman Rank-Order Correlation Coefficient article,

17  was marked for purposes of identification.)

18              VIDEOGRAPHER:  We're on the record.

19              MR. TORRES:  Thank you.

20  BY MR. TORRES:

21      Q.   **Mr. Ungers, I had asked last whether there**

22  **was any formula that relates the age of a -- of a**

23  **roof with sample concentrations, and I believe you**

24  **said that it would be this document 28; is that**

25  **correct?**

Page 190

1      A.   Yes, sir.

2      Q.   And what is document 28, sir?

3      A.   Again, it's a printout, a different scale

4  just because of my printer, I think, of the same

5  Spearman rank correlation software from the Vassar

6  site that we used.  The first page provides you

7  things we talked about in terms of the --

8  interpreting the tables in the past.  And then this

9  was the same rank analysis we did except we compared

10  the concentration to the age of the attic.

11      Q.   And -- and you compared concentration of

12  what?

13      A.   Of -- of the phosphorus in the

14  phosphogypsum -- excuse me, no, I'm sorry.  The

15  phosphorus in the attic samples.

16      Q.   Okay.  So you compared, for example, 64

17  years with the 5396.61 on Table 5 of dust and

18  surface soil study, correct?

19      A.   Well, I know that this -- 64 would have

20  been the year of the -- of the age of the attic at

21  Lenna.  Is that Lenna?

22      Q.   Um-hmm.

23      A.   That pronunciation.  And that 5397 should

24  have been the concentration in the attic dust.

25      Q.   And on Exhibit 28, the second page --

Page 191

1        A.    Yes.

2        **Q.    -- you see the -- Miss Williams' address**

3  **lined up with the phosphorus in Table 4 of 1021.85,**

4  **correct?**

5        A.    That's the 52 and the 1022, is that what

6  you said?

7        **Q.    Yes.**

8        A.    Yes.  I mean, I'm assuming --

9        **Q.    Yes?**

10       A.    -- you're reading those correctly, yes.

11       **Q.    Yes.  And the 53 is matched with a 683.76**

12  **for the 5202 South 86th Street?**

13       A.    Yes, we rounded to a whole number.

14       **Q.    Right.  And the 34-year-old roof, the 5914**

15  **South 78th Street, is matched to 526, which is not**

16  **on Table 5 of your study.  Do you know why?**

17       A.    I would have to look.  Let me look at the

18  table.

19       **Q.    It's Exhibit 3.**

20       A.    Exhibit, too many exhibits here.  Exhibit

21  3, 10, 12.  Which one was Exhibit 3, Counselor?  I'm

22  not --

23       **Q.    It is the final settled dust and surface**

24  **soil study.**

25       A.    Okay.

Page 192

1           MS. HOGAN:  Do you mind if he uses my

2      copy for ease?

3           MR. TORRES:  No, it doesn't matter.

4           THE WITNESS:  Okay.  Well, this would

5      be in the tables.

6  BY MR. TORRES:

7      **Q.    Yes, I'm looking at Table 5.**

8      A.    You're looking at Table 5?

9      **Q.    Yes.**

10     A.    And we're talking about the fourth one,

11  right?

12     **Q.    Yes, exactly.  Yes, I'm looking at -- the**

13  **three pages I'm looking at are the second page of**

14  **Spearman rank order correlation coefficient, Table**

15  **2 --**

16     A.    And the one --

17     **Q.    -- and Table 5?**

18     A.    The one in question is -- the one that you

19  have for me is the one that's 34 years old?

20     **Q.    Correct.**

21     A.    Okay.  34 years old, yes -- no, that value

22  is there.  If we had the table that provided the

23  imputed geometric mean, that's the number that would

24  be there.

25     **Q.    So -- okay.  So the 526 is an imputed**

Page 193

1   mean?

2        A.   Yes.

3        Q.   Why is that an imputed mean?

4        A.   Well, because the -- the four -- the

5   sample in the attic dust, they would have been below

6   the reporting limit for that sample.  It's the same

7   situation as in the previous analysis.  It doesn't

8   affect the rank because it's -- it's low, it's below

9   detection, and so we use that value.  I shouldn't

10  say it doesn't affect the rank, it establishes the

11  rank.

12       Q.   And when I look at, for example, Exhibit

13  5, if you could pull out Exhibit 5 one more time.

