EXHIBIT F

**Expert Report of Kennard F. Kosky, M.S., P.E.**

**In the Matter Of: Rhonda Williams v. Mosaic Fertilizer, LLC**

**I.      Professional Background**

**A. Education**

I received a Bachelor's of Science in engineering from Florida Atlantic University in June 1970 and a Master's of Science in environmental engineering from the University of Central Florida in March 1976.  My Master's Thesis was sponsored by the National Academy of Sciences and involved a detailed assessment of the air quality impacts of highway construction.  I worked on a Ph.D. program at the University of Florida as a full-time Ph.D. candidate in environmental engineering from 1980 to 1981 for approximately a year and a half, and completed all the required classes.  Beginning in March 1971, I attended numerous US Environmental Protection Agency (EPA) training courses on various aspects of air pollution including emission estimates, air dispersion modeling, air pollution control, and air monitoring and meteorology.  My education in mechanical and environmental engineering together with my training from EPA provided me the educational background to determine air pollutant emissions, assess their impacts to the environment and evaluate air pollution controls.

**B. Professional Experience**

Since December 1970 I have been working exclusively in the field of air pollution, which includes emission estimates, air monitoring, and air impact analyses. I started employment with the EPA back when the agency was founded in 1970.  I worked for two and a half years as a state assignee for the predecessor of the Florida Department of Environmental Protection (FDEP).  In September of 1972, I transferred to the Florida environmental agency as a full-time state employee until about September of 1974. While with the EPA and the State of Florida, I co-authored the federally mandated State Implementation Plan (SIP).  The SIP is a comprehensive plan required by each state to meet the ambient air quality standards (AAQS) and prevent the deterioration of air

1    quality.   I developed emissions inventories and computer programs as the first "air
2    dispersion models" to assess impacts of sources. Air dispersion models are
3    "computerized tools" that if used properly assist in the evaluation of air impacts from
4    sources of air pollution.  These "computerized tools" have become highly sophisticated,
5    accurate, are regularly used to determine compliance with air standards, and a capable of
6    estimating past, present and future air impacts.  The model accepted and approved by
7    EPA and FDEP is the AERMOD model with which I am intimately familiar and have
8    used since its approval.
9
10   From 1974 through the next 11 years (September 1985), I worked with Environmental
11   Science and Engineering, initially as a group leader of air quality management and then
12   as vice-president of air resources.  In these capacities I directed and managed the group
13   that performed air monitoring and air dispersion modeling.   I co-founded KBN
14   Engineering and Applied Sciences in 1985, which merged with Golder Associates Inc. in
15   1996.  During my time at KBN, I was the President and Principal Engineer and continued
16   to direct and manage air pollution projects.  Since 1996, I have been employed by Golder
17   Associates as a Principal involved in directing and managing air resource projects.
18
19   During the last 40 years I have directed, managed, and performed hundreds of projects
20   involving the assessment of emissions, the air quality impacts of those emissions, and the
21   regulatory consequences of those impacts.  This has included air quality assessments of
22   single air pollution sources, such as new and old electric power plants and industrial
23   facilities, to multi-state air pollution analyses.  I have provided expert testimony in over
24   50 proceedings related to air pollution.  This included testimony before the State of
25   Florida environmental board on the approval of emission standards that would meet the
26   AAQS to providing expert testimony to the Governor of Florida for the temporary
27   relaxation of air emission standards due to the oil crisis in the mid to late 1970's.  I have
28   also testified as an expert in cases in Maryland, Georgia, South Carolina, Hawaii,
29   California, and Louisiana, and as an expert witness on three occasions in a State Court
30   and Federal District Court.
31

1     The studies I have directed, managed, or performed were in 26 different states, including

2     Louisiana, and 24 foreign countries.  I conducted studies for World Bank to assess air

3     pollution in Poland, Hungary, and Bulgaria and co-authored portions of the World Bank

4     Environmental Assessment Guidelines.

5

6     I have taught dozens of seminars and courses on the various aspects of air pollution

7     including air emission estimates, air impact analyses, and air pollution control.  I have

8     been an instructor at the University of Florida and University of Central Florida in air

9     pollution.

