## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

RHONDA WILLIAMS, a single person,
                    Plaintiff,

v.

MOSAIC FERTILIZER, LLC, a Delaware          Case No. 8:14-cv-1748-T-35TGW
Corporation doing business in Florida
                    Defendant.                               Plaintiff requests a half-day hearing.
_____/

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT[1]

Plaintiff, RHONDA WILLIAMS, ("Plaintiff"), by and through her undersigned

attorneys, hereby responds to Defendant's, MOSAIC FERTILIZER, LLC's; ("Mosaic

Fertilizer"), Motion for Summary Judgment ("Motion"), (Doc. 92) and says:

Mosaic rests its entire argument for summary judgment on its anticipation that

Plaintiff's experts, Dr. Frank Mink, and Les Ungers, will be excluded in their entirety from

offering any evidence in this case, and thus in its words, making "it impossible for Plaintiff to

present evidence of causation to a jury…" (Motion at pp. 1-4).  Specifically, Mosaic has

contended that neither Dr. Mink nor Mr. Ungers applied any methodology, thus making their

testimony unreliable. And if excluded, Mosaic contends, that the element of causation cannot

be satisfied for Counts 1-4 and 6. Mosaic's primary legal authority in support of these

contentions is Chapman v. Proctor Gamble Distrib., LLC, 766 F. 3d 1296 (11th Cir. 2014).

---

[1] Ms. Williams has not attached the depositions of her physicians that are referenced herein, however,
she will make them immediately available for in camera review, should the Court request.  In
addition, Ms. Williams, refers to certain deposition transcripts and other records that are attached to
the Daubert Responses as exhibits; to avoid duplication, she does not reattach here as exhibits.

Plaintiff has demonstrated in her Responses to Mosaic's Motion to Exclude,[2] that Dr. Mink has satisfied fully the threshold requisite of reliability of Federal Rules of Evidence,[3] Rule 702, Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and as applicable to this action, Chapman and The Federal Reference Manual of Scientific Evidence's Reference Guide on Toxicology, 3rd Ed. (2011).[4]  In addition, Plaintiff has shown that Les Ungers, has fully satisfied the requirements of Daubert.[5] Further, Plaintiff has shown that the two-part causation analysis of Chapman does not apply to Mr. Ungers.[6]  Plaintiff submits that since Mosaic's Motions to Exclude must be denied, Mosaic's Motion too must fail.

Mosaic also claims that if only one of Plaintiff's experts were excluded, judgment as a matter of law is still warranted as to all counts on the grounds of lack of causation.  This claim is nonsensical and lacks support.  Even if this Court excluded Mr. Ungers, Dr. Mink's testimony and opinions would remain firm and unchanged as to Ms. Williams' exposure to Sulfur Dioxide (S02), the source of the S02, and the adverse health effects to Ms. Williams caused by the exposure.  As Mr. Ungers' testified, he did not perform an testing of the dust or soil samples for S02; nor could he as S02 is a gas, and difficult to find in dust.[7]  Further,

---

[2] Mosaic's Motion to Exclude Proffered Testimony of Plaintiff's Proposed Expert Toxicologist, Dr. Franklin Mink, (Doc. 89); and Mosaic's Motion to Exclude Proffered Testimony of Plaintiff's Proposed Expert Exposure Scientist, Leslie Ungers, (Doc 90).  (collectively, "Motions to Exclude").

[3] Although Mosaic cites to Rules 104 and 403, of the Fed. R. of Evid., it makes no argument as to how they apply to the subject motion.  Nonetheless, Ms.Williams contends that since the testimony of her experts is reliable it does not constitute unfair prejudice; nor is there any question as to their respective qualifications.

[4] Ms. Williams specifically incorporates by reference her Responses to Mosaic's Motions to Exclude Dr. Mink and Mr. Ungers, filed simultaneously herewith, (hereinafter, "Daubert Response," if referring to one, and "Daubert Responses" if referring to both).

[5] See fn.3.

[6] While Mosaic makes an assertion that these apply to Mr. Ungers, they fail to ever articulate how.

[7] See Ungers' deposition at pp. 106-107.

both Dr. Mink and Mr. Ungers reviewed and relied on the same documents, including the Technical Support Document (TSD), Florida Area Designations for the 2010 S02 Primary National Ambient Air Quality Standard, concerning S02.[8]

Last, Mosaic has also contended that summary judgment should be granted as to Count V, for lack of evidence of destruction or loss of real or personal property, and Count IV, on the grounds that Florida does not recognize strict liability for failure to warn outside the products liability context.   (See Motion at pps. 11 – 12).   Mosaic states no further grounds warranting summary judgment as to any count of Plaintiff's Second Amended Complaint (SAC). For the reasons stated herein, and in Plaintiff's Daubert Responses, which Plaintiff specifically incorporates by reference, Mosaic's contentions all fail as a matter of law.

