**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RHONDA WILLIAMS, a single person,

        Plaintiff,

v.                              Case No. 8:14-cv-1748-T-35TGW

MOSAIC FERTILIZER, LLC, a Delaware
Corporation doing business in Florida,

        Defendant.

_____/

**PLAINTIFF'S OBJECTION TO MOSAIC'S MOTION TO EXCLUDE PROFFERED TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT TOXICOLOGIST, DR. FRANKLIN MINK**

### I.    Introduction

The admissibility of expert testimony in the Eleventh Circuit requires trial courts to "engage in a rigorous three-part inquiry" in which the court considers whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rosenfeld v. Oceania Cruises, Inc.,* 654 F.3d 1190, 1193 (11th Cir.2011) (internal citations omitted).  The burden is on the proponent of expert testimony to establish that those requirements have been met by a preponderance of the evidence. *See Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11th Cir.2010).

Mosaic does not dispute the credentials of Dr. Mink as a toxicologist specializing in environmental toxicology and risk assessment during his thirty (30) year career.

The second criterion is reliability. "The evidentiary requirement of reliability is lower than the merits standard of correctness. *Daubert* states that a judge should find an expert opinion reliable under Rule 702 if it is based on 'good grounds,' *i.e.,* if it is based on the methods and procedures of science." *In re Paoli R.R. PCB Litigation,* 35 F.3d 717, 744 (3d Cir. 1994). Hence "in most cases, objections to the inadequacies of a [scientific] study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir.2003) cited in *Tampa Bay Water v. HDR Eng'g, Inc.*, No. 8:08-CV-2446-T-27TBM, 2011 WL 3101803, at *1 (M.D. Fla. July 25, 2011).

The third criterion requires that the expert testimony assist the trier of fact. Dr. Mink's testimony is the critical bridge between Mosaic's pollution and Ms. Williams' injuries. Dr. Mink's testimony both "logically advances a material aspect of the proposing party's case," *Allison v. McGhan Medical Corp.,* 184 F.3d 1300,1312 (citing *v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (on remand)), and assists the jury in understanding scientific principles underlying both Plaintiff's allegations and Defendant's defenses. Mosaic does not dispute this criterion to the extent that Dr. Mink's testimony is determined to be reliable.

Mosaic asserts that Dr. Mink has failed to determine general and specific causation to a degree that his expert testimony must be excluded. Mosaic is wrong because it either

misunderstands or purposefully ignores the peer reviewed methodologies applied by Dr. Mink to reach his conclusions in his Expert Report[1]. Exhibit 1.

Dr. Mink opines on both general causation and specific causation in his Expert Report[2]. He begins by focusing on Ms. Williams' simplest disease process – her respiratory morbidity[3] as evidenced by her chronic and increasingly problematic asthma, as well as associated impacts of airway remodeling and chronic bronchitis documented in her medical records.   Next he establishes that due to her rare inherited blood disorder (G6PD) that adversely affects (or worsens) an immune mediated inflammatory disease like asthma, she is at greater risk than the general population for suffering adverse impacts from exposure to chemicals causing oxidative stress including sulfur dioxide ("SO2") and other Constituents (or Chemicals) of Concern ("COC").[4]  As a member of the general population in Progress Village, she is already at significant risk for adverse health effects from SO2.  This is so because she has lived all of her life in an area designated by U.S. EPA as an area where SO2 emissions exceed U.S. EPA health-based standard of 75 parts per billion (ppb) from 2009 to date, and where according to U.S. EPA, and Hillsborough County monitoring data, the standard was likely violated for many prior decades.

---

[1] "Summary of Expert Opinions of Franklin Mink" dated June 25, 2015 ("Expert Report").
[2] Mosaic asked Dr. Mink to color code his expert report line-by-line in his deposition where he discusses specific causation (green) and general causation (orange).  His color coded Expert Report is attached as Exhibit 2.
[3] Morbidity is generally defined as a state of poor health or disease.  Respiratory morbidity describes poor health or disease in the respiratory system.
[4] Dr. Mink was asked to identify the constituents of concern ("COC") at his deposition, which he color coded in pink.  Tr. 67:7-13.

Furthermore, Dr. Mink relies on (1) the Li Study[5] that used U.S. EPA peer reviewed risk assessment methodology to demonstrate increased respiratory morbidity caused by other compounds that travel from the Mosaic Riverview facility to Ms. Williams home and (2) the Chakraborty Study[6] as a peer reviewed study in Tampa Bay showing alternative relative air pollution sources and hazardous substances in her neighborhood.  Dr. Mink relies on actual, physical data (not models) that measured the COCs in the dust in her attic and kitchen that Mr. Ungers fingerprints to components of phosphogypsum processed by Mosaic. Dr. Mink has reviewed Ms. Williams' genetic testing, peer reviewed medical literature on her disorders, as well as testimony from her physicians from 1995-2015 documenting that her inherited disorder (G6PD) increases her susceptibility to oxidative stresses.

Dr. Mink's opinion integrates these mechanisms, symptoms, clinical tests and medical history to show by the weight of evidence using the Bradford Hill criteria/approach and U.S. EPA Risk Assessment methodology (including a quantitative cumulative risk assessment). By the use of those methodologies, he defines the pathology (mechanism) and associated etiology (cause) of Ms. Williams' respiratory morbidity and other adverse health effects.  He concludes with a reasonable degree of scientific certainty that the pathology and associated etiology (cause) is Ms. Williams' chronic exposure to SO2 and the cumulative effect of exposure to other COC from Mosaic Riverview facility.

---

[5] Li et al. Impacts of hazardous air pollutants emitted from phosphate fertilizer production plants on their ambient concentration levels in the Tampa Bay area. Air Qual. Atmos. Health. Sept. 2014. ("Li Study") Exhibit 3.

[6] Chakraborty, J. "Cancer risk from exposure to hazardous air pollutants; spatial and social inequalities in Tampa Bay, Florida." Intern. Journal of Env. Health Research, April 2012.  Exhibit 4.

Mosaic's motion attacks Dr. Mink, as it did Mr. Ungers, by arguing there were analyses he did not do and should have done.  Ms. Williams' response to Mosaic's motion is to educate the court on what Dr. Mink actually did, explain his findings of general and specific causation for sulfur oxides and COC and demonstrate how his methodology complies with the requirements of *Daubert v. Merrell Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct 2786 (1993)(hereinafter "*Daubert*").

The 11th Circuit has recognized two broad categories of toxic tort cases: (1) those where the medical community generally recognizes the toxicity of the substance in question, and (2) those in which it does not recognize the substance as both toxic and causing the plaintiff's alleged injury.  *Chapman v. Proctor & Gamble Distributing, LLC. 766 F.3d 1296, 1303 (11*[th] *Cir. 2014)* citing *McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1239 (11th Cir. 2005) cert. denied,* 135 S. Ct. 2312, 191 L. Ed. 2d 1000 (2015).In the first category of toxic tort cases, the court need not undertake an extensive *Daubert* inquiry as to general toxicity-whether the substance is capable of causing harm. *Id.*  In cases where the cause and effect or resulting diagnosis is clear, the court simply looks to specific causation-whether the substance actually caused harm to the plaintiff.  *Id. Evans v. Matrixx Initiatives, Inc.,* No. 3:07-CV-357-J-34JRK, 2009 WL 2914252, at *5 (M.D. Fla. Feb. 18, 2009)[7]. For the SO2 and COC in this case, the scientific community, including the medical community, has determined that these chemicals can and do cause the harm(s) suffered by Ms. Williams. This determination was made through the rigorous development of health based regulatory standards and toxicological assessments.

---

[7] Per the conditions of publication, this case is being cited as an example and not as precedent.

II.     **Dr. Mink Establishes General Causation for Ms. Williams' Exposure to SO2 by reference to U.S. EPA's primary ambient air quality standard for SO2 and its supporting documentation**.

A.  Brief History of the Standard

U.S. EPA identified sulfur oxides[8] as a "criteria pollutant" pursuant to the original Clean Air Act of 1970 ("CAA") because sulfur oxides were known to have an adverse effect on the public health and welfare.  *See* Section 108(a) of the Act, as added, 84 Stat. 1678, 42 U.S.C. 1857c-3(a). 75 Fed.Reg. 35,519 (June 22, 2010).   The mission of the CAA was to identify and eliminate the serious public health risks presented by emissions of criteria pollutants.  In April 1971 U.S. EPA reviewed the state of the science on the serious health risks of SO2 and promulgated the original SO2 National Ambient Air Quality Standard ("NAAQS"). [9] In 2008 U.S. EPA completed a multi-year process of reassessing that science with review by the medical community, the scientific community and the public.  Based on incontrovertible evidence of serious health impacts, U.S. EPA lowered the SO2 standard to 75 ppb on June 2, 2010 effective on August 23, 2010. 75 Fed.Reg 35,520 (June 22, 2010).

B.  U.S. EPA's 75 ppb NAAQS is based on a peer reviewed, scientifically established determination of general causation that exposure to SO2 above 75 ppb unequivocally causes respiratory morbidity.

When the NAAQS for SO2 was lowered in 2008, U.S. EPA relied upon its own document, the Integrated Science Assessment for Sulfur Oxides – Health Criteria ("ISA") as the foundation for the regulatory action. Exhibit 5.  The ISA was written by the Clean Air Scientific Advisory Committee for Sulfur Oxides Primary NAAQS Review Panel, which

---

[8] Oxides of sulfur are measured in air by measuring sulfur dioxide ("SO2") 75 Fed.Reg 35,520, 35,521(June 22, 2010).

[9] The original standard was 0.14 parts per million (ppm) (140 ppb) averaged over a 24-hour period, not to be exceeded more than once per year, and 0.030 ppm annual arithmetic mean. 75 Fed. Reg 35,520, 35,522 (June 22, 2010)

consisted of more than twenty of the nation's most prominent scientific and medical experts

on sulfur oxides. The ISA is:

> …a concise review, synthesis, and evaluation of the most policy-relevant science, and communicates critical science judgments relevant to the NAAQS review. As such, the ISA forms the scientific foundation for the review of the primary (health-based) NAAQS for SOX.(footnote omitted). Ex. 5, p.34.

U.S. EPA relied on this critical document when it lowered the SO2 standard in 2010:

According to U.S. EPA:

> **"ISA concluded that there was sufficient evidence to infer a ``causal relationship'' between respiratory morbidity and short-term (5-minutes to 24-hours) exposure to SO2 (ISA, section 5.2). Importantly, we note that a ``causal relationship[10]'' is the strongest finding the ISA can make.** This conclusion was based on the consistency, coherence, and plausibility of findings observed in controlled human exposure studies of 5-10 minutes, epidemiologic studies mostly using 1-hour daily maximum and 24-hour average SO2 concentrations, and animal toxicological studies using exposures of minutes to hours.[11] (emphasis added)

75 Fed. Reg 35,525 (June 22, 2010).

Dr. Mink relied on this standard for establishing general causation for Ms. Williams'

exposures to SO2.  *See i.e.,* Tr. at 82:17-20. He also relied on the underlying science U.S.

EPA used to promulgate the NAAQS.  Tr. at 71:1 and 85:9-14.  By relying on the NAAQS

---

[10] U.S. EPA states: "A causal relationship is based on ``[e]vidence [that] is sufficient to conclude that there is a causal relationship between relevant pollutant exposures and the health outcome. That is, a positive association has been observed between the pollutant and the outcome in studies in which chance, bias, and confounding could be ruled out with reasonable confidence. Evidence includes, for example, controlled human exposure studies; or observational studies that cannot be explain by plausible alternatives or are supported by other lines of evidence (*e.g.* animal studies or mechanism of action information). Evidence includes replicated and consistent high-quality studies by multiple investigators.'' ISA Table 1–2, at 1–11." 75 Fed. Reg. 35,525 (June 22, 2010).

[11] These elements – human exposure studies, epidemiological studies and human and animal toxicology studies – are the studies Mosaic asserts are missing from Dr. Mink's analysis. U.S. EPA states: "Taken together, the ISA concluded that the controlled human exposure, epidemiologic, and toxicological evidence supported its determination of a causal relationship between respiratory morbidity and short-term (5- minutes to 24-hours) exposure to SO2." 75 Fed. Reg. 35,526 (June 22, 2010)

and its underlying science, he stands upon the shoulders of the U.S. EPA and its authoritative Clean Air Scientific Advisory Committee, who conclusively determined that SO2 levels in excess of the NAAQS cause respiratory morbidity. This conclusion and its foundation moot Mosaic's assaults on Dr. Mink for failing to personally calculate a dose response curve for SO2 for Ms. Williams. Tr. at 25:6-20.[12]

Dr. Mink also relied on the ISA's conclusion regarding epidemiological studies of **past** SO2 exposure in populations like Ms. Williams in attainment areas that were designated nonattainment areas after U.S. EPA lowered the NAAQS standard in 2010:

> In [our review of] the epidemiologic studies, the SO2-related respiratory effects were consistently observed in areas where the maximum ambient 24-hour avg SO2 concentration was BELOW the current [pre-2010 and post- 1971] 24-h avg NAAQS level of 0.14 ppm (references to Tables omitted). Potentially susceptible and vulnerable subgroups include asthmatics, children, older adults, and individuals who spend a lot of time outdoors at increased exertion levels. (emphasis added).

Exhibit 5, P. 5-10.

These conclusions unequivocally support Dr. Mink's opinion that Ms. Williams has been exposed to harmful levels of SO2 from Mosaic for at least twenty (20) years, and likely over the course of her lifetime. Tr. at 144:1-7. [13] Furthermore, the ISA finding negates Mosaic's inference that Hillsborough County's compliance with the pre-2010 NAAQS of 0.14 ppm is somehow evidence or even "proof" that Ms. Williams was not exposed to harmful levels of SO2 prior to 2010 when the standard changed.

---

[12] Mosaic also asserts that Dr. Mink did not do epidemiological studies. Dr. Mink replies that they were inherent in the standard. Tr. at 84:18-23.

[13] Because Dr. Mink does not have medical records going back beyond 1995 (approx. 20 years ago), he has conservatively limited his opinion to the time period corresponding to the medical records he has.

The ISA's conclusion is not fantasy.  Monitoring data from southern Hillsborough County that Dr. Mink relied upon shows that when the 2010 NAAQS for SO2 is applied retroactively to existing monitoring data, the monitor closest to Mosaic shows significant violations of the 70 ppb standard going back to 1999, the year monitoring began at that location.  Exhibit 6. [14] These retroactive exceedences between 1999 and 2004 are approximately **twice** the health based 70 ppb standard.

> C.  Dr. Mink's Reliance on U.S. EPA's 75 ppb SO2 NAAQS complies with 11th Circuit law on establishing general causation for toxic tort cases.

General causation is established by demonstrating, often through review of scientific and medical literature, that exposure to a substance *can* cause a particular disease. *In re Neurontin,* 612 F.Supp.2d 116, 123 (D. Mass. 2009) (citations omitted). *See also,* Green, et al., *Reference Guide on Epidemiology,* in *Reference Manual on Scientific Evidence,* 604 (Fed. Judicial Ctr. 3rd ed. 2011).  The SO2 NAAQS was based a through review of scientific and medical literature done by nationally prominent scientists, epidemiologists and toxicologists, not Dr. Mink alone.  The Clean Air Act Committee concluded that exposure to 75 ppb of SO2 causes (not "may cause" or "can cause," but actually DOES cause) respiratory morbidity in the general population including asthmatics like Ms. Williams.  Reliance on the SO2 NAAQS by Dr. Mink has established general causation within a reasonable degree of certainty per the requirements of *Daubert, McCain* and *Oceania.*

---

[14] The Hillsborough County Environmental Protection Commission calculated the Table showing these retroactive exceedences. May 17, 2011 Letter from Jerry Campbell, Air Management Division Director, to Mike Halpin, Florida Department of Environmental Protection.  The letter stated "…we believe that the population exposed to the unacceptable levels of SO2 is limited to the area surrounding the East Bay site."

Dr. Mink's establishment of general causation within a "reasonable degree of certainty" is further enhanced by the fact that Ms. Williams is a carrier of a G6PD mutation. The voluminous medical literature on G6PD relied upon by Dr. Mink[15] shows that Ms. Williams is likely to be even more sensitive to S02 than the typical asthmatic that the regulatory standard is designed to protect.   See Tr. at 25: 24, 27-28.

Mosaic does not dispute that Dr. Mink's reliance on a duly promulgated regulatory standard passes the reliability test mandated by *Daubert*.   Mosaic has cited no case holding that reliance on a statutorily mandated, health based, peer reviewed, duly promulgated regulatory standard by an expert to opine on general causation is in any way "unreliable." *See McMunn v. Babcock & Wilcox Power Generation Grp., Inc.,* No. 2:10CV143, 2014 WL 814878, at *8 (W.D. Pa. Feb. 27, 2014)(the court is unable to find it scientifically unreliable, or unreasonable, to determine the existence of a risk of cancer by a reference to the body of science establishing the carcinogenicity of ionizing radiation).

III.   **Dr. Mink establishes specific causation for SO2 exposure based on where Ms. Williams lives, the status of that area as a S02 nonattainment zone and the government determinations that Mosaic was primarily responsible for the nonattainment status due to the magnitude of its SO2 emissions.**

A.   Ms. Williams lives in the portion of Hillsborough County designated as a non-attainment area for SO2.

According to U.S. EPA, when a SO2 monitoring station exceeds the applicable NAAQS, the default area designated as "nonattainment" is the county surrounding the monitoring station.[16]   The Florida Department of Environmental Resources ("FDEP")

---

[15] Expert Report, p. 17-21.
[16] Air Quality Designations for the 2010 Sulfur Dioxide (SO2) Primary National Ambient Air Quality Standard, 78 Fed.Reg 47,191-02 (Aug. 5, 3013).

submitted data to U.S. EPA that estimated by modeling (not air test data) that a much smaller area within Hillsborough County should be the official SO2 "nonattainment area." ("Nonattainment Area")[17]. The meaning of that designation is important.  In 1980 U.S. EPA promulgated criteria for defining nonattainment status: Criterion No. 5 stated:

> A nonattainment area should be as small as possible while <u>encompassing all areas of expected violation</u> and all sources of significant impact[18] on those violations. (emphasis added).

46 *Fed.Reg.* 55,724 (Nov. 12, 1981).

Furthermore, Ms. Williams "lives" in the broadest sense of the word, in the Nonattainment Area and has lived there all of her life.[19]  While much ado has also been made by Mosaic whether her residence is 1000 feet or 2000 feet from the "boundary" of the nonattainment area, such hair splitting is misplaced.  This court is not required to check its common sense at the court house door.   The Nonattainment Area "boundary" is not a physical one, rather it is an estimate from a computer program drawn on a map.    The boundary does not operate like a barrier to confine SO2 molecules. As to the distance to Mosaic, FDEP has stated in an official regulatory submittal to U.S EPA that Progress Village is within a 1.86 mile radius around Mosaic Riverview.[20] Ms. Williams' community has

---

[17] While the county boundary where the monitoring station is located is the initial presumptive boundary according to U.S. EPA, the state is permitted to conduct additional area-specific analyses that could justify establishing either a larger or smaller area.  78 Fed.Reg 47,191 (Aug. 5, 2013).

[18] Ms. Williams notes that TECO is not included in the Hillsborough County nonattainment area for SO2 as it is not a significant source for the Hillsborough SO2 nonattainment area.

[19] See Plaintiff's Response to Mosaic's First Set of Interrogatories, Interrogatory No. 5, attached as Exhibit to Plaintiffs Opposition to Mosaic's Motion for Summary Judgment.

[20] http://www.dep.state.fl.us/air/rules/regulatory/SO2-nonattain-Hillsborough/FL-SIP-2015-04-SO2-Nonattainment-Area-Plan-Hillsborough-County-Final-04-03-2015.pdf, p. 21.

always has been Progress Village and there is no dispute that Progress Village, where she resides is well within the area where SO2 exposure are at levels at or above 75 ppb.

C.  Mosaic is the primary source of SO2 in the Nonattainment Area

The Florida Department of Environmental Protection ("FDEP") transmitted its recommendation for the nonattainment boundary in a letter to U.S. EPA dated June 13, 2011. Exhibit 7.  That letter stated:  "The nonattainment area boundary recommendation for non-complying monitoring site in Hillsborough County is described in Appendix 2.  The violation at this site can be overwhelmingly attributed to a single source. Exhibit 7 at p. 1.  That single source is the Mosaic Riverview facility.

Page 2 of the June 11, 2011 states:

…[W]e recommend a nonattainment area boundary encompassing an area that, based upon air dispersion modeling, may be experiencing violation of the standard caused by the identified source [Mosaic].  We believe it is important for the public, particularly potentially affected asthmatics, to understand that violations of the 1 hour SO2 standard are localized events not reflective of county wide air quality, and that **the only area for which we currently have reasonable evidence of high levels of SO2 is the designated non-attainment area.** (emphasis added).

Therefore Dr. Mink's opinion regarding the respiratory morbidity suffered by Ms. Williams relies upon a duly promulgated governmental standard for SO2 that has been exceeded by emissions from Mosaic Riverview in the Nonattainment Area where she lives.

**IV.   Dr. Mink relied on U.S. EPA's Chemical Assessment Summary Integrated Risk Information System (IRIS) standards and other standards to establish general causation for COC.**

Like SO2, many of the COC at issue in this case have established, peer reviewed regulatory standards that prescribe the levels of inhalation exposure that causes adverse health effects.  Such standards are published in the U.S. EPA's National Center for

Environmental Assessment's Chemical Assessment Summary that is part of the Integrated Risk Information System (IRIS)[21].

According to U.S. EPA, an IRIS Assessment includes the first two steps of the U.S. EPA's four-step risk assessment process discussed below.  IRIS assessments include:

> Hazard Identification, which identifies credible health hazards associated with exposure to a chemical, and **Dose-Response Assessment**, which characterizes the **quantitative relationship between chemical exposure and each credible health hazard**. These quantitative relationships are then used to derive toxicity values [i.e., RfCs or inhalation reference concentration].   http://www.epa.gov/iris/basic-information-about-integrated-risk-information-system (last reviewed 12/4/2015)

The IRIS Assessment for Chromium is an example of an assessment relied upon by Dr. Mink in this case.[22]  The IRIS [Assessment] Summary for chromium (IV) states in pertinent part:

> The inhalation reference concentration (RfC) … is likewise based on the assumption that thresholds exist for certain toxic effects such as cellular necrosis. The inhalation RfC considers toxic effects for both the respiratory system (portal-of-entry) and for effects peripheral to the respiratory system (extrarespiratory effects). It is generally expressed in units of mg/m3. In general, the <u>RfC is an estimate (with uncertainty spanning perhaps an order of magnitude) of a daily inhalation exposure of the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime.</u>

Chromium (VI), Integrated Risk Information System (IRIS), U.S. Environmental Protection Agency, Chemical Assessment Summary, National Center for Environmental Assessment, Exhibit 8 p. 7.

---

[21] U.S. EPA describes IRIS as follows:  "EPA's mission is to protect human health and the environment. EPA's IRIS Program supports this mission by identifying and characterizing the health hazards of chemicals found in the environment. Each IRIS assessment can cover a chemical, a group of related chemicals, or a complex mixture.  IRIS assessments are the preferred source of toxicity information used by EPA and are an important source of toxicity information used by state and local health agencies, other federal agencies, and international health organizations." http://www.epa.gov/iris/basic-information-about-integrated-risk-information-system.
[22] Tr. at 83:21-22.

This means that similar to SO2 NAAQS, RfCs are peer reviewed values based on epidemiological studies, animal data and human testing for daily inhalation exposures that define the line between deleterious effects during a lifetime[23] and reasonable health.

Standardized information from IRIS including RfCs were reviewed and used by Dr. Mink in his assessment of COCs to confirm that each and every one of compounds were capable of causing adverse respiratory effects demonstrated by Ms. Williams.     For compounds not listed in the IRIS, Dr. Mink used other health based criteria.[24]   He testified that because he relied on the standard(s), he did not do epidemiological studies involving Ms. Williams;[25] and did not consider her weight, specific activities, whether or not her house had air conditioning, nor did he calculate a dose response curve that is specific to her.[26].

IV.    **Dr. Mink used established methodologies to define specific causation for Ms. Williams' exposure to chromium and other metals**.

Dr. Mink identified the four basic elements of U.S. EPA's risk assessment methodology he used – (1) hazard identification; (2) exposure assessment; (3) dose response assessment; and (4) risk characterization.[27]   He then explained precisely what he did under each and every element.  Tr. at 47-52.  In summary, Dr. Mink testified as to the following:

---

[23] According to Dr. Mink, U.S. EPA's standard lifetime exposure is based on 30 years.  Ms. Williams has exceeded that metric by more than 17 years.

[24] For example, carbon monoxide is a criteria pollutant that has health-based criteria developed in its own ISA document.  Tr. at 82:21-25, 83:1-7.

[25] Tr. at 84:18-23.

[26] Tr. at 62:22-23.

[27] Dr. Mink states the following regarding risk assessment methodology. "Well, they're pretty well established. I helped formulate them while I was at US EPA. And they're that you do a hazard identification, you do an exposure assessment, you do a dose response assessment and then you do a risk characterization. Those are the four basic elements of risk assessment. And they're used by almost every state. I believe they're used by all states, but they're primarily US EPA methodologies." Tr. at 47.  U.S. EPA's website shows these four steps to a human health risk assessment.  http://www.epa.gov/risk/conducting-human-health-risk-assessment.

1. <u>Hazard Identification</u> – He performed a literature review on emission constituents from phosphogypsum manufacturing around the world and in Florida.  He looked at the IRIS information on those emissions and identified those that were toxic.  He looked at the Li Report on hazardous air pollutants from phosphogypsum facilities in Florida, specifically including Mosaic's Riverview facility.  He looked at the chemical analyses of attic dust in Ms. Williams' home from the Ungers Report to see what constituents were physically present at her home.  From these sources, he identified a set of COC that are highlighted in his Expert Report during his deposition. Exhibit 2.

2. <u>Exposure Assessment</u> - He reviewed air monitoring data from air monitoring sites (primarily Hillsborough County data and assessments)[28]; Mr. Ungers' data from soil and attic sampling in Ms. Williams home and surrounding areas, Mosaic's Toxic Release Inventory from the Riverview Facility that lists its toxic air emissions and hazardous air pollutants identified in Dr. Li's Report.  Tr. at 50-52. He states:

> She's [Ms. Williams] been exposed to elevated levels of heavy metals and ionizing radiation through looking at the attic and soil samples that Ungers & Associates did, and 133 total hazardous air pollutants that Dr. Li looked at and quantitated based on reasonable and dependable cumulative methodology. Tr. at 143:11-17.

3. <u>Dose Response Characterization -</u>  Dr. Mink looked at the IRIS system for dose response,[29] along with the Li and Chakraborty Reports[30].  Tr. at 62-63.  He relied on U.S.

---

[28] He has reviewed the Air Quality Reports- Hillsborough County Environmental Protection Commission, 2000-2013, Mosaic Annual emissions 2008-2012, Hillsborough County 2010-12 Air Quality Reports and Mosaic Correspondence dated August 8, 2014 to FDEP regarding Mosaic Riverview- SO2 Emissions Reduction Permit Application and Mosaic's Models.  Expert Report, Reference Section.

[29] Dr. Mink testified that "dose response" in inherent in the IRIS system.  Tr. at 62:22-23.

[30] It is important to note that Dr. Mink uses the Chakrabordy report to examine the air emission sources in Ms. Williams' neighborhood.

EPA's health based standard of 75 ppb standard for SO2. Tr. at 82:17-20.  He relied upon

IRIS standards and other duly promulgated standard information for COC.[31]

4.  <u>Risk Characterization -</u>  Dr. Mink evaluated risk based on the strength of association[32]

metric of the Bradford Hill Criteria, using all the available information described above.

Here is what he said:

> [I looked] at "Ungers -- Mr. Ungers, Ungers & Associates, looked at samples in attics
> and soils near the neighborhood of Mrs. Williams and her residence, and we saw
> results that I would have expected. The concentrations of the metals were higher in
> the attics than they were in the soils and that they fingerprinted well to
> phosphogypsum fertilizer emissions.  And that's what we were interested in,
> fingerprinting them. That was my -- what I wanted to see out of that. And how it
> turned out, actually it turned out much better  I would have guessed from the
> hypotheses. Tr. at 64-65.

> So in addition to what he [Dr. Li] calculated risk for, you have 110 million tons of
> radioactive toxic heavy metal dust 1.8 miles downwind of Mrs. Williams' home 20
> percent of the time that she's lived in for half a century. It's clear that that material has
> deposited in her neighborhood and in her house. She lives in a non-attainment zone.
> She resides less than 2,000 feet from the arbitrary line of the [non]attainment zone.
> You would expect the health effects that she has. And she developed exactly the
> health effects that are in the literature. So that was our risk characterization in a
> nutshell. Tr. at 65.

As part of his risk characterization, Dr. Mink looked at the health effects of exposure

to constituents <u>below</u> health-based levels.  He had concluded from his SO2 analysis that Ms.

Williams lung tissue has been injured by more than twenty years of exposure to SO2.  He

---

[31] To prove exposure levels, plaintiffs need not produce a mathematically precise table equating levels of
exposure with levels of harm.  Rather, a plaintiff need only make a threshold showing that he or she was
exposed to toxic levels known to cause the type of injuries he or she suffered**.** *Mattis v. Carlon Elec. Prods.,*
295 F.3d 856, 860-61 (8th Cir. 2002) (quotation and citation omitted).

[32] Strength of association is one of nine Bradford Hill factors cited in the Federal Judicial Center, Reference
Manual on Scientific Evidence, at 599–600 (3d ed.2011).  They are: "1. Temporal Relationship, 2. Strength of
the association, 3. Dose-response relationship, 4. Replication of the findings, 5. Biological plausibility
(coherence with existing knowledge), 6. Consideration of alternative explanations, 7. Cessation of exposure, 8.
Specificity of the association, and 9. Consistency with other knowledge.

also concludes from the kitchen and attic dust sampling that she has suffered additional, cumulative historical assaults from the other COC, likely at less than health based limits.

The methodology to assess those cumulative risks is, under established U.S. EPA risk assessment protocol, to perform a qualitative cumulative risk assessment. In essence, this method combines the impacts of the individual COCs. The methodology for his qualitative cumulative risk assessment is U.S. EPA Risk Assessment Guidance for Superfund Sites, ("RAGS") which is also listed as one of Dr. Mink's reference and is a peer reviewed document.   According to this reference, to qualitatively assess multiple non-cancer risks posed by two or more COC, Dr. Mink determined a  "Hazard Index," which is the sum of two or more hazard quotients for multiple substances and/or multiple pathways. USEPA, RAGS, 1989 Vol. 1, Part B.  For non-cancer substances, it was in excess of 1, which makes it a significant non-cancer risk.  *Id*.

Data from the Li Study is an important component in Dr. Mink's qualitative cumulative risk assessment.   Li modeled federally designated Hazardous Air Pollutants ("HAP")[33] emissions from 4 phosphate facilities in the Tampa Bay Region, including the Mosaic plant (known as "Plant D" in the study).[34] Li used data either from Mosaic's submissions to U.S. EPA or from Mosaic itself to model those emissions.[35]  He hypothesized

---

[33] Li describes these compounds in his paper as "compounds which are known or suspected to cause cancer and other serious health effects .. when present in sufficient quantities subject to specific conditions of exposure." Exhibit 3, Li Report, p. 2.

[34] Unlike the other three facilities, Mosaic did not publish data from its actual stack emissions of chromium or any other metal. See Li Report, Figure 2 where toxic emissions from Mosaic's smoke stakes was missing. Plaintiff speculates that this absence could be explained by the fact that the submittal date for publication (August 2014) was during the pendency of this litigation.  Mosaic's own expert was "surprised" that data was not in the report or available to him.  James Tr. at 138.

[35] Mosaic was involved with this study through its participation in the Florida Industrial and Phosphate Research Institute. See Acknowledgment Section in Li Report, Exhibit 3.

that improvements in phosphate plant emission controls should result in reduced HAP emissions from the 4 plants contaminating the surrounding neighborhoods. Li reported, based on his modeling efforts, that the "highest Cr [chromium] concentration emission (from the stacks at Mosaic Riverview) was at Tower Dairy (monitoring site) (2.49 pg/m3), which is located 3.70 miles from Plant D (Mosaic)."  Exhibit 3, Li Report, p. 10, Table 2.  This data shows through air dispersion modeling that chromium emitted from Mosaic's process stacks is estimated to travel at least 3.70 miles from those stacks, far enough to get to Ms. Williams' house when the wind blows in her direction even accepting Mosaic's assumption that her house is more than 3 miles from the stacks.[36] Not only does it the there, the amount getting there is the highest estimated amount of any metal coming from Mosaic's stacks.

Mr. Ungers' work showed that the chromium levels in Ms. Williams' attic and on top of her cabinets were not consistent with the concentrations of metals in the soils in her area yet were generally consistent[37] with the ratio of metals in phosphogypsum rock.  This is what Dr. Mink means by "fingerprinting."  Tr. at 64:16-20.  Mr. Ungers' work establishes that there are site-specific, actual (not modeled) data documenting chromium particulates (and other metals) in her house at levels that are above background.  The Li Report shows by modeling that chromium particles from Mosaic's stacks travel 3.7 miles from its stacks, which means the particles can travel to Ms. Williams' house and neighborhood.  This information is incorporated into Dr. Mink's qualitative risk assessment done per U.S. EPA Risk Assessment protocols for cumulative risk.

---

[36] Note that Mosaic asserts in Dr. Mink's deposition that Ms. Williams' house is "more than 3 miles from the stacks."  Trans. p. 72, p. 8-14.
[37] Dr. Mink testifies that the certainty of association is 1:10,000 meaning that the probability that the association is random only 1:10,000. Tr. at 149:6-9.

D.  Legal Standard for Specific Causation

The Fourth Circuit's decision in *Westberry v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir.1999)("*Westberry*") is instructive on specific causation in environmental toxic tort cases. *Westberry* reiterated the well-established specific causation standard of showing both a minimum level of exposure that is capable of causing injury and the plaintiff's actual level of exposure.   The court recognized, however, that it is often difficult to establish with quantitative precision the specific level of exposure (e.g., how many grams of asbestos did plaintiff inhale).  The court stated:

> Consequently, while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiffs exposure are beneficial, such evidence is not **always** available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not **invariably** provide the basis for an expert's opinion on causation." *Westberry,* 178 F.3d at 264 (emphasis added).

> The approach utilized instead is a **qualitative analysis** based upon the information available such as the source of exposure, how the source was emitted into the community and for what period of time, to determine whether the exposure contributed to a particular illness. *Id.* at pp. 142–144.  (emphasis added).

> That is precisely what Dr. Mink did in this case.

> E.  Dr. Mink's opinions are reliable because he used standard U.S. EPA approved risk assessment methodology.

In the 11th Circuit, to determine the reliability of a particular scientific expert opinion, the court must consider, to the extent possible: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Daubert,* 509 U.S. at 593–94;

*Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir.2003) (citing *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir.2002)).

Dr. Mink was questioned extensively about his methodology at his deposition. He stated that in this case he used U.S. EPA Risk Assessment methodologies that he helped develop when he was employed at U.S. EPA for over eleven years.[38] This methodology began to be used in 1989 and is currently used by U.S. EPA, as well as a large percentage of the states per Dr. Mink's deposition testimony. Because it is a public document first published in 1989 and is always undergoing revision, it has been subject to continuing peer review and re-publication for more than 25 years.

Dr. Mink also used the Bradford Hill criteria as referenced by Mosaic to evaluate the data. Tr. at 203:20-25[39]. Dr. Mink's principles and methods are consistent with the Bradford Hill criteria and that consistency suggests that his testimony is reliable. *In re Stand-n- Seal Prods Liab. Litig.,* 623 F. Supp. 2d 1355 (N.D. Ga. 2009); *See In re Viagra Prods. Liab. Litig.,* 572 F. Supp. 2d 1071, 1081 (D. Minn. 2008).

By relying on standard U.S. EPA Risk Assessment methodologies to assess cumulative risk qualitatively from multiple sources of elevated constituents, Dr. Mink has established

---

[38] Dr. Mink was involved in the formulation of the risk assessment guidelines in 1986 US EPA as well as many other US EPA national risk policy documents. Dr. Mink was listed by the US EPA (1987) as one of the top 20 risk assessment experts in the country and was offered the first Senior Environmental Science Advisor position with region five in early 1988.

[39] "So based on Bradford Hill she has -- she has the disease from those constituents from her exposure over that time. She had significant dose, she had significant duration, and she has the disease. It's really tough when you have all those elements to say it's not causative."

that his risk assessment methodologies have been tested and subject to peer review.  Such widely disseminated methodology is generally accepted in the community.[40]

Federal Rules of Evidence 702 advisory committee note (2000) states "the rejection of expert testimony [on the basis of unreliability] is the exception rather than the rule." Likewise, *Daubert* warned that the district court, exercising its gatekeeper's role, must focus 'solely on principles and methodology, not on the conclusions that they generate.' 509 U.S. at 595.  But most importantly, the First Circuit states that *"Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct"; instead, the "proponent of the evidence must show only that 'the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.' ". *See Milward v. Acuity Specialty Products Group, Inc.,* 639 F.3d 11, 15 (1st Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 1002, 181 L.Ed.2d 734 (2012)." *Maiz v. Virani,* 253 F.3d 641, 666 (11th Cir.2001) (quoting *Allison,* 184 F.3d at 1311).  The First Circuit articulates the issues before this court best when it states "*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.,* 161 F.3d 77, 85 (1st Cir.1998).

---

[40] Dr. Mink testified that the methodology he used was "… used by almost every state. I believe they're used by all states, but they're primarily US EPA methodologies."  Tr.at 47:12-14.

**V.      Mosaic's specific attacks on Dr. Mink go to the weight of the evidence, not its admissibility.**

A.   <u>Standard of Review</u> -Where there is an issue regarding whether or not a plaintiff has a disease, the issue goes to the weight, not the admissibility of the expert's testimony. *Cartwright v. Home Depot U.S.A., Inc., 936 F. Supp. 900, 901 (M.D. Fla. 1996); see Bazemore v. Friday*, 478 U.S. 385, 400 100 S.Ct. 3000 (1986).   In *Cartwright*, the court admitted expert testimony that the plaintiff had asthma because there was evidence of asthma in the record, although the evidence was disputed by the defendant.   The court held that factual disputes are to be resolved by the jury. *See Campos v. Safety-Kleen Sys., Inc.*, 98 F. Supp. 3d 372, 378 (D.P.R. 2015)

Whether the proposed testimony is scientifically correct is not a consideration for this court, but only whether or not the expert's testimony, based on scientific principles and methodology, is reliable. *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1312 (11th Cir.1999). Mosaic's assertions that Ms. Williams exhibits "mild" effects of G6PD and does not exhibit hemolytic anemia are factual disputes for the jury.

Mosaic argues that some of Ms. Williams' treating physicians take the position that she fails to show signs of hemolytic anemia, which is a hallmark of the genetic disorder G6PD.  First and foremost, Ms. Williams' genetic tests definitively show she has the disorder G6PD. And to the contrary, at his deposition Dr. Mink used a highlighter to show evidence of hemolysis in laboratory testing recounted in Ms. Williams' medical history. Mosaic says she doesn't have evidence of hemolytic anemia per her physicians; while Dr. Mink says she does and points to blood test data that concurs with the testimony of Ms. Williams' physician

that she does have such evidence. This purely factual dispute cannot disqualify Dr. Mink. According to *Cartwright* and *Campos*, the dispute must be left to the trier of fact.

      B.  Dr. Mink considered alternative causes and confounding factors for Ms. Williams' disorders

Mosaic argues that Dr. Mink did not eliminate alternative causes and confounding factors.  To the contrary, as just one example, Dr. Mink considered an array of causes of Ms. Williams obstructive pulmonary disease such as smoking, illicit drug use, family history and employment/hobbies – she had no history of any of these potential causes.  Tr. at 160:3-25, 161:1-2. So he eliminated those causes based on probability, "so low so can eliminate." Tr. at 183:5-15.

      C.  Dr. Mink considered and accounted for a myriad of potential "other" sources for the pollution at issue in this case.

When asked how he addressed alternative sources of COCs, Dr. Mink testified that he relied on Mr. Ungers sampling analysis comparing the phosphogypsum constituents to soil and attic dust and looked at their quantitative values relative to one another.  Tr. at 148-150. If the constituents came from the same place, they will be present at certain relative concentrations to each other, therefore providing a fingerprint.  The fact that the ratios are not exact shows impacts of other sources.  Tr. at 149.  Looking at the ratios and correlations, air monitoring data, the Chakrabordy Report, applying the Branford Hill criteria and using the U.S. EPA quantitative risk methodology, he concludes that the "majority" of hazardous air pollutants are from Mosaic.  Greater than 50% in his opinion, leaving the remaining percentage allocated to other sources.  Tr. at 149:21-23.

Mosaic's attack on Dr. Mink for failing to consider other sources cannot withstand scrutiny.  This Court has said that when a expert fails to eliminate alternative causes of an incident, that failure would be the proper subject of cross examination and affect the weight the jury should give the testimony, not the admissibility.  Calta v. N. Am. Arms, Inc., 805-CV-1266T-MSS, 2007 WL 4800641, at *7 (M.D. Fla. 2007).  So if Dr. Mink's consideration of alternatives "fails," that failure is insufficient grounds to preclude his testimony.  Mosaic's motion must be denied.

SUMMARY

Dr. Mink's Expert Report, its references and his deposition testimony meet the criteria for reliability under *Daubert*. After exhaustive review of the facts of the case, Dr. Mink relied on a qualitative risk assessment process to reach his conclusions. The district court in the McMunn case aptly discussed an expert's use of a qualitative analysis of specific causation that sums up this case:

> Recognizing that Dr. Melius is opining based upon a qualitative analysis and not a quantitative dose analysis, the Court finds enough support in the record for the contention that the Plaintiffs' exposure levels exceeded the normal background level. Plaintiffs were present during the periods of release, both acute and general, and were exposed to ionized radiation, a carcinogen known to cause the injuries complained of in this matter. …The Court agrees with Plaintiffs that a jury could well infer that persons living, working, or otherwise spending time, in the affected area were regularly and frequently exposed to a substantial, though unquantifiable, dose of iodized radiation emitted from the Apollo facility.

*McMunn v. Babcock & Wilcox Power Generation Grp., Inc.,* No. 2:10CV143, 2014 WL 814878, at *14 (W.D. Pa. Feb. 27, 2014).

Mr. Ungers and Dr. Mink have determined that Ms. Williams' exposures from Mosaic's activities exceed background levels.   She has lived in an area where she has

regularly and frequently been exposed to a substantial individual (from SO2) and cumulative (from COCs) dose of chemicals known to cause the respiratory symptoms she suffers.  Dr. Mink' conclusion to that effect is based on U.S. EPA cumulative quantitative risk assessment methodology using Bradford Hill criteria that is peer reviewed and generally accepted.  Mosaic's motion must be denied.

Dated:  January 4, 2016                            /s/ Laureen Galeoto
                                                   Laureen Galeoto, Trial Counsel
                                                   FBN 0194107
                                                   Law Office of Laureen Galeoto, PLLC
                                                   511 W. Bay Street, Suite 350
                                                   Tampa, FL  33611
                                                   P. 813.280.9326
                                                   Laureen@laureenlaw.com

                                                   Mary Ellen Hogan
                                                   FBN 0065372
                                                   The Green Counselor, PLLC
                                                   511 W. Bay Street, Suite 350
                                                   Tampa, FL  33611
                                                   P. 813.964.6515
                                                   Maryellen@thegreencounselor.com

                                                   William P. Walker, Jr.
                                                   Walker Morgan, LLC
                                                   135 E. Main Street
                                                   Lexington, SC  29072
                                                   P. 803.359.6194
                                                   bw@walkermorgan.com