UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

*    *    *

RHONDA WILLIAMS, A SINGLE
PERSON,

          PLAINTIFF,

   vs.                   Case No.
                             8:14-CV-01748-MSS-TGW

MOSAIC FERTILIZER, LLC, A
DELAWARE CORPORATION DOING
BUSINESS IN FLORIDA,

          DEFENDANT.

*    *    *

        Videotaped deposition of FRANKLIN L.
MINK, Ph.D., Witness herein, called by the Defendant
for cross-examination pursuant to the Rules of Civil
Procedure, taken before me, Connie Sumner, RPR, a
Notary Public in and for the State of Ohio, at the
offices of Statman, Harris & Eyrich, LLC, 441 Vine
Street, Suite 3800, Cincinnati, Ohio on Wednesday,
August 19, 2015, at 9:31 o'clock a.m.

*    *    *

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 2

1                  EXAMINATIONS CONDUCTED        PAGE

2    BY MR. TORRES:................................  6

3    BY MS. HOGAN:................................ 235

4    BY MR. TORRES:............................... 244

5                    EXHIBITS MARKED

6    (Thereupon, Mink Exhibit No. 1, summary of expert

7    opinions of Franklin L. Mink, Ph.D., was marked

8    for purposes of identification.)...............  15

9    (Thereupon, Mink Exhibit No. 2, summary of expert

10   opinions of Franklin L. Mink, Ph.D., resubmitted

11   references by CV inclusion, was marked for purposes

12   of identification.)...........................  16

13   (Thereupon, Mink Exhibit No. 3, Hillsborough County

14   Air Monitoring & Assessments 2007 Air Quality

15   Technical Report, was marked for purposes of

16   identification.)..............................  53

17   (Thereupon, Mink Exhibit No. 4, Hillsborough County

18   Air Monitoring & Assessments 2010 Air Quality

19   Technical Report, was marked for purposes of

20   identification.)..............................  55

21   (Thereupon, Mink Exhibit No. 5, Hillsborough County

22   Air Monitoring & Assessments 2011 & 2012 Air Quality

23   Data Summary, was marked for purposes of

24   identification.)..............................  56

25   (Thereupon, Mink Exhibit No. 6, summary of expert

Page 3

1    opinions of Franklin L. Mink, Ph.D., resubmitted

2    references by CV inclusion, was marked for purposes

3    of identification.)........................   57

4    (Thereupon, Mink Exhibit No. 7, Plaintiff's First

5    Responses to Defendant Mosaic Fertilizer, LLC's

6    First Set of Interrogatories, was marked for

7    purposes of identification.)..................   58

8    (Thereupon, Mink Exhibit No. 8, Impacts of hazardous

9    air pollutants emitted from phosphate fertilizer

10   production plants on their ambient concentration

11   levels in the Tampa Bay area, was marked for

12   purposes of identification.)..................   61

13   (Thereupon, Mink Exhibit No. 9, consultation record

14   from Brandon Regional Hospital, was marked for

15   purposes of identification.)..................   99

16   (Thereupon, Mink Exhibit No. 10, diagnostic imaging

17   report from Signet Diagnostic, was marked for

18   purposes of identification.)..................   109

19   (Thereupon, Mink Exhibit No. 11, nephrology progress

20   note from Brandon Regional Hospital, was marked for

21   purposes of identification.)..................   113

22   (Thereupon, Mink Exhibit No. 12, medical chronology,

23   was marked for purposes of identification.)...

24   (Thereupon, Mink Exhibit No. 13, decision from the

25   Social Security Administration, was marked for

Williams, Rhonda v. Mosaic Fertilizer, LLC                      Frankiin L. Mink, Ph.D.

Page 4

1    purposes of identification.).................. 114

2    (Thereupon, Mink Exhibit No. 14, Notice of

3    Reconsideration from the Social Security

4    Administration, was marked for purposes of

5    identification.)............................. 166

6    (Thereupon, Mink Exhibit No. 15, Ambient Air Radon

7    Monitoring Report on Mosaic Riverview Phosphogypsum

8    Stack, was marked for purposes of

9    identification.)............................. 188

10   (Thereupon, Mink Exhibit No. 16, Ambient Air Radon

11   Monitoring Report on Mosaic Riverview Phosphogypsum

12   Stack Part II, was marked for purposes of

13   identification.)............................. 189

14   (Thereupon, Mink Exhibit No. 17, medical record from

15   Allergy, Asthma & Immunology Associates, was marked

16   for purposes of identification.).............. 191

17   (Thereupon, Mink Exhibit No. 18, result details from

18   Premier Hematology & Oncology, was marked for

19   purposes of identification.).................. 235

20   (Thereupon, Mink Exhibit No. 19, Survival Analysis

21   of Victims of Sulfur Oxide Air Pollution Suffering

22   from COPD or Asthma in Yokkaichi, Japan, in Relation

23   to Predisposing Exposure, was marked for purposes of

24   identification.)............................. 237

25

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 5

```
 1    APPEARANCES:

 2         On behalf of the Plaintiff:

 3              The Green Counselor, PLLC

 4         By:  Mary Ellen Hogan
                Laureen Galeoto (via teleconference)
 5              Attorneys at Law
                100 South Ashley Drive
 6              Suite 600
                Tampa, Florida  33602
 7
                Walker, Morgan LLC
 8
           By:  William P. Walker (via teleconference)
 9              Attorney at Law
                135 East Main Street
10              Lexington, South Carolina  29072

11         On behalf of the Defendant:

12              Greenberg Traurig PA

13         By:  Christopher Torres
                Attorney at Law
14              Courthouse Plaza
                625 East Twiggs Street
15              Suite 100
                Tampa, Florida  33602
16
           Also present:
17
                Robert Miller, Videographer
18
                          *    *    *
19

20

21

22

23

24

25
```

Page 6

```
 1              VIDEOGRAPHER:  We're on the record.
 2              FRANKLIN L. MINK, Ph.D.
 3   of lawful age, Witness herein, having been first
 4   duly cautioned and sworn, as hereinafter certified,
 5   was examined and said as follows:
 6                    CROSS-EXAMINATION
 7   BY MR. TORRES:
 8       Q.   Please state your name and address for the
 9   record, sir.
10       A.   Franklin Lee Mink, 4358 Hinton, H I N T O
11   N, Webber W E B B E R, Road, Corinth, C O R I N T H,
12   Kentucky 41010.
13              MR. TORRES:  I think we should close
14         it.  Thank you, Mary Ellen.
15   BY MR. TORRES:
16       Q.   My name is Chris Torres.  You saw me
17   yesterday.  I represent Mosaic Fertilizer, LLC.
18   You're being deposed today.  And when you answer
19   questions, I need you to answer verbally.  Do you
20   understand that, sir?
21       A.   Yes, I do.
22       Q.   Okay.  And you are competent to answer my
23   questions today, meaning you're under -- you have no
24   condition or under no medication that affects your
25   memory?
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 7

1        A.    Other than age, yes, that's correct.

2        **Q.    If I ask a question and you don't**

3   **understands it, will you let me know?**

4        A.    I will.

5        **Q.    Thank you.  You understand that the court**

6   **reporter is here today and she will prepare a**

7   **transcript of your testimony?**

8        A.    I do.

9        **Q.    If you need to take a break, let me know.**

10  **The only thing I will ask is you answer any pending**

11  **question before we actually break; is that okay?**

12       A.    That's okay.  Thank you.

13       **Q.    You understand your attorney may make**

14  **objections, but unless you're instructed not to**

15  **answer, you must answer.  Do you understand that?**

16       A.    Yes, I do.

17       **Q.    Dr. Mink, how did you prepare for today's**

18  **deposition?**

19       A.    Do you mean actual preparation for the

20  deposition or the entire case since I've started?

21       **Q.    No, preparation for today's deposition.**

22       A.    Oh, I met with our attorney, Mary Ellen

23  Hogan, and Les Ungers, the other expert, on Monday.

24  We went over a few things looking at our reports and

25  sat in on yesterday's deposition of Mr. Ungers and

Page 8

1     that's pretty much it.

2          Q.    Did you review documents?

3          A.    Not -- not recently.  I mean, not in the

4     last five days.

5          Q.    Did you review -- you reviewed your expert

6     report, correct?

7                UNIDENTIFIED SPEAKER:  They're trying

8           to call in, but the phone -- I mean, are

9           you guys on it?

10               MS. HOGAN:  We are.  I don't know how

11          to conference -- do you know how to

12          conference it?

13               UNIDENTIFIED SPEAKER:  I don't know

14          how to get it in here if you're on it.

15               MR. TORRES:  Let's go off.

16               VIDEOGRAPHER:  We're off the record.

17               (Off the record.)

18               VIDEOGRAPHER:  We're on the record.

19               MR. TORRES:  Thank you.

20     BY MR. TORRES:

21          Q.    Dr. Mink, did you review your expert

22     report to prepare for this deposition?

23          A.    Yes, I did.

24          Q.    Any other documents?

25          A.    I looked at Mr. Ungers' report to refresh

Williams, Rhonda v. Mosaic Fertilizer, LLC                           Frankiin L. Mink, Ph.D.

Page 9

1    my memory and a couple references.  That was it.

2         Q.   Do you remember what references?

3         A.   I remember I looked at a Japanese report

4    on asthma and sulfur oxide.  I reviewed the Li

5    report again.  I think it's pronounced Li, L I.  And

6    the Chakraborty reports that I had referenced.

7    That's what I recall.

8         Q.   Okay.  The Japanese report on asthma, do

9    you remember who the author is?

10             MS. HOGAN:  We can give you a copy if

11        you like.

12   BY MR. TORRES:

13        Q.   Do you remember?

14        A.   I don't remember offhand.

15        Q.   Okay.  And what was the significance of

16   the Japanese report on asthma?

17        A.   I had mentioned to counsel that it came to

18   my memory back in the '70s, that some studies they

19   had done on sulfur oxide in Japan on asthmatics,

20   which had really started the regulatory process

21   while I was at EPA towards reducing the standard

22   based on a sensitive subpopulation of asthmatics.

23        Q.   And what is the significance of the Li

24   report, L I, or the Li report as you mentioned?

25        A.   Li or Li, I'll call it Li.  But that

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 10

1    looked at several fertilizer plants -- phosphate

2    fertilizer plants in the Tampa Bay area.  And looked

3    at potential emissions and air modeling from those

4    emissions and risks -- human health risks at, I

5    think, four plants, and one of those was the

6    Riverview Mosaic plant.

7         **Q.   And what was the conclusion of the Li**

8    **report?**

9         A.   The conclusion was -- the hypothesis was,

10   if I can step back, that the modern control

11   technology probably had reduced risk to levels that

12   weren't significant.  The conclusions were in regard

13   to the Mosaic plant and the Li's data were presented

14   on the Mosaic plant was that at the border of the

15   plant emissions from 2001, I think, to 2005 from

16   the, I'll call them, smoke stacks, because I don't

17   want to confuse it with stack -- waste stacks, but

18   from the emissions caused excess cancer risks at the

19   property boundary primarily from chromium, which was

20   an unexpected result by the authors.

21        **Q.   Any other constituents that you believe**

22   **that Li concluded caused excess cancer risks or**

23   **believed caused excess cancer risks?**

24        A.   There were some issues with nickel, but

25   that was the primary one was chrome.

Page 11

1     Q.    Okay.   Chrome or chromium?

2     A.    Chromium.

3     Q.    Okay.   Any other constituents that you

4  recall?

5     A.    That they looked at or caused risk?  I'm

6  sorry.

7     Q.    Caused risk.

8     A.    No, I believe that was it.

9     Q.    Okay.   And what is the significance of the

10  Chakraborty study that you looked at?

11     A.    I think professor of geography, I think,

12  from South Florida, and he -- I guess he's looked at

13  environmental justice issues for the last decade and

14  he's done a lot of work on the Tampa Bay area, in

15  Florida in general, and I've kind of followed him

16  for years on some of his work.  And he's -- he did

17  some really interesting air modeling and he looks at

18  distribution of contributors, like mobile sources

19  versus industrial plants versus major industry

20  versus local industry.  It's -- you know, it's

21  really good work.

22     Q.    Why is it good?

23     A.    Why is it good?

24     Q.    Yes.

25     A.    Because he's worked on it, like I said,

Page 12

1    it's been a big part of his life's work for the last

2    decade.  He follows very rigid and accepted

3    methodologies.  And I think because of his position

4    he's fairly unbiased.  I think just his work is

5    solid.

6         Q.    **How do you conclude he's unbiased?**

7         A.    Well, he gets funding from a variety of

8    sources and he -- his conclusions seem to be data

9    driven, evidence driven, and so that's -- that's how

10   I make that determination.

11        Q.    **And what air modeling did he use to --**

12   **what air modeling did he use in that --**

13        A.    A little different, but he uses -- mostly

14   used US EPA methods like AERMOD, which is, you know,

15   kind of the current, well known standard.

16        Q.    **And did he do any actual -- did he take**

17   **actual measurements?**

18        A.    No, he used air monitoring data.

19        Q.    **Air monitoring?**

20        A.    Yes.

21        Q.    **And air modeling?**

22        A.    And air modeling.

23        Q.    **Anything else?**

24        A.    I'm not sure I understand that question,

25   anything else.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 13

1    Q.   Did he use any other method to collect

2  data?

3    A.   Oh, I don't think he did any actual

4  collection of data if you're asking me that other

5  than statistically looking at the air modeling data

6  provided by the state and US EPA.

7    Q.   Have you ever spoken with, I assume it's,

8  Professor Chakraborty?

9    A.   No.

10   Q.   Okay.  I'm going to go back to Li for a

11 moment -- oh, I'm sorry.  My apologies.  What --

12 what did Chakraborty conclude in the study that

13 you're referring to?

14   A.   He concluded several things, but the ones

15 that I remember is that, you know, mobile sources

16 are always a large part of risk from different, you

17 know, air toxics, and that major industry throughout

18 the region were significant contributors.

19   Q.   Anything else outside of mobile sources

20 and major industry?

21   A.   No, that was -- that was what I recall was

22 the major findings.

23   Q.   What are mobile sources?

24   A.   Transportation, cars, trains, buses,

25 airplanes.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 14

1      Q.    Okay.  Ships?

2      A.    Ships.  If they move and emit pollution,

3    they're a mobile source.

4      Q.    Okay.  What major industries did he look

5    at?

6      A.    Oh, he looked at electric power plants.

7    He looked at phosphate mines.  He looked at large

8    manufacturing plants, any -- lump those together, he

9    didn't separate those out.

10     Q.    Did Chakraborty calculate any

11   contributions from these mobile sources or major

12   industries?

13     A.    Yes, he did.

14     Q.    And if I go to the study I will see that

15   there?

16     A.    Yes.  He's done quite a few.  I think the

17   one you would probably want to look at is mobile

18   sources is pretty significant in the 2009

19   publication and 2011 is -- is the mobile sources

20   compared to the major industries.

21     Q.    Okay.

22     A.    I have a copy of the 2011 if you need it.

23     Q.    You have a copy with you?

24     A.    I think so.

25     Q.    Can you pull it out?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                                  Page 15

 1        A.    Sure.  You know, I have the 2009, not the

 2    2011, but you're welcome to that.

 3        Q.    Okay.  Thank you.  I'm just going to take

 4    a quick look.  Do you have the Li study there as

 5    well?

 6        A.    I do.  It's not marked other than it has

 7    some highlighting on it.  I don't know if you can

 8    use that.  You're welcome to it.

 9        Q.    Let me take a look at the Li.  Okay.  Put

10    those there for a bit.

11              MS. HOGAN:  Since the exhibits have

12          been provided to you by the witness, I

13          would want to have them marked as exhibits.

14              MR. TORRES:  That is fine, but let's

15          just wait until we mark them if you don't

16          mind, but yes, we can mark them.

17              MS. HOGAN:  All right.  Thank you.

18              MR. TORRES:  You're welcome.

19              (Thereupon, Mink Exhibit No. 1,

20    summary of expert opinions of Franklin L. Mink,

21    Ph.D., was marked for purposes of identification.)

22    BY MR. TORRES:

23        Q.    Mr. Mink, I'm going to hand you Exhibit 1.

24    Can you tell me what Exhibit 1 is?

25        A.    This looks like my expert report submitted

Williams, Rhonda v. Mosaic Fertilizer, LLC                          Franklin L. Mink, Ph.D.

                                                          Page 16

1    on April 30th, 2015 to counsel.

2        **Q.   Okay.  And I'm going to hand you Exhibit**

3    **2.**

4              **(Thereupon, Mink Exhibit No. 2,**

5    **summary of expert opinions of Franklin L. Mink,**

6    **Ph.D., resubmitted references by CV inclusion, was**

7    **marked for purposes of identification.)**

8              MR. TORRES:  That's 2, Mary Ellen.

9    BY MR. TORRES:

10       **Q.   And can you tell me what Exhibit 2 is?**

11       A.   That looks like my summary of expert

12   opinions resubmitted June 25th, 2015.

13       **Q.   And what is the difference between the**

14   **June 25th report and the April 30 report?**

15       A.   I had references in included by CV and

16   they asked me to include them specifically in the

17   reference section.

18       **Q.   Okay.  Do you know what additional**

19   **references you added?  Can you identify them in**

20   **Exhibit 2?**

21       A.   As I recall, I believe I added the

22   Superfund Public Health Evaluation Manual from US

23   EPA of 1986; the RAGS, Risk Assessment Guidance and

24   Superfund Sites, US EPA, '89; and I may have added

25   some Integrated Risk Information System reference.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 17

```
 1        Q.    IRIS?

 2        A.    Yes, correct.

 3        Q.    I R I S.  Otherwise there is no difference

 4   in the substance of the report between April 30 and

 5   June 25, correct?

 6        A.    I believe that's correct.

 7        Q.    Okay.

 8              MS. HOGAN:  Off the record one

 9         second, please.

10              VIDEOGRAPHER:  We're off the record.

11              (Off the record.)

12              VIDEOGRAPHER:  We're on the record.

13              MR. TORRES:  Thank you.

14   BY MR. TORRES:

15        Q.    Dr. Mink, we'll be working from Exhibit 2

16   today, Mink_000909 through 000924.  Are those the

17   Bates numbers on that document?

18        A.    Yes, I believe so.

19        Q.    Thank you.

20              MS. HOGAN:  I'm sorry, did you say

21         935?

22              MR. TORRES:  909.

23              MS. HOGAN:  To -- the ending Bates is

24         935, correct?

25              MR. TORRES:  I'm just going to work
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 18

```
 1            through 924, the report part --
 2                 MS. HOGAN:  Oh, okay.
 3                 MR. TORRES:  -- for now.  Okay.
 4                 MS. HOGAN:  All right.
 5   BY MR. TORRES:
 6        Q.   Dr. Mink, did you author Exhibit 2?
 7        A.   Yes.
 8        Q.   Did anyone help you with this?
 9        A.   No.
10        Q.   Can you turn -- please turn to page two of
11   your report.  And do you see in the -- right before
12   the numbered paragraph that sentence reads after a
13   thorough and thoughtful review of all case materials
14   at my disposal, my expert knowledge and my
15   subsequent analysis of the data I wish to assert the
16   following preliminary opinions with a degree of
17   scientific certainty.  Do you see that?
18        A.   Yes, with a reasonable degree of
19   scientific certainty, yes.
20        Q.   Are these three numbered paragraphs your
21   opinions?
22        A.   Those are my opinions.
23        Q.   Are there other opinions in the report or
24   are those are your basic opinions?
25                 MS. HOGAN:  Objection, compound.
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 19

1            THE WITNESS:  If I understand the

2        question, as the title says is the summary

3        of my opinions.  This is as succinct as I

4        could put the opinions in three paragraphs.

5  BY MR. TORRES:

6        **Q.   Are there other separate opinions that you**

7  **provide in the report?**

8        A.   No, I don't believe so.  I believe they

9  explain these opinions.

10        **Q.   Okay.  And those are the opinions listed**

11  **in paragraphs one, two and three, correct?**

12        A.   Yes, on pages two and three.

13        **Q.   Okay.  Are you familiar with the term**

14  **general causation?**

15        A.   I am.

16        **Q.   And what does it mean?**

17        A.   It means to a population or group of

18  people an agent that would be causative of their

19  adverse effect or disease.

20        **Q.   Are you familiar with the term specific**

21  **causation?**

22        A.   I am.

23        **Q.   And what -- can you define that, please?**

24        A.   Specific causation is the specific agent

25  to an individual or small group that is causative of

Williams, Rhonda v. Mosaic Fertilizer, LLC                      Franklin L. Mink, Ph.D.

                                                              Page 20

1    their disease or adverse effect.

2        **Q.    I'm going to hand you -- use an orange**

3    **highlighter, can you highlight in Exhibit 2 all your**

4    **discussions of general causation as it applies in**

5    **this case?**

6        A.    I'm not sure I understand the question.

7        **Q.    Can you highlight in your report all of**

8    **your discussions on general causation in this case?**

9              MR. WALKER:  I would like to -- I

10             mean, I don't think -- I withdraw it.

11             Never mind.  Go ahead.

12             THE WITNESS:  I would start on page

13             six if this makes it easier because

14             otherwise I'm going to be highlighting

15             quite a bit.

16   BY MR. TORRES:

17       **Q.    You can highlight it.**

18       A.    Well, let me answer it this way and then

19   if you want me to highlight it, I'll be happy to do

20   it.

21       **Q.    Okay.**

22       A.    Start on page six going through page 16 --

23   through page 16.

24       **Q.    Page six through 16 is your discussion of**

25   **general causation?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 21

1      A.   General and specific causation, which are

2   together in this discussion for brevity.

3      **Q.   I'm going to hand you a green highlighter,**

4   **can you highlight your conversation -- your**

5   **discussions of specific causation in your report?**

6      A.   If I can answer that question, general and

7   specific causation overlap depending on the size of

8   the population and the agents.  Pages six through 16

9   deal with general causation and specific causation.

10  Now, it's specific to this plaintiff where I mention

11  her name and an effect, such as her G6PD.  It's

12  general when I mention the physiological processes

13  that lead to her disease because they would lead to

14  the same disease in someone else.  Does that answer

15  that question?

16     **Q.   In part.  Can you highlight the**

17  **discussions on specific causation please with the**

18  **green highlighter?**

19            MS. HOGAN:  Objection, asked and

20        answered.

21            THE WITNESS:  Yeah, I would say asked

22        and answered.

23  BY MR. TORRES:

24     **Q.   Can you please highlight specific**

25  **causation discussions in your report in green?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                              Page 22

 1      A.   Is it okay if I do it by section and not

 2  by line?

 3      **Q.   No, I would like you to do it by line,**

 4  **please.**

 5      A.   Green is for specific?

 6      **Q.   Yes.**

 7      A.   Okay.

 8            MS. HOGAN:  Let's make at the top a

 9         key that -- draw a line for green and then

10         put specific.

11            MR. TORRES:  That's fine.

12            THE WITNESS:  Green specific.

13            MR. TORRES:  No objection to that.

14            MS. HOGAN:  And then orange for

15         general.

16            THE WITNESS:  Do you mind if I do

17         this by page, do you, otherwise it's going

18         to get confusing?

19            MR. TORRES:  I do not.

20            MR. WALKER:  I respectfully request

21         that the court reporter read back the last

22         question.

23            (Thereupon, the record was read back

24  by the court reporter.)

25            MR. WALKER:  Thank you.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                          Page 23

1              THE WITNESS:  Pages six through 16

2          are marked and the key is on page six of

3          the two different color highlighters.

4    BY MR. TORRES:

5        Q.    Thank you, Dr. Mink.  Did you -- can you

6    identify any calculations you performed in your

7    report?

8        A.    Can you be a little more specific?  I'm

9    sorry.

10       Q.    Did you perform any calculations in your

11   report?

12       A.    We review calculations.  I didn't do

13   independent calculations.

14       Q.    Did you -- you didn't perform any

15   independent calculations?

16       A.    No, we used other people's data.

17       Q.    Okay.  What data -- what data did you use?

18   What data are you referring to?

19       A.    Well, I -- and interrupt me if this answer

20   is not -- doesn't answer your question, how's that?

21   But to give you the reason we wrote the report, I

22   try to make these reports as user friendly as

23   possible.  Litigations are adversarial by nature,

24   nothing personal.  But we try to use data that

25   are -- either the methods are proven, the state or

Page 24

 1    federal governments have methodologies or studies or

 2    peer-reviewed literature have studies that we rely

 3    on so that you and I don't have to argue about what

 4    Dr. Mink did.  If I can find studies that are --

 5    that are concurrent and applicable, I prefer to use

 6    those.  I think it makes for a much cleaner report

 7    and it follows the Bradford Gill causation process

 8    in a way that's much clearer to judges, attorneys

 9    and juries that don't have highly technical

10    backgrounds.  So we review that data.  We make

11    conclusions based on that data.

12           And the data we looked at was the air

13    quality monitoring from Hillsborough County and the

14    national ambient air quality monitoring from US EPA.

15    We looked at Mr. Ungers' soil and attic data taken

16    in the vicinity of Mrs. Williams' home and living

17    area.  We looked at the Li report, which was being

18    prepared at the time we were doing this report.  We

19    looked at the Chakraborty reports because they've

20    been done over the last decade and are relevant.  We

21    looked at the US EPA and associated health-based

22    criteria primarily from IRIS on the compounds of

23    concern.  And we looked at the air modeling data

24    from Li and the conclusions on the 133 hazardous air

25    pollutants he associated with phosphogypsum

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 25

1    fertilizer plants, and his conclusions based on

2    IRIS's dose response information, hazard

3    identification information, our exposure assessment

4    and risk characterization, and that led to these

5    opinions.

6         Q.    **Did you perform any dose calculations for**

7    **Miss Williams?**

8         A.    There's no need to.

9         Q.    **Why not?**

10        A.    Because they're already done.  They're

11   inherent -- I helped form the IRIS system when I was

12   at EPA.  The two functions that IRIS do for you is

13   dose response and hazard identification.  If you

14   read the IRIS preamble, it tells you that.  You

15   combine that with your individual exposure

16   assessment and then do your risk characterization.

17   Those dose response curves are well known for the

18   general population and sensitive subpopulation, such

19   as children, you know, pregnant mothers, nursing

20   mothers, et cetera.

21             So we do have one nuance in that

22   Mrs. Williams' G6PD -- has G6PD and therefore her

23   dose response curves are altered.  In some ways

24   she's much more sensitive.  Unfortunately the

25   literature doesn't yet know how much more sensitive.

Page 26

1   We know she's significantly more sensitive and all

2   G6PD sufferers are.  We just don't know how much.

3   So we used general causation to establish if there

4   was risk in the general population, then there -- by

5   association in the Bradford Hill criteria would have

6   to mean that she's more at risk.

7        **Q.    All right.  Let's unpack this a little.**

8        A.    Sorry.  I hope that answered the question.

9        **Q.    It really doesn't, but did you -- so you**

10   **did not perform any dose calculations for**

11   **Miss Williams because you don't believe you needed**

12   **to; is that right?**

13       A.    We didn't need to, that's correct.

14       **Q.    Okay.**

15       A.    They've been done.

16       **Q.    They had been done by whom?**

17       A.    They had been done for the general

18   population by IRIS, by US EPA, and by Li, which he

19   applied them specifically to her neighborhood.

20       **Q.    To her neighborhood.  How about to her,**

21   **did anyone apply any of these calculations directly**

22   **to her, Miss Williams?**

23       A.    No one has and no one could.

24       **Q.    All right.  And you did not of course?**

25       A.    No, I did not.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 27

1      Q.    So you performed no -- no specific dose

2   calculations for Miss Williams, correct?

3      A.    Again, no, and it can't be done.

4      Q.    And you also said that you don't know how

5   much more sensitive she is made by her G6PD

6   condition; is that right?

7      A.    Again, I nor no other published expert

8   knows.

9      Q.    So how could you conclude that she is much

10  more sensitive as a result of her G6PD condition?

11     A.    Well, if you read the peer-reviewed

12  literature, they are much more sensitive.  They have

13  episodes that can lead to fatality on low dose

14  short-term exposures, which would not be very

15  significant to you or I.  I'm assuming you're not

16  G6PD.  You don't have that adverse health effect.  I

17  know I don't.  So we know that.  The literature is

18  fairly strong on that association.  It's a disease

19  that reduces their protective mechanism in the red

20  blood cells.  And you can look at it clinically and

21  see when they've had insults by their anemic events,

22  their hemolytic anemia, which lead to a plethora of

23  other diseases.  So in reality they really don't

24  have the protective mechanisms that we have and they

25  tend to have high episodes.  And if you combine that

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 28

1   with any other disease, like asthma, then you see,

2   like the Japanese studies, where they've already

3   shown that, in court, it's causative evidence that

4   sulfur oxides cause mortality -- increases

5   mortality, not just disease, but deaths

6   significantly in populations.  And she's much more

7   sensitive than an asthmatic without G6PD.

8        Q.   **How do you know she is much more**

9   **sensitive, is it just based on the literature?**

10       A.   Based on the literature.  And again, no

11  one can quantitate it because it's an extreme

12  complex disease.

13       Q.   **All right.  So you can't quantify it,**

14  **correct?**

15       A.   You can't quantify how much more

16  sensitive, correct.

17       Q.   **Okay.  And consequently you've made no**

18  **efforts to quantify how much more sensitive she is,**

19  **correct?**

20       A.   Well, we made an effort.  We looked

21  through all the literature and tried to find if

22  there was anything to base that on.  I can't -- I

23  can't make things up, so if I don't have a methods

24  or standards or peer-reviewed literature to rely on,

25  then we know by that literature she's much more

Williams, Rhonda v. Mosaic Fertilizer, LLC                                    Frankiin L. Mink, Ph.D.

Page 29

1  sensitive, but I nor no one else that has published

2  knows how much more sensitive, so it would be a

3  futile effort.

4       **Q.   And have identified --**

5       A.   At this point in time.

6       **Q.   I understand.  And did you review**

7  **Miss Williams' medical records?**

8       A.   I did.

9       **Q.   And what conclusions did you draw**

10  **regarding her sensitivity from those medical**

11  **records?**

12      A.   She shows clinical signs, you know,

13  biochemically structurally, and in her target organs

14  of damage that would be consistent in the Bradford

15  Hill criteria with the disease state you would

16  expect from exposures to these chemicals.  Ones that

17  you or I may not exhibit, may or may not exhibit.

18      **Q.   What signs does she demonstrate?**

19      A.   Well, for 20 years she's had an elevated

20  MCV, which is mean corpuscular volume, which is one

21  of the markers of hemolytic anemia events after the

22  fact, simple blood chemistry test.  And literally

23  she's had those consistently for over 20 years, so

24  we know that she's had those events.  It's a fact.

25  It's not a supposition or opinion.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 30

1        Q.    **What other signs?**

2        A.    She has airway remodeling, which is

3   consistent with an asthmatic without G6PD or with

4   G6PD that's exposed to sulfur oxides and certain

5   heavy metals and particulates.

6        Q.    **What other signs does she demonstrate?**

7        A.    Again, I think they're detailed pretty

8   thoroughly between six and 16 pages in my report.

9   Her spirometry, her lung function test, says she has

10  about a ten percent reduction in actual lung

11  function, which would be consistent with the

12  remodeling of her airways as diagnosed by several

13  physicians and their evidence-based clinical tests,

14  spirometry, which is remarkable given her fairly

15  young age.  I think she's approximately 47 or eight

16  years old.  She has obstructive pulmonary disease as

17  diagnosed.  And she has chronic asthma.  She's an

18  unusual individual that she's lived in the same

19  neighborhood for almost half a century, that's

20  pretty unusual.

21       Q.    **What are all the causes for an elevated**

22  **MCV?**

23       A.    Anything that would cause a breaking of

24  the cell wall and hemolysis of red blood cells at

25  such a rate that your blood cell reproduction -- red

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 31

1    blood cell reproduction couldn't keep up with the

2    replacement.  And she has another clinical sign when

3    you look at her elevated MCVs, she has what they

4    call microcytic anemia.  Her -- when you look under

5    a microscope clinically, she has enlarged red blood

6    cells, which are immature blood cells because she

7    can't replace her red blood cells quick enough as

8    they're destroyed when she has oxidative stress

9    either from environmental factors or medications.

10        **Q.   So let me ask the question again and maybe**

11   **you can answer it.  What are the other potential**

12   **causes for an elevated MCV?**

13        A.   I think asked and answered at the

14   beginning of the question.  Anything that causes

15   hemolysis of the red blood cell.

16        **Q.   And what might those things be?**

17        A.   Any -- those are usually chemical insults

18   or trauma insults.

19        **Q.   Anything else?**

20        A.   Those are the two general categories.

21        **Q.   Does genetics play a factor?**

22        A.   Genetics play a factor in?  I'm sorry.

23        **Q.   An increased MCV.**

24        A.   Well, sure, she has G6PD, which directly

25   affects that.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 32

1       Q.    Anything else?

2       A.    Yes, sickle cell anemia, any

3    red-blood-cell-related disease may have that

4    possibility.

5       Q.    What -- what chemicals would constitute a

6    chemical insult?

7       A.    Any toxic chemical, that's why we do a

8    hazard identification.  If it's inherently toxic --

9    you have to remember the dose makes the poison,

10   so -- but at a level that is significant, a toxic

11   chemical exerts a toxic effect.

12      Q.    And how do you know she's had a toxic

13   effect when you didn't calculate any dose for

14   Miss Williams?

15      A.    Well, again, her general population

16   already has doses calculated, and therefore she's

17   part of that general population, a more sensitive

18   part, therefore by inference we know -- we don't

19   think, we know that she's that -- she would be

20   impacted to a greater degree.

21      Q.    And you highlighted in orange all the

22   general causation that would include that

23   conversation; is that correct?

24            MS. HOGAN:  Objection as to form.

25   BY MR. TORRES:

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

                                                               Page 33

 1        Q.    In Exhibit 2?

 2        A.    You said --

 3              MS. HOGAN:  Let's hear the question

 4         again, please.

 5              THE WITNESS:  Yes, I'm sorry.  I'm

 6         sorry.  I forgot it by now.

 7              (Thereupon, the record was read back

 8    by the court reporter.)

 9              THE WITNESS:  If I understand that

10         question, I have highlighted in orange the

11         pertinent sections of my report that

12         address general causation.  Is that an

13         answer to your question?

14              MR. TORRES:  That is close enough.

15    BY MR. TORRES:

16        Q.    What trauma insults can cause an increase

17    in MCV?

18        A.    Well, if you have trauma -- physical

19    trauma, you have a car wreck, you have physical

20    trauma, you break bones, you'll have cell damage,

21    all cell damage, red blood cell, whatever is

22    affected by that trauma.  You can have trauma such

23    as fevers when you have an infection that can be

24    traumatic to the cell.

25        Q.    Okay.  Any other trauma insults?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 34

1         A.    Well, other than physical or chemical, I

2    think that covers them.

3         Q.    Okay.  Could an increased MCV come from a

4    **person's family medical history?**

5         A.    I'm not sure I understand that question.

6    Can you be a little more specific?

7         Q.    **Can a person inherit a propensity for an**

8    **increased MCV?**

9         A.    I think I asked and answered that, but if

10   I understand the question, if they have a

11   red-blood-cell-related disease, then they will have

12   a propensity to have issues with red blood cells,

13   including elevated MCVs.

14        Q.    **What are the potential causes for airway**

15   **remodeling?**

16        A.    Airway remodeling is due in large part to

17   insults to the -- to the airways, lower and upper,

18   either, again, by some trauma, which is unusual,

19   such as almost drowning, or more likely chemical

20   events, fine particulates, toxic chemicals, dust,

21   radioactivity.  These are very fine structures

22   especially in the lower lung and they're very

23   susceptible to damage as the capillaries run through

24   them.

25        Q.    **What else -- what other potential causes**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 35

1    for airway remodeling exists?

2         A.   Well, there's -- any time there's an

3    irritant in the lung and a susceptibility to that

4    irritant, such as asthma, bronchitis, COPD, those

5    would all involve, you know, airway remodeling.

6         Q.   Is that everything you can think of?

7         A.   Those are the major, major ones.  There's

8    medications that would cause that.  Again, I put

9    that under chemical insults or irritants.  I think

10   that covers them, broad general categories.

11        Q.   What is spirometry?

12        A.   That's a measurement of the lungs'

13   capacity to both inhale and exhale.

14        Q.   And did you review spirometry results for

15   Miss Williams?

16        A.   Yes, I did.

17        Q.   And what did they indicate to you?

18        A.   As my report states I think she has about

19   a ten percent reduction in lung function compared to

20   what she should be at at this age and in this city.

21        Q.   And what should she be at at this age and

22   in this city?

23        A.   Well, again, they compare it to

24   100 percent, so she's at 90 percent of her age

25   adjusted level, that's how they report the results.

Page 36

1      **Q.    What -- what causes can you think of that**
2  **might result in a ten percent reduction in her**
3  **spirometry, in Miss Williams' spirometry**
4  **measurements?**

5      A.    In her measurements?

6      **Q.    Uh-huh.**

7      A.    Her measurements are, I believe, due to
8  her airway remodeling to her chronic asthma and the
9  problems that have been associated with that asthma.

10     **Q.    Anything else?**

11     A.    Well, again, I don't know her whole
12  medical history.  I know a fair amount from the last
13  20 years, but that's what I know from the last 20
14  years from her medical records.

15     **Q.    What are the potential causes for chronic**
16  **asthma?**

17     A.    Asthma is an airway constriction that's
18  caused by swelling of the airways acutely in
19  response to some irritant, whether it's -- it's a
20  trigger, whether it's pollen, ragweed or a toxic
21  chemical.

22     **Q.    Any other causes for -- potential causes**
23  **for chronic asthma?**

24     A.    It's pretty much an irritant-mediated
25  disease.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

1      Q.      Is obesity a potential cause for asthma?

2      A.      Obesity is a confounding factor.

3      Q.      What do you mean by confounding factor?

4      A.      Someone who has asthma, like someone that

5   has almost any disease I can think of, being

6   overweight is a factor that is going to make the

7   body's defenses much less effective at combating

8   that disease.  It's not the cause, but it is a

9   complication.

10     Q.      And did you say that allergies were also a

11  potential cause of asthma?

12     A.      Yes, any irritant.

13     Q.      Okay.  And exposure to secondhand smoke is

14  a potential cause for asthma?

15     A.      Triggering asthma, correct.

16     Q.      And is family history a risk factor for

17  asthma?

18     A.      There are factors genetically that affect

19  the development of asthma, yes.

20     Q.      You also referenced obstructive pulmonary

21  disease, what are the potential causes for

22  obstructive pulmonary disease?

23     A.      That's long-term irritation or damage to

24  the lung structures.

25     Q.      So what are the potential causes outside

1    of long-term exposure of some undefined type?

2        A.   The vast majority of obstructive pulmonary

3    disease is caused by long-term chemical insult to

4    the lung.

5        Q.   So is chronic bronchitis a potential

6    cause?

7        A.   Well, chronic bronchitis is an associated

8    disease.

9        Q.   You mentioned mital static anemia?

10       A.   Macrostatic.

11       Q.   Macrostatic, I'm sorry?

12       A.   It's actually macrocytic, C Y T I C,

13   macrostatic -- or cytic.

14       Q.   Macrocytic?

15       A.   Yes.

16       Q.   And what is macrocytic anemia?

17       A.   Again, that is when one has a low

18   hemoglobin count, red blood cells, but they show an

19   abnormal structure because they're immature.  The

20   replacement can't be facilitated as quickly as

21   you're losing red blood cells through destruction.

22       Q.   And what are the potential causes for

23   macrocytic anemia?

24       A.   Vast majority of cases are caused by a --

25   a sensitive individual being exposed to chemical

Page 39

1    insults.  Typical in drug therapies such as

2    chemotherapy or being exposed to industrial

3    pollutants or any insult to the lung by a foreign

4    material.

5         Q.    Anything else?

6         A.    Or I'm sorry, insult to the body by a

7    foreign material.

8         Q.    Anything else?

9         A.    That's the vast majority.

10         Q.    Can you hand me Exhibit 2, the exhibit you

11    highlighted?  Thank you, sir.

12         A.    Yes.

13         Q.    Thank you.

14         A.    And just for the record, when I go across

15    the line with the marker, if I missed the last part

16    of a word, the entire line is underlined.

17         Q.    Yes, I know.  You did a good job with

18    this.  Thank you.  Thank you, sir.  Can we turn to

19    page two of your report?

20         A.    Yes.

21         Q.    And in the second sentence at the top of

22    page two -- forgive me, the third sentence, you

23    write the law firm of Walker & Morgan has retained

24    me.  Do you see that?

25         A.    Yes.

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Franklin L. Mink, Ph.D.

 1          Q.    **Have you worked with Mr. Walker in the**
 2    **past?**
 3          A.    Yes, I have a few times.
 4          Q.    **How many?**
 5          A.    I think twice.
 6          Q.    **And do you remember when those were?**
 7          A.    Oh, they would have been approximately
 8    2011 maybe, 2012, small matters.  I don't recall
 9    exactly, but somewhere in that time range.
10          Q.    **Do you remember were you retained by**
11    **Mr. Walker those times that you worked with him?**
12          A.    That's what I recall, yes.
13          Q.    **And what were you retained for?**
14          A.    To provide an expert opinion.
15          Q.    **And is that -- were you retained both**
16    **times to provide expert opinions?**
17          A.    I believe so.  I do a lot of site work,
18    but I believe both of those were expert opinions.
19          Q.    **Okay.  Do you remember the names of these**
20    **cases?**
21          A.    I don't.  I think they should be listed on
22    what I provided.  They're newer than 2011, I know
23    that.
24          Q.    **Okay.  Do you remember the opinions that**
25    **you rendered in those cases?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 41

1       A.    I -- I recall one.

2       Q.    **And which is the one you recall?**

3       A.    It was a matter where there was a fatality

4   involving a driver that was -- tested positive

5   postmortem with cocaine in their bloodstream.

6       Q.    **And what was the opinion you rendered in**

7   **connection with that case?**

8       A.    Consistent with my modus operandi of

9   testifying I took the National Transportation and

10  Highway Safety Administration's detailed analysis of

11  cocaine's effects on driving, and their conclusion

12  was there is no effect on driving ability.

13      Q.    **And is that something you agreed with?**

14      A.    The data were pretty strong.

15      Q.    **And did you testify in that case?**

16      A.    I thought I was deposed in that case.  As

17  a matter of fact, I'm fairly certain I was deposed

18  in that case, but it did not go to trial that I'm

19  aware of.

20      Q.    **And as we sit here right now, you have no**

21  **recollection of the other matter; is that correct?**

22      A.    Correct.

23      Q.    **Can you look at Exhibit 1, and maybe look**

24  **at the list of -- list of testimony and identify**

25  **these cases if you see them?**

Page 42

 1      A.   Sure.

 2      **Q.   Thank you.**

 3      A.   Mary Frost, the first one listed on page

 4  37.

 5      **Q.   Okay.**

 6      A.   Is the case I just described.

 7      **Q.   Okay.**

 8      A.   And I don't see the other one.  And I

 9  remember, to the best of my recollection, I wasn't

10  deposed in that -- in that --

11      **Q.   Okay.  Thank you, sir.**

12      A.   -- matter.

13      **Q.   Have you worked with any of the other**

14  **attorneys in this case before this case?**

15      A.   Not that I recall.

16      **Q.   On -- staying on page two of your report,**

17  **you write I wish to assert the following preliminary**

18  **expert opinions.  Why do you refer to your expert**

19  **opinions as preliminary?**

20      A.   Two reasons, the scientific and medical

21  literature is constantly changing, so if we know --

22  if we learn something after I've published this

23  report, I am more than happy to revise my opinion.

24  I hope we're always learning.  Second thing is we

25  ask for data from Mosaic as we usually do from

Page 43

1    plaintiffs or defendants, depending on your side,

2    and I believe they probably have a far greater

3    wealth of data than I had access to publicly and so

4    obviously I would like to see that to see if it

5    affects the opinions.

6         Q.    **Did you review any records provided by**

7    **Mosaic?**

8         A.    I haven't seen any.

9         Q.    **All right.  Have you asked for any?**

10        A.    I believe the attorneys did.

11        Q.    **Have you asked for any?**

12        A.    Well, it's been my experience -- I can't

13   imagine that I, as an expert, would without my

14   attorneys ask the defendant for information.

15        Q.    **Did you ask anybody?**

16        A.    For Mosaic information?

17        Q.    **For Mosaic records, yes.**

18             MS. HOGAN:  What time frame, are you

19        talking about in preparation of this

20        report, prior to that?

21             MR. TORRES:  No time frame involved.

22   BY MR. TORRES:

23        Q.    **I'm just asking have you ever requested**

24   **records -- have you ever requested records to review**

25   **from Mosaic from anybody?**

Page 44

```
 1        A.    I understood the question until you said
 2   anybody.  I've never asked for records from Mosaic.
 3        Q.    I understand that.  Have you ever asked
 4   them from anyone?
 5        A.    Asked anyone what?
 6        Q.    For Mosaic records.
 7        A.    No, I looked at the public -- what's
 8   available publicly, but no, I've never asked anyone
 9   if that's the answer.
10        Q.    In order to -- so is -- is -- is the
11   review of additional information the only thing that
12   causes you to write that these opinions that you
13   rendered are preliminary or was there anything else?
14              MS. HOGAN:  Let me hear the question
15         again, please.
16              (Thereupon, the record was read back
17   by the court reporter.)
18              MS. HOGAN:  Objection, compound.
19              MR. TORRES:  You can answer.
20              THE WITNESS:  If I understand that
21         question, the only revisions I would make
22         to this report summary -- this report
23         summary of opinions would be based on
24         additional data.  That's my anticipation.
25   BY MR. TORRES:
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 45

1      Q.    Thank you.  You write you rendered your

2   opinions with a reasonable degree of scientific

3   certainty.  Do you see that?

4      A.    Yes.

5      Q.    Is that a term of art?

6      A.    Yes, scientific or medical certainty.

7      Q.    And what makes something -- what do you

8   believe makes your opinions scientifically certain

9   to a reasonable degree?

10      A.    Two things.  Number one, it's more likely

11   than not.  And second of all, under the federal

12   rules of evidence, especially Rule 702, the Daubert

13   rules, it meets those criteria.

14      Q.    What causes you to conclude that it is --

15   well, what do you mean by it is more likely than

16   not?

17      A.    Again, that's a term of probability, it's

18   more likely than not.

19      Q.    What is more likely than not?

20      A.    That the conclusion is correct and a

21   tested hypothesis.

22      Q.    And the basis for the conclusions that you

23   believe are rendered to a reasonable degree of

24   scientific certainty based on the specific and

25   general causation in your report that you

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 46

1    **highlighted in orange and green; is that correct?**

2                    THE WITNESS:  Could you reread that?

3         I'm sorry.

4                    (Thereupon, the record was read back

5    by the court reporter.)

6                    MS. HOGAN:  One more time, please.

7                    (Thereupon, the record was read back

8    by the court reporter.)

9                    MR. TORRES:  And let me reask the

10         question because there's a word missing.

11   BY MR. TORRES:

12       **Q.   Are the preliminary expert opinions that**

13   **you believe you rendered to a reasonable degree of**

14   **scientific certainty based on the general and**

15   **specific causation elements you highlighted in**

16   **Exhibit 2?**

17       A.   If I understand that question, and I think

18   sentence number five or so on page two after a

19   thorough and thoughtful review of all case materials

20   at my disposal, my expert knowledge and my

21   subsequent analysis of the data, I asserted those

22   preliminary opinions, and that would include

23   everything in the report that you have and anything

24   that I've provided you.

25       **Q.    Thank you, sir.  Continuing in that**

Page 47

1    **sentence, you write you primarily followed the**

2    **principles of US EPA risk assessment.  Do you see**

3    **that?**

4         A.   Yes.

5         **Q.   What are these principles?**

6         A.   Well, they're pretty well established.  I

7    helped formulate them while I was at US EPA.  And

8    they're that you do a hazard identification, you do

9    an exposure assessment, you do a dose response

10   assessment and then you do a risk characterization.

11   Those are the four basic elements of risk

12   assessment.  And they're used by almost every state.

13   I believe they're used by all states, but they're

14   primarily US EPA methodologies.

15        **Q.   Thank you.**

16             MR. TORRES:  Can you read back that

17        question -- or that answer please.

18             (Thereupon, the record was read back

19   by the court reporter.)

20             MR. TORRES:  Thank you.

21   BY MR. TORRES:

22        **Q.   What -- Dr. Mink, what hazard**

23   **identification did you perform?**

24        A.   I looked at the profile in the literature

25   of emission constituents from phosphogypsum

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 48

1    manufacturers in general worldwide and then in

2    Florida.

3        Q.    What else did you do?

4        A.    And then I looked at the IRIS information

5    on those constituents -- you asked me just on the

6    hazard identification?

7        Q.    Only on hazard identification.

8        A.    Then I looked at those that have -- are

9    considered toxic and those that were emitted by

10   phosphogypsum facilities and that became the

11   chemicals of concern.

12       Q.    Did you do anything else in your hazard

13   identification process?

14       A.    Well, I did rely on Dr. Li because he had

15   a far more extensive list of 133.  I think I looked

16   at what we had in Mr. Ungers' reports, which was far

17   less.

18       Q.    And in performing the hazard

19   identification, did you identify the constituents of

20   concern in your report?

21       A.    Yes, I did.

22       Q.    Okay.  Let me see if I can give you

23   another highlighter.  I'm going to give you a pink

24   highlighter.  Can you somehow mark them with this

25   pink highlighter?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 49

1    A.   Sure.

2    **Q.    Thank you.**

3              MS. HOGAN:  Please amend the key at

4         the beginning of the page to reflect the

5         pink highlighter and it's --

6              THE WITNESS:  Page six I put the pink

7         highlighter is?

8              MR. TORRES:  Constituents of concern.

9              THE WITNESS:  Oh, COCs, okay.  And

10        I'm going to have to mark again over that.

11             MR. TORRES:  That's fine.  And see if

12        you can do it in a way that makes sense.

13        I'll let you use your judgment.

14             THE WITNESS:  I believe I can.

15             MR. TORRES:  Thank you.  That's a lot

16        of colors.  And is it changing, as you mark

17        is it changing the underlying colors?

18             THE WITNESS:  No, I'm trying not to

19        overlap.

20             MR. TORRES:  Perfect.

21             THE WITNESS:  You're testing my skill

22        level here artistically, but I'm doing my

23        best.

24             MR. TORRES:  What's the book,

25        everything we learned we learned in

Page 50

1          kindergarten, everything we need to know we

2          learned in kindergarten?

3                    THE WITNESS:  I have marked those.

4                    MR. TORRES:  Okay.

5                    THE WITNESS:  On page -- they were

6          all on page six or seven.

7     BY MR. TORRES:

8          **Q.    Okay.  Are there any others in your report**

9     **or are those all of them?  I want to make sure we**

10    **have them all.**

11         A.    Can I make a quick statement?

12         **Q.    Absolutely.**

13         A.    A clarification?

14         **Q.    Absolutely, please.**

15         A.    On page 12 I talk about the secondary

16    effects of therapeutic medications.  I did not in my

17    hazard identification look at those as COCs because

18    they're not the environmental constituent.

19         **Q.    I understand.**

20         A.    So I think it would be confusing to mark

21    them, but I will mark them if you would like me to.

22         **Q.    No, don't bother then.  Thank you for**

23    **making that clarification.  What did you do to**

24    **conduct an exposure assessment?**

25         A.    There's a couple elements.  First was we

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 51

1    looked at the air monitoring -- modeling data -- air

2    monitoring data, excuse me, from the national air

3    monitoring sites.

4         **Q.    Air monitoring or air modeling?**

5         A.    Monitoring.

6         **Q.    Okay.**

7         A.    Excuse me.  Sorry for that.

8         **Q.    No, my apologies.  Go ahead.**

9         A.    And then we looked at Mr. Ungers' data in

10   the attics and the soils.

11        **Q.    Okay.  What else?  Anything else?**

12        A.    Toxic release inventory for Mosaic's

13   Riverview facility.

14        **Q.    Okay.**

15        A.    That -- I believe that that's what we

16   looked at -- I looked at.

17        **Q.    Okay.  By air monitoring data -- or is the**

18   **air monitoring data that you referenced the**

19   **Hillsborough County air monitoring and assessments?**

20        A.    That's the primary one.

21        **Q.    What other sources of air monitoring data**

22   **did you review?**

23        A.    By reference we looked at 133 different

24   chemicals in Dr. Li's -- Professor Li's report.

25        **Q.    Okay.**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 52

1    A.    He obviously has access to data I don't

2    have.

3    Q.    Okay.  So you looked at Li.  You looked at

4    the Hillsborough County air monitoring assessments?

5    A.    Correct.

6    Q.    Did you look at anything else?

7    A.    I think inherent in Li was the hazardous

8    air pollution that the toxic -- toxic inventory

9    data, the hazardous air pollutants, the HAPs that

10   were monitored, yes, for that area.

11   Q.    Okay.

12   A.    And that's it.

13   Q.    So the data you looked at for the exposure

14   assessment was Li, was whatever was in the Li study,

15   correct?

16   A.    Correct.

17   Q.    And whatever was in the Hillsborough

18   County air monitoring and assessments, correct?

19   A.    Correct.

20   Q.    Okay.  So I'm going to hand you --

21   A.    And we've requested data from Mosaic.

22   Q.    Understood.  And when you say we?

23   A.    Through the attorneys.

24   Q.    And is -- and that's data that you

25   specifically requested, correct?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 53

1        A.    Correct.  They asked me for a list of what

2    I would need, would be helpful.

3                (Thereupon, Mink Exhibit No. 3,

4    Hillsborough County Air Monitoring & Assessments

5    2007 Air Quality Technical Report, was marked for

6    purposes of identification.)

7    BY MR. TORRES:

8        Q.    Okay.  So I'm going to hand you Exhibit

9    3 -- oh, is that 3?  Yes, 3.  My apologies.

10               MR. TORRES:  And for the telephone,

11          this is Ungers_ 007972 through

12          Ungers_008043.

13               MS. HOGAN:  I would like to take a

14          quick break if you don't mind?

15               MR. TORRES:  Sure.

16   BY MR. TORRES:

17       Q.    Can I just answer -- can I just --

18               MS. HOGAN:  Sure.

19       Q.    -- ask Mr. Ungers (sic) is this an air

20   monitoring and assessments report you reviewed?

21               THE WITNESS:  Yes.

22               MR. TORRES:  Okay.  We can break.

23               MS. HOGAN:  Sure thing.

24               MR. TORRES:  Thank you.

25               VIDEOGRAPHER:  We're off the record.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 54

1            (Off the record.)

2            VIDEOGRAPHER:  We're on the record.

3            MR. TORRES:  Thank you.

4            THE WITNESS:  Can I ask a quick

5       question?

6            MR. TORRES:  Of course.

7            THE WITNESS:  What was the last

8       question we were on, can you repeat it, and

9       the answer?  I'm sorry.

10           MR. TORRES:  No, that's okay.

11           (Thereupon, the record was read back

12    by the court reporter.)

13           THE WITNESS:  Oh, okay.  I think it

14      was the question before that I

15      was thinking.  I do recall I looked at the

16      documents I told you.  I did look at the

17      Technical Support Document from EPA on the

18      sulfur oxide non-attainment zone.  And I

19      looked at some correspondence from Mosaic

20      in response to that.

21           MR. TORRES:  Okay.

22           THE WITNESS:  So I apologize, I

23      didn't recall.  It's amazing what a walk to

24      the restroom can do.

25           MR. TORRES:  Yes, I appreciate that.

Page 55

1   BY MR. TORRES:

2        Q.   **Would you hand me back the air monitoring**

3   **document I gave you and we'll mark that in a**

4   **moment -- or we did mark it.  My apologies.**

5        A.   Yes, Ungers.

6        Q.   **So let me do this, we can just put that**

7   **down, but Exhibit 3 is a document you reviewed,**

8   **correct?**

9        A.   Correct.

10             (Thereupon, Mink Exhibit No. 4,

11   Hillsborough County Air Monitoring & Assessments

12   2010 Air Quality Technical Report, was marked for

13   purposes of identification.)

14   BY MR. TORRES:

15       Q.   **Okay.  I'm going to hand you Exhibit 4.**

16   **This is -- let me read the Bates -- does that have**

17   **Bates numbers on it?**

18       A.   This one does not I don't believe.

19       Q.   **All right.  Let me trade that for this one**

20   **and I'll switch them.  They're the same, but for**

21   **some reason I have some which I pulled off of your**

22   **materials that were original, I think original**

23   **materials.  They've just gotten separated.  They're**

24   **the same.  I'm going to hand you Exhibit 4 Mink,**

25   **which is Mink_000055 through Mink_000129.**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 56

```
 1              MS. HOGAN:  This one is the

 2        unBates'd?

 3              MR. TORRES:  So is mine.

 4              MS. HOGAN:  Okay.  So he has the

 5        Bates and we don't.

 6              MR. TORRES:  Right.  Exhibit 4.

 7   BY MR. TORRES:

 8        Q.   And I just handed you a Hillsborough

 9   County air monitoring and assessments 2010 air

10   quality technical report.  Is that a report you

11   reviewed?

12        A.   Yes.

13        Q.   Okay.

14              MR. WALKER:  Can we have a Bates

15        number for that document, please?

16              MS. HOGAN:  That's the one off the

17        exhibit, Exhibit 4, it is 055, Mink.

18              MR. WALKER:  Thank you.

19              MR. TORRES:  You're welcome.

20              (Thereupon, Mink Exhibit No. 5,

21   Hillsborough County Air Monitoring & Assessments

22   2011 & 2012 Air Quality Data Summary, was marked for

23   purposes of identification.)

24   BY MR. TORRES:

25        Q.   And I'm going to hand you Exhibit 5, which
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

                                                          Page 57

1    is Hillsborough County air monitoring and

2    assessments 2011 and 2012 air quality data summary,

3    which I do not have Bates labels for.  Can you tell

4    me whether that is a document you reviewed?

5        A.    I believe so.

6                (Thereupon, Mink Exhibit No. 6,

7    summary of expert opinions of Franklin L. Mink,

8    Ph.D., resubmitted references by CV inclusion, was

9    marked for purposes of identification.)

10   BY MR. TORRES:

11       Q.    Okay.  I'm going to hand you Exhibit 6,

12   which is a clean copy of your complete report.  And

13   what I would like you to do is to go to your -- any

14   references you have in your report and just take a

15   look through it and tell me whether there are any

16   other materials you relied on to perform an exposure

17   assessment outside of Li, the Hillsborough County

18   air quality assessments, the Technical Support

19   Document and the Mosaic -- in fact, if you can

20   identify, you can mark, I'll give you a -- we're

21   running out of highlighters, I'll give you a blue

22   highlighter, if you can mark any references you

23   relied on to perform an exposure assessment.

24       A.    And you want me to mark this copy?

25       Q.    Yes.  I want you to mark this copy.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 58

 1      A.   Okay.

 2      Q.   **Exhibit 6.  Thank you.  Just any**

 3   **references you relied on to perform your exposure**

 4   **assessment.**

 5             MR. TORRES:  For the typist on the

 6        phone, can you mute your phone?

 7             THE WITNESS:  I do not see, and I

 8        don't know if it was via interrogatory or

 9        what, but the Li and Chakraborty reports,

10        2014 and 2011 and '12.  Do you want me to

11        write those on there?  They're in my

12        interrogatories, I think.

13   BY MR. TORRES:

14      Q.   **What do you mean your interrogatories?**

15      A.   I answered -- supplied that I -- I

16   mentioned in this deposition, I'm sorry, that I

17   relied on those.  And I put that -- submitted to

18   counsel at some point in time both Li and

19   Chakraborty.  I don't see them in here.

20      Q.   **Is Li not at the bottom of page 19 of your**

21   **report?**

22      A.   Could be.  No, a different Li.

23      Q.   **A different Li.  Okay.**

24      A.   The Li I submitted to you here and the

25   Chakraborty here.

Page 59

 1                    (Thereupon, Mink Exhibit No. 7,

 2     Plaintiff's First Responses to Defendant Mosaic

 3     Fertilizer, LLC's First Set of Interrogatories, was

 4     marked for purposes of identification.)

 5     BY MR. TORRES:

 6          Q.    **I'm going to hand you Exhibit 7, which are**

 7     **interrogatory answers.**

 8                    MR. TORRES:  Mary Ellen.

 9     BY MR. TORRES:

10          Q.    **Can you tell me whether --**

11          A.    Page three.

12          Q.    **Page three.  Can you mark Exhibit 7 in the**

13     **same manner, and if you would for -- also just make**

14     **a key.**

15          A.    Sure.  I have done that.

16          Q.    **Okay.  So is now everything that you**

17     **referenced and relied on to perform your exposure**

18     **assessments now highlighted in Exhibits 6 and 7?**

19                    MS. HOGAN:  Let's hear the question

20            again, please.

21                    (Thereupon, the record was read back

22     by the court reporter.)

23                    MS. HOGAN:  Apart from his testimony

24            or -- his testimony said more than what's

25            highlighted there?

Williams, Rhonda v. Mosaic Fertilizer, LLC                          Frankiin L. Mink, Ph.D.

1              MR. TORRES:  I understand, but the

2          question is what I asked.

3              MS. HOGAN:  All right.  You can

4          answer if you understand it.

5              THE WITNESS:  Sure.  On my exposure

6          assessment I relied upon the highlighted

7          materials in Exhibits 6 and 7, Mink.  The

8          items I testified to and the primary and

9          secondary references that are associated

10         with those highlighted materials.

11   BY MR. TORRES:

12       Q.   **You reviewed all of the primary and**

13   **secondary sources relied on by Li?**

14       A.   Again, I try to review the pertinent ones

15   to the extent of my ability what's available, yes.

16       Q.   **Did you provide those studies to anyone?**

17       A.   No, I always give my primary references.

18   If we gave secondary references, you would have

19   reports the size of this table.

20       Q.   **Do you have -- earlier you handed me, is**

21   **this the Li report that you're referring to, the Li**

22   **study?**

23       A.   Yes, it is.

24       Q.   **Would you mind if I mark that as an**

25   **exhibit?**

Page 61

1      A.    I don't have a problem with it.

2            MS. HOGAN:  Please do.  Go ahead.

3      **Q.    Thank you.**

4      A.    There's one annotation on there, just for

5      the record, it says stacks not stacks, that was just

6      a note to myself that waste stacks are not emission

7      stacks.

8      **Q.    I appreciate that.  Thank you for that**

9      **clarification.**

10           **(Thereupon, Mink Exhibit No. 8,**

11     **Impacts of hazardous air pollutants emitted from**

12     **phosphate fertilizer production plants on their**

13     **ambient concentration levels in the Tampa Bay area,**

14     **was marked for purposes of identification.)**

15     BY MR. TORRES:

16     **Q.    I'm going to hand you -- well, mark the**

17     **document you provided today as Exhibit 8, which we**

18     **only have one copy of.  And can you identify -- mark**

19     **in blue the references in Li that you relied on to**

20     **perform your exposure assessment?**

21     A.    Put a key on it?

22     **Q.    Please.**

23           MS. HOGAN:  Yes, put a key on it,

24           please.

25           THE WITNESS:  Can I ask a question of

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 62

1          clarification?

2                    MR. TORRES:  Absolutely.

3                    THE WITNESS:  You know, there are

4          several lines in a reference, is it okay

5          just to mark the authors, it obviously

6          encompasses the reference?

7                    MR. TORRES:  I am fine with that,

8          yes.

9                    THE WITNESS:  Okay.  Thank you.  A

10         caveat, I'm obviously doing this from

11         memory --

12                   MR. TORRES:  I understand.

13                   THE WITNESS:  -- to the best of my

14         ability.

15                   MR. TORRES:  I appreciate that.

16                   THE WITNESS:  I have marked those to

17         the best of my recollection.

18                   MR. TORRES:  Thank you, sir.

19    BY MR. TORRES:

20         **Q.   Dr. Mink, can you please tell me what you**

21    **did to perform a dose response assessment?**

22         A.   The dose response assessment, again, is

23    inherent in the IRIS system.  I looked at the

24    chemicals of concern in IRIS, the most up-to-date

25    information and particularly the RfCs reference --

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 63

1    reference criteria.  Those are for inhaled

2    substances versus the world.  And then I looked at

3    the Li -- underlying references in the Li report and

4    the Chakraborty 2011 and '12.  And I say '11 and '12

5    because it's the same publication, I think it was

6    online in 2011 and 2012 it was actually published.

7         Q.    And is Chakraborty highlighted in the

8    interrogatory answers?

9         A.    Yes.

10        Q.    Okay.  And Li as well, correct?

11        A.    Correct.

12        Q.    What else did you do to perform a dose

13   response assessment, anything else?

14        A.    I believe that's it.

15        Q.    And if you remember something, you know,

16   just please tell me.

17        A.    Sure.

18        Q.    What did you do to perform a risk

19   characterization?

20        A.    Well, we looked at the data that were

21   available in toto.  And, you know, basically I -- I

22   agree with a couple of things.  Number one, Li, I

23   think his calculations for the data he used seemed

24   correct and accurate.  He tested his hypotheses with

25   recognized methods.  And he obviously has

Page 64

1    availability of data that I can't review, so it's

2    not publicly available, but I have to believe it's

3    probably -- it's probably accurate in that he was

4    funded by the Phosphate Institute, which Mosaic is a

5    member of.  So I'm assuming they knew about this

6    study and I have to assume the data was good.  So I

7    agree with his conclusions within the confines of

8    what he was trying to do, good air modeling work,

9    same way with Chakraborty in his 2011, '12 report.

10          Our ultimate conclusion was if you -- risk

11   characterization was if you look at the strengths of

12   association on all these things, that Ungers -- Mr.

13   Ungers, Ungers & Associates, looked at samples in

14   attics and soils near the neighborhood of

15   Mrs. Williams and her residence, and we saw results

16   that I would have expected.  The concentrations of

17   the metals were higher in the attics than they were

18   in the soils and that they fingerprinted well to

19   phosphogypsum fertilizer emissions.  And that's what

20   we were interested in, fingerprinting them.  That

21   was my -- what I wanted to see out of that.  And how

22   it turned out, actually it turned out much better

23   than I would have guessed from the hypotheses.

24          Then we looked at the Li data, the air

25   modeling.  We looked at the non-attainment zones,

Page 65

1    the data.  And it was clear that if you just even

2    look at the sulfur oxide or just look at the

3    chrome -- and no one has looked at cumulative

4    effects.  You have to add risk, that it's cancer

5    risk and you have to add noncancer risk to come up

6    with total risk, no one has done that.  But without

7    even looking at those, for your general population

8    it's clear -- and it makes sense if you think about

9    it just literally from a base perspective, you have

10   Li only looked at emissions from smoke stacks, not

11   waste stacks.

12           So in addition to what he calculated risk

13   for, you have in a single chemical, not

14   cumulatively, you have 110 million tons of

15   radioactive toxic heavy metal dust 1.8 miles

16   downwind of Mrs. Williams' home 20 percent of the

17   time that she's lived in for half a century.  It's

18   clear that that material has deposited in her

19   neighborhood and in her house.  She lives in a

20   non-attainment zone.  She resides less than

21   2,000 feet from the arbitrary line of the attainment

22   zone.  You would expect the health effects that she

23   has.  And she developed exactly the health effects

24   that are in the literature.  So that was our risk

25   characterization in a nutshell trying to just boil

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 66

1    it down simply.

2        Q.   Are you testifying today that

3    Miss Williams lives within the non-attainment

4    boundary identified in the Technical Support

5    Document?

6        A.   She does live -- as the Bible would say,

7    she lives, dwells and has her beans -- her bean in

8    that area.  Her residence is 2,000 feet from that

9    line, which in terms of a toxicologist or even an

10   air modeler I think is within -- within any air

11   limit of AERMOD.  So I think it's an accurate

12   statement to say she has lived for almost half a

13   century in the non-attainment area.

14       Q.   So your testimony is that she lives -- she

15   resides -- her home is within the non-attainment

16   boundary?

17       A.   No, it's within the error -- error margin

18   of the non-attainment zone, but she resides a little

19   less than 2,000 feet outside of it.  She lives, she

20   went to school, played, drives through, travels in

21   the non-attainment zone.

22       Q.   What constituents of concern -- Dr. Mink,

23   you're testifying as a toxicologist, correct?

24       A.   Correct.

25       Q.   What constituents of concern are causing

Page 67

1    **Miss Williams' alleged illnesses?**

2        A.   Well, you may have to reask.  I'll do the

3    best I can with that question.  I believe that her

4    exposure to multiple chemicals, because it's an

5    additive risk, but primarily the metals I listed,

6    nickel, chrome, manganese, et cetera --

7        **Q.   Can -- can you look at your expert report**

8    **that you highlighted --**

9        A.   Sure.

10       **Q.   -- the constituents of concern?**

11       A.   Sure.  I think it's on page six and seven,

12   yes, bottom of page six and the top of page seven in

13   Mink 000914, my expert report.

14       **Q.   And this is Exhibit 6?**

15       A.   Correct.

16       **Q.   Okay.  So what constituents of concern are**

17   **we talking about?**

18       A.   I think the -- the radioactive

19   particulates between 2.5 and ten microns.

20       **Q.   Radioactive particulates?**

21       A.   Yes, radioactive particulates between 2.5

22   and ten microns, and the sulfur dioxide, the

23   arsenic, cadmium, chrome, lead, manganese, nickel,

24   phosphorus, zinc and the decayed products from

25   basically uranium and radium.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 68

1        Q.    What decayed products?

2        A.    Cesium, thorium, polonium.

3        Q.    Any others?

4        A.    That's to my recollection.  And the

5   cumulation of the effects, both cancer and

6   noncancer, has caused her present health effects and

7   her expected health effects.

8        Q.    Well, let's go through this a little more

9   carefully --

10       A.    Sure.

11       Q.    -- instead of just generally.

12       A.    Sure.

13       Q.    SO2, you are asserting that sulfur dioxide

14   caused what illnesses or injuries Miss Williams is

15   suffering, can you explain?

16       A.    I believe sulfur dioxide has aggravated

17   her asthma, caused it to be uncontrolled, resulting

18   along with her G6PD, remodeling in her airways,

19   which ultimately has caused obstructive pulmonary

20   disease, and has a significant potential to cause

21   her ultimate mortality early.  And I base that on

22   the Japanese studies over the last 40 years --

23       Q.    Does exposure to SO --

24       A.    -- primarily.

25       Q.    Excuse me.  Does exposure to SO2 cause

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

1    G6PD?

2         A.    No.

3         Q.    What causes G6PD?

4         A.    It's a genetic disease.

5         Q.    So there's nothing that she could be

6    exposed to that would cause G6PD, correct?

7         A.    Correct.

8         Q.    Okay.  At what levels does exposure to SO2

9    aggravate asthma?

10        A.    If you exceed the attainment level of 75

11   parts per billion over an hour, you expect

12   irritation in the general population and potentially

13   serious irritation of asthmatics.  In an asthmatic

14   with G6PD there's -- there's a possibility of fatal

15   effects.

16        Q.    And what level was Miss Williams exposed

17   to?

18        A.    Well, she's for most -- we don't know

19   exactly over her entire lifetime, but we know with

20   modern technology, as Li would say, and far reduced

21   emissions, she's still exposed primarily where she

22   lives on a daily basis to levels that exceed 75

23   parts per billion.  And we would expect to see the

24   effects that we see.

25        Q.    And what do you base your assertion on

Page 70

1    **that she is exposed to in excess of 75 parts per**

2    **billion of SO2 where she resides?**

3         A.   Where she lives.  Where she resides we

4    don't know exactly.  Residing is where she sleeps

5    and spends some of her time.  Where she lives, her

6    neighborhood, again and where she drives and plays

7    and walks and does everything within 2,000 feet,

8    again that arbitrary border.  SO2 doesn't know it

9    needs to stop at the border of the non-attainment

10   zone.  It's a model.  It's an estimate and has an

11   error rate and she's within that error rate.

12        So it's a reasonable fact to consider that

13   based on air monitoring data she's been exposed to

14   more than 70 parts -- 75 parts per billion currently

15   and in the past much more.  And if you're exposed to

16   those levels as an asthmatic, take away the G6PD for

17   right now, you would expect her to have exactly the

18   effects she has.

19        **Q.   Can you show me in your report what levels**

20   **of SO2 Miss Williams was exposed to?**

21        A.   Again, we did that by inference.  We're

22   using US EPA's data because any number I put down

23   there you're going to argue with.

24        **Q.   You didn't put a number down, correct?**

25        A.   No.  The non-attainment zone is

Page 71

1    self-explanatory.  It's 75 parts per billion.

2    That's a common fact.  You either know what

3    non-attainment is or you don't.

4         **Q.    How do you define where Miss Williams**

5    **lives?**

6         A.    The way I define where anyone lives.

7         **Q.    Okay.**

8         A.    It's -- where they live is where they

9    work, play, walk, recreate, eat, visit, et cetera.

10        **Q.    Okay.  Tell me where she walks.**

11        A.    Well, if you -- your Exposure Factors

12   Handbook, which again was part of the original 1989

13   version, hopping off of that.  We look at the normal

14   resident's time of being 30 years, which she's

15   exceeded, is a lifetime resident.  We look at the

16   vicinity of where someone lives, not only where they

17   sleep, in their yard, but where they drive their

18   car, et cetera, which I think is generally

19   considered within two miles of their home.  Now,

20   people take vacations, et cetera, but that's all

21   figured into the 30-year average that US EPA uses.

22   And I think that's a reasonable assumption of her.

23   The waste pile stacks are 1.8 miles from her house.

24   So I think it's fair to say she lives in that

25   non-attainment zone.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 72

1      Q.   And how about the emissions stacks, how

2   far are those from her house?

3      A.   I think the actual emissions stacks, they

4   might be about two miles.

5      Q.   Did you calculate that at any time?

6      A.   I looked at it on Google Earth and

7   measured it, yes.

8      Q.   What if I told you they were more than

9   three miles away, would you agree with that?

10     A.   The closest emission stack?

11     Q.   The closest SO2 emission stack.

12     A.   The way the bird flies, not via road?

13     Q.   The way the bird flies.

14     A.   I would be surprised.

15     Q.   Okay.  And how far is she from --

16     A.   That's not the value that Li used.

17     Q.   Okay.

18          MR. WALKER:  If I may, I don't know

19       if I can say anything?

20          MS. HOGAN:  Go ahead, Billy.

21          MR. WALKER:  You have a document

22       which contends that --

23          MR. TORRES:  Billy, Billy, it's

24       improper to have a speaking objection.  I'm

25       not sure what you're getting to.

Page 73

 1          MR. WALKER:  Don't worry about it.  I

 2      will withdraw it and I will get it to Mary

 3      Ellen.  Thank you.  Sorry to bother you.

 4          MR. TORRES:  No, no, no bother.

 5          THE WITNESS:  Can I ask a quick

 6      question?  When you finish that line of

 7      questions, can we break for lunch?  I'm

 8      getting a little blood sugary here.

 9          MR. TORRES:  Yes.  Absolutely.

10  BY MR. TORRES:

11      **Q.   Where -- how far is Miss Williams from the**

12  **closest SO2 monitoring where there were measurements**

13  **in excess of 75 parts per billion of SO2?**

14      A.   I think the closest one to her, if I

15  remember correctly, this is obviously recall from a

16  lot of data, I thought it was called tower dairy,

17  and I'm not exactly sure how close it is.  It's

18  closer than the stacks, I know that.  I don't know

19  how much closer.

20      **Q.   Okay.  All right.  When was the last**

21  **time -- have you ever met Miss Williams?**

22      A.   Yes.

23      **Q.   When was that?**

24      A.   I met her a couple of times in the last

25  couple years.  So I think the last time I met her

Page 74

1    was probably maybe nine months ago.

2         **Q.    How much time have you spent with her**

3    **overall do you think?**

4         A.    Total?

5         **Q.    Um-hmm.**

6         A.    Less than an hour.

7         **Q.    Okay.  So tell me did she ever explain to**

8    **you her daily routine?**

9         A.    Not in any detail that I recall.

10         **Q.    So how do you account for where**

11    **Miss Williams drives, where she walks, where she**

12    **shops, all of these things, how do you account for**

13    **these?**

14         A.    Same way we did at EPA.  That's why I use

15    EPA's methodologies and numbers.  We assume -- and

16    you have to make assumptions, but based on

17    statistics that are predicative you look at where

18    people travel.  It's pretty easy, I mean.  And

19    they've done GPS tracking studies.  They've done

20    sociology studies to see the majority how far you

21    live.

22              And there's a great -- I remember at EPA

23    one of the great references for us was the insurance

24    industry because they determine how -- the

25    percentage of accidents that happen how far away

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 75

1    from where you reside.  And -- and I remember we

2    looked at those and that was part of the Exposure

3    Factors Handbook and we took some of that data into

4    account.  And like I said, my recollection is it's

5    you spend, depending on where your work is, you

6    spend your living time outside of work within about

7    two miles of your home --

8         Q.    So despite --

9         A.    -- as an average.

10        Q.    So despite having access to Miss Williams

11   and despite having the ability to talk to her,

12   you're relying on assumptions instead of information

13   from Miss Williams, correct?

14        A.    I think that's correct.

15        Q.    Okay.

16        A.    But those are assumptions that someone

17   else has used in standard methodology.  You have to

18   be careful on causation, use standard methodology.

19        Q.    I agree you do have to be careful on

20   causation, that's why I'm asking these questions.

21   So what were the SO2 levels at Miss Williams' home,

22   do you know?

23        A.    Inside her house?

24        Q.    Yes.

25        A.    As far as I know there's never been any

Page 76

1    measurements taken.

2        Q.    Okay.  And so what do you rely on to

3    assert that Miss Williams was exposed to SO2 in her

4    home?

5        A.    Again, you're using in her home versus her

6    residence.  I said we know that she lives in a

7    non-attainment zone.  A large percentage of her time

8    she sleeps within 2,000 feet of that estimated line,

9    so I think it's within the error rate.  I think

10   historically she's been exposed to more than 140

11   parts per million and now she's being exposed to

12   more than 75 parts per million -- or billion.  I'm

13   sorry.

14       Q.    And this is -- this is based on the

15   assumptions that you described earlier, correct?

16       A.    The historic data and those assumptions,

17   yes.

18       Q.    Okay.  But, in fact, you have no

19   knowledge, as we sit here today, of what levels of

20   SO2 Miss Williams was exposed to; is that correct?

21              MS. HOGAN:  Let's hear the question

22          again, please.

23              (Thereupon, the record was read back

24   by the court reporter.)

25              THE WITNESS:  Asked and answered over

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 77

1            and over.

2      BY MR. TORRES:

3            Q.   Is the answer yes or is the answer no?

4            A.   The answer is --

5                 MS. HOGAN:  Same objection.

6                 THE WITNESS:  -- it's over 75 parts

7            per billion currently, over 140 parts per

8            billion historically, and how far over I

9            don't know.  And no measurements have been

10           taken in her residence that I'm aware of.

11     BY MR. TORRES:

12           Q.   Okay.  Did you model levels at

13     Miss Williams' residence?

14           A.   No, I did not.

15           Q.   Why not?

16           A.   Because to model those you would want the

17     data that we -- that I believe Mosaic has.  I think

18     they have the historic data that I don't have any

19     access to.

20           Q.   Did you have access to the AERMOD data on

21     which the Technical Support Document was based?

22           A.   Did I have access to it?

23           Q.   Yes.

24           A.   I did not look at it.

25           Q.   Okay.  And why didn't you look at it?

Page 78

 1        A.   Well, because, again, I'm here as a

 2   toxicologist.  I rely on standard methodologies.

 3   And I -- there's no reason for me to in any way,

 4   shape or form disagree with the Technical Support

 5   Document.

 6        Q.   **Do you know how much time a day**

 7   **Miss Williams spends outside of her residence?**

 8        A.   No, I do not.

 9        Q.   **Okay.  Do you know where Miss Williams**

10   **shops?**

11        A.   No, I do not.

12        Q.   **Do you know where Miss Williams goes to**

13   **church?**

14        A.   Actually I do.  I don't recall, but I --

15   but she did tell me that.

16        Q.   **Okay.  And do you remember -- you have no**

17   **recollection of where that is, correct?**

18        A.   It's in her neighborhood.  I don't know

19   where.

20        Q.   **Okay.**

21        A.   Because I actually remember her telling me

22   the pastor's name and the church and all that.

23        Q.   **When you say it's in her neighborhood, do**

24   **you mean in Progress Village?**

25        A.   Yes, it's in that vicinity, yes.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 79

1       Q.   Okay.  Do you know what the approximate

2   size of Progress Village?

3               MS. HOGAN:  In terms of area,

4          population?

5               MR. TORRES:  Yes, area.

6               THE WITNESS:  I don't know the total

7          area.  I don't recall.  Are we getting

8          close?  Just out of curiosity.

9               MS. HOGAN:  I think we should break

10          for lunch.

11               MR. TORRES:  Let me just finish this

12          line on SO2, please.

13               THE WITNESS:  Sure.

14   BY MR. TORRES:

15       Q.   Are there any other illnesses that

16   Miss Williams is alleging that you assert are caused

17   by exposure to SO2?

18       A.   I believe that the ones I've stated

19   involving her lungs, those unfortunately, that

20   cascade with other chemicals into other organ

21   systems because of her G6PD, has some role in the

22   illnesses that I mention in my report clearly based

23   on her medical records, the chemicals she was

24   exposed to and the data that I've -- and references

25   that I have in my report.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 80

1      Q.   What is the SO2 exposure route that

2  Miss -- that you allege Miss Williams is suffering?

3      A.   Majority of it is inhaled.

4      Q.   What else?  Anything else?

5      A.   In any inhaled substance you have dermal

6  exposure obviously, it's on your skin, that's

7  usually a minor route, usually.

8      Q.   How much -- did you perform any

9  calculations on how much SO2 Miss Williams has

10  inhaled?

11      A.   Over her lifetime?

12      Q.   Over any time.

13      A.   No.

14      Q.   Have you performed any calculations

15  relating to any dermal exposure that you allege

16  Miss Williams suffered?

17      A.   No, because that, as I said, is a minor

18  component.  The inhalation is the major component

19  and those assumptions are already made in the

20  health-based non-attainment levels, so they've

21  already been done.  I'm not re-inventing the wheel

22  here.

23      Q.   Is Miss Williams' home air conditioned?

24      A.   I have not been in her home.

25            MR. TORRES:  What time is it?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 81

 1                    THE WITNESS:  It's 12:07.

 2                    MR. TORRES:  We can break for lunch.

 3                    MS. HOGAN:  Before we go off the

 4           record, I do want to go back to an issue

 5           you raised regarding the distance of

 6           Miss Williams' house from either the

 7           emissions, smoke stacks or the stacks

 8           themselves, and you asserted that they were

 9           three miles and the witness indicated he

10           was surprised at that.  I would request

11           that you provide documentation of that for

12           him to review.

13                    MR. TORRES:  We can go off the

14           record.  Thank you.

15                    VIDEOGRAPHER:  We're off the record.

16                    (Brief luncheon recess.)

17                    VIDEOGRAPHER:  We're on the record.

18     BY MR. TORRES:

19           Q.   Dr. Mink, how did you use IRIS or the

20     Integrated Risk Information System in preparing your

21     opinions?

22           A.   I looked at the studies and the weight of

23     evidence under the reference concentrations, the

24     RfCs, and I looked at the underlying dose response

25     curves, and then looked at the regulatory values

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 82

 1    that they came up with.

 2         Q.    Do you know if there is an IRIS summary

 3    for sulfur dioxide?

 4         A.    No, there's not.

 5         Q.    So is the RfC something different than --

 6    would the RfC be in the IRIS summary for sulfur

 7    dioxide if there were one?

 8         A.    Yes.  And there is health-based criteria

 9    underlying the SOX standard, but I don't think it's

10    in IRIS.

11         Q.    So when you said you used general

12    information regarding sulfur dioxide, you didn't use

13    an IRIS summary because there was none for sulfur

14    dioxide, correct?

15         A.    That I recall, correct.

16         Q.    But you did use RfC, correct?

17         A.    I used a health-based criteria that was

18    used for the 75 part per billion non-attainment

19    standard, that's a health-based standard, not a

20    technology-based standard.

21         Q.    And where is the health-based standard,

22    where did you find that?

23         A.    If you look under the -- there's a -- it's

24    the six primary pollutants on EPA's website.  And

25    they go over the six primary marker pollutants and

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 83

1    sulfur oxide is one of those and they go through the

2    health-based criteria.

3          Q.    **Sulfur oxide or sulfur dioxide?**

4          A.    It's sulfur oxides, SOX, which the

5    majority of that is sulfur dioxide.

6          Q.    **Sulfur dioxide is subsumed within SOX?**

7          A.    Yes, it -- it regulates the class.

8          Q.    **Is there an IRIS summary for carbon**

9    **monoxide?**

10         A.    Not that I'm aware of, that I recall.

11         Q.    **Is there an IRIS summary for NOX, N O X?**

12         A.    Nitrous oxides?

13         Q.    **Yes.**

14         A.    Not that I'm aware.

15         Q.    **Is there an IRIS summary for ammonia?**

16         A.    Don't recall.

17         Q.    **Is there an IRIS summary for arsenic?**

18         A.    Yes.

19         Q.    **Is there an IRIS summary for cadmium?**

20         A.    Yes.

21         Q.    **Is there an IRIS summary for chromium?**

22         A.    Yes.

23         Q.    **Is there an IRIS summary for lead?**

24         A.    Yes.

25         Q.    **Is there an IRIS summary for manganese?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 84

 1        A.   Don't recall.

 2        Q.   **Is there an IRIS summary for nickel?**

 3        A.   Yes.

 4        Q.   **Is there an IRIS summary for aluminum?**

 5        A.   Not aluminum as the element I don't

 6   believe.

 7        Q.   **Is there an IRIS summary for phosphorus?**

 8        A.   I don't recall.

 9        Q.   **Is there an IRIS summary for zinc?**

10        A.   Don't recall.

11        Q.   **Is there -- there is no IRIS summary for**

12   **polonium, decayed products?**

13        A.   No, not the radioactive.

14        Q.   **Okay.  Is the Li study that you relied on**

15   **an epidemiological study?**

16        A.   No, it is not.  It's a -- it is not

17   primarily an epidemiological study.

18        Q.   **Did you rely on any epidemiological**

19   **studies in connection with your analysis of sulfur**

20   **dioxide?**

21        A.   Only those that were inherent in the

22   standard.  Sulfur dioxide is a good example, that's

23   based on epidemiological data.

24        Q.   **Are any --**

25        A.   Experimental too, but mostly

Page 85

1    epidemiological.

2        **Q.   Are any of these referenced in your list**

3    **of references in your report?**

4             MS. HOGAN:  Objection as to form,

5         vague.  Let's hear the question again,

6         please -- actually two questions, please.

7             (Thereupon, the record was read back

8    by the court reporter.)

9             THE WITNESS:  I think, again, my

10        primary references that I talk about

11        relying on for sulfur dioxide and the

12        secondary references show how the standard

13        was developed, which includes those

14        studies.

15   BY MR. TORRES:

16        **Q.   So --**

17        A.   And I think I mentioned the Japanese

18   study, went from memory, back in the '70s, and

19   there's an update -- actually I have an update I

20   just found recently that was -- tracked those same

21   populations here in like 2000 whatever, '10 or '13,

22   something like that.

23        **Q.   Can you take this update out?  Do you have**

24   **it with you?**

25        A.   I'm not sure.  Let me see.  I do.  I

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

 1    apologize for whatever is on it.

 2        **Q.    Okay.**

 3        A.    Looks like part of my dinner.

 4        **Q.    Can you just read the title of the study**

 5    **into the record?**

 6        A.    Sure.  Survival analysis of victims of

 7    sulfur oxide air pollution suffering from COPD or

 8    asthma in Yokkaichi, Japan in relation -- in

 9    relation to predisposing exposure.  And that is in

10    the Journal of Environmental Protection 2012, number

11    three, pages 1251 to 1259.

12        **Q.    And you did not consider that study in**

13    **preparing your report, correct?**

14        A.    I considered the underlying studies from

15    the '70s and '80s of this same population, but no,

16    this particular study I've just seen recently.

17        **Q.    Thank you.**

18        A.    Do you want me to keep this out or not?

19        **Q.    No, you can put it away.  Thank you.  You**

20    **mentioned --**

21        A.    Just to clarify, you were asking me I

22    didn't rely on it for this report, correct?

23        **Q.    Correct.**

24        A.    Okay.  Yes.  Asked and answered by me --

25    asked by him, answered by me.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 87

 1                    MR. TORRES:  Objection sustained.

 2                    THE WITNESS:  Yes.  Sorry.

 3                    MS. HOGAN:  He doesn't need counsel.

 4                    THE WITNESS:  Yes.

 5     BY MR. TORRES:

 6          Q.    **You mentioned earlier the EPA Exposure**

 7     **Factors Handbook, correct?**

 8          A.    Yes, I mentioned it.

 9          Q.    **Okay.  And I assume it's something you're**

10     **familiar with?**

11          A.    Like I said, I helped formulate the first

12     version in '89, one of the last things I did at the

13     agency.

14          Q.    **And you understand that the anatomy and**

15     **physiology of the respiratory system diminishes the**

16     **pollutant concentration in inspired air, such that**

17     **the amount of a pollutant that actually enters a**

18     **body through the upper respiratory tract and lung is**

19     **less than that measured at the boundary of the body,**

20     **do you agree with that statement?**

21                    MS. HOGAN:  Counsel, is that taken

22            from --

23                    MR. TORRES:  Yes.

24                    MS. HOGAN:  -- the study?  Can you

25            provide a reference for us on that for the

Page 88

```
 1        record, please?

 2              MR. TORRES:  It is Exposure Factors

 3        Handbook, the current Exposure Factors

 4        Handbook, Chapter Six, Section 6.1, page

 5        six-one.

 6              THE WITNESS:  That's the 2011

 7        version?

 8              MR. TORRES:  Correct.

 9              THE WITNESS:  I agree with that

10        statement.  It's intake versus contact,

11        which is concentration versus dose.

12  BY MR. TORRES:

13     Q.   And do you also agree with the statement

14  that the characteristics of the inhaled agent

15  diminishes the pollution -- the pollutant

16  concentration in inspired air such that the amount

17  of a pollutant that actually enters the body through

18  the upper respiratory track and lung is less than

19  that measured at the boundary of the body?  Do you

20  agree with that statement?

21              MS. HOGAN:  Is that also from that,

22        Counsel, just for the record?

23              MR. TORRES:  Yes.

24              MS. HOGAN:  Same chapter, same

25        section?
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 89

 1              MR. TORRES:  Yes.

 2              MS. HOGAN:  Okay.  Let's hear the

 3         question against, please.

 4              MR. TORRES:  I'm sorry.  Do you

 5         understand the question?

 6              THE WITNESS:  Could you reread it

 7         just now?  I was doing fine, now I lost my

 8         train of thought here.  Sorry.

 9              (Thereupon, the record was read back

10    by the court reporter.)

11              THE WITNESS:  I agree with that

12         statement.

13    BY MR. TORRES:

14         **Q.   Reading from the same section, same page,**

15    **Dr. Mink, do you agree with the following statement:**

16    **When constructing risk assessments that concern the**

17    **inhalation route of exposure, one must be aware of**

18    **any adjustments that have been employed in the**

19    **estimation of the pollutant concentration to account**

20    **for this reduction in potential dose?**

21         A.   I rely on those statements, I agree with

22    those statements and that's why I like to use EPA's

23    numbers.

24         **Q.   Is there an IRIS dose response factor for**

25    **sulfur dioxide?**

Page 90

 1      A.   No, there's health-based criteria, but not

 2   in IRIS that I -- that I recall.  For sulfur dioxide

 3   you said, correct?

 4      **Q.   Yes.  Is there a dose response factor for**

 5   **carbon monoxide?**

 6      A.   In IRIS?

 7      **Q.   Yes.**

 8      A.   Not that I recall.

 9      **Q.   Did you search IRIS for all of the**

10   **constituents that you list on pages -- on page seven**

11   **of your report?**

12      A.   I searched IRIS for those constituents,

13   the constituents that Mr. Ungers reported sampling,

14   but not all 133 that was in the Li report.

15      **Q.   And for clarity, you did not calculate**

16   **inhaled dose for Miss Williams with respect to**

17   **sulfur dioxide, correct?**

18      A.   No, I relied on EPA's numbers.

19      **Q.   The current health-based standard for**

20   **sulfur dioxide is an acute standard, correct?**

21      A.   That's correct.

22      **Q.   Did you consider Miss Williams' activity**

23   **level at all in your analysis?**

24      A.   Again, I relied on the assumptions that

25   EPA used.  I have no idea over the last 47 or eight

Page 91

1    years what her activity level has been or changed or

2    how.

3         Q.   So you don't know anything about her

4    activity level, correct?

5         A.   Correct.  I assume she's a standard person

6    like EPA.

7         Q.   A standard person, does that mean

8    sedentary or passive?

9         A.   No, a standard person that -- you have the

10   Exposure Factors Handbook.  It's pretty clear.  It's

11   a pretty good size volume about different exposure

12   factors, weight, you know, for the standard person,

13   activity level, ingestion, inhalation rates, you

14   know, those are -- those are all in the Exposure

15   Factors Handbook.

16        Q.   Okay.

17        A.   And yet that's how you change contact

18   concentration to an internal dose and then compare

19   it to the dose response curve to see if you should

20   have a response of probability.

21        Q.   Okay.  What else do you consider for

22   internal dose outside of weight, activity and

23   inhalation rate?

24        A.   Well, you look at anything that might

25   affect dose.  Again, you're converting -- as you

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 92

1   read earlier, you're converting that outside the

2   body concentration into an internal dose or intake.

3       Q.   Did you consider Miss Williams' specific

4   weight?

5       A.   No, I did not.  Again, I relied on EPA.

6       Q.   Did you consider any specific activities

7   of Miss Williams?

8       A.   No.  Again, I replied on EPA.

9       Q.   Did you calculate a specific inhalation

10  rate for Miss Williams?

11      A.   No.  Again, standard US EPA exposure

12  factor inhalation rates.

13      Q.   Did you consider, what you said, anything

14  else to determine internal dose to sulfur dioxide

15  for Miss Williams?

16      A.   Anything else on exposure factors you're

17  asking me?  I'm not sure --

18      Q.   Internal dose.

19           THE WITNESS:  Can you read back?  I'm

20       sorry.  I got lost.  I apologize.

21           (Thereupon, the record was read back

22  by the court reporter.)

23           MS. HOGAN:  I'm going to object,

24       assumes facts not in evidence.

25           THE WITNESS:  What was the word

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 93

1              before internal dose?  The one I didn't

2              hear the first or second time.

3                   (Thereupon, the record was read back

4        by the court reporter.)

5                   THE WITNESS:  Difficult question to

6              understand, but I'll take a stab at it.

7              What I said I considered was EPA standard

8              considerations, that's what I considered in

9              her internal dose, which is inherent in the

10             concentration that she was exposed to.

11             That's how that concentration was

12             calculated by EPA.

13       BY MR. TORRES:

14            **Q.   You considered nothing else in determining**

15       **internal dose, correct?**

16            A.   As far as exposure factors you're asking

17       me?

18            **Q.   Yes.**

19            A.   I believe that's correct.

20            **Q.   How did you convert the attic -- the attic**

21       **dust samples to exposure?**

22            A.   That was a qualitative measure for me.

23       The quantitation wasn't important in this particular

24       case.

25            **Q.   So you didn't rely on Mr. Ungers' samples**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 94

1  for any quantitative analysis, correct?

2      A.   Correct, I -- well, other than the fact

3  that the ratio from the soil to the attic just to

4  determine origin, no, it was a fingerprinting

5  exercise.  Was it from phosphogypsum manufacturing,

6  that's all I was looking at.

7      Q.   It wasn't an exposure-determining factor

8  for you, correct?

9           MS. HOGAN:  Objection as to form,

10          vague.

11          THE WITNESS:  I think I answered, but

12          if I understood the question I didn't look

13          at the quantitation that Mr. Ungers had in

14          any of his reports to determine an exposure

15          dose.

16          MR. TORRES:  Thank you.

17  BY MR. TORRES:

18      Q.   Did you rely on any literature to

19  determine any inhalation rate estimates?

20      A.   When I -- in late -- or well, in the late

21  summer of 2014, I looked at -- when I looked --

22  reviewed the Li report the first time, I looked

23  at -- he referred to the human exposure models,

24  pretty standard model in US EPA, and looked at the

25  assumptions that they were using for inhalation

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 95

1    rates, and he used all standard inhalation rates it

2    appeared, so I was fine with that.

3         Q.    So you relied on Li for that?

4         A.    Yes, Li or Li, L I.

5         Q.    Li.  Did you take into account -- did you

6    consider when forming your opinion Miss Williams'

7    lung structure and function?

8         A.    Let me answer that this way:  I looked at

9    her specific medical records and diagnostic tests.

10   I'm familiar with lung function, its structure as a

11   toxicologist.  And her particulars of lung structure

12   and function, I looked at it through her medical

13   records.

14        Q.    And did you consider that when forming

15   your opinion?

16        A.    Yes.

17        Q.    And where would that be in your report,

18   anywhere?

19        A.    All the references that refer to asthma

20   and the -- I think if you globally search this

21   document for asthma, anywhere I've mentioned that

22   because an asthmatic has a -- has a slightly

23   different airway structure.  And when it's chronic

24   and remodels, they have a very different structure,

25   so that would be how I would answer that.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

 1      Q.    How is it different?

 2      A.    Well, she has chronically constricted

 3   lower airways.

 4      Q.    So does that mean her inhalation rate is

 5   not standard?

 6      A.    Well, I'm sure over a vast majority of her

 7   life when her episodes are controlled, which have --

 8   in early life, from what I can tell, seemed to be

 9   better.  And as she's progressed in age, it seems

10   from her medical records she's had more and more

11   issues.  So my guess is during times of asthmatic

12   attacks, she obviously has a different respiration

13   rate.  And at times when she doesn't have an

14   asthmatic attack, we know within the last year or so

15   she has about a ten percent reduction from standard

16   ventilation rates for her age.  In the past beyond

17   that, I don't know.

18      Q.    Did you consider this ten percent

19   reduction in rate at all in your report?

20      A.    The great thing about the EPA, 75 parts

21   per billion is they based it on, like I said, a

22   large part of those Japanese studies over the last

23   four decades and they were considering the

24   asthmatics.  Asthmatics are the ones that are very

25   vulnerable to short-term exposures of oxidizing

Page 97

1    gases, such as SO2.  So that was the great -- that's

2    why it was just such a good fit.  I mean, it's

3    Bradford Hill's dream study.

4         **Q.   What are the Bradford Hill causation**

5    **criteria?**

6         A.   I think he has nine criteria.  I've used

7    them so many years.  And it's really -- you know,

8    it's called environment and disease and it was for

9    epidemiological data originally, but it's been

10   widely used for causation.

11        **Q.   How did you consider strength of**

12   **association between any constituent and any illness**

13   **Miss Williams alleges?**

14        A.   If you look at the airway remodeling, her

15   diabetes, her -- several of her blood-borne issues,

16   you will see that -- if you look at the -- the toxic

17   database that drive IRIS or the health-based

18   criteria, the association between those exact

19   effects at the levels she has experienced that we

20   know of, you would -- you would expect exactly what

21   she developed, so I would call that as strong

22   association as you can get.  She's a great

23   epidemiological study of one.

24        **Q.   Can you have an epidemiological study of**

25   **one?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 98

1        A.    Well, when you're G6PD you don't have a

2    lot of choices.  It's hard to find any of them in an

3    area of exposure.

4        Q.    Is G6PD that uncommon?

5        A.    Pretty rare, especially in females.  She

6    is the canary in the mine.

7        Q.    She is.  And what makes her -- what about

8    her G6PD makes her the canary in the mine?

9        A.    Again, she's asthmatic, which may be a

10   result of her G6PD and early exposures, it's

11   impossible to recreate, but she's far more

12   susceptible to oxidative stress through all of her

13   blood elements, which affect all her organs.  And

14   particularly the fine capillary organs, such as the

15   alveoli in the lower lung.  And that creates --

16   where you and I may have a protective buffer, as you

17   said and read in the exposure handbook, protective

18   buffer from our airways, she doesn't have near that

19   protective buffer because she has G6PD.  She doesn't

20   have the enzyme to be protected for those cells.

21       Q.    Is G6PD like an on and off switch or are

22   there gradations of its symptomatology?

23            MS. HOGAN:  Objection to form,

24       compound.

25   BY MR. TORRES:

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 99

1          Q.    You can answer.

2          A.    Well, you either have G6PD or not.  It's a

3     chromosome abnormality.  But depending on this

4     severity, whether you're a male, a female, or some

5     other factors, and how well it's controlled is what

6     you're measuring, whether you're severe, you know,

7     moderate, you know, et cetera.  And most G6PD

8     patients, if they don't have a lot of triggers tend

9     to live pretty normal lives in this country, let me

10    caveat that.

11         Q.    Have you ever spoken with Dr. David

12    Robinson?

13         A.    No, I've seen his reports.  I've not

14    spoken with him.

15         Q.    Have you ever spoken with Dr. Dorothy

16    Ogundu?

17         A.    I've not spoken to any of Mrs. Williams'

18    physicians if that helps you.

19         Q.    Thank you.  Do you know whether any of her

20    treating physicians or any of her treating doctors

21    questioned her G6PD condition?

22         A.    Yes, I am aware that one did.

23         Q.    And how did you account for that?

24         A.    Well, she was tested.  It's a simple

25    evidence-based -- all you have to do is test her

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                           Page 100

1    genetically.  She either is or isn't.  It's not an

2    opinion.

3                   (Thereupon, Mink Exhibit No. 9,

4    consultation record from Brandon Regional Hospital,

5    was marked for purposes of identification.)

6    BY MR. TORRES:

7         Q.   **I'm going to hand you what I've marked as**

8    **Exhibit No. 9, which is Bates labeled Brandon**

9    **Hosp_000957 through 959.  Have you ever seen that**

10   **document?**

11        A.   I believe I have.

12        Q.   **Okay.  And do you see where it says**

13   **history of present illness?**

14        A.   Yes.

15        Q.   **Can you read that paragraph into the**

16   **record, please?**

17        A.   Yes.

18                   MS. HOGAN:  Objection, the record

19             speaks for itself.

20   BY MR. TORRES:

21        Q.   **Can you, please?**

22        A.   Yes.  Would you like me to do that?

23        Q.   **Yes.**

24        A.   Thank you much, Dr. Agzew, for asking us

25   to see this 45-year-old African-American patient --

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 101

1    this was on 5/7/13 -- who is admitted with asthma

2    attack and apparently with a history of G6PD

3    deficiency and what she refers to -- she refers to

4    repeated crises, but from what I can gather no clear

5    evidence of acute hemolytic disease and who has been

6    seen in the past by Dr. Julio Lautersztain as well

7    as more recently Dr. Ramesh Shah and Dr. Martine

8    Extermann at Moffitt and I referred to Dr. Ramesh

9    Shah's recent office visit and labs wherein it was

10   noted that she has a serum G6PD level that is low

11   and mild macrocytosis, but otherwise a normal CBC,

12   no reticulocytosis, normal macrocytosis -- wait a

13   minute.  I'm sorry.  Normal bilirubin -- strike

14   that -- normal bilirubin and normal haptoglobin --

15        Q.    **Can you stop there for a moment?**

16        A.    Sure.

17        Q.    **Do you disagree with the statement that**

18   **there is no clear evidence of hemolytic disease?**

19        A.    No, I would strongly disagree.

20        Q.    **Can you point to anything that would**

21   **support your strong disagreement?**

22        A.    Yes.

23        Q.    **What can you point to?**

24        A.    Well, if you look at her medical records

25   over the last 20 years in toto.  And even he

Page 102

1    suggests -- well, he didn't suggest.  The thing he

2    measured was she did have macrocytosis.  Okay.

3    That's -- that is an elevated MCL.  That's part of

4    an elevated MCL.  That's the driving force behind it

5    is the factor that shows you had a hemolytic -- a

6    hemolytic event.

7              Look at her medical records, and again, if

8    you see enough physicians, they can only diagnose

9    based on what they see at the time.  I've seen many

10   diagnoses -- 20 percent are considered to be

11   incorrect is the average by the American Medical

12   Association of diagnoses.  And I would say in her

13   case, there's several that just didn't have the

14   facts and made -- made -- what did he call it -- but

15   from what I can gather, he makes it clear that this

16   is an opinion.  That's the problem when you don't

17   have evidence-based opinions.  If you look at the

18   evidence, she clearly had hemolytic anemia over a

19   long period of time.

20        **Q.   And the evidence you would point to, we**

21   **would find in her medical records, correct?**

22        A.   Yes.

23        **Q.   And what --**

24        A.   Since -- I've only reviewed them since '95

25   or so.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

1      Q.    And what -- what would we specifically

2  look at in her medical records?

3      A.    Well, you would look at the number of

4  times that she saw the doctor or was hospitalized

5  for fatigue, anemia, for -- and had had clinical

6  tests that showed she had macrocytosis.  I think

7  she's been diagnosed, like I said, in the past of

8  not having G6PD, which was a simple test, which made

9  that diagnosis incorrect.  She's been -- as we just

10  read, there was an opinion, not an expert opinion,

11  but an office diagnosis that says, you know, he

12  thinks the focus might be a little different and he

13  sees no clear evidence, and my guess is he didn't go

14  through her medical records, he looked at her, he

15  looked at the last office visit he refers to and the

16  clinical evidence, and if I saw that in a vacuum I

17  would say I'm not sure about that either if I was a

18  physician, but I'm not a physician and I didn't see

19  her in that office.

20      Q.    So you disagree with Dr. Robinson's

21  statement that there is no clear evidence of acute

22  hemolytic disease, correct?

23      A.    I think her medical records clearly

24  disagrees with that.

25      Q.    I'm asking if you disagree?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 104

1      A.   Yes, I disagree with that.

2      **Q.   You also disagree with the statement that**

3  **she has a mild macrocytosis?**

4      A.   I assume there's a lab report with this,

5  and I would assume that he can read a lab report,

6  and at this particular time her clinical serology

7  probably showed a mild macrocytosis.

8      **Q.   I'm going to ask the question one more**

9  **time.  Do you disagree with the statement here that**

10  **she suffers a mild macrocytosis?**

11      A.   Again, macrocytosis is an intermittent

12  event based on an injury, so at that time I have no

13  idea unless I see the clinical evidence, which I

14  would assume is attached, but I haven't got to read

15  it.

16      **Q.   Can you read in Exhibit 9 the next two**

17  **sentences?**

18           MS. HOGAN:  You mean 7?

19           MR. TORRES:  Exhibit 9.  The one

20      that's in your hand.

21           THE WITNESS:  Where does it start?  I

22      lost track.

23  BY MR. TORRES:

24      **Q.   You left off at haptoglobin.**

25      A.   Oh okay.  She indicates that there is no

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 105

1    family history of blood disorders.  The patient has

2    never had a blood transfusion and denies any history

3    of splenectomy.

4          **Q.    Read one more sentence, please.**

5          A.    She does have a booklet she pulled off the

6    Internet with a list of medications to avoid for

7    G6PD deficiency and that certainly is quite valid,

8    but otherwise I do not see any active issues that

9    suggest active clinical problem and G6PD deficiency

10   at the present time.

11         **Q.    Do you disagree with Dr. Robinson's**

12   **statement that there was nothing suggesting active**

13   **clinical problem and G6PD deficiency at that time?**

14         A.    Well, I certainly wouldn't want to

15   interpret what he's saying here -- I mean, what is

16   in his notes, but I would agree that it's valid that

17   she looked into her own disease.  And is there any

18   active -- I do not see any active issues, that's

19   technically incorrect.  He just named an active

20   issue.  So he contradicted himself, so I couldn't

21   agree with that.  That suggest active clinical

22   problem, I don't know what active clinical problem

23   he's referring to, and G6PD deficiency at the time.

24   It's impossible to have G6PD and then not have G6PD.

25   So the way he wrote it, which I don't know if he

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 106

1    meant it that way, but you either have G6PD

2    deficiency or not.  If he meant episode, there's

3    probably not a lot of evidence at that particular

4    time that she had an immediate G6PD episode, if

5    that's what he meant, but I can't interpret what

6    he's saying, so I can't say if I agree or disagree.

7    I can only say what I just said.

8         Q.    **You're not a medical doctor, correct?**

9         A.    That's correct.  I cannot diagnose

10   disease.

11        Q.    **And you are not an expert in G6PD,**

12   **correct?**

13        A.    I think I'm -- as a toxicologist -- a

14   mechanistic toxicologist fairly familiar with G6PD.

15   I've looked at it for 25 years.

16        Q.    **Okay.**

17              MS. HOGAN:  Just for the record --

18              MS. GALEOTO:  Can I get the Bates on

19         the last Exhibit 7?  I'm sorry.

20              MS. HOGAN:  Brandon hospital 000957.

21         And for the record, it's important to note

22         that the drafter of this particular note is

23         referring not to his own conclusions, but

24         to Dr. Shah's, quote recent office visit

25         and labs wherein it is noted that she has a

Page 107

1          serum G6PD level that is low and mild

2          macrocytosis, but otherwise a normal CBC,

3          no reticulocytosis, normal bilirubin, and

4          normal haptoglobin.  That is a quotation of

5          Dr. Shah and not independent opinion by the

6          author of this particular note, which

7          appears to be Dr. Robbins.

8                MR. TORRES:  Okay.  And I'm going to

9          for the record ask counsel to refrain from

10          testifying.

11                MS. HOGAN:  Only correcting the

12          record, Chris.

13    BY MR. TORRES:

14      **Q.    Can we turn to the next page, 958?**

15      A.    Yes.

16      **Q.    And can you read the first sentence under**

17    **assessment and plan?**

18      A.    Stated history of G6PD deficiency with a

19    G6PD level having been drawn apparently in the

20    steady state by Dr. Shah and being reported as low,

21    but with none of the other stigma of active G6PD

22    deficiency.  Do you want me to continue reading on

23    the next page?

24      **Q.    Yes.**

25      A.    With respect to evidence of hemolysis with

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                            Page 108

1    a normal retic count, normal haptoglobin, normal

2    bilirubin, and normal hemoglobin --

3        Q.    Okay.  You can stop there.  Did you review

4    in Miss Williams' medical records retic count?

5        A.    I'm sorry.  Can you say that again?

6              MR. TORRES:  Read the question back,

7          please.

8              (Thereupon, the record was read back

9    by the court reporter.)

10             THE WITNESS:  Yes, that's her red

11         blood cell counts.  It's in most of her

12         medical records over time.

13   BY MR. TORRES:

14       Q.    Did you record any of this information

15   anywhere?

16       A.    No, it's all in her medical records.  It's

17   recorded.

18       Q.    And -- but you did review it all, correct?

19       A.    Yes.

20       Q.    Okay.  And did you review Miss Williams'

21   haptoglobin levels?

22       A.    Again, I reviewed all the medical records

23   that I was provided since 1995, including all these

24   blood elements if that helps.

25       Q.    So the answer is yes, correct?

Page 109

1      A.    Yes.

2      **Q.    And you reviewed bilirubin counts, right?**

3      A.    Yes.

4      **Q.    And hemoglobin counts, correct?**

5      A.    Correct.

6      **Q.    And you considering that, you continue to**

7    **maintain your opinion that Miss Williams suffers**

8    **from a severe hemolysis?**

9      A.    Hemolysis?

10     **Q.    Yes.**

11     A.    Well, I think that's a mischaracterization

12   of my testimony.  Could you read where I said that?

13     **Q.    What -- what you said earlier, you**

14   **disagreed with the doctor's statement that there was**

15   **no clear evidence of acute hemolytic disease,**

16   **correct?**

17     A.    That's correct.

18     **Q.    And you maintain that position, correct?**

19     A.    Correct.

20           (Thereupon, Mink Exhibit No. 10,

21   diagnostic imaging report from Signet Diagnostic,

22   was marked for purposes of identification.)

23   BY MR. TORRES:

24     **Q.    Okay.  I'm going to hand you Exhibit No.**

25   **10.  And this is a document Bates labeled Dr. Amit**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 110

1    A. Johnsingh-Brandon Neprology 000001 through 4.

2    Have you seen this document before, Dr. Mink?

3         A.    I can honestly say I don't recall each

4    medical record.  And I don't recall this one

5    specifically.  I would assume by the date it was in

6    the records I had.

7         **Q.    Do you see the section on page two**

8    **entitled history of present illness?**

9         A.    Yes, I do.

10        **Q.    Can you read the first three sentences of**

11   **that section?**

12        A.    Yes, I can.

13        **Q.    Please do.**

14        A.    The patient is a 46-year-old

15   African-American female whom I know from this office

16   setting who has seen me for complaints of left flank

17   pain and also for hypertension.  Over the course of

18   the past year or so I have seen her, she has had

19   multiple -- multiple complaints that has lead to

20   extensive investigations, including the finding of a

21   probable G6PD deficiency.  However, the patient has

22   been admitted several times to hospitals and upon

23   evaluation by Dr. Mark Robbins in May 2013, the G6PD

24   deficiency remains somewhat suspect, given the lack

25   of obvious hemolysis or other somatic symptoms that

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

                                                          Page 111

1    the patient has described, which is not consistent

2    with G6PD deficiency.

3        Q.    Okay.  You can stop there.  And you would

4    disagree with the assessment that there was a lack

5    of obvious hemolysis; is that correct?

6        A.    No, I wouldn't disagree with that.  At

7    this time I'm not exactly sure, but would that

8    surprise me, I assume most of the time she doesn't

9    have evidence of hemolysis, only during times of

10   oxidative stress.  She would -- she would be dead if

11   she had it on a chronic basis.

12       Q.    Can you turn to page three and look at

13   assessment number two?

14       A.    Yes.

15       Q.    And can you read that section into the

16   record, please?

17       A.    Number one?

18       Q.    Number two.

19       A.    Number two.  She has some macrocytosis

20   with a wide red blood cell distribution width

21   without any signs of anemia with mildly elevated

22   reticulocyte count perhaps suggestive of subclinical

23   G6PD deficiency, which is documented by slightly low

24   levels of G6PD as described by Dr. Mark Robbins from

25   May 2013.  Continue?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 112

1        Q.    Yes.

2        A.    However, she has tolerated various

3   medications that probably would have contraindicated

4   under the conditions of G6PD, including furosemide

5   without any obvious side effects that are consistent

6   with Dr. Robbins' notes from May 2013.  Continue?

7        **Q.    No, that's it.  Now, Dr. Mink, how did**

8   **you -- what did you -- did you consider this**

9   **statement by the doctor at all, she has tolerated**

10  **various medications that probably would be**

11  **contraindicated -- contraindicated under conditions**

12  **of G6PD, including furosemide without any obvious**

13  **side effects that is consistent with Dr. Robbins'**

14  **note from May 2013?**

15              MS. HOGAN:  What was the question,

16         please?

17              MR. TORRES:  You can read it back.

18              (Thereupon, the record was read back

19  by the court reporter.)

20              THE WITNESS:  My answer to that

21         question, I believe, is I tediously went

22         through a stack of medical records from

23         approximately 1995 to 2015, I think the

24         last one I saw was July 2015, in great

25         detail.  And in toto I looked at all these

Williams, Rhonda v. Mosaic Fertilizer, LLC                          Frankiin L. Mink, Ph.D.

Page 113

1              remarks in their context.  Is that what you

2              asked me, if I considered it, right?

3                   MR. TORRES:  Yes.

4                   THE WITNESS:  So I considered it in

5              totality of her medical records, yes.

6       BY MR. TORRES:

7          Q.    Did you prepare any -- any type of summary

8       of her medical records?

9          A.    No, I did not.  I read a summary of her

10      medical records in addition to her medical records.

11         Q.    Who prepared the summary of her medical

12      records?

13         A.    I don't recall.  It was a medical

14      professional.  I don't recall who it was.

15         Q.    Was it one of the experts in this case?

16         A.    I don't recall.

17         Q.    Was it Dr. Paul Deutsch?

18         A.    Again, I don't recall.  I'm sorry.

19         Q.    Are you familiar with that name at all?

20         A.    I've heard of the name -- or read the

21      name, yes.

22                   (Thereupon, Mink Exhibit No. 11,

23      nephrology progress note from Brandon Regional

24      Hospital, was marked for purposes of

25      identification.)

Page 114

1    BY MR. TORRES:

2         **Q.    I'm going to hand you Exhibit 11, which is**

3    **Bates labeled Brandon Hosp_000683 through 684.  Have**

4    **you seen that document before?  Do you believe you**

5    **have reviewed that document in the past?**

6         A.    I believe I've seen this document in the

7    past.

8         **Q.    And do you see under diagnosis, assessment**

9    **and plan number two?**

10        A.    Yes.

11        **Q.    Can you read that statement in number two?**

12        A.    Yes.  Diagnosis, assessment and plan.

13   Number two, question mark, macrocytosis with wide

14   red cell distribution width without any anemia,

15   mildly elevated red count and no history of

16   hemolysis.  PLS see Dr. Robbins' note from May 2013

17   for details.  G6PD def remains questionable.

18        **Q.    And again, you disagree with that**

19   **statement, correct?**

20        A.    The data disagree with that statement.

21   These are opinions.  We got the facts.  I -- based

22   on medical records, I asked her to be -- asked the

23   counsel to have her tested for G6PD.  She was

24   tested.  She has G6PD.  It's not an opinion.  It's

25   fact.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

                                                            Page 115

 1        Q.    I'm not questioning whether she has G6PD.

 2        A.    Well, that's what this says.  This says

 3   G6PD def remains questionable.  And it's the same

 4   guy, Dr. Robbins, every time you have me read this.

 5   He obviously didn't believe she had it or was --

 6   thought it was questionable when he could have

 7   performed a simple test.

 8               (Thereupon, Mink Exhibit No. 12,

 9   medical chronology, was marked for purposes of

10   identification.)

11   BY MR. TORRES:

12        Q.    I'm going to hand you Exhibit No. 12,

13   which is Bates labeled Mink_000742 through 783.

14   Have you seen that document before?

15        A.    Yes.  This is the one I referred to just a

16   moment ago.

17        Q.    Okay.  And you said earlier you reviewed

18   medical records going back to 1995, correct?

19        A.    Yes, approximately '95.

20        Q.    Okay.  This summary goes back to 2004,

21   correct?

22        A.    I believe that's correct.

23        Q.    Okay.

24        A.    My recollection is that's correct.

25        Q.    Where in this summary would you assert are

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 116

1    **medical records suggesting that Miss Williams**

2    **suffers an acute hemolysis?**

3        A.   Well, these are since 2004 and since --

4    unless you want me to go through this page by page,

5    I don't recall specifically.  But her elevated MCV

6    and macrocytosis is throughout literally on a

7    regular basis from the mid '90s until the present,

8    which are clear evidence of a past event of

9    hemolysis.  If you're looking for hemolysis when the

10   patient gets to the hospital or doctor's office, you

11   rarely find it because the event has passed, but the

12   evidence of it is when you have macrocytic red blood

13   cells and you have elevated MCVs.

14       Q.   **Can you flip through this and tell me**

15   **where you see elevated MCVs?**

16       A.   I can't flip through this and do that, but

17   I can go through this and do that.

18       Q.   **You can go through it and do that.**

19       A.   You want me to mark them, do you want me

20   to --

21       Q.   **I'll hand you an orange highlighter.**

22       A.   Elevated MCVs you want?

23       Q.   **Correct.**

24       A.   I'll key that.  Can I ask a clarifying

25   question?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 117

1       Q.    Certainly.

2       A.    Do you want me to mark anything that has

3   to do with hemolytic anemia or do you want me to

4   just mark elevated MCVs?

5       Q.    Just elevated MCVs.

6       A.    Okay.

7               MS. HOGAN:  While Dr. Mink is

8           undertaking his highlighting, I do wish to

9           note for the record that on the production

10          CD for this document labeled Exhibit 12,

11          it's listed as a draft and it likewise does

12          not include medical records post 2013,

13          noted for the record there.

14              THE WITNESS:  Just note for the

15          record there's some yellow markings on this

16          that are not mine.  Mine's all orange.

17              MR. TORRES:  I understand.  Thank

18          you.

19              THE WITNESS:  I'm finished.

20              MR. TORRES:  Thank you.

21   BY MR. TORRES:

22       Q.    Dr. Mink, are there --

23              MR. TORRES:  Let's go off the record.

24          We've got to change the tape.

25              VIDEOGRAPHER:  We're off the record.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                        Page 118

 1                    (Off the record.)

 2                    VIDEOGRAPHER:  We're on the record.

 3                    MS. HOGAN:  During the course of the

 4              break we had a discussion regarding the

 5              status of Miss Williams' G6PD testing, and

 6              we have verified that the genetic testing

 7              establishing the G6PD deficiency is

 8              documented by lab work and that lab work

 9              has been produced, so for the record we'll

10              make sure that's clear.

11                    MR. TORRES:  Thank you.

12    BY MR. TORRES:

13         Q.    Dr. Mink, are there varying grades or

14    levels of a G6PD condition -- or deficiency?

15         A.    I think I answered that before, but you

16    have it or you don't have it.  It's recessive or

17    dominant based on your genetics.  That means it's on

18    one chromosome or both depending on your sex and how

19    you inherit it.  But the symptomatology can be

20    graded and it can change over time.  It can go from,

21    you know, mild to more severe or severe to more

22    mild.  It's really based on the triggers that you

23    get.  The disease itself is susceptible to triggers.

24    As long as you don't encounter a lot of triggers,

25    you tend to be fairly mildly symptomatic.

Page 119

1        Q.    What is the difference between mild and --

2              MS. HOGAN:  Excuse me.

3              MR. TORRES:  Go off for a moment.

4              MS. HOGAN:  I apologize.

5              VIDEOGRAPHER:  We're off the record.

6              (Off the record.)

7              VIDEOGRAPHER:  We're on the record.

8              MR. TORRES:  Thank you.

9    BY MR. TORRES:

10       Q.    Dr. Mink, what is the difference between a

11   mild G6PD symptomatology and a severe G6PD

12   symptomatology?

13       A.    Mild symptoms would be fatigue, weakness,

14   mild anemia, that would be considered an episode.

15   More severe would be clinically, you know, fairly

16   anemic, you have blood cell elements that are

17   clinically not in the normal range, and you can be

18   hospitalized because you're -- you're so weak and,

19   you know, you can be fairly sick.

20       Q.    Is there any relationship between the

21   degree of symptomatology and a responsiveness to

22   environmental triggers?

23       A.    Can I rephrase that to see if I understand

24   it?

25       Q.    Yes.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 120

1        A.    You're saying does the degree of G6PD

2    symptomatology affect how the degree to which

3    triggers affect you?

4        **Q.    Correct.**

5        A.    Certainly in an acute situation it can.

6    If you're exposed and you're in a weakened state and

7    you're hospitalized, you know, you're obviously more

8    susceptible to anything that insults you.  You can

9    only take so many insults on the body.  But normally

10   a trigger is a trigger, you respond to it or you

11   don't, and that's just the way it is.  And if you

12   can avoid the triggers, you don't have a response.

13   And those that are more severe in their G6PD

14   response usually have more severe triggers.

15       **Q.    Okay.  What references do you cite to**

16   **support your assertion that Miss Williams' G6PD**

17   **makes her a canary in the coal mine?**

18       A.    I think I said canary in the mine, but

19   that's fine, that's close enough.  She -- she has

20   two major areas of susceptibility that are outside

21   the realms of what we look at in standard exposure

22   factors.  And that's she has a rare genetic

23   disorder, G6PD, which takes away a protective system

24   in her body to some extent, and she has long-term

25   chronic asthma, which makes her susceptible to

Page 121

1    inhaled insults.  So both of those things combined

2    make her very sensitive to airborne contamination.

3    She may or may not be more sensitive to dermal

4    insults.  She may or may not be more or less

5    sensitive to trauma, but inhaled triggers she's much

6    more sensitive because of both of those, one genetic

7    and one developed disease state.

8        **Q.   Thank you.  And the question that I asked**

9    **was what references did you cite to support that**

10   **assertion?**

11       A.   Again, if you look at my report, Mink 6,

12   the references and the secondary references

13   contained within them are -- there's a plethora of

14   G6PD references.

15       **Q.   Well, which -- which -- which ones are you**

16   **referring to in your report in your list of**

17   **references from page 17 through 27?**

18       A.   Would you like me to mark them or --

19       **Q.   Yes.  What color did you use in the front**

20   **of that document already?**

21       A.   Blue.

22       **Q.   And what was it for?**

23       A.   Exposure.

24       **Q.   Okay.  I'll give you pink.**

25       A.   Okay.

Page 122

1      **Q.   And you can make a key as well.  It will**

2   **help us.**

3      A.   Oh, okay.  And that key should say, what's

4   the quickest, easiest way of saying it?

5      **Q.   G6PD.**

6      A.   G6PD.  Again, is it okay just to do the

7   author and assume the reference?

8      **Q.   Yes.**

9      A.   Thank you.

10      **Q.   And you are marking the G6PD related --**

11      A.   Correct.

12      **Q.   -- that you're relying on?**

13      A.   Correct.

14      **Q.   Thank you.**

15      A.   You're welcome.

16           MR. TORRES:  Go off while she's

17         dialing.

18           VIDEOGRAPHER:  We're off the record.

19           (Off the record.)

20           VIDEOGRAPHER:  We're on the record.

21           MR. TORRES:  Thank you.

22   BY MR. TORRES:

23      **Q.   You state in your report, page 16, Exhibit**

24   **2, that Miss Williams is a sensitive individual that**

25   **has more -- a more complicated**

Page 123

1    biological/immunological response to all these

2    substances, i.e., the canary in the mine so to

3    speak, correct?

4        A.   Correct.

5        Q.   Okay.  Have you ever advised anyone that

6    Miss Williams should move?

7        A.   Yes.

8        Q.   And to your knowledge has she?

9        A.   I don't know.

10       Q.   And whom did you advise?

11       A.   I advised her counsel, Laureen Galeoto in

12   particular when I met her that she needed to move.

13       Q.   Okay.  You did not advise Miss Williams

14   yourself, correct?

15       A.   No, I didn't have -- quick meeting, didn't

16   speak to her about it.

17       Q.   Let's go back to Exhibit 12.

18       A.   Exhibit 12.

19       Q.   Exhibit 12, this is the summary.

20       A.   Got it.

21            MR. WALKER:  Give the Bates number

22         please, thank you.

23            MR. TORRES:  Page Mink_ 000767.  It's

24         page 26 of the --

25   BY MR. TORRES:

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 124

1      Q.    And I'm looking at an entry dated

2  12/7/2012, Florida Cancer Specialists in the middle

3  of the page that says low -- it's the highlighted

4  entry, low glucose-6-phosphate dehydrogenase G6PD:

5  6.  Do you see that?

6      A.    Yes I do.

7      Q.    What does the six refer to?

8      A.    I have no idea.

9      Q.    You testified earlier that you were an

10 expert in G6PD, that you've studied this for the

11 last 20 years.

12     A.    Yes.

13     Q.    Do you know how G6PD is measured?

14     A.    I know how it's graded, yes.

15     Q.    Is this a grade?

16     A.    I cannot assume that because there's no

17 note.  That would be a bad assumption.  It could be,

18 but I don't know that.

19     Q.    You've never seen a number like this?

20     A.    Yes, I have, but again, I can't make that

21 assumption.  I see, you know, glucose-6-phosphate

22 dehydrogenase G6PD in parens a colon and a number

23 six with absolutely no notes, and so this is a --

24 from my understanding this is a summary of medical

25 chronology, so, again, I wouldn't -- I wouldn't

Williams, Rhonda v. Mosaic Fertilizer, LLC                          Franklin L. Mink, Ph.D.

```
                                                    Page 125
 1    hazard a guess.  It could mean that.  It could

 2    mean -- I don't know.

 3        Q.   Now, you spent a large chunk of your

 4    expert report discussing G6PD.  And a measure of

 5    G6PD was something that you didn't pay great

 6    attention to?

 7              MS. HOGAN:  What?  Could you reread

 8         that, please?

 9              (Thereupon, the record was read back

10    by the court reporter.)

11              MS. HOGAN:  Objection,

12         mischaracterizes his testimony.

13              THE WITNESS:  Do you want me to

14         answer?

15    BY MR. TORRES:

16        Q.   Yes.

17        A.   Well, first of all, I'm not sure what

18    measure you're talking about because, again, I don't

19    know if in these notes that's what that denotes, so

20    I cannot make that assumption.  And number two, I'm

21    interested in any of her medical records that talk

22    about her degree of G6PD symptomatology at the time.

23        Q.   Did you take those -- all the G6PD

24    symptomatology records and sequester them in any

25    way?
```

Williams, Rhonda v. Mosaic Fertilizer, LLC                          Franklin L. Mink, Ph.D.

Page 126

1        A.    If I understand it, you mean did I

2   summarize them or rewrite them?

3        **Q.    Yes.**

4        A.    No.

5        **Q.    Did you make a stack of G6PD-related**

6   **records at any time?**

7        A.    Independent from her medical records?

8        **Q.    From her medical records.**

9        A.    No, I mean, parse them out, so to speak?

10       **Q.    Yes.**

11       A.    No.

12       **Q.    On page 27 or 768 of the Bates, there is a**

13   **carryover from Dr. Ramesh Shah.  Do you know who**

14   **Dr. Ramesh Shah is?**

15       A.    Yes -- I mean, I know who it is from the

16   medical records.

17       **Q.    Do you know what he treated Miss Williams**

18   **for?**

19       A.    You mean at this particular time or in

20   general?

21       **Q.    In general.**

22       A.    From my recollection of the medical

23   records he treated her for periodic visits for her

24   G6PD or symptoms related to -- what she thought or

25   was, in fact, symptoms of G6PD.

Page 127

1      Q.    Okay.   Looking at page 27 and the third

2    line from the top, he writes G6PD was found to be

3    with a low value of six.   Do you understand what he

4    is talking about there?

5      A.    Yes, I do.

6      Q.    And what is he talking about?

7      A.    He is talking about a gradation, which may

8    or not -- may or may not be related to the reference

9    of a month and a half earlier that we just spoke of.

10   But he's reiterating a value at six at some time in

11   her medical records was prescribed by some doctor

12   based on her symptomatology.   And remember that's

13   symptomatology, that's not her disease progression

14   or state.   It's symptomatology at the time of the

15   visit.

16     Q.    I understand.   Do you know how G6PD is

17   valued or how G6PD symptomatology is valued?

18     A.    Yes.

19     Q.    What is that range?

20     A.    It's graded, and it's my understanding --

21   there's been several different criteria.   The one

22   that's used most frequently is -- is from mild to

23   severe or no symptoms to severe.   They do sometimes

24   use a numerical value which is basically from one to

25   ten.

Page 128

1        Q.    Do they use any other numerical values?

2        A.    Well, I'm sure they do.  It's a -- there's

3   all kind of ways to look at symptomatology.  And

4   again, that's a physician as part of a diagnoses of

5   a particular visit.

6        Q.    Okay.  Do you know -- do you have any

7   reason to disagree with the sentence four lines down

8   on page 27 of Exhibit 12 where Dr. Shah writes she

9   was told she has mild G6PD deficiency?

10       A.    Wait a minute, I'm -- oh, okay.  Yes, I

11  see it.  I'm sorry, and the question was?

12       Q.    Do you have any reason to disagree with

13  that statement?

14       A.    I think her medical records certainly show

15  that she had been told --

16                 UNIDENTIFIED SPEAKER:  You lost

17            Laureen again.

18                 MR. TORRES:  Let's finish this before

19            you get her back on.

20                 MS. HOGAN:  All right.

21                 THE WITNESS:  I wouldn't have any

22            reason to disagree that she's been told

23            that.

24  BY MR. TORRES:

25       Q.    Do you have any reason to disagree that

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 129

1    she has a mild G6PD deficiency?

2        A.   Well, I think that's a mischaracterization

3    of the medical records.  She had -- at one time she

4    had a visit with a physician who ranked her

5    symptomatology at the time of an episode at a six,

6    which is low.  That doesn't -- that doesn't --

7    that's not a measure of her disease over time.

8    That's a measure of her symptomatology.  Like the

9    paragraph you're reading, two sentences down, she

10   had an increase in MCV to 105, which you had me

11   earlier mark.  Which every single time she had a lab

12   test for MCV, it was elevated, every single time.

13   And it went up 20 percent over a ten-year period.

14       Q.   Do you have a reason to disagree with the

15   statement that Miss Williams had a mild G6PD

16   symptomatology then?

17       A.   At this particular time --

18       Q.   Yes.

19       A.   -- by this physician, I don't have any

20   reason to agree or disagree.  I would assume

21   they're -- I would assume looking at this by itself

22   I wouldn't see any reason they wouldn't say that.  I

23   think they're repeating something from earlier, but

24   yes, at that time I'm sure it probably was.

25       Q.   And these are, in fact, part of the

Page 130

1    **medical records you reviewed to make your**

2    **determinations and your opinion, correct?**

3        A.   They are, but as you know there's --

4    there's some things that aren't correct.  I mean, he

5    also says she has COPD in this same paragraph you're

6    reading.

7        **Q.   Okay.  Did you say she doesn't have COPD?**

8        A.   She doesn't have COPD.

9        **Q.   Did you discard -- or disregard certain**

10   **G6PD medical records in forming your opinion, were**

11   **there some that you weighed more heavily and some**

12   **that you weighed less heavily?**

13            MS. HOGAN:  Objection, compound.

14            THE WITNESS:  No.  Evidence is

15        evidence and opinion is opinion.  A medical

16        opinion is what it is.

17   BY MR. TORRES:

18       **Q.   Okay.  So this is a medical opinion,**

19   **correct?**

20       A.   Right.  And as long as it's not

21   contradicted by the record and by the clinical

22   tests, then I don't have any problem with it.  I

23   don't have any reason not to believe it.

24            MR. TORRES:  Okay.  Let's go off the

25        record and we can dial Laureen back in.

Page 131

1          VIDEOGRAPHER:  Okay.  We're off the

2       record.

3          (Off the record.)

4          VIDEOGRAPHER:  We're on the record.

5          MR. TORRES:  Thank you.

6   BY MR. TORRES:

7      **Q.   Dr. Mink, was there -- did you find a**

8   **single medical record asserting that Miss Williams'**

9   **G6PD symptomatology was severe?**

10     A.   No, not that I recall.

11     **Q.   I would like to turn to page 32 of Exhibit**

12  **12.  And I am looking at a Ramesh Shah, another**

13  **Ramesh Shah entry, 5/21/2013.  You see that?**

14     A.   Page 32 did you say?

15     **Q.   Yes.**

16     A.   And it's five what?

17     **Q.   5/21/2013.**

18     A.   No.

19         MS. HOGAN:  No, not on this one.

20      What's the Bates, please?

21         THE WITNESS:  I've got 5/7/13.

22         MR. TORRES:  The Bates range is 775.

23         THE WITNESS:  Oh, 775.

24         MS. HOGAN:  It's 34.

25         MR. TORRES:  Oh, 34.  I'm sorry.  I

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 132

1          had a dyslexic moment.

2                  THE WITNESS:  5/13 did you say?

3                  MR. TORRES:  Yes -- 5/21.

4                  THE WITNESS:  Oh, 5/21.  Okay.

5          Ramesh Shah.

6    BY MR. TORRES:

7          Q.    Yes, Ramesh Shah.  Can you read the

8    assessment in that summary?

9          A.    Sure.  The patient had mild G6PD

10   deficiency without any evidence of hemolysis.  She

11   is not anemic and does not have any reticulocytosis

12   or -- or decreased haptoglobin or LDH.  I do not

13   think any of her symptoms are related to G6PD

14   deficiency.  She does have fibromyalgia and multiple

15   other medical issues.  The etiology of her left

16   hydronephrosis is unclear -- hydronephrosis, I'm

17   sorry.

18         Q.    Okay.  Do you remember reviewing this

19   record?

20         A.    Not specifically, but I'm sure I did.

21         Q.    On page 37 Dr. Johnsingh states that --

22   under the assessment --

23         A.    Wait a minute, I don't see that.

24         Q.    Page 37.

25         A.    Yes.  I don't see Johnsingh.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 133

1    Q.    He's on the page 36.  I'm just identifying

2    him.

3    A.    I've got Amit Jones --

4    Q.    Amit Johnsingh.

5    A.    Oh, Amit Johnsingh.  Okay.

6              MS. HOGAN:  For the record, it's

7         Bates 777 Mink.

8    BY MR. TORRES:

9    Q.    And now we're going to page 778.

10   A.    Okay.

11   Q.    So we can go to the assessment.

12   A.    Sure.

13   Q.    And do you see in the second paragraph of

14   the assessment?

15   A.    I see the second, yes.

16   Q.    Okay.  And it reads she has some

17   macrocytosis with a wide red cell distribution

18   without -- width without any signs of anemia with

19   mildly elevated reticulocyte count perhaps

20   suggestive of subclinical G6PD deficiency.  What is

21   a subclinical G6PD deficiency?

22   A.    She's not in crisis from her

23   symptomatology.

24   Q.    Okay.  Can we turn to page 39, which is

25   Bates labeled --

Page 134

1        A.    Can I just say what you just read you know

2   was a restatement from the same Dr. Robbins from May

3   '13.

4        **Q.    I understand that.**

5        A.    They're all the same.

6        **Q.    I'm just asking you --**

7        A.    Okay.

8        **Q.    -- if you can describe subclinical**

9   **G6PD deficiency.**

10       A.    Sorry.

11       **Q.    That's okay.  Let's turn to page 39, which**

12  **is Bates labeled 780.**

13       A.    Yes.

14       **Q.    And I'm looking at the entry on the bottom**

15  **of the page, 7/25/2013, Pulmonary Associates of**

16  **Tampa.  Do you see that?**

17       A.    Yes.

18       **Q.    And this entry states G6PD was confirmed**

19  **to be low, only six?**

20       A.    Do I see that?

21       **Q.    Yes.**

22       A.    Yes.

23       **Q.    Do you know what in this case Dr. Cosmo is**

24  **referring to?**

25       A.    From my recollection and looking at the

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 135

1    record, he was looking at her -- he's a

2    pulmonologist.  He was looking at her for asthma

3    symptoms and that's one of his notes, which I assume

4    he gleaned from the medical records.  I don't see

5    any clinical testing.

6         **Q.    Do you know what the six refers to here?**

7         A.    Again, we're referring to the exact same

8    single doctor visit over and over.

9         **Q.    Are you suggesting that all the doctors**

10   **are just restating a prior doctor's opinion?**

11        A.    Well, they do.  It's part of the record

12   and part of the notes, that's exactly what they're

13   doing.

14        **Q.    Did you do anything different?**

15        A.    Did I do anything different?

16        **Q.    Yes.  Did you do something that a doctor**

17   **did not regarding Miss Williams' G6PD -- regarding**

18   **your assessment of Miss Williams' G6PD?**

19             MS. HOGAN:  Objection as to form,

20        vague.

21             THE WITNESS:  Well, not knowing

22        exactly what they did from these summary

23        notes, I -- I'm not treating her, so I

24        would assume I didn't do anything that they

25        did.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 136

1    BY MR. TORRES:

2        **Q.   Did you consider any other -- outside of**

3    **the cited references in your report, did you**

4    **consider any other data relating to Miss Williams'**

5    **G6PD outside of the medical records you reviewed?**

6        A.   Well, I think, as I stated at the

7    beginning of my report, I reviewed her medical

8    records, the references contained, primary and

9    secondary, and the -- my expert knowledge over the

10   last 35 years.  Yes, that is the whole of what I

11   relied on.

12       **Q.   I would like to turn to the last page of**

13   **Exhibit 12.**

14       A.   What was the date you just said?

15       **Q.   The last page.**

16       A.   Oh, okay.

17       **Q.   And I am -- the last -- top of the last**

18   **page is a carryover from another Dr. Ramesh Shah**

19   **entry?**

20       A.   Yes.

21       **Q.   And if you look at that assessment -- can**

22   **you read that assessment, please?**

23       A.   Yes.  This patient has mild deficiency of

24   G6PD without any signs of hemolysis.  In fact, her

25   CBC is normal.  I do not think she has any

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 137

1    significant G6PD deficiency issues.  She has

2    multiple other medical problems and she has been

3    followed by her PCP, primary care physician I

4    assume, quite closely.  I would also like to discuss

5    her case with a physician in New York regarding

6    further workup for G6PD deficiency.  I still believe

7    her symptoms do not correlate with G6PD deficiency.

8         **Q.   Have you done any follow-up regarding this**

9    **further workup for G6PD?  Did you review any records**

10   **in connection with that?**

11        A.   Yes.

12        **Q.   You did?**

13        A.   Yes.

14        **Q.   Okay.  And what were those records?**

15        A.   I think some time in earlier 2015 she had

16   the genetic testing and I saw that.  I wanted to see

17   the results.  It's -- you know, everyone can have an

18   opinion, but it's simple to do a test.  The test

19   shows that, you know, she has the deficiency.  And

20   apparently Dr. Shah, and I remember this from the

21   records, is skeptical of her relationship to the

22   symptoms she describes when she's in his office

23   versus the issues and how they're related to G6PD.

24   And it's interesting because in that same visit, the

25   9/17/13 follow-up visit that you just read he said

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 138

1    in fact her CBC is normal.  I don't think she has

2    any significant G6PD deficiency.  And in his labs he

3    never even tested her for MCV.  Yet in every MCV

4    test or every RBC test she has a reduced red blood

5    cell count and increased mean corpuscular volume.

6    So I mean when you don't do the test, sure, you

7    don't think there's any association.  He has no

8    basis.  And by the way, the next day she had the

9    highest MCV recorded in her ten-year history.

10        **Q.   I just counted over, and you can verify if**

11   **you want, over 40 entries for 2013 alone?**

12        A.   Oh, I -- I have no reason to disbelieve

13   that.  I think that's probably accurate.

14        **Q.   Are you suggesting that every time a**

15   **doctor states that Miss Williams' G6PD deficiency is**

16   **mild, that they are wrong?**

17        A.   No.  I'm suggesting two things.  Number

18   one, in that same time period every time she had a

19   clinical laboratory test, she did have the symptoms

20   of a hemolytic anemic event.  And they're getting

21   worse over time, steadily over ten years.  Second of

22   all --

23        **Q.   Can you show me where they're getting**

24   **worse?**

25        A.   Yeah, if you start -- I have them all

Page 139

1    underlined for you.  They start at, I think -- yeah,

2    98.6 and they end at 108 over that ten-year period.

3    And it's almost an exact linear correlation.  And

4    again, I've marked them all for you.

5        **Q.   Let's go back to Exhibit 2.**

6        A.   2?

7        **Q.   Um-hmm.**

8             MR. WALKER:  What's the number,

9        please?

10            MR. TORRES:  It is the -- Dr. Mink's

11       expert report.

12            MR. WALKER:  All right.  Thank you.

13            MR. TORRES:  You're welcome.

14            MS. HOGAN:  It's Mink 909 for the

15       Bates range.

16   BY MR. TORRES:

17       **Q.   But now we're going to look at page two of**

18   **your report.**

19       A.   Two?

20       **Q.   Um-hmm.  Where in your report, Dr. Mink,**

21   **do you apply the Bradford Hill causation criteria?**

22       A.   I'm sorry, I don't know if I gave that

23   back to you, but we did general and specific

24   causation with two different colored markers on my

25   report.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 140

1        Q.    Yes.

2        A.    That is -- you must have it.  I don't know

3    which one that is.

4        Q.    I don't have it.  Is that it there?

5        A.    Hold on.  Let me see.

6               MR. TORRES:  No.  What's that there?

7               MS. HOGAN:  No, that's my copy.

8               THE WITNESS:  Is it that one?

9               MS. HOGAN:  This one?

10              THE WITNESS:  No, it's got a -- it's

11         got a key on it, a key.

12              MR. TORRES:  All right.  Let's go off

13         the record for a moment.  It's got to be

14         somewhere.

15              VIDEOGRAPHER:  We're off the record.

16              (Off the record.)

17              VIDEOGRAPHER:  We're on the record.

18              MR. TORRES:  Thank you.

19              THE WITNESS:  Do you want me to

20         respond to that question?

21              MR. TORRES:  Yes.  Read the last

22         question back, please.

23              (Thereupon, the record was read back

24    by the court reporter.)

25              THE WITNESS:  Because I was asked

Page 141

1              earlier in the deposition in my report

2              dated June 25th, 2015, Exhibit Mink 2,

3              Bates number 000909, pages six through 16

4              in green highlights I carefully highlighted

5              specific causation and in orange

6              highlighted at your request general

7              causation were highlighted.

8    BY MR. TORRES:

9        **Q.   Okay.  So all -- any of the Bradford Hill**

10   **causation criteria that you applied would be within**

11   **those highlighted sections, correct?**

12       A.   Correct, consistency, coherence,

13   experimental evidence coherent between animal and

14   human data, plausibility of biological theory, all

15   the nine criteria.

16       **Q.   Looking at your first general opinion or**

17   **summary opinion, however you want to refer to it,**

18   **number one.**

19       A.   Yes.

20       **Q.   You write Rhonda Williams has been exposed**

21   **to significant quantities of regulated pollutants**

22   **and hazardous materials.  Do you see that?**

23       A.   Yes.

24       **Q.   And is it correct that you assert that**

25   **Miss Williams has been exposed through inhalation?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                              Page 142

     1        A.    Yes.

     2        Q.    And how about ingestion?

     3        A.    To some extent.

     4        Q.    And has she been exposed by dermal

     5   exposure?

     6        A.    To some extent, caveated by those are both

     7   far less significant than inhalation.

     8        Q.    You don't know what degree she's been

     9   exposed by dermal exposure, correct?

    10        A.    I didn't look at that, no.

    11        Q.    And you don't know what degree she's been

    12   exposed by ingestion, correct?

    13        A.    No, I didn't look at that or the

    14   references associated with that.

    15        Q.    And you don't know what degree she has

    16   been exposed to by inhalation, correct?

    17        A.    No, I do know that.

    18        Q.    What is that?

    19        A.    Excuse me, what is what?  The degree?

    20        Q.    Yes.

    21        A.    It's significant or elevated quantities.

    22   Significant meaning there's an adverse health

    23   effect.  EPA's definition is a cancer risk of more

    24   than one in a million or a hazard quotient of more

    25   than one.  Elevated means it's elevated above

Page 143

1    background.  And she has been exposed to both

2    elevated and significant quantities of regulated

3    pollutants and hazardous materials as I state in

4    both direct and fugitive sources.

5        **Q.   And what are the quantities -- the**

6    **significant quantities that she was exposed to?**

7        A.   She again lives in a non-attainment area

8    for sulfur dioxide and sulfur oxides, so she's been

9    exposed to levels we know factually are adverse to

10   human health of the normal general population and

11   certainly more so to her.  She's been exposed to

12   elevated levels of heavy metals and ionizing

13   radiation through looking at the attic and soil

14   samples that Ungers & Associates did, and 133 total

15   hazardous air pollutants that Dr. Li looked at and

16   quantitated based on reasonable and dependable

17   methodology.

18       **Q.   What was the measured quantity of SO2 she**

19   **was exposed to?**

20             MS. HOGAN:  Objection, asked and

21          answered.

22   BY MR. TORRES:

23       **Q.   You can answer.**

24       A.   Over 75 parts per billion.

25       **Q.   Over what period of time?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

                                                              Page 144

1          A.    Her lifetime -- excuse me, let me amend

2     that.  As far as I know she's been exposed to that

3     for at least 20 years.  And I would -- I would have

4     to be careful because you get into speculation

5     because the data are -- there's a dearth of data and

6     older data, but for a very long period of time, at

7     least 20 years.

8          Q.    And -- but you have not actually

9     quantified the amount of SO2 she was specifically

10    exposed to, correct?

11         A.    No, that's correct.

12         Q.    Okay.

13         A.    I relied on the data in the references.

14         Q.    Okay.  Did you quantify the specific

15    quantity of carbon monoxide she was exposed to?

16         A.    I think I answered these before, but no.

17         Q.    Okay.  Did you quantify the quantity of

18    ammonia she was exposed to?

19         A.    No, I did not.

20         Q.    Did you quantify the quantity of arsenic

21    she was exposed to?

22         A.    No, I relied on others.

23         Q.    Did you quantify the amount of cadmium she

24    was exposed to?

25         A.    Again, relied on others, no.

Page 145

1      Q.   Did you quantify the amount of chromium

2   she was exposed to?

3      A.   Relied on references, no.

4      Q.   Did you quantify the amount of lead she

5   was exposed to?

6      A.   Same answer.

7      Q.   Did you quantify the amount of manganese

8   she was exposed to?

9      A.   Same answer.

10      Q.   Did you quantify the amount of nickel she

11   was exposed to?

12      A.   Same answer.

13           MR. WALKER:  Can I object to this

14       line of questioning?  Why don't you ask him

15       the metals you want to ask him about and

16       ask him all at one time and he'll give you

17       the same answer?  This is ludicrous.  I

18       don't know whether it's proper or not, but

19       I said what I wanted to say.  Thank you.

20           MR. TORRES:  Thank you.

21   BY MR. TORRES:

22      Q.   Did you quantify the amount of aluminum

23   she was exposed to?

24      A.   Same answer.

25      Q.   Meaning no, right?

Page 146

1      A.    No, I did through reference, but not

2   independently.

3      Q.    Okay.  So you made no independent -- you

4   made no quantifications specific to Miss Williams

5   for any of these constituents, correct?

6              MS. HOGAN:  For the third time, yep.

7              THE WITNESS:  Asked and answered.

8   BY MR. TORRES:

9      Q.    You can answer the question.

10     A.    Again, by reference, but no, not

11  independently.

12     Q.    Okay.

13     A.    Intentionally and thoughtfully.

14     Q.    Okay.  The same answer is true for

15  exposure to phosphorus, right?

16     A.    Correct.

17     Q.    And the same answer is true for exposure

18  to zinc, correct?

19     A.    Correct.

20     Q.    And the same answer is true for exposure

21  to any radionuclide, correct?

22     A.    That's correct.

23     Q.    When you made your assumptions regarding

24  exposure, how did you account for Mosaic's

25  contribution to any exposure values?

Williams, Rhonda v. Mosaic Fertilizer, LLC                Frankiin L. Mink, Ph.D.

Page 147

1      A.   Relied on a couple of things.  Number one,

2   I relied on Dr. Li and his data on the actual plant

3   emissions and the calculated risk and

4   quantification.  I relied on the Ungers report from

5   the attic and soil samples.  And I relied on US

6   EPA's Exposure Factors Handbook and their standards

7   and health-based criteria, of which they had already

8   done.

9      **Q.   Okay.  Earlier you testified, however,**

10  **that you didn't rely on Ungers for any**

11  **quantification of exposure, correct?**

12     A.   Quantification, that's true, other than

13  the comparison between the soils and the attic.

14     **Q.   Are there any other potential sources for**

15  **exposure to the constituents you assert**

16  **Miss Williams was exposed to outside of Mosaic?**

17     A.   I would have to answer that in all my

18  years of experience, I've never seen an instance

19  where there was only one source.

20     **Q.   How did you account for any alternative**

21  **sources for these constituents?**

22     A.   Well, there's some interesting, although

23  maybe a little biased data in Li, but he has a very

24  specific hypothesis.  There's really solid data over

25  the last ten years from Chakraborty.  He's really

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 148

1    done a really good job.  The US EPA has a pretty

2    good inventory of -- of sulfur oxides over time.

3    And the air monitoring data from the county and the

4    ambient air quality monitoring, hazardous air

5    pollution monitoring over the last -- over a decade

6    have been sources of quantitation.

7        Q.    So how did you distinguish between the --

8    all the potential sources for exposure to these

9    constituents?

10       A.    That's a good question.  That's why Mr.

11   Ungers did his report because the thing you have to

12   establish is -- we know the disease -- the diseases

13   that Miss Williams have are caused by the

14   constituents that are emitted out of Mosaic's

15   fertilizer plant, but did they come to some extent

16   from there, you would have to have a fingerprint.

17   If you look at the soils and you look at the attic

18   and you look at the constituents of phosphogypsum

19   production and their quantitative values relative to

20   one another, and the correlation that Mr. Ungers

21   spoke about between the two, you clearly fingerprint

22   that those constituents have been literally at her

23   residence as well as in her neighborhood.

24            And then you take air monitoring data from

25   the SO2 that shows she's in a non-attainment area in

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Frankiin L. Mink, Ph.D.

Page 149

1    her neighborhood and where she lives -- and these

2    pollutants all flow together.  They may deposit at

3    different states, but they all come from -- if they

4    come from the same origin, they will be at certain

5    relative contributions to each other.  It literally

6    is a fingerprint.  And it's fairly -- well, there's

7    a very high correlation, a less than one in 10,000

8    chance that randomly they could have come from it.

9            Now, how much -- the fingerprint is there.

10   We know it's there.  How much came from other

11   sources, well, that's why the ratios aren't exactly

12   the same, but if you look at those ratios and the

13   correlations, and you look at the air monitoring

14   data, and you look at the published literature, and

15   you take all those things together as Bradford Hill

16   asks you to do, the strength of association, the

17   repeatability, the experimental evidence tells you

18   that altogether, and EPA agrees, and the press

19   publicly, the State of Florida agrees, the majority

20   of air pollution in that area is from Mosaic's

21   Riverview plant.  So it's greater than 50 percent.

22   How much greater than 50 percent, I have absolutely

23   no idea.

24           Now, I will caveat that in that it's

25   greater than 50 percent from nonmobile sources.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                        Page 150

1    Mobile sources are removed from that because those

2    are voluntary risks, not involuntary risks.  And

3    we're interested in voluntary risks in -- or

4    involuntary risks/excess risks in risk assessment.

5        **Q.   So you didn't make any effort to quantify**

6    **Mosaic's contribution to any of the constituents you**

7    **described on page seven of your report, correct?**

8              MS. HOGAN:  Objection,

9              mischaracterizes his prior testimony.

10             THE WITNESS:  I think -- I literally

11             think I just answered that.  I would give

12             the exact same answer.  If you want to read

13             it back.

14   BY MR. TORRES:

15       **Q.   There's no quantification in your report,**

16   **correct, to any of these constituents?**

17       A.   Listed, no.

18       **Q.   Okay.  And you said that Li was biased,**

19   **how was he biased?**

20             MS. HOGAN:  Objection,

21             mischaracterizes what he said.

22             MR. TORRES:  That's his testimony.

23             We can go back and read it.

24             MS. HOGAN:  Yes, go back and read

25             what he said, please.

Page 151

1          (Thereupon, the record was read back

2     by the court reporter.)

3     BY MR. TORRES:

4          **Q.    How is Li's data biased?**

5               MS. HOGAN:  Objection, that isn't

6          what he said.  Go ahead.

7               THE WITNESS:  If you're referring to

8          my comment that was just read on the

9          record, I said that he's biased by his

10          hypothesis.  And all scientific research is

11          biased to some extent.  We spend a lot of

12          time trying to reduce our bias.  He had a

13          hypothesis, which I stated before, and that

14          obviously creates a bias he has to work

15          against.  I think he did a great job.

16     BY MR. TORRES:

17          **Q.    You opine that Miss Williams was exposed**

18     **to constituents from direct and fugitive sources; is**

19     **that right?**

20          A.    Correct.

21          **Q.    Okay.  What were the fugitive sources?**

22          A.    Well, I believe I state on page two that

23     they were a result of Mosaic's operations, including

24     mining -- phosphogypsum mining, processing, storage,

25     transportation and waste handling.  So the -- the

Page 152

1    part that's emitted out of the stack is what happens

2    in the factory.  Everything outside of the factory

3    is fugitive.

4        **Q.   Do you know if Mosaic performs any mining**

5    **in the Riverview area?**

6        A.   I believe -- I'm sorry.

7            MS. HOGAN:  Objection as to form and

8        vague.

9    BY MR. TORRES:

10       **Q.   You can answer.  Do you know if they mine**

11   **in the Riverview area?**

12       A.   I believe the vast majority of their rock

13   comes -- is transported into their facility.

14       **Q.   My question is you say including**

15   **phosphogypsum mining, are you suggesting that they**

16   **actually mine?**

17       A.   No, I'm suggesting that they have

18   transportation of rock, which is associated with

19   mining.  You have to get the rock out of the ground

20   somewhere.

21       **Q.   Outside of relying on for qualitative**

22   **purposes on Mr. Ungers' work, did you perform any**

23   **fate and transport analysis for any of the**

24   **constituents listed on page seven of your report?**

25           MS. HOGAN:  Objection, asked and

Page 153

1           answered.

2                   THE WITNESS:  I think I went through

3           that many times, but again, outside of what

4           was in the published literature, no.

5    BY MR. TORRES:

6        **Q.   On the bottom of page two, you assert that**

7    **Miss Williams was exposed primarily through**

8    **inhalation and dermal exposures.  You said it was**

9    **mostly inhalation, correct?**

10       A.    Correct.

11       **Q.    Okay.  So you're not opining that there**

12   **was no exposure from ingestion; is that right?**

13   **You're saying just saying she was primarily exposed**

14   **through inhalation and dermal exposure, correct?**

15       A.    That's correct.

16       **Q.    And how did you make the determination**

17   **that she was exposed primarily through inhalation**

18   **and dermal exposure?**

19       A.    Because we're looking at air emissions and

20   fugitive dust.  Those are inhaled.  Now, do they

21   deposit on skin, yes.  And do they deposit on

22   surfaces and you lick your fingers or you touch

23   things, yes, but those are very minor compared to

24   the inhalation -- the direct inhalation.  That's

25   considered the exposure pathway of relevance.

Page 154

1      **Q.    Is -- there are different size of**
2  **particulate matter, correct?**
3      A.    Yes.
4      **Q.    Is all particulate matter inhaled?**
5      A.    Is all particulate matter?
6      **Q.    Yes, or does it depend on the size of the**
7  **particulate matter?**
8      A.    If you use the broad nonenvironmental
9  definition of particulates, you do not inhale a
10  baseball, but you do inhale fine dust.  And the
11  standard definition is between 2.5 and ten -- or
12  below 2.5 and 2.5 to ten microns, that's how they
13  normally look at respirable particulates.  Those
14  particulates you do inhale.
15      **Q.    On page three of your report in your**
16  **second opinion, you state Miss Williams has**
17  **developed significant adverse health effects as a**
18  **result of these hazardous exposures.  What -- do you**
19  **list all of the health effects that you're opining**
20  **to in the report?**
21      A.    I believe I do.
22      **Q.    Okay.  And can you tell me where?**
23      A.    The broadest general terms are page eight.
24  If you go down the middle of the page, as a result
25  of, do you see that?  Bates number 000916, page

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 155

1    eight, as a result of Mrs. Williams' increased

2    genetic susceptibility, do you see that

3    susceptibility?

4        **Q.    Yes, I do.**

5        A.    Due to the lack of blood forming G6P

6    enzyme, her respiratory and organ systems symptoms

7    are significantly exacerbated by her long-term

8    repeated exposure to the hazardous materials

9    primarily from the Mosaic Fertilizer operation,

10   which related -- which is located in close proximity

11   to the community where she resides.

12           And then I say on page three there,

13   include G6PD associated pulmonary hypertension,

14   obstructive pulmonary lung disease, diminished

15   quality of life and potentially reduced life span.

16   And I go to lengths to show on page ten that the

17   type of hemolytic anemia that she's subjected to

18   leads to paleness, yellowing of the skin, whites of

19   the eyes or jaundice, darkening of urine, fatigue,

20   shortness of breath, enlarging the spleen and a

21   rapid heart rate.

22           And then I spend a fair amount of time

23   going over exactly how you have damage to the red

24   blood cells based on insults.  And that these small

25   capillaries, on page 11, they particularly affect

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 156

1    when you have reactive oxygen species accumulate and

2    damage red blood cells particularly in the small

3    capillaries first, such as in lung, kidney,

4    urogenital tract and nervous system.  So they're

5    more susceptible to certain cancer types, cardiac

6    arrests, chronic diseases of the liver, lung and

7    blood and kidneys -- and blood, such as diabetes.

8    And I go on to talk about her obstructive lung

9    disease, her allergy asthma and respiratory problems

10   and airway remodeling.  I think that's it.

11        **Q.   Okay.  Which of the listed constituents on**

12   **page seven are you asserting caused Miss Williams'**

13   **pulmonary hypertension?**

14        A.   Well, again, it's cumulative risk, so it's

15   all those together that are listed in IRIS or

16   health-based criteria that have effects on the lung

17   or the circulatory system that affects hypertension

18   in the lung.  And those are contained in my

19   references and repeatedly referred to in this

20   deposition.

21        **Q.   So you're not tying a specific constituent**

22   **on page seven to a specific condition, correct?**

23        A.   Correct.  There are those that are

24   obviously more toxic to an organ system and those

25   that are less, but it's a cumulative effect.

1      Q.   And --

2      A.   Dose and duration.

3      Q.   -- are you making any assertions regarding

4   how this combination of constituents might cause

5   pulmonary hypertension?

6      A.   The best I can tell you is that is

7   certainly beyond my ability and I have not found

8   anyone in the literature that looks at that

9   complexity of interaction.  The risk assessment of

10   complex chemical mixtures is truly on the forefront

11   of risk assessment science.  We know it occurs, but

12   to quantitate it is extremely difficult.

13      Q.   Would that answer be the same for this

14   combination of constituents and all of the injuries

15   you're alleging Miss Williams suffered as a result

16   of exposure to them?

17            MS. HOGAN:  Objection as to form.

18            THE WITNESS:  I think -- I think it

19            would be scientifically incorrect to say

20            that all those that have an inherent

21            ability to attack tissues of the lung, the

22            airway or the associated blood systems and

23            the small capillaries of the lung would

24            have some role to play in that disease

25            process, I think you would have to say that

Page 158

1          that's true.

2              Obviously if you look at obstructive

3          pulmonary disease, the vast majority of

4          effect is caused by sulfur oxides, but

5          particulates, the heavy metals, certain

6          ones definitely enhance or increase that

7          ability and accumulative effect.

8    BY MR. TORRES:

9        **Q.   So let's take, for example, arsenic for a**

10   **moment, you're not saying that arsenic caused**

11   **condition X --**

12       A.   Correct.

13       **Q.   -- correct?**

14       A.   Correct.

15       **Q.   You don't do that for any of the**

16   **constituents, correct?**

17       A.   That's correct.

18       **Q.   Okay.  Dr. Mink, what is the prevalence of**

19   **G6PD in the US population?**

20       A.   It's extremely low.  It's -- across all

21   population in the US, I think it's less than --

22   well, I know it's less than three percent.  That's

23   my recollection.

24       **Q.   Do you know what the contribution of G6PD**

25   **is to pulmonary hypertension?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 159

1        A.    You mean statistically?

2        Q.    Yes.

3        A.    It's a common disease process from G6PD,

4    but how prevalent with G6PD hasn't been studied,

5    just not funded.

6        Q.    And I know I asked this about some of the

7    illnesses, but I don't think I asked it for

8    pulmonary hypertension.  What are the potential

9    causes for pulmonary hypertension?

10       A.    You mean all the causes?

11       Q.    Um-hmm.

12       A.    The easiest way to summarize is anything

13   that increases the blood pressure in the small

14   capillaries of the lung cause pulmonary

15   hypertension.

16       Q.    What is the prevalence of pulmonary

17   hypertension in the population, the general

18   population?

19       A.    I don't recall.  It's not large.

20       Q.    What is the prevalence of obstructive

21   pulmonary disease in the population?

22       A.    I don't recall specifically, but it's

23   significant.

24       Q.    How do you separate the causes, at least

25   in Miss Williams' case, of obstructive pulmonary

Page 160

1    disease, did you do that?  I'm sorry.  Let me ask

2    the question again.  It was a bad question.

3            Did you consider an array of causes for

4    Miss Williams' obstructive pulmonary disease?

5        A.    Yes.

6        Q.    Okay.  And what was that array of causes?

7        A.    Smoking, which she does not.

8        Q.    Okay.

9        A.    Illicit drug use, which as far as we know

10   she does not or does not have a history of.

11       Q.    Um-hmm.

12       A.    Family history, which of the records I

13   reviewed there is no evidence of.

14       Q.    What else?

15       A.    And employment or hobbies in an industry

16   or field which exposed her to the same type of heavy

17   metals, radioactivity or sulfur oxides.

18       Q.    Anything else?

19       A.    That's what I recall right now.

20       Q.    And for Miss Williams' asthma, what array

21   of causes did you consider for Miss Williams'

22   asthma?

23       A.    Pretty much the same with the addition of

24   the -- the allergy index in her -- I think in the

25   Tampa Bay Metro statistical area.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 161

1      Q.    Anything else?

2      A.    That's what I recall at this time.

3  Certainly the major ones.

4      Q.    You say that -- in your second opinion

5  that exposure -- that the significant adverse health

6  effects resulting from exposure result in a

7  diminished quality of life.  Do you see that?

8      A.    Yes.

9      Q.    And diminished in what way?

10     A.    When you read Mrs. Williams' medical --

11  extensive medical records over the last 20 years,

12  and you speak to her for any length of time at all,

13  a large portion of her life has been spent in

14  inactivity because of asthma attacks, lung issues,

15  illnesses, and an inordinate amount of time has been

16  spent in hospitals and doctors' offices, having

17  tests, very invasive tests, very uncomfortable

18  tests.  And having a mother that passed away

19  recently, I can tell you that when you spend an

20  inordinate amount of time in doctors' offices, it's

21  just a tough quality of life for most people.  I

22  haven't met a person that thinks that's a great way

23  to live.

24     Q.    Well, you said here resulting in a

25  diminished quality of life, is that all you meant,

Page 162

1    **what you just explained?**

2         A.   Well, the constant pain and illness,

3    certainly, but yes, her general quality of life,

4    that's what I meant.  She really can't do a lot of

5    things that you and I can do.

6         Q.   **I'm going to hand you Exhibit 13.**

7              MR. TORRES:  And for the people on

8         the phone, that is Mink_000724 through 728.

9    BY MR. TORRES:

10        Q.   **Dr. Mink, have you seen Exhibit 13 before?**

11        A.   I have seen -- I don't recall seeing this

12   three-page document.  I recall seeing -- seeing this

13   hearing and the results of this hearing, but to the

14   best -- it's been a while, but to the best of my

15   recollection I -- I don't recall seeing all three of

16   these pages -- or, I guess, this is six pages, five

17   pages.

18        Q.   **Can you look at the page that is Bates**

19   **labeled Mink_000725?**

20        A.   Yes.

21        Q.   **And do you see that second paragraph under**

22   **rationale?**

23        A.   Yes.

24        Q.   **Can you -- can you read that paragraph**

25   **into the record, please?**

Page 163

 1      A.    The first one?

 2      **Q.    The second one, sir.**

 3      A.    Oh, the second, the evidence of record?

 4      **Q.    Yes.**

 5      A.    The evidence of record shows that

 6   status-post motor vehicle accident in April 1992,

 7   claimant had complaints of residual pain in her

 8   neck, back, right arm, right hand, right foot,

 9   facial pain, headaches and trouble sleeping.  The

10   evidence indicates that she was treated

11   unsuccessfully with medication, physical therapy and

12   considered totally disabled by her treating board

13   certified orthopedic surgeon, Dr. Michael A. Waslik

14   on December 29th, 1992 and on March 8th, 1993,

15   parens Exhibit 16.  Claimant underwent epidural

16   nerve blocks which provided only temporary relief

17   and developed a loss of memory function.  The

18   medical evidence shows that the claimant suffered

19   from bilateral temporomandibular joint syndrome with

20   manifestations of headaches and facial pain,

21   endometriosis, irritable bowel syndrome and

22   increased SED rate.  On January 25th, 1995,

23   claimant's treating sources indicated in a

24   treating/examining source statement of physical

25   capability that the claimant was unable to perform

Page 164

1    sedentary exertion due to myofascial pain syndrome

2    and an abnormal SED rate, parens Exhibit 28.

3         **Q.    Thank you.  Do you think any of these**

4    **conditions could similarly result in a diminished**

5    **quality of life?**

6         A.    Oh, I certainly think they could

7    temporarily or permanently depending on the damage.

8         **Q.    Okay.  Turn to the next page of**

9    Mink_000726.

10        A.    Yes.

11        **Q.    And if you could just read the first**

12   **paragraph on that page.**

13        A.    The medical evidence?

14        **Q.    Yes.**

15        A.    The medical evidence shows that the

16   claimant also suffers from major depression for

17   which she undergoes biweekly individual

18   psychotherapy sessions for manifestations of

19   irritability, social withdrawal and a lack of self

20   confidence, significant preoccupation with physical

21   integrity and feelings of being misunderstood and

22   mistreated.  Continue?

23        **Q.    Yes.**

24        A.    In a mental residual functional capacity

25   assessment dated January 27, 1995, claimant's

Page 165

1    treating psychologist indicates that she had -- had

2    moderate degree of limitations in her activities of

3    daily living and maintaining social function.  The

4    psychologist also opined that the claimant often had

5    deficiencies of concentration, persistence or pace

6    resulting in failure to complete tasks in a timely

7    manner, and that she has had one or two episodes of

8    deterioration or decompensation in work or work-like

9    settings, which have caused her to withdraw from

10   that situation or to experience exacerbation of

11   signs and symptoms.  The psychologist indicated that

12   the claimant was unable to deal with stress or work

13   in large groups due to panic attacks and increased

14   anxiety, parens Exhibit 31.

15        **Q.    Dr. Mink, do you know if Miss Williams**

16   **still suffers from any of the conditions in the two**

17   **paragraphs you just read?**

18        A.    The mental or physical?

19        **Q.    Um-hmm.**

20        A.    In the medical records I've reviewed, I

21   don't recall any of the myofascial pain.  I don't

22   recall any of the physical trauma.  I think she's

23   had a history of anxiety-related issues from the

24   review of the medical records.

25        **Q.    And you are not asserting, are you, that**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 166

1   **any of the conditions mentioned in the two**

2   **paragraphs you just read were caused by Mosaic,**

3   **correct?**

4       A.    That's correct.

5       **Q.    Okay.**

6               MS. HOGAN:  It's a little after four,

7          break time?

8               MR. TORRES:  That's fine.

9               VIDEOGRAPHER:  We're off the record.

10              (Off the record.)

11              VIDEOGRAPHER:  We're on the record.

12              MR. TORRES:  Thank you.

13              MS. HOGAN:  Could I have the last

14         question and answer read back, please.

15              (Thereupon, the record was read back

16   by the court reporter.)

17              (Thereupon, Mink Exhibit No. 14,

18   Notice of Reconsideration from the Social Security

19   Administration, was marked for purposes of

20   identification.)

21   BY MR. TORRES:

22      **Q.    Dr. Mink, I'm going to hand you Exhibit**

23   **14, which is a document Bates labeled Mink_000712**

24   **through 723.  Can you tell me whether you've seen**

25   **this record before?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

                                                        Page 167

 1       A.   I do not recall seeing this.  I may have,

 2  but I certainly don't recall it.

 3       Q.   I'm just going to read from Exhibit 6

 4  Mink_000913, which is item 12 that you relied on,

 5  SSI disability findings from 1995 and 2005

 6  concerning Rhonda Williams.  This is a document you

 7  relied on, correct?

 8       A.   That's correct.

 9       Q.   Okay.  And --

10       A.   That's not this document.  It may be a

11  summary of this document, but I haven't seen this

12  one, two, three, four, five, six, seven, eight,

13  nine, ten, 11, 12-page document before to my

14  recollection.

15       Q.   Okay.  Even though it has a Mink Bates

16  label on it, correct?

17       A.   That's correct.  Again, I may have seen

18  portions of this or a summary.  And I may have seen

19  it, but I don't recall it.

20       Q.   All right.  That's fine.  What I would

21  like you to do is to turn to Bates label page 715,

22  and if you can read that -- that one paragraph on

23  page 715?

24       A.   Following is a summary of the claimant's

25  testimony?

Page 168

1       Q.    Yes.

2       A.    Claimant testified that she still has

3    myofascial pain syndrome and the pain is worse since

4    the CPD, parens, comparison point decision, end

5    parens.  She still has TMJ all of the time.  She has

6    aches and pains all over her body all of the time

7    and they are very severe.  She gets severe headaches

8    two to three times a week.  She still has

9    endometriosis and facial pain.  She has about four

10   good days a month.  She has irritable bowel syndrome

11   and constantly has diarrhea or constipation and it

12   has not been possible for the doctors to stabilize

13   this condition.  She stays inside all the time

14   because she is allergic to a number of substances

15   outside that cause asthma flare-ups.  Her

16   hypertension has been high.  She still has GERD and

17   her white blood count is low.  She has been told to

18   stay away from people because since her white blood

19   count is low she has a poor immune system and can

20   get sick very easily.  She lives alone, but a friend

21   comes over to do all the housework chores for her

22   because she is not able to do any of them.  Half of

23   the time she sleeps if she is able to, but it is

24   hard to sleep with her pains.  It's hard for her to

25   focus, to read or to watch TV -- I think it's and,

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

1    it looks like sand, but it's and doesn't really do

2    much of these activities.  She stays home all the

3    time and can't sit at church very long and doesn't

4    always go to church.  She rarely drives, perhaps

5    four times a month, usually gets someone to drive

6    her if she has to go someplace.  She's able to walk

7    slowly and walks for only a short distance.  She's

8    able to stand for only a few minutes and she has to

9    shift when she sits.  And it's hard for her to lift

10   even a gallon of juice.  It is hard for her to reach

11   with her right arm.  Her grip is not real good in

12   her hand and her hands ache.  In general she has

13   trouble with all types of physical activity due to

14   her pains.  Regarding mental limitations, she has

15   trouble with concentration due to her pain.  She is

16   depressed because of her physical pains.  She is

17   able to get along with others okay.  She started

18   working as a computer engineer in 1990, but was able

19   to do this for only six months before she got sick.

20   She is on several medications for all her

21   impairments and takes Vicodin twice a day for pain.

22   She would not be able to work with all of her pains

23   and Vicodin would severely affect her mental

24   alertness.  She went through vocational

25   rehabilitation about a year ago, but they said they

Page 170

1    weren't able to help her.

2        Q.   Dr. Mink, are any of the conditions the

3    claimant testified to, at least in this document,

4    are you asserting that any of them are caused by

5    Mosaic?

6                MS. HOGAN:  Objection, lack of

7            foundation.

8    BY MR. TORRES:

9        Q.   You can answer.

10       A.   I'm sorry, can you repeat the question?

11       Q.   Are you asserting that any of the

12   conditions listed in the paragraph you just read,

13   are you saying any of them are caused by Mosaic?

14       A.   Well, to me -- I mean, there's -- I mean,

15   it's a claimant's testimony, so it's secondhand

16   account of a long-term medical history, I guess.  I

17   have -- I can honestly say I couldn't tell you.  It

18   doesn't surprise me that she has pain.  The

19   description of her pain and how it's related to this

20   or that, I couldn't tell you much about this.

21       Q.   Thank you, sir.  In your second opinion,

22   you say that these -- her conditions result in a

23   potentially reduced life span.  Do you have any

24   sense of the probability of a reduced life span for

25   her that's caused by exposure to these -- to the

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 171

1    constituents?

2        A.   And that's directly related to the fact

3    that asthmatics have an increased mortality, you

4    know, from the Japanese studies I mentioned to you

5    and the follow-up.  If she is fortunate and doesn't

6    have triggers of her asthma, especially with her

7    G6PD, hopefully she can live a reasonably long life.

8    If she does have flare-ups and doesn't control her

9    asthma, it's -- it's a significant probability that

10   she could have a reduced life span.

11       Q.   **Are -- are you opining that -- or did you**

12   **opine in your report that exposure to the**

13   **constituents caused asthma or that they aggravated**

14   **asthma?**

15       A.   It's difficult to know whether they caused

16   or aggravated.  We know they aggravate asthma.  The

17   cause, because she's had it so long, it's -- it's --

18   it's hard to say.  I don't have medical records from

19   then.  I don't know.  There's not enough

20   information.

21       Q.   **So you can't opine?**

22       A.   I cannot.

23       Q.   **Okay.**

24       A.   At this time I cannot.

25       Q.   **Thank you.  Okay.  In your third opinion,**

Page 172

1    **Dr. Mink, you write -- or you wrote Rhonda Williams**

2    **has developed significant adverse health effects as**

3    **a result of secondary effects from therapeutic**

4    **agents used to treat her diseases/symptoms resulting**

5    **from these exposures.  What health effects from what**

6    **agents are you referring to?**

7         A.   If you look through Mrs. Williams' medical

8    records, and again if I can confine it to the last

9    20 years, the last count I think she's had 38 or

10   nine different therapeutic agents for a range of

11   medical symptoms.  And long-term use of something

12   like albuterol or, you know, corticosteroids for

13   control of her asthma or for uncontrolled asthma

14   symptoms, have -- have adverse health effects.  I

15   mean, they're listed on the drugs.  So the longer

16   she has to -- the more she has to try to control

17   uncontrolled asthma and these other symptoms, as any

18   person, it would be adverse to her health.

19        Q.   **Are you -- did you opine in your report**

20   **that exposure to the alleged constituents resulted**

21   **in her having to take all of these therapeutic**

22   **agents?**

23        A.   No, some of the therapeutic agents, not

24   all of the therapeutic agents.

25        Q.   **Do you know which specific therapeutic**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 173

1    **agents you would relate to Mrs. Williams' alleged**

2    **exposure to the constituents of concern listed in**

3    **your report?**

4         A.   Not at this time.  That's something I've

5    been reviewing.  It was the last thing asked to

6    review and it's very complex and I'm not at the

7    point where I can opine.

8         Q.   **How long have you been reviewing the**

9    **effect of the therapeutic agents?**

10        A.   Since what date or how much time?

11        Q.   **Since when did you start?**

12        A.   I started reviewing those probably in --

13   oh, latter part of 2014.

14        Q.   **Dr. Mink, following your opinions, you**

15   **write the basis of the above expert opinions are in**

16   **the reports and references found at the end of this**

17   **report, as well as my extensive education and**

18   **background in the field of environmental toxicology.**

19   **Do you see that?**

20        A.   Yes.

21        Q.   **I think I asked this before, but I don't**

22   **remember, are you familiar with the Reference Manual**

23   **on Scientific Evidence?**

24        A.   You asked that before, yes.

25        Q.   **Okay.  And you are familiar with the**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 174

1     specific reference guides in the reference manual?

2          A.    Yes.

3          Q.    Okay.  So you're familiar with the

4     reference guide and exposure signs, correct?

5          A.    Yes.

6          Q.    And the reference guide and epidemiology,

7     correct?

8          A.    Yes.

9          Q.    And the reference guide on toxicology,

10    correct?

11         A.    Yes.

12         Q.    You also testified earlier that you're

13    familiar with the EPA Exposure Factors Handbook,

14    correct?

15         A.    Correct.

16         Q.    And are you familiar with the chapter on

17    variability and uncertainty?

18         A.    Yes, I am.

19         Q.    Okay.  And the chapter on soil and dust

20    ingestion, correct?

21         A.    Yes.  Again, I helped to write the early

22    documents.

23         Q.    And the chapter on inhalation rates,

24    correct?

25         A.    Correct.

Page 175

1      Q.    And the chapter on dermal exposure

2  factors, correct?

3      A.    Yes.

4      Q.    On the top of page five of your report,

5  you cite as among your references -- or documents

6  you relied on rather, medical records for Rhonda

7  Williams going from 2004 to 2015, correct?

8      A.    Correct.

9      Q.    Earlier you referred to a medical history

10 going back to 1995.  How did you -- if you reviewed

11 records -- medical records going back to 2004, how

12 do you draw conclusions going back to 1995?

13     A.    I had a, what I believe is, a fairly

14 complete set of records from 2004 to 2015 and a

15 summary from -- that you -- we've discussed from, I

16 think, 2004 to 2013.

17     Q.    Okay.

18     A.    I have a smattering of records from

19 approximately 1994 or '95 and I listed them this way

20 because they can't be complete.

21     Q.    Okay.

22     A.    They don't appear complete.

23     Q.    Okay.  Which records don't appear

24 complete?

25     A.    The '94 or '5 to 2004.

Page 176

1      Q.    Okay.  And you have nothing between 1995

2   and 2004, correct, that you're aware of?

3      A.    Those were scattered between 1994 or '5

4   and 2005.  As I recall, there's like a '94, '96,

5   '98, something like that, but very few.

6      Q.    Thank you.  And it is your contention that

7   the medical records -- these medical records for

8   Miss Williams from 2004 to 2015 support your

9   assertion that Miss Williams' illnesses were caused

10  by exposure to chemicals being emitted by Mosaic; is

11  that right?

12     A.    Correct.  I'm not saying every illness

13  that she has necessarily.

14     Q.    I understand.  I understand.  Conversely,

15  is it fair to say that those medical records may not

16  support your assertion that Miss Williams' illnesses

17  were caused by exposure to chemicals being emitted

18  by Mosaic?

19               MS. HOGAN:  Wait, let's hear the

20          question again, please.

21               THE WITNESS:  Yes, can I hear that

22          again?  I'm sorry.

23               (Thereupon, the record was read back

24  by the court reporter.)

25               THE WITNESS:  Well, I think the

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 177

1           medical records that I reviewed and have

2           listed support my opinions.

3    BY MR. TORRES:

4        Q.    **You believe they support your opinions?**

5        A.    Yes.

6        Q.    **Okay.**

7        A.    In toto they support my opinions.

8        Q.    **Okay.  It's -- would it be -- are you**

9    **asserting that it would be unreasonable for another**

10   **expert to opine that they do not, these medical**

11   **records do not support your opinions?**

12              THE WITNESS:  I'm sorry.  I got most

13          of that, but just to be sure could you read

14          it.

15              (Thereupon, the record was read back

16   by the court reporter.)

17              THE WITNESS:  I don't know about the

18          term unreasonable, I don't know that I can

19          answer, but I think it would be inaccurate.

20   BY MR. TORRES:

21       Q.    **Did you review any medical records in**

22   **which a doctor concluded that Miss Williams'**

23   **illnesses were caused by exposure to emissions from**

24   **the Mosaic facility?**

25       A.    There was a written conclusion to that

Page 178

1    effect?

2         **Q.   Yes.**

3         A.   No, I did not.

4         **Q.   Did you examine Miss Williams?**

5         A.   No, I'm not a physician.  I wouldn't

6    examine her.

7         **Q.   And I think you testified earlier you**

8    **never conferred with a doctor who examined**

9    **Miss Williams, correct?**

10        A.   You know, I don't ever remember talking --

11   I think I talked to one fellow briefly on the phone,

12   Albi or something from Florida, a pulmonologist, but

13   that's a brief -- the only brief conversation that I

14   remember.

15        **Q.   Alabi?**

16        A.   Something like that.

17        **Q.   Okay.  And you just remember having a**

18   **brief conversation, correct?**

19        A.   Just a brief conversation.

20        **Q.   Thank you.  Do you remember what you**

21   **discussed?**

22        A.   Yes.

23        **Q.   And what was that?**

24        A.   Looking at the medical records, very

25   similar to what you were saying about the mild G6PD.

Page 179

1    There's -- there's several references that are

2    repeated over and over by different doctors about

3    her having COPD when they recite her history.  And

4    if you look at the spirometry, she does not have

5    COPD.

6        Q.    **When you reviewed Miss Williams'**

7    **spirometry, did any of them say they were not**

8    **normal?**

9        A.    Yeah, they're outside of normal because

10   there's a ten percent decline.

11       Q.    **Did --**

12       A.    That's not normal.

13       Q.    **Did anyone -- do you know of any medical**

14   **records where a doctor concluded that her spirometry**

15   **results were normal?**

16       A.    Where a physician --

17       Q.    **Yes.**

18       A.    -- you're asking?

19       Q.    **Yes.**

20       A.    I don't recall.

21       Q.    **Okay.  It's something you would have**

22   **looked for --**

23       A.    Oh, yes.

24       Q.    **-- when reviewing the medical records?**

25       A.    Yes, yes.

Williams, Rhonda v. Mosaic Fertilizer, LLC                Frankiin L. Mink, Ph.D.

Page 180

1        Q.    When you reviewed Miss Williams' Social

2   Security Disability records, did you come to the

3   understanding that Miss Williams sought Social

4   Security Disability in connection with an automobile

5   accident?

6        A.    I recall that vaguely, yes.

7        Q.    Okay.

8        A.    You're talking about the original 1990 --

9   yes.

10       Q.    Exactly, yes.  Thank you.  Was there any

11   materials you reviewed that you rejected when

12   forming your opinions?

13       A.    I try to look at all the evidence.

14       Q.    Okay.  So the list of -- of materials on

15   pages four, five -- I'm sorry, four, five and six of

16   your expert report you feel is a complete list; is

17   that fair?

18       A.    You mean --

19             MS. HOGAN:  Objection, asked and

20         answered.

21             THE WITNESS:  You mean in addition to

22         my references?

23             MR. TORRES:  Yes.

24             THE WITNESS:  Yes.  To my

25         recollection, that's true.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 181

1            MR. TORRES:  Thank you.

2    BY MR. TORRES:

3       Q.    In your -- in plaintiff's background on

4    page six, second sentence, you write Miss Williams

5    was a nonsmoker.  Do you see that?

6       A.    Yes.

7       Q.    Do you know if -- one, did you make that

8    determination from Miss Williams' medical records?

9       A.    From her medical records it's stated

10   several times and she told me herself she had not

11   smoked.

12      Q.    Do you know if she was exposed to

13   secondhand smoke as a child?

14      A.    My guess is if she was a normal person 46

15   or seven years ago, she was exposed to secondhand

16   smoke to some degree.

17      Q.    Did you encounter in your review of the

18   medical records any medical records stating that?

19      A.    Not that I recall.

20      Q.    What -- what efforts, Dr. Mink, did you

21   make to eliminate any alternative causes for

22   Miss Williams' alleged injuries referenced in your

23   report?

24            MS. HOGAN:  Objection, asked and

25        answered.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 182

1              THE WITNESS:  I looked at in the

2         literature the potential causes of her

3         symptomatology and disease states, her

4         clinical chemistries in -- in medical

5         records.  I looked at the toxicity inherent

6         in the different chemicals that we looked

7         at her being exposed to and the levels in

8         the literature.  And looked at the

9         probability -- that's what risk assessment

10        is is really a probability exercise to see

11        how likely those were.  And there's always

12        confounding factors, nothing is ever always

13        or never, but we tried to look at the most

14        plausible causes.

15   BY MR. TORRES:

16        Q.   **How did you --**

17        A.   If she had been a smoker, I would have had

18   to consider that --

19        Q.   **Of course.**

20        A.   -- as extremely important.

21        Q.   **How did you treat -- how did you eliminate**

22   **confounding factors?**

23        A.   It's kind of the Bradford Hill criteria.

24   Again, the strength of association, the coherence

25   between the studies.  We looked at those that were

Page 183

1   most likely.  And then we relied on a lot of the

2   published literature to say they were more likely

3   than not or the potential they had to cause these

4   effects.

5        Q.   So what I understand you saying, and

6   correct me if I'm wrong, is that what you -- what

7   you really looked at were -- what you really tried

8   to do is make an effort to determine causation, but

9   you were unable to eliminate alternative causes; is

10  that fair?

11       A.   Oh, I think we eliminated causes based on

12  their probability.  I mean, they were so low in

13  comparison that -- that we can eliminate them.  Are

14  they totally nonexistent, absolutely not, and I

15  think I testified to that earlier.

16       Q.   All right.  Are any of the conditions that

17  you are alleging or asserting that Miss Williams

18  suffers as a result of exposure idiopathic?

19       A.   I would like to hear your definition of

20  idiopathic because sometimes it's different legally

21  than medically.

22       Q.   Well, tell me medically.

23       A.   Are they inherent in her are you asking

24  me?

25       Q.   That's not what I'm asking.

Page 184

1        A.    Okay.  What are you asking me?  If you can

2    ask it a different way.  It's the origin of.

3        **Q.    Do her -- do some of her conditions have**

4    **unknown origins?**

5        A.    She has a fair number of conditions.

6        **Q.    Um-hmm.**

7        A.    And I would say some.  And I'll give you

8    an example.  She has a very common symptom, which is

9    depression and anxiety, which affects an extreme

10   large portion of our population.  I'm sure there are

11   many factors that contribute to that that are so

12   complex that that is something I could not make a

13   determination if that was related to Mosaic or not,

14   so therefore we don't look at that in the scheme of

15   things.  Hopefully that answers your question.

16       **Q.    Did you perform or rely on any historical**

17   **air modeling to determine historical dose to**

18   **Miss Williams?**

19       A.    Outside of those that I've stated,

20   Chakraborty and Li, no.  You asked modeling,

21   correct?

22       **Q.    Yes.**

23       A.    Yes, that's my answer.

24       **Q.    Okay.  Is there a diagnostic test to**

25   **determine inhalation exposure to any of the**

Page 185

1    constituents you list in your report?

2          A.   When you say -- you mean a medical test?

3          Q.   **Um-hmm.**

4          A.   There's evidence based on what's left

5    behind, such as the elevated MCV or et cetera, but

6    as far as literally finding the substance in tissue,

7    I can't think of a noninvasive test that would be

8    used that's standardized.

9          **Q.   And there are -- and I think we talked**

10   **about this earlier.  There are factors that can**

11   **cause an -- an elevation of MCV outside of exposure**

12   **to the constituents described in your report,**

13   **correct?**

14         A.   Again, there's -- never and always are

15   rare, but yes, correct.

16         **Q.   Dr. Mink, what is the toxicological**

17   **definition of a dose?**

18         A.   A dose is the amount of intake that is

19   received within the body or at the target organ.

20         **Q.   Does that mean that there are two measures**

21   **of dose?**

22         A.   Again, you can look at it on an organism

23   level as a person or you can look at it on a

24   cellular level on a target organ.

25         **Q.   Did you look at dose on a target organ in**

Page 186

1    **any of the materials you relied on?**

2        A.    A large amount of the data that is in

3    IRIS, the Integrated Risk Information System, is

4    based on animal models and many of those are based

5    even on cellular models, so from that extent by

6    inference I did.  As far as -- again, I didn't do

7    experimentation, so no, I did not other than those.

8        **Q.    Would that be the case for constituents**

9    **that don't have an IRIS summary?**

10       A.    Yes, when they have health-based criteria,

11   yes.

12       **Q.    And are the health-based criteria for the**

13   **constituents of concern in your report listed**

14   **anywhere in your report?**

15       A.    I think they're listed in -- with the 133

16   that we looked at that were in Li, Chakraborty,

17   those by inference had -- you know, were calculated

18   based on those health-based criteria.

19       **Q.    Okay.  Were -- were those the only sources**

20   **that you relied on?**

21       A.    Outside of IRIS, yes.

22       **Q.    Yes.  And -- okay.  When you say -- let**

23   **me -- is significant quantities a dose?**

24       A.    Significant is a term of art that means

25   above a significant risk -- risk level as calculated

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 187

1    per US EPA methods.

2        **Q.   So if it's not above a significant risk**

3    **level --**

4        A.   It can be elevated, but it's not

5    significant from a health-effects perspective

6    individually.

7        **Q.   If there is exposure to a constituent**

8    **below a health-based level, can you conclude that it**

9    **caused harm?**

10       A.   Yes, if you're looking at cumulative risk.

11   Now, if you're looking at it individually by itself,

12   that's not true because risk is additive if it's the

13   same target organ effect.

14       **Q.   What is the -- what is the toxicological**

15   **definition of exposure?**

16       A.   Exposure is when there's contact with a

17   person.  In other words, if you -- you can inhale

18   it, you can ingest it, you can have it on your skin,

19   then you're exposed.

20       **Q.   Dr. Mink, do you know what radioactive**

21   **substances -- forgive me.**

22           **Was Miss Williams exposed to radioactive**

23   **substances from Mosaic?**

24       A.   I believe so.

25       **Q.   Okay.  And do you know what radioactive**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 188

1  **substances she was exposed to?**

2      A.    Those listed in my report, which are

3  common to phosphate rock and phosphogypsum

4  production.

5      **Q.    And do you know if -- do you know what the**

6  **background level is for these radioactive substances**

7  **in the Progress Village neighborhood?**

8      A.    Background in that area, it varies because

9  of the phosphate industry.  It really does.  And the

10  soils, because you have a lot of fill and dredged

11  places in the Tampa Bay, and the background levels

12  in total radioactivity are somewhere in the one to

13  two picocuries per gram.

14      **Q.    Do you know what -- do you know what they**

15  **are in Progress Village?**

16      A.    No, I don't.  I mean, we have samples that

17  tell what they were in our sampling locations, but

18  I'm not aware of any background for Progress

19  Village.

20      **Q.    Do you know what the background levels are**

21  **for any of the constituents of concern referenced in**

22  **your report in Progress Village?**

23      A.    No, I think we used Chen as a regional

24  resource through Ungers' reports, but no, not in

25  Progress Village that I'm aware of.

Page 189

1      **Q.   Did you ever review an ambient air radon**

2  **monitoring report on Mosaic Riverview phosphogypsum**

3  **stack?**

4      A.   Can you tell me the date of that?

5           (Thereupon, Mink Exhibit No. 15,

6  Ambient Air Radon Monitoring Report on Mosaic

7  Riverview Phosphogypsum Stack, was marked for

8  purposes of identification.)

9  BY MR. TORRES:

10     **Q.   I'm going to hand it to you as an exhibit.**

11 **And I don't have this -- I don't have Bates numbers**

12 **for this.  So have you ever seen Exhibit 15?**

13     A.   Did you cover the date on that or does it

14 got -- does it have a date on this?

15     **Q.   No, it doesn't have a date on the front.**

16     A.   It looks like it's 2010 data.

17     **Q.   Have you ever reviewed this document?**

18     A.   To the best of my knowledge, I have not

19 reviewed this document.  I don't recall seeing it.

20           (Thereupon, Mink Exhibit No. 16,

21 Ambient Air Radon Monitoring Report on Mosaic

22 Riverview Phosphogypsum Stack Part II, was marked

23 for purposes of identification.)

24 BY MR. TORRES:

25     **Q.   Okay.  I'm going to hand you Exhibit 16 as**

Williams, Rhonda v. Mosaic Fertilizer, LLC                      Frankiin L. Mink, Ph.D.

Page 190

1    **well, and can you let me know whether you ever**

2    **reviewed Exhibit 16?**

3             MR. WALKER:  What is Exhibit 16,

4         please?

5             MR. TORRES:  It's part two of the

6         same report, Billy.

7             MS. HOGAN:  And these are not Bates

8         stamped.

9             MR. TORRES:  No.  Just asking if Dr.

10        Mink has ever reviewed them.

11            THE WITNESS:  I don't recall ever

12        seeing these.  I've heard of their

13        existence before this case actually, but

14        I've never seen them as far as I know.

15   BY MR. TORRES:

16       **Q.   So if you heard of their existence before**

17   **this case and you were addressing radioactivity --**

18   **or exposure to radioactive materials in Progress**

19   **Village, why didn't you rely on either of these**

20   **studies?**

21       A.   Because it deals with radon.

22       **Q.   So this report would have been**

23   **uninformative to you, is that what you're saying?**

24       A.   Well, I'm sure many things would be

25   informative, but you can't look at them all and

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 191

1   radon wasn't a focus here.  Radon because of its

2   gaseous nature, its distribution, and its background

3   sources would be very, very hard to look at as a

4   causative agent even though it may be.  And to

5   attribute it to a single source would be difficult.

6   It was off-site.

7        Q.   So you are not asserting that

8   Miss Williams has ever been exposed to radon from

9   the Mosaic Riverview facility?

10              MS. HOGAN:  Let's hear that question

11         again, please.

12              (Thereupon, the record was read back

13   by the court reporter.)

14              THE WITNESS:  I don't have an opinion

15         on her exposure to radon.

16              (Thereupon, Mink Exhibit No. 17,

17   medical record from Allergy, Asthma & Immunology

18   Associates, was marked for purposes of

19   identification.)

20   BY MR. TORRES:

21        Q.   I'm going to hand you Exhibit 17, Bates

22   labeled Dr. Sandra J. Downes 00053 through 55.  Do

23   you recognize that document at all?

24        A.   I've seen this in her medical records.

25        Q.   I would like you to turn to the last page

Page 192

1    of that and I point you to the top of that page that

2    reads pulmonary function test.

3         A.    Yes.

4         Q.    Do you see that?

5         A.    Um-hmm.

6         Q.    And shows values for FVC of 90, FEV1 of

7    109 percent, and FEF of 211 percent, and on the

8    bottom it says spirometry interpretation, normal.

9    Do you disagree with Dr. Downes' interpretation?

10        A.    Again, I don't have the actual spirometry,

11   but I would have to say that she's had several

12   rounds of spirometry.  She has some confounding

13   factors because of her asthma to take an accurate

14   spirometry.  I think these -- is that what was

15   recorded, it may have been.  Obviously something

16   interesting, I mean therapy they say counseling on

17   cessation of tobacco use, and again she didn't use

18   tobacco, but I -- I don't have any basis to agree or

19   disagree on it.

20        Q.    So how did you come to a determination

21   when there are various medical records that I showed

22   you today, for example, this one just now stating

23   that her spirometry results are normal, how did you

24   discount these when you reviewed the medical

25   records?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 193

1        A.    Well, easy, Bradford Hill, you look at the

2   strength of association, you look at the specificity

3   of the tests, and you look at the -- the coherence

4   of the evidence.  And what you've got here -- and

5   the consistency, experimental values.  This is one

6   test on one day.  She's had several of these tests

7   over many days.  And just like she's been diagnosed

8   with COPD, the -- I mean, I can say all day oh,

9   she's got COPD, but that's not accurate.  If you

10  look at the spirometry she doesn't have COPD.  She

11  would need a 20 percent reduction in lung function

12  tests and she only has a ten.  She has obstructive

13  pulmonary disease, but not COPD.  Doesn't mean she

14  won't develop it, but she doesn't have it now.  And

15  that's a medical fact despite what a doctor has

16  diagnosed her.

17             As I told you earlier, the AMA says

18  20 percent of diagnoses are inaccurate.  And a lot

19  of times that's because of the situation they're

20  looking at are a very limited snapshot.  So we look

21  at all of that evidence, and if 80 percent says she

22  has a ten percent reduction in lung function and ten

23  percent says she's normal and ten percent says she

24  has a 20 percent reduction in lung function, then

25  it's by the scientific method you would say the

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 194

1    preponderance of the evidence says she has ten

2    percent reduction in lung function.

3         Q.   And the complete Bradford Hill causation

4    criteria that you opine to is highlighted in your

5    report as the green and the orange, correct?

6         A.   Correct.

7         Q.   Okay.  Have you measured concentrations of

8    any of the constituents listed on page seven in

9    Progress Village?

10        A.   I'm sorry, what document are we on?

11        Q.   On your report, sir.

12        A.   Oh, okay.  Sorry.

13        Q.   My apologies.

14        A.   Could you repeat that again?

15             MR. TORRES:  Can you read the

16        question back, please.

17             (Thereupon, the record was read back

18    by the court reporter.)

19             THE WITNESS:  Well, again, other than

20        Ungers & Associates, you're asking me have

21        I physically measured any concentrations?

22             MR. TORRES:  Yes.

23             THE WITNESS:  No, I have not.

24    BY MR. TORRES:

25        Q.   And you haven't relied on any measured

Page 195

1   concentrations other than what's in --

2        A.   What I've opined to, correct.

3        Q.   Okay.  Do you know if Progress Village

4   contain -- contains elevated levels of the

5   constituents listed on page seven of your report?

6        A.   I don't recall.  I don't recall any

7   Progress Village specific data.

8        Q.   Okay.  So the only way you might determine

9   that Miss Williams was exposed to elevated

10  concentrations of any of the constituents listed on

11  page seven was by your reliance on Li and

12  Chakraborty?

13       A.   And Ungers.

14       Q.   And Ungers?

15       A.   The sampling, correct.

16       Q.   Thank you.  Dr. Mink, does being within

17  the SO2 non-attainment zone or boundary presume that

18  a person residing within that boundary will develop

19  adverse health effects?

20       A.   It's based on predicative statistics.

21  That's really what risk assessment is.  It's a

22  modeling effort.  And therefore, we've tried to put

23  in safety factors so that the general population if

24  you don't have an exceedance should be okay.  At the

25  attainment level, even despite our best efforts,

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 196

1    there's sensitive individuals that are not covered

2    by that, so you're going to see that small fraction

3    that will develop -- or be expected to develop

4    adverse health effects.

5         Q.   **Are you aware of any literature discussing**

6    **adverse health effects in the Progress Village**

7    **neighborhood outside of the references you listed**

8    **earlier?**

9         A.   That studied Progress Village?

10        Q.   **Yes.**

11        A.   Not that I'm aware of.  Not that I recall.

12        Q.   **Yesterday in Dr. Ungers' deposition I**

13   **showed him this exhibit, Ungers 23, have you ever**

14   **seen that document before?**

15             MS. GALEOTO:  I apologize, Chris,

16             while he's looking at that could you give

17             me that Bates?

18             MR. TORRES:  Sure.  Ungers 20 -- oh,

19             the Bates number, he's got it in his hand.

20             Is there a Bates number on there?

21             THE WITNESS:  Yes, it's Ungers

22             004526, point source emissions of sulfur

23             oxide.  You know, I've certainly seen

24             tables like this in some of the EPA sources

25             and the air quality sources, but as far as

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 197

1              knowing if I've seen this exact one, I

2              don't recall.

3    BY MR. TORRES:

4        Q.    Okay.  Was there any other efforts you

5    took outside of relying on Mr. Ungers' soil and dust

6    study to eliminate alternative sources of SO2

7    exposures to Miss Williams?

8        A.    Yes.  And I looked at data like this and

9    toxic inventories, you know, over many years.  It

10   doesn't say and I don't know what year this is, but

11   these are -- I mean, there are several of these type

12   documents.  And yeah, you look at all those and it

13   changes year to year with different industries.

14   Some no longer exist, some do.  Some produce more,

15   some produce less.  Some are better controlled, some

16   are less controlled.  But we look at all that to see

17   a contribution, as you said.

18       Q.    Did you in any way account for Teco's

19   contribution to the SO2 non-attainment boundary?

20       A.    Yes.

21       Q.    And --

22       A.    If you're asking me specifically, no, but

23   in general, yes.

24       Q.    Okay.  And did you quantify any

25   contribution by Teco to the non-attainment boundary?

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 198

1        A.    In Teco in particular, no.

2        **Q.    Did you calculate any other sources**

3   **outside of Mosaic to the SO2 non-attainment**

4   **boundary?**

5        A.    No, I relied on EPA and the State of

6   Florida.

7        **Q.    Let's say for a minute that a person is**

8   **exposed to a constituent below a health-based level,**

9   **how would you conclude as a toxicologist that that**

10  **exposure caused injury?**

11       A.    That's kind of a hypothetical what if.

12       **Q.    It is a hypothetical question, yes, I**

13  **recognize that.**

14       A.    Well, what little I know from what you

15  told me, my off-the-cuff answer based on my

16  experiences, it by itself by definition would not

17  cause an adverse effect, but it may contribute to a

18  cumulative adverse effect if it has the same target

19  organ effect.  I think I testified to that earlier.

20  And I will caveat that to say there are some very

21  sensitive subpopulations that could be affected.

22       **Q.    I'm going to hand you from yesterday Mr.**

23  **Ungers' Deposition Exhibit 29.**

24             MR. TORRES:  And for the phone that

25             is Ungers_004957 through 5266.

Page 199

1    BY MR. TORRES:

2        **Q.    Take a look at that.**

3        A.    Sure.

4        **Q.    Have you ever seen that document before?**

5        A.    I have seen this document before.

6        **Q.    I am looking at page 142 of that document**

7    **or Ungers_005099.  And I'm specifically looking at**

8    **Figure 5.**

9              MS. HOGAN:  What's that reference

10         again, please?

11              MR. TORRES:  Page 142, Figure 5.

12              THE WITNESS:  Figure 5.

13              MR. TORRES:  Yes.

14    BY MR. TORRES:

15        **Q.    Are you familiar with Figure 5?**

16        A.    Yes, I am.

17        **Q.    And what is Figure 5?**

18        A.    It's an equation for developing acceptable

19    risk-based concentrations in soil for

20    noncarcinogens.

21        **Q.    And what does that mean?**

22        A.    Usually it means for site cleanups you

23    look at acceptable risk-based concentrations for

24    specific media and specific exposures, and states in

25    the federal government usually have criteria for

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 200

1    doing that.

2        Q.    Are you aware of any constituents of

3    concern that Mr. Ungers sampled that were above soil

4    cleanup target levels?

5        A.    Didn't look at that because, again, I was

6    looking at the qualitative, what was there and then

7    the relationship to each other of soil and attic.

8        Q.    Right.  Again, you weren't looking at it

9    from a quantitative perspective, only from a

10   qualitative perspective?

11       A.    Right.  I'm not looking at soil exposures.

12       Q.    So the only -- so here, for example, you

13   didn't consider an ingestion rate for Miss Williams?

14       A.    No.  I think I testified to that earlier.

15       Q.    Or a surface area of skin exposed for

16   Miss Williams, correct?

17       A.    Correct.

18       Q.    Or dermal absorption for Miss Williams,

19   correct?

20       A.    Correct, not from soils, no.

21       Q.    Right.  Or an inhalation rate?

22       A.    Not from soils, correct.

23       Q.    Okay.  How do you determine that in her

24   home Miss Williams was exposed to the constituents

25   listed on page seven in exceedance of any

Page 201

1   **health-based standard?**

2              THE WITNESS:  I'm sorry.  Could you

3        read that again?

4              (Thereupon, the record was read back by

5   the court reporter.)

6              THE WITNESS:  There's a couple of

7        ways.  First of all, we know that she has

8        deposition in her actual house, not just

9        where she just lives, but in her residence

10       in the attic of materials from Mosaic -- or

11       phosphogypsum manufacturing, so we know

12       they're present.  We know they're present

13       above soil backgrounds when you compare

14       them to soil and they're the same type of

15       constituents.

16              So the attic becomes a historical

17       archive, somewhat of a film versus a

18       snapshot of what has been deposited via the

19       air emissions over time, as long as that

20       attic has been there.  So that gives us an

21       idea if it's present, number one, if it's

22       present in measurable quantities.  And then

23       you can compare the soil levels to regional

24       soil levels like Mr. Ungers did to see if

25       they're -- if they're background levels, if

Page 202

1              they're truly from background, or if

2              they're from man's activities.  And when

3              they're elevated they're man's activities,

4              so you look at those things.

5                   And then you take a trusted study,

6              like Li or Chakraborty, and you look at

7              your chemicals of concern that you know are

8              from those facilities and are deposited at

9              that house, and you can determine -- and

10             not necessarily directly in her house, but

11             in that area surrounding it in a small area

12             because you have to model things if you

13             didn't physically measure them --

14             everything you don't measure, you have to

15             model.  You'll know that those exceed

16             health-based standards and would cause the

17             health effects that Mrs. Williams has.

18   BY MR. TORRES:

19        Q.   **But you didn't use Ungers quantitatively?**

20        A.   No, we only used it to see if the presence

21   was there.  Li and Chakraborty and the SO2 data from

22   the air monitoring stations in toto tell you where

23   it's distributed and at what levels and if they

24   cause a risk or not.  The great thing about those,

25   they've already -- if you look at this several

Page 203

1   hundred page document that you gave me, the Ungers

2   004957, Ungers 29, on 142 is a fairly complex

3   calculation, takes in a lot of factors.  And there's

4   pages and pages and pages of those calculations

5   depending on if it's air emissions or soil or dust

6   or water or whatever.  And that's the kind of things

7   that are inherent in the health-based criteria in

8   IRIS.  And then they're applied in large scale

9   studies, like Li or Chakraborty or the air

10  monitoring reports from the county.  And that's why

11  we rely on them.

12          Because if I do that, you're going to

13  question every assumption I make.  And I'm not

14  saying that's unfair, but I prefer to use those when

15  they're available instead of re-inventing the wheel

16  and say well, we know there's a health risk and we

17  know where the material is from, therefore she was

18  exposed to it.  Now, did she have diseases that you

19  would expect from that exposure based on the target

20  organ effects, and she does.  So based on Bradford

21  Hill she has -- she has the disease from those

22  constituents from her exposure over that time.  She

23  had significant dose, she had significant duration,

24  and she has the disease.  It's really tough when you

25  have all those elements to say it's not causative.

Page 204

1   Are they the sole cause, I cannot say that.  They're

2   the majority, but not the sole.

3       **Q.   Now -- and -- and you don't know from the**

4   **Ungers soil study -- soil and dust study how much of**

5   **any constituents Miss Williams actually inhaled, you**

6   **can't -- you can't make that determination from the**

7   **soil and dust study, correct?**

8       A.   There would be a lot of uncertainty.  I

9   wouldn't do it based on only that data.

10      **Q.   All right.  So consequently you would rely**

11  **on other studies like Li and Chakraborty?**

12      A.   In conjunction with those, yes, because

13  it's a weight of evidence.

14      **Q.   Going back to your report, Dr. Mink, page**

15  **seven in your report.**

16      A.   Yes.

17      **Q.   In the middle of the page there's a**

18  **parenthetical that reads indirectly through side**

19  **effects of long-term therapeutic measures to control**

20  **symptoms related to primary injuries.  Do you see**

21  **that?**

22      A.   Yes.

23      **Q.   What do you mean by this statement?**

24      A.   She wouldn't have to take certain

25  therapeutic agents, such as inhalers, if her asthma

Page 205

1    was controlled by not having triggers that were

2    present in her environment.  Therefore, she takes

3    them because she has an uncontrolled episode and

4    she's very susceptible to that with her G6PD and

5    asthma.

6         Q.    **Earlier today, and we never went back to**

7    **this, you discussed -- you mentioned that G6PD**

8    **episode, what do you mean by that?**

9         A.    Well, a G6PD person, you know, 24/7 since

10   birth has the enzyme deficiency in their red blood

11   cells.

12        Q.    **Um-hmm.**

13        A.    But in the normal processing of

14   carbohydrates in a cell's life, it's not a problem.

15   It's a problem if you have -- if you're exposed to

16   an oxidative substance, a food or an inhaled

17   substance, et cetera, et cetera, which those are

18   listed in my report, then -- then they attack the

19   cell.  The cell breaks open.  It's called hemolysis.

20   And the evidence of that -- usually when you have

21   that attack, you become very ill, weak, you know,

22   you have all kinds of issues, fatigue, and you end

23   up excreting those wasted cells one way or the

24   other.  And your body tries to rebuild those cells.

25   It can't do it fast enough.  You have a lot of

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 206

1    immature cells.  And you can see that by clinical

2    evidence, such as the MCV, RCV, et cetera.  So

3    that's an episode.

4            Now, people can live long lives with very

5    little episodes, just like asthma.  I mean, if you

6    live in a really clean environment, and you avoid a

7    lot of things, and you live in the right part of the

8    country, and you can afford to do all that, and you

9    have that privilege, you can control your asthma

10   much better than trying to control it once you have

11   an attack and trigger and then take a corticosteroid

12   or inhaler, et cetera.  So it's a lot like asthma in

13   the fact that you have episodes.  It's not all the

14   time.

15   **Q.    How do you know when she's -- when**

16   **Miss Williams is having a G6PD episode as opposed to**

17   **something else?**

18       A.   Well, most of her hospital visits -- well,

19   I can't say most, but a large portion of them over

20   the years have been when she has symptoms that would

21   be typical of G6PD or asthma attacks or both.  And

22   that's why every time she goes and have -- every

23   time she has a blood test that measures those

24   after-the-fact evidence of the hemolysis, she has

25   it.  So, I mean, your body is pretty keen and your

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 207

1   mind on knowing when you don't feel well and you go

2   and you get checked, but you usually don't go at the

3   moment you're feeling sickest.  You go when you're

4   able to as quickly as you can get an appointment.

5   And that -- usually that episode is passed, but you

6   see the evidence of it.

7        **Q.   And you are making -- are you making**

8   **assumptions that -- are you making any assumptions**

9   **when you conclude that a visit was the result of a**

10  **G6PD episode?**

11       A.   Well, I mean, she mentions it in a lot of

12  her visits and she's criticized many times for it by

13  certain doctors, but she -- when they do clinical

14  testing, she shows the evidence of it.  Now, there's

15  other times when she's gone in for asthma or

16  something else.  From my limited experience,

17  Miss Williams is a bright person, but she's not a

18  physician, and so, you know, she has symptoms and

19  she goes in and describes as best she can.  She's no

20  dummy, so she probably says I think it's this or

21  that, but the doctor ultimately tells her what she

22  has, but the clinical evidence is what you have to

23  look at.  I apologize for the wordy answer.

24       **Q.   No, that's okay.  Does Miss Williams have**

25  **any risk factors for pulmonary hypertension?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 208

1     A.    Yes, she has one big one, G6PD.

2     **Q.    Does she have any others?**

3     A.    Asthma, chronic bronchitis.

4     **Q.    Does she have any others?**

5     A.    Those are by far the major ones.

6     **Q.    Okay.  Are there any others?**

7     A.    It's a confounding factor, her diabetes

8  and her associated weight gain.

9     **Q.    Is that everything?**

10    A.    Again, everything and never are -- you

11  know, I would say that's the majority.

12    **Q.    Is Miss Williams obese?**

13    A.    You're asking me in clinical terms?

14    **Q.    Yes.**

15    A.    I believe she would be considered morbidly

16  obese.

17    **Q.    Does she have --**

18    A.    So would I with another couple pounds.

19    **Q.    Does she have a body mass index of greater**

20  **than 30?**

21    A.    Yes, she does last I checked.

22    **Q.    Does Miss Williams have a family history**

23  **of asthma?**

24    A.    Well, she certainly has had asthma since

25  childhood and I believe she has a family history of

Page 209

1    it.

2        Q.    Does she have a family history of

3    hypertension?

4        A.    Hypertension, yes.  Not pulmonary

5    hypertension, but hypertension, yes.

6        Q.    Do you know what types of specialists

7    Miss Williams has received care from over the last

8    two years?

9        A.    What type?

10        Q.    Um-hmm.

11        A.    I think she's had a couple.  I know --

12        Q.    Types I said.

13        A.    Types oh, yes, she's -- definitely a

14    pulmonologist.  She's had allergy and asthma.  She's

15    had a general practitioner.  She's had -- she's had

16    treatment or -- or treatment for oncology, but --

17    and I think they're oncologists at the Florida

18    Cancer Center that she's seen.

19        Q.    Does Miss Williams have cancer?

20        A.    Not that I'm aware of.

21        Q.    What is the -- do you know why she seeks

22    treatment from an oncologist?

23        A.    They had suspected that she had some --

24    some potential issues because of her blood issues

25    that may be related to cancer, but the testing

Page 210

1    showed that that wasn't the case at the time.  And I

2    think that was around 2012, 2013 time frame.

3         Q.   Is body weight a component of the

4    calculation to determine human health risks

5    associated with chemicals?

6         A.   Yes.

7         Q.   Do you have a list of the -- anywhere in

8    your records of therapeutic agents you refer to in

9    your report?

10        A.   No, I have, I think, four of the

11   over-the-counter type medications she used, but the

12   list is -- I mean, you've given me several documents

13   that just from her summaries that list ten or 11

14   apiece.  So no, I did not.  I would spend all my

15   time listing her medications.

16        Q.   Page eight of your report, the first

17   sentence you write a review of Rhonda Williams'

18   medical records shows that after multiple visits to

19   various medical facilities over the last 15 years in

20   which she suffered from a range of illnesses,

21   including extreme fatigue, diabetes, weight gain,

22   intense abdominal pain, allergic reactions and

23   various breathing difficulty.  You see that,

24   correct?

25        A.   Yes.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 211

1          Q.    Is extreme fatigue caused by exposure to

2     any of the constituents listed on page seven of your

3     report?

4          A.    It would be a very common symptom of a

5     G6PD episode from exposure to any oxidative species.

6          Q.    So you're not suggesting that any one --

7     any exposure to any of the constituents listed on

8     page seven is a direct cause of extreme fatigue?

9          A.    Well --

10                MS. HOGAN:  Objection as to form,

11            vague.

12                THE WITNESS:  If I understand what

13            you're asking in Mrs. Williams' case -- in

14            my case that wouldn't be true or your

15            case -- well, I don't know your medical

16            history, but assuming you don't have G6PD.

17            But in her case with G6PD that would be an

18            expected symptom when she has an insult or

19            trigger from these compounds as well as

20            compounds like them.

21     BY MR. TORRES:

22          Q.    And what does the -- what does the fact

23     that many of at least the medical records that we

24     saw today state that her G6PD symptomatology is

25     mild, does that have any impact here?

Page 212

1      A.   I'm not sure I understand the question,

2   but obviously if it's a mild symptomatology at the

3   time she was examined, that's better than having a

4   severe symptomatology, and worse than having no

5   symptomatology, so hopefully I answered that.

6      **Q.   Is diabetes caused by exposure to any of**

7   **the constituents listed on page seven?**

8      A.   I -- I would not attribute it as highly

9   probable.

10     **Q.   Is there any basis?**

11     A.   Well, diabetes has to be controlled.

12  It's, again, a disease that has to be controlled.

13  The blood sugar and insulin levels have to be

14  controlled.  When you have G6PD, which has an

15  element of carbohydrate metabolism that's associated

16  with diabetes, if you have episodes, it affects your

17  ability to control your diabetes, which affects your

18  weight, which affects your blood sugar, which

19  affects your peripheral nervous system.  It's kind

20  of a cascade of effects that are -- I mean, we're

21  pretty complex biological beings.

22     **Q.   So let me ask the question again.  Can**

23  **exposure to any of the constituents cause diabetes?**

24     A.   No -- for Mrs. Williams, it can cause the

25  inability to control it or a lessened ability to

Page 213

1    control it, but it does not cause diabetes.  Does

2    that answer your question?

3         **Q.   Yes.  Does -- does exposure to any of the**

4    **constituents listed on page seven cause weight gain?**

5         A.   Again, her ability to control her weight

6    is affected by her triggers to these substances, but

7    no, it is not the cause of her weight gain directly.

8         **Q.   Okay.  And does -- can exposure to any of**

9    **the constituents listed on page seven be the cause**

10   **for intense abdominal pain?**

11        A.   Is it possible, yes.  Is it probable, I

12   have -- I have not looked at it in enough detail to

13   tell you that.  It would be tough.  It's a pretty

14   general symptom.

15        **Q.   Okay.  Yes, but it's the one that you**

16   **list.  Can --**

17        A.   I just took the ones she tend to mention

18   quite a bit.

19        **Q.   Did you try -- make any effort to parse**

20   **intense abdominal pain into certain illnesses?**

21        A.   No, I did not.  I mean, it's common in so

22   many illnesses.  No, I did not.

23        **Q.   Did you do that for extreme fatigue?**

24        A.   No.  Again, that's a pretty broad

25   spectrum, but it is a very common symptom of G6PD.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 214

1      Q.    Did you do it for weight gain?

2      A.    Same answer.

3      Q.    And how about allergic reactions?

4      A.    Well, I include asthma in that to some

5    extent.  And obviously we looked at that more

6    closely.  That's a more specific symptom and

7    disease.  So yeah, we looked at that from a direct

8    exposure standpoint.  Same way with her breathing

9    difficulties, which is a broad term.

10     Q.    And I think I asked this before, but I

11   apologize, I'm going to ask it now.  Does exposure

12   to any of the constituents listed on page seven

13   cause asthma?

14     A.    Again, I think it -- it definitely causes

15   the inability to control it or the lessened ability

16   to control it.  Is it the causative agent in the

17   formation of asthma, I don't -- I don't know that.

18   I don't -- I don't believe that's -- it's hard to

19   say especially with childhood asthma.

20     Q.    Did Miss Williams suffer from childhood

21   asthma?

22     A.    I believe in her medical records it says

23   she's had it since she was a child.  I don't know

24   what that means age-wise.

25     Q.    You refer in your report to long-term

Page 215

1    **repeated exposure to hazardous materials.  Are you**

2    **referring to the constituents listed on page seven**

3    **of your report?**

4         A.   Yes.

5         **Q.   And your conclusion that there is a**

6    **long-term repeated exposure is based on what?**

7         A.   The air monitoring references that I went

8    over before, the Ungers data, the attic samples.

9         **Q.   You -- are you able to say what level of**

10   **exposure Miss Williams was -- suffered in any**

11   **particular time frame?**

12        A.   I'm not sure I -- can you repeat that?

13        **Q.   Sure.  Can you tell me what Miss Williams'**

14   **exposure to the constituents was, say, in the year**

15   **2000?**

16        A.   No, I -- I know that controlled

17   technologies were worse not better, but no, I don't

18   know.  I know more recent data.  I don't know

19   longer-term data.

20        **Q.   So if you don't know longer-term data, how**

21   **do you conclude a long-term repeated exposure?**

22        A.   Attic sample references that I've cited,

23   the air monitoring data, the known knowledge that

24   controlled technologies even admittedly in the

25   literature were worse, emissions were higher, so we

Page 216

1  know today if you see risk today, you certainly saw

2  more risk earlier.

3      Q.   Okay.  What is -- when you say that she

4  **lives in close proximity to the Mosaic Fertilizer**

5  **operation, what is close proximity?**

6      A.   Two miles is -- I mean, I consider that

7  close proximity.

8      Q.   **Is more than two miles not close**

9  **proximity?**

10     A.   No.  I think close proximity is -- is what

11 it is.  I mean, I think her 1.8 miles or 2.3 miles

12 is -- that's close proximity.

13     Q.   **And proximity matters, doesn't it?**

14          MS. HOGAN:  Objection as to form,

15          vague.

16          THE WITNESS:  A difficult question,

17          you can't answer yes or no.  In air

18          emissions you can have higher

19          concentrations further away, but you can

20          have higher concentrations closer, that's

21          why you do air modeling.

22          MR. WALKER:  How much more time is

23          left on this deposition just out of

24          curiosity?

25          VIDEOGRAPHER:  I don't know.  Roughly

Page 217

1          40, 35 minutes.

2                    MS. HOGAN:  Thirty-five.

3                    MR. WALKER:  How many minutes?

4                    THE WITNESS:  Thirty-five.

5                    MR. WALKER:  Okay.

6                    VIDEOGRAPHER:  That's about right.

7    BY MR. TORRES:

8        **Q.   On page 13 of your report -- let me just**

9    **ask this -- let me ask it this way, it will be**

10   **easier.  Are you asserting exposure to any**

11   **constituents outside of those listed on page seven**

12   **of your report?**

13       A.   Again, if you -- if you look at those

14   constituents and then the et cetera at the end, as I

15   explained, the 133, they overlap of those 133 hazard

16   air pollutants, like Li and Chakraborty, and it's

17   kind of your standard 133 hazardous air pollutants,

18   the subsection that Dr. Ungers sampled for are those

19   associated with phosphogypsum emissions, those are

20   the ones I'm ascertaining these are the major ones.

21   So did I answer that?

22       **Q.   Are any of the others discussed in your**

23   **report?**

24       A.   Well, that's why the and others, and I

25   explained in this deposition what the and others

Page 218

1    are.  And the easiest way to look at that is to look

2    at the Ungers' report, that's really the ones I

3    looked at.  And these are the ones that were the

4    major ones of that -- subsection of that, but I

5    looked at those.  I think there's approximately 30.

6         Q.   **But you didn't discuss any of those in**

7    **your report, correct?**

8         A.   I discussed them all the same.

9         Q.   **You didn't discuss any of the specific**

10   **ones in your -- any of the other specific**

11   **constituents in your report, correct?**

12        A.   You mean I didn't list them, is that what

13   you're asking me?

14        Q.   **Um-hmm.**

15        A.   That's correct.

16        Q.   **And consequently by not listing them,**

17   **there's no discussion of them in the report, right,**

18   **sir?**

19        A.   Yeah, it is what it is.

20        Q.   **Do you know if there was ever an**

21   **exceedance of PM10 in Progress Village?**

22        A.   In Progress Village?

23        Q.   **Um-hmm.**

24        A.   I don't think the closest monitoring

25   station is in Progress Village, but the one closest

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Frankiin L. Mink, Ph.D.

Page 219

1    to Progress Village -- I don't recall there was

2    exceedances of PM10 in monitoring stations in the

3    area.

4         Q.   So you just don't recall if there were?

5         A.   I don't recall specifically.

6         Q.   Are you aware of any complaint from any

7    other Progress Village residents similar to

8    Miss Williams'?

9         A.   Not that I'm aware of.

10        Q.   Do you know which of the constituents

11   listed on page seven of your report outside of what

12   you testified earlier is SO2 exceed regulatory

13   levels?

14        A.   I believe in the Li report that chromium

15   and nickel were issues and cumulatively there were

16   more issues, but individually if that's what you're

17   asking me, those were the other two.

18        Q.   Okay.  Those were the only two?

19        A.   Radioactivity wasn't discussed in any of

20   the ones that I -- those studies, and PM10 wasn't

21   looked at, so yes, I think that's correct, my

22   recollection.

23        Q.   Okay.  Do you know what the regulatory

24   levels are that were exceeded -- or do you know --

25   sorry.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 220

1          **Do you know what the regulatory level is**

2   **for chromium?**

3          A.   Again, I looked at the -- at those because

4   it's specific to a set of assumptions and air

5   emissions.  And if you look at Li and Chakraborty

6   both, you're talking about a ten percent exceedance

7   over the one in a million standard -- risk standard.

8   So about a ten percent excess risk, that's how I

9   always look at it.

10         Q.   Okay.  Ten percent compared to what?

11         A.   One in a million, the regulatory standard

12   for residents.

13         **Q.   So of the constituents listed on page -- I**

14   **just want to make sure I have this right.  For the**

15   **constituents listed on page seven, the only**

16   **constituents you assert individually exceed any**

17   **regulatory level is chromium and nickel and SO2,**

18   **correct?**

19              MS. HOGAN:  At any time?

20              MR. TORRES:  Yes, at any time.

21              THE WITNESS:  At any time?

22              MR. TORRES:  Yes.

23              THE WITNESS:  Well, unfortunately I

24         don't know at any time.  But in the data --

25         the newer data that's looked at, those are

Page 221

1            the constituents.  When I say newer, 2010

2       up.

3            MR. TORRES:  I understand, sir.  I

4       just want to make sure I understand.

5       That's okay.

6            THE WITNESS:  And I'm anxiously

7       awaiting the older data.

8  BY MR. TORRES:

9       Q.   **Are there US regulatory levels for dust?**

10      A.   There is for particulates.  Some people

11 call dust, depending on its diameter, particulates,

12 but again we went over those earlier.

13      Q.   **So only particulate matter?**

14      A.   Just dust, dust.  There's regulatory

15 standards in the workplace, but I'm not aware of any

16 that's for residents.

17      Q.   **Okay.  Are there regulatory standards for**

18 **indoor dust?**

19      A.   Again, if it's not associated with a

20 particular chemical, like lead or an element, I'm

21 not aware of any.

22      Q.   **On the top of page 14 of your report, you**

23 **state and several of these constituents exceed**

24 **Florida and federal health-based criteria/standard**

25 **for protection of human health individually, but as**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 222

1    a whole represent a significant cumulative public

2    health threat.  You see that?

3        A.   Yes.

4        Q.   Is there a -- well, is there -- sorry.  Is

5    there a regulatory method for assessing exposures as

6    a whole?

7        A.   Yes, cumulative risk.  And you have to

8    assess cumulative risk under risk assessment.

9        Q.   And what is the best guidance for

10   assessing cumulative risk that you're aware of?

11       A.   The total set of appendices and the main

12   document of US EPA risk assessment guidance for

13   superfund sites from 1989.  And the appendices have

14   different dates, including Exposure Factors

15   Handbook.

16       Q.   1989?

17       A.   No, that's 2011.  I said the appendix, you

18   know, are revisions and additions.

19       Q.   What are the particulate matter levels in

20   the ambient air downwind of the Mosaic facility that

21   you reference on page 14 of your report?

22       A.   I don't recall right now.

23       Q.   You don't know what the concentration of

24   PM is at Miss Williams' home, correct?

25       A.   PM10, no.  Same answer, I don't recall.

Page 223

1      Q.    Okay.  And do you know what her exposure

2  was to PM10?

3      A.    Again, I didn't calculate it and I don't

4  remember seeing it calculated.  I don't recall that.

5      Q.    On page 15 of your report after the list

6  of constituents there, you write most are known to

7  be acute irritants as well as chronic toxicants.  At

8  what level do any of the elements listed on page 15

9  become acute irritants?

10      A.    Again, there's established health-based

11  criteria that are chronic, and then there's those

12  that are subchronic, and then there's those that are

13  acute, and that's listed in IRIS and the

14  health-based criteria.

15              MR. TORRES:  Let's go off the record

16         for five minutes.

17              VIDEOGRAPHER:  We're off the record.

18              (Off the record.)

19              VIDEOGRAPHER:  We're on the record.

20              MR. TORRES:  I did say that before.

21         Thank you.

22  BY MR. TORRES:

23      Q.    In the Exposure Factors Handbook,

24  section -- page two-two there's a section that

25  refers to spatial variability that I just want to

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 224

1    read and then ask you a question on.  It says

2    spatial variability refers to the differences that

3    may occur because of location.  For example, outdoor

4    pollutant levels can be affected at the regional

5    level by industrial activities and at the local

6    level by activities of individuals.

7            Dr. Mink, what did you do in your report

8    to account for spatial variability?

9        A.   I, again, relied on Li and Chakraborty and

10   they did extensive analysis on that.

11       Q.   Okay.  The Exposure Factors Handbook, page

12   two-two states this with respect to temporal

13   variability.  Temporal variability refers to the

14   variations over time, whether long or short-term.

15   Different seasons may cause varied exposure to

16   pesticides, bacteria or indoor air pollution, each

17   of which might be considered an example of long-term

18   variability.

19           Dr. Mink, same question, what did you do

20   in your report to account for temporal variability?

21       A.   Same answer.

22       Q.   Okay.  The Exposure Factors Handbook, page

23   two-two states this regarding intraindividual

24   variability.  Intraindividual variety is a function

25   of the fluctuations in an individual's physiologic,

Page 225

1    e.g., body weight, or behavioral characteristics,

2    e.g., ingestion rates or activity patterns.  For

3    example, patterns of food intake change from

4    day-to-day and may do so significantly over a

5    lifetime.

6              Same question, Dr. Mink, what did you do

7    in your report to account for intraindividual

8    variability?

9         A.   Used standard default EPA values, which is

10   recommended, and that was used, I believe, in both

11   Li and Chakraborty.

12        Q.   And last -- last part on this.  The

13   Exposure Factors Handbook, page two-two, discusses

14   interindividual variability and it says this,

15   interindividual variability refers to variations

16   across individuals.  Three broad categories include

17   the following:  Individual characteristics, such as

18   sex, age, race, height or body weight, including any

19   obesity, phenotypic genetic expressions and

20   pathophysiological conditions; two, individual

21   behavior, such as activity patterns and ingestion

22   rates; and three, susceptibilities due to such

23   things as life stage or genetic predispositions.

24             What did you do -- Dr. Mink, same

25   question, what did you do in your report to account

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 226

1    **for interindividual variability?**

2        A.   It's not something that's looked at

3    normally even by EPA even in large superfund sites.

4    But what we did do in addition to the references

5    I've talked about and the references in my report,

6    is we looked at phenotypes and genotype, and that's

7    the bulk of the discussion here about her G6PD and

8    its interrelationship with her other disease states.

9    That's what we've talked about pretty extensively,

10   so that's -- that's pretty much the same answer,

11   plus that.

12       **Q.   Dr. Mink, where in your report do you**

13   **discuss the notion that there may be other factors**

14   **present that can affect distribution of the**

15   **constituents mentioned on page seven in your report**

16   **within the human body?**

17            MS. HOGAN:  Can I hear the question

18       again, please?

19            THE WITNESS:  Yeah, I don't know that

20       I understand that.  If you can reread it.

21            (Thereupon, the record was read back

22   by the court reporter.)

23            MS. HOGAN:  If you understand it, go

24       for it.

25            THE WITNESS:  If I understand that

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                    Page 227

 1            correctly you're asking me do we do any

 2            adjustments to internal dose for

 3            Mrs. Williams?

 4                 MR. TORRES:  Correct.

 5                 THE WITNESS:  No.  Again, we use the

 6            default values via reference.

 7   BY MR. TORRES:

 8        Q.    Dr. Mink, were you -- do you believe you

 9   were provided with everything you needed to prepare

10   your report?

11        A.    I will have been when I receive the

12   requested information that I -- that we asked for,

13   that I asked counsel for to request from Mosaic, but

14   I think they supplied me with everything I requested

15   that they had available.

16        Q.    And you certainly believe you had enough

17   information to render the opinions you rendered,

18   correct?

19        A.    Yes.

20        Q.    Okay.  Without divulging, have -- have you

21   communicated with anyone about the work you've done

22   in this case?

23                 MS. HOGAN:  Apart from counsel I

24            assume?

25                 MR. TORRES:  Yes, apart from counsel,

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

                                                      Page 228

 1          of course.

 2                    THE WITNESS:  You mean apart from

 3          counsel?

 4                    MR. TORRES:  Yes.

 5                    THE WITNESS:  No.

 6    BY MR. TORRES:

 7       **Q.   Okay.  No colleagues or -- do you have any**

 8    **employees?**

 9       A.   No, I'm a sole practitioner these days.

10    No, I haven't discussed it with anyone.  I think

11    that would be a violation of ethics.

12       **Q.   Is there any way you recorded your**

13    **observations or thoughts regarding the matters you**

14    **discussed in your report that are outside of your**

15    **report?**

16       A.   Do you mean do I have like notes or

17    other --

18       **Q.   Yes.**

19       A.   No.

20       **Q.   So you didn't take any notes in the**

21    **preparation of your report, correct?**

22       A.   No.  I tend to write drafts in sections

23    and then submit, and then we destroy drafts and keep

24    final versions.

25       **Q.   Dr. Mink, have you ever been excluded as**

Page 229

1    an expert?

2         A.   No, I have not.

3         Q.   **Have you ever been challenged as an**

4    **expert?**

5         A.   I've had a Daubert challenge probably 20

6    years ago.

7         Q.   **And what was the outcome of that Daubert**

8    **challenge?**

9         A.   I can't remember 20 years ago.  I think it

10   was Daubert.  It wasn't Fry at the time.  What was

11   the outcome?

12        Q.   **Um-hmm.**

13        A.   I wasn't excluded.

14        Q.   **Do you have any planned future tasks for**

15   **work in this case?**

16        A.   The only two tasks that I'm aware of are

17   I'm continuing to look at her therapeutic agents and

18   I am going to look at the data that's received from

19   the Mosaic interrogatories that apply to me.

20        Q.   **And what documents -- or what areas of**

21   **information are you specifically looking for?**

22        A.   I supplied a long list to counsel.  I

23   can't recall right now.  Anything that has to do

24   with quantitative or qualitative information of

25   these substances, their effects, safety issues,

Williams, Rhonda v. Mosaic Fertilizer, LLC                     Frankiin L. Mink, Ph.D.

Page 230

1    emissions at the plant, operations, et cetera.

2                  MS. HOGAN:  Beyond that I'm going to

3            instruct him not to answer further on

4            communications with counsel on that, so --

5    BY MR. TORRES:

6        Q.    **Why -- why do you think you need to review**

7    **quantitative data from Mosaic?**

8                  THE WITNESS:  Did you instruct me not

9            to answer?

10                 MR. TORRES:  That's a different

11           question.

12                 THE WITNESS:  I thought that was a

13           different question.

14                 MR. TORRES:  It is a different

15           question.

16                 MS. HOGAN:  It is a different

17           question.

18                 THE WITNESS:  Well, I would like to

19           see what their emissions inventory is

20           historically that they have.  Obviously Li

21           had more information than I do

22           quantitatively.  I can't reproduce his

23           studies because I don't have the

24           information, so I would like to see those.

25           I always like to see the base information.

Page 231

1    BY MR. TORRES:

2         Q.    **Is the emissions inventory only available**

3    **from Mosaic?**

4         A.    To the level of detail that they had to

5    have used, yes.

6         Q.    **What level of detail would you have to**

7    **consider?**

8         A.    Oh, they have historic records.  I don't

9    have very detailed records, I think, pre2000.

10        Q.    **Is there anything that you would like to**

11   **have done that you did not do when rendering your**

12   **opinion?**

13        A.    Not that I recall at this time, no, not

14   really.

15        Q.    **Were there any tasks you considered**

16   **undertaking in preparing your opinion, but rejected?**

17        A.    None that I recall.

18        Q.    **Do you recall what rate you're charging**

19   **for your work in this case?**

20        A.    Yes.

21        Q.    **What is that?**

22        A.    Majority of it I charge 395 an hour.

23        Q.    **Is that a normal hourly rate for you?**

24        A.    Yes.  It just went up, I think, last month

25   to 415.  And my testimony rate is 515.

Page 232

1       **Q.    And is that a normal rate, the 515?**

2       A.    Yes.  That's all clients are charged the

3   same.

4       **Q.    Are there -- do you know of any Florida**

5   **toxicologists who could do the work you did in this**

6   **case?**

7               MS. HOGAN:  Do you need an expert?

8               MR. TORRES:  Toxicologists.

9               THE WITNESS:  Right off the top of my

10          head no one comes to mind.

11  BY MR. TORRES:

12      **Q.    Okay.  Do you know any Florida**

13  **toxicologists?**

14      A.    Yes, and most of them do not like to do

15  testimony for reasons that are displayed today,

16  nothing personal.

17      **Q.    I understand.  Have you consulted any**

18  **experts in this case?**

19      A.    You mean other than Mr. Ungers?

20      **Q.    Yes.**

21      A.    No.

22      **Q.    Are there any other cases that you have --**

23  **that are listed in the list of cases in your report**

24  **that you believe are similar to the current case?**

25      A.    My testimony is always on risk assessment

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 233

1    or causation almost, but as far as specifics of an

2    individual or phosphogypsum, no.

3         **Q.   Okay.  Have you ever testified in a**

4    **case -- or have you ever been retained as an expert**

5    **in a case in the past involving phosphogypsum?**

6         A.   Not that I recall.

7         **Q.   Have you ever been retained as an expert**

8    **in a case involving phosphate mining?**

9         A.   No, not that I recall.

10        **Q.   Have you ever been --**

11        A.   You're speaking as an expert, correct?

12        **Q.   Yes, as an expert.  Have you ever been**

13   **retained in a case as an expert involving sulfur**

14   **dioxide?**

15        A.   Yes.

16        **Q.   Okay.  What cases or case was that?**

17        A.   I don't recall, but there's several

18   probably 15 years ago that we were involved in.

19   They involved sulfur oxide emissions and health

20   effects.

21        **Q.   And none of them that are listed in your**

22   **report?**

23        A.   I don't think they were listed.  They're

24   older than ten years.

25        **Q.   Okay.  Have you ever been retained in a**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

                                                        Page 234

 1    case in which you testified involving a person

 2    having the G6PD condition?

 3        A.    As an expert, no.

 4        Q.    Do you believe now that you have updated

 5    your report, that the CV that is attached to it is

 6    accurate and complete?

 7        A.    I don't update them very often, but I'm

 8    sure it's substantially complete.

 9        Q.    Do you know when the last time was that

10    you updated it?

11        A.    Oh, I would say in the last year.  I tend

12    to do it about every year or two.

13              MS. HOGAN:  How are we doing

14         time-wise?

15              VIDEOGRAPHER:  Eleven minutes.

16              THE WITNESS:  If at all possible, I

17         would love to make it back to my car in

18         time not to be locked up.

19    BY MR. TORRES:

20        Q.    Dr. Mink, did you advise Mr. Ungers

21    regarding -- or did you instruct him to perform any

22    specific tasks?

23        A.    No, we discussed what was to be sampled,

24    but other than that, I don't remember any

25    discussions.

Page 235

1      **Q.    Are there email communications between the**

2  **two of you?**

3      A.    I don't believe so.

4      **Q.    Do you believe we've now discussed all the**

5  **work you've done in this case so far?**

6      A.    I believe so.

7      **Q.    Is there anything that you're aware of**

8  **that you believe refutes any of the opinions you**

9  **rendered in this case?**

10     A.    You mean since I've produced this report,

11  is that what you're asking me?

12     **Q.    No.  Generally.**

13     A.    No, I do not.

14          MR. TORRES:  I think I have no

15      further questions.

16          THE WITNESS:  Thank you, Counselor.

17          MR. TORRES:  Thank you.

18          MS. HOGAN:  Well, let's go off the

19      record for about 15 minutes or so and let

20      them get their cars and then I'll go ahead

21      and ask a couple questions.

22          THE WITNESS:  But I can't get my car

23      and come back.

24          VIDEOGRAPHER:  We're off the record.

25          (Off the record.)

Page 236

1                    VIDEOGRAPHER:  We're on the record.

2                    MS. HOGAN:  Thank you.

3                    (Thereupon, Mink Exhibit No. 18,

4      result details from Premier Hematology & Oncology,

5      was marked for purposes of identification.)

6                              EXAMINATION

7      BY MS. HOGAN:

8          **Q.    Dr. Mink, I would like to show you what**

9      **we've marked as Mink Exhibit 18, which is a**

10     **three-page document that's Bates numbered Premier**

11     **Hematology 1 through 3.  I will show that to you and**

12     **please let me know whether you have seen that**

13     **document before?**

14         A.    I have seen this document before.

15         **Q.    Can you tell us what this document**

16     **represents?**

17         A.    I believe this is when Mrs. Williams was

18     tested for G6PD.

19         **Q.    And what were the results of that testing?**

20         A.    She was positive for G6PD.  It was

21     detected.

22         **Q.    And how was it detected, in terms of**

23     **genetics or some other mechanism?**

24         A.    Yes, genetically.  I mean, he actually

25     says one copy of the benign African G6PD A plus

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

Page 237

1    allele, A376G on one chromosome, and one copy of the

2    A minus allele, A376G and G202A mutation on the

3    other chromosome, were detected.

4         **Q.    And what significance does this laboratory**

5    **report have for you in your analysis and opinions of**

6    **Miss Williams' conditions?**

7         A.    It confirms that she has G6PD and has had

8    since birth.

9         **Q.    Okay.**

10        A.    Well, since conception.

11        **Q.    Fair enough.  Okay.  I will mark now as**

12   **Mink Exhibit 19 an unBates numbered document that is**

13   **titled Survival Analysis of Victims of Sulfur Oxide**

14   **Air Pollution Suffering from COPD or Asthma in**

15   **Yokkaichi, Japan, in Relation to Predisposing**

16   **Exposure.  It is accepted as of August 17th, 2012.**

17             **(Thereupon, Mink Exhibit No. 19,**

18   **Survival Analysis of Victims of Sulfur Oxide Air**

19   **Pollution Suffering from COPD or Asthma in**

20   **Yokkaichi, Japan, in Relation to Predisposing**

21   **Exposure, was marked for purposes of**

22   **identification.)**

23   BY MS. HOGAN:

24        **Q.    Dr. Mink, I would like you to take a look**

25   **at this document and let me know whether you've seen**

Page 238

1    **this document before?**

2         A.    I have seen this document before.

3         **Q.    Is it correct that it's a document we**

4    **discussed earlier today?**

5         A.    Yes, we discussed earlier today.

6              MS. HOGAN:  I only have one copy, so

7         I apologize.

8              MR. TORRES:  That's okay.

9              MS. HOGAN:  So we will have that in

10        the record as well.

11   BY MS. HOGAN:

12        **Q.    Dr. Mink, we've had a number of questions**

13   **today regarding compounds referred to as**

14   **particulates.  Can you explain for the record how**

15   **particulates function in the body once they are**

16   **inhaled?**

17        A.    Well, and I went over part of this.

18   Particulates are ranked by size, below two and a

19   half micrograms and those between two and a half

20   micrograms and ten micrograms.  The smaller the

21   particulate, the further and deeper it goes into the

22   lung.  And that's important because in the deep

23   lung, it's absorbed -- absorbed.  And bigger

24   particles are deposited further up in the lung and

25   they're absorbed -- adsorbed.

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 239

1             In other words, one is on the surface,

2    goes across.  The other is absorbed through the

3    surface by physical means, so the smaller the

4    particulate -- the layperson is always saying the

5    smaller the particulate, the deeper in the lung you

6    have distribution.  So whatever is associated with

7    that particulate is driven deeper into the lung,

8    which I say in my report.

9        **Q.   All right.  Next, Dr. Mink, I would like**

10   **to show you what has been previously marked as**

11   **Exhibit 13 and 14, which in summary are the two**

12   **Social Security Administration documents concerning**

13   **Miss Williams.  In those reports, if you could take**

14   **a look at them and let me know your thoughts on**

15   **whether the injuries that are discussed in Exhibit**

16   **13 are the same or different from the injuries that**

17   **are discussed in Exhibit 14?**

18       A.   And Exhibit 14 is March 21st, 2005,

19   versus, I believe, 13 is 1995, February 23rd.

20       **Q.   That's correct.**

21       A.   Both Social Security hearings, both of

22   which I have not seen until today the entirety of

23   these reports.  I have seen some -- some summary

24   version of these reports.  And I believe the '95 was

25   a car accident and she had typical injuries of a car

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 240

1    accident with her -- let's put it this way, she had

2    bony injuries, soft tissue injuries, which you would

3    expect in a car wreck.  I assume that those injuries

4    she has minimal or no long-term issues with.  Her

5    anxiety and some of the other issues, her feelings,

6    social anxiety, et cetera, et cetera, we talked

7    about, are difficult to ascertain, but she's been

8    exposed her entire life to these constituents at

9    some level.  We believe it's higher in the past.  So

10   I think again she is susceptible.  She has a cascade

11   of injuries that -- that -- from childhood asthma

12   on.  So there's some overlap.  I just want to make

13   it clear there's an overlap.

14             And then when you look at the 2005, which

15   is much more recent, which she mentioned some of her

16   more recent medical issues, obviously her allergic

17   rhinitis, some of her numbness, her depression, all

18   that possibly overlap with her exposures to

19   oxidative stress and her G6PD.  And hopefully I made

20   that clear before.  And the testimony -- it says on

21   page Bates number 000716, which I think is page

22   three on the one, two, three, four -- fifth

23   paragraph, it says, the last sentence, testimony of

24   the claimant was credible and there was no

25   indication of malingering or exaggeration of

Page 241

1    symptoms.  So I think she tells what her symptoms

2    are.  She continues to complain of those symptoms

3    and the symptoms have overlap of their causes, as I

4    said.  But the major cause of many of her lingering

5    lifelong symptoms are a result of her G6PD

6    predisposition to injury from these toxic chemicals

7    and their exposure over her entire life.

8         **Q.   So in your opinion the car accident**

9    **referred to in the 1995 SSI documents is not a**

10   **continuing source of the injuries or complaints that**

11   **are present with Miss Williams today?**

12        A.   Doesn't appear to have a tremendous amount

13   of overlap.

14        **Q.   Okay.  During the course of your testimony**

15   **today, Dr. Mink, we talked about and used the term**

16   **major source.**

17        A.   Yes.

18        **Q.   Can you explain for us your understanding**

19   **of the term major source as it applies to a national**

20   **ambient air quality criteria pollutant, sulfur**

21   **dioxide?**

22        A.   Well, NESHAP says when you exceed a

23   certain amount of emissions, then you're considered

24   a major -- a major contributor versus a minor

25   contributor by statute.  And those are based on --

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Franklin L. Mink, Ph.D.

                                                              Page 242

1    for sulfur oxides they're based on health effects.

2    For many other chemicals under NESHAP there's --

3    they're based on technology-based standards.  But in

4    sulfur oxide, they are based on health-based

5    standards and they have been updated recently.

6         Q.   When you refer to NESHAP, for those of us

7    that are not always in the mix there, is that a

8    National Emission Standard for Hazardous Air

9    Pollutants, is that an acronym for that?

10        A.   That's correct.

11        Q.   And am I correct that when you refer to

12   the NESHAP standard that you stated that it's

13   technology-based and not a health-based standard?

14        A.   A lot of that is best available

15   technology, what you can reach, not how it affects

16   health.  The sulfur oxide standard is a health-based

17   standard.

18        Q.   Okay.  And do you know whether when an

19   industry or more specifically facility is designated

20   a major source, are the emissions considered by EPA

21   solely those coming out of the smoke stacks or are

22   fugitive emissions included in that designation?

23        A.   You know, I don't recall specifically, but

24   I -- I believe it's emissions from the facility, not

25   the outside stacks, but again, I don't recall that

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 243

1    exactly.

2         Q.   Okay.  Turning now to the other

3    terminology you used during your testimony today.

4    Hazardous air pollutants or HAP, what is your

5    understanding of the statutory or regulatory

6    definition of HAP?

7         A.   Hazardous air pollutants are those that --

8    literally, I mean, they actually use acronyms that

9    make sense -- that are hazardous when distributed as

10   emissions in air.  They're considered a contaminant

11   and pollutant at levels where they exceed a

12   regulatory standard and will cause an adverse

13   impact.

14        Q.   Okay.  Do you know which of the

15   constituents that you identified in your report are

16   designated hazardous air pollutants under the Clean

17   Air Act?

18        A.   I believe the metals that I listed are

19   hazardous air pollutants as well as the -- the NOXs,

20   I believe.  So I believe the majority, if not all of

21   them, are, including the radioactivity.

22        Q.   Okay.  And do you know how EPA calculates

23   whether a facility is a major source of hazardous

24   air pollutants?

25        A.   Again, I apologize.  That's more in Mr.

Page 244

1   Ungers' field, but in my recollection from many

2   years ago at the agency, it's based on their amount

3   of emissions and toxicity of those emissions and the

4   combination of those factors and the exposure to the

5   surrounding area.

6        Q.   Okay.  And do you know whether the Mosaic

7   Riverview facility is designated as a major source

8   under the National Ambient Air Quality Standards for

9   sulfur dioxide?

10       A.   I think that was asked and answered

11   earlier and the answer is yes.

12       Q.   Okay.

13       A.   I apologize if I didn't make it clear.

14       Q.   How about for the hazardous air

15   pollutants, if you know?

16       A.   I believe they are.

17            MS. HOGAN:  Okay.  All right.

18            MR. TORRES:  Cross-examination.

19                 RECROSS-EXAMINATION

20   BY MR. TORRES:

21       Q.   Mr. Ungers --

22       A.   No, no.  Dr. Mink.

23       Q.   Dr. Mink, forgive me.

24       A.   No problem.

25       Q.   In Exhibit 18, the -- would you hand him

Page 245

1    **Exhibit 18, please, if you can?**

2         A.   Here it is.

3         **Q.   Yes.**

4         A.   Got it.

5         **Q.   Under the section three mutations.**

6         A.   Yes.

7         **Q.   It also lists -- Exhibit 18 also states**

8    **this individual may or may not have symptoms of G6PD**

9    **deficiency, correct?**

10        A.   It does say that.

11        **Q.   You don't disagree with that obviously,**

12   **correct?**

13        A.   No, I don't disagree with that.

14        **Q.   And in Mink 19, which I have in my hand,**

15   **the Survival Analysis of Victims of Sulfur Oxide Air**

16   **Pollution Suffering from COPD or Asthma in**

17   **Yokkaichi, Japan, in Relation to Predisposing**

18   **Exposure.  Was this study listed in your expert**

19   **report?**

20        A.   No, I came across that study just recently

21   as a follow-up to, like I said.  I think I testified

22   to that earlier.

23        **Q.   And in the conclusion, it reads it appears**

24   **that the effects of clinical changes were greater in**

25   **males than females.  Do you disagree with that?**

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 246

1      A.    No, I think that's what the data shows.

2      **Q.    Do you know what the degree of the**

3   **difference is?**

4      A.    I don't believe it was significant, but it

5   was statistically significant.

6      **Q.    Statistically significant.  And Miss**

7   **Williams is of course female, correct?**

8      A.    That is my belief.

9      **Q.    Yes.  And you talked about major sources,**

10  **major sources are identified in part by Title V**

11  **permits, correct?**

12     A.    That's my understanding.

13     **Q.    Okay.  And are you aware that there are**

14  **more than 30 major sources in Hillsborough County?**

15     A.    That's my recollection.

16     **Q.    Okay.  And did you calculate contributions**

17  **from all of these major sources to the constituents**

18  **referenced in your report?**

19     A.    No, I did not.

20          MR. TORRES:  I have no further

21       questions.

22          THE WITNESS:  Are we good?

23          MS. HOGAN:  That's it.

24          VIDEOGRAPHER:  We're off the record.

25          (Thereupon, the deposition was

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 247

1    concluded at 6:58 o'clock p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 248

1              I, FRANKLIN L. MINK, Ph.D., do hereby

2     certify that the foregoing is a true and accurate

3     transcription of my testimony.

4

5

6

7

8              Dated

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 249

1    STATE OF OHIO          )

2    COUNTY OF MONTGOMERY )    SS:  CERTIFICATE

3           I, Connie Sumner, a Notary Public within

4    and for the State of Ohio, duly commissioned and

5    qualified,

6           DO HEREBY CERTIFY that the above-named

7    FRANKLIN L. MINK, Ph.D., was by me first duly sworn

8    to testify the truth, the whole truth and nothing

9    but the truth.

10          Said testimony was reduced to writing by

11   me stenographically in the presence of the witness

12   and thereafter reduced to typewriting.

13          I FURTHER CERTIFY that I am not a relative

14   or Attorney of either party, in any manner

15   interested in the event of this action, nor am I, or

16   the court reporting firm with which I am affiliated,

17   under a contract as defined in Civil Rule 28(D).

18

19

20

21

22

23

24

25

Williams, Rhonda v. Mosaic Fertilizer, LLC                    Frankiin L. Mink, Ph.D.

Page 250

1          IN WITNESS WHEREOF, I have hereunto set my

2     hand and seal of office at Dayton, Ohio, on this 1st

3     day of September, 2015.

4

5

6

7     _____

8     CONNIE SUMNER
      NOTARY PUBLIC, STATE OF OHIO
9     My commission expires 09-03-2017

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25