14       A.   Yes, Exhibit 5, is that it?  Thank you.

15  Yes.

16       Q.   The first row -- and I'm looking at

17  Ungers_010938.

18       A.   I'm sorry, Counselor, I'm not following.

19       Q.   I'm looking at --

20       A.   Oh, I see.  It's the Bates stamp number.

21       Q.   Right.

22       A.   938?

23       Q.   Yes.

24       A.   Yes.

25       Q.   And that number one across goes 1 25 25

Page 194

1   740 985.46, right?

2        A.   Yes.

3        Q.   Is that the rank, is that number one?

4        A.   No, no, that -- again, I mentioned that

5   earlier.  That's the first row.  The rank for X and

6   the rank for Y are both 25th.

7        Q.   So in 010938 --

8        A.   010 --

9        Q.   938, Exhibit 5.

10       A.   Okay.

11       Q.   What is the constituent that contributes

12  the most to the R coefficient?

13       A.   Again, Counselor, I'm just getting

14  confused here.  Oh, I'm looking for the Bates stamp

15  number.  I don't have -- I don't have --

16       Q.   It's the first -- first page of Exhibit 5.

17       A.   Oh, okay.  Okay.  Yes.

18       Q.   I'm just asking generally which is the --

19  which constituent is -- contributes most to the R --

20  to the r2, to the R coefficient?

21       A.   My -- again, I would have to look at

22  the -- the -- the formulas for and the -- the

23  methodology for the Spearman, but they all

24  contribute equally as individual entities because

25  they get ranked.  The combined ranking is the

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 195

1    objective assessment of the relationship.  When I

2    say combined ranking, comparing all the ranks of all

3    the constituents.

4         **Q.   When you say rank, I'm not sure I follow**

5    **you in terms of what rank means then?**

6         A.   The Spearman looks at the values and ranks

7    each of the constituents.

8         **Q.   Um-hmm.**

9         A.   In the order they are within their

10   samples, and they do it for both X and Y.

11        **Q.   What does that mean, ranks them in the**

12   **orders they are within their samples?**

13        A.   In other words, if -- if the -- if a

14   substance was the first -- was ranked first then --

15   in both, then it would get a ranking of one, that

16   means it was prominent.  And then if it was last, it

17   would be ranked last.  A constituent can be ranked,

18   say, 16th in one and 17th in another, that would be

19   considered a very strong relationship.

20        **Q.   Um-hmm.**

21        A.   A constituent ranked first in the other

22   and 29th would be considered a very unlikely

23   relationship.  And of course we probably do that

24   subjectively when we look at the data tables.

25        **Q.   Um-hmm.**

Page 196

1      A.    And the Spearman ranks objectively and

2  then -- and again, I can't remember the math.

3  Basically establishes the relationship and the

4  significance of the relationship.

5      **Q.    So what -- what do I look at to determine**

6  **the significance of the relationship for each**

7  **individual constituent?**

8      A.    That's non sequitur.  That doesn't --

9  that's not what it addresses.  It addresses all the

10 constituents equally.  It doesn't predispose -- it

11 doesn't assume one is more important than the other.

12     **Q.    No, I'm not suggesting one is more**

13 **important than the other.  But you said that a rank**

14 **of one with a rank of two would have a stronger**

15 **correlation, is that what you just said?**

16     A.    Yes.  Right.

17     **Q.    So what would I look at?  How would I --**

18 **what would I look at to know what should rank a**

19 **constituent one and two is what I'm saying?**

20     A.    Well, the -- the ordering of these again

21 is for the equation, but, for instance, I give

22 you -- if you look at this subjectively and look at

23 row number nine.

24     **Q.    Okay.**

25     A.    Now, it's identified -- obviously when you

Page 197

1    look across X and Y, it is the highest two values

2    and they're ranked the same.  Now, don't take the

3    order to 29.  This is just the way it scales it.  So

4    what it's saying is -- as you can see subjectively

5    these are the two largest concentrations of both

6    samples.

7         Q.   Um-hmm.

8         A.   And if you go -- let's go the exact

9    opposite and you look at one, since this is just the

10   way the software orders it, the least highest is

11   1.31.  And so if you can-- the way I envision it is

12   you plot all of these relationships and draw a

13   straight line and -- well, the computer does and

14   then it says okay, is there a strong relationship

15   here and yes, there is, it's over .5.  And then

16   it -- you know, and then what's the significance,

17   whether one-tail or two-tail test.

18        Q.   And -- and what -- what gives us

19   confidence when we use imputed values that those

20   imputed values don't skew --

21        A.   Well, they can.

22        Q.   -- the results?  They can?

23        A.   They can skew it if it becomes a

24   significant number of the results.  At one point we

25   did count, there were very few that ended up in the

Page 198

1    29 with imputed values, but -- and that's one of the

2    reasons you use a Spearman over a Pearson's.  The

3    Pearson is more subject to error if you have those

4    type of values because you're not -- here remember

5    we're interested in rank.  And because the different

6    reporting levels establish rank without assigning a

7    number, they work very well in the Spearman.

8         Q.   So let's go back to -- let's go back to

9    Exhibit 3 for a moment now and I want to look at --

10        A.   Exhibit 3?

11        Q.   Exhibit 3, and I want to look at Tables 2

12   and -- let's start -- let's start with 2 and 6 and

13   then we'll to go 2 and 5, but 2 and 6.

14        A.   2 and 6.

15        Q.   Table 2 and Table 6.

16        A.   Okay.  Fine.

17        Q.   Okay.  And I am looking, for example,

18   at -- I'm just picking a constituent because it's at

19   the top of the row, aluminum?

20        A.   Okay.  And this is in Table 6?

21        Q.   In Table 6.  I'm looking at aluminum.

22        A.   Yes.

23        Q.   And I am looking at locations, the 8616

24   Progress Boulevard and the 5202 South 86th Street.

25        A.   5202 South 86th, yes.

Page 199

1      Q.   Right.  And these -- these churches are

2    relatively close together, correct?

3      A.   Yes, I believe that's true.

4      Q.   In fact, they're -- of the five sampled

5    locations, the sites that are, in fact, the closest

6    together; isn't that right?

7      A.   That's correct, yes.

8      Q.   Okay.  And the 8616 Progress has a roof

9    that is 54 years old?

10     A.   Yes.

11     Q.   And the 5202 has a roof that is 53 years

12    old, correct?

13     A.   Yes.

14     Q.   And you told me earlier that of all the

15    characteristics of the roof impacting sampled

16    concentrations is the age of the roof, correct?

17     A.   For the attic samples, not for the soil.

18     Q.   For the attic samples, I understand.  For

19    the attic samples?

20     A.   Yes.

21     Q.   Yet when we look at the surface soil

22    results, we see the results for 5202 that are four

23    times higher than they are for 8616?

24     A.   That's true.

25     Q.   How do you explain that?

Page 200

1      A.    It's very easy.  Unlike the attic dust,

2  the constituents in soil are subject to weathering

3  and leaching and physical washout, particularly

4  sandy soils like we have here.  And what will happen

5  is if a particular yard gets more water, more rain,

6  if it's sheltered from a tree or an awning, you're

7  not going to have the same weathering as another

8  yard.  And it's one of the reasons that you'll often

9  find the soil levels much lower in terms of their

10  constituents in the attics because the attics are

11  not exposed to that weathering.

12      Q.    Okay.  In other words, the point that

13  you're making is the attics accumulate dust over

14  time?

15      A.    That's only half.  The attics accumulate

16  dust -- certainly the ground does, but unlike the

17  ground, which gets it washed out, the attics are

18  archived.

19      Q.    Do not?

20      A.    Yeah.

21      Q.    So now let's look at Table 5.  Let's look

22  at the same two locations.  And 8616 Progress has an

23  aluminum sample of a geometric means for the samples

24  of 5912.05 for a -- in a 53-year-old roof, and 5202

25  is twice as high for a roof that's a year younger,

Page 201

1    we'll call it; is that right?

2         A.    Let's see, they're both essentially the --

3    yeah, they're close enough to be considered the same

4    age.

5         Q.    Okay.

6         A.    Yeah.

7         Q.    Yeah.   One has twice as much of the

8    constituent as the other?

9         A.    That's true, yes.

10        Q.    And how do you explain that?

11        A.    I don't know that it requires explanation.

12   When you look at these, you're looking at samples

13   collected and the sample collection has some

14   variability in it.   A difference of twice is not

15   unusual because it would range, you know, based on

16   other factors.

17        Q.    How about a difference of three times?

18        A.    Again, Counselor, it's the variability in

19   the sampling analytical method.   My position is that

20   the age is the primary variable, not the only

21   variable that will determine the attic

22   concentrations.

23        Q.    But when we look at this data with the --

24   with our -- with our naked eyes --

25        A.    Well, Counselor -- go ahead.   I'm sorry.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

1      Q.   -- and we're looking at -- and we're

2   looking at two attics that you say are the same in

3   age that are practically neighbors, how do we

4   explain all of the differences in the settled dust?

5      A.   Counselor, the -- we are picking fruit

6   here.  I don't know if they're low fruit or high

7   fruit here and making subjective assessments of it,

8   which is fine, but that's the purpose of statistics,

9   it's objective and it looks at the data across

10  locations.

11     Q.   Well, I'm not sure that they're entirely

12  subjective or that we're picking fruit because we

13  are looking in your own words at sort of archiveable

14  data of settled constituents, correct?

15     A.   Yes.

16     Q.   Okay.  And we see when we look at 8616 and

17  5202, certainly when we -- if we plotted these

18  numbers together, do you think we would see a linear

19  relationship?

20          MS. HOGAN:  Objection, vague.

21          THE WITNESS:  Yes, I -- I -- I have

22          to look again.  When you do a statistical

23          analysis, it considers all of them.  Okay.

24          And the analysis, of course, is not going

25          to be perfect.  It's going to, if you will,

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 203

1              if you did a Spearman, regress to the best

2              line and so you will see some differences,

3              but if you do that as we showed in my

4              analysis, it's not one, you're never going

5              to get an R value of one or a significant P

6              value of zero.  You're going to have some

7              variation.  And that's -- that's why the

8              statistics allow you to learn more than

9              picking and choosing things to look at.

10  BY MR. TORRES:

11      Q.   And did you perform any other statistical

12  analyses of these geometric means in either Table 5

13  or Table 6 in any way?

14      A.   No, you have the ones that I've done.

15      Q.   Just -- these are the only ones, which

16  would be Exhibit 5, correct?

17      A.   Yes.

18      Q.   No others?

19      A.   No, no others.

20      Q.   Are there any others that you would

21  perform or would you only perform the statistical

22  analysis under Exhibit 5 if you wanted to be

23  certain?

24      A.   Well, again, Counselor, this -- this was

25  merely to confirm in our sampling what we see in the

Page 204

1  published literature where they have done this a

2  number of times and actually tested it.  And this

3  was just I wanted to see if our results were

4  comparable to what was in the literature.  And it's

5  well established that the concentration varies with

6  age.

7      **Q.   So what I understand you saying is that**

8  **when we look at the summary of settled attic dust**

9  **results for -- based on age, 8616 Progress**

10  **Boulevard, 5202 South 86th Street, and 4810 South**

11  **87th Street, are you suggesting to me that the**

12  **differences in the settled concentrations are just**

13  **typical variation?**

14      A.   Counselor, you're -- again, you're picking

15  things out and you're using a calculation of

16  difference.  You're subtracting one from the other.

17  If you look across the board at all of them, they

18  form, if you will, a picture of the association.

19  You can't pick one out or exclude one.  You've got

20  to include them all.  And when you do that as I

21  demonstrate with the phosphorus in Mrs. -- in the --

22  in the age, you see the same thing that we see in

23  the published literature, and a very good

24  correlation.

25          I would supplement that with exact --

Page 205

1    because I can pick and choose too.  If you look at

2    Lenna for aluminum it's by far the largest and by

3    far the oldest, and that's what drives the rest of

4    the equation.

5         Q.    And it's also the furthest?

6         A.    Yes, it is also the furthest, yes.

7         Q.    And --

8              MS. HOGAN:  For the record, furthest

9         from what reference point?

10             MR. TORRES:  Furthest -- furthest

11        from the facility.

12             THE WITNESS:  Right, and you won't

13        get a similar correlation if you look at

14        all the data and plot it as I did with

15        distance.

16   BY MR. TORRES:

17        Q.    Right.  And you did not consider distance

18   in this?

19        A.    I knew it wouldn't affect it.  I ran it.

20   I didn't print it out because it didn't show a

21   correlation.

22        Q.    You ran the data.  Did you record the

23   data?

24        A.    No, I didn't.

25        Q.    So you just ran it as a test?

Page 206

1      A.    I ran it as a test.  My concern was had it

2   not correlated with age, we wouldn't be sitting here

3   talking about it.

4      **Q.    And that test showed that there was no**

5   **correlation with respect to distance from the**

6   **facility, correct?**

7      A.    Yes.  Counselor, I'll say no, it wasn't

8   significant.  There might have been a correlation

9   there.  I don't believe it was negative, but the R

10  value was, I believe, well below .5 and it was not

11  considered a significant relationship.

12     **Q.    And did you exclude it because there was**

13  **not a significant relationship or did you exclude it**

14  **for a different reason?**

15     A.    I didn't exclude it.  It just -- my -- the

16  question I was trying to decide is our data agreed

17  with the published literature, which is based on

18  age.

19     **Q.    And just for clarity, then you discarded**

20  **the notion of distance when you did not see a**

21  **sufficient correlation, correct?**

22     A.    I didn't discard it.  It just met with my

23  expectations and with the published literature.

24     **Q.    And is there no published literature that**

25  **speaks about air deposition and its relationship to**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                        Page 207

1    distance?

2         A.   Not with attic dust samples, no, not that

3    I'm aware of.

4         Q.   But certainly with soil, correct?

5         A.   Well, that's going to depend on the

6    conditions of the location.  In some areas you're

7    going to see strong correlation.  In other areas

8    where you get a lot of rain, you may or may not.

9         Q.   And how about ambient air, the same thing?

10        A.   As what?

11        Q.   As soil.

12        A.   I'm not understanding.

13        Q.   If you're looking at -- if you're looking

14   at air dispersion.

15        A.   Okay.

16        Q.   Is distance a factor?

17        A.   In --

18             MS. HOGAN:  Objection as to form,

19        vague.

20             THE WITNESS:  In the plume at a

21        monitoring site?  I don't understand the

22        question.

23   BY MR. TORRES:

24        Q.   In terms of -- you can measure

25   constituents in the air, correct?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                          Page 208

1        A.    Yes, at a sampling site.

2        **Q.    At a sampling site?**

3        A.    Yes.

4        **Q.    Does distance have any -- is distance an**

5   **input when you perform those measurements?**

6        A.    Well, no, just to clarify your question,

7   if you're taking -- the only way you can analyze

8   these toxic components is take an air sample if

9   you're looking at the air itself.

10       **Q.    Um-hmm.**

11       A.    And that's only a momentary snapshot.

12   Okay.  Distance in modeling is considered, but in

13   the industrial source complex models, in the AERMOD

14   model, that relationship isn't established at all.

15   In fact, it can -- can exist the opposite way.  In

16   other words, sites closer to you can have lower

17   concentrations than sites far away.

18       **Q.    Depending on all sorts of circumstances,**

19   **right?**

20       A.    Well, there -- there are not all sorts.

21   There are basically three, topography because a

22   plume shoots over the first one, that doesn't apply

23   here, but can be covered.  Then dispersion of the

24   plume, if you have a tall stack, if you have weather

25   conditions frequently that don't allow the quick

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 209

1   mixing and dispersion of it, the site further down

2   line will have a higher concentration than the site

3   nearby.  And the third one that I can think of here

4   is, and I know it occurs in the Tampa area, I don't

5   know the frequency, is inversions, which basically

6   allow the plume to miss miles of potential sites and

7   then bounce down on the ground, if you will, and

8   affect that site.  So whether you're modeling or

9   sampling, distance is an important variable, don't

10  get me wrong, but it's not necessarily a determinant

11  variable.

12      **Q.   And in this case it's a variable that**

13  **showed no correlation?**

14      A.   Well, we're looking at attic dust, not air

15  sampling.

16      **Q.   I understand that.**

17      A.   Yeah, it didn't establish a correlation.

18           MS. HOGAN:  Is now a good time to

19           stop?  It's about 6:15.

20           MR. TORRES:  Yes, let me -- let me --

21           okay.  Let me ask one very quick final set

22           of questions and than we'll convene.  It's

23           not nearly as bad as it looks.

24           MS. HOGAN:  Are you still good to go,

25           Les?

Page 210

1                    THE WITNESS:  I'm good, yeah.

2                    MS. HOGAN:  Good.

3                    (Thereupon, Ungers Exhibit No. 29,

4    Final Technical Report:  Development of Cleanup

5    Target Levels for Chapter 62-777, F.A.C., was marked

6    for purposes of identification.)

7    BY MR. TORRES:

8         Q.   I'm going to hand you Exhibit 29, which

9    is -- thank you -- Bates labeled Ungers_004957

10   through 5266.  Have you -- do you recognize this

11   document?

12        A.   I do recognize this document.

13        Q.   And what is it?

14        A.   It's a technical report developed, I

15   believe, to support the cleanup target levels for

16   the Florida Department of Environmental Protection.

17        Q.   And how did you use it?

18        A.   I didn't, Counselor.

19        Q.   Is there a reason you did not?

20        A.   Again, I wasn't asked to do an exposure

21   assessment or dose reconstruction and so -- it

22   downloaded, I think, with the -- with the document I

23   used to -- for the comparison in my tables.

24        Q.   Are you aware of anyone doing an exposure

25   assessment or dose reconstruction?

Page 211

1      A.   I'm not, no.

2      Q.   **Okay.  Do you know whether anyone**

3 **calculated a particulate emission factor?**

4      A.   I don't -- I didn't.  I don't know if one

5 way or other whether someone did.

6      Q.   **Do you know if anyone calculated averaging**

7 **times?**

8      A.   For -- I don't -- I don't think any

9 averaging times were calculated outside of our

10 dealing with averaging times in the report of air

11 quality data or looking at the modeling results for

12 the SO2.

13      Q.   **Any calculations of exposure frequency?**

14      A.   I didn't do any.

15      Q.   **Any calculations of exposure duration?**

16      A.   I didn't do any of those, no.

17      Q.   **Any calculations of ingestion rates?**

18      A.   No, I didn't.

19      Q.   **Any calculations of surface area of skin**

20 **exposed?**

21      A.   I didn't.

22      Q.   **Adherence factors?**

23      A.   I didn't, no.

24      Q.   **General absorption?**

25      A.   I didn't, no.

Page 212

1        Q.    Inhalation rates?

2        A.    No, I didn't.

3        Q.    Volatilzation factors?

4        A.    I don't know if that would apply here, but

5    no, I didn't.

6              MR. TORRES:  Okay.  We will stop

7         here.  And as we mentioned on the record

8         earlier, we will go back to our offices and

9         figure out how to finalize this.

10             THE WITNESS:  Understood.

11             MS. HOGAN:  That's correct.

12             MR. TORRES:  Thank you, sir.

13             THE WITNESS:  Thank you.

14             MS. HOGAN:  Off the record.

15             VIDEOGRAPHER:  We're off the record.

16             (Thereupon, the deposition was

17    continued in progress at 6:17 o'clock p.m.)

18

19

20

21

22

23

24

25

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 213

1           I, LESLIE J. UNGERS, do hereby certify

2     that the foregoing is a true and accurate

3     transcription of my testimony.

4

5

6

7

8           Dated

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

Page 214

1   STATE OF OHIO          )

2   COUNTY OF MONTGOMERY )    SS:   CERTIFICATE

3           I, Connie Sumner, a Notary Public within

4   and for the State of Ohio, duly commissioned and

5   qualified,

6           DO HEREBY CERTIFY that the above-named

7   LESLIE J. UNGERS, was by me first duly sworn to

8   testify the truth, the whole truth and nothing but

9   the truth.

10          Said testimony was reduced to writing by

11  me stenographically in the presence of the witness

12  and thereafter reduced to typewriting.

13          I FURTHER CERTIFY that I am not a relative

14  or Attorney of either party, in any manner

15  interested in the event of this action, nor am I, or

16  the court reporting firm with which I am affiliated,

17  under a contract as defined in Civil Rule 28(D).

18

19

20

21

22

23

24

25

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Leslie Joseph Ungers

                                                          Page 215

1            IN WITNESS WHEREOF, I have hereunto set my

2   hand and seal of office at Dayton, Ohio, on this 1st

3   day of September, 2015.

4

5

6

7   _____

8            CONNIE SUMNER
             NOTARY PUBLIC, STATE OF OHIO
9            My commission expires 09-03-2017

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25