10

11     **C. Registrations**

12     I am a registered Professional Engineer in the State of Florida since 1976.  I have signed

13     and sealed, as required by Florida Law, hundreds of documents for which I have certified

14     that the emission calculations including hazardous air pollutants, air pollution control

15     equipment, and other supporting information conforms with sound engineering principles

16     and applicable standards.  Many of these documents include complex air pollution

17     analyses for industrial projects.

18

19     **D. Professional Memberships**

20     I have been a member of the state and national Air and Waste Management Association

21     since 1974.  This organization was formally called the Air Pollution Control Association.

22     I was the state chairman, vice chairman, secretary, and treasurer of that organization in

23     the late 1980s.

24

25     **E. Publications, Prior Testimony and Other Experience**

26     My resume is attached as Exhibit 1.  A list of cases that I have testified at trial or

27     deposition is listed as Exhibit 2.

28

29     **F. Compensation**

30     I am being compensated $215 per hour to provide this report, and $325 to provide

31     testimony in this case.

II.      Opinions

**A. Summary of Opinions**

1.  Plaintiff's expert reports provide no relevant or technically acceptable air quality information regarding the air concentrations from Mosaic operations at the Plaintiff's residence or neighborhood.  The Plaintiff's expert, Mr. Ungers, relied on a report that not only provides no relevant information on air quality in the Plaintiff's neighborhood but actually suggests that compounds and phosphorus (Mosaic's main product) were higher at a location much farther from the Mosaic operations than the Plaintiff's neighborhood.  That report does not support Mr. Ungers' opinions but actually refutes them.

2.  Contrary to the Plaintiff's assertions that she lives within the nonattainment area of sulfur dioxide ($SO_2$), the Plaintiff's residence is actually outside the recently established air quality nonattainment boundary established by the FDEP and approved by the EPA.  The Plaintiff's residence is well below the air quality standards for $SO_2$ and maximum air quality impact from Mosaic's operations at the Plaintiff's residence is far below the air quality standards established by EPA under the Clean Air Act and contained in FDEP rules.  My analysis and the FDEP analysis demonstrates that the air is much better than those air quality standards established by EPA under the Clean Air Act to protect public health and welfare for $SO_2$.

3.  The Plaintiff's residence is well below the air quality standards established by EPA and adopted by FDEP for particulate matter (dust).  This is demonstrated by air quality data taken over two decades from two monitoring stations in proximity of Mosaic operations and the Plaintiff's residence and neighborhood.  These data demonstrate that the air is much better than those air quality standards established by EPA under the Clean Air Act to protect public health and welfare from particulate emissions.

**B. Background**

Mosaic Fertilizer LLC and predecessors operate a fertilizer manufacturing facility in Hillsborough County.  Mr. Leslie Ungers, an industrial hygienist, prepared a report based

1    on an inspection of the Plaintiff's home and neighborhood, including surface and soil

2    sampling, and review of publically available information.   In this review, Mr. Ungers

3    offers opinions related to technical issues that are purported to support technical

4    information related to the air quality impact of the Mosaic facility's past and present

5    operations at the Plaintiff's home and neighborhood.   These statements and opinions are

6    related to Mosaic as a major source, the types of Mosaic air emissions, and the

7    contamination caused by the operations of the Mosaic facility.   The information

8    presented by Mr. Ungers while containing some factual information is at best misleading

9    and does not present any valid technical methodology related to the air quality impact of

10   Mosaic facility's in terms of magnitude and duration to the Plaintiff or the Plaintiff's

11   residence.

12

13   **C. Mosaic Facility is Highly Regulated Under Federal and State Law and is Subject**

14   **to Regular Inspection and Reporting to Confirm Air Quality Requirements**

15   **Including Air Quality Standards**

16   Mr. Ungers' statement that the Mosaic facility is a major source does not provide any

17   technical information regarding the air quality impact of Mosaic's operations to the

18   Plaintiff or the Plaintiff's residence.   A "major source" is a definition under Federal and

19   State of Florida regulations concerning a threshold of air emissions for which certain

20   types of authorizations are required for modification and operation of a source of air

21   emissions, such as Clean Air Act Title V permitting.   There are numerous "major

22   sources" in Hillsborough County many of which are in proximity to the Plaintiff's

23   residence. These facilities are highly regulated by federal and State of Florida regulations

24   requiring compliance and reporting requirements mandated by the federal Clean Air Act

25   for the purpose of achieving air quality standards.   The fact that the Mosaic facility is a

26   major source provides no technical information on the air quality impact of the facility.   It

27   means that the Mosaic facility is highly regulated facility subject to regular scrutiny and

28   compliance assurance by federal, state and local regulators.

29

**D.   Contrary to Mr. Ungers' Assertions Mosaic Air Emissions Did Not Adversely Impact Air Quality at Plaintiff's Residence**

At any manufacturing facility there are various types of air emissions that can occur.  The types of constituents referenced in Mr. Ungers' opinions and report are irrelevant to the air quality contribution of a facility's emissions and air quality impact.  Mr. Ungers provides no technical information on the possible magnitude or duration of exposure of the Plaintiff to air emissions for the Mosaic facility.  While wind direction information is provided regarding the percentage of the time the wind blows toward the north and east, this fact is both meaningless and irrelevant to any possible air quality to the Plaintiff or the Plaintiff's residence.  The air quality impact is highly dependent not only on wind direction but many other variables such as wind speed, atmospheric conditions, topography and surface features of the surrounding area.  Moreover, the type, location, and magnitude of air emissions are extremely important in determining the magnitude and duration of air quality impacts to a location or area. Mr. Ungers presents no such information.

Mr. Ungers does present information related to a portion of Hillsborough County being designated a nonattainment area for the $SO_2$.  What Mr. Ungers does not present from the information he reviewed and relied on were the following facts:

- Location: the location of the air quality monitor that triggered the designation of non-attainment for the 1-hour $SO_2$ National Ambient Air Quality Standard (NAAQS) was directly south of the Mosaic facility that is in a completely opposite direction than the Plaintiff's residence or Plaintiff's neighborhood (see Figure 1).  Most importantly, the location of the air quality monitor was very close to the Mosaic facility.  The Plaintiff's residence is not only in the opposite direction, but over 10 times farther than the air monitor for which the NAAQS was exceeded.  The importance of distance is that air quality concentrations are lower at greater distances and any inference related to NAAQS at the very least should take distance into account.

- Nonattainment Area:  the Technical Support Document (TSD) prepared by the FDEP for Florida Area Designations that Mr. Ungers relied on shows information

6

1    that the Plaintiff's residence and surrounding neighborhood are <u>not</u> within the
2    area designated as nonattainment.  In fact it should have been immediately
3    obvious to him.  Indeed, the data and analyses used by FDEP to develop that
4    information in the TSD clearly demonstrates that the 1-hour $SO_2$ concentration at
5    the Plaintiff's residence does not exceeded the 1-hour $SO_2$ NAAQS, and has not
6    exceeded the 1-hour $SO_2$ NAAQS according to FDEP's analysis.  This is shown
7    in Figure 1 that is a zoomed image from FDEP's air quality analysis (Figure 4
8    from TSD).

9    • Timeframe:  The designation of nonattainment was for a newly adopted NAAQS
10   for 1-hour $SO_2$ concentration that was promulgated in 2010.  Prior to 2010, the air
11   quality in Hillsborough County was in compliance with the applicable NAAQS
12   for $SO_2$.  The maximum impact of the Mosaic facility at the Plaintiff's residence
13   was also well below the $SO_2$ NAAQS established prior to 2010.   This is
14   illustrated in Figure 2 showing Mosaic's maximum air quality impacts compared
15   to the $SO_2$ NAAQS in existence prior to 2010.

16   • $SO_2$ Impact at Plaintiff's Residence and Surrounding Areas: At the Plaintiff's
17   residence the maximum air quality impact from the Mosaic facility could have
18   never exceeded 55% of the NAAQS.   That is the theoretical maximum
19   contribution, but having reviewed 23 years of data the actual was less. This
20   concentration is well below the NAAQS.  Figure 3 shows the maximum air
21   quality impact of the Mosaic facility compared to the 1-hour $SO_2$ NAAQS.  This
22   maximum impact is based on the maximum permitted emissions.   These
23   maximum emission rates are higher than actual emissions that have occurred over
24   the last two decades. As shown in Figure 3, the maximum concentration from the
25   Mosaic facility at the Plaintiff's residence is well less than the NAAQS.

26   • Mr. Ungers' opinion relied on a report of attic dust and soil concentrations, which
27   imply results inconsistent with FDEP's analysis and my analysis.

28

29   The importance of being in compliance with the NAAQS as stated above is that the
30   standards are designed to protect public health and welfare with significant margins of

1    safety for the most sensitive populations.  This premise was established in the 1970
2    Amendments to the Clean Air Act and is true today as shown in EPA's summary:

3        "The Clean Air Act established two types of national air quality standards. ***Primary***
4        ***standards*** set limits to <u>protect public health, including the health of at-risk</u>
5        <u>populations such as people with pre-existing heart or lung disease (such as</u>
6        <u>asthmatics), children, and older adults</u>. ***Secondary standards*** set limits to protect
7        public welfare, including protection against visibility impairment, damage to animals,
8        crops, vegetation, and buildings. The Clean Air Act requires periodic review of the
9        science upon which the standards are based and the standards themselves."
10       http://www.epa.gov/ttn/naaqs/

11

12   **E. Mr. Ungers' Opinions and Report Do Not Support Any Air Quality Problems at**
13   **the Plaintiff's Residence and In Fact Demonstrate the Opposite**

14   Mr. Ungers correctly states that Hillsborough County is <u>not</u> in violation of the NAAQS
15   for particulate matter with an aerodynamic diameter of 10 microns or less ($PM_{10}$).
16   Indeed, a reference he relies on from the Hillsborough County Environmental Protection
17   Commission (EPC) clearly indicates that air monitors in close proximity to the Mosaic
18   facility have been in compliance with the $PM_{10}$ NAAQS for many years.  Since 1995
19   there have been two air quality monitoring stations measuring $PM_{10}$ in the vicinity of
20   Mosaic's operations.  One station located east of the Mosaic facility and closest to
21   Mosaic operation (referred to as the Gardinier Site).  The second air monitoring station
22   was located north of Mosaic operations (referred to as the Union Site) and was operated
23   from 1995 through 2008 (14 years).  The Union Site is located east of Progress Village.
24   These stations are shown in Figure 5.  Over the period 1995 through 2008 at the Union
25   Site, the average annual PM concentrations and the maximum 3-year average 24-hour
26   $PM_{10}$ concentrations compared to the NAAQS are illustrated in Figure 5.  The annual
27   average $PM_{10}$ NAAQS was rescinded by EPA in 2006 but shown for illustrative
28   purposes.  At the Gardinier Site, the average annual $PM_{10}$ and the maximum 3-year
29   average 24-hour concentrations compared to the NAAQS are shown in Figure 6 for the
30   period 1995 through 2014.  The air monitoring data from these $PM_{10}$ air monitoring

1  stations in proximity of Mosaic operations and the Plaintiff's residence represents 34
2  years of data all of which demonstrated compliance with the $PM_{10}$ NAAQS.

3

4  In contrast, Mr. Ungers suggests that the Mosaic facility contributes to airborne
5  particulate and asserts that the Plaintiff's residence is downwind of Mosaic operations.
6  Mr. Ungers' listed air quality data collected in Hillsborough County in the materials he
7  relied on in the preparation of his report.  However, he does not present any specific
8  information on the magnitude of that contribution while the air monitoring data clearly
9  demonstrates compliance with the $PM_{10}$ NAAQS, which should have been obvious to
10 him.  These sources show the same information as the air quality data presented in
11 Figures 5 and 6.

12

13 Mr. Ungers states that the neighborhoods north and east, including Progress Village, are
14 downwind as much as 16 percent to 20 percent of the time; but he fails to provide any
15 information on the magnitude of any contribution from Mosaic operations or any other
16 source.  The importance of direction from any air emission source cannot be understated
17 since air quality impacts are highly dependent on the sources location relative to the
18 location that air quality impacts would occur.  Based on the meteorological data used in
19 the FDEP air modeling study any individual source of air emissions could only possibly
20 contribute to a location in the Plaintiff's neighborhood including the Plaintiff's residence
21 about 2 percent of the time; 98 percent of the time there would be no air quality impacts
22 from potential air emission sources in that direction.  Mr. Ungers' overstates the
23 importance of direction by almost a factor 10.

24

25 Mr. Ungers also asserts that substances common to phosphate rock and phosphogypsum
26 are found in concentrations in the air surrounding Mosaic and in the vicinity of several
27 neighborhoods, he presents neither technical information on the magnitude or duration of
28 such concentrations in the neighborhoods nor any link to Mosaic operations.  Moreover,
29 the substances he cited such as sulfates, $PM_{10}$, and metals [arsenic (As), cadmium (Cd),
30 chromium (Cr), lead (Pb), manganese (Mn) and nickel (Ni) are commonly emitted in
31 many types of sources including vehicles and are not specific to the Mosaic facility.  As

1  discussed below, the surface and soil sampling conducted by Ungers & Associates is in
2  direct conflict with Mr. Ungers implications.

3

4  **F. Mr. Ungers' Report Does Not Support the Opinions that Mosaic Operations**
5  **Adversely Impact the Air Quality Plaintiff's Residence**
6  Mr. Ungers states that particulate matter settled out or deposited in soil and surface
7  samples collected in communities in the vicinity of Mosaic operations at concentrations
8  higher than typical levels.   He also states that phosphorous is present at elevated
9  concentrations.   For these statements he relies on the report titled: "Elemental and
10  Radiochemistry of Settled Dust and Surface Soil in Residential Communities of Central
11  Hillsborough County Florida, September 2014 prepared by Ungers & Associates, Inc."
12  This report was listed in the documents he relied on. In the report, surface and soil
13  samples were taken from 5 locations.   Four of the locations were in or near Progress
14  Village and one location was located much farther away located in Seffner, Florida (see
15  Figure 4). The sampling location located in Seffner, Florida is in the opposite direction
16  from the Mosaic facility.

17

18  Particulate matter generated from a stack or as fugitive dust is made up of various particle
19  sizes.  Particles of larger size settle out on surfaces at closer distances from the source of
20  the particulate matter than smaller sources.   As a result, if a source emits particulate
21  matter the larger particles settle out in soil and surfaces closer to that source.   The results
22  of attic dust as shown in Table 5 of the Ungers report has higher concentrations at the
23  location farthest from the Mosaic operations for five substances cited by Mr. Ungers [Cd,
24  Chromium (Cr), Pb, Mn, and Ni].  The highest phosphorous concentration was also at the
25  location farthest from the Mosaic operations.   Mr. Ungers noted in his report that
26  phosphorus was the "primary commercial resource of Mosaic operations."   The
27  phosphorous concentration was also five times higher than any of the observed
28  concentration in Progress Village.  Similar results were also reported for the surface soil
29  samples shown in Table 6 of the Ungers Report.   Concentrations at the farthest location
30  purportedly from the Mosaic facility were also higher for seven substances cited by Mr.
31  Ungers [As, beryllium (Be), Cd, Cr, Pb, Mn, and Ni] as was phosphorus.   These results

1    are entirely inconsistent with air deposition from the Mosaic facility.   If Mosaic
2    operations were a dominate source of settable particulate matter containing phosphorus to
3    the Progress Village neighborhood in the vicinity as Mr. Unger implies, than it seems that
4    higher phosphorus concentrations would be expected closer to the Mosaic operations.
5    The exact opposite was observed in Mr. Ungers' report.
6
7    This is illustrated in Tables 1 and 2 that present a summary of the results from the Ungers
8    & Associates report for settled attic dust and surface locations.   These tables indicate the
9    distances of each sampling location from the Mosaic facility, the reported phosphorus
10   concentration, and the reported concentration of metals considered Hazardous Air
11   Pollutants (HAPs) under EPA and FDEP regulations. As shown in Table 1, the
12   phosphorus at the sampling located about 10.7 miles from the Mosaic facility is almost
13   6 times higher than the average settled attic dust concentrations observed in the four
14   sampling locations located in Progress Village located about 3 miles from the Mosaic
15   facility.   The reported concentrations for settled attic dust were higher for 6 of the 9
16   HAPs.   For surface soils, the reported phosphorus concentration was almost 4 times
17   higher than the average concentration at the sampling locations in Progress Village.   The
18   concentrations of HAPs in surface soils were higher in 8 of the 9 reported values.
19
20   These results indicate that Mr. Ungers' statement that "this settling out deposition was
21   evidenced from soil and surface samples in soil and surface samples collected in
22   communities in the vicinity of Mosaic operations" is misleading, baseless and
23   scientifically unreliable given the nature of air deposition.   If any conclusion can be
24   drawn, there is no link between Mosaic operations and the particulate matter that may
25   settle out based on the report Mr. Ungers relied on for his opinions.   Indeed,
26   concentrations of many of the constituents were found to be higher farther away from
27   Mosaic operations and lower closer to Mosaic operations.
28
29   **F. Conclusion**
30   The expert report provided by Mr. Ungers and the settled attic dust and surface soils
31   report by Ungers & Associates Inc. neither provides substantive evidence of the air

1    quality conditions existing at the Plaintiff's residence.  Moreover, there is no evidence

2    presented by Mr. Ungers of any contributions of the Mosaic operation at the Plaintiff's

3    residence or neighborhood of the air quality.  Additionally, Mr. Ungers fails to provide

4    any scientific method or basis as to why the scientifically excepted principals of air

5    quality do not apply in this case.  He provides no information as to why his results

6    confound basic air quality science and generally accepted modeling principals.

7

8    Publicly available information, much that is included in Mr. Unger's "Reliance

9    Materials," clearly indicate that the Plaintiff's residence and surrounding neighborhood

10    were in compliance with the NAAQS designed to protect public health and welfare.

11    FDEP demonstrated in the air modeling evaluation to support a nonattainment area and

12    control strategy that maximum impacts did not exceed the NAAQS for 1-hour $SO_2$

13    concentration at the Plaintiff's residence.  The maximum impacts at the Plaintiff's

14    residence for all sources FDEP evaluated were less than the NAAQS for the 1-hour $SO_2$

15    standard and Mosaic's maximum contribution is well less than the NAAQS.

16

17    For $PM_{10}$, 34 years of air quality monitoring in close proximity of the Plaintiff's

18    residence and Mosaic operations indicate that concentration were well less than the

19    NAAQS for $PM_{10}$.  The observed $PM_{10}$ concentrations were well less than the NAAQS

20    and over the period of monitoring often less than ½ of the NAAQS for $PM_{10}$.   In

21    addition, the Ungers & Associates Inc. settled dust and surface soil report provides no

22    relevant information related to any contribution from Mosaic operations and in fact show

23    higher concentrations of metals and phosphorous at a location that is twice as far from

24    Mosaic operations than Progress Village and lower concentrations at locations closer to

25    Mosaic operations.  This fact alone suggests that there was no significant contribution of

26    $PM_{10}$ or any other analyzed constituent to the Plaintiff's residence from Mosaic

27    operations.

28

29    Mr. Ungers' attic dust and soil sampling results cannot be explained or justified by

30    FDEP's or my own analysis and cannot be used to support any opinions that Mosaic

31    emissions adversely impacted air quality at the Plaintiff's residence.   Mr. Ungers'

1   opinions are invalidated by his own report.  Based on FDEP's analysis, my analysis, and
2   the air monitoring data, the air quality at the Plaintiff's residence was not adversely
3   impacted by Mosaic operations.
4
5   **III.    Bases of Opinions**
6   The bases of my opinions are the documents and data reviewed and my analysis of those
7   data and analyses.  In addition, information from the FDEP air modeling files used in the
8   development of the $SO_2$ control strategy were used to estimate $SO_2$ concentrations at the
9   Plaintiff's residence.  The following were the basis of the air modeling performed for this
10  report and comparison to NAAQS:
11  - Modeling followed the requirements of EPA Guideline on Air Quality Models
12    codified in 40 Code of Federal Regulations (CFR) Part 50, Appendix W.
13  - AERMOD Version 14134 developed by a technical committee from the
14    American Meteorological Society and Environmental Protection Agency used for
15    determining air quality impacts.
16  - AERMOD meteorological data obtained from FDEP for Tampa and Ruskin.
17  - Comparison of air quality impacts to NAAQS based on the averaging times
18    specified in 40 CFR Part 50.
19
20  **A.  Documents and Data Used to Perform Analyses**
21  Documents and data used in the preparation of this report are listed below:
22
23  Florida Department of Environmental Protection, 2011. Letter from Herschel Vinyard, Jr.
24  Secretary for FDEP to Gwendolyn Keyes Fleming Regional Administrator ,U.S.
25  Environmental Protection Agency Region 4; Nonattainment Area Boundaries. June 13,
26  2011.
27
28  Florida Department of Environmental Protection, 2015. PROPOSED REVISION TO
29  STATE IMPLEMENTATION PALN, SUBMITTAL NUMBER 2015-04 SO2
30  NONATTAINMENT AREA PLAN HILLSBOROUGH COUNTY, FLORIDA.
31

1    Florida Department of Environmental Protection, 2015. Technical Support Document

2    (TSD) Florida Area Designations For the 2010 SO2 Primary National Ambient Air

3    Quality Standard.

4

5    Florida Department of Environmental Protection, 2015. Appendix B to FDEP TSD

6    Florida Area Designations For the 2010 SO2 Primary National Ambient Air Quality

7    Standard

8

9    Florida Department of Environmental Protection, 2015. Air Modeling Files for FDEP

10    TSD Florida Area Designations For the 2010 SO2 Primary National Ambient Air Quality

11    Standard

12

13    Florida Department of Environmental Protection, 2015. Annual Operating Reports 1991-

14    2014 Mosaic Fertilizer, LLC Riverview Facility.

15

16    Florida Department of Environmental Protection, 2015. Air Quality Monitoring Quick

17    Look Reports; http://www.dep.state.fl.us/air/air_quality/techrpt/quicklook.htm

18

19    U.S. Environmental Protection Agency, 2015. National Emission Inventory (NEI) for

20    2001, Tier 1 and Tier II; http://www.epa.gov/ttnchie1/net/2011inventory.html

21

22    Second Amended Complaint in Williams v. Mosaic Fertilizer, LLC and The Mosaic

23    Company.

24

25    Expert Opinion of Leslie J. Ungers.

26

27    Ungers & Associates, Inc., 2014. Elemental and Radiochemistry of Settled Dust and

28    Surface Soil in Residential Communities of Central Hillsborough County Florida,

29    September 2014.

30

31    /s/ Kennard F. Kosky, M.S., P.E.

**TABLES**

**Table 1. Settled (Attic) Dust Results (micrograms/gram)**

| Sampling Location | Sampling Site | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| Distance (miles[a]) | 3.41 | 2.6 | 3.19 | 3.16 | 10.68 |
| Parameter [b] | | | | | |
| Phosphorus | 1,021.85 | * | * | 861.49 | **5,396.61** |
| Arsenic | **205.95** | * | * | * | * |
| Beryllium | 1.08 | * | * | **4.06** | 2.95 |
| Cadmium | * | * | * | * | **20.32** |
| Chromium | 165.54 | * | * | 115.41 | **267.35** |
| Colbalt | * | * | * | * | **17.85** |
| Lead | 91.48 | * | * | * | **1,431.30** |
| Manganese | 222.14 | 49.97 | 49.97 | **529.91** | 363.14 |
| Nickel | 7.13 | * | * | 12.85 | **42.73** |
| Selenium | * | * | * | * | * |

Source : Ungers & Associates Inc. (2014)
 * Not reportable (below the laboratories reporting limit).
 [a]  Distance from Mosaic Operation
 [b] Phosphorus and metal HAPs


Golder Associates

**Table 2. Surface Soil Results (micrograms/gram)**

| Sampling Location | Sampling Site | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| Distance (miles[a]) | 3.41 | 2.6 | 3.19 | 3.16 | 10.68 |
| Parameter [b] | | | | | |
| Phosphorus | 827.24 | 1,332.51 | 149.11 | 389.39 | **2,576.31** |
| Arsenic | 0.56 | 0.65 | 0.46 | 0.25 | **1.06** |
| Beryllium | 0.04 | 0.20 | 0.04 | 0.04 | **0.25** |
| Cadmium | 0.32 | 0.38 | 0.08 | 0.06 | **0.56** |
| Chromium | 5.22 | 5.26 | 1.11 | 2.25 | **18.15** |
| Colbalt | 0.22 | **0.41** | 0.03 | 0.12 | 0.34 |
| Lead | 12.03 | 7.30 | 4.32 | 4.73 | **22.07** |
| Manganese | 11.87 | 16.73 | 2.06 | 4.52 | **25.72** |
| Nickel | 1.54 | 1.20 | 0.36 | 0.85 | **2.52** |
| Selenium | 0.11 | 0.46 | 0.09 | 0.14 | **0.51** |

Source : Ungers & Associates Inc. (2014)

 * Not reportable (below the laboratories reporting limit).

 [a] Distance from Mosaic Operation

 [b] Phosphorus and metal HAPs



**FIGURES**

PATH:



LEGEND

⊕ Plaintiff's Residence

⊙ Mosaic Plant

● SO$_2$ Monitor East Bay

▭ Mosaic Property Boundary (Approximate)

▭ Buildings (Obstruction to Air Flow; Approximate)

▭ FDEP Modeled Potential Nonattainment Area (Approximate)

⊏⊐ FDEP Recommended Nonattainment Boundary

 Golder Associates

NOTE(S)
N/A

REFERENCE(S)
PLANTIFF'S RESIDENCE, GOLDER ASSOCIATES INC., 2015
NONATTAINMENT AREA (RECOMMENDED), BUILDINGS, MOSAIC PROPERTY BOUNDARY,
MODELED CONCENTRATIONS, FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
2011. TECHNICAL SUPPORT DOCUMENT (TSD) FLORIDA AREA DESIGNATIONS FOR THE 2010

**AERIAL WITH FDEP RECOMMENDED
NONATTAINMENT AREA BOUNDARY**

0    2,540    5,080

1:100,004          METERS

**FIGURE  1**



Figure 2. Comparison of Maximum Predicted $SO_2$ Concentrations of Mosaic Operations to $SO_2$ NAAQS Prior to 2010 at Plaintiff's Residence





Figure 3. Comparison of Maximum Predicted 1-hour $SO_2$ Concentration of Mosaic Operations to Current $SO_2$ NAAQS at Plaintiff's Residence



LEGEND

🔴 Mosaic Plant

🟧 PM₁₀ Air Monitoring Stations in Proximity to Mosaic Facilities

➕ Plaintiff's Residence

🌸 Ungers & Associates Surface and Soil Sampling Locations

1 - 4810 S. 87ᵗʰ St., Tampa, FL - (Plaintiff's Residence; 3.41 miles from Mosaic)
2 - 5914 S. 78ᵗʰ St., Tampa, FL - (2.6 miles from Mosaic)
3 - 8616 Progress Blvd., Tampa, FL - (3.19 miles from Mosaic)
4 - 5202 S. 86ᵗʰ St., Tampa, FL - (3.16 miles from Mosaic)
5 - 1906 S. Lenna Ave., Seffner, FL - (10.68 miles from

NOTE(S)
LOCATIONS 1 - 4 ARE LOCATED IN PROXIMITY TO THE PLAINTIFF'S LOCATION. LOCATION 5 IS LOCATED IN SEFFNER FLORIDA.

REFERENCE(S)
MOSAIC FACILITY, PLANTIFF'S RESIDENCE, GOLDER ASSOCIATES INC., 2015
SURFACE AND SOIL SAMPLE LOCATIONS, UNGERS & ASSOCIATES, 2014
FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, 2015. AIR QUALITY MONITORING QUICK LOOK REPORTS;
HTTP://WWW.DEP.STATE.FL.US/AIR/AIR_QUALITY/TECHRPT/QUICKLOOK.HTM

**UNGERS & ASSOCIATES SURFACE AND SOIL SAMPLING LOCATIONS, AND PM10 AIR MONITORING STATIONS**

**Golder Associates**

0        5,080        10,160

1:200,000                    METERS

**FIGURE   4**





**Figure 6.   PM$_{10}$ Concentrations at Gardinier Site from 1995 - 2014**