### MOSAIC'S "STATEMENT OF MATERIAL UNDISPUTED FACTS"

In Mosaic's short "Statement of Undisputed Material Facts," Mosaic makes several statements that are not based in fact but are pure legal conclusions, as inaccurate as they might be, that concern purported standards that Mosaic claims: 1) applied to Dr. Mink and Mr. Ungers; and 2) that they did not follow.  See Motion at pp 4-6.  For the reasons stated in Ms. Williams' Daubert Responses, Ms. Williams strongly disputes Mosaic's application of certain of these standards on the grounds that they are inaccurate statements, overreaches of the law, and/or wholly misplaced and misapplied by Mosaic.  No other "undisputed facts" were submitted by Mosaic in support of its Motion.

---

[8] See Ungers' deposition at pp.56-57, 104-105; See Dr. Mink's deposition at 143-144, 197-198.  See also the reference materials contained in Dr. Mink's and Mr. Ungers' expert reports which are included in the Daubert Responses.

**PLAINTIFF'S STATEMENT OF MATERIAL UNDISPUTED FACTS**

Ms. Williams is a college-educated woman who holds a degree in computer science engineering from the University of South Florida.  She was born in 1967, has lived her entire life in her childhood home located at 4810 S. 87th Street in Riverview, Florida, which is in the heart of the Progress Village neighborhood.[9]  Over the course of the last twenty years, Ms. Williams has never been away from her home for more than a two-week period of time.[10]

Mosaic and its predecessors have continuously operated the Riverview Facility over the course of Ms. Williams' life, where they have been involved in the production of fertilizer, sulfuric acid, electrical power, phosphoric acid and fluoridation ingredients.[11] These processing and production operations at the Riverview Facility are approximately three miles from Ms. Williams' home.[12]   In addition to the processing and production operations, Mosaic and its predecessors have also operated and maintained two waste pilings, referred to as phosphogypsum stacks.[13]  One of the phosphogypsum stacks has become inactive.  The second phosphogypsum stack, the one closest to Ms. Williams' home remains active.[14] The active phosphogypsum stack is approximately one mile from Ms. Williams

---

[9] See Williams' deposition transcript at pp. 14-15, attached as Exhibit A.
[10] See Plaintiff's Response to Mosaic's First Set of Interrogatories, Interrogatory No. 5, attached as Exhibit C.
[11] See Mosaic's Am. Answer to the Second Amended Complaint (SAC) at paragraph nos. 3-6, 11.
[12] See Mosaic's Am. Answer to the SAC at paragraph no. 21; and Ungers' deposition at p. 95.
[13] See Mosaic's Am. Answer to the SAC at paragraphs 18-20.
[14] See Mosaic's Am. Answer to the SAC at paragraphs 19- 21.

home, and the center of the stack is approximately 1.8 miles from Ms. Williams' home, and is directly adjacent to the Progress Village neighborhood.[15]

In 2013, Mosaic Fertilizer, with its three sulfuric acid plants, was found to be a "major source of S02 emissions," and the "primary S02 emissions source," by the U.S. Environmental Protection Agency, (EPA), at a violating monitor, resulting in the designation of a nonattainment zone for Sulfur Dioxide (S02).[16] The available emissions data also shows Mosaic as a major source going back as early as 2003.[17] The nonattainment zone which encompasses the entirety of the Mosaic Riverview Complex and a large portion of the Progress Village neighborhood,[18] connotes the fact that the air within that boundary is in violation of the 2010 one-hour S02 primary national ambient air quality standard (NAAQS).[19] Significantly, Ms. Williams' home is approximately 2000 feet from the modeled boundary of the nonattainment zone, well within the nonattainment boundary's margin of error;[20] and more importantly, she has spent her entire life in a neighborhood that falls well within a nonattainment zones' boundary.[21] In addition, Mosaic has admitted that its S02 emissions, at its Riverview Facility's fenceline, is at 166ppb, exceeding by over

---

[15] See Mosaic's Am. Answer to the SAC at paragraph 21, Exhibit A to the SAC, and Ungers' deposition testimony at p. 119.

[16] See the Technical Support Document (TSD), Florida Area Designations for the 2010 S02 Primary National Ambient Air Quality Standard, at pps. 5, 8 and 10, attached as Exhibit C. Per Mosaic's Am. Answer to the SAC paragraph 41, Mosaic admits that the TSD speaks for itself.

[17] See Ungers' deposition at p. 104.

[18] A photo of the modeled nonattainment zone is located a page 10 of the TSD.

[19] The TSD defines nonattainment as "an area which EPA has determined, based on a state recommendation and/or on the technical analysis included in this document, has violated the 2010 S02 NAAQS, based on the most recent three years of air quality monitoring data, or contributed to a violation in a nearby area." See p.2 of the TSD.

[20] See Mink's Deposition at pp. 66, 70, 76.

[21] See Williams' Deposition at p. 14.

100% the NAAQS 75ppb one-hour S02 standard.[22]  Concerning this NAAQS violation, on February 6, 2013, the EPA wrote to Governor Rick Scott concerning the said nonattainment zone, and advised that, "[Exposure to S02 can cause a range of adverse health effects, including narrowing of the airways which can cause difficulty breathing and increased asthma symptoms."[23]  This is true for the general population, and particularly true for sensitive members of the population, including and asthmatics.[24]  Ms. Williams is both an asthmatic, and she suffers from a genetic disorder, Glucose 6 phosphate dehydrogenase deficiency (G6PD), as a result she is a sensitive member of the population.[25]

Ms. Williams' exposure to the S02 has aggravated her asthma, and G6PD, and caused a remodeling of her airways, chronic bronchitis, obstructive pulmonary disease and has caused a significant potential of early mortality.[26]  S02 is a potent oxidative stressor and Ms. Williams' exposure to it has aggravated her G6PD, resulting in hemolytic anemia events, chronic pain, macrocytic anemia, allergies, and breathing edema.[27]  Ms. Williams has also been exposed to constitutes of concern (COC), from Mosaic's emissions, which are known to be acute irritants as well as chronic toxicants.[28]  These toxic substances include PM10, radioactive materials and toxic metals including, arsenic, cadmium, chromium, lead,

---

[22] See Mosaic's Aug. 8, 2014 correspondence to the Florida Department of Environmental Protection, attached as Exhibit D.
[23] See the EPA's letter to Governor Rick Scott, dated Feb. 6, 2013, attached as Exhibit E.
[24] See Id., and Mink's deposition testimony at pp. 69; and sources relied on Dr. Mink, including, 75 Fed. Reg, 519 (June 22, 2010), discussing the ISA conclusions regarding the causal relationship between respiratory morbidity and short-term exposure to S02; and the ISA conclusions in epidemiological studies of past S02 exposure at ISA, p. 5 – 10, attached to Mink's Daubert Response.
[25] See Mink's deposition at pp. 27-28.
[26] See Mink's deposition at p. 38, 68, 79.
[27] See Id. and Dr. Dorothy Ogundu's deposition at pp. 218, 232-241, and 260.
[28] See Mink's deposition at p. 223, and Ungers' deposition at pp. 121-122

manganese, nickel, phosphorous and zinc.[29] All are present in the ambient air north of

Mosaic's operations, and in particular, in Progress Village and Ms. Williams' home.[30]  In

particular, the dust in the Plaintiff's home is contaminated with toxic substances at

significantly higher levels than typical Florida soils, including, but not limited to, arsenic at

thirteen times the typical level, phosphate at over thirteen times the typical level, and

chromium at over two times the typical level in Florida's soils.[31]  Mosaic is the only

industrial source of phosphorous in Hillsborough County.[32] The statistical association

between the dust at Ms. Williams' home, the phosphogypsum, the toxic metals, pollutants

and radioactive material demonstrates Mosaic is the major contributing source.[33]  These toxic

substances have been directly fingerprinted to Mosaic, and there is no evidence showing

otherwise.[34]

Dr. Mink has articulated in his expert report and in his deposition that exposure to

these substances are known to cause adverse health effects and that Ms. Williams has been

diagnosed with and has shown the anticipated adverse health effects.[35] Ms. Williams suffers

from the following documented health conditions: chronic severe asthma, obstructive

pulmonary disease, restrictive airways, G6PD related pulmonary hypertension, chronic pain,

---

[29] See Mr. Ungers' Elemental and Radiochemistry of Settled Dust and Surface Soil in Residential Communities of Central Hillsborough County Florida,, March 2015 (Settled Dust Study), attached to Ungers' Daubert Response; see also Unger's deposition at pp. 59-61.

[30] See Unger's Settled Dust Study, and Unger's deposition testimony at pp. 108-109

[31] See Ungers' Settled Dust Study.

[32] See Ungers' deposition  at p. 69

[33] See Ungers' deposition at pp. 121-122.

[34] See Mink deposition testimony at pp. 64, 94, 148, 149.  Further, to the extent Mosaic argues that a fate and transport mechanism was the proper methodology, it never actually performed said methodology, and has introduced no evidence that controverts Mr. Ungers' dust and soil findings.

[35] See Mink's Daubert Response, and Mink's deposition at pp. 143, 153- 157.

fibromyalgia, chronic bronchitis, G6Pd related allergies, anemia, kidney and liver enzyme

abnormalities, depressive disorder[36], dysthymic disorder, general anxiety

disorder, adjustment disorder, chronic pain disorder, avoidant personality disorder, severe

hypoglycemia, life stressors secondary to disability and psychological response to exposure

to disability.[37]

     Dr. Saprunova, a treating physician, testified that she is not an expert concerning

G6PD, a very rare disease, but she does agree that S02 is an oxidative stressor for people

with G6PD; and further explained that oxidative stressors can impact every cell and organ in

Ms. Williams' body.[38]  Further, Dr. Saprunova testified that Ms. Williams is a diligent

patient who, after removing all other obvious oxidative stressors from her life, except the

environment for where she lives, has shown no improvement.[39]   Dr. Saprunova testified that

if Ms. Williams is exposed to S02, a known oxidative stressor, it could produce hemolytic

anemia and a multitude of symptoms.[40] Further, Dr. Saprunova agreed with Dr. Mink's

opinion, that "Among the treatment she received, she has been prescribed several cycles of

---

[36] Dr. Deutsch, Plaintiff's Life Care Planner, testified that the somatic complaints he identified were outgrowths of real, objective medical diagnosis of Plaintiff, and in no way challenged the veracity of her medical diagnosis or the psychological outgrowths directly related to those medical diagnoses. See Deutsch deposition at 248 – 259.

[37] See Dr. Alabi's deposition at pp. 57 – 58, 80; See Dr. Ogundu's deposition at pp. 232-234, 235, 238, 243, 260; See Dr. Saprunova's testimony at pp. 62, 182-184,, 186, 188-189, 191-192; See Dr. Deutsch's deposition at pp. 140-141, 248-250.

[38] See Dr. Saprunova's testimony at pp. 14 – 16, 62, 181 - 184, 205

[39] Id.

[40] See Dr. Saprunova's deposition at pp. 14 -16.  See also Dr. Alabi's deposition at p. 85, agreeing that SO2 is a known lung irritant and source of asthma.

various therapeutic agents over the period of decades resulting in various expected side effect, which were also adverse to her general health."[41]

Dr. Ogundu, a medical doctor who has seen and treated Ms. Williams and has consulted with her physicians concerning G6PD, has been treating patients and consulting on the condition for twenty-five years.[42] Dr. Ogundu agreed with Dr. Mink's finding that Ms. Williams' blood lab work evidenced incidents of hemolysis.[43]

Dr. Mink reviewed twenty plus years of medical records for Ms. Williams, which would have included records from her pulmonologist concerning her family history of second hand smoke.[44] Dr. Fortune Alabi, a treating pulmonologist, testified that Ms. Williams' exposure to secondhand smoke, which ceased almost fifteen years ago is "most likely unrelated," to her present day issues with asthma.[45]

## LEGAL STANDARD

Rule 56, of the Federal Rules of Civil Procedure, controls. Pursuant to that Rule, Mosaic must show an absence of any genuine dispute as to a material fact, and that in that absence it is entitled to judgment as a matter of law.   This burden of proof rests on Mosaic. Ms. Williams respectfully submits that Mosaic has not satisfied this high burden of proof.

Mosaic has sought to satisfy its burden through its Motions to Exclude. Mosaic argues that Ms.Williams has not satisfied the Eleventh's Circuit's application of Daubert as enunciated in Chapman v. Procter & Gamble Distrib., LLC., 766 F.3d 1296 (11th Cir. 2014),

---

[41] See Dr. Saprunova's deposition at p. 16
[42] See Dr. Ogundu's deposition at p. 241.
[43] See Dr. Ogundu's deposition at pp. 232-234.
[44] See Mink's deposition at pp. 112-113
[45] See Dr. Alabi's deposition transcript at pps. 80, 82, 84 and 89.

relying on <u>McClain v. Metabolife Int'l., Inc.,</u> 401 F.d 3rd 1233, 1239 (11th Cir. 2005).

Mosaic's attack against Dr. Mink and Mr. Ungers is grounded in their alleged failure to

satisfy the **both** the general and specific causation showings enunciated in <u>McClain</u> and

<u>Chapman.</u>  In particular, Mosiac contends that Dr. Mink and Mr. Ungers have not only failed

to show a reliable methodology for the causation opinions, but have failed to show any

methodology.  But as strongly demonstrated in the Daubert Responses, Dr. Mink and Mr.

Unger's not only applied methodologies, they both rigorously applied appropriate and

scientifically valid, tested and peer reviewed reliable methodologies.  As illuminated in Ms.

Williams' Daubert Responses, Mosaic has misapplied the legal standard and has inaccurately

stated what each of Ms. Williams' experts did and what each was obligated to do within their

respective fields of expertise.  At best Mosaic's attacks go to the weight, not the admissibility

of these experts' opinions; but in no instance do such attacks result in exclusion or judgment.

Importantly, Mosaic has put forth no explanation for why its application of <u>Chapman</u>

to the facts in this case is correct.  Ms. Williams' strongly submits that Mosaic's application

is wrong.  In its Motion, Mosaic simply presumes that because this is a toxic tort case, with

"alleged toxic substances," Ms. Williams must "prove both general and specific causation,"

to overcome <u>Daubert</u> and summary judgment. See Motion at pp. 8, 10.  Mosaic's additional

reasoning, as articulated in its Motion to Exclude Dr. Mink, was that, "[This case falls within

the second category as Dr. Mink demonstrated no generally accepted relationship between

the toxicity of the constituents at issue and the myriad of Plaintiff's alleged illnesses.  Dr.

Mink also testified that Plaintiff's G6PD-related sensitivities cannot be 'quantitate[d] it

because it's an extreme complex disease."[46]   Unbelievably, no argument was even made by

Mosaic as to <u>Chapman's</u> application to Mr. Ungers; Plaintiff submits that is because there is

none.

The <u>Chapman</u> two-part categorization of the toxic tort case was first birthed in 2004

by <u>McClain;</u> there the court explained that "toxic tort cases **usually** come in two broad

categories."  [Emphasis added].  <u>Id.</u> at 1239.   The first category is those where, "the medical

community generally recognizes the toxicity of the drug or chemical at issue, and second,

those cases in which the medical community does not generally recognize the agent as both

toxic and causing the injury plaintiff alleges."  <u>Id.</u>   Under the first category, "federal courts

need not consider expert opinions for diagnoses 'medical doctors routinely and widely

recognize as true….'" <u>Chapman</u> at 1303. The threshold question is, whether it is generally

known in the medical community that the toxicity of the substance at issue can cause the type

of injury alleged by the plaintiff.  If yes, the inquiry stops and no analysis under category two

takes place.  See <u>Chapman</u> at 1303.

## ARGUMENT

## APPLICABILITY OF CHAPMAN

From the outset it is axiomatic that the <u>McClain,</u> and <u>Chapman</u> causation standards

apply only to those experts opining on medical causation, or the toxicity of a substance and

its causal relationship to the alleged harm caused.  This is significant, because Mr. Ungers

never opined on whether the level of S02 and other toxins to which Ms. Williams was

---

[46] See Motion to Exclude Dr. Mink at pp. 15.  Furthermore, Plaintiff's genetic disease does not
control the threshold question. Rather, the focus is the toxicity of the chemical or substance she has
been exposed to.

exposed, caused or could have caused her adverse health effects.[47]   Thus, Mosaic's generalized attempt to apply the <u>McClain</u> criteria to Mr. Ungers, is like trying to force the proverbial square into the round whole.   Ultimately, Mosaic's real issue with Mr. Ungers appears to be his choice of methodology.   Mosaic argues that Mr. Ungers failed to perform fate and transport study. However, such a study is simply the wrong methodology to assess contaminant deposition over time.[48] Rather, Mr. Ungers followed tested, peer reviewed and reliable methodologies to determine whether air particulate emissions from Mosaic's operations were depositing at Ms. Williams' home; and found that yes, in fact, that it was depositing air particulates at her home.   Mr. Unger's confirmed Mosaic as the unequivocal source by fingerprinting the dust in Ms. Williams' home to the fingerprint of phosphogypsum.[49]   For these reasons and more Ms. Williams has contended that Mosaic's Motion to Exclude Mr. Ungers, and ultimately this Motion must be denied.[50]

In addition to the above, both the <u>McClain</u> and <u>Chapman</u> cases are distinguishable from the case at hand on several grounds.   First, both courts held that their respective cases were category two cases.   Specifically, <u>McClain</u> found that neither ephedrine nor caffeine were known to be toxic, nor was the combination of those two drugs generally known to be toxic.   Likewise, in <u>Chapman</u>, while the plaintiff's argued that the medical community recognized an association between excess zinc and copper deficiency, the toxicity of the calcium-zinc compound at issue was not generally known, and thus it fell under category two.   In contrast, the present action's subject toxins unambiguously fall into category one.

---

[47] See fn.3, and see Mr. Ungers' expert opinion attached to the Mink Daubert Response.
[48] See fn.3, and Ungers's deposition at p. 132
[49] See fn.3, and also Ungers' deposition at pp. 121-122.
[50] See fn.3.

As overwhelmingly demonstrated in Mink's Daubert Response, SO2 has long been recognized by the medical and toxicology communities to cause the exact type of harm alleged by Ms. Williams.[51] The referenced scientific studies and well established conclusions weigh strongly in favor of Chapman category 1; and Mosaic has offered absolutely no evidence or argument to the contrary. Similarly, Ms. Williams has also demonstrated that the toxicity of the subject constituents of concern (COC),[52] are also generally recognized and well known by the U.S. Environmental Protection Agency, to cause the type harm alleged. The standards published by the U.S. EPA, are scientifically tested and peer reviewed, concerning levels of inhalation exposure that cause adverse health effects.[53]  And Dr. Mink has confirmed that each and everyone of the COC at issue can cause the adverse effects demonstrated by Ms. Williams.[54]  Again, Mosaic has not offered an iota of evidence to the contrary.  At bottom, Mosaic offers no support for why this case does not fall into category 1; this is a fatal flaw to Mosaic's Motions to Exclude and this Motion. Furthermore, both Dr. Mink and Mr. Ungers have demonstrated Ms. Williams' exposure to the S02 and COCs, and Dr. Mink has shown that the exposure was at levels known to cause the harm alleged, and actually did cause the harm alleged.[55]  This completes the Chapman analysis.

---

[51] See fn.3, and 37, 39, 40, 42.
[52] See fn.3.  The phosphogypsum associated contaminates include: aluminum, arsenic, copper, boron, chromium, iron, calcium, lead, phosphorus, potassium, silica, sodium, and zinc.  See Mink's expert report at p. 15, included with Mink's Daubert Response.
[53] See fn.3
[54] See fn.3, and the U.S. EPA's Chemical Assessment Summary Integrated Risk Information System (IRIS) standards, and other health based criteria, including the ISA document on carbon monoxide, and the EPA's Reference Handbook, referenced therein.
[55] See Dr. Mink's Daubert Response, and the citations and referenced contained therein.

Mosaic, however, having not made a single showing under category 1, leaps to the conclusion this is a category 2 case. What's Mosaic's basis? The previously referenced shallow assertions in its Motion. Such assertions are woefully insufficient and ignore the Court's inherent responsibility as gatekeeper. Importantly, category two toxic-tort cases require a two-part analysis concerning causation testimony, the first part is referred to as "general causation," and the second as "specific causation," or "individual causation." See Chapman at 1303; and McClain at 1239. The focus of both is the reliability of the expert's opinions. Irrespective of whether this Court finds that category one or category two applies here, Ms. Williams respectfully submits that she has met her burden and has demonstrated that both her experts used reliable methodology, satisfying the general and specific causation reliability requisites for the S02 and the COC exposure.[56] Further, Ms. Williams submits that Mosaic's attacks on her experts methodologies go to the weight not the admissibility of their testimony; such an attack has never been an accepted grounds for exclusion of expert testimony or the granting of judgment as a matter of law. See In re Trasylol Prods. Liab. Litig., 2010 U.S. Dist. LEXIS 116929, 144-145 (S.D. Fla. September 10, 2010); and Calta v. North American Arms, Inc., 2007 WL 4800641, 7 (M.D. Fla. November 27, 2007).

Ms. Williams points out one more relevant distinction. Chapman and McClain are pharmaceutical-ingestion exposure toxic tort cases. They are not environmental exposure toxic tort cases. Thus, neither case considered methodologies utilized in the field of toxicology related to inhalation or dermal exposure, where like in work related exposure

---

[56] See fn.3.

cases may involve encounters with inconsistent amounts over time as opposed to medicines to which the exposure can be more accurately measured.[57]

After repeatedly failing to establish that this is a category 2 Chapman case, Mosaic nonetheless goes on to attack the methodologies used by Mosaic's experts as if it were. Mosaic's arguments fail as a matter of law.   To begin, Mosaic's asserts that Dr. Mink did not: 1) rely upon trusted studies that did not directly contradict his opinions; 2) he did not rely on trusted and specific dose calculations; and 3) did not consider and eliminate other relevant potential alternative causes.  See Motion at pp. 2-3.  As to each claim, Mosaic is wrong. First, Ms. Williams has shown that Dr. Mink did rely on trusted studies.[58] Moreover, Mosaic's questioning of certain studies does not render his opinions unreliable or speculative; to the contrary, Mosaic's contention is one of weight, not admissibility.  See In re Trasylol, at 143-146; and Calta at 7.   Next, Mosaic again misstates the record; Dr. Mink specifically testified that he applied the Bradford Hill criteria which includes the dose response relationship, and the U.S. EPA's IRIS, and where applicable, ISA dose calculations.[59] The fact that Dr. Mink relied on U.S. EPA IRIS based dose responses that were developed, vetted and peer reviewed does not constitute a failure to apply the criteria; to

---

[57] See Campos v. Safety-Kleen Systems, 98 F. Supp 2d (D. Puerto Rico 2015); and In re Stand 'n Seal, 623 F. Supp. 2d 1355 (N.D. GA. 2009); and see Westberry v. Gislaved Gummi AB, 178 F.ed 257, 263 (4th Cir. 1999) (Explaining that that in these type of exposure cases, that "while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiffs exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation.").
[58] See fn.3, specifically Mink's Daubert Response.
[59] See Mink's deposition at pp. 23-26, 29, 32, 96-97.

the contrary, it confirms the reliability of his methodology.[60] As to Mosaic's final point,

neither this Circuit nor this District demand that Dr. Mink eliminate every possible

alternative cause.  That is simply not the law.[61]

Concerning Mr. Ungers, Mosaic completely ignores the work he performed.   Mosaic

contends that Mr. Ungers failed to: 1) conduct a fate and transport analysis; 2) failed to

calculate exposure; and 3) failed to enumerate and eliminate alternative sources.  Again,

Mosaic's assertions fall to the ground.  Concerning the first point, Mr. Ungers did not

perform a fate and transport analysis, because, for the reasons previously articulated, based

on the weight of all the peer reviewed data available, it was clearly not the proper

methodology to be applied.[62]  And the methodology Mr. Ungers did apply was firmly based

on scientific evidence and knowledge.[63]  Interestingly, the primary basis of Mosaic's attack is

a statement from Mosaic's expert Mr. Ken Kosky; but even he himself did not do a fate and

transport analysis.  Thus, Mosaic has offered no evidence that counters in any way Mr.

Ungers' methodology or findings.  At best, Mosaic's attack goes to weight.  See In re

Trasylol, at 143-146; and Calta at 7.  Concerning Mosaic's later two claims, it is clear that

---

[60] See Campos v. Safety-Kleen Systems, Inc. 98 F. Supp 3d 372, 379 (D. Puerto Rico 2015)(Denying a motion to exclude where the expert relied on reliable scientific evidence, including Bradford Hill Criteria, concerning exposure to benzene).  Furthermore, scientific literature also recognizes that not establishing a dose response is not without justification in certain cases, including instances involving inhalation.  See In re Stand'n Seal 623 F.supp. 2d 1355, 1373 (N.D. GA 2009).

[61] See Calta v. North American Arms, Inc., 2007 WL 4800641, 7 (M.D. Fla. November 27, 2007)("Daubert does not require an expert to test every single element leading to an expert's conclusions," (citing Cooper v. Toshiba Home Tech Corporation, 76 F. Supp. 2d 1269, 1278-1279), and further found that the **alternative causes** that Plaintiff allegedly failed to eliminate were the proper subject of cross exam as they went to the weight, not the admissibility of the evidence)(Emphasis added).  Further, Dr. Mink did consider alternative causes.  See Mink deposition at 182-183.

[62] See Ungers' deposition testimony at pp.39-40.  See also Ungers' Daubert Response and the citations contained therein.

[63] See Ungers' Daubert Response and the citations contained therein.

Mosaic has completely ignored the nature of the work performed by Mr. Ungers.  Mr. Ungers

engaged in dust and soil sampling at five locations in central Hillsborough County, including

Ms. Williams' home, which when compared to Florida soils unambiguously fingerprinted

Mosaic as the source to a high degree of statistical confidence.[64]  That fingerprint

unequivocally supports Mr. Ungers' opinions.[65]  As to Mosaic's last point, it is not only

factually incorrect, but is not a grounds for exclusion or judgment as a matter of law.  See

<u>Calta,</u> at 7.  For all the above reasons Mosaic's Motion must be denied outright.

## COUNT V

Section 376.311(3), Florida Statutes, is a strict liability statute that **does not require**

that Ms. Williams prove negligence, or offer **proof of causation**.  See <u>Curd v. Mosaic

Fertilizer, LLC,</u> 39 So. 3d 1216, 1221 (Fla. 2010), citing <u>Aramark Uniform and Apparel v.

Easton,</u> 894 So. 2d 20, 23-24 (Fla. 2004)[Emphasis added].  The statute provides, in

pertinent part that:

> **(3)** …Except as otherwise provided in subsection (4) or subsection (5), in any such
> suit, it is not necessary for such person to plead or prove negligence in any form or
> manner. **Such person need only plead and prove the fact of the prohibited
> discharge or other pollutive condition and that it has occurred. The only defenses
> to such cause of action shall be those specified in <u>s. 376.308</u>. [Emphasis added].**

Plaintiff has unequivocally satisfied her burden of proof under this statute.  It is

undisputed and documented that Ms. Williams' home, her real property, is: 1) located within

2000 feet of the EPA's S02 nonattainment zone boundary, and well within the margin of

error of that nonattainment zone;[66] 2) that Mosaic is the primary source of the S02

---

[64] See Ungers' Daubert Response, and his Settled Dust Study.
[65] See fn.3.
[66] See Mink's Deposition at pp. 66, 70, 76.

emissions;[67] 3) that her home is contaminated with dust containing highly toxic substances,

and that the point source of that dust is Mosaic[68]; and 4) that pollutive discharge remains a

constant latent defect so long as Mosaic's operations remain at the status quo.  Moreover,

Mosaic has failed to identify a single affirmative defense as articulated in Section 376.308,

Florida Statutes, that would prevent a finding of liability.  Rather, Mosaic sole argument is

that Ms. Williams cannot show any documented destruction of loss of her property.  See

Motion p. 11.  For the reasons stated above, this argument must fail as a matter of law.

Mosaic relies on the Florida Supreme Court's decision in Curd v. Mosaic Fertilizer,

LLC, 39 So. 3d 1216 (Fla. 2010), in support of its contention but without any explanation

of how its application here supports judgment in favor of Mosaic. Plaintiff here explains

how Curd fully supports her claim.  The Legislature "intended that the statute be liberally

construed;"  this is significant because the statute, recognizes that escaped pollutants, "pose

threats of great danger and damage… to citizens."  See also Curd at 1221.   Further, the

statutory scheme is aimed at remedying, preventing, and removing the discharge of

pollutants.  Id. at 1222.

Taking into consideration the legislative intent, and the definition of "damages" at

Section 376.031(5), Florida Statutes, the Curd Court held that commercial fisherman could

recover for loss of income, even though they did not own the property that had been

contaminated by Mosaic's pollution.  Note, the question of damages did not turn on what

damages the fisherman personally suffered, e.g., loss of income, but rather turned on

whether a "prohibitive discharge" or " pollutive condition" occurred to the "real property"

---

[67] See the TSD.

[68] See fns. 32 & 33.

or a "natural resource." Curd at 1221- 1222.   Mosaic argued that the fisherman could not

recover because they did not own any property, and thus they could not show "damages to

real or personal property." Id. at1220-1221. The Curd court rejected that argument and

concluded that fisherman's claim that the Mosaic's spilled pollutants resulted in a loss of

"underwater plant life, fish, bait fish, crabs, and other marine life," was sufficient to state a

claim.   Applying this reasoning here, it is clear that Ms. Williams has satisfied her burden.

It is well documented that a pollutive condition has occurred and is occurring to Ms.

Williams' real property; and that that pollutive condition cannot be immediately remedied

or removed, thus resulting in ongoing damage and insult, *e.g.,* the accumulation of toxic

dust particulates, and exposure to gaseous S02, to her real property.[69]   Accordingly, denial

of Mosaic's Motion as to Count V is warranted.

## COUNT IV

Last, Mosaic is not entitled to judgment as a matter of law on Count IV, Strict

Liability for Failure to Warn.  Florida law unequivocally states that, "[W]hen a set of facts

will support both a theory of common law negligence and strict liability, a plaintiff is entitled

to proceed on either theory or both." See Baione v. Owens-Ill., Inc., 599 So. 2d 1377, 1379

(Fla. 2nd DCA 1992), citing Ford Motor Co. v. Hill, 404 So. 2d 1049 (Fla. 1989).  Inherent in

---

[69] Furthermore, it is well settled Florida law, that where the seller of a home knows of facts which
materially affect the value of the property the seller is under a duty to disclose them to the buyer. See
U.S. Home Corp., Rutenberg homes Div. v. Metropolitan Property & Liability Ins., Co, 516 So. 2d 3,
4 (Fla. 2nd DCA 1987), citing Johnson v. Davis, 480 So.2d 625 (Fla. 1985).  Ms. Williams' real
property continues to be subject to toxic emissions. Mosaic's documented pollutive discharges have
had negative impact on the value of her property, and they would have to be disclosed.  Ms.
Williams' testimony concerning the negative impact on her ability to sell her home remains
undisputed.   See Williams' deposition. at pp. 136.

the law is a recognition that the doctrine of strict liability has evolved to compliment the traditional theories of negligence.  See Ferayorni v. Hyundai Motor Co., 711 So. 2d 1167, 1169 (Fla. 4th DCA 1998).   Florida's failure to warn negligence law is well established, lending to the application of a similar strict liability failure to warn cause of action.

Baione is instructive.  In Baione, the plaintiff, a sailor, was exposed to products on a ship that were made with the by-product asbestos.  On a motion to dismiss, the court determined that the allegations of exposure to the by-product were sufficient to overcome a challenge to the strict liability failure to warn claim. Id. at 1377-1379. Comparatively, Ms. Williams has been exposed to the hazardous by-product of Mosaic's primary manufactured product, phosphoric acid, a fertilizer product.   See also Ferayorni, at 1169.   McConnell v. Union Carbide Corp., 937 So. 2d 148 (Fla. 4th DCA 2006), is also instructive.  There the defendant had a duty to warn of a hidden by-product, asbestos, and the defendant could not hide behind a future supplier of other intermediary once the product hit the market. Id. Further, like asbestos, Mosaic's S02 and COC emissions are known to be dangerous and hazardous.  See the McConnell court's discussion of comment n to section 388 of the Restatement (Second) of Torsts. at Id. at 155 – 156. At bottom, Florida law supports, not hinders Ms. Williams' claim and Mosaic has failed to cite to authority that prohibits her claim.   Accordingly, Mosaic's Motion as to Count IV must be denied.

WHEREFORE, Ms. Williams' requests an Order denying in full Mosaic's Motion for Summary Judgment, and any other relief this Court deems just and proper.

Dated January 4, 2016.


_____/s/_____                    Mary Ellen Hogan
*Laureen Galeoto*                                FBN 0065372
Laureen Galeoto, Trial Counsel                   The Green Counselor, PLLC
FBN 0194107                                       100 S. Ashley Drive, Ste. 600
Law Office of Laureen Galeoto, PLLC              Tampa, FL  33602
100 S. Ashley Drive, Ste. 600                    P. 813.964.6515
Tampa, FL  33602                                  Maryellen@thegreencounselor.com
P. 813.280.9326
Laureen@laureenlaw.com


William P. Walker, Jr.
Walker Morgan, LLC
135 E. Main Street
Lexington, SC  29072
P. 803.359.6194
bw@walkermorgan.com


<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on January 4, 2016, that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

_____/S/_____
Laureen Galeoto

Counsel for Ms. Williams