1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION
                CASE NO.: 8:14-cv-01748-MSS-TGW
 3

    RHONDA WILLIAMS,
 4
          Plaintiff,
 5
    vs.
 6
    MOSAIC FERTILIZER, LLC, a Delaware corporation
 7  doing business in Florida,

 8        Defendant.
    _____/
 9
     VOLUME I (Pages 1 to 129)
10

11  VIDEOTAPED
    DEPOSITION OF:          PAUL M. DEUTSCH, Ph.D.
12
    TAKEN:                  Pursuant to Notice by
13                          Counsel for Defendant

14  DATE:                   November 16, 2015

15  TIME:                   9:49 a.m. to 1:34 p.m.

16  LOCATION:               Paul M. Deutsch & Associates, P.A.
                            10 Windsormere Way
17                          Suite 400
                            Oviedo, Florida  32765
18
    REPORTED BY:            Melanie Keefe
19                          Notary Public
                            State of Florida at Large
20

21

22

23

24

25
```

```
                                                                 2
1    APPEARANCES:      LAUREEN GALEOTO, ESQUIRE
                       Law Office of Laureen Galeoto, PLLC
2                      100 South Ashley Drive
                       Suite 600
3                      Tampa, Florida  33602

4                          Attorney for the Plaintiff

5                      CHRISTOPHER TORRES, ESQUIRE
                       RYAN HOPPER, ESQUIRE
6                      Greenberg Traurig, P.A.
                       101 East Kennedy Boulevard
7                      Suite 1900
                       Tampa, Florida  33602
8
                           Attorneys for the Defendant
9

10   ALSO PRESENT:   Rick Spector, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

| INDEX | PAGE NUMBER |
|---|---|
| Examination by Mr. Torres | 6 |
| Read Letter | 127 |
| Errata Sheet | 128 |
| Reporter's Certificate | 129 |

4

1      EXHIBITS                                PAGE NUMBER

2      Exhibit No. 1 for identification          6
       (Amended Notice of Taking Deposition)
3
       Exhibit No. 2 for identification         11
4      (Book 1 and 2 of Administrative Files)

5      Exhibit No. 3 for identification         29
       (Dr. Deutsch's Report)
6
       Exhibit No. 4 for identification         34
7      (Binder of Medical Records)

8      Exhibit No. 5 for identification         69
       (Log Sheet, Items Added to the File)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          THE VIDEOGRAPHER:  Good morning.  My name is Rick

2     Spector.  I'm the videographer appearing on behalf of

3     Regency Court Reporting.  This matter is before the

4     United States District Court, Middle District of

5     Florida, Tampa Division.  This is the matter of Rhonda

6     Williams, a single person as plaintiff v. Mosaic

7     Fertilizer, LLC, a Delaware corporation doing business

8     in Florida as defendant.  The case number is

9     8-cv-14-01748-MSS-TGW.  This is the deposition of Paul

10     M. Deutsch, Ph.D.  Today is Monday, November 16, 2015,

11     and it is 9:49 in the morning.

12          At this time I'll ask the attorneys to please

13     introduce themselves.

14          MR. TORRES:  Christopher Torres representing

15     Mosaic Fertilizer, LLC, and I have with me Ryan Hopper.

16          MS. GALEOTO:  Laureen Galeoto on behalf of the

17     plaintiff, Ms. Williams.

18          MR. TORRES:  Okay.  Melanie, can you please swear

19     the witness?

20  THEREUPON,

21               PAUL M. DEUTSCH, Ph.D.,

22     a witness herein, having been duly sworn, was examined

23  and testified upon his oath as follows:

24          THE WITNESS:  I do.

25          MR. TORRES:  Thank you.

6

1                         EXAMINATION

2    BY MR. TORRES:

3         Q.    Dr. Deutsch, can you please state your name and

4    work address for the record?

5         A.    Certainly.  It's Paul Michael Deutsch.  That's

6    D-E-U-T-S-C-H.  Address is 10 Windsormere, that's

7    W-I-N-D-S-O-R-M-E-R-E, Way, Oviedo, O-V-I-E-D-O, Florida

8    32765.  And we're just a bedroom community of Orlando,

9    Florida.

10        Q.    Dr. Deutsch, if there's a question that I don't

11   -- you don't understand, please just let me know and I will

12   try to make it clear.

13        A.    To the same statement, I'll say that if I go

14   ahead and answer it thinking I understand it and it's

15   clearly unresponsive, please indicate so and repeat the

16   question and make sure I -- I am responding appropriately to

17   it.

18        Q.    I will do that.  Thank you.

19              If you need to take a break, just let me know and

20   we'll break.

21        A.    Certainly.

22        Q.    Dr. Deutsch, are you represented today by

23   counsel?

24        A.    No.

25              (Exhibit No. 1 is marked for identification.)

7

1          Q.    Okay.  I'm going to hand you Exhibit 1, which is

2     an Amended Notice of Taking Deposition.

3          A.    You handing me this reminds me I may have

4     misstated slightly.  And you've typed this slightly wrong.

5     You have 19 Windsormere Way.  It's 10 Windsormere Way, Suite

6     400, and I left the suite number out, I believe, when I gave

7     you my address --

8          Q.    Thank you.

9          A.    -- but it is Suite 400.  But we're 10, not 19.

10          Q.    Thank you.  And -- and we will send a -- a second

11     amended notice of taking deposition for the second part of

12     today's deposition if we need to.

13          A.    Otherwise this appears correct.

14          Q.    Thank you, sir.

15          A.    And that is listed as Exhibit 1.

16          Q.    Dr. Deutsch, how did you prepare for today's

17     deposition?

18          A.    Basically I reviewed every piece of information

19     in my file starting from the beginning and moving forward

20     from there.  I reviewed everything, even if it was older

21     material.  I don't throw anything out of the file.  So, for

22     example, the original medical summary that was uncorrected

23     but later corrected for the report, I still went through

24     that.

25               Now, I have a -- I impose my own cap on prep

1    time.  So it may have taken me three or four hours, but I

2    don't charge more than one and a half, and you'll see that

3    on the posted charges that haven't been billed yet.  So

4    there's a one-and-half-hour charge for prep time, and -- but

5    it really took me in this case probably close to four hours

6    just so I felt comfortable that I had gotten through

7    everything and I had refreshed my memory, gotten all the

8    other cases out of my head.

9           And I need the file because it's almost

10   impossible to accurately answer all questions, particularly

11   on a case this involved, if you don't have the case to refer

12   back to.  I -- I don't memorize them, and there are a lot of

13   cases, especially after 45 full years of practice.

14       Q.   Is -- are these documents that you have with you

15   today your complete file for --

16       A.   Yeah.

17       Q.   -- Ms. Williams?

18       A.   Even anything that was in the electronic file,

19   which would include mostly e-mails, notes between ourselves,

20   things of that nature, if they didn't have a specific area

21   to go into -- and we're very, very detailed even about

22   making up tabs for the file.

23          There is a miscellaneous section which contains

24   any tabs that didn't fit specifically into the tab format we

25   have.  So you'll find mostly in the miscellaneous sections

9

1    there might be notes and conversations between client and

2    myself.

3         You might find fax cover sheets because there

4    were a number of faxes that went out, things of that nature.

5    The actual copies of the fax and whatever was faxed out

6    would be in correspondence, PMDA correspondence, standing

7    for Paul M. Deutsch & Associates correspondence.  But if it

8    was like a fax cover sheet for sending out the report, life

9    care, I wouldn't put another report and life care plan in

10   there when it's so prominently displayed at the very opening

11   of the file.  So it just depends on what was sent as to

12   whether or not we keep a second copy in the correspondence

13   section.

14        There's also an attorneys' correspondence

15   section.  Everything that came into the office is set up in

16   that.

17   Q.   Will I be able to get a copy of these records?

18   A.   Absolutely.

19        MS. GALEOTO:  Although I will object to the

20        extent that you're asking for attorney correspondence

21        because you know the rule.

22   A.   I'll just say in response to that, the attorneys'

23   correspondence was almost exclusively transmittal letters,

24   but I haven't gone -- I went through it, but I don't

25   remember enough to say if there was anything other than

1    transmittal letters.  But you're welcome to everything

2    except -- I cannot -- under the rules for psychological

3    testing, I can't give you broad data on a psychological

4    testing without either the permission of the judge, or if

5    you have an expert in that arena, I can send it to them

6    overnight.

7          Q.   Okay.

8          A.   But I'm not allowed to hand it to you.  And if

9    you need the section, the rule section that indicates that,

10   I'd be happy to provide it to you.  I tried it one time and

11   got my hand slapped.  I mean, I didn't get in any trouble,

12   but I did get my hand slapped and a letter from the testing

13   company saying, "Under no circumstances are you allowed to

14   ever do that again."

15          And they explained why and the impact it has if

16   it gets around to the general public, because once I release

17   it, it's part of the court files, and therefore, open to

18   anybody under the Freedom of Information Act and it skews

19   potentially the public's knowledge of test questions,

20   potentially, and therefore, eventually negates the validity

21   of the testing.

22          So I -- I can't provide it without a court order,

23   and it -- it provides specific provisions for the judge and

24   how they do it.  The judges are all aware of it.

25          Q.   I understand.

1          MR. TORRES:  Ms. Galeoto, you raised an

2     objection.  What was the basis for the objection?

3          MS. GALEOTO:  The rule provides that you are not

4     entitled to correspondence from experts and counsel.

5          MR. TORRES:  And what rule is that?

6          MS. GALEOTO:  It's Rule 26.

7          MR. TORRES:  Okay.  Thank you.

8     Q.    So I think the arrangement we will make, Dr.

9     Deutsch, is I will ask you on the record for copies of -- of

10    the file.  I will --

11    A.    There are two volumes.  You want to mark one of

12    them as a -- and make it a composite?

13    Q.    I'm perfectly fine with that.

14          (Exhibit No. 2 is marked for identification.)

15    A.    Okay.  I put it on the inside because when we put

16    it on the outside, every time they pull it off the shelf,

17    they end up --

18    Q.    I understand.

19    A.    -- tearing them off.  So the -- Book 1 and 2 of

20    the administrative files will be Exhibit No. 2, and we will

21    make a complete copy.  I think everything is on one side,

22    but anything that's two sided will be copied as a two-sided

23    item.

24          Now, are you comfortable with not a notebook?  We

25    can recreate the notebook and recreate the tabs, but we

1    charge for that.  If you are comfortable with a complete

2    copy and -- like this first tab says "Revision Cover

3    Letter," if we can take Revision Cover Letter and put that

4    in bold and in large letters on a hard piece like this and

5    separate out each section, it'll have the exact same tab

6    numbers and we don't charge anything for that.

7         Q.   I'm perfectly fine with that.

8         A.   Okay.

9         Q.   Now, the only thing I will ask is that for your

10   communications with plaintiff's counsel, that you would

11   separate those --

12        A.   Okay.

13        Q.   -- and give them to Ms. Galeoto and she will make

14   a determination in terms of what I can receive of those

15   communications.

16        A.   That's no problem.

17        Q.   Okay.

18        A.   Let me make a quick note, though, because I won't

19   remember.

20        Q.   Yeah.  I will also advise you that we have

21   retained a clinical psychologist in this case.

22        A.   We can send it to the -- to that person

23   overnight.

24        Q.   Thank you.

25        A.   Who is that?

13

1          Q.    Her name is Dr. Katherine McKay.

2          A.    Dr. McKay, okay.

3          Q.    Yes.  And she is in St. Petersburg.

4          A.    Yeah.  I'm pretty familiar with her.  I could've

5     found her anyway, but if you happen to have her address

6     handy, I will -- that's just as convenient for us.

7          Q.    Okay.

8          A.    But if not, I'll find it.  Thank you.

9          Q.    You're welcome.

10         A.    Is this going to eventually be attached to the

11    court reporter --

12         Q.    Yes.

13         A.    -- or you just want it mailed to you?

14         Q.    You know what?  Go ahead and mail me a copy and I

15    will make sure that the court reporter gets it.  And if you

16    can overnight that, that would be best.

17         A.    Yeah.

18         Q.    I will give you a --

19         A.    No problem.

20              MS. GALEOTO:  Why don't we just have him send it

21         directly to the court reporter?

22              MR. TORRES:  We can send it directly to the court

23         reporter as well.

24              MS. GALEOTO:  Okay.  And what are we sending to

25         Dr. McKay?

1          MR. TORRES:  The raw data --

2          MS. GALEOTO:  Okay.

3          MR. TORRES:  -- for the psychological

4      examination.

5      A.    I'm sorry, but if I don't write it down, I won't

6      remember later.  Go ahead, please.

7      Q.    I prefer you do.  Are you -- are you finished?

8      A.    Yeah.

9      Q.    Okay.  Did you speak with anyone in preparation

10     for today's deposition?

11     A.    Not in preparation for today's depo.  I mean, I

12     spoke to a lot of people in the development of the life care

13     plan.  Very few -- although several did, very few actually

14     filled out my questionnaires.  So when I spoke to the

15     doctors on the phone, I just went through my questionnaire

16     so there would be consistency that you could observe between

17     the questionnaires and those things that were asked and the

18     answers I was getting from them.  If they wanted to add

19     something after that, I certainly allowed that and took

20     notes, but I wanted to make sure all of those questions were

21     properly answered.

22     Q.    Are the notes from those conversations and

23     questionnaires in the file that is marked Exhibit 2?

24     A.    Let me show you real quick so you have no trouble

25     finding it.  Notebook 2 has a list, gastroenterologists,

```
1       Pulmonologist No. 1 -- excuse me.  Let's go urologists;

2       Pulmonologist No. 1, which was Dr. Alabi who responded;

3       Pulmonologist No. 2, which was Dr. Furman who did not

4       respond; allergist, Dr. Downes, who did respond, and just

5       for -- make my life simpler here, you can see where they all

6       are, the very start of Notebook 2.  So I heard from Dr.

7       Alabi; Dr. Qazi, who was the gastroenterologist; Dr. Downes,

8       the allergist; Dr. Patel, the urologist; and Dr. Vasudeva on

9       Dr. Downes --

10          Q.    Okay.

11          A.    Oh, no.  Excuse me.  Dr. Downes was on the phone

12      with her when I was speaking -- I -- I didn't mean -- about

13      Dr. Downes, so his -- whatever he's -- his medical problems

14      are -- were uninteresting to me.

15          Q.    Do you mind if I -- if I take a look at that

16      notebook very quickly?

17          A.    Sure.  No problem.

18          Q.    Thank you, sir.

19          A.    I mean, there's a lot more in there than just --

20          Q.    I understand.

21          A.    -- that.

22          Q.    This is just one I wanted to look at.

23          A.    The bills and the original referral information

24      will also be in the back end of that unless I'm, for any

25      reason, incorrect, but that looks to be the case.
```

1      Q.    And, Dr. Deutsch, the -- the purpose for these

2   conversations was for you to determine what care would be

3   necessary for Ms. Williams?

4      A.    Yeah.  The four foundational areas that each life

5   care planner should include in developing a life care plan,

6   those aspects of the plan that are medical in nature require

7   medical input.  The second area would be psychological

8   aspects of the disability, which I'm --I'm board certified

9   under the -- not board certified.  I'm licensed under the

10   Psychology Practices Act and can do that, or if they have a

11   treating physician, I would -- or treating psychologist, I

12   would first go to the treating psychologist to establish

13   that.  But then you would go to the clinical practice

14   guidelines from the standpoint of each physician specialty,

15   so like the pulmonary clinical practice guidelines, the

16   gastroenterological clinical practice guidelines, urological

17   clinical practice guidelines, and so forth.

18           It's a very complex system developed by the U.S.

19   government.  They don't make anything easy.  But once you

20   understand how to do it, it's not too difficult to pull the

21   specific area of clinical practice guideline and determine

22   what it says, download it if it's applicable.  And we did

23   download -- there's a tab called Clinical Practice

24   Guidelines.  We have two clinical practice guidelines --

25   hold on.  I think we have three.  Let's see.  Nope.  I'm

1          sorry.  We have four clinical practice guidelines.

2                  And we also look at the latest research

3     literature, and we have ten research articles.  So you can

4     establish medical information primarily -- or -- or in

5     addition to the doctors through clinical practice guidelines

6     and research literature, but I'm not satisfied that we've

7     done that until we've talked to the doctors because the

8     doctors are not locked in to any treatment protocol by those

9     clinical practice guidelines.

10                 They are a direction in which the physician is

11    expected to go based on the majority of these cases and how

12    they're treated across the nation, but there is no

13    requirement that they follow the clinical practice

14    guidelines.  And only they can judge what aspects of the

15    patient's treatment require moving in this direction or that

16    direction, and it may be perfectly reasonable for them.

17    Let's say they're a bariatric patient and they have to do

18    things slightly different, that's fine.

19                 So I like the physician input very much, and I've

20    taught for years in the -- I know a number of judges that

21    have upheld this, that it's important to build your plan

22    around the information that's being developed by these --

23    and -- and that you're getting from these physicians.  I

24    know of at least three Daubert decisions where life care

25    planners were tossed out if they built plans and looked for

1    a physician to rubber-stamp what they did later.

2           What I did was I couldn't get them at first.  I

3    held back my recommendations, although clearly I was capable

4    of putting it out because I had gotten the medical from the

5    clinical practice guidelines and the research literature and

6    very shortly thereafter did get the recommendations for the

7    -- from the physicians that I needed and completed the plan

8    and went on from there.  But you have to build your -- your

9    medical aspects of the plan around what the doctors are

10   telling you, not just get it rubber-stamped after the fact,

11   and that is, in fact, what I did.

12          The second area I said was psychological.  The

13   treating psychologist takes precedent over any consulting.

14   So if I'm the consultant and they say they want something

15   more, it's usually more in my experience, I am willing to

16   accept it to a point.  But if a psychologist tells me, "I

17   want them seen the two times a week for the remainder of

18   their life," I have a problem with that.  And -- because if

19   it goes beyond a certain point, like two or three years, I

20   generally feel like you're not going to accomplish what you

21   want to accomplish.  Because if you can't accomplish it in

22   two or three years, it's unlikely you're going to.

23          I'm willing to give an allowance that

24   periodically allows someone to return to counseling, but the

25   truth is is if you can't do it in a two- to three-year

1    period, they may have a need to go back periodically, but

2    the likelihood is you're never going to achieve what you're

3    trying to accomplish on a recommendation that says unchanged

4    level of frequency going on to the end of life because it's

5    like the day before you're going to bury them or they're

6    going to die, you're going for one last session.

7         It doesn't make a lot of sense to me, and I've

8    been doing this, like I said, for 45 full years.  I -- I

9    have nobody that has ever gone for twice a week or three

10   times a week or twice a month, three times a month for their

11   entire life.  And the fact is that they will develop a

12   rapport with the counselor, make a determination as to when

13   they're receptive to counseling and when they're not, and

14   they need a break away from it.

15        So we'll usually do whatever I -- you know, I

16   feel is correct, like two times a week for two years, and

17   then they choose their break times.  They may break for five

18   years.  They just don't want it anymore, and then they can

19   come back when they feel they're ready to reestablish

20   counseling.  But ongoing counseling for a lifetime is just

21   unrealistic.

22   Q.   Okay.  You said, Dr. Deutsch, there are four

23   foundational areas.

24   A.   The -- the --

25   Q.   You said medical, psychological --

1      A.    Rehabilitation and case management.

2      Q.    Okay.

3      A.    I'm a board certified rehabilitation counselor

4  that looks at anything from additional rehabilitation

5  services to coordination of therapies, if there's more

6  physical or -- or rehabilitation therapy, any program

7  therapies that need to be looked at, case management.  I'm

8  also a board certified case manager, would look to

9  coordinating the team's effort in additional rehab, so

10  coordinating physical therapy, occupational therapy, speech

11  therapy.

12            And again, life expectancy recommendations with

13  -- within those arenas is just not realistic.  Even physical

14  therapy to life expectancy is unrealistic.  It's -- the only

15  time I ever do that is if it's just an evaluation.  We're

16  doing a home therapy program that's guided by an annual

17  re-evaluation by PT saying, "Okay.  You're meeting these

18  goals based on my re-evaluation, but as age and -- and

19  disability combined, we need to make a little change in

20  therapies based on what she's going to be able to tolerate

21  and how the disability and functionality of the patient

22  changed based on aging."

23            But she -- so that's one time a year just for a

24  re-evaluation, but you do not do professional aggressive

25  physical therapy to life expectancy.  And you may follow

1    that with as many as six hours a year of seeing the

2    therapist, but it's not going to be the patient seeing them.

3    It's going to be the caregivers who have been chosen to

4    follow through to help with the home therapy so that if they

5    have questions, if there's a problem they need answers to,

6    they are -- are paid under that six times a year of -- of

7    further training, getting questions answered.

8             If there's turnover in home health staff, we

9    don't want the other staff members to train them.  That's

10   like the old telephone game.  By the time you get to the

11   end, what was communicated is totally different, so we want

12   consistency in what they're trained to do.  But you never

13   are going to look at home therapy in a program like that

14   where you're using the therapist -- or the home health

15   professionals to train the home health professionals.

16            We want to try to the best of our ability to

17   utilize home programs in certain types of home-based

18   systems, and we'll get to that when we look at long-term

19   care, because that way we're using caregivers as being

20   duplicative in their provision of services.  We get the

21   maximum amount -- amount out of them at the least cost.

22        Q.   Okay.  All right.  So for -- just for

23   clarification and for -- for the record largely, the four

24   foundational areas to every life care plan are medical,

25   psychological, rehabilitation, and case management; is that

1    correct?

2         A.    Correct.

3         Q.    Thank you.  And these are effectively inputs into

4    the life care plan; is that --

5         A.    Correct.  Now, these don't replace the

6    international academy of life care planners regulations on

7    the other aspects of minimum standards, which include a

8    variety of aspects that should be in the life care plan that

9    you -- you know, you should include a team approach that --

10   and -- and a variety of other things.  I can print them out

11   and give them to you.

12               They actually charge to download those to print

13   them out.  I find that -- I don't believe in that and I

14   voted against that.  I was a consultant and we talked about

15   it.  They didn't want to have me join the team because they

16   wanted me to be available to consult in all areas, not

17   restricted to one.  So I agreed and I didn't join the team.

18   I remained a consultant to all areas of the standards and

19   consulted in all of those, but I was against the idea of

20   charging us to provide that to the counselors.

21               So I just try and minimize how many copies you

22   need.  I just photocopy the one or two I download and I

23   absorb the cost because I just don't think it's right, but

24   that's neither here nor there.  The point is is if you want

25   them, I'll get them.  If plaintiff counsel want them, I'll

1    get them.

2              But I make sure I follow standards, and I've been

3    teaching this since 1982.  That was my first seminar and --

4    the minimum standards and their requirements for being taken

5    prior to the -- the exam -- the -- the -- exam -- the core

6    curriculum requirements you have to finish before you can

7    take the examination process are something that, you know,

8    I've been teaching before the -- the course that's offered

9    by the -- the life care planning foundation.

10             And so everybody, every certified planner out

11   there, including Ms. Pennachio, is a former student.  There

12   -- there had been three programs.  That's getting narrowed

13   down right now.  Kaplan University has decided to go all

14   degree-seeking and stop their continuing education program,

15   so I'll no longer be involved as faculty there.  But I wrote

16   their curriculum.  My textbooks were one of the sets of

17   textbooks, and I have ten multivolume textbooks in my --

18   forgetting that statement specifically, my 13th textbook I'm

19   under contract now.  It's to be four volumes and 6,000 pages

20   at printing.

21             My -- I have over a hundred peer review journal

22   articles in the journals, and I have, I don't know, 20, 30

23   chapters in other people's texts.  And it grows every year.

24   It's a big part of what I do just because I see myself more

25   than anything an -- as an instructor and remaining

24

1       available.

2               So when you go through my website, it's not

3       showing chapters, journal articles, et cetera, for

4       attorneys, but you're welcome to read them; but I provide

5       them for the life care planners out there to better

6       understand from -- how to utilize the research literature,

7       to better understand the articles you're reading, and it's

8       very fundamental.

9               And I -- I developed that along with Dr. Kendall,

10      K-E-N-D-A-L-L, putting the life care planner as the first

11      person in there so that -- because the nurses have no

12      background history of training in graduate-level courses in

13      statistics.  So we teach it to them in a very fundamental

14      way.  We've gotten a lot of positive feedback about it.  Now

15      they understand through that what it means to -- to have

16      reliability, what does validity mean, you know, et cetera,

17      et cetera.

18              And I think it's just as useful for the attorneys

19      even though we didn't write it for the attorneys, but the

20      guide is -- or the goal is to read it and understand not

21      just the abstract but the actual purpose and -- and outcome

22      of how the research was done, what does the -- the research

23      design mean, and -- and what do you get from that so that

24      you're -- you're determining the real value of the article.

25              Most people, frankly, in our level -- I don't

1    mean the doctorate level people, but most of the nurses and

2    the master's level people read the title and say it sounds

3    consistent with my client.  Most of them don't know how to

4    look at the abstract and interpret how consistent it is.

5    Most of them have no way of knowing, even when reading the

6    abstract, how their patient actually falls into this study

7    and whether it's meaningful or not, and they have no clue

8    how to read it in terms of it's research design and outcomes

9    and how much the patient falls into that category.  That's

10   what we're trying to solve.

11          No -- does your patient fit this category, and do

12   the statistics and research design include your patient?

13   And so -- so avoid making a mistake and finding out you've

14   picked articles that either don't include your patient at

15   all or, for whatever reason, don't apply to your patient.

16   So you get an article like -- there's one on -- there's

17   actually a half dozen on life expectancy for patients with

18   cerebral palsy that very clearly states that if the

19   determination of cerebral palsy comes six months post birth

20   and it is established based on an injury versus a birth

21   onset and it didn't occur until six months post -- post

22   birth, you cannot extrapolate the information from the birth

23   onset material to your client.  And there's another couple

24   of other caveats, and therefore, this data simply cannot be

25   assumed to include those patients.  Your patient cannot be

1    diagnosed as a birth onset of -- of catastrophic brain

2    injury, can't be determined to be a catastrophic birth onset

3    brain injury, and it makes a huge difference.

4            In -- in the case I was involved in where an

5    epidemiologist out of Canada used only that data to

6    establish what the patient had and what the life expectancy

7    was, I wasn't discussing -- I don't set life expectancy, but

8    as a disorder in a group overall, I explained that they

9    needed to read that portion to understand that my opinion,

10   the group as a whole should not be based on those articles,

11   which is all they based it on.  And that if you read it,

12   that is not a subset of data that can be considered.  Well,

13   the defense got very upset at me, said I was filibustering.

14   I was just trying to give the information that legitimately

15   needed to be read and understood, and they basically refused

16   to pay for my depo.

17           Well, I'm a major donor to the University of

18   Florida.  And when the president of the university got --

19   you know, got all this information, I got a letter of

20   apology from the attorney.  And the risk manager wrote me

21   and apologized, because they tried to have me fired from the

22   university, so it became a big deal because I got supported

23   by all the university professors.  You can't fire on --

24   based on freedom of speech, and it -- it was a wild time.

25           You know, so the bottom line was, is I didn't

1     even say what the life expectancy should be.  I just said,

2     "Read this data and understand it."  It's in the same

3     article.

4          Q.   Right.

5          A.   So we want our people to understand, not jump to

6     conclusions, about life expectancy, but know what you're

7     reading.  That's the kind of data that's in that -- that

8     website that's in that -- the specific articles that I've

9     recommended.  Whether they're my articles or I attached

10    different ones, we're trying to continue to educate them.

11    And a lot of people use them.

12         Q.   Dr. Deutsch, in -- in the Exhibit 2, are all of

13    the materials that you relied on for the medical component

14    of the life care plan in that -- within Exhibit 2?

15         A.   Okay.  Are all the medical components --

16         Q.   Yes.

17         A.   Some are; some aren't.  For example, the -- the

18    medical reports are not within Exhibit 2.  They're in the

19    notebook that we have down here.  All the records from the

20    doctors, all the reports that I referenced are in the -- we

21    haven't marked that yet, but they're in Exhibit -- they're

22    in Book 1 of 1, which is a large three-ring notebook binder

23    that includes all the medicals.

24              Now, if you turn in my notebook, the 1 of

25    Exhibit 2, you'll find a tab that reads -- oh, where's --

1   oh, I'm sorry.  So if you go to Notebook 1, you'll find the

2   tab that reads Medical Records and there's two pages of

3   logged in records.  The first column says, "Medical Records

4   Received."  The second column is the inclusive dates of

5   those records.  The third column is the date I received

6   them.  The next column is the date I began reviewing them.

7   So there are multiple dates in there, and they're all

8   included in the medical summary that was done.

9           So the -- let me see.  The medical summary starts

10   just before it.  There's the medical summary, then there are

11   the medical summary addendums because they came in on

12   different dates.  So there's Addendum 1 through 7, so there

13   was seven separate addendums with Franklin -- Franklin Mink

14   being at the last addendum.  And when it was published in

15   the report, I have to look whether all of the addendums got

16   published in the report or whether the report went out

17   before the final addendum got there, but we'll still do the

18   addendum because we need in depo or trial to be able to

19   refer to it.

20           And then there's two ways we look at the medical

21   record.  One is is a -- is a summary, which I can define how

22   we do it.  And the other is just after the list of medical

23   records, and that's called a documentation of

24   recommendations.  And in that instance, what we're trying to

25   do is establish in the records which recommendations have

1    been made by the doctors that are still appropriate and

2    consistent with the condition of the patient and remain

3    viable and should be considered in the plan.  And we'll ask

4    questions about that in our questionnaire that goes out.

5            But basically there's -- the documentation of

6    recommendations is not a narrative.  It's more a bullet

7    point, and it's about six and a half pages long.  And we

8    just identify the date -- the report, the date of the report

9    in which we're focusing.  Like Brandon Regional Hospital on

10   3/25/10 showed a clinical impression of acute headache and

11   uncontrolled hypertension.  Obviously that needed to be

12   addressed in follow-up over time to see if we bring that

13   hypertension down and that headache under control.  It

14   doesn't specifically say how, so that specifically would

15   require follow-up questions; but all of those are outlined

16   in documentation of recommendations.

17           (Exhibit No. 3 is marked for identification.)

18      Q.   Dr. Deutsch, I'm going to hand you Exhibit 3,

19   which was the report that you prepared that was produced to

20   me.  Can you just take a look at that and tell me whether

21   you're familiar with that report?

22      A.   It's clear you must've gotten the report

23   electronically.  So depending upon what font you chose, it

24   could be a different pagination.  Oh, what you have included

25   with the report, my Rule 26 list of depositions and trials,

1    which definitely would make your -- the report much longer.

2    Well, let me get to just the report first.  Oh, you've got

3    the life care plan in there also.  Okay.  Let's just go to

4    the narrative report first.  Interestingly, even with all

5    that, my last page is 23 and your last page is 23.  So it

6    appears like, despite the different font and all the other

7    things you attached, it is -- it appears to be an exact

8    duplicate, 23 pages long.  Then you have the life care plan.

9    Do you want me to look at that too?

10        Q.    You can, please.

11        A.    Okay.  I won't do every single page, but I'll

12   come as close as I can to making sure we've covered

13   everything.  Okay.  Let's see.  What year was this?  Okay.

14   That's -- okay.  You've got the right number of columns, the

15   right order, the right -- it's Item No. 68 and 69.  So it

16   appears to be an exact duplicate of the life care plan

17   completed February 6th -- or started February 6, 2015, and

18   so I would say that is accurate.

19             And the last thing is the Rule 26 report on

20   trials and depositions.  I would suggest, but it's entirely

21   up to you, that you take an updated one because it changes.

22   It can change every week.

23        Q.    I understand.

24        A.    And if you would like the updated one, I have

25   several here.

31

1          Q.    Thank you, sir.

2          A.    But this all appears to be current and accurate.

3          Q.    Thank you.  In the report, I'm going to hand the

4     report back to you.

5          A.    I say -- I'm sorry.  I say all appears to be

6     current and accurate except for the Rule 26 report, which

7     has some new things that have been entered into it.

8          Q.    I understand.  Thank you.  Dr. Deutsch, in your

9     report is a medical summary.  And it looks like it goes from

10    pages 9 through -- or can -- can you just tell me what pages

11    your medical summary goes through?

12         A.    Well, it starts on page 9 with a bold summary

13    that -- that's -- or a bold title that says "Medical

14    Summary."  And it ends on page 19 just above the bold

15    notice, that the next section is Activities of Daily Living.

16         Q.    Thank you.

17         A.    And under each addendum, it lists what record

18    went into that addendum.  So in this case the last addendum

19    shows Southshore Cardiovascular Associates from 1/13/15 as

20    the last addendum.

21         Q.    Now, how many addenda or addendums do you have in

22    your records?

23         A.    I believe I indicated there were a total of

24    seven, but in my addendums, the last one was actually

25    deposition of Franklin Mink, M-I-N-K, Ph.D.  I don't exactly

1    know why -- let me just take a look.  I'm not exactly sure

2    why the last one here is Southshore, but I just want to make

3    sure Southshore is listed in the addendums here.  I don't

4    see Southshore here.  It was about a half-page addendum, and

5    it may just not have made it in.  This is

6    February 6th.  Let's go to -- back to the addendum for

7    Southshore and see when that was completed, 8/19/15.  So it

8    was actually completed just after -- about 30 days after the

9    report was completed, so it would not have made it into the

10    report.

11        Q.    Okay.  So to -- I guess to state the obvious,

12    missing from the report are part of Addendum 4, Addendum 5,

13    Addendum 6, and Addendum 7; is that fair?

14        A.    It appears to be so, but let's look at Addendum

15    6.  Yeah, it came out 12/20/13, so it definitely is a part

16    of the --

17        Q.    And -- and what are the -- what are the

18    addendums, not individually, but what are they generally?

19        A.    Well, any time you receive a new group of medical

20    reports or even a single medical report, you summarize it,

21    add it to the report, but you just don't add it in like it

22    was the same as -- the same time frame.  You're trying to

23    point out that you have a new addendum --

24            MS. GALEOTO:  Excuse me.

25        A.    -- to the summary that you received later and you

1    summarized later, and the same thing using the addendum as

2    part of the documentation of recommendations.  It -- it's

3    showing you the same thing.  It was received later and

4    documented later in the bullet points, so it's got nothing

5    to do with whether it's good, bad, indifferent, better.

6    It's just an update, and that's often what it is, is it's an

7    update on previously identified information, so --

8         Q.    I understand.  The binder that I have in front of

9    me, is -- are these the medical records that you reviewed --

10        A.    Yes.

11        Q.    -- in connection with the life care plan?

12        A.    Right.  And if you need that copied, we have

13   trained -- we took it on ourselves and got permission from

14   the manager at Staples to pull -- put aside or pull aside

15   two of the regular employees that work in photocopying to

16   train them on HIPAA regulations.  And they're the only two

17   allowed to work with our notebooks, so there's no -- as --

18   they're secure as possible by taking the time to have

19   trained them.  They're a lot less expensive because they're,

20   I think, something like a nickel a page.

21        But what we want to do is make sure that they're

22   picking up every yellow highlight, every underlining.  And

23   -- and then we come back and when it gets back to us and we

24   add -- we look at every page, if there are any flags --

25        Q.    Um-hmm.

1      A.   -- we -- we try and replace every flag that's on

2    it if you determine you want a copy so that you literally

3    get an exact copy.  Now, we don't provide a notebook.  We

4    just replace the tabs with these sheets that I showed you

5    before, and we do make duplicates of the tabs and put them

6    where they were in this notebook.  So -- but that's the only

7    thing we produce outside the office.  It saves you a little

8    bit of money, but most importantly, it's by people who know

9    exactly what we're looking for.

10     Q.   Do you mind if I mark this as Exhibit 4?

11     A.   No.  That's where it should be marked --

12     Q.   Thank you.

13     A.   -- not on the outside.

14     Q.   Thank you.

15          (Exhibit No. 4 is marked for identification.)

16     Q.   So I'll mark this.  I'll mark the binder of

17   medical records as Exhibit 4, and I will ask you to --

18     A.   And --

19     Q.   -- have it copied for me --

20     A.   Okay.

21     Q.   -- the same -- the same way we did with what we

22   were going to send to the court reporter, please.

23     A.   Okay.

24     Q.   Thank you, sir.  Now, Dr. Deutsch, are these all

25   of the medical records under Exhibit 4 that you have

1    received or are they just what you reviewed?

2         A.    No.  They're everything I've received that you'll

3    find on the log-in sheet except for Notebook No. 2 of

4    Exhibit 2 where I have received questionnaires from the

5    doctors.  Those are my questions to the doctors or my

6    staffing with the doctors, and that's all in Notebook 2 of

7    Exhibit 2.

8             And you'll get -- you've already marked that, and

9    you can -- you -- if you want, it's possible to copy them

10   separately and add them to the binder, but it might be a

11   little confusing.  I try and make things exactly as they are

12   in my notebook so that at trial, we don't get confused as to

13   how -- make sure we're both in the same place at the same

14   time.

15        Q.    And there is some yellow highlighting in Exhibit

16   4.  What is the yellow highlighting intending to signify?

17        A.    Well, it's just -- the first thing that's done

18   with the records that we get is they're put in chronological

19   order.  Then duplicates of the professional I -- I trained

20   here, duplicates are removed.  So if I have two or three or

21   four copies, and sometimes I do, of the same record, they're

22   tossed and I just keep one.  Then I'm identifying an area or

23   a statement made by a physician that's important enough to

24   go into the summary.

25             I'm using the summary as a way of getting back

1   into important aspects of the case without having to sit

2   down and re-review the entire summary -- excuse me --

3   re-review the entire record.  So I'm trying to use the

4   highlights as a way of identifying the most important

5   aspects, sometimes the most important data that kind of

6   shifts the direction of the medical summary.

7          It's not supposed to explain the entirety of the

8   physical case or the mental case, but it's supposed to show

9   me where a change may have taken place that requires a phase

10  change in the life care plan.  So for me it -- it literally

11  means it's a potential phase change in the direction of the

12  life care plan and the medical summary.  It could be

13  significant.  It may be of minor or moderate significance,

14  and it may be major significance.

15         It's not so much that that particular statement

16  in the highlight is overwhelmingly important, but the area

17  in which it represents can be extremely important.  And that

18  keeps my eye focused back on it when I'm writing the summary

19  so that I can be sure I include the whole conceptual area

20  that is included.

21     Q.    Okay.  I think I understand that.  Dr. Deutsch,

22  then would the binder that I marked as Exhibit 4 and the two

23  binders that you have in front of you marked as Exhibit 2

24  comprise at least all of the paper that you relied on in

25  preparing your report?

1      A.    That's a fair statement.  What -- what was in

2    electronic form, like e-mails, et cetera, doesn't really

3    comprise much in terms of data, I mean, unless Rhonda is

4    answering questions.  And once or twice, because I had a lot

5    of follow-up questions, she -- she could be somewhat

6    difficult, not intentionally, but just because of the state

7    of her mind.  She -- we didn't often get a clear, concise,

8    direct answer.  And I'm not lacking in being wordy either.

9    So sometimes we just weren't understanding exactly what she

10   was trying to communicate.  We would repeat the question in

11   e-mail format and ask her to respond, so there are times she

12   responds through e-mail, and we made sure we printed that

13   off and pulled all of that out to, you know, get responses

14   or add to the summary of -- of the intake.

15          So in total, there were 13.7 hours between the

16   intake and one, two, three -- three additional -- two

17   intakes and three additional telephone conferences that were

18   of substance, so 13.7 hours total.  There may have been one

19   or two others that I just forgot to charge for, but 13.7

20   hours between the two intakes and the telephone conferences

21   with her all in all, and, you know, that was pretty

22   significant.

23          To be truthful, the majority of initial intakes

24   are around four and a half hours.  With her, it took six and

25   half hours.  The update intake is usually around two and a

1    half hours, maybe three.  For her, it was another six and a

2    half hours.  I mean, she just takes a long time, because

3    often I'm having to repeat my question and repeat her

4    response to make sure it's been clarified accurately.  I

5    don't want to just take it down and then find out she has to

6    correct it.  I want to hear from her that "Yes, I understand

7    your question.  Yes, you've understood my answer.  That's an

8    accurate answer I gave you."

9         So it took a long time, but by the time we

10   completed that she still once or twice called us after

11   reviewing it, because I'm one life care planner who believes

12   firmly that you don't -- it's not done until the patient

13   and/or family, preferably the patient, very involved in

14   reading and correcting, in her view, anything she found that

15   wasn't quite right.

16        She did the review.  She may have had a family

17   member with her, but she did the review and she did the

18   responses, and she almost always had a slight change in the

19   way something was phrased.  And we ended up, like I said,

20   taking 13.7 hours in total one-on-one direct interview as

21   well as telephone interviews.

22        Q.   Did you take notes of those conversations?

23        A.   Oh, yeah, absolutely.  I know that there's some

24   guys that say they don't take notes, so it makes it very

25   difficult to do a depo with them.  I take very, very

1    extensive notes.  And what my goal is is really my notes

2    becomes --

3        Q.    Let me help you with that.  Okay.

4        A.    Here, you need that?

5        Q.    No, no.  I was just trying to help.

6        A.    My notes become my report.  We build our entire

7    intake on a platform called FileMaker Pro.  And at the end

8    all we have to do is punch one button and it -- it populates

9    the --

10       Q.    Fields.

11       A.    -- the fields or the form under Microsoft Word

12   that becomes our report.  Now, we have to, of course, read

13   that and make sure it's all appropriate for each section,

14   turn it into complete sentences, correct any grammar or

15   punctuation mistakes, although obviously I rarely make

16   those, but I have to make some so the proofreader feels her

17   job is secure.  But in truth, I do make some and she does

18   clean it up.

19            But it's all the -- if you compare the report to

20   the specifics of the interview, you'd see that the majority

21   of the interview is what has made up the report.  The first

22   portion, which just establishes who referred the patient and

23   why and the conclusions, are the only things that don't

24   appear in the report and that I add to the report.  Then we

25   move on to all the rest.

1    But you'll -- you'll see that it's -- the report

2    itself is relatively easy to write because one reason I take

3    so much time in -- in completing the clinical interview and

4    history and the intake, the only difference being that the

5    intake doesn't include the clinical interview.  That's

6    something that I do that takes into account all physical

7    disability, how she's responded to it, the psychological

8    response to it, and so I need to do that aspect.  But you'll

9    find that all of the information and notes that cover that

10    area is something she responded to.

11    And even if at the end, I don't rely just on

12    that.  I've, of course, looked at the doctors and how they

13    feel she responded.  I talked to her in great detail to see

14    how she feels she responded, and then I move on from there,

15    you know, to -- to -- to look at all the aspects of

16    psychological as well as physiological responses to what she

17    sees as -- and recalls as the major response physically to

18    the disability and then separately the major response to

19    long-term exposure to pain and disability from a

20    psychological standpoint.  I asked her to tell me over time

21    how she's handled that, and that's added in as well,

22    primarily in a section that talks about that, and how her

23    family has responded over time to her perception of her

24    being disabled.

25    Q.    Dr. Deutsch, what is the tab that contains your

41

1       notes in Exhibit 2?  Where is it at?

2           A.    It's actually multiple tabs.  It starts with the

3       tab marked Intake --

4           Q.    Okay.

5           A.    -- and it continues with the Present Treatment

6       section, and then it continues with Supplies and Equipment

7       that she's utilizing.  There's a Homework section, which is

8       her answering questions and outlining anything that she has,

9       like durable medical equipment, employment, her employment

10      history.  In addition to the equipment, what is her current

11      -- I thought I saw that in here -- current nutritional

12      intake, specialty foods; because she is seeing a

13      nutritionist, so I wanted to outline what is, in fact, she

14      getting as a result of seeing the nutritionist, what

15      supplies does she utilize, where does she get them; an

16      outline of all the physicians she's currently seeing and on

17      what schedule, when was the last time she saw each of them,

18      how does that compare against the verbal list she gave us,

19      how does it compare against what we find when we talk to the

20      physicians.

21          We go through her medications currently and --

22      and whether or not, as far as she understands, those doctors

23      are intending to continue those medications.  All of that --

24      these are the supplies weekly and monthly and whether or not

25      she staffed those or talked to the physicians about those.

1          The next section is just her release of

2     information forms.  The next section has got a big red

3     sheet.  On the top of it, it says "Stop.  Do not copy,"

4     that's all the raw test data.

5          The next section is not part of the evaluation,

6     though, but I can tell you what it is if you'd like.  It's

7     the source list of all costs obtained by telephone

8     interview.  So in other words, if the person -- we always do

9     this as a team.  If the person on the team who's responsible

10    for identifying what physicians -- what physician

11    specialists are available that are comparable to the

12    physician specialists we're looking at as part of the team

13    in the same area, then we'll call that specialist and find

14    out, you know, what their office visit charge is, what their

15    initial evaluation charge is, and a whole bunch of other

16    data, and it'll all be outlined.

17         We looked at -- we looked at endocrinologists,

18    gastroenterologists, GP internists, and multiple of each,

19    allergist, cardiologist, nephrologist, neurologist, two

20    different hematologists, neurologist, and on and on.  I

21    don't -- did you want me to reiterate --

22    Q.   Dr. Deutsch, who are the -- who are the two

23    hematologists that you have listed there?

24    A.   Dr. David N. Robinson and Dr. Fernando Rodriguez.

25    And normally we don't name the patient.  We just go over the

1     details.  I know Dr. Robinson was at one time at least -- I

2     don't know.  I have to look to see if he currently is --

3     were -- had seen her.  The Dr. Robinson I thought we talked

4     to, my staff talked to, wasn't me, basically he didn't

5     respond to the questionnaire, and he only saw her once

6     without a follow-up.

7              But we went ahead and made the contact, and he

8     basically answered the most important questions.  But

9     because of the lack of follow-up and long-term

10    follow-through, there were other questions he didn't feel

11    comfortable answering.  And you can read that when you get

12    to his report.

13             And there are a lot of other doctors, but I don't

14    know that I need to go through all of them --

15        Q.   No.

16        A.   -- unless you wish me to.

17        Q.   No, absolutely not.

18        A.   Okay.  And also in here are, you know, case

19    managers in that -- in her area and what they cost per hour.

20    And there are specific ways we cost that out according to

21    factors in -- in the region.  For example, the IRS and Labor

22    Department require that the base rate in their calculations

23    of what the hourly rate is must be increased by enough to

24    cover matching Social Security or -- or Social Security

25    withholding, unemployment compensation, I already said

1   matching Social Security, all of the benefits essentially

2   that an employee working full time would've required, and

3   just because you're working for someone in their home does

4   not relieve you of that responsibility.

5            There's a quarterly newsletter that comes out

6   that tells you what must be covered and how much.  Currently

7   it's gotten rather high.  Currently you have to pay a total

8   29.3 percent that -- that it cost.  So we took the current

9   rather low figure of -- what did I say?  Well, I'd go back

10  to the life care plan.  There's a footnote that spells it

11  out, but I think it was $10 and change an hour times

12  29.3 percent.  I outlined exactly what the 29.3 percent

13  added, and it came out to whatever the results were.  It's

14  like $12 and change, and I showed that in the life care

15  plan.

16           And we -- if you're going to do a home care

17  private hire, you've got to include that and determine how

18  much you're actually saving to make it worthwhile to do that

19  versus do an agency-based plan.  And so we do show that as

20  well.

21           There's a nutritionist, because a lot of this

22  research is also based on are we hiring new or does she

23  already have professionals in that area, because I'm not

24  going to change from what the current physicians have --

25  from those the current physicians referred her to.

1          We have the lab fees that the doctors

2     recommended, not the fees, of course.  They recommended that

3     nutritionist, and we also outlined surgical costs,

4     health-care -- and we use the Healthcare Cost and

5     Utilization Project agency for health-care research and

6     quality.  And we just utilized whatever their current

7     research on that particular procedure would be.

8          Q.   I think I understand.  Dr. Deutsch, on your -- on

9     your records of your conversations with Ms. Williams, are

10    those dated based on the date of the conversation?

11         A.   They're -- yes, they are.  Verified -- for the

12    next one, for example, was research on physician fees for

13    procedures.  It's -- and it came from the medical fees in

14    the United States at www.medicalbookstore.com on 12/5/2014.

15    And it shows that the date, the verified date of the

16    different procedures we were getting was 12/5/2014, so...

17         Q.   Dr. Deutsch, are -- are the e-mail communications

18    that you had with Ms. Williams in Exhibit 2 as well?

19         A.   They should be in Exhibit 2 as well, but I've got

20    to look and see if it's Exhibit 2, Book 2 or Book 1.

21         Q.   Okay.

22         A.   Give me just a second.

23         Q.   Absolutely.

24         A.   I think I saw miscellaneous.  Hold on.  Yeah.

25    This looks like -- in miscellaneous what we mostly -- well,

1    no.  We have more than that.  So miscellaneous covers

2    University of South Florida grades and any -- any

3    undergraduate testing programs, her -- her associate's in

4    arts degree that she got while in University of South

5    Florida on her -- on her effort to work toward her

6    bachelor's, Social Security statement.  This is more social

7    security information, employment history.  You want -- and

8    you can go through that real quick and see if there's

9    anything --

10        Q.    Well, I'm just -- I'm just curious about e-mails.

11        A.    Yeah, I know.  I'm not finding e-mails in the --

12    in that section.  So if you don't mind, I'll look in -- I'll

13    look in the Correspondence section.  Okay.  There's nothing

14    under PMDA correspondence.  I wouldn't worry too much about

15    -- I mean, our original letter setting a date for the

16    evaluation is in there.  And for some reason, it's in there

17    twice.  So I don't know if they didn't get the first one or

18    why it's twice, but that's all that's in there.

19             There is no correspondence from the attorneys.

20    Now, that's in -- there is an Attorney Correspondence

21    section that has this intake in it.  There is a -- one

22    transmittal letter here I see, the original referral letter,

23    which just talked about our retainer.  There's a patient

24    demographics letter, but --

25        Q.    You don't need to share any -- any of your

1    communications with counsel.

2         A.    And that's -- you know, that's basically it.

3         Q.    But you do remember e-mails with Ms. Williams?

4         A.    Yes, I do.  I'm just trying to find them.  And

5    I'm -- I'm not honestly sure exactly where they were put,

6    but I'm going to go through the balance.  And -- and if I --

7    as we're talking, if I find anything else, I will let you

8    know.  Oops.

9         Q.    Okay.  And if they are not in -- in Exhibit 2 --

10        A.    I'll re-review the electronic, but, you know, I

11   do remember that we had some e-mails or at least that it was

12   copied to me.  And I'm just pulling something that belongs

13   in another section of the report --

14        Q.    That's fine.

15        A.    -- and I want to make sure it's where it's

16   supposed to be so that there's no issue later in my being

17   able to find it.  I get rather --

18        Q.    Want me to help you there?

19        A.    I think I got it.  I get rather picky.

20        Q.    I understand.

21        A.    And I look where I'm used to seeing something,

22   and if I don't see it, I get irritated.

23             MS. GALEOTO:  I would like to look through the

24        binder before it's produced since there was not a

25        subpoena because I'd like to make sure there's nothing

48

1        in there that is protected or otherwise privileged.

2              MR. TORRES:  There was a document request.

3              MS. GALEOTO:  That -- there was an RFP that we

4        responded to several months ago, but I have not been

5        through this binder, which is a new thing.  So there's

6        not an outstanding subpoena.  There's a document

7        request from May that we responded to, that you sent to

8        counsel.  This -- this particular individual, Dr.

9        Deutsch, has not received a subpoena from you.

10             MR. TORRES:  I understand.

11             MS. GALEOTO:  And I have not seen this binder,

12       and I would like to make sure that there's nothing in

13       that before he produces it to you that's privileged.

14             MR. TORRES:  You do understand you have a duty to

15       supplement?

16             MS. GALEOTO:  Well, I can supplement, but I'm

17       going to go through whatever is there to make sure

18       there's nothing that cannot be produced --

19             THE WITNESS:  Well, do you want to do the whole

20       binder --

21             MS. GALEOTO:  -- because it's privileged.

22             THE WITNESS:  -- or just what was added to what

23       you -- what was already sent to them?

24             MS. GALEOTO:  We'll look at the whole thing, but,

25       I mean, I'm sure it's only -- I'm pretty sure we

1           already sent everything that you sent us back then.

2           Q.   (By Mr. Torres)  And, Dr. Deutsch, are your

3     communications with counsel separated in Exhibit 2?

4           A.   Well, they're their own tab.

5           Q.   They're their own tab?

6           A.   Yeah.  It says "Attorney Correspondence, PMDA

7     Correspondence."  They're each their own tab.

8           Q.   Everything else -- everything else in the binder

9     is --

10          A.   Work product.

11          Q.   -- work product that's --

12          A.   Well --

13          Q.   -- your work product?

14          A.   Yes.  It's my -- as -- and I'm describing that

15    rather broadly.  I'm not saying it's work product as defined

16    by a law book, meaning as I understand work product, meaning

17    that it's not subject to subpoena.  I don't mean that at

18    all, just that it is the product of my work effort.

19          Q.   I understand.  So --

20          MS. GALEOTO:  But --

21          MR. TORRES:  Excuse me.

22          Q.   So the only thing Ms. Galeoto would need to

23    review to -- to identify any potentially privileged

24    communications would be the tab that is entitled Attorney

25    Correspondence; is that correct?

1          MS. GALEOTO:  Object to form.  Object to form.

2          You can -- you can respond, Dr. Deutsch.

3     A.    Well, I don't know the answer to that because I

4     can't define the -- the legal nature of what she should and

5     shouldn't review.  But I know that everything in the

6     notebook is what was reviewed before when we responded

7     except for the items in -- that are logged in here and --

8     and represent anything that was placed in the file since the

9     last time.

10    Q.    Okay.  So is everything in Exhibit 2 then, Dr.

11    Deutsch, everything -- well, we know the addendums did not

12    make it into the report.  Is everything in Exhibit 2,

13    outside of the addendum, 4, 5, 6, and 7, relied on for your

14    report?

15         MS. GALEOTO:  Object to form.

16         MR. TORRES:  What's the basis for the objection?

17         MS. GALEOTO:  I would like to review.  I've never

18         seen these binders, and this particular expert was

19         retained to consult and not testify on another item.

20         MR. TORRES:  I understand.

21         MS. GALEOTO:  And if there is any data in that

22         binder related to that consulting that is privileged

23         and is not subject to discovery, I would like to see it

24         and I'm not going to produce it going through a

25         response to --

1          MR. TORRES:  What is the objection to the

2     question?

3          MS. GALEOTO:  -- in response to the RFP.  I -- I

4     don't know that he goes -- that he's gone through that

5     to make that decision, that there's nothing in there

6     related to that consult.  And I'm not going to agree to

7     it without having seen it.

8     A.    In answer to your question, the addendums were

9     added in, the -- anything that in terms of correspondence

10    that were not produced at that time are produced now, any

11    additional bills, which, frankly, have an explanation right

12    down to a tenth of an hour.  It will tell you this is what

13    was done, represents detailed information because we explain

14    every bill, what was done.

15         If it's, you know, one tenth of an hour, it -- or

16    hour, rather, we're going to explain in fairly decent detail

17    exactly what was done and why.  And so, again, it's -- it's

18    pretty detailed.  So we try not to allow things to go out

19    that don't give a good explanation of why they were done, so

20    essentially there's a narrative that's built up even through

21    the bills.

22    Q.    So -- and, Dr. Deutsch, you did mention earlier

23    that you reviewed Exhibit 2 in preparation of today's

24    deposition; is that right?

25    A.    I'm sorry.  Say that again.

1          Q.   You testified earlier that you reviewed

2    Exhibit 2 --

3          A.   Yes.

4          Q.   -- in preparation for this deposition; correct?

5          A.   That's true.

6          Q.   Okay.  And -- and I just want to see if I can get

7    a clear answer on was everything in Exhibit 2, and I will

8    exclude attorney correspondence, relied on in the

9    development of your expert report?

10          MS. GALEOTO:  I'm going to state -- restate the

11          same objection because we have not been through that

12          binder and we don't --

13          MR. TORRES:  It doesn't matter that you've been

14          through the binder or not.  This is a simple question

15          and it is not objectionable.

16          MS. GALEOTO:  I'm going to object to form.

17          Again, if there's anything in there related to a

18          consult that did not go into the report, I'm not going

19          to agree to that production, Chris.

20          MR. TORRES:  Are we on -- I'm -- I'm sorry.  We

21          understand your point.  Your point is made.  What is

22          the objection to the question?  What is wrong with the

23          question?

24          MS. GALEOTO:  Because without him sitting here

25          going through every single piece of paper, I don't

1          think that that's a fair question.  He can say, "Yes,

2          every single piece of paper in here I relied upon that

3          went into the --

4               MR. TORRES:  All right.

5               MS. GALEOTO:  -- actual report."

6               MR. TORRES:  Fair is not an objection.

7               MS. GALEOTO:  There is -- you're asking him an

8          overly broad question.  You have hundreds and hundreds

9          of pieces of paper here, Chris.

10          Q.   (By Mr. Torres)  Dr. Deutsch --

11          A.   I'd have to say no because there's a number of

12     sections where we still provide you what went to every

13     single doctor.  Whether they responded or not, we'll still

14     provide in there a section saying "Cardiologist" even if all

15     we have is a copy of the questionnaire that went out to

16     them, a copy of the fax cover sheet that explains who we are

17     and what we're looking for and why.  But obviously if we

18     never received a binder and -- or an answer, we're still

19     going to have it in there, but obviously there's nothing to

20     rely on.

21               One of the copies we got, and I think it may have

22     been Dr. Robinson, but I'm not a hundred percent sure,

23     answered none, none, and maybe a third none across a broad

24     basis, and then one or two other legitimate responses.

25     Well, I think that is something to rely on.  If he says as

1    far as he's concerned she doesn't need any of this, she

2    doesn't need any of this, she doesn't need any of this,

3    that's a legitimate response.  Even if he follows up by

4    saying, "You need to defer to this doctor or this doctor to

5    get that information," he's not actually -- and he's saying

6    to us, "I'm not actually the one who should answer this.  So

7    from my standpoint, she doesn't need it.  But I'm not saying

8    she doesn't need it.  I'm saying I defer to this other

9    doctor," which was the smarter way, she should've -- he

10   should've said that rather than none, none, none.  But as

11   long as he came out with it, I'm fine.  That I would rely

12   on.

13           But if -- if there was no response at all even

14   though I'm showing you the questions that needed to be

15   asked, I'm not necessarily including that among the list of

16   things I relied on absolutely.  You -- you -- could you --

17   they don't even give me enough to say they're saying

18   nothing.  You can't assume that they're -- they're stating

19   she doesn't need anything in this area if you know there is

20   a legitimate finding of a cardiovascular problem.  They're

21   just not responding.  Then you can't just toss it out the

22   window.  So there may still need to be information obtained

23   in those areas.

24           And to the extent that we reviewed the records,

25   developed the questions, and are trying to find answers to

1    them, clearly getting zero answers means that we still have

2    -- had work to do to try and find out those answers.  We got

3    them through clinical practice guidelines and through

4    physician correspondence where we could.  And after that,

5    we're going to have to rely on either research -- further

6    research in the clinical practice guidelines as to how

7    that's treated now or what were the last things that were

8    said to the patient.

9            But that particular doctor has not given us

10   anything.  Do I rely on that?  Well, I certainly think it's

11   important to keep that in mind even if the reason is just

12   that he wasn't comfortable or she wasn't comfortable in

13   answering the question.

14   Q.    Right.  So in those instances, it's certainly

15   information that you sought.  You may not have gotten a

16   response to it.  It's information you sought; is that

17   correct?

18   A.    Yes.

19   Q.    Thank you.  Okay.

20   A.    Sorry.

21   Q.    You're okay.

22   A.    Well, I don't want that on the tape, but --

23   Q.    It's too late.

24   A.    Yeah.

25   Q.    Dr. Deutsch, can you -- can you explain what a

56

1    life care -- do you need a break?

2         A.    No.

3         Q.    Okay.  Can you explain what a life care plan is?

4         A.    Well, right on the first page is the accepted

5    definition.  The first page of the life care plan is the

6    generally accepted definition.  It's when -- I -- I was the

7    first person to ever write textbooks on the -- the life care

8    plan concept.  And when I was certified, I was given

9    Certificate No. 1 in recognition what people -- how people

10   introduced me all these years as -- which is the father of

11   life care planning.

12        Q.    And, Dr. Deutsch, can you -- do you mind using

13   Exhibit 3, the --

14        A.    Oh, no, not at all.

15        Q.    -- just so we know what we're talking about given

16   the dispute over the binder.

17        A.    Okay.  Okay.  It says, "A life care plan is a

18   dynamic document based upon published standards of practice,

19   comprehensive assessment, data analysis and research which

20   provides an organized, concise plan for current and future

21   needs with associated costs for individuals who have

22   experienced catastrophic injury or have chronic health-care

23   needs."  And that's from the International Academy of Life

24   Care Planners, International Academy -- okay.  I'm sorry.

25             "Through the development of a comprehensive life

1    care plan, a clear, concise, and sensible presentation of

2    the complex requirements of the patient are identified as a

3    means of documenting current and future medical needs for

4    individuals who have experienced catastrophic injury or who

5    have chronic health-care needs.

6            "The goals of a comprehensive life care plan are

7    to improve and maintain the clinical state of the patient,

8    prevent secondary complications, provide the clinical and --

9    the clinical and physical environment for optimal recovery,

10   provide support for the family, and to provide a disability

11   management program aimed at preventing unnecessary

12   complications and minimizing the long-term care needs of the

13   patient."

14           So that is the accepted definition based on what

15   the first summit in life care planning came up with.  And

16   that -- there are 150, 175 planners at the first summit, and

17   they -- and there was representatives from the International

18   Academy of Life Care Planning, the International -- oh, the

19   International Association of Rehabilitation Professionals,

20   the International Association of Healthcare certification,

21   which does the international -- which does the certification

22   for life care planners.

23           They were all represented to see what the

24   consensus definition would come out to be, and that's what

25   was accepted.  My textbooks define it slightly differently,

58

1     but essentially the same --

2          Q.   Okay.

3          A.   -- even though it was -- the wording was slightly

4     different.

5          Q.   Doctor, and -- and just for the record, you just

6     read from Exhibit 3, page Bates-labeled Deutsch_ 000025; is

7     that correct?

8          A.   Yes.  That's the Bates stamp?

9          Q.   Yes.

10         A.   Yes.

11         Q.   Okay.  And part of the accepted definition that

12    you read for the life care plan says, "The goal of a

13    comprehensive life care planner, to improve and maintain the

14    clinical state of the patient, prevent secondary

15    complications, provide the clinical and physical environment

16    for optimum recovery, provide support for the family, and

17    provide a disability management program aimed at preventing

18    unnecessary complications and minimizing the long-term care

19    needs of the patient."  Do you see that?

20         A.   Yes.

21         Q.   Okay.  Dr. Deutsch, what was the value, what was

22    the total value of the life care plan?

23         A.   I don't -- usually an economist does that, and I

24    haven't read the economist's --

25         Q.   Okay.

1      A.   -- report.  I usually don't unless someone brings

2    it to me and it's way out of proportion than what I'm used

3    to.  I'm -- I haven't read it and don't know -- frankly, I

4    can't even name the life care planner off the top of my

5    head.

6      Q.   You mean the economist?

7      A.   The economist.  I'm sorry.

8      Q.   That's okay.

9      A.   I'm the life care planner.  Maybe I need a break

10   and I don't realize it.

11     Q.   Okay.  So the life care plan only includes what

12   you believe are the costs necessary to accomplish the goals

13   that I just read?

14     A.   Right.  But it's not number driven.  Life care

15   plans are needs driven, and whatever the number turns out to

16   be is what -- is what it turns out to be.  I've always told

17   my students if someone came to you and said, "Look, I have a

18   half a million dollars.  Can you draw up a life care plan

19   based on that?"  The answer is no because the best you can

20   do is draw up the needs based -- the life care plan based on

21   the needs the patient has.  And preferably you just draw it

22   up, period, regardless of needs and you show what's

23   necessary based on the disability.

24          And if in the end the needs converted to or added

25   to with costs turn out to be greater than that half a

1     million that they say they have, you seek to supplement that

2     in any way you can, but you cannot make a determination of

3     cost and then off the top of your head and try to cut back

4     costs based on whether or not this individual's

5     circumstances may change in the future.  So the realty is

6     that it's a needs-driven program or a plan, not a

7     cost-driven plan.

8          Q.   Okay.  So the life care plan is not cost-driven.

9     It's not based on the dollar requirements.  It is based on

10    the needs for the patient?

11         A.   Right.

12         Q.   Do you call -- do -- do you call Ms. Williams a

13    patient or is she a client?  How do you -- how would you

14    refer to her?

15         A.   Well, we always refer to them as patients --

16         Q.   Okay.

17         A.    -- largely because we have a lot of patients that

18    are in our counseling program, and I only counsel with

19    catastrophic patients.  I don't counsel with our

20    noncatastrophics.  We don't do job placement with our

21    noncatastrophics because we only work with supported work

22    programs that are designed to embrace the catastrophics even

23    if they're never going to work full time, but it's a goal

24    for -- for part-time work for the really severe

25    catastrophics.  It still gives them a basis or a reason for

1    getting up in the morning and for trying to fulfill one of

2    the more important aspects of a patient's life.

3            So, you know, there may be individuals who have a

4    much greater capacity to take advantage of a program, but we

5    don't assume that these are individuals who can never work

6    unless we truly believe that because work has a -- its own

7    therapeutic value.

8        Q.    Sure.  Is -- is Ms. Williams catastrophic or

9    noncatastrophic?

10       A.    I would call her catastrophic, not because any

11   one single diagnosis is catastrophic, but because of the

12   multiplicity of -- of her diagnoses.  They -- you turn left

13   and you -- you run into a brick wall.  You turn right and

14   there's another brick wall.  And it's just not an easy case

15   because we have such a multiplicity of problems, that

16   getting her into the right work environment and trying to

17   get her comfortable and settled into something that would be

18   work and would lead her to a comfortable work setting that

19   did not challenge all of the different problems she has is

20   going to be a very difficult one to achieve.  So right now

21   I'd say she was catastrophic, and I would say she likely

22   could qualify for a supported work program.

23       Q.    And you're not in any way opining in your report

24   regarding the causation of --

25       A.    Absolutely not.  I have no knowledge of

1    causation.  I have no intent to speak to causation.  It's

2    just, you know, for me this -- that's particularly complex

3    in this area.

4        Q.    And why is it, and why do you call it

5    particularly complex in this area?

6        A.    Well, there's -- for the same reason I say it's

7    -- it's -- it's complex is because of the -- or it's

8    catastrophic is due to the multiplicity of the different

9    diagnoses.  And for that very same reason, it -- it becomes

10   difficult for me at least to get a grip on the nature of

11   causation.

12          Frankly, this may be inappropriate to say and

13   hopefully I'm not creating any problems, but when we first

14   went back, the plaintiff attorney and I, I asked her today

15   for the very first time, because usually I stay away from

16   it, who is being sued?  Because in -- in -- to be frank, I

17   really didn't know and it doesn't matter to what I do.  I

18   didn't know who was being sued or under what -- on what

19   basis because I certainly didn't ask the client.

20          I told the client, clearly, that was unnecessary

21   for me to know for the nature of what I do.  And if she

22   started to talk to me about liability or started to answer

23   anything when she answered a question that involved a

24   response that touched on liability or the party to whom she

25   felt was responsible, I was going to cut her off.  And I

1    hope she wouldn't feel I was being rude when I did so, but

2    that's an area well outside my area of expertise and I just

3    can't get involved with it.

4            Even if I don't write it down, I can't tell you I

5    won't remember it, and therefore, it's best you not tell me

6    in the first place.  So I didn't get anything -- comments

7    from her, Rhonda, regarding it at all, but I was just

8    curious and I asked the question.

9            But if you ask me today who specifically or what

10   specifically is the name of the entity, even though I know

11   you mentioned who you are representing and she -- and she

12   being plaintiff counsel mentioned it when she answered

13   before, I don't know whether I just have a Freudian ability

14   to not remember, but I couldn't answer that question right

15   now.  I just stay away from it, and I don't know who is

16   being sued, but I have a sense of what the premise is.

17      Q.    And what is your sense of the premise?

18      A.    That there's a type of plant whose production of

19   whatever is -- the plant is meant to produce is leading to

20   problems for her based on what's being released into the

21   atmosphere near her home and is -- that is part of what's

22   causing her so many problems.

23           MR. TORRES:  I'm sorry?

24           THE VIDEOGRAPHER:  When you were playing with the

25      wire, that makes noise.

64

1          THE WITNESS:  Shame on you.

2     Q.   Did you -- did you discuss the premise that you

3     just described with any of the treating physicians?

4     A.   No, not at all.  Never brought it up.

5     Q.   Did you discuss the premise that you just

6     described with any other retained experts in this case?

7     A.   No.  I haven't really spoken to any other

8     retained experts.

9     Q.   When you say "haven't really," you have not or --

10    A.   I have not.

11    Q.   Okay.  Do you know Dr. Franklin Mink?

12    A.   No.

13    Q.   Okay.  Do you know Mr. Leslie Ungers?

14    A.   No.

15    Q.   Okay.

16         THE WITNESS:  May -- may I ask how much longer do

17         you have on this particular tape?

18         MR. TORRES:  We can break if you need to.

19         THE WITNESS:  Well, I would like to break at the

20         end of the tape unless it's an hour or two longer.

21         THE VIDEOGRAPHER:  We can go, either way.

22         MR. TORRES:  Well, how much time do we have left

23         on the tape?

24         THE VIDEOGRAPHER:  About 12 minutes.

25         THE WITNESS:  All right.  Well, let's go to the

1          end of the tape.

2               MR. TORRES:  Thank you.  I appreciate that.

3          Q.   Okay.  Have you ever -- the work that you do for

4     patients, do you call it treatment?  What do you call it?

5          A.   Well, if I'm working with a patient in this

6     environment, I'm -- I am not treating.  I'm -- I'm a

7     consultant --

8          Q.   Okay.

9          A.   -- in the litigation.  Now, I wrote a text about

10    this once.  It was one of the ten texts that I produced, and

11    it was called the *Rehabilitation Counselor as Educator*, and

12    it went on.  I forget the rest of the title, but it -- it

13    explained that your role as a rehabilitation counselor in

14    litigation is to be an educator, not to be presenting a case

15    as an advocate, that if you're asked a legitimate question,

16    you need to provide a legitimate answer and not be seen as

17    advocating for either side.

18               So my belief is just -- is literally just that,

19    that if you sit down and took the time to craft a

20    hypothetical question, I need to take the time to write it

21    down and get a sense of the priorities or parameters of that

22    question and answer it in an appropriate fashion.

23               If you are one of these gentleman who just kind

24    of crafted off the top of your head and probably couldn't

25    repeat it, well, it may be difficult to answer it because

1    even though I'll write it down, it may not touch all the

2    bases necessary to form a clear hypothetical that

3    encompasses a question that I can answer.

4         But if it's appropriate, then I'm going to answer

5    it and I'm going to explain, "Based on these parameters

6    outlined in your hypothetical, this is how I would

7    respond."  But I'm not there to advocate for either side.

8    I'm a consultant.  I am not her case manager.  I am not her

9    life care planner, and -- and I can't do anything to change

10   that because that, in fact, is what my role is.

11        Now, outside of litigation, the patients that I

12   bring in who are referred in and/or who are requesting on

13   their own by word of mouth entry into the counseling

14   program, if they're able to pay for it, you know, we call

15   them patients and our expectation is to provide help with

16   the problem that they're having.

17        If on the other hand we get five patients in a

18   row, all of whom need to be taken in on a sliding scale

19   basis, we found out pretty quickly that we -- we need to

20   control that.  I can only take in so many patients on a

21   sliding scale.  Part of the problem is even in the

22   counseling practice and even though I'm doing relatively

23   well in that arena because, frankly, over the long term, it

24   -- you know, we do well enough in the counseling practice to

25   still at least break even or make -- make a bit of profit.

1          If I have five paying counseling patients and ten

2     on a -- a sliding scale, I'm going to go broke in that area.

3     You can't do that, so, you know, I limit the number of

4     sliding scale to about five and the rest I charge at a --

5     most of them are charged at a reduced rate.  Most of them

6     don't have the money to pay in full.  Many of them have just

7     come out of a rehab program and they need that kind of

8     support in someone who's that concerned with them.  So I

9     don't exceed five; they just have to go on our waiting list.

10    But I keep them on the waiting list, and I do pursue with

11    all diligence bringing them in as soon as I reasonably can.

12         Part of my problem is, is that, you know, I

13    travel a great deal in the work I do and I can't just take

14    on too many patients and then keep dropping appointments and

15    changing them because of my travel.  As I reach a point in

16    my career -- I'm almost 67 now.  So as I reach a point in my

17    career where I slow down a bit on travel, I'm averaging --

18    like this last year I averaged 150,000 miles and 240 nights

19    in a Marriott hotel.

20         Well, first of all, I feel like I'm really

21    missing out on my grandchildren's growth, and I'm tired.

22    It's hard to do that.  So as I start to slow down a little

23    bit, there's going to be another professional -- and

24    actually two that are going to pick up the slack and I'll

25    stay to monitor their work and the quality of it.  But it

1    will be easy to mentor their work and make sure that, you

2    know, it's going out with all possible oversight mentoring.

3           But the fact is is that getting a good life care

4    plan and making sure the good case managers are actively

5    able to follow through are available.  But as I do that, I

6    want to pick up and maintain more counseling patients.  My

7    daughter, Laura, has got a master's in mental health

8    counseling, but she doesn't want to work in litigation.  She

9    -- she wants to -- she has two children.  She wants to be

10   there for them.

11          And I was fortunate.  I had sole custody of my

12   two daughters.  And when I was working in the Soviet Union,

13   for example, the school gave me permission to take them with

14   me.  So she had her 10th birthday in Moscow, and we set up a

15   relationship between their school and the school in Moscow.

16   And it turned out to be a wonderful program, and she was

17   very involved with it.  In the envy of all the other kids,

18   the school found it to be a wonderful experience and -- and

19   I did too and she was thrilled.  So it worked out very well

20   for me.

21          But the bottom point -- or the -- the important

22   point was that it'll give me a chance to dedicate more time

23   to the counseling and the family, working with the family

24   and the patients.  And -- and Laura will have that much more

25   time to do the same.  So, you know, that's going to be our

1    primary goal as we reduce, to me, some of the roughly 15 to

2    20 new catastrophics I see every -- every single month.

3    It's just -- it's just gotten very tiresome.

4          Q.    I understand.

5                MR. TORRES:  How much time do we have left on the

6          tape now?

7                THE VIDEOGRAPHER:  About nine.

8                MR. TORRES:  Nine minutes?  Okay.

9          A.    I can't believe I said all of that in just three

10   minutes.

11         Q.    Can -- do you mind if I mark this as --

12         A.    Yeah.  No, no, not all.

13         Q.    Should I mark the red or should I mark the

14   manila?

15         A.    I would mark the red as a composite of the whole,

16   but I'm not going to tell you what to do.  I know we're very

17   careful about never losing the red.  And if we're copying it

18   at all, that'll -- that'll make sure that all of it gets

19   copied.

20               (Exhibit No. 5 is marked for identification.)

21               MS. GALEOTO:  Is that 5?

22         Q.    So I'm going to hand you Exhibit 5.  And can you

23   just tell me what Exhibit 5 is generally?

24         A.    Well, it's the log sheet as well as copies in the

25   envelope of everything that's been added to the file since

70

1    an original copy of the file dated 5/5/15 was made as a

2    composite and sent to defense counsel.  I think it actually

3    went to plaintiff counsel to review and then be sent on to

4    plaintiff -- or defense counsel.  But anything we added

5    since then from any new reports, to any new PMDA

6    correspondence, to any new notice of deposition,

7    documentation of recommendations, clinical practice

8    guidelines, additional articles, PMDA bill again, that all

9    is -- is contained within the manila envelope.  And I'll

10   handle it any way you instruct me to handle it.

11        Q.    And what was the source?  How did you get the

12   documents in Exhibit 5?

13        A.    Well, most of these documents are made up by the

14   office.  For example, there's one, two, three -- there are

15   -- are, I think, five PMDA, Paul M. Deutsch & Associates,

16   bills, so we made those.  There's at least one, two, three

17   additional articles we added in in an attempt to establish

18   recommendations based on what we were told versus what we

19   had to go research on our own, so we reviewed and calculated

20   those in relation to known diagnostics.

21             And then there's the addendum that Ms. Pennachio

22   reached.  And I like Ms. Pennachio.  And she is actually

23   serving on the board for the Foundation for Life Care

24   Planning Research, which is a great giving organization that

25   I started in 2002, which is very important to me.  I've -- I

71

1    really believe very strongly in it, and I would've worked

2    very hard to make sure she didn't serve on the board if I

3    didn't trust her professionalism and her dedication.  So she

4    is on that board, and I'm pleased that she is, and that's --

5    you know, that's basically it.

6            So it's -- there was a notice of -- the notice

7    for my deposition is in here.  Some clinical practice

8    guidelines are in here, and you'll get copies of those when

9    you -- when you get the file.  But these -- these were

10   actually sent out on 7/18/2015 when they were formally

11   completed.

12           And give me a moment.  There's something I can't

13   find on the front here, like that other misplaced -- there

14   should be a yellow file activity sheet that's gone missing

15   here that tells me when -- oh, here it is.  The -- I can't

16   specifically tell that -- what -- what No. 3 is.  I do know

17   it's -- it was -- and I think it was Ms. Pennachio's report,

18   life care plan with my comments sent to the attorney FedEx

19   on 2/6/15, but I'm not sure of that.  So it may have been my

20   revised report and revised life care plan to the attorney

21   sent FedEx.  All three of these FedExes were set up to go by

22   Dawn Thomas.  That's the initials DT.  So I'm not really

23   sure, quite frankly, which were done.

24           Now, I do notice here -- we didn't talk about it

25   before -- I think all the medical records are contained on

1    this CD.  Would you want me to have the IT guy in the office

2    copy the CD?

3          Q.    Please.

4          A.    It doesn't -- it's no big deal, but --

5                MS. GALEOTO:  Again, if there are draft reports

6          in there, Chris, we're not going to produce them.

7                MR. TORRES:  I understand.

8                THE VIDEOGRAPHER:  Three minutes.

9                MR. TORRES:  That is, of course, under the

10         protections of Rule 26; right?

11               MS. GALEOTO:  Yes.

12         A.    Okay.

13               MS. GALEOTO:  Not to be confused with what we're

14         asking for regarding Dr. McKay.

15         Q.    Okay.  So let me just borrow that, borrow

16    this.  So Exhibits 2, 4, and 5, do these constitute your

17    entire file related to your consultation --

18         A.    Yes.

19         Q.    -- for Ms. Williams?

20         A.    They -- they do.

21         Q.    Thank you.

22         A.    Did you want the draft bill, what posted but not

23    yet charged?

24         Q.    That is perfectly fine.  You might as well add it

25    in.

1          A.   All right.  Well, you can mark it however you

2     wish.

3          Q.   Okay.

4               MR. TORRES:  We're going to go off the record

5          and --

6          A.   This is the updated -- we'll wait until we get

7     back.

8          Q.   We'll -- we'll -- we'll get back.

9               MR. TORRES:  Let's go off the record --

10              THE WITNESS:  Okay.

11              MR. TORRES:  -- so the videographer can change

12         the tape and we can all take a restroom break.

13              THE WITNESS:  Okay.  We'll do that.

14              MR. TORRES:  Thank you, sir.

15              Off.

16              THE VIDEOGRAPHER:  This concludes Disk No. 1 of

17         the deposition of Paul Deutsch.  It is 11:46.  We're

18         going off the record.

19              (A recess was taken.)

20              THE VIDEOGRAPHER:  This is the beginning of Disk

21         No. 2 of the deposition of Paul Deutsch, Ph.D.  It is

22         12:02.  We're back on the record.

23              MR. TORRES:  Okay.  Laureen, you wanted to state

24         a -- an objection for the record?

25              MS. GALEOTO:  I do.  I -- I don't believe that we

1    can produce the raw psychiatric data in response to the

2    request for production.  And absent court order, I will

3    not.  I don't believe that you've stated any grounds

4    yet today for why you'd be entitled to it.  I believe

5    the law provides specifically that general claims for

6    emotional distress and damages is not sufficient to

7    subject that to discovery and that it has to be some

8    specific type of mental psychiatric injury or disorder

9    at issue or unusually severe emotional distress at

10   issue in order to have that.  We don't have a

11   psychiatrist testifying about any severe or specific

12   mental psychiatric injury that would open that up for

13   discovery.  And we also know that Dr. McKay's time to

14   file a report has closed.

15        MR. TORRES:  Anything else?

16        MS. GALEOTO:  That's all.

17   A.    Could I just state the only thing I have, of

18   course, is psychological test data, not psychiatric.  And --

19   and even if counsel agreed somehow later to allow me to

20   release it, that's insufficient.  I would still be called by

21   the board and sanctioned.

22        One woman not too long ago lost her license for

23   releasing it because she didn't have sufficient

24   understanding that you can't do that.  So I would not be

25   able to release it even if you reached agreement unless the

REGENCY REPORTING SERVICE, INC. (813)224-0224

1    judge ordered it because that releases me or unless I gave

2    it to one of the professionals that you have consulting with

3    you, and then I can release it to them.

4         But anything else, I'm not going to end my career

5    being sanctioned or -- or having my license pulled in the

6    last -- last year or two of my career.  So I'm going to be

7    pretty strict in following the board's rulings.

8         Q.   (By Mr. Torres)  Absolutely.  I would not ask you

9    to do anything else than that.

10        I do have a couple of questions, though, about

11   the raw psychological data.

12        A.   Sure.

13        Q.   The raw psychological data is what?  Can you just

14   describe it generally, not obviously --

15        A.   Sure.

16        Q.   -- what it says?  What is it generally?

17        A.   I'm going to name the test, and then tell you

18   generally what each one provides, and then I'll tell you

19   specifically a response to your question.  The testing

20   included the Minnesota Multiphasic Personality

21   Inventory-2-RF.  The 2-RF is a very well-researched clinical

22   personality inventory that was designed to recognize -- or

23   in recognition of the fact that so many psychologists and

24   mental health professionals work with individuals who simply

25   can't take the long form.  They get so tired and it's so

1    difficult for them because the long form is like 598

2    questions.

3          What this test did was ran research that

4    identified those questions in each clinical section that

5    were most highly correlated with the items it was looking to

6    determine.  So the -- the -- if they were looking to

7    determine the top 70 percent, the questions that are in the

8    top 70 percent in their correlation to the clinical arena of

9    depression, then that 70 percent would be kept.  The others

10   were dropped so that we ended up with instead of 598

11   questions, 338 questions, so a significant reduction.  So

12   instead of two and a half hours of questions and answers, we

13   ended up with the average disabled patient being able to

14   complete it anywhere from 45 minutes to an hour and 10

15   minutes.

16         The substantial difference allowed us to get into

17   other testing that provided strong backup and affirmation or

18   may show some differences that would help us understand what

19   those differences might, in fact, represent.  So we did the

20   MMPI-2-RF.  Because of fatigue and -- and even after doing

21   this test and other areas of complaints of pain, et cetera,

22   that still ended up being the only testing we did, but it's

23   one of the strongest, most well-researched personality

24   inventories and it gives us a lot of insight into what's

25   going on clinically with the patient.

1          So, you know, I -- I have no problem answering

2     questions about how she did.  I just have problems passing

3     out the questions and the raw data.  That's where, you know,

4     you -- I -- I run into a problem.  And like I said in here

5     under testing, I have a letter from one of the test

6     companies, that in this case Pearson, and it's Pearson

7     because the computer you see in the back of the room is --

8     contains Q Local, which is a testing protocol.  And a lot of

9     tests that weren't published by Pearson are still in there

10    under a Pearson agreement.

11         And they were -- they determined or found out

12    that I released it in another deposition, and I thought I

13    could.  I -- I -- because what I did is I submitted a letter

14    to the patient and explained where it was needed and why I

15    thought the patient could release it.  Well, I was wrong,

16    and they wrote me this letter basically saying, "You cannot

17    do that, and not only will the board come after you, but we

18    will come after you."  That's a pretty strong threat.  First

19    of all, they can refuse to sell any more testing to me,

20    which is a serious problem for me.  They can also sue me,

21    and they can be very -- go that one step further on pushing

22    the board to have my license removed or give me sanctions.

23         I know one of the HIPAA sanctions, the first

24    HIPAA sanction is $50,000 fine and a six-month suspension of

25    my license, which is much, much greater than it is for

1       physicians.  They always make psychological sanctions much,

2       much harsher than they do physician sanctions.  And I -- I

3       just don't want to see a $50,000 fine --

4            Q.   Of course not.

5            A.   -- a six-month suspension of my license.  At my

6       age, that just is the end of my practice.  So -- and not

7       exactly a -- a --

8            Q.   Not a good way to go out.

9            A.   It's not a good way to end it -- end things after

10      all these years.  Your point is probably stated better.

11      But, you know, if at any point in discussion of the report

12      you want to ask what I found in that testing, that I can do.

13           Q.   Okay.  So what did you find in the testing then?

14           A.   Okay.  Let's turn to that -- that report and

15      answer.

16           Q.   Are we looking at the -- at the -- your report?

17           A.   Right.

18           Q.   Exhibit 3?

19           A.   Okay.  Well, that's never happened before.  I

20      turned right -- right to that page, 20 --

21           Q.   What page are we on?

22           A.   Starts at the bottom of 21 and it continues on

23      through the top 10 percent, 15 percent of 20 -- of page 23.

24      I -- it starts at 21, ends on 23.

25           Q.   I see.  Under Tested -- Tests Administered?

1         A.    Right.

2         Q.    And why did you administer to Ms. Williams the

3    MMPI-2-RF?

4         A.    Well, I administered, first of all, the 2-RF for

5    several reasons.  It has a -- a strong correlation with the

6    MMPI-2.  Both tests, and particularly the MMPI-2-RF, is

7    extremely insightful with respect to the clinical scales and

8    it helps you -- helps me as a mental health professional get

9    a better insight into her response to exposure to

10   disability, pain, and any other factors that result in any

11   kind of -- of emotional, psychological, or even

12   physiological discomfort with pain and disability over time.

13        And so it starts out just saying, "As part of

14   this evaluation, Rhonda is asked to complete the Minnesota

15   Multiphasic Personality Inventory-2-RF.

16        "Scores on the 2-RF validity scales raised

17   concerns about the possible impact of overreporting on the

18   validity of the protocol.  A careful examination of the

19   patient's medical records, coupled with clinical interview,

20   lay this issue to rest and leave this examiner quite

21   comfortable that this patient's responses legitimately

22   represent what she perceives she is experiencing and it

23   remains consistent with the medical records and it is

24   consistent with her reports to the physicians.  Therefore,

25   these responses do not represent overreporting.

1           "There is also evidence of possible

2      underreporting on some scales of the clinical profile, but

3      this does not invalidate the testing."

4           So moving on, let's talk about what it does

5      suggest.  It suggests that with that concern out of the way

6      based on the itemized review of -- of either over- or

7      underreporting items.  And it's easier to establish what's

8      going on with overreporting than underreporting because

9      underreporting, really all you can say is we can't tell how

10     much higher the scale would've been if it was a legitimate

11     response versus an underreported response.

12          But it -- it basically -- "With that concern out

13     of the way, the caution expressed by the protocol laid to

14     rest, scores on the substantive scales indicate somatic and

15     cognitive complaints, along with emotional, thought and

16     interpersonal dysfunction."  These actually were the ones

17     that -- that appeared elevated.  How much more elevated they

18     might have been, I can't say.

19          "Somatic complaints include a preoccupation with

20     poor health, malaise, head pain, neurological symptoms, and

21     gastrointestinal complaints.  Cognitive complaints include

22     difficulties with memory and concentration.

23     Emotional-internalizing findings include risks for suicidal

24     ideation, depression, stress and worry, along with anxiety

25     and fears.  Dysfunctional thinking relates to aberrant

1    perceptions and thoughts.  Interpersonal difficulties

2    include social avoidance.

3            "She is very likely to be preoccupied with poor

4    health," largely because she's so focused on somatic or

5    bodily concerns, "and to complaint of sleep disturbance,

6    fatigue, low energy, not coping well with stress, and to

7    experience difficulties in concentration."

8            She's so focused on disability, frankly, she

9    wakes up in the middle of the night thinking about

10   disability.  She's created disability as the center of her

11   universe.  And so at any time she wakes up, she experiences

12   that same stress, that same focus.  And all decisions are

13   made surrounding her belief in her disability; and she

14   shouldn't be making that the center of her universe because

15   it's only going to create more of a pain cycle.

16           She states that -- or the -- with her answers,

17   "She reports sexual dysfunction, along with a lack of

18   positive emotional experiences with her profile suggesting

19   anhedonia."  Anhedonia -- anhedonia is a lack of positive

20   feeling.  Some people just say it's depression.  It's not,

21   although a component of anhedonia.  And that's

22   A-N-E-H-E-D-O-N-I-A, anhedonia.  A component of it certainly

23   is depression.  I think I said that wrong.  It's

24   A-N-H-E-D-O-N-I-A.

25           But the majority of it is a lack of positive

82

1    feelings and attitudes regarding those things that made you

2    happy in -- in -- in -- in which you enjoyed in your life

3    but no longer do you get emotional satisfaction or happiness

4    in those same things now.  So she reports sexual

5    dysfunction, a lack of positive emotional experience, and

6    anhedonia.

7         "She shows significant pessimism.

8         "Rhonda is not currently on any kind of

9    psychotropic medication, but her psychological condition and

10   diagnosis suggests she is a candidate to be evaluated by a

11   psychiatrist for medication.  She should be followed by a

12   psychiatrist for risk factors for suicide, along with a

13   counselor."

14        Q.   And -- and, Dr. Deutsch, does -- does your -- has

15   your opinion on the results of the MMPI-2-RF administered to

16   Ms. Williams, have they changed at all?

17        A.   No.  I mean, as far -- I think she finds it

18   extremely difficult to admit to the fact that there is a

19   psychological component to her complaints.  She sees it all

20   as physiological, the suggestion that she may be impacted by

21   her complaints of pain, that she may be in social avoidance,

22   that the pain cycle includes a cycle of pain that is in part

23   resulting from the very high and extreme level of

24   psychological response to days when she just cannot

25   participate because she's emotionally unable to participate.

1    She's unable to work.  She just can't really manage a

2    normal -- normal, active lifestyle.  And even if part of it

3    is judged to be from the psychological emotional aspects of

4    disability, it very much still significantly leaves her not

5    functional in terms of her normal activities.

6              I noted that I felt she was a depressive

7    disorder, single episode, meaning that she had not a period

8    since onset of at least six months or greater without any

9    depression or anhedonia, that it stayed -- it stayed there

10   at this level for at least that period of time, six months

11   or greater, and that it's a single episode depressive

12   disorder.  I felt it was severe in nature, and she's a

13   296-23.

14             I thought she was dysthymic disorder, 300.4; a

15   general anxiety disorder, 300.02; an adjustment disorder

16   with severe depression, mood, and anxiety disorder, 309.0; a

17   chronic disability/chronic pain disorder due to general

18   medical condition and psychological factors.

19             And I felt that on Axis II, the only pinpoint

20   diagnosis I felt I could legitimately make was an avoidant

21   personality disorder, 301.82.  When you look at the avoidant

22   personality disorder coupled with the anhedonia, what you're

23   seeing is an individual who just cannot bring herself to

24   participate in the kind of social environment she may have

25   enjoyed before.  She doesn't enjoy it now.  She doesn't

84

1    interact well with people.  She -- she just has a negative

2    response to the activity that would be called upon for her

3    to perform a more -- in a more normal functional lifestyle

4    than that -- that would require that or result in that

5    diagnosis to be dropped off.

6            Axis III is nothing more than a reflection of

7    what the diagnosis has been from all the various physicians

8    and diagnostic reports have been.  And I don't know that you

9    need that read into the record, but that's up to you.  If

10   you want me to read it, I will.

11       Q.    No, no, not necessary.

12       A.    Okay.  Then the next area is -- hmm -- oh, Axis

13   V, whether there's any social --

14       Q.    I think you skipped Axis IV.

15       A.    Oh, I meant IV.  I'm sorry.  I'm looking at IV

16   and I said V.  Axis IV really looks at whether there are any

17   other outside influences in general life such as being fired

18   all of a sudden from a job you've been very proud of or

19   whether anything of that nature has occurred.  I simply said

20   life stressors secondary to disability and psychological

21   response to exposure to disability have been a factor.

22           It's -- it's not a vocational implication in

23   terms of I was fired from a job that I never expected to be

24   fired from, but it is suggesting that the disability itself,

25   her physical response to or emotional response to disability

85

1    and lack of movement in any fashion, either psychologically

2    or emotionally, has definitely added to the overall

3    emotional psychological factors.

4                And lastly was Axis V, which is the -- if you go

5    to the Axis V table in front of the DSM-5, it tells you that

6    -- what the outcome is likely to be.  Well, if you have an

7    Axis V score of 70, you're up there saying -- it's saying,

8    you know, you're capable still of going to school, engaging

9    or integrating with your social environment and the people

10   within that social environment, and you're able to function

11   in -- in a world with people around you and with appropriate

12   outcomes.

13               I listed her as a 60 as the current general area

14   function, and the highest GAF in the past year I saw is a

15   60, which says she's not functioning vocationally.  She's

16   not functioning in terms of interaction with her social

17   peers or social environment.  She does not have a perception

18   of herself enjoying life in a fashion she did before, and

19   she does not see herself as functionally able to participate

20   in normal activities, wanting to participate, agreeing to

21   participate.  She just simply does not perceive herself as

22   -- as a reliable, functional, happy individual in any way,

23   shape, or form.  And I think that's more of an emotional

24   perception than a physiological perception, quite frankly.

25               And I'm not suggesting that -- that there's no

1    emotional aspect behind it.  In fact, the diagnosis of

2    chronic pain/chronic disability disorder specifically states

3    in the DSM-5 chronic pain/chronic disability disorder

4    secondary to a general medical condition, so you have to

5    have a medical -- a general medical condition to develop the

6    chronic pain/chronic disability disorder solving the

7    particular question.  But the realty is that there is a

8    significant psychological component that comes about as a

9    result of that ongoing pain and disability syndrome.

10       Q.   Dr. Deutsch, what is the relationship between the

11   MMPI-2-RF and the DSM-5?

12       A.   Well, first of all, understand this:  That when a

13   licensed -- someone licensed under the Psychology Practices

14   Act, whether they're licensed as a clinical psychologist or

15   in my case I'm a Ph.D. in counseling psychology with a

16   subspecialty in rehabilitation, which gives me a license in

17   mental health -- as a professional mental health counselor

18   with a specialty in rehabilitation and severe disability.

19   But essentially I'm allowed to do everything a clinical

20   psychologist does except I don't do any neuropsychological

21   testing and most clinical psychologists don't either unless

22   they got boarded in neuropsychology.

23            But the bottom line, what's the relationship?

24   The relationship is that the DSM-5 outlines all of the

25   criteria that must be met to reach a diagnosis such as a

1    diagnosis of clinical -- excuse me -- of chronic

2    pain/chronic disability disorder, or if the diagnosis was

3    being made of suicidal disorder or -- or any other

4    legitimate psychological disorder, it would be within the

5    DSM-5.

6           Now, it has changed somewhat this year in that

7    they're merged all of the -- excuse me -- all of the autism

8    disorders into one area, autism spectrum disorder, because

9    it was just too hard generally to distinguish within the

10   DSM-5 all of the different types of autistic disorders.  We

11   just wanted to get the patients treatment, so everybody was

12   pretty uniform in understanding that the best thing to do

13   was make sure they were diagnosed --

14       Q.   Right.

15       A.   -- instead of just sitting around arguing over

16   what type of autism.

17          But the bottom line is it -- it helps you

18   understand the -- how to figure out which criteria has been

19   met for which diagnosis.  From my standpoint, and I think

20   the -- the -- the textbooks will back me up on this,

21   diagnosis is made by your clinical assessment.  Testing

22   doesn't make the diagnosis.  Testing merely allows you to

23   gain quantitative data or -- that helps bring you to further

24   insight that helps establish the -- the diagnosis you've

25   made.

1          But I made the diagnoses first, go to the test

2    data and get affirmed or not.  And there's certainly been

3    times I've not been affirmed and been surprised, but still I

4    go with that surprise and have to live with it because the

5    fact is is that although you may make that diagnosis and

6    believe in it firmly, if, in fact, the testing proves to

7    be --

8          Q.    Inconsistent.

9          A.    -- inconsistent with your clinical diagnosis,

10   first of all, you should stick with your clinical diagnosis

11   first if you strongly believe it to be accurate and not

12   worry about what the testing -- whether it affirms or

13   doesn't affirm.  I would prefer it affirmed it, and in this

14   case I think it does affirm it.  In fact, it goes a little

15   further than what I was thinking in terms of my clinical

16   diagnosis.  I absolutely felt she was a chronic pain/chronic

17   disability patient.

18          Let me go back here a second.  I don't know that

19   I specifically indicated that I saw her -- oh, I -- and I

20   absolutely felt she was a depressive disorder.  I did not

21   necessarily see her as a general anxiety disorder.  I did

22   feel she was an adjustment disorder, but -- but the general

23   anxiety and dysthymic disorders and the adjustment disorder,

24   I just never put down on paper.

25          I -- I -- I felt like, if anything, it was

1    borderline, but the test came out a lot stronger than

2    borderline.  So, you know, I feel pretty good about the

3    testing in terms of its insights.  But again, nothing, no

4    one aspect, in my opinion, of the physical or psychological

5    disability here creates the level of disability this

6    individual has.  It's the totality of all of the problems,

7    the psychological problems, the -- the neuropsychological --

8    well, not neuropsychological problems.  Let's just leave it

9    at that.  The psychological problems, the various physical

10   diagnoses that she has, its impact on reducing her

11   functionality in total, those all have a significant impact

12   on her.

13           No one item is going to leave her free and clear,

14   and I don't know any way that any one item would allow her

15   to -- you know, if any one item were -- were resolved or

16   cured, I don't know that would make -- that that would make

17   a major difference.  I mean, the doctors can answer that

18   better than I can because I simply can't answer causation,

19   but I don't think there's any -- as I'm understanding this,

20   that there's any single physical diagnosis or even mental

21   health situation that if resolved could leave her so

22   comfortable and resolved that she no longer would have a

23   problem with the -- the mental health disability issues .

24           I think she's got a significant problem,

25   significant in terms of vocational gains into the future,

1    and she's going to have to hopefully do well with the kids.

2    Let them grow up, then they're eventually going to, in their

3    later years in, you know, the last half of their -- their

4    teen years, probably raise themselves or -- and each other.

5         Q.   Dr. Deutsch, on -- on Exhibit 3, pages 22 and 23

6    of your report, you list these Axis I through Axis V.  Can

7    you just generally describe what these axes are?

8         A.   Sure.  Axis I is a list of neurotic behaviors or

9    diagnoses, so they are not -- they're significant, but they

10   tend to be more treatable than Axis II disorders, which are

11   much more likely to be psychopathic disorder.

12        Now, as far as being psychopathic, the Axis II,

13   the avoidant personality disorder, in my opinion, is one of

14   the less severe of -- of that type of pathological disorder.

15   It's still very scary for her, but not as severe as -- not

16   as severely scary as some of the other diagnoses you could

17   put in its place.

18        Axis III is a list of the physiological or

19   physical disorders that the doctors have identified that is

20   significant.  It's something she has to live with, and it's

21   a major component of the onset of the -- the emotional

22   disability and also a major component of the combined

23   diagnosis of chronic pain/chronic disability disorder.

24        Axis IV, as we just talked about, is the -- here

25   we are.  I'm sorry -- is whether or not there are any

1    outside -- when I say "outside," I mean not -- not

2    necessarily clinical but any general psychological factors

3    in the environment or problems in the environment, stresses,

4    nervous conditions, et cetera, that add to the psychological

5    responses to disability that she's having, and I think there

6    are.  I mean, I think that, you know, she has a number of

7    life stressors trying to deal with the children and their

8    problems.  It creates a lot of stress for her trying to

9    raise these children by herself, as she perceives it without

10    the kind of help she really feels she needs.  It's very

11    stressful and very difficult for her to maintain.

12          And, you know, Axis V is her current general

13    level of function and what -- what the highest level of

14    function was in the past year and what it's been over the --

15    in the last few weeks and I rated both at a 60.  Now, I -- I

16    don't think the Axis V for her would be that difficult to

17    get resolved, but in her perception, it is that difficult to

18    get resolved.

19          And the fact of the matter is is I have a younger

20    daughter that, you know, I have told a million times,

21    perception is reality.  If that is your perception, even

22    though it may be that you're angry at me, if that's your

23    perception, honestly, than that's fact.  For you, it's fact.

24    I can't argue the accuracy of it with -- you know, with you

25    if you honestly perceived it in that fashion.

1          So we need to sit down and talk about what really

2     happened, make sure you understand; and after we talk, that

3     you honestly still believe that's what you saw or that's

4     what you heard.  So you can't say, you know, you're just

5     wrong because you may have heard it and seen it that way,

6     but you're absolutely inaccurate in your interpretation of

7     it.  You've got to recognize if that's what you saw or

8     heard, that adds to the overall psychological component of

9     disability, and that unquestionably is, you know, part of

10    what she's dealing with.

11         Q.   Does Ms. Williams have children?

12         A.   Oh, that's a good question.  When I said that --

13         Q.   Was that just general?

14         A.   Yeah, yeah.  I'm sorry.  When I --

15         MS. GALEOTO:  I thought I heard him reference --

16    reference his own daughter, that is what he tells his

17    own daughter.

18         MR. TORRES:  I'm asking him.

19         A.   No.  I did -- when I said that, that statement, I

20    -- I flashed, uh-oh, I think I just made an error.  So let

21    me go back and tell you exactly who she lives with.

22         Q.   Thank you.

23         A.   No.  I'm sorry.  I apologize.  That was a

24    complete misstatement.  I was thinking in generalities, and

25    I applied it without looking.  She lives alone in her house.

1    It's a one-story block home.  She doesn't have anyone there

2    to help her, and I have a list of the things that she can

3    and cannot do in trying to maintain the house.  But she does

4    not have children of her own, and that was a complete

5    misstatement on my part.

6         Q.    Oh, that's okay.

7         A.    I apologize.

8         Q.    No big deal.  Dr. Deutsch, going back to Axis I

9    on page 22 of Exhibit 3, your -- your report, there are

10   numbers by the disorders.

11        A.    Yes.

12        Q.    Can you tell me what those numbers signify?

13        A.    Sure.  That's the -- the DSM-5, just like a --

14        Q.    It's the section --

15        A.    It's just like an ICD-10 number where the -- if

16   you're filing it, everybody is on the same page because you

17   -- the -- everybody will -- who's involved in this kind of

18   work will know immediately, every physician, every, you

19   know, carrier, whatever, will know automatically what the

20   ICD-10 number means and everybody will know what the DSM-5

21   number is standing for or immediately can look it up.

22        Q.    I understand.

23        A.    But that's all -- that's what the number stands

24   for.  It's nothing else.

25        Q.    That's what I thought it was.  Okay.  Once --

94

1    once you said --

2         A.    And the last two numbers after the point, like if

3    it's 296.21, 21 would be mild, 22 is moderate, and 23 is

4    severe.

5         Q.    And how about if we look at chronic

6    disability/chronic pain disorder?  Can you first explain

7    what chronic disability/chronic pain disorder is?

8         A.    Sure.  The original bible on chronic pain/chronic

9    disability disorder is actually in my office.  I don't -- I

10   don't -- I may have moved it in here, but I don't see it.

11   Oh, that may be it over there.  But anyway, it was written

12   by Wilbur, B-U-R, W-I-L-B-U-R, Fordyce, F-O-R-D-Y-C-E, in

13   1962, and much -- not much has changed since then in terms

14   of our understanding.

15             And he defines each of the personality types that

16   fit into the different types of personalities that come

17   through in a chronic pain/chronic disability disorder.

18   These are individuals almost assuredly who, prior to the

19   onset of a disability, have had a significant component of

20   this issue that has developed over time and which will be --

21   which will grow out of the onset of an accident.

22             So that component might be growing up as a child

23   seeing a family member who is a disabled and how that's

24   utilized by that family member to control the social and

25   family environment or how it's used by a family member to

1    control just the family environment and to get what they

2    want in that control.  It may be also that they've --

3    they're trying to control through the disability, the

4    control of peer group relations, control work issues, if not

5    leave work at, you know -- to be off work for the remainder

6    of their life, obtain disability, whatever that is.  But

7    they see the individual as having more control over their

8    environment than the nondisabled and get more attention and

9    more help than the nondisabled typically get.

10          So it's very significant to them that, well, you

11   know, maybe the easiest thing to do is -- is be hurt

12   sufficiently to give me that same kind of control.  So it's

13   not unusual at all that the personality type involved in --

14   in a chronic pain/chronic disability disorder begins years

15   prior to the onset of an accident.

16          The individual who begins a chronic pain/chronic

17   disability disorder by having a significant accident on the

18   job, being unable to let go and -- and make progress in the

19   rehabilitation and finding themselves unwilling to

20   participate fully in a treatment program so that they

21   overcome the physiological disability can lead to a chronic

22   pain/chronic disability disorder.

23          Many don't even know what they're doing.  They

24   just realize that it's turning them into this older chronic

25   pain/chronic disability patient.  And when an effort is made

1    to push them through a program, they -- that's appropriate

2    for them, then they simply can't -- they simply can't pursue

3    it.

4        Q.   Okay.  So -- and I'm going to say this grossly

5    because I -- I don't have anything like your background,

6    never will.

7        A.   That's a little harsh, but go ahead.

8        Q.   What I -- what I understand you saying to me is

9    that for chronic disability/chronic pain disorder, there are

10   psychological conditions that might preexist a medical

11   condition; is that --

12       A.   That wasn't gross, nor was it harsh --

13       Q.   Okay.

14       A.   -- but -- but it was a legitimate way of phrasing

15   and -- and bringing down to the basics what I said.

16       Q.   Thank you.  And a -- a physical harm, a medical

17   condition -- I don't want to use the word "trigger," but I

18   can't think of a better word right now -- sort of triggers

19   the expression of the disorder?

20            MS. GALEOTO:  Objection.

21       A.   Often the onset of a -- an injury or an accident,

22   a disability can trigger, absolutely -- it's not a bad word

23   -- can trigger the onset of a significant chronic

24   pain/chronic disability disorder in much the same fashion as

25   a sudden severe explosion in combat can trigger a --

97

1      Q.    Post-traumatic stress disorder?

2      A.    -- a post-traumatic stress syndrome when others

3    might think, Why is it doing that?  Well, if you've had a

4    couple of other exposures, not severe enough to bring it

5    about, but now you have a really severe explosion, you watch

6    a couple of friends severely hurt or killed or you watch one

7    friend get severely burned even though you're unharmed, you

8    can very much have outgrowth of that from that event.

9          It doesn't mean you have to be hurt, but at least

10   if you're observing and -- and see yourself emotionally very

11   much involved with and failing to have protected or cared

12   for a good friend who's now burned and in the hospital, very

13   easily become the onset of a post-traumatic stress

14   syndrome.  So there are a variety of factors, but there's

15   almost always also a variety of triggers.  And it doesn't

16   mean that the individual that you're working with is -- is

17   the sole reason that it's developed, but it can be.

18         I have an 11-year-old boy, for example, who was

19   walking to the bus stop with his roughly 8-year-old brother.

20   And they borrowed mom's coat and were playing the two-headed

21   monster.  One had his arm in one -- his arm in one of mom's

22   sleeves, the other had his arm in the other sleeve, and they

23   had the coat wrapped around themselves.  When a garbage

24   truck backing up got the 8-year-old.  And while he was

25   pulled under the wheels and his leg and his arm were just

REGENCY REPORTING SERVICE, INC. (813)224-0224

1      literally degloved of tissue, the other boy wasn't hurt

2      physically at all, but he was watching what was happening to

3      the 8-year-old brother, and he's far more disabled from his

4      extreme emotional trauma than the 8-year-old boy is.  He's

5      up, got prostheses, ready to go.

6              The 11-year-old is so traumatized from

7      post-traumatic stress disorder, it's lucky if we can even

8      get him up and get him out of bed.  We're having a really

9      hard time getting him moving because childhood

10     post-traumatic stress is that much more difficult to deal

11     with and engage a patient in -- the patient in therapy.

12             So, you know, it just depends on the situation,

13     but, you know, it -- it -- you know, just -- there's so many

14     factors in your preexisting life.  And what -- what I've got

15     to say to you is I don't care who the patient is and what

16     their diagnosis is.

17             You've been around for 40 years or 35 years.

18     There's always going to be something in your makeup, not

19     necessarily baggage, not necessarily unhealthy baggage, but

20     your personality type has been developing for that 35 years,

21     and it's going to be a part of what creates the person who

22     can handle that kind of major stress or who can't.  And so

23     it's going to be a factor in the development of the kind of

24     emotional reaction you have.

25         Q.   Do you know in Ms. Williams's case what medical

1    conditions -- and I'll use the word "trigger" again --

2    triggered the expression of the chronic disability/chronic

3    pain disorder?

4            MS. GALEOTO:  Objection.

5       A.   I can't really say that I -- I would point to any

6    one.  Now, if they can't -- if I went back and I studied the

7    chronological onset -- and I've got it laid out.  I just

8    don't -- never put it in chronological order, this diagnosis

9    came first, this one came second, I would say that it's very

10   easy to look at, in that sense, that the first two or three

11   diagnoses were significant enough with her other histories

12   to pinpoint that this is a likely point at which she was

13   starting to really develop the chronic pain/chronic

14   disability disorder.

15           It certainly didn't require every one of the

16   physiological diagnoses.  Although there's no question that

17   with the totality of them, each -- each additional one began

18   to so reinforce her image of herself as totally disabled and

19   -- and a chronic pain/chronic disability component on top of

20   it, that she was in for a long-standing period of

21   post-traumatic stress.

22      Q.   And -- and that is not something that you

23   undertook in your report to try to determine when the onset

24   of these disorders occurred?

25      A.   No, I didn't.

1        Q.   And is there a reason?

2        A.   I just was never thinking about an onset date

3    because I usually don't have anything to do, or I'm usually

4    not asked about causation or date of onset.  That's usually

5    something that's done by others, but, you know, it can be

6    done.  I -- I'm not -- it's not an area I'm usually

7    comfortable in simply because I'm never asked that, but I

8    can see why in this instance it may be a question that is

9    asked.

10       Q.   And how would you -- how would you go about

11   specifically making the determination of when a particular

12   disorder began to express itself?

13            MS. GALEOTO:  Objection.  He already said that he

14       didn't do that here.

15            MR. TORRES:  I understand.

16       A.   Well, that's a little bit different because when

17   it began to develop versus when it began to express the

18   symptomology could be two different things.  You can start

19   developing the post-traumatic stress disorder, but not let

20   it show for some period of time.  But I think by the second

21   or third diagnoses of a physiological disability, you're --

22   you're going to start seeing some level of behaviors that

23   are going to show the fact the individual is beginning

24   symptomology of chronic pain/chronic disability disorder.

25   And I think when we pull Fordyce's book, which I'll and try

1    and -- and to do for this case, it identified his

2    perceptions.  Even though I know it's an older text, like I

3    said, it's still considered the bible in chronic pain.  It

4    was wonderfully written and insightfully written, and I

5    thought he was a real leader.  And I owned a chronic

6    pain/chronic disability program with an orthopedic surgeon

7    and a clinical psychologist.  The three of us ran it.  And

8    after a few years, I kind of got sick of the population and

9    decided that's not where I wanted to spend my life.  I much

10   preferred working with the severely brain injured, and I got

11   out of it.

12            But the fact is is that it -- it really didn't

13   come with an understanding of when the behavior started as

14   simply recognizing that you had to learn as a therapist

15   never to ask:  Well, how are you this morning?  You just

16   don't ask that question or you'd be there for an hour and

17   45 minutes.

18            And you also had to recognize that whether

19   they're -- whether it's the first time you're meeting them

20   or it's a long-standing relationship, the symptoms may be

21   starting with nothing more than an expression of how they

22   feel.  You know, I -- I feel stiff and fatigued this

23   morning.  I'm not sleeping well.  They may be -- compared to

24   their actual injuries or their actual statements, it may

25   appear to be relatively mild, but I start looking for

1    records on the level of sleep habits, the type of sleep

2    habits.  Are they getting away from use of the CPAP machine,

3    which -- which helps them with their eyes, their fatigue

4    levels, et cetera?

5           So all of it is important.  And -- but I think if

6    you studied the history long enough, you can find pretty

7    close approximate dates of -- of onset of behavior as well

8    as the other questions you're asking about, you know, onset

9    date.

10   Q.   What sort of behaviors would you look for?  If

11   you were making this determination for Ms. Williams --

12   A.   Well --

13   Q.   -- what behaviors would you look for?

14          MS. GALEOTO:  For -- for which -- for which

15   disorder?

16          MR. TORRES:  The disorder that we're discussing.

17          MS. GALEOTO:  He was discussing several today,

18   and he was also giving --

19          MR. TORRES:  All right.

20          MS. GALEOTO:  -- post-traumatic stress disorder

21   as an example.

22          MR. TORRES:  We're on -- we were just -- just

23   discussing chronic disability/chronic pain disorder for

24   the last ten minutes.  Please.

25          MS. GALEOTO:  I -- I'm going to object to

1      counsel's characterization.

2      A.   All right.  Well, you know, if you're looking

3    about -- at what point is she showing chronic pain/chronic

4    disability behaviors, you know, you look for the

5    symptomology described in the DSM-5 that -- that -- you

6    know, that outlines the diagnostics for chronic pain/chronic

7    disability behavior.  You carefully list them out, and then

8    you go back through her history, whether pre or post, and

9    you identify when she's first showing signs that are similar

10   to or exactly like the description in the DSM-5.

11      Q.   Okay.  I got it.  That is helpful.  Dr. Deutsch,

12   what is the relationship between the MMPI-2-RF and pain?

13      A.   Well, what you're looking for -- well, what the

14   relationship is is it's no different than the pain profile

15   you'll find in the MMPI-2.  In both, you'll get that classic

16   V shape or the inverted V that you'll find for most.  So

17   axis -- if -- in the old MMPI-2, for example, the inverted V

18   was an elevation on Scale 1, somatic focus, going up to

19   rather than the normal V -- the average V shape, which would

20   be going down to the next scale, which is really a -- a

21   level of -- let's see.  I think that, if I remember

22   correctly, it's a level of depression.  I -- I -- let me go

23   look at her test so I don't -- I used to have this so well

24   memorized.  You get older and you don't have it as closely

25   on memory.

1       Q.   You don't have to get older to be challenged on

2    that.

3       A.   Now, I used to, you know, be able to state the --

4    an article's date of publication, the name of the journal,

5    the pages they were on.  I just don't do that anymore.

6       Q.   My wife contends I'm only good for irrelevant

7    information.

8            MS. GALEOTO:  That's bad.

9       A.   Well, I haven't been married in 30 years, and she

10   still contends that.

11           Well, basically it deals mostly -- scaled to

12   mostly with emotional factors and I think depression is a --

13   is a common one, that -- and this is more the MMPI-2 versus

14   the MMPI-2-RF, but both deal with emotional factors.  It's

15   just -- it's a little broader in the MMPI-2 that -- 2-RF

16   than it is in the MMPI-2.

17           So if you have the elevated somatic focus, the

18   elevated but not quite as high depression, and then Scale 3,

19   which is hysteria, in the MMPI-2, so you're much -- you have

20   the elevated hysterical response where stress, pressure, you

21   know, you -- you recognize or you react to and take in

22   psychologically any of the anxieties or stresses or common

23   emotional issues that come up, bill collectors, whatever,

24   and you interpret those all physiologically, you take them

25   in and they all -- for example, if you've been in pain for a

1    long while and you take them in physically, they have a

2    significant impact on areas that have been a problem for you

3    where you have avoided exercise and you've let them rest and

4    they've atrophied and they're the first, then, that are

5    going to react to those emotional -- those areas of

6    emotional tension, stress that you've taken in.  So you

7    either get the -- the classic chronic pain V or the inverted

8    V.

9         So you look for those kinds of things, and then

10   you look for how that relates to later scales such as the --

11   the -- the psychopathic deviant scale or the -- although I'm

12   not saying that she's psychopathic deviant.

13        Q.   I understand.

14        A.   But when you get an elevation in that by itself,

15   it does have a relationship; or you get an elevation on the

16   schizophrenia scale, not high enough to suggest she's

17   schizophrenic, but high enough to say that, "Look, she has

18   some disorder or aberrant thinking," and you put that

19   together with the profile of the chronic pain patient and

20   you realize that part of the classic framework for the

21   chronic pain patient is that her -- her perceptions and her

22   thought processes are aberrant.  She has feelings of

23   persecution.  They're just not clear in terms of the

24   behaviors she's -- she's exhibiting or announcing.

25        That helps you also determine what kind of pain

1    program do you go to, because, you know, if those are all

2    relatively valid profiles and she's experiencing a lot of

3    that, I might be more likely to refer her out to Freedom

4    Hospital in Phoenix versus the Rosomoff program in Miami.

5    Miami's program is a focused program on chronic pain/chronic

6    disability.  It works with primarily programs, or it works

7    mostly from a psychological standpoint using guided imagery,

8    using behavior modification, using biofeedback, muscular --

9    neuromuscular reeducation.

10          And -- and it has a great success if the patient

11   is going in there knowing, look, this is your last resort

12   and you've got to focus on this program, otherwise, there is

13   nothing else that can be done for you.

14          If on the other hand, you have a patient who's in

15   pain but it's largely from things like post-traumatic stress

16   disorder that they can accept treatment outside strictly,

17   the belief that there's nothing going on psychologically, if

18   they believe there's a psychological component, if they

19   understand all of this, Freedom Hospital may be the way --

20   way to go.  Now, they treat -- they're the first to -- to --

21   to -- the first hospital that utilizes this and the first

22   approved by the FDA, they utilize ketamine infusion therapy.

23          Those who historically have been using ketamine

24   coma therapy know that it's not approved in the United

25   States, so they maintain a clinic -- each of them will

1      maintain a clinic area down in Mexico.  They'll get up, 25,

2      30 patients that want the ketamine coma, block a week to do

3      it, and put them all into that clinic or have them all meet

4      them down there.  And the idea behind the ketamine coma

5      therapy is you're literally infusing the body with ketamine,

6      which is a horse sedative, and you're shutting down the

7      nervous system.  The idea is it's like rebooting a computer.

8      We're letting the computer reboot so that if there's some

9      problems with the software, hopefully it'll -- when you

10     reboot, it'll straighten itself out.

11             And it works for a lot of people.  Well, the

12     advantage of ketamine infusion therapy is, first of all,

13     it's legal.  Second of all, it identifies the exact nerves

14     that are sending the false pain signals on a repetitive

15     basis.  Third, it then infuses ketamine to the base of those

16     nerves exactly where they come out of the dural sac and

17     between the vertebrae.  Then it floods the base of that

18     nerve with ketamine coma, like 12 hours a day.  So it

19     essentially shuts that one nerve down, not the entire

20     nervous system.

21             It runs for ten days.  And if there's ten nerves

22     involved, then ten nerves get infused.  And it goes on, like

23     I said, for ten days.  If by day six or seven it appears to

24     be working and you're essentially no longer in pain, they'll

25     continue it for the ten days and then there's a two-day

1    booster series that will go on and it's -- it's over.  Now,

2    for those who had the success and went the 12 days, they're

3    expected to need a two-day booster every five to ten years,

4    and -- and that's part of your follow-up plan.

5            Which one works, you know, for the patient?

6    Well, for those who absolutely continue to still have pain,

7    still have anhedonia, and still have, you know, other

8    symptoms related to the diagnosis, if they're resistant to a

9    belief that -- that the -- that the therapeutic involvement

10   has been meaningful, you may never get them to participate.

11   They've got to believe you found a significant way to help

12   them and -- other than just letting them run around with

13   pain all their lives.  But both approaches can be very

14   significant.

15       Q.    I think I understand.  Dr. Deutsch, on page 22,

16   you write in your report -- here you go, sir.  I think it's

17   actually that page.  You write, "With that concern out of

18   the way," and that was the underreporting and the

19   overreporting --

20       A.    Um-hmm.

21       Q.    -- that you referred to --

22       A.    Yes.

23       Q.    -- before?  "And the caution expressed by the

24   protocol laid to rest, scores in the substantive scale

25   indicate somatic and cognitive complaints."

1          What do you mean by somatic and cognitive

2     complaints?

3          A.   Well, if we go back earlier and see that --

4     first, we're talking about the validity scales and we do a

5     -- a item analysis looking at how she responded to each item

6     in comparison to what the doctors found and how she

7     responded to doctors' questions in that area.  So if we feel

8     we've cleared that -- those questions of nonresponsiveness

9     or inaccurate responsiveness with an item analysis, we move

10    to the somatic complaints where we're actually looking -- or

11    the -- the -- the scale, the first few scales, and we're

12    looking at exactly what her responses were and what's

13    covered.

14          So, first of all, she shows elevations on somatic

15    complaints, preoccupation with poor health, and that's what

16    somatic complaints are.  It's a preoccupation with health

17    issues.  It is inclusive of emotional thought and

18    interpersonal dysfunction.  And you can -- I'll define each

19    one of those.

20          With somatic complaints, the first thing it -- it

21    shows is that she's preoccupied with poor health.  That's a

22    pretty easy one to define.  She just sees herself as overly

23    unhealthy and consistently feeling unhealthy; malaise, a

24    general feeling of lack of energy due to her health

25    problems, almost like a chronic general feeling of -- of

1    poor health even though poor health is already mentioned,

2    that -- but poor health that leaves her tired, fatigued all

3    the time, as well as having emotional issues; head pain,

4    which is mostly headaches, but it could include head, neck,

5    even pain inside, like a migraine or something of that

6    nature, along with emotional problems, thought processing

7    problems, and interpersonal dysfunction.  And interpersonal

8    dysfunction can include neurological symptoms,

9    gastrointestinal problems, nausea, vomiting, anything like

10   that.  So that's what you're looking at with the somatic

11   complaints.

12        With the cognitive, I personally -- well, let's

13   say what it says and then let me tell you what I think.

14        Q.   Thank you.

15        A.   Cognitive complaints include difficulties with

16   memory and concentration.  Well, we see that an awful lot,

17   but the problem is there are a lot of things that mimic, you

18   know, cognitive complaints or complaints of loss of memory

19   and -- and concentration.  If you're depressed, you're not

20   going to be as focused as you normally would be.  If you're

21   not focused, you're not going to store information that you

22   would normally be paying attention to and retain them to a

23   level sufficient to recall them later.

24        So if you're kind of -- you're listening to the

25   news but you're not because you're focused on other things

1      and you hear bits and pieces but not all of it, the fact is

2      you're still going to show up as being -- having a memory

3      problem because you can't answer the questions.  You can't

4      answer them because you really weren't listening, focused,

5      and concentrating.  So I really don't see her as having a

6      severe head injury or even a minor head injury that's

7      causing memory and concentration problems.  I think it's

8      more a -- an emotional, psychological issue than I think

9      it's a chronic pain issue.

10            Okay.  Then we have emotional internalizing

11     findings, including risk for suicidal ideation, depression,

12     stress and worry, along with anxiety and fears.  Well, I

13     don't have any question she has a lot of emotional feelings.

14     I don't believe in my own clinical interview that she's

15     likely to commit suicide.  She's got a strong belief in God.

16     She believes that she will never obtain a chance to see or

17     meet God in the hereafter if she commits suicide.  I just

18     don't see her as suicidal.  She had a number of reasons why

19     she said she would not do that, but there are times she

20     entertains the thought.

21            She does complain of feeling depressed, having

22     stress and worry, along with anxiety and fears.  So I -- I

23     believe that is all an accurate statement.  I think she has

24     a lot of stress, but a lot of it's created by herself in the

25     worries that she developed through somatic focus, through

1    the general malaise, and -- and other factors that she

2    creates by focusing on making -- making somatic focus the

3    center of her world, making disability the center of her

4    world.  But I have no question that those things exist.

5         Emotional internalizing findings put her at risk

6    for suicidal ideation, depression, stress and worry, along

7    with anxiety and fears, and I think that's very real.  I

8    think all of those things, because of her belief in how

9    threatened she is by suicide, depression, stress and anxiety

10   and fears, she needs to understand that no one is there to

11   -- that's really a threat to her except her.  And if she

12   just will maintain, you know, a level, an emotional basis,

13   there's no threat for suicide other than the threat she may

14   be to herself.  And she needs to pull herself together in

15   that regard.

16        Interpersonal difficulties include the social

17   avoidance and she needs to hear how important avoiding

18   social avoidance, if you will, can be to her.  And it's very

19   important to -- to interact with other peer group members.

20   It's very important to socialize with them first long before

21   she worries about working with them.  And if those two

22   factors can be brought into play as part of the counseling,

23   I think that she'll do much better.

24        I think if her brother is -- oh, let me make sure

25   I'm not -- I'm not assigning this to somebody else.  Let me

1    go to the intake just a second before I do the same thing I

2    did with the -- the daughters, which she doesn't

3    have.  Yeah, I think I may have made a mistake.  I'm just

4    looking real quick here, but I don't see any -- any notes

5    regarding other family members, so I'm going to stay off of

6    that because I don't know that there is a sibling that can

7    help her in any way.  So I'm just going to stay away from

8    that statement I was about to make.

9        Q.    Okay.

10       A.    The thing is is that often someone like myself

11   licensed under the Psychology Practices Act will say, "You

12   know, she needs more talk therapy."  Now, I'm not -- with

13   the disabled, I'm not a strong believer in talk therapy and

14   I'll explain that in a minute.  And -- but I'm also not a

15   strong believer in medication in every instance.

16            But in this case it may be necessary to use a

17   modest amount of psychotropic medication to break the cycle

18   so that you can get in there and work with her one on one.

19   So some antidepressants and antianxiety medication may be

20   necessary.  And I think she should be seen by a psychiatrist

21   just to ascertain that and to clear her as nonsuicidal as

22   far as the psychiatrist concern so we can work with her

23   without coming up and saying, "You know, you really were --

24   are a threat to her because she's more suicidal now than she

25   would've been if you had gotten her to me before you started

1    anything."

2            For me, with respect to disability, if you're

3    going to make any progress, the way isn't -- to do it is not

4    to bring somebody into your office for talk therapy once or

5    twice a week.  The way you need to do it is set up, for

6    example, a supported work program in the community, and then

7    you bring her into your office so you can -- the two of you

8    together can analyze what went on in that supported work

9    program.  "How did the work program go this week?

10           "It went well."

11           And you help her make sure that she's reviewing

12   it in -- in a -- an objective fashion.  If there was a

13   problem, spit it out and talk to me about it.  If it went

14   well, you'll know that because you'll have talked to the

15   supervisors first.  But you need to know what went well,

16   what went wrong.  So if things went wrong, you can explore

17   different ways of dealing with it than she might have dealt

18   with it.

19           The facts are that it's -- it's my opinion, a

20   much more successful approach because you have a solid

21   specific set of circumstances to talk about.  If she's

22   running into problems, you talk about the -- the -- the

23   components for solving those problems.  You talk about how

24   to -- you work around those problems.  You help -- you --

25   you help the patient learn how to educate peers on the

1    nature of the problems she's having from a disability

2    standpoint in such a way that they're not afraid of her

3    anymore because they've learned about the disability enough

4    that -- that they can work with her and be part of her peer

5    group without being afraid that something is going to go

6    wrong and they're going to be in the middle of a dangerous

7    situation.  So if you give her her right tools, she's going

8    to do just fine.

9            So, you know, that's a very different approach to

10   counseling than just coming in and saying every week, "Well,

11   I think you're -- you know, you're good looking.  You're

12   doing well.  You should consider going on a date."  I mean,

13   everybody wants to hear that, but it's not the kind of

14   therapy that's going to make any difference for a patient

15   like this.  You've got to find very specific factors that

16   are meaningful to her and -- and show her the kind of

17   objective options or alternatives for focusing in on and

18   solving whatever kind of problems she may be having on a

19   day-to-day basis.

20       Q.   Sir, you -- you write that she should be followed

21   by a psychiatrist for risk factors for suicide, along with a

22   counselor.  Do you know if she is being followed by a

23   psychiatrist?

24       A.   She -- she is not as far as I know.  Unless

25   something started very recently, she has not been.  And if

1    she's -- at any point starts to be -- starts receiving

2    psychotropic medication and the only follow-up is that

3    required by law, which is the psychiatrist has to see her

4    once every three months or times a year to follow up the

5    impact of the psychotropic medication, although there's a

6    big hole in that requirement and I'll explain it in a

7    moment, then it's not enough because it's not real therapy.

8    She's getting the medication, but she's not getting any

9    support.

10          The problem is is that a primary care doctor

11   instead could give her the medication and there's no

12   requirement under the law that he follow her every four

13   months or every three months, four times a year to see how

14   the medication is being handled, which I never understood

15   that.  They just never contemplated that any other doctor

16   would give it to her and follow her to see how she's doing.

17          The advantage of being followed is it gives the

18   psychiatrist the opportunity to bring in someone like myself

19   or Rob Tremp, who's another counselor in the office, or

20   Laura Brown, who's another counselor in the office, any one

21   of us would be happy to see her.  I just have known her the

22   longest, and I have the biggest fear that she's growing

23   closer to actually thinking suicide, although I'm not ready

24   to have her license taken away or ready to -- to basically,

25   "You either get with a -- a good psychopharmacologist or

1    psychiatrist with absolutely excellent credentials on the

2    medication side, knows what will work and what won't, and

3    then I'll take it over from there."  I'm not quite ready to

4    do that.  But if it turns out to be needed, I'll certainly

5    talk to them.

6         Q.   Was -- was Ms. Williams advised that she should

7    be followed by a psychiatrist?

8         A.   Well, I indicated to her that -- although she

9    insisted that I was wrong, I indicated to her that she was

10    close enough on her MMPI-2 to the suggestion of suicide,

11    that I'd feel a lot more comfortable if we had a suicide

12    assessment done.  And I also indicated that at some point I

13    really felt she was going to do much better if she got on a

14    medication for suicide and if we got on to antianxiety

15    medication, and that would require the psychiatrist to

16    follow the legal requirement, which is the four-time-a-year

17    follow-up.

18         She's just one of these patients, and I see them

19    all the time, who's very uncomfortable with the idea that

20    anybody would be saying that a component of what's going on

21    is -- has an underlying psychological or psychiatric basis.

22    She's almost thinking I'm saying, "Your problems are

23    psychologically based."  Well, she should know enough and

24    does know enough about her problems to know that that's an

25    impossible statement to make.  She has so many legitimate,

1    well-founded physical diagnoses, nobody is going to come in

2    and say, "Hey, it's all psychological."

3             But she doesn't want any suggestion that there's

4    some issues that are psychologically based.  And the thing

5    is is there's no way I can say anything else.  Based on my

6    assessment and my tools, it's a legitimate statement and

7    it's much easier to overcome than -- and explain with the

8    right testing and the right treatment than explaining no

9    treatment, no effort to make a difference.  I think -- so

10   this -- that's where it's gone in answer to your question.

11   I don't think she's seeing anybody, but I certainly made an

12   attempt to educate her.

13            And I want her to understand it's -- I want this

14   done and it's more educational than counseling.  It's

15   helping you learn and understand what's going on.  We're

16   trying to give you the tools for coping, for reducing stress

17   and anxiety, and how to use that to help you feel better in

18   the future.

19       Q.   Okay.  That is -- that is helpful.  We've got

20   just a couple of minutes left for the -- our 1:30

21   agreement.

22            So she did not -- there was no suicide assessment

23   performed for Ms. Williams; is that right?

24       A.   We didn't do a -- a Beck suicidal ideation scale.

25   And truthfully, the MMPI-2 and the MMPI-2-RF are very strong

1   assessments of suicidal ideation.  So, no, there wasn't a

2   separate test of suicidal ideation, but the emotional

3   internalizing scale of the clinical scales for the MMPI-2-RF

4   contains assessments of suicidal ideation, and it found that

5   she was at risk for suicidal ideation.

6           So I -- I think it's -- it's as good, if not much

7   better, than the scales for suicidal ideation, like the MMP

8   -- excuse me -- the Beck scale for suicidal ideation or one

9   of those, which are good scales, but their screening

10  inventory is more than their clinical assessments, like the

11  MMPI-2-RF.

12      Q.   I understand.  Last question and then we'll --

13  we'll meet again.

14           And I don't want to put words in your mouth, but

15  what I understood you saying a couple of minutes ago was

16  that you were concerned that she -- she could be growing --

17  becoming more suicidal; is that fair?

18           MS. GALEOTO:  Objection.

19      A.   Well --

20      Q.   Or at least you had some concerns?

21      A.   I think -- no.  I'm -- you don't need to change

22  the question.  I don't think there's much question that when

23  you look at this testing compared to my own clinical

24  assessment, the testing suggests more risk factors for

25  suicidal ideation than my own clinical assessment.  The next

REGENCY REPORTING SERVICE, INC. (813)224-0224

1    scale to really give her is not a suicide ideation scale,

2    but the Beck scale for hopelessness because the best

3    identifier of future suicide attempts is -- is the -- is

4    scales like the Beck scale for suicidal ideation, which

5    eventually gets down to measuring depressed, suicidal

6    ideation versus those who are just depressed and have a -- a

7    high finding of -- or an elevated finding of being depressed

8    and changing location, for example, so they -- you know,

9    they feel bad or get upset because they lose a lot of their

10   contacts and don't have the support they need.

11          Whereas, on the MMPI, you know, with -- with the

12   incredible number of suppliers around the country that they

13   have, I mean, supporters who have gone through the same kind

14   of thing, she's much more -- she's much more at risk.  And I

15   think if we find with the Beck hopeless that, you know, she

16   has a scale, let's say, of -- of 12 or 14, 9 is the --

17   anything 9 or above puts her at increasingly higher risks,

18   then, yes, she's definitely a depressed, suicidal ideator

19   who's really at threat or high risk for suicidal ideation,

20   which case I would work very strongly with her and the

21   psychiatrist in -- in dealing with this issue.

22       Q.   Okay.  Just a couple of housekeeping questions

23   and then -- then we'll -- we'll end.

24          When will you have the documents that were marked

25   2, 4, and 5 copied?

```
 1          A.    Yeah, this is 2 and these --

 2          Q.    This -- this is 4 and this is 5.

 3          A.    Yeah.  4 and 5 -- well, 4 is the notebook that'll

 4    go to Staples, should be done by tomorrow afternoon,

 5    depending upon how busy they are.  They'll get over there

 6    this afternoon.

 7          Q.    Okay.

 8          A.    These two they'll start on this afternoon.  And

 9    with any luck, we'll be done by tomorrow mid-morning.  As

10    long as there's nothing interfering, you'll be the first in

11    line, which will make the people who have pushed me into a

12    Friday, Saturday, and Sunday deposition, 3 -- 3 of 14

13    patients down in the Dominican Republic, and that's their

14    problem, not mine.  I can't believe I even agreed to that.

15    But I would say if they get started, they should be done by

16    tomorrow afternoon.

17          Q.    Okay.  And --

18          A.    I can't guarantee it --

19          Q.    I understand.

20          A.    -- but it will be very close to that.

21                And then are you -- you here in Oviedo or --

22                THE COURT REPORTER:  In Tampa.

23          A.    Oh, you're all the way in Tampa.  Then we'll have

24    to FedEx it -- are we FedEx'ing -- we're sending it to you

25    or the court reporter?
```

```
 1          Q.    Well, I --

 2                MS. GALEOTO:  To the --

 3          Q.    Ms. -- Ms. Galeoto wants to review these records

 4     first.

 5                MR. TORRES:  So when do you think you'll review

 6          these?

 7                MS. GALEOTO:  If -- if he has time, I can look

 8          through -- I tried to look through it on the last

 9          break.  I didn't see --

10                MR. TORRES:  Okay.

11                MS. GALEOTO:  -- anything in there that -- that

12          hasn't been previously produced or was privileged, so

13          -- except for the e-mail correspondence with counsel.

14                MR. TORRES:  If -- if you can, I appreciate it.

15                MS. GALEOTO:  So I'll try to -- yeah.  I mean --

16          and then this I haven't seen.  This he just put

17          together, so --

18                MR. TORRES:  I understand.

19                MS. GALEOTO:  And these -- these medical records

20          are on a CD, which is --

21                THE WITNESS:  Right.

22                MS. GALEOTO:  -- also in there.  Do you want the

23          hard copy or do you want the CD?

24                MR. TORRES:  Well, the CD --

25                MS. GALEOTO:  The CD you have.
```

1          MR. TORRES:  I don't know if the CD is going to

2     -- I don't know if the CD is going to contain the

3     highlights that are in the --

4          THE WITNESS:  No.

5          MR. TORRES:  They won't, okay.

6          MS. GALEOTO:  Okay.

7          MR. TORRES:  All right.  So then we're going to

8     need the hard copy.

9          THE WITNESS:  But she was only comparing it to

10    this, not the whole -- not this.

11         MS. GALEOTO:  Right.  No, no.  The -- the --

12    there's a CD --

13         THE WITNESS:  They included that too --

14         MS. GALEOTO:  Right.

15         THE WITNESS:  -- but I knew they don't have the

16    highlights and -- and the other things --

17         MS. GALEOTO:  Okay.

18         THE WITNESS:  -- so...

19    Q.    Okay.  Let's see if there's anything else.  And

20    when was the -- when -- when was the last, approximately,

21    record created in Exhibit 2, just out of curiosity?

22    A.    Let have that log sheet.  Well, the last thing

23    that was done is we added some additional research articles

24    on 11/10/15, some additional clinical practice guidelines on

25    11/10.  We -- we -- we -- we added to the documentation of

```
1     recommendations by reading some additional materials on

2     11/10/15, notice of deposition that was sent to us on

3     11/9/15, and then the additional materials that Ms.

4     Pennachio wrote to us.

5              Did anybody ever spell her name for you?  Oh,

6     it's P-E-N-N-A-C-H-I-O.  It's a Greek name.

7         Q.    Dr. Deutsch --

8         A.    And that was 10/26/15.  I'm sorry.

9         Q.    Thank you.  And what I'm asking about is Exhibit

10    2, not -- not -- not the exhibit that you're looking at.

11    I'm asking --

12        A.    I know, but this is the log sheet.  It tells me

13    when I added things to it.

14        Q.    Oh, I see.  So you started adding things to it --

15        A.    I added things on those dates.

16        Q.    All right.  So on -- on May the 7th --

17        A.    All the way through to November the 15th.

18        Q.    So in other words -- all right.  So -- and is

19    what you added on -- in this red sheet, in this --

20        A.    Yes.  It's in -- it's in here too.

21        Q.    It's in both places?

22        A.    But this --

23        Q.    Okay.

24        A.    Sometimes, you know, I've sat in a depo and

25    they've wanted me to compare, and that's hard to do if you
```

1    haven't separated it in advance.

2        Q.   Got you.

3        A.   So I started just saying, "Look, if you've made a

4    copy, on the front of the file, I want a log sheet of

5    everything you put in."  And on their own, they decided,

6    "Well, let's do a log sheet, but let's put a copy in the

7    manila envelope and make it really easy."  So I said, "Hey,

8    that's a good idea."  So --

9        Q.   That's your practice?

10       A.   Look, it's -- the reality is I've been around a

11   long time.  The ladies allow me to keep my name on the front

12   door.  Every now and then, I slip out of my office and I'm

13   -- I -- I come up with an idea and I express it and they all

14   sit there smiling and say, "Hey, it's a nice idea."  And

15   then I go -- I'm shuffled back into my room like a good boy,

16   and then they go and do what they think is the best thing to

17   do.  So I -- I don't have much say, but I -- I do a pretty

18   good job, so they're -- they've allowed me to stay around.

19            MR. TORRES:  Thank you so much.  Let's end here.

20            MS. GALEOTO:  Wait.  I wanted to note.  You do

21       have -- I didn't send the e-mail with Rhonda, but you

22       do have it.  We produced it.

23            MR. TORRES:  Okay.

24            MS. GALEOTO:  It's at Williams001782.

25            MR. TORRES:  Thank you.

126

1           THE VIDEOGRAPHER:  This concludes Disk No. 2 of

2       the deposition of Paul Deutsch, Ph.D.  It is 1:34.

3       We're going off the record.

4               (The deposition recessed at 1:34 p.m.)

5               (Proceedings continued in Volume II.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

127

1          **REGENCY REPORTING SERVICE, INC.**
                500 East Kennedy Boulevard
2                      Suite 100-B
                  Tampa, Florida 33602
3                     (813)224-0224

4
       November 20, 2015
5
       LETTER TO DEPONENT
6
       Paul M. Deutsch, Ph.D.
7      Paul M. Deutsch & Associates, P.A.
       10 Windsormere Way
8      Suite 400
       Oviedo, Florida  32765
9

10     CASE REFERENCE:  RHONDA WILLIAMS vs. MOSAIC FERTILIZER, LLC,
       a Delaware corporation doing business in Florida
11
       Dear Dr. Deutsch:
12
       The transcript of your deposition taken in the above case on
13     November 16, 2015 is now ready for you to complete the
       reading and signing process.  Please contact this office to
14     schedule an appointment.

15     Florida law gives you 30 days from the time you receive this
       letter to complete this process.  Failure to do so may
16     constitute a waiver of your right to read and sign the
       transcript and note corrections or amendments on the errata
17     sheet.
       Please govern yourself accordingly.
18
       Sincerely,
19

20     _____
       Melanie Keefe
21     Court Reporter

22

23

24

25

128

1          SIGNATURE PAGE/ERRATA SHEET

2    WITNESS:   PAUL M. DEUTSCH, Ph.D.

3    CASE REFERENCE:   RHONDA WILLIAMS vs. MOSAIC FERTILIZER, LLC,
     a Delaware corporation doing business in Florida
4
     CASE NUMBER:   8:14-cv-01748-MSS-TGW
5
     DATE:  November 16, 2015
6
7          After you have read your transcript, please note
     any errors in transcription on this page.  Do not mark on
     the transcript itself.  Please sign and date this sheet as
8    indicated below.  If additional lines are required for
     corrections, attach additional sheets.  If no corrections,
9    please indicate "None."

10   _____

11   PAGE      LINE      ERROR OR AMENDMENT          REASON

12   _____
     _____
13   _____
     _____
14   _____
     _____
15   _____
     _____
16   _____
     _____
17   _____
     _____
18   _____
     _____
19   _____

20         Under penalties of perjury, I declare that I have
     read the foregoing transcript, and I subscribe to its
21   accuracy, to include the corrections or amendments noted
     above or hereto attached.
22
                        _____
23                      PAUL M. DEUTSCH, Ph.D.      DATE

24

25

1                          CERTIFICATE OF REPORTER

2        STATE OF FLORIDA              )

3        COUNTY OF HILLSBOROUGH        )

4

5              I, Melanie Keefe, Court Reporter, certify that I
   was authorized to and did stenographically report the
6    deposition of PAUL M. DEUTSCH, Ph.D.; that a review of the
   transcript was requested; and that the transcript, pages 5
7    through 126, inclusive, is a true and complete record of my
   stenographic notes.

8
               I further certify that I am not a relative,
9    employee, attorney, or counsel of any of the parties, nor am
   I a relative or employee of any of the parties' attorney or
10   counsel connected with the action, nor am I financially
   interested in the action.

11
                          _____
12                        Melanie Keefe
                          Court Reporter
13   _____

14                          CERTIFICATE OF OATH

15       STATE OF FLORIDA              )

16       COUNTY OF HILLSBOROUGH        )

17             I, the undersigned authority, certify that
   PAUL M. DEUTSCH, Ph.D. personally appeared before me and was
18   duly sworn.

19             WITNESS my hand and official seal this 20th day
   of November, 2015.

20

21                        _____
                          Melanie Keefe
22                        Notary Public
                          State of Florida
23                        My Commission No.:  EE843634
                          Expires:  December 9, 2016

24

25

─────REGENCY REPORTING SERVICE, INC. (813)224-0224─────

1

## $

**$10** [1] - 44:11
**$12** [1] - 44:14
**$50,000** [2] - 77:24, 78:3

## 0

**000025** [1] - 58:6

## 1

**1** [18] - 1:9, 4:2, 4:4, 6:25, 7:1, 7:15, 11:19, 15:1, 15:2, 27:22, 27:24, 28:1, 28:12, 45:20, 56:9, 73:16, 103:18
**1/13/15** [1] - 31:19
**10** [7] - 1:16, 6:6, 7:5, 7:9, 76:14, 78:23, 127:7
**10/26/15** [1] - 124:8
**100** [1] - 2:2
**100-B** [1] - 127:2
**101** [1] - 2:6
**10th** [1] - 68:14
**11** [1] - 4:3
**11-year-old** [2] - 97:18, 98:6
**11/10** [1] - 123:25
**11/10/15** [2] - 123:24, 124:2
**11/9/15** [1] - 124:3
**11:46** [1] - 73:17
**12** [4] - 64:24, 107:18, 108:2, 120:16
**12/20/13** [1] - 32:15
**12/5/2014** [2] - 45:14, 45:16
**126** [1] - 129:7
**127** [1] - 3:3
**128** [1] - 3:4
**129** [2] - 1:9, 3:5
**12:02** [1] - 73:22
**13.7** [4] - 37:15, 37:18, 37:19, 38:20
**13th** [1] - 23:18
**14** [2] - 120:16, 121:12
**15** [2] - 69:1, 78:23
**150** [1] - 57:16
**150,000** [1] - 67:18
**15th** [1] - 124:17
**16** [4] - 1:14, 5:10, 127:13, 128:5
**175** [1] - 57:16

## 19

**19** [3] - 7:5, 7:9, 31:14
**1900** [1] - 2:7
**1962** [1] - 94:13
**1982** [1] - 23:3
**1:30** [1] - 118:20
**1:34** [3] - 1:15, 126:2, 126:4

## 2

**2** [37] - 4:3, 4:4, 11:14, 11:19, 11:20, 14:23, 14:25, 15:3, 15:6, 27:12, 27:14, 27:18, 27:25, 35:3, 35:4, 35:6, 35:7, 36:23, 41:1, 45:18, 45:19, 45:20, 47:9, 49:3, 50:10, 50:12, 51:23, 52:2, 52:7, 72:16, 73:21, 120:25, 121:1, 123:21, 124:10, 126:1
**2-RF** [4] - 75:21, 79:4, 79:16, 104:15
**2/6/15** [1] - 71:19
**20** [5] - 23:22, 69:2, 78:20, 78:23, 127:4
**2002** [1] - 70:25
**2015** [7] - 1:14, 5:10, 30:17, 127:4, 127:13, 128:5, 129:19
**2016** [1] - 129:23
**20th** [1] - 129:19
**21** [3] - 78:22, 78:24, 94:3
**22** [4] - 90:5, 93:9, 94:3, 108:15
**23** [7] - 30:5, 30:8, 78:23, 78:24, 90:5, 94:3
**240** [1] - 67:18
**25** [1] - 107:1
**26** [5] - 11:6, 29:25, 30:19, 31:6, 72:10
**29** [1] - 4:5
**29.3** [3] - 44:8, 44:12
**296-23** [1] - 83:13
**296.21** [1] - 94:3

## 3

**3** [12] - 4:5, 29:17, 29:18, 56:13, 58:6, 71:16, 78:18, 90:5, 93:9, 104:18, 121:12
**3/25/10** [1] - 29:10
**30** [5] - 23:22, 32:8,

## 19 (continued)

104:9, 107:2, 127:15
**300.02** [1] - 83:15
**300.4** [1] - 83:14
**301.82** [1] - 83:21
**309.0** [1] - 83:16
**32765** [3] - 1:17, 6:8, 127:8
**33602** [3] - 2:3, 2:7, 127:2
**338** [1] - 76:11
**34** [1] - 4:6
**35** [2] - 98:17, 98:20

## 4

**4** [14] - 4:6, 32:12, 34:10, 34:15, 34:17, 34:25, 35:16, 36:22, 50:13, 72:16, 120:25, 121:2, 121:3
**40** [1] - 98:17
**400** [4] - 1:17, 7:6, 7:9, 127:8
**45** [4] - 8:13, 19:8, 76:14, 101:17

## 5

**5** [13] - 4:8, 32:12, 50:13, 69:20, 69:21, 69:22, 69:23, 70:12, 72:16, 120:25, 121:2, 121:3, 129:6
**5/5/15** [1] - 70:1
**500** [1] - 127:1
**598** [2] - 76:1, 76:10

## 6

**6** [6] - 3:2, 4:2, 30:17, 32:13, 32:15, 50:13
**6,000** [1] - 23:19
**60** [3] - 85:13, 85:15, 91:15
**600** [1] - 2:2
**67** [1] - 67:16
**68** [1] - 30:15
**69** [2] - 4:8, 30:15
**6th** [2] - 30:17, 32:6

## 7

**7** [3] - 28:12, 32:13, 50:13
**7/18/2015** [1] - 71:10
**70** [4] - 76:7, 76:8, 76:9, 85:7

## 7th

**7th** [1] - 124:16

## 8

**8-cv-14-01748-MSS-TGW** [1] - 5:9
**8-year-old** [4] - 97:19, 97:24, 98:3, 98:4
**8/19/15** [1] - 32:7
**813)224-0224** [1] - 127:3
**8:14-cv-01748-MSS-TGW** [1] - 1:2, 128:4

## 9

**9** [5] - 31:10, 31:12, 120:16, 120:17, 129:23
**9:49** [2] - 1:15, 5:11

## A

**A-N-H-E-D-O-N-I-A** [1] - 81:24
**a.m** [1] - 1:15
**aberrant** [3] - 80:25, 105:18, 105:22
**ability** [2] - 21:16, 63:13
**able** [11] - 9:17, 20:20, 28:18, 47:17, 66:14, 68:5, 74:25, 76:13, 85:10, 85:19, 104:3
**absent** [1] - 74:2
**absolutely** [12] - 9:18, 38:23, 43:17, 45:23, 54:16, 61:25, 88:16, 88:20, 92:6, 96:22, 108:6, 117:1
**Absolutely** [1] - 75:8
**absorb** [1] - 22:23
**abstract** [3] - 24:21, 25:4, 25:6
**Academy** [3] - 56:23, 56:24, 57:18
**academy** [1] - 22:6
**accept** [2] - 18:16, 106:16
**accepted** [5] - 56:4, 56:6, 57:14, 57:25, 58:11
**accident** [4] - 94:21, 95:15, 95:17, 96:21
**accomplish** [5] - 18:20, 18:21, 19:3, 59:12
**according** [1] - 43:20

## A (continued)

**accordingly** [1] - 127:17
**account** [1] - 40:6
**accuracy** [2] - 91:24, 128:21
**accurate** [6] - 30:18, 31:2, 31:6, 38:8, 88:11, 111:23
**accurately** [2] - 8:10, 38:4
**achieve** [2] - 19:2, 61:20
**Act** [4] - 10:18, 16:10, 86:14, 113:11
**action** [2] - 129:10, 129:10
**active** [1] - 83:2
**actively** [1] - 68:4
**Activities** [1] - 31:15
**activities** [2] - 83:5, 85:20
**activity** [2] - 71:14, 84:2
**actual** [5] - 9:5, 24:21, 53:5, 101:24
**acute** [1] - 29:10
**add** [9] - 14:18, 32:21, 33:24, 35:10, 37:14, 39:24, 72:24, 91:4
**Added** [1] - 4:8
**added** [14] - 40:21, 44:13, 48:22, 51:9, 59:24, 69:25, 70:4, 70:17, 85:2, 123:23, 123:25, 124:13, 124:15, 124:19
**addenda** [1] - 31:21
**Addendum** [6] - 28:12, 32:12, 32:13, 32:14
**addendum** [13] - 28:14, 28:17, 28:18, 31:17, 31:18, 31:20, 32:4, 32:6, 32:23, 33:1, 50:13, 70:21
**addendums** [9] - 28:11, 28:13, 28:15, 31:21, 31:24, 32:3, 32:18, 50:11, 51:8
**adding** [1] - 124:14
**addition** [2] - 17:5, 41:10
**additional** [14] - 20:4, 20:9, 37:16, 37:17, 51:11, 70:8, 70:17, 99:17, 123:23, 123:24, 124:1, 124:3, 128:8, 128:8
**address** [4] - 6:4, 6:6, 7:7, 13:5

addressed [1] - 29:12
adds [1] - 92:8
adjustment [3] - 83:15, 88:22, 88:23
administer [1] - 79:2
Administered [1] - 78:25
administered [2] - 79:4, 82:15
Administrative [1] - 4:4
administrative [1] - 11:20
admit [1] - 82:18
advance [1] - 125:1
advantage [3] - 61:4, 107:12, 116:17
advise [1] - 12:20
advised [1] - 117:6
advocate [2] - 65:15, 66:7
advocating [1] - 65:17
affirm [2] - 88:13, 88:14
affirmation [1] - 76:17
affirmed [3] - 88:2, 88:3, 88:13
affirms [1] - 88:12
afraid [2] - 115:2, 115:5
afternoon [4] - 121:4, 121:6, 121:8, 121:16
age [2] - 20:18, 78:6
agency [2] - 44:19, 45:5
agency-based [1] - 44:19
aggressive [1] - 20:24
aging [1] - 20:22
ago [3] - 48:4, 74:22, 119:15
agree [2] - 51:6, 52:19
agreed [3] - 22:17, 74:19, 121:14
agreeing [1] - 85:20
agreement [3] - 74:25, 77:10, 118:21
ahead [5] - 6:14, 13:14, 14:6, 43:7, 96:7
aimed [2] - 57:11, 58:17
Alabi [2] - 15:2, 15:7
allergist [3] - 15:4, 15:8, 42:19
allow [4] - 51:18, 74:19, 89:14, 125:11
allowance [1] - 18:23
allowed [7] - 10:8, 10:13, 14:19, 33:17,

76:16, 86:19, 125:18
allows [2] - 18:24, 87:22
almost [8] - 8:9, 9:23, 38:18, 67:16, 94:18, 97:15, 109:25, 117:22
alone [1] - 92:25
ALSO [1] - 2:10
alternatives [1] - 115:17
amended [1] - 7:11
Amended [2] - 4:2, 7:2
AMENDMENT [1] - 128:11
amendments [2] - 127:16, 128:21
amount [3] - 21:21, 113:17
analysis [3] - 56:19, 109:5, 109:9
analyze [1] - 114:8
ANEHEDONIA [1] - 81:22
angry [1] - 91:22
anhedonia [9] - 81:19, 81:21, 81:22, 82:6, 83:9, 83:22, 108:7
announcing [1] - 105:24
annual [1] - 20:16
answer [24] - 6:14, 8:10, 37:8, 38:7, 38:8, 50:3, 51:8, 52:7, 53:18, 54:6, 59:19, 62:22, 63:14, 65:16, 65:22, 65:25, 66:3, 66:4, 78:15, 89:17, 89:18, 111:3, 111:4, 118:10
answered [6] - 14:21, 21:7, 43:8, 53:23, 62:23, 63:12
answering [5] - 37:4, 41:8, 43:11, 55:13, 77:1
answers [7] - 14:18, 21:5, 54:25, 55:1, 55:2, 76:12, 81:16
antianxiety [2] - 113:19, 117:14
antidepressants [1] - 113:19
anxieties [1] - 104:22
anxiety [10] - 80:24, 83:15, 83:16, 88:21, 88:23, 111:12, 111:22, 112:7, 112:9, 118:17
anyway [2] - 13:5,

94:11
apologize [2] - 92:23, 93:7
apologized [1] - 26:21
apology [1] - 26:20
appear [2] - 39:24, 101:25
APPEARANCES [1] - 2:1
appeared [2] - 80:17, 129:17
appearing [1] - 5:2
applicable [1] - 16:22
applied [1] - 92:25
apply [1] - 25:15
appointment [1] - 127:14
appointments [1] - 67:14
appreciate [2] - 65:2, 122:14
approach [2] - 22:9, 114:20, 115:9
approaches [1] - 108:13
appropriate [6] - 29:1, 39:13, 65:22, 66:4, 85:11, 96:1
appropriately [1] - 6:16
approved [2] - 106:22, 106:24
approximate [1] - 102:7
area [23] - 8:20, 16:7, 16:21, 18:12, 35:22, 36:16, 36:19, 40:10, 42:13, 43:19, 44:23, 54:19, 62:3, 62:5, 63:2, 67:2, 84:12, 85:13, 87:8, 100:6, 107:1, 109:7
areas [9] - 16:4, 19:23, 21:24, 22:16, 22:18, 54:23, 76:21, 105:2, 105:5
arena [3] - 10:5, 66:23, 76:8
arenas [1] - 20:13
argue [1] - 91:24
arguing [1] - 87:15
arm [4] - 97:21, 97:22, 97:25
arrangement [1] - 11:8
article [3] - 24:24, 25:16, 27:3
article's [1] - 104:4
articles [11] - 17:3, 23:22, 24:3, 24:7,

25:14, 26:10, 27:8, 27:9, 70:8, 70:17, 123:23
arts [1] - 46:4
ascertain [1] - 113:21
Ashley [1] - 2:2
aside [1] - 33:14
aspect [3] - 40:8, 86:1, 89:4
aspects [15] - 16:6, 16:8, 17:14, 18:9, 22:7, 22:8, 36:1, 36:5, 40:15, 61:2, 83:3
assessment [7] - 56:19, 87:21, 117:12, 118:6, 118:22, 119:24, 119:25
assessments [3] - 119:1, 119:4, 119:10
assigning [1] - 112:25
associate's [1] - 46:3
associated [1] - 56:21
Associates [5] - 1:16, 9:7, 31:19, 70:15, 127:7
Association [2] - 57:19, 57:20
assume [2] - 54:18, 61:5
assumed [1] - 25:25
assuredly [1] - 94:18
atmosphere [1] - 63:21
atrophied [1] - 105:4
attach [1] - 128:8
attached [4] - 13:10, 27:9, 30:7, 128:21
attempt [2] - 70:17, 118:12
attempts [1] - 120:3
attention [2] - 95:8, 110:22
attitudes [1] - 82:1
Attorney [4] - 2:4, 46:20, 49:6, 49:24
attorney [8] - 9:20, 26:20, 52:8, 62:14, 71:18, 71:20, 129:9, 129:9
attorneys [5] - 5:12, 24:4, 24:18, 24:19, 46:19
Attorneys [1] - 2:8
attorneys' [2] - 9:14, 9:22
authority [1] - 129:17
authorized [1] - 129:5
autism [3] - 87:7,

87:8, 87:16
autistic [1] - 87:10
automatically [1] - 93:19
available [4] - 22:16, 24:1, 42:11, 68:5
average [2] - 76:13, 103:19
averaged [1] - 67:18
averaging [1] - 67:17
avoid [1] - 25:13
avoidance [4] - 81:2, 82:21, 112:17, 112:18
avoidant [3] - 83:20, 83:21, 90:13
avoided [1] - 105:3
avoiding [1] - 112:17
aware [1] - 10:24
awful [1] - 110:16
axes [1] - 90:7
Axis [18] - 83:19, 84:6, 84:12, 84:14, 84:16, 85:4, 85:5, 85:7, 90:6, 90:8, 90:10, 90:12, 90:18, 90:24, 91:12, 91:16, 93:8
axis [1] - 103:17

## B

bachelor's [1] - 46:6
background [2] - 24:12, 96:5
backing [1] - 97:24
backup [1] - 76:17
bad [4] - 33:5, 96:22, 104:8, 120:9
baggage [2] - 98:19
balance [1] - 47:6
bariatric [1] - 17:17
base [3] - 43:22, 107:15, 107:17
Based [1] - 66:5
based [27] - 17:11, 20:18, 20:20, 20:22, 21:17, 25:20, 26:10, 26:11, 26:24, 44:19, 44:22, 45:10, 56:18, 57:14, 59:19, 59:20, 59:23, 60:4, 60:9, 63:20, 70:18, 80:6, 117:23, 118:4, 118:5
bases [1] - 66:2
basics [1] - 96:15
basis [10] - 11:2, 50:16, 53:24, 60:25, 62:19, 66:19, 107:15, 112:12,

115:19, 117:21
**Bates** [2] - 58:6, 58:8
**Bates-labeled** [1] - 58:6
**became** [1] - 26:22
**Beck** [5] - 118:24, 119:8, 120:2, 120:4, 120:15
**become** [2] - 39:6, 97:13
**becomes** [3] - 39:2, 39:12, 62:9
**becoming** [1] - 119:17
**bed** [1] - 98:8
**bedroom** [1] - 6:8
**began** [5] - 28:6, 99:17, 100:12, 100:17
**beginning** [3] - 7:19, 73:20, 100:23
**begins** [2] - 95:14, 95:16
**behalf** [2] - 5:2, 5:16
**behavior** [4] - 101:13, 102:7, 103:7, 106:8
**behaviors** [6] - 90:8, 100:22, 102:10, 102:13, 103:4, 105:24
**behind** [2] - 86:1, 107:4
**belief** [6] - 65:18, 81:13, 106:17, 108:9, 111:15, 112:8
**believer** [2] - 113:13, 113:15
**believes** [2] - 38:11, 111:16
**belongs** [1] - 47:12
**below** [1] - 128:8
**benefits** [1] - 44:1
**best** [7] - 13:16, 21:16, 59:19, 63:5, 87:12, 120:2, 125:16
**better** [11] - 24:5, 24:7, 33:5, 78:10, 79:9, 89:18, 96:18, 112:23, 117:13, 118:17, 119:7
**between** [9] - 8:19, 9:1, 14:16, 37:15, 37:20, 68:15, 86:10, 103:12, 107:17
**beyond** [1] - 18:19
**bible** [2] - 94:8, 101:3
**big** [6] - 23:24, 26:22, 42:2, 72:4, 93:8, 116:6
**biggest** [1] - 116:22
**bill** [4] - 51:14, 70:8,

72:22, 104:23
**billed** [1] - 8:3
**bills** [4] - 15:23, 51:11, 51:21, 70:16
**binder** [15] - 27:22, 33:8, 34:16, 35:10, 36:22, 47:24, 48:5, 48:11, 48:20, 49:8, 50:22, 52:12, 52:14, 53:18, 56:16
**Binder** [1] - 4:7
**binders** [2] - 36:23, 50:18
**biofeedback** [1] - 106:8
**birth** [6] - 25:19, 25:20, 25:22, 26:1, 26:2
**birthday** [1] - 68:14
**bit** [5] - 34:8, 66:25, 67:17, 67:23, 100:16
**bits** [1] - 111:1
**block** [2] - 93:1, 107:2
**board** [10] - 16:8, 16:9, 20:3, 20:8, 70:23, 71:2, 71:4, 74:21, 77:17, 77:22
**board's** [1] - 75:7
**boarded** [1] - 86:22
**bodily** [1] - 81:5
**body** [1] - 107:5
**bold** [4] - 12:4, 31:12, 31:13, 31:14
**book** [2] - 49:16, 100:25
**Book** [5] - 4:4, 11:19, 27:22, 45:20
**booster** [2] - 108:1, 108:3
**borderline** [2] - 89:1, 89:2
**borrow** [2] - 72:15
**borrowed** [1] - 97:20
**bottom** [5] - 26:25, 68:21, 78:22, 86:23, 87:17
**Boulevard** [2] - 2:6, 127:1
**boy** [4] - 97:18, 98:1, 98:4, 125:15
**brain** [3] - 26:1, 26:3, 101:10
**Brandon** [1] - 29:9
**break** [13] - 6:19, 6:20, 19:14, 19:17, 56:1, 59:9, 64:18, 64:19, 66:25, 73:12, 113:17, 122:9
**brick** [2] - 61:13, 61:14

**bring** [8] - 29:12, 66:12, 83:23, 87:23, 97:4, 114:4, 114:7, 116:18
**bringing** [2] - 67:11, 96:15
**brings** [1] - 59:1
**broad** [3] - 10:3, 53:8, 53:23
**broader** [1] - 104:15
**broadly** [1] - 49:15
**broke** [1] - 67:2
**brother** [2] - 97:19, 98:3, 112:24
**brought** [2] - 64:4, 112:22
**Brown** [1] - 116:20
**build** [3] - 17:21, 18:8, 39:6
**built** [2] - 17:25, 51:20
**bullet** [2] - 29:6, 33:4
**bunch** [1] - 42:15
**BUR** [1] - 94:12
**burned** [2] - 97:7, 97:12
**bury** [1] - 19:5
**bus** [1] - 97:19
**business** [4] - 1:7, 5:7, 127:10, 128:3
**busy** [1] - 121:5
**button** [1] - 39:8
**BY** [2] - 1:18, 6:2

# C

**calculated** [1] - 70:19
**calculations** [1] - 43:22
**Canada** [1] - 26:5
**candidate** [1] - 82:10
**cannot** [10] - 10:2, 25:22, 25:24, 25:25, 48:18, 60:2, 77:16, 82:24, 83:23, 93:3
**cap** [1] - 7:25
**capable** [2] - 18:3, 85:8
**capacity** [1] - 61:4
**cardiologist** [1] - 42:19
**Cardiologist** [1] - 53:14
**Cardiovascular** [1] - 31:19
**cardiovascular** [1] - 54:20
**Care** [3] - 56:24, 57:18, 70:23
**care** [58] - 9:9, 14:12,

16:2, 16:5, 17:24, 21:19, 21:24, 22:4, 22:6, 22:8, 23:9, 24:5, 24:10, 27:14, 30:3, 30:8, 30:16, 33:11, 36:10, 36:12, 38:11, 44:10, 44:14, 44:16, 45:4, 45:5, 56:1, 56:3, 56:5, 56:7, 56:11, 56:17, 56:22, 57:1, 57:5, 57:6, 57:12, 57:15, 57:22, 58:12, 58:13, 58:18, 58:22, 59:4, 59:9, 59:11, 59:14, 59:18, 59:20, 60:8, 66:9, 68:3, 71:18, 71:20, 98:15, 116:10
**cared** [1] - 97:11
**career** [4] - 67:16, 67:17, 75:4, 75:6
**careful** [2] - 69:17, 79:18
**carefully** [1] - 103:7
**caregivers** [2] - 21:3, 21:19
**carrier** [1] - 93:19
**case** [29] - 5:8, 8:5, 8:11, 12:21, 15:25, 20:1, 20:7, 20:8, 21:25, 26:4, 31:18, 36:1, 36:8, 43:18, 61:14, 64:6, 65:14, 66:8, 68:4, 77:6, 86:15, 88:14, 98:25, 101:1, 113:16, 120:20, 127:12
**CASE** [4] - 1:2, 127:10, 128:3, 128:4
**cases** [3] - 8:8, 8:13, 17:11
**catastrophic** [10] - 26:1, 26:2, 56:22, 57:4, 60:19, 61:8, 61:10, 61:11, 61:21, 62:8
**catastrophics** [3] - 60:22, 60:25, 69:2
**category** [2] - 25:9, 25:11
**causation** [6] - 61:24, 62:1, 62:11, 89:18, 100:4
**causing** [2] - 63:22, 111:7
**caution** [2] - 80:13, 108:23
**caveats** [1] - 25:24
**CD** [9] - 72:1, 72:2, 122:20, 122:23,

122:24, 122:25, 123:1, 123:2, 123:12
**center** [4] - 81:10, 81:14, 112:3
**cerebral** [2] - 25:18, 25:19
**certain** [2] - 18:19, 21:17
**certainly** [11] - 6:5, 6:21, 14:19, 55:10, 55:14, 62:19, 81:22, 88:2, 99:15, 117:4, 118:11
**CERTIFICATE** [2] - 129:1, 129:14
**Certificate** [2] - 3:5, 56:9
**certification** [2] - 57:20, 57:21
**certified** [6] - 16:8, 16:9, 20:3, 20:8, 23:10, 56:8
**certify** [3] - 129:5, 129:8, 129:17
**cetera** [7] - 24:3, 24:16, 24:17, 37:2, 76:21, 91:4, 102:4
**challenge** [1] - 61:19
**challenged** [1] - 104:1
**chance** [2] - 68:22, 111:16
**change** [13] - 20:19, 30:22, 36:9, 36:10, 36:11, 38:18, 44:11, 44:14, 44:24, 60:5, 66:9, 73:11, 119:21
**changed** [4] - 20:22, 82:16, 87:6, 94:13
**changes** [1] - 30:21
**changing** [2] - 67:15, 120:8
**chapters** [2] - 23:23, 24:3
**characterization** [1] - 103:1
**charge** [9] - 8:2, 8:4, 12:1, 12:6, 22:12, 37:19, 42:14, 42:15, 67:4
**charged** [2] - 67:5, 72:23
**charges** [1] - 8:3
**charging** [1] - 22:20
**child** [1] - 94:22
**childhood** [1] - 98:9
**children** [5] - 68:9, 91:7, 91:9, 92:11, 93:4
**choose** [1] - 19:17
**chose** [1] - 29:23

**chosen** [1] - 21:3
**Chris** [3] - 52:19, 53:9, 72:6
**CHRISTOPHER** [1] - 2:5
**Christopher** [1] - 5:14
**chronic** [34] - 56:22, 57:5, 83:17, 86:2, 86:3, 86:6, 87:1, 88:16, 90:23, 94:5, 94:7, 94:8, 94:17, 95:14, 95:16, 95:21, 95:24, 96:9, 96:23, 99:2, 99:13, 99:19, 100:24, 101:3, 101:5, 102:23, 103:3, 103:6, 105:7, 105:19, 105:21, 106:5, 109:25, 111:9
**chronological** [3] - 35:18, 99:7, 99:8
**circumstances** [3] - 10:13, 60:5, 114:21
**claims** [1] - 74:5
**clarification** [1] - 21:23
**clarified** [1] - 38:4
**classic** [3] - 103:15, 105:7, 105:20
**clean** [1] - 39:18
**clear** [9] - 6:12, 29:22, 37:7, 52:7, 57:1, 66:2, 89:13, 105:23, 113:21
**cleared** [1] - 109:8
**clearly** [5] - 6:15, 18:3, 25:18, 55:1, 62:20
**client** [6] - 9:1, 25:3, 25:23, 60:13, 62:19, 62:20
**clinic** [3] - 106:25, 107:1, 107:3
**Clinical** [1] - 16:23
**clinical** [46] - 12:21, 16:13, 16:15, 16:16, 16:17, 16:21, 16:24, 17:1, 17:5, 17:9, 17:13, 18:5, 29:10, 40:3, 40:5, 55:3, 55:6, 57:7, 57:8, 57:9, 58:14, 58:15, 70:7, 71:7, 75:21, 76:4, 76:8, 79:7, 79:19, 80:2, 86:14, 86:19, 86:21, 87:1, 87:21, 88:9, 88:10, 88:15, 91:2, 101:7, 111:14, 119:3, 119:10, 119:23, 119:25, 123:24

**clinically** [1] - 76:25
**close** [6] - 8:5, 30:12, 102:7, 117:10, 121:20
**closed** [1] - 74:14
**closely** [1] - 103:24
**closer** [1] - 116:23
**clue** [1] - 25:7
**coat** [2] - 97:20, 97:23
**cognitive** [7] - 80:15, 80:21, 108:25, 109:1, 110:12, 110:15, 110:18
**collectors** [1] - 104:23
**column** [4] - 28:3, 28:4, 28:5, 28:6
**columns** [1] - 30:14
**coma** [4] - 106:24, 107:2, 107:4, 107:18
**combat** [1] - 96:25
**combined** [2] - 20:19, 90:22
**comfortable** [12] - 8:6, 11:24, 12:1, 43:11, 55:12, 61:17, 61:18, 79:21, 89:22, 100:7, 117:11
**coming** [2] - 113:23, 115:10
**comments** [2] - 63:6, 71:18
**Commission** [1] - 129:23
**commit** [1] - 111:15
**commits** [1] - 111:17
**common** [2] - 104:13, 104:22
**communicate** [1] - 37:10
**communicated** [1] - 21:11
**communications** [6] - 12:10, 12:15, 45:17, 47:1, 49:3, 49:24
**community** [2] - 6:8, 114:6
**companies** [1] - 77:6
**company** [1] - 10:13
**comparable** [1] - 42:11
**compare** [4] - 39:19, 41:18, 41:19, 124:25
**compared** [2] - 101:23, 119:23
**comparing** [1] - 123:9
**comparison** [1] - 109:6
**compensation** [1] - 43:25
**complain** [1] - 111:21

**complaint** [1] - 81:5
**complaints** [17] - 76:21, 80:15, 80:19, 80:21, 82:19, 82:21, 108:25, 109:2, 109:10, 109:15, 109:16, 109:20, 110:11, 110:15, 110:18
**complete** [11] - 8:15, 11:21, 12:1, 39:14, 76:14, 79:14, 92:24, 93:4, 127:13, 127:15, 129:7
**completed** [7] - 18:7, 30:17, 32:7, 32:8, 32:9, 38:10, 71:11
**completing** [1] - 40:3
**complex** [5] - 16:18, 57:2, 62:2, 62:5, 62:7
**complications** [4] - 57:8, 57:12, 58:15, 58:18
**component** [13] - 27:13, 81:21, 81:22, 82:19, 86:8, 90:21, 90:22, 92:8, 94:19, 94:22, 99:19, 106:18, 117:20
**components** [2] - 27:15, 114:23
**composite** [3] - 11:12, 69:15, 70:2
**comprehensive** [4] - 56:19, 56:25, 57:6, 58:13
**comprise** [2] - 36:24, 37:3
**computer** [3] - 77:7, 107:7, 107:8
**concentrating** [1] - 111:5
**concentration** [5] - 80:22, 81:7, 110:16, 110:19, 111:7
**concept** [1] - 56:8
**conceptual** [1] - 36:19
**concern** [4] - 80:5, 80:12, 108:17, 113:22
**concerned** [3] - 54:1, 67:8, 119:16
**concerns** [3] - 79:17, 81:5, 119:20
**concise** [3] - 37:7, 56:20, 57:1
**concludes** [2] - 73:16, 126:1
**conclusions** [2] -

27:6, 39:23
**condition** [7] - 29:2, 82:9, 83:18, 86:4, 86:5, 96:11, 96:17
**conditions** [3] - 91:4, 96:10, 99:1
**conferences** [2] - 37:17, 37:20
**confused** [2] - 35:12, 72:13
**confusing** [1] - 35:11
**connected** [1] - 129:10
**connection** [1] - 33:11
**consensus** [1] - 57:24
**consider** [1] - 115:12
**considered** [3] - 26:12, 29:3, 101:3
**consistency** [2] - 14:16, 21:12
**consistent** [5] - 25:3, 25:4, 29:2, 79:23, 79:24
**consistently** [1] - 109:23
**constitute** [2] - 72:16, 127:16
**consult** [4] - 22:16, 50:19, 51:6, 52:18
**consultant** [5] - 18:14, 22:14, 22:18, 65:7, 66:8
**consultation** [1] - 72:17
**consulted** [1] - 22:19
**consulting** [3] - 18:13, 50:22, 75:2
**contact** [2] - 43:7, 127:13
**contacts** [1] - 120:10
**contain** [1] - 123:2
**contained** [2] - 70:9, 71:25
**contains** [4] - 8:23, 40:25, 77:8, 119:4
**contemplated** [1] - 116:15
**contends** [2] - 104:6, 104:10
**continue** [4] - 27:10, 41:23, 107:25, 108:6
**continued** [1] - 126:5
**continues** [3] - 41:5, 41:6, 78:22
**continuing** [1] - 23:14
**contract** [1] - 23:19
**control** [10] - 29:13, 66:20, 94:24, 95:1, 95:2, 95:3, 95:4, 95:7, 95:12

**convenient** [1] - 13:6
**conversation** [1] - 45:10
**conversations** [5] - 9:1, 14:22, 16:2, 38:22, 45:9
**converted** [1] - 59:24
**coordinating** [2] - 20:9, 20:10
**coordination** [1] - 20:5
**copied** [6] - 11:22, 33:12, 34:19, 47:12, 69:19, 120:25
**copies** [7] - 9:5, 11:9, 22:21, 35:21, 53:21, 69:24, 71:8
**coping** [2] - 81:6, 118:16
**copy** [17] - 9:12, 9:17, 11:21, 12:2, 13:14, 34:2, 34:3, 35:9, 42:3, 53:15, 53:16, 70:1, 72:2, 122:23, 123:8, 125:4, 125:6
**copying** [1] - 69:17
**core** [1] - 23:5
**corporation** [4] - 1:6, 5:7, 127:10, 128:3
**Correct** [2] - 22:2, 22:5
**correct** [9] - 7:13, 19:16, 22:1, 38:6, 39:14, 49:25, 52:4, 55:17, 58:7
**corrected** [1] - 7:23
**correcting** [1] - 38:14
**corrections** [4] - 127:16, 128:8, 128:21
**correctly** [1] - 103:22
**correlated** [1] - 76:5
**correlation** [2] - 76:8, 79:5
**Correspondence** [5] - 46:13, 46:20, 49:6, 49:7, 49:25
**correspondence** [15] - 9:6, 9:7, 9:12, 9:14, 9:20, 9:23, 11:4, 46:14, 46:19, 51:9, 52:8, 55:4, 70:6, 122:13
**Cost** [1] - 45:4
**cost** [8] - 21:21, 22:23, 43:19, 43:20, 44:8, 60:3, 60:7, 60:8
**cost-driven** [2] - 60:7, 60:8
**costs** [6] - 42:7, 45:3,

56:21, 59:12, 59:25, 60:4
**could've** [1] - 13:4
**Counsel** [1] - 1:13
**counsel** [17] - 6:23, 11:4, 12:10, 22:25, 47:1, 48:8, 49:3, 60:18, 60:19, 63:12, 70:2, 70:3, 70:4, 74:19, 122:13, 129:9, 129:10
**counsel's** [1] - 103:1
**counseling** [16] - 18:24, 19:13, 19:20, 60:18, 66:13, 66:22, 66:24, 67:1, 68:6, 68:8, 68:23, 86:15, 112:22, 115:10, 118:14
**Counselor** [1] - 65:11
**counselor** [8] - 19:12, 20:3, 65:13, 82:13, 86:17, 115:22, 116:19, 116:20
**counselors** [1] - 22:20
**country** [1] - 120:12
**COUNTY** [2] - 129:3, 129:16
**couple** [7] - 25:23, 75:10, 97:4, 97:6, 118:20, 119:15, 120:22
**coupled** [2] - 79:19, 83:22
**course** [7] - 23:8, 39:12, 40:12, 45:2, 72:9, 74:18, 78:4
**courses** [1] - 24:12
**court** [9] - 10:17, 10:22, 13:11, 13:15, 13:21, 13:22, 34:22, 74:2, 121:25
**COURT** [2] - 1:1, 121:22
**Court** [5] - 5:3, 5:4, 127:21, 129:5, 129:12
**cover** [5] - 9:3, 9:8, 40:9, 43:24, 53:16
**Cover** [2] - 12:2, 12:3
**covered** [3] - 30:12, 44:6, 109:13
**covers** [1] - 46:1
**CPAP** [1] - 102:2
**craft** [1] - 65:19
**crafted** [1] - 65:24
**create** [1] - 81:15
**created** [3] - 81:10, 111:24, 123:21
**creates** [4] - 89:5,

91:8, 98:21, 112:2
**creating** [1] - 62:13
**credentials** [1] - 117:1
**criteria** [2] - 86:25, 87:18
**cured** [1] - 89:16
**curiosity** [1] - 123:21
**curious** [2] - 46:10, 63:8
**current** [12] - 31:2, 31:6, 41:10, 41:11, 44:8, 44:24, 44:25, 45:6, 56:20, 57:3, 85:13, 91:12
**curriculum** [2] - 23:6, 23:16
**custody** [1] - 68:11
**cut** [2] - 60:3, 62:25
**cycle** [4] - 81:15, 82:22, 113:17

# D

**D-E-U-T-S-C-H** [1] - 6:6
**Daily** [1] - 31:15
**damages** [1] - 74:6
**dangerous** [1] - 115:6
**data** [20] - 10:3, 14:1, 25:24, 26:5, 26:12, 27:2, 27:7, 36:5, 37:3, 42:4, 42:16, 50:21, 56:19, 74:1, 74:18, 75:11, 75:13, 77:3, 87:23, 88:2
**date** [14] - 28:5, 28:6, 29:8, 45:10, 45:15, 46:15, 100:2, 100:4, 102:9, 104:4, 115:12, 128:7
**DATE** [3] - 1:14, 128:5, 128:23
**dated** [2] - 45:10, 70:1
**dates** [5] - 28:4, 28:7, 28:12, 102:7, 124:15
**Daubert** [1] - 17:24
**daughter** [4] - 68:7, 91:20, 92:16, 92:17
**daughters** [2] - 68:12, 113:2
**David** [1] - 42:24
**Dawn** [1] - 71:22
**day-to-day** [1] - 115:19
**days** [7] - 32:8, 82:24, 107:21, 107:23, 107:25, 108:2, 127:15
**deal** [7] - 26:22, 67:13,

72:4, 91:7, 93:8, 98:10, 104:14
**dealing** [3] - 92:10, 114:17, 120:21
**deals** [1] - 104:11
**dealt** [1] - 114:17
**Dear** [1] - 127:11
**December** [1] - 129:23
**decent** [1] - 51:16
**decided** [3] - 23:13, 101:9, 125:5
**decision** [1] - 51:5
**decisions** [2] - 17:24, 81:12
**declare** [1] - 128:20
**dedicate** [1] - 68:22
**dedication** [1] - 71:3
**defendant** [1] - 5:8
**Defendant** [2] - 1:8, 1:13, 2:8
**defense** [3] - 26:13, 70:2, 70:4
**defer** [2] - 54:4, 54:8
**define** [5] - 28:21, 50:4, 57:25, 109:18, 109:22
**defined** [1] - 49:15
**defines** [1] - 94:15
**definitely** [4] - 30:1, 32:15, 85:2, 120:18
**definition** [5] - 56:5, 56:6, 57:14, 57:24, 58:11
**degloved** [1] - 98:1
**degree** [2] - 23:14, 46:4
**degree-seeking** [1] - 23:14
**Delaware** [4] - 1:6, 5:7, 127:10, 128:3
**demographics** [1] - 46:24
**Department** [1] - 43:22
**depo** [5] - 14:11, 26:16, 28:18, 38:25, 124:24
**DEPONENT** [1] - 127:5
**deposition** [19] - 5:9, 7:11, 7:12, 7:17, 14:10, 31:25, 51:24, 52:4, 70:6, 71:7, 73:17, 73:21, 77:12, 121:12, 124:2, 126:2, 126:4, 127:12, 129:6
**DEPOSITION** [1] - 1:11
**Deposition** [2] - 4:2,

7:2
**depositions** [2] - 29:25, 30:20
**depressed** [6] - 110:19, 111:21, 120:5, 120:6, 120:7, 120:18
**depression** [12] - 76:9, 80:24, 81:20, 81:23, 83:9, 83:16, 103:22, 104:12, 104:18, 111:11, 112:6, 112:9
**depressive** [3] - 83:6, 83:11, 88:20
**describe** [2] - 75:14, 90:7
**described** [3] - 64:3, 64:6, 103:5
**describing** [1] - 49:14
**description** [1] - 103:10
**design** [3] - 24:23, 25:8, 25:12
**designed** [2] - 60:22, 75:22
**despite** [1] - 30:6
**detail** [2] - 40:13, 51:16
**detailed** [3] - 8:21, 51:13, 51:18
**details** [1] - 43:1
**determination** [6] - 12:14, 19:12, 25:19, 60:2, 100:11, 102:11
**determine** [8] - 16:2, 16:21, 34:2, 44:17, 76:6, 76:7, 99:23, 105:25
**determined** [2] - 26:2, 77:11
**determining** [1] - 24:24
**DEUTSCH** [6] - 1:11, 5:21, 128:2, 128:23, 129:6, 129:17
**Deutsch** [44] - 1:16, 5:10, 6:3, 6:5, 6:10, 6:22, 7:16, 9:7, 11:9, 16:1, 19:22, 27:12, 29:18, 31:8, 34:24, 36:21, 40:25, 42:22, 45:8, 45:17, 48:9, 49:2, 50:2, 50:11, 51:22, 53:10, 55:25, 56:12, 58:6, 58:21, 70:15, 73:17, 73:21, 82:14, 86:10, 90:5, 93:8, 103:11, 108:15, 124:7,

126:2, 127:6, 127:7, 127:11
**Deutsch's** [1] - 4:5
**develop** [4] - 19:11, 86:5, 99:13, 100:17
**developed** [7] - 16:18, 17:22, 24:9, 54:25, 94:20, 97:17, 111:25
**developing** [3] - 16:5, 98:20, 100:19
**development** [4] - 14:12, 52:9, 56:25, 98:23
**deviant** [2] - 105:11, 105:12
**diagnosed** [2] - 26:1, 87:13
**diagnoses** [10] - 61:12, 62:9, 88:1, 89:10, 90:9, 90:16, 99:11, 99:16, 100:21, 118:1
**diagnosis** [22] - 61:11, 82:10, 83:20, 84:5, 84:7, 86:1, 86:25, 87:1, 87:2, 87:19, 87:21, 87:22, 87:24, 88:5, 88:9, 88:10, 88:16, 89:20, 90:23, 98:16, 99:8, 108:8
**diagnostic** [1] - 84:8
**diagnostics** [2] - 70:20, 103:6
**die** [1] - 19:6
**difference** [6] - 26:3, 40:4, 76:16, 89:17, 115:14, 118:9
**differences** [2] - 76:18, 76:19
**different** [18] - 17:18, 21:11, 27:10, 28:12, 29:24, 30:6, 42:20, 45:16, 58:4, 61:19, 62:8, 87:10, 94:16, 100:16, 100:18, 103:14, 114:17, 115:9
**differently** [1] - 57:25
**difficult** [12] - 16:20, 37:6, 38:25, 61:20, 62:10, 65:25, 76:1, 82:18, 91:11, 91:16, 91:17, 98:10
**difficulties** [5] - 80:22, 81:1, 81:7, 110:15, 112:16
**diligence** [1] - 67:11
**direct** [2] - 37:8, 38:20
**direction** [5] - 17:10, 17:15, 17:16, 36:6,

36:11
**directly** [2] - 13:21, 13:22
**disability** [58] - 16:8, 20:19, 20:21, 40:7, 40:18, 40:19, 57:10, 58:17, 59:23, 79:10, 79:12, 81:8, 81:10, 81:13, 83:4, 84:20, 84:21, 84:24, 84:25, 86:2, 86:3, 86:6, 86:9, 86:18, 87:2, 88:17, 89:5, 89:23, 90:22, 90:23, 91:5, 92:9, 94:9, 94:17, 94:19, 95:3, 95:6, 95:14, 95:17, 95:21, 95:22, 95:25, 96:22, 96:24, 99:14, 99:19, 100:21, 100:24, 101:6, 103:4, 103:7, 106:6, 112:3, 114:2, 115:1, 115:3
**disability/chronic** [6] - 83:17, 94:6, 94:7, 96:9, 99:2, 102:23
**disabled** [6] - 40:24, 76:13, 94:23, 98:3, 99:18, 113:13
**discomfort** [1] - 79:12
**discovery** [3] - 50:23, 74:7, 74:13
**discuss** [2] - 64:2, 64:5
**discussing** [4] - 26:7, 102:16, 102:17, 102:23
**discussion** [1] - 78:11
**Disk** [3] - 73:16, 73:20, 126:1
**disorder** [49] - 26:8, 74:8, 83:7, 83:12, 83:14, 83:15, 83:16, 83:17, 83:21, 83:22, 86:2, 86:3, 86:6, 87:2, 87:3, 87:4, 87:8, 88:20, 88:21, 88:22, 88:23, 90:11, 90:13, 90:14, 90:23, 94:6, 94:7, 94:9, 94:17, 95:14, 95:17, 95:22, 96:9, 96:19, 96:24, 97:1, 98:7, 99:3, 99:14, 100:12, 100:19, 100:24, 102:15, 102:16, 102:20, 102:23, 105:18, 106:16
**disorders** [7] - 87:8, 87:10, 88:23, 90:10,

90:19, 93:10, 99:24
**displayed** [1] - 9:10
**dispute** [1] - 56:16
**distinguish** [1] - 87:9
**distress** [2] - 74:6, 74:9
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 5:4
**disturbance** [1] - 81:5
**Division** [1] - 5:5
**DIVISION** [1] - 1:2
**Doctor** [1] - 58:5
**doctor** [7] - 53:13, 54:4, 54:9, 55:9, 116:10, 116:15
**doctorate** [1] - 25:1
**doctors** [17] - 14:15, 17:5, 17:7, 17:8, 18:9, 27:20, 29:1, 35:5, 35:6, 40:12, 41:22, 43:13, 45:1, 89:17, 90:19, 109:6
**doctors'** [1] - 109:7
**document** [3] - 48:2, 48:6, 56:18
**documentation** [6] - 28:23, 29:5, 29:16, 33:2, 70:7, 123:25
**documented** [1] - 33:4
**documenting** [1] - 57:3
**documents** [4] - 8:14, 70:12, 70:13, 120:24
**dollar** [1] - 60:9
**dollars** [1] - 59:18
**Dominican** [1] - 121:13
**done** [19] - 17:7, 24:22, 28:8, 35:17, 38:12, 51:13, 51:14, 51:17, 51:19, 71:23, 100:5, 100:6, 106:13, 117:12, 118:14, 121:4, 121:9, 121:15, 123:23
**donor** [1] - 26:17
**door** [1] - 125:12
**down** [23] - 14:5, 23:13, 27:19, 29:13, 36:2, 38:5, 51:12, 63:4, 65:19, 65:21, 66:1, 67:17, 67:22, 88:24, 92:1, 96:15, 103:20, 107:1, 107:4, 107:6, 107:19, 120:5, 121:13
**Downes** [5] - 15:4, 15:7, 15:9, 15:11,

15:13
**download** [4] - 16:22, 16:23, 22:12, 22:22
**dozen** [1] - 25:17
**Dr** [57] - 4:5, 6:3, 6:10, 6:22, 7:16, 11:8, 13:1, 13:2, 13:25, 15:2, 15:3, 15:4, 15:6, 15:7, 15:8, 15:9, 15:11, 15:13, 16:1, 19:22, 24:9, 27:12, 29:18, 31:8, 34:24, 36:21, 40:25, 42:22, 42:24, 43:1, 43:3, 45:8, 45:17, 48:8, 49:2, 50:2, 50:10, 51:22, 53:10, 53:22, 55:25, 56:12, 58:21, 64:11, 72:14, 74:13, 82:14, 86:10, 90:5, 93:8, 103:11, 108:15, 124:7, 127:11
**draft** [2] - 72:5, 72:22
**draw** [3] - 59:18, 59:20, 59:21
**Drive** [1] - 2:2
**driven** [5] - 59:14, 59:15, 60:6, 60:7, 60:8
**dropped** [2] - 76:10, 84:5
**dropping** [1] - 67:14
**DSM-5** [10] - 85:5, 86:3, 86:11, 86:24, 87:5, 87:10, 93:13, 93:20, 103:5, 103:10
**DT** [1] - 71:22
**due** [3] - 62:8, 83:17, 109:24
**duly** [2] - 5:22, 129:18
**duplicate** [2] - 30:8, 30:16
**duplicates** [3] - 34:5, 35:19, 35:20
**duplicative** [1] - 21:20
**durable** [1] - 41:9
**dural** [1] - 107:16
**duty** [1] - 48:14
**dynamic** [1] - 56:18
**dysfunction** [6] - 80:16, 81:17, 82:5, 109:18, 110:7, 110:8
**Dysfunctional** [1] - 80:25
**dysthymic** [2] - 83:14, 88:23

## E

**e-mail** [5] - 37:11, 37:12, 45:17, 122:13, 125:21
**e-mails** [6] - 8:19, 37:2, 46:10, 46:11, 47:3, 47:11
**easier** [2] - 80:7, 118:7
**easiest** [1] - 95:11
**easily** [1] - 97:13
**East** [2] - 2:6, 127:1
**easy** [7] - 16:19, 40:2, 61:14, 68:1, 99:10, 109:22, 125:7
**economist** [4] - 58:23, 59:6, 59:7
**economist's** [1] - 58:24
**educate** [3] - 27:10, 114:25, 118:12
**education** [1] - 23:14
**educational** [1] - 118:14
**Educator** [1] - 65:11
**educator** [1] - 65:14
**EE843634** [1] - 129:23
**effectively** [1] - 22:3
**effort** [5] - 20:9, 46:5, 49:18, 95:25, 118:9
**either** [12] - 10:4, 25:14, 37:8, 55:5, 64:21, 65:17, 66:7, 80:6, 85:1, 86:21, 105:7, 116:25
**electronic** [3] - 8:18, 37:2, 47:10
**electronically** [1] - 29:23
**elevated** [6] - 80:17, 104:17, 104:18, 104:20, 120:7
**elevation** [3] - 103:18, 105:14, 105:15
**elevations** [1] - 109:14
**embrace** [1] - 60:22
**emotional** [30] - 74:6, 74:9, 79:11, 80:15, 80:23, 81:18, 82:3, 82:5, 83:3, 84:25, 85:3, 85:23, 86:1, 90:21, 98:4, 98:24, 104:12, 104:14, 104:23, 105:5, 105:6, 109:17, 110:3, 110:6, 111:8, 111:10, 111:13, 112:5, 112:12, 119:2
**emotional-**

**internalizing** [1] - 80:23
**emotionally** [3] - 82:25, 85:2, 97:10
**employee** [3] - 44:2, 129:9, 129:9
**employees** [1] - 33:15
**employment** [3] - 41:9, 46:7
**encompasses** [1] - 66:3
**end** [15] - 11:17, 15:24, 19:4, 21:11, 39:7, 40:11, 59:24, 64:20, 65:1, 75:4, 78:6, 78:9, 120:23, 125:19
**ended** [4] - 38:19, 76:10, 76:13, 76:22
**endocrinologists** [1] - 42:17
**ends** [2] - 31:14, 78:24
**energy** [2] - 81:6, 109:24
**engage** [1] - 98:11
**engaging** [1] - 85:8
**enjoy** [1] - 83:25
**enjoyed** [2] - 82:2, 83:25
**enjoying** [1] - 85:18
**entered** [1] - 31:7
**entertains** [1] - 111:20
**entire** [6] - 19:11, 36:2, 36:3, 39:6, 72:17, 107:19
**entirely** [1] - 30:20
**entirety** [1] - 36:7
**entitled** [3] - 11:4, 49:24, 74:4
**entity** [1] - 63:10
**entry** [1] - 66:13
**envelope** [3] - 69:25, 70:9, 125:7
**environment** [13] - 57:9, 58:15, 61:16, 65:6, 83:24, 85:9, 85:10, 85:17, 91:3, 94:25, 95:11, 95:8
**envy** [1] - 68:17
**epidemiologist** [1] - 26:5
**episode** [2] - 83:7, 83:11
**Equipment** [1] - 41:6
**equipment** [2] - 41:9, 41:10
**errata** [1] - 127:16
**Errata** [1] - 3:4
**ERROR** [1] - 128:11
**error** [1] - 92:20

**errors** [1] - 128:7
**especially** [1] - 8:13
**ESQUIRE** [3] - 2:1, 2:5, 2:5
**essentially** [6] - 44:1, 51:20, 58:1, 86:19, 107:19, 107:24
**establish** [7] - 16:12, 17:4, 26:6, 28:25, 70:17, 80:7, 87:24
**established** [1] - 25:20
**establishes** [1] - 39:22
**et** [7] - 24:3, 24:16, 24:17, 37:2, 76:21, 91:4, 102:4
**evaluated** [1] - 82:10
**evaluation** [8] - 20:15, 20:17, 20:18, 20:24, 42:5, 42:15, 46:16, 79:14
**event** [1] - 97:8
**eventually** [4] - 10:20, 13:10, 90:2, 120:5
**evidence** [1] - 80:1
**exact** [5] - 12:5, 30:7, 30:16, 34:3, 107:13
**exactly** [13] - 31:25, 32:1, 34:9, 35:11, 37:9, 44:12, 47:5, 51:17, 78:7, 92:21, 103:10, 107:16, 109:12
**exam** [2] - 23:5
**EXAMINATION** [1] - 6:1
**Examination** [1] - 3:2
**examination** [3] - 14:4, 23:7, 79:18
**examined** [1] - 5:22
**examiner** [1] - 79:20
**example** [12] - 7:22, 27:17, 43:21, 45:12, 68:13, 70:14, 97:18, 102:21, 103:17, 104:25, 114:6, 120:8
**exceed** [1] - 67:9
**excellent** [1] - 117:1
**except** [7] - 10:2, 31:6, 35:3, 50:7, 86:20, 112:11, 122:13
**exclude** [1] - 52:8
**exclusively** [1] - 9:23
**excuse** [8] - 15:1, 15:11, 32:24, 36:2, 49:21, 87:1, 87:7, 119:8
**exercise** [1] - 105:3
**exhibit** [1] - 124:10

**Exhibit** [49] - 4:2, 4:3, 4:5, 4:6, 4:8, 6:25, 7:1, 7:15, 11:14, 11:20, 14:23, 27:12, 27:14, 27:18, 27:21, 27:25, 29:17, 29:18, 34:10, 34:15, 34:17, 34:25, 35:4, 35:7, 35:15, 36:22, 36:23, 41:1, 45:18, 45:19, 45:20, 47:9, 49:3, 50:10, 50:12, 51:23, 52:2, 52:7, 56:13, 58:6, 69:20, 69:22, 69:23, 70:12, 78:18, 90:5, 93:9, 123:21, 124:9
**exhibiting** [1] - 105:24
**EXHIBITS** [1] - 4:1
**Exhibits** [1] - 72:16
**exist** [1] - 112:4
**expectancy** [8] - 20:12, 20:14, 20:25, 25:17, 26:6, 26:7, 27:1, 27:6
**expectation** [1] - 66:15
**expected** [3] - 17:11, 84:23, 108:3
**expensive** [1] - 33:19
**experience** [4] - 18:15, 68:18, 81:7, 82:5
**experienced** [2] - 56:22, 57:4
**experiences** [2] - 81:11, 81:18
**experiencing** [2] - 79:22, 106:2
**expert** [3] - 10:5, 50:18, 52:9
**expertise** [1] - 63:2
**experts** [3] - 11:4, 64:6, 64:8
**Expires** [1] - 129:23
**explain** [10] - 36:7, 51:13, 51:16, 55:25, 56:3, 66:5, 94:6, 113:14, 116:6, 118:7
**explained** [4] - 10:15, 26:8, 65:13, 77:14
**explaining** [1] - 118:8
**explains** [1] - 53:16
**explanation** [2] - 51:11, 51:19
**explore** [1] - 114:16
**explosion** [2] - 96:25, 97:5
**exposure** [3] - 40:19, 79:9, 84:21

**exposures** [1] - 97:4
**express** [3] - 100:12, 100:17, 125:13
**expressed** [2] - 80:13, 108:23
**expression** [3] - 96:19, 99:2, 101:21
**extensive** [1] - 39:1
**extent** [2] - 9:20, 54:24
**extrapolate** [1] - 25:22
**extreme** [2] - 82:23, 98:4
**extremely** [3] - 36:17, 79:7, 82:18
**eye** [1] - 36:18
**eyes** [1] - 102:3

## F

**fact** [19] - 18:10, 18:11, 19:11, 41:13, 66:10, 68:3, 75:23, 76:19, 82:18, 86:1, 88:5, 88:6, 88:14, 91:19, 91:23, 100:23, 101:12, 111:1
**factor** [2] - 84:21, 98:23
**factors** [15] - 43:21, 79:10, 82:12, 83:18, 85:3, 91:2, 97:14, 98:14, 104:12, 104:14, 112:1, 112:22, 115:15, 115:21, 119:24
**facts** [1] - 114:19
**faculty** [1] - 23:15
**failing** [1] - 97:11
**Failure** [1] - 127:15
**fair** [5] - 32:13, 37:1, 53:1, 53:6, 119:17
**fairly** [1] - 51:16
**falls** [2] - 25:6, 25:9
**false** [1] - 107:14
**familiar** [2] - 13:4, 29:21
**family** [13] - 38:13, 38:16, 40:23, 57:10, 58:16, 68:23, 94:23, 94:24, 94:25, 95:1, 113:5
**far** [7] - 41:22, 54:1, 82:17, 90:12, 98:3, 113:22, 115:24
**fashion** [2] - 65:22, 85:1, 85:18, 91:25, 96:24, 114:12

**father** [1] - 56:10
**fatigue** [3] - 76:20, 81:6, 102:3
**fatigued** [2] - 101:22, 110:2
**fax** [4] - 9:3, 9:5, 9:8, 53:16
**faxed** [1] - 9:5
**faxes** [1] - 9:4
**FDA** [1] - 106:22
**fear** [1] - 116:22
**fears** [5] - 80:25, 111:12, 111:22, 112:7, 112:10
**February** [3] - 30:17, 32:6
**FedEx** [3] - 71:18, 71:21, 121:24
**FedEx'ing** [1] - 121:24
**FedExes** [1] - 71:21
**feedback** [1] - 24:14
**feelings** [3] - 82:1, 105:22, 111:13
**fees** [4] - 45:1, 45:2, 45:12, 45:13
**felt** [10] - 8:6, 62:25, 83:6, 83:12, 83:19, 83:20, 88:16, 88:20, 88:25, 117:13
**Fernando** [1] - 42:24
**FERTILIZER** [3] - 1:6, 127:10, 128:3
**Fertilizer** [2] - 5:7, 5:15
**few** [5] - 14:13, 91:15, 101:8, 109:11
**fields** [2] - 39:10, 39:11
**figure** [2] - 44:9, 87:18
**file** [17] - 7:19, 7:21, 8:9, 8:15, 8:18, 8:22, 9:11, 11:10, 14:23, 50:8, 69:25, 70:1, 71:9, 71:14, 72:17, 74:14, 125:4
**File** [1] - 4:8
**FileMaker** [1] - 39:7
**files** [2] - 10:17, 11:20
**Files** [1] - 4:4
**filibustering** [1] - 26:13
**filing** [1] - 93:16
**filled** [1] - 14:14
**final** [1] - 28:17
**financially** [1] - 129:10
**findings** [3] - 80:23, 111:11, 112:5
**fine** [9] - 11:13, 12:7, 17:18, 47:14, 54:11, 72:24, 77:24, 78:3,

**115:8
**finish** [1] - 23:6
**finished** [1] - 14:7
**fire** [1] - 26:23
**fired** [4] - 26:21, 84:17, 84:23, 84:24
**firmly** [2] - 38:12, 88:6
**first** [45] - 12:2, 16:12, 18:2, 23:3, 24:10, 28:3, 30:2, 30:4, 35:17, 39:21, 46:17, 56:4, 56:5, 56:7, 57:15, 57:16, 62:13, 62:15, 63:6, 67:20, 77:18, 77:23, 79:4, 86:12, 88:1, 88:10, 88:11, 94:6, 99:9, 99:10, 101:19, 103:9, 105:4, 106:20, 106:21, 107:12, 109:4, 109:11, 109:14, 109:20, 112:20, 114:15, 121:10, 122:4
**fit** [3] - 8:24, 25:11, 94:16
**five** [7] - 19:17, 66:17, 67:1, 67:4, 67:9, 70:15, 108:3
**flag** [1] - 34:1
**flags** [1] - 33:24
**flashed** [1] - 92:20
**floods** [1] - 107:17
**FLORIDA** [3] - 1:1, 129:2, 129:15
**Florida** [18] - 1:7, 1:17, 1:19, 2:3, 2:7, 5:5, 5:8, 6:7, 6:9, 26:18, 46:2, 46:5, 127:2, 127:8, 127:10, 127:15, 128:3, 129:22
**focus** [6] - 81:12, 103:18, 104:17, 106:12, 111:25, 112:2
**focused** [8] - 36:18, 81:4, 81:8, 106:5, 110:20, 110:21, 110:25, 111:4
**focusing** [3] - 29:9, 112:2, 115:17
**follow** [18] - 17:13, 20:25, 21:4, 23:2, 29:12, 29:15, 37:5, 43:6, 43:9, 43:10, 68:5, 108:4, 116:2, 116:4, 116:12, 116:16, 117:16,

117:17
**follow-through** [1] - 43:10
**follow-up** [8] - 29:12, 29:15, 37:5, 43:6, 43:9, 108:4, 116:2, 117:17
**followed** [5] - 82:11, 115:20, 115:22, 116:17, 117:7
**following** [1] - 75:7
**follows** [2] - 5:23, 54:3
**font** [2] - 29:23, 30:6
**foods** [1] - 41:12
**footnote** [1] - 44:10
**Fordyce** [1] - 94:12
**FORDYCE** [1] - 94:12
**Fordyce's** [1] - 100:25
**foregoing** [1] - 128:20
**forget** [1] - 65:12
**forgetting** [1] - 23:18
**forgot** [1] - 37:19
**form** [10] - 37:2, 39:11, 50:1, 50:15, 52:16, 66:2, 75:25, 76:1, 85:23
**formally** [1] - 71:10
**format** [2] - 8:24, 37:11
**former** [1] - 23:11
**forms** [1] - 42:2
**forth** [1] - 16:17
**fortunate** [1] - 68:11
**forward** [1] - 7:19
**foundation** [1] - 23:9
**Foundation** [1] - 70:23
**foundational** [3] - 16:4, 19:23, 21:24
**founded** [1] - 118:1
**four** [12] - 8:1, 8:5, 16:4, 17:1, 19:22, 21:23, 23:19, 35:21, 37:24, 116:12, 116:13, 117:16
**four-time-a-year** [1] - 117:16
**frame** [1] - 32:22
**framework** [1] - 105:20
**frank** [1] - 62:16
**Franklin** [4] - 28:13, 31:25, 64:11
**frankly** [8] - 24:25, 51:11, 59:3, 62:12, 66:23, 71:23, 81:8, 85:24
**free** [1] - 89:13
**freedom** [1] - 26:24
**Freedom** [3] - 10:18,

106:3, 106:19
**frequency** [1] - 19:4
**Freudian** [1] - 63:13
**Friday** [1] - 121:12
**friend** [2] - 97:7, 97:12
**friends** [1] - 97:6
**front** [6] - 33:8, 36:23, 71:13, 85:5, 125:4, 125:11
**fulfill** [1] - 61:1
**full** [6] - 8:13, 19:8, 44:2, 60:23, 67:6
**fully** [1] - 95:20
**function** [4] - 85:10, 85:14, 91:13, 91:14
**functional** [2] - 83:5, 85:22
**functionality** [2] - 20:21, 89:11
**functionally** [1] - 85:19
**functioning** [2] - 85:15, 85:16
**fundamental** [2] - 24:8, 24:13
**Furman** [1] - 15:3
**future** [6] - 56:20, 57:3, 60:5, 89:25, 118:18, 120:3

## G

**GAF** [1] - 85:14
**gain** [1] - 87:23
**gains** [1] - 89:25
**GALEOTO** [55] - 2:1, 5:16, 9:19, 11:3, 11:6, 13:20, 13:24, 14:2, 32:24, 47:23, 48:3, 48:11, 48:16, 48:21, 48:24, 49:20, 50:1, 50:15, 50:17, 50:21, 51:3, 52:10, 52:16, 52:24, 53:5, 53:7, 69:21, 72:5, 72:11, 72:13, 73:25, 74:16, 92:15, 96:20, 99:4, 100:13, 102:14, 102:17, 102:20, 102:25, 104:8, 119:18, 122:2, 122:7, 122:11, 122:15, 122:19, 122:22, 122:25, 123:6, 123:11, 123:14, 123:17, 125:20, 125:24
**Galeoto** [6] - 2:1, 5:16,

11:1, 12:13, 49:22, 122:3
**game** [1] - 21:10
**garbage** [1] - 97:23
**gastroenterological** [1] - 16:16
**gastroenterologist** [1] - 15:7
**gastroenterologists** [2] - 14:25, 42:18
**gastrointestinal** [2] - 80:21, 110:9
**general** [16] - 10:16, 74:5, 83:15, 83:17, 84:17, 85:13, 86:4, 86:5, 88:21, 88:22, 91:2, 91:12, 92:13, 109:24, 109:25, 112:1
**generalities** [1] - 92:24
**generally** [9] - 18:20, 32:18, 56:6, 69:23, 75:14, 75:16, 75:18, 87:9, 90:7
**gentleman** [1] - 65:23
**given** [3] - 55:9, 56:8, 56:15
**goal** [5] - 24:20, 39:1, 58:12, 60:23, 69:1
**goals** [3] - 20:18, 57:6, 59:12
**God** [2] - 111:15, 111:17
**govern** [1] - 127:17
**government** [1] - 16:19
**GP** [1] - 42:18
**grades** [1] - 46:2
**graduate** [1] - 24:12
**graduate-level** [1] - 24:12
**grammar** [1] - 39:14
**grandchildren's** [1] - 67:21
**great** [4] - 40:13, 67:13, 70:24, 106:10
**greater** [5] - 59:25, 61:4, 77:25, 83:8, 83:11
**Greek** [1] - 124:6
**Greenberg** [1] - 2:6
**grip** [1] - 62:10
**gross** [1] - 96:12
**grossly** [1] - 96:4
**grounds** [1] - 74:3
**group** [6] - 26:8, 26:10, 32:19, 95:4, 112:19, 115:5
**grow** [2] - 90:2, 94:21

**growing** [3] - 94:22, 116:22, 119:16
**grows** [1] - 23:23
**growth** [1] - 67:21
**guarantee** [1] - 121:18
**guess** [1] - 32:11
**guide** [1] - 24:20
**guided** [2] - 20:16, 106:7
**guideline** [1] - 16:21
**guidelines** [15] - 16:14, 16:15, 16:16, 16:17, 16:24, 17:1, 17:5, 17:9, 17:14, 18:5, 55:3, 55:6, 70:8, 71:8, 123:24
**Guidelines** [1] - 16:24
**guy** [1] - 72:1
**guys** [1] - 38:24

## H

**habits** [2] - 102:1, 102:2
**half** [13] - 8:2, 8:4, 25:17, 29:7, 32:4, 37:24, 37:25, 38:1, 38:2, 59:18, 59:25, 76:12, 90:3
**half-page** [1] - 32:4
**hand** [10] - 7:1, 10:8, 10:11, 10:12, 29:18, 31:3, 66:17, 69:22, 106:14, 129:19
**handing** [1] - 7:3
**handle** [3] - 70:10, 98:22
**handled** [2] - 40:21, 116:14
**handy** [1] - 13:6
**happiness** [1] - 82:3
**happy** [4] - 10:10, 82:2, 85:22, 116:21
**hard** [8] - 12:4, 67:22, 71:2, 87:9, 98:9, 122:23, 123:8, 124:25
**harm** [1] - 96:16
**harsh** [2] - 96:7, 96:12
**harsher** [1] - 78:2
**head** [9] - 8:8, 59:5, 60:3, 65:24, 80:20, 110:3, 110:4, 111:6
**headache** [2] - 29:10, 29:13
**headaches** [1] - 110:4
**headed** [1] - 97:20
**health** [23] - 21:8, 21:14, 21:15, 45:4,

45:5, 56:22, 57:5, 68:7, 75:24, 79:8, 80:20, 81:4, 86:17, 89:21, 89:23, 109:15, 109:16, 109:21, 109:24, 110:1, 110:2
**health-care** [4] - 45:4, 45:5, 56:22, 57:5
**Healthcare** [2] - 45:4, 57:20
**hear** [4] - 38:6, 111:1, 112:17, 115:13
**heard** [5] - 15:6, 92:4, 92:5, 92:8, 92:15
**held** [1] - 18:3
**help** [15] - 21:4, 39:3, 39:5, 47:18, 66:15, 76:18, 91:10, 93:2, 95:9, 108:11, 113:7, 114:11, 114:24, 114:25, 118:17
**helpful** [2] - 103:11, 118:19
**helping** [1] - 118:15
**helps** [7] - 79:8, 87:17, 87:23, 87:24, 102:3, 105:25
**hematologists** [2] - 42:20, 42:23
**hereafter** [1] - 111:17
**herein** [1] - 5:22
**hereto** [1] - 128:21
**herself** [10] - 83:23, 85:18, 85:19, 85:21, 91:9, 99:18, 109:22, 111:24, 112:14
**high** [7] - 44:7, 82:23, 104:18, 105:16, 105:17, 120:7, 120:19
**higher** [2] - 80:10, 120:17
**highest** [2] - 85:14, 91:13
**highlight** [2] - 33:22, 36:16
**highlighting** [2] - 35:15, 35:16
**highlights** [3] - 36:4, 123:3, 123:16
**highly** [1] - 76:5
**HILLSBOROUGH** [2] - 129:3, 129:16
**HIPAA** [3] - 33:16, 77:23, 77:24
**hire** [1] - 44:17
**hiring** [1] - 44:22
**historically** [1] - 106:23

histories [1] - 99:11
history [6] - 24:12, 40:4, 41:10, 46:7, 102:6, 103:8
hmm [3] - 33:25, 84:12, 108:20
hold [2] - 16:25, 45:24
hole [1] - 116:6
home [12] - 20:16, 21:4, 21:8, 21:13, 21:14, 21:15, 21:17, 44:3, 44:16, 63:21, 93:1
home-based [1] - 21:17
Homework [1] - 41:7
honestly [4] - 47:5, 91:23, 91:25, 92:3
hope [1] - 63:1
hopefully [3] - 62:13, 90:1, 107:9
hopeless [1] - 120:15
hopelessness [1] - 120:2
Hopper [1] - 5:15
HOPPER [1] - 2:5
horse [1] - 107:6
hospital [2] - 97:12, 106:21
Hospital [3] - 29:9, 106:4, 106:19
hotel [1] - 67:19
hour [9] - 8:4, 43:19, 44:11, 51:12, 51:15, 51:16, 64:20, 76:14, 101:16
hourly [1] - 43:23
hours [13] - 8:1, 8:5, 21:1, 37:15, 37:18, 37:20, 37:24, 37:25, 38:1, 38:2, 38:20, 76:12, 107:18
house [2] - 92:25, 93:3
housekeeping [1] - 120:22
huge [1] - 26:3
hundred [2] - 23:21, 53:22
hundreds [2] - 53:8
hurt [4] - 95:11, 97:6, 97:9, 98:1
hypertension [2] - 29:11, 29:13
hypothetical [3] - 65:20, 66:2, 66:6
hysteria [1] - 104:19
hysterical [1] - 104:20

**I**

ICD-10 [2] - 93:15, 93:20
idea [7] - 22:19, 107:4, 107:7, 117:19, 125:8, 125:13, 125:14
ideation [15] - 80:24, 111:11, 112:6, 118:24, 119:1, 119:2, 119:4, 119:5, 119:7, 119:8, 119:25, 120:1, 120:4, 120:6, 120:19
ideator [1] - 120:18
identification [10] - 4:2, 4:3, 4:5, 4:6, 4:8, 6:25, 11:14, 29:17, 34:15, 69:20
identified [5] - 33:7, 57:2, 76:4, 90:19, 101:1
identifier [1] - 120:3
identifies [1] - 107:13
identify [3] - 29:8, 49:23, 103:9
identifying [3] - 35:22, 36:4, 42:10
II [4] - 83:19, 90:10, 90:12, 126:5
III [2] - 84:6, 90:18
image [1] - 99:18
imagery [1] - 106:7
immediately [2] - 93:18, 93:21
impact [6] - 10:15, 79:17, 89:10, 89:11, 105:2, 116:5
impacted [1] - 82:20
implication [1] - 84:22
important [6] - 17:21, 35:23, 36:1, 36:4, 36:5, 36:16, 36:17, 43:8, 55:11, 61:2, 68:21, 70:25, 102:5, 112:17, 112:19, 112:20
importantly [1] - 34:8
impose [1] - 7:25
impossible [2] - 8:10, 117:25
impression [1] - 29:10
improve [2] - 57:7, 58:13
IN [1] - 1:1
inaccurate [2] - 92:6, 109:9
inappropriate [1] -

62:12
INC [1] - 127:1
include [19] - 8:19, 16:5, 22:7, 22:9, 25:12, 25:14, 25:25, 36:19, 40:5, 44:17, 80:19, 80:21, 80:23, 81:2, 110:4, 110:8, 110:15, 112:16, 128:21
included [5] - 28:8, 29:24, 36:20, 75:20, 123:13
includes [3] - 27:23, 59:11, 82:22
including [3] - 23:11, 54:15, 111:11
inclusive [3] - 28:4, 109:17, 129:7
inconsistent [2] - 88:8, 88:9
incorrect [1] - 15:25
increased [1] - 43:23
increasingly [1] - 120:17
incredible [1] - 120:12
INDEX [1] - 3:1
indicate [4] - 6:15, 80:14, 108:25, 128:9
indicated [6] - 31:23, 88:19, 117:8, 117:9, 117:12, 128:8
indicates [1] - 10:9
indifferent [1] - 33:5
individual [8] - 48:8, 83:23, 85:22, 89:6, 95:7, 95:16, 97:16, 100:23
individual's [1] - 60:4
individually [1] - 32:18
individuals [6] - 56:21, 57:4, 61:3, 61:5, 75:24, 94:18
influences [1] - 84:17
Information [1] - 10:18
information [18] - 7:18, 15:23, 17:4, 17:22, 25:22, 26:14, 26:19, 33:7, 40:9, 42:2, 46:7, 51:13, 54:5, 54:22, 55:15, 55:16, 104:7, 110:21
infused [1] - 107:22
infuses [1] - 107:15
infusing [1] - 107:5
infusion [2] - 106:22, 107:12
initial [2] - 37:23,

42:15
initials [1] - 71:22
injured [1] - 101:10
injuries [1] - 101:24
injury [10] - 25:20, 26:2, 26:3, 56:22, 57:4, 74:8, 74:12, 96:21, 111:6
input [2] - 16:7, 17:19
inputs [1] - 22:3
inside [2] - 11:15, 110:5
insight [3] - 76:24, 79:9, 87:24
insightful [1] - 79:7
insightfully [1] - 101:4
insights [1] - 89:3
insisted [1] - 117:9
instance [3] - 28:24, 100:8, 113:15
instances [1] - 55:14
instead [4] - 76:10, 76:12, 87:15, 116:11
instruct [1] - 70:10
instructor [1] - 23:25
insufficient [1] - 74:20
intake [9] - 37:14, 37:16, 37:25, 39:7, 40:4, 40:5, 41:12, 46:21, 113:1
Intake [1] - 41:3
intakes [1] - 37:17, 37:20, 37:23
integrating [1] - 85:9
intending [2] - 35:16, 41:23
intent [1] - 62:1
intentionally [1] - 37:6
interact [2] - 84:1, 112:19
interaction [1] - 85:16
interested [1] - 129:10
interestingly [1] - 30:4
interfering [1] - 121:10
internalizing [4] - 80:23, 111:10, 112:5, 119:3
international [2] - 22:6, 57:21
International [6] - 56:23, 56:24, 57:17, 57:18, 57:19, 57:20
internists [1] - 42:18
interpersonal [5] - 80:16, 109:18, 110:7, 112:16
Interpersonal [1] - 81:1
interpret [2] - 25:4,

104:24
interpretation [1] - 92:6
interview [8] - 38:20, 39:20, 39:21, 40:3, 40:5, 42:8, 79:19, 111:14
interviews [1] - 38:21
introduce [1] - 5:13
introduced [1] - 56:10
invalidate [1] - 80:3
inventories [1] - 76:24
inventory [2] - 75:22, 119:10
Inventory-2-RF [2] - 75:21, 79:15
inverted [3] - 103:16, 103:17, 105:7
involved [1] - 8:11, 23:15, 26:4, 38:13, 62:23, 63:3, 68:17, 93:17, 95:13, 97:11, 107:22
involvement [1] - 108:9
irrelevant [1] - 104:6
irritated [1] - 47:22
IRS [1] - 43:21
issue [8] - 47:16, 74:9, 74:10, 79:20, 94:20, 111:8, 111:9, 120:21
issues [6] - 89:23, 95:4, 104:23, 109:17, 110:3, 118:4
IT [1] - 72:1
it'll [5] - 12:5, 42:16, 68:22, 107:9, 107:10
item [8] - 11:23, 50:19, 89:13, 89:14, 89:15, 109:5, 109:9
Item [1] - 30:15
itemized [1] - 80:6
Items [1] - 4:8
items [3] - 50:7, 76:5, 80:7
itself [6] - 40:2, 84:24, 100:12, 105:14, 112:17, 128:7
IV [5] - 84:14, 84:15, 84:16, 90:24

**J**

job [6] - 39:17, 60:20, 84:18, 84:23, 95:18, 125:18
join [2] - 22:15, 22:17
journal [3] - 23:21, 24:3, 104:4

**journals** [1] - 23:22
**judge** [4] - 10:4, 10:23, 17:14, 75:1
**judged** [1] - 83:3
**judges** [2] - 10:24, 17:20
**jump** [1] - 27:5

# K

**Kaplan** [1] - 23:13
**Katherine** [1] - 13:1
**Keefe** [5] - 1:18, 127:20, 129:5, 129:12, 129:21
**keep** [6] - 9:12, 35:22, 55:11, 67:10, 67:14, 125:11
**keeps** [1] - 36:18
**Kendall** [1] - 24:9
**KENDALL** [1] - 24:10
**Kennedy** [2] - 2:6, 127:1
**kept** [1] - 76:9
**ketamine** [8] - 106:22, 106:23, 107:2, 107:4, 107:5, 107:12, 107:15, 107:18
**kids** [2] - 68:17, 90:1
**killed** [1] - 97:6
**kind** [19] - 27:7, 36:5, 65:23, 67:7, 79:11, 82:8, 83:24, 91:10, 93:17, 95:12, 98:22, 98:23, 101:8, 105:25, 110:24, 115:13, 115:16, 115:18, 120:13
**kinds** [1] - 105:9
**knowing** [2] - 25:5, 106:11
**knowledge** [2] - 10:19, 61:25
**known** [2] - 70:20, 116:21
**knows** [1] - 117:2

# L

**lab** [1] - 45:1
**labeled** [1] - 58:6
**Labor** [1] - 43:21
**lack** [7] - 43:9, 81:17, 81:19, 81:25, 82:5, 85:1, 109:24
**lacking** [1] - 37:8
**ladies** [1] - 125:11

**laid** [3] - 80:13, 99:7, 108:24
**large** [2] - 12:4, 27:22
**Large** [1] - 1:19
**largely** [4] - 21:23, 60:17, 81:4, 106:15
**last** [24] - 19:6, 28:14, 30:5, 30:19, 31:18, 31:20, 31:24, 32:2, 41:17, 50:9, 55:7, 67:18, 75:6, 90:3, 91:15, 94:2, 102:24, 106:11, 119:12, 122:8, 123:20, 123:22
**lastly** [1] - 85:4
**late** [1] - 55:23
**latest** [1] - 17:2
**Laura** [3] - 68:7, 68:24, 116:20
**LAUREEN** [1] - 2:1
**Laureen** [3] - 2:1, 5:16, 73:23
**law** [5] - 49:16, 74:5, 116:3, 116:12, 127:15
**Law** [1] - 2:1
**lay** [1] - 79:20
**lead** [2] - 61:18, 95:21
**leader** [1] - 101:5
**leading** [1] - 63:19
**learn** [3] - 101:14, 114:25, 118:15
**learned** [1] - 115:3
**least** [12] - 17:24, 21:21, 36:24, 43:1, 47:11, 62:10, 66:25, 70:16, 83:8, 83:10, 97:9, 119:20
**leave** [5] - 79:20, 89:8, 89:13, 89:21, 95:5
**leaves** [2] - 83:4, 110:2
**left** [5] - 7:6, 61:12, 64:22, 69:5, 118:20
**leg** [1] - 97:25
**legal** [3] - 50:4, 107:13, 117:16
**legitimate** [10] - 53:24, 54:3, 54:20, 65:15, 65:16, 80:10, 87:4, 96:14, 117:25, 118:6
**legitimately** [3] - 26:14, 79:21, 83:20
**Leslie** [1] - 64:13
**less** [2] - 33:19, 90:14
**LETTER** [1] - 127:5
**Letter** [3] - 3:3, 12:3
**letter** [10] - 10:12, 26:19, 46:15, 46:22,

46:24, 77:5, 77:13, 77:16, 127:15
**letters** [3] - 9:23, 10:1, 12:4
**letting** [2] - 107:8, 108:12
**level** [16] - 19:4, 24:12, 24:25, 25:1, 25:2, 82:23, 83:10, 89:5, 91:13, 100:22, 102:1, 103:21, 103:22, 110:23, 112:12
**levels** [1] - 102:4
**liability** [2] - 62:22, 62:24
**license** [7] - 74:22, 75:5, 77:22, 77:25, 78:5, 86:16, 116:24
**licensed** [5] - 16:9, 86:13, 86:14, 113:11
**Life** [3] - 56:23, 57:18, 70:23
**life** [68] - 9:8, 9:9, 14:12, 15:5, 16:4, 16:5, 17:24, 18:18, 19:4, 19:11, 20:12, 20:14, 20:25, 21:24, 22:4, 22:6, 22:8, 23:9, 24:5, 24:10, 25:17, 26:6, 26:7, 27:1, 27:6, 27:14, 30:3, 30:8, 30:16, 33:11, 36:10, 36:12, 38:11, 44:10, 44:14, 56:1, 56:3, 56:5, 56:7, 56:11, 56:17, 56:25, 57:6, 57:15, 57:22, 58:12, 58:13, 58:22, 59:4, 59:9, 59:11, 59:14, 59:18, 59:20, 60:8, 61:2, 66:9, 68:3, 71:18, 71:20, 82:2, 84:17, 84:20, 85:18, 91:7, 95:6, 98:14, 101:9
**lifestyle** [2] - 83:2, 84:3
**lifetime** [1] - 19:20
**likelihood** [1] - 19:2
**likely** [7] - 61:21, 81:3, 85:6, 90:11, 99:12, 106:3, 111:15
**limit** [1] - 67:3
**line** [4] - 26:25, 86:23, 87:17, 121:11
**LINE** [1] - 128:1
**lines** [1] - 128:8
**list** [13] - 14:25, 28:22, 29:25, 41:18, 42:7,

54:15, 67:9, 67:10, 90:6, 90:8, 90:18, 93:2, 103:7
**listed** [4] - 7:15, 32:3, 42:23, 85:13
**listening** [2] - 110:24, 111:4
**lists** [1] - 31:17
**literally** [5] - 34:2, 36:10, 65:18, 98:1, 107:5
**literature** [4] - 17:3, 17:6, 18:5, 24:6
**litigation** [4] - 65:9, 65:14, 66:11, 68:8
**live** [2] - 88:4, 90:20
**lives** [3] - 92:21, 92:25, 108:13
**Living** [1] - 31:15
**LLC** [5] - 1:6, 5:7, 5:15, 127:10, 128:3
**Local** [1] - 77:8
**location** [1] - 120:8
**LOCATION** [1] - 1:16
**locked** [1] - 17:8
**Log** [1] - 4:8
**log** [6] - 35:3, 69:24, 123:22, 124:12, 125:4, 125:6
**log-in** [1] - 35:3
**logged** [2] - 28:3, 50:7
**long-standing** [2] - 99:20, 101:20
**long-term** [5] - 21:18, 40:19, 43:9, 57:12, 58:18
**longest** [1] - 116:22
**look** [37] - 15:15, 15:22, 17:2, 20:8, 21:13, 21:18, 25:4, 28:15, 28:20, 29:20, 30:9, 32:1, 32:14, 33:24, 40:15, 43:2, 45:20, 46:12, 46:13, 47:21, 47:23, 48:24, 83:21, 93:21, 94:5, 99:10, 102:10, 102:13, 103:4, 103:23, 105:9, 105:10, 106:11, 119:23, 122:7, 122:8, 125:10
**Look** [3] - 59:17, 105:17, 125:3
**looked** [5] - 17:25, 20:7, 40:12, 42:17
**looking** [18] - 34:9, 42:12, 53:17, 76:5, 76:6, 78:16, 84:15, 92:25, 101:25,

103:2, 103:13, 109:5, 109:10, 109:12, 110:10, 113:4, 115:11, 124:10
**looks** [5] - 15:25, 20:4, 31:9, 45:25, 84:16
**lose** [1] - 120:9
**losing** [1] - 69:17
**loss** [1] - 110:18
**lost** [2] - 44:9, 81:6
**low** [2] - 44:9, 81:6
**luck** [1] - 121:9
**lucky** [1] - 98:7

# M

**machine** [1] - 102:2
**mail** [6] - 13:14, 37:11, 37:12, 45:17, 122:13, 125:21
**mailed** [1] - 13:13
**mails** [6] - 8:19, 37:2, 46:10, 46:11, 47:3, 47:11
**maintain** [8] - 57:7, 58:13, 68:6, 91:11, 93:3, 106:25, 107:1, 112:12
**major** [8] - 26:17, 36:14, 40:17, 40:18, 89:17, 90:21, 90:22, 98:22
**majority** [4] - 17:11, 37:23, 39:20, 81:25
**makeup** [1] - 98:18
**malaise** [2] - 80:20, 109:23, 112:1
**manage** [1] - 83:1
**management** [5] - 20:1, 20:7, 21:25, 57:11, 58:17
**manager** [4] - 20:8, 26:20, 33:14, 66:8
**managers** [2] - 43:19, 68:4
**manila** [3] - 69:14, 70:9, 125:7
**mark** [10] - 11:11, 34:10, 34:16, 69:11, 69:13, 69:15, 73:1, 128:7
**marked** [6] - 6:25, 11:14, 14:23, 27:21, 29:17, 34:11, 34:15, 35:8, 36:22, 36:23, 41:3, 69:20, 120:24
**married** [1] - 104:9
**Marriott** [1] - 67:19

**master's** [2] - 25:2, 68:7
**matching** [2] - 43:24, 44:1
**material** [2] - 7:21, 25:23
**materials** [3] - 27:13, 124:1, 124:3
**matter** [5] - 5:3, 5:5, 52:13, 62:17, 91:19
**maximum** [1] - 21:21
**McKay** [4] - 13:1, 13:2, 13:25, 72:14
**mcKay's** [1] - 74:13
**mean** [23] - 10:11, 14:11, 15:12, 15:19, 24:16, 24:23, 25:1, 37:3, 38:2, 46:15, 48:25, 49:17, 59:6, 82:17, 89:17, 91:1, 91:6, 97:9, 97:16, 109:1, 115:12, 120:13, 121:15
**meaning** [3] - 49:16, 83:7
**meaningful** [3] - 25:7, 108:10, 115:16
**means** [5] - 24:15, 36:11, 55:1, 57:3, 93:20
**meant** [2] - 63:19, 84:15
**measuring** [1] - 120:5
**Medical** [4] - 4:7, 28:2, 28:3, 31:13
**medical** [41] - 7:22, 15:13, 16:6, 16:7, 17:4, 18:4, 18:9, 19:25, 21:24, 27:13, 27:15, 27:18, 28:8, 28:9, 28:10, 28:11, 28:20, 28:22, 31:9, 31:11, 32:19, 32:20, 33:9, 34:17, 34:25, 36:6, 36:12, 41:9, 45:13, 57:3, 71:25, 79:19, 79:23, 83:18, 86:4, 86:5, 96:10, 96:16, 98:25, 122:19
**medicals** [1] - 27:23
**medication** [13] - 82:9, 82:11, 113:15, 113:17, 113:19, 116:2, 116:5, 116:8, 116:11, 116:14, 117:2, 117:14, 117:15
**medications** [2] - 41:21, 41:23
**meet** [3] - 107:3,

111:17, 119:13
**meeting** [2] - 20:17, 101:19
**Melanie** [6] - 1:18, 5:18, 127:20, 129:5, 129:12, 129:21
**member** [4] - 38:17, 94:23, 94:24, 94:25
**members** [3] - 21:9, 112:19, 113:5
**memorize** [1] - 8:12
**memorized** [1] - 103:24
**memory** [7] - 8:7, 80:22, 103:25, 110:16, 110:18, 111:2, 111:7
**mental** [10] - 36:8, 68:7, 74:8, 74:12, 75:24, 79:8, 86:17, 89:20, 89:23
**mention** [1] - 51:22
**mentioned** [2] - 63:11, 63:12, 110:1
**mentor** [1] - 68:1
**mentoring** [1] - 68:2
**merely** [1] - 87:22
**merged** [1] - 87:7
**met** [2] - 86:25, 87:19
**Mexico** [1] - 107:1
**Miami** [1] - 106:4
**Miami's** [1] - 106:5
**Michael** [1] - 6:5
**Microsoft** [1] - 39:11
**mid** [1] - 121:9
**mid-morning** [1] - 121:9
**MIDDLE** [1] - 1:1
**Middle** [1] - 5:4
**middle** [2] - 81:9, 115:6
**might** [11] - 9:1, 9:3, 35:10, 72:24, 76:19, 80:18, 94:22, 96:10, 97:3, 106:3, 114:17
**migraine** [1] - 110:5
**mild** [2] - 94:3, 101:25
**miles** [1] - 67:18
**million** [3] - 59:18, 60:1, 91:20
**mimic** [1] - 110:17
**mind** [7] - 15:15, 34:10, 37:7, 46:12, 55:11, 56:12, 69:11
**mine** [1] - 121:14
**minimize** [1] - 22:21
**minimizing** [2] - 57:12, 58:18
**minimum** [1] - 22:7, 23:4

**MINK** [1] - 31:25
**Mink** [3] - 28:13, 31:25, 64:11
**Minnesota** [2] - 75:20, 79:14
**minor** [2] - 36:13, 111:6
**minute** [1] - 113:14
**minutes** [10] - 64:24, 69:8, 69:10, 72:8, 76:14, 76:15, 101:17, 102:24, 118:20, 119:15
**miscellaneous** [5] - 8:23, 8:25, 45:24, 45:25, 46:1
**misplaced** [1] - 71:13
**missing** [3] - 32:12, 67:21, 71:14
**misstated** [1] - 7:4
**misstatement** [2] - 92:24, 93:5
**mistake** [2] - 25:13, 113:3
**mistakes** [1] - 39:15
**MMP** [1] - 119:7
**MMPI** [1] - 120:11
**MMPI-2** [9] - 79:6, 103:15, 103:17, 104:13, 104:15, 104:16, 104:19, 117:10, 118:25
**MMPI-2-RF** [10] - 76:20, 79:3, 79:6, 82:15, 86:11, 103:12, 104:14, 118:25, 119:3, 119:11
**moderate** [2] - 36:13, 94:3
**modest** [1] - 113:17
**modification** [1] - 106:8
**mom's** [2] - 97:20, 97:21
**moment** [2] - 71:12, 116:7
**Monday** [1] - 5:10
**money** [2] - 34:8, 67:6
**monitor** [1] - 67:25
**monster** [1] - 97:21
**month** [5] - 19:10, 69:2, 77:24, 78:5
**monthly** [1] - 41:24
**months** [8] - 25:19, 25:21, 48:4, 83:8, 83:10, 116:4, 116:13
**mood** [1] - 83:16
**morning** [6] - 5:1, 5:11, 61:1, 101:15,

101:23, 121:9
**MOSAIC** [3] - 1:6, 127:10, 128:3
**Mosaic** [2] - 5:6, 5:15
**Moscow** [2] - 68:14, 68:15
**most** [15] - 24:25, 25:1, 25:3, 25:5, 34:8, 36:4, 36:5, 43:8, 67:5, 70:13, 76:5, 76:23, 86:21, 103:16
**mostly** [7] - 8:19, 8:25, 45:25, 104:11, 104:12, 106:7, 110:4
**mouth** [2] - 66:13, 119:14
**move** [3] - 39:25, 40:14, 109:9
**moved** [1] - 94:10
**movement** [1] - 85:1
**moving** [4] - 7:19, 17:15, 80:4, 98:9
**MR** [51] - 5:14, 5:18, 5:25, 6:2, 11:1, 11:5, 11:7, 13:22, 14:1, 14:3, 48:2, 48:10, 48:14, 49:21, 50:16, 50:20, 51:1, 52:13, 52:20, 53:4, 53:6, 63:23, 64:18, 64:22, 65:2, 69:5, 69:8, 72:7, 72:9, 73:4, 73:9, 73:11, 73:14, 73:23, 74:15, 92:18, 100:15, 102:16, 102:19, 102:22, 122:5, 122:10, 122:14, 122:18, 122:24, 123:1, 123:5, 123:7, 125:19, 125:23, 125:25
**MS** [54] - 5:16, 9:19, 11:3, 11:6, 13:20, 13:24, 14:2, 32:24, 47:23, 48:3, 48:11, 48:16, 48:21, 48:24, 49:20, 50:1, 50:15, 50:17, 50:21, 51:3, 52:10, 52:16, 52:24, 53:5, 53:7, 69:21, 72:5, 72:11, 72:13, 73:25, 74:16, 92:15, 96:20, 99:4, 100:13, 102:14, 102:17, 102:20, 102:25, 104:8, 119:18, 122:2, 122:7, 122:11, 122:15,

122:19, 122:22, 122:25, 123:6, 123:11, 123:14, 123:17, 125:20, 125:24
**Multiphasic** [2] - 75:20, 79:15
**multiple** [3] - 28:7, 41:2, 42:18
**multiplicity** [3] - 61:12, 61:15, 62:8
**multivolume** [1] - 23:17
**muscular** [1] - 106:8
**must** [3] - 43:23, 44:6, 86:25
**must've** [1] - 29:22

## N

**name** [1] - 5:1, 6:3, 13:1, 42:25, 59:4, 63:10, 75:17, 104:4, 124:5, 124:6, 125:11
**narrative** [3] - 29:6, 30:4, 51:20
**narrowed** [1] - 23:12
**nation** [1] - 17:12
**nature** [10] - 8:20, 9:4, 16:6, 50:4, 62:10, 62:21, 83:12, 84:19, 110:6, 115:1
**nausea** [1] - 110:9
**near** [1] - 63:21
**necessarily** [5] - 54:15, 88:21, 91:2, 98:19
**necessary** [7] - 16:3, 59:12, 59:23, 66:2, 84:11, 113:16, 113:20
**neck** [1] - 110:4
**need** [41] - 6:19, 7:12, 8:9, 10:9, 19:1, 19:14, 20:7, 20:19, 21:5, 22:22, 28:18, 33:12, 39:4, 40:8, 43:14, 46:25, 49:22, 54:1, 54:2, 54:4, 54:7, 54:8, 54:19, 54:22, 56:1, 59:9, 64:18, 65:16, 65:20, 66:18, 66:19, 67:7, 84:9, 92:1, 108:3, 114:5, 114:15, 119:21, 120:10, 123:8
**needed** [7] - 18:7, 26:9, 26:15, 29:11,

54:14, 77:14, 117:4
**needs** [18] - 56:21, 56:23, 57:3, 57:5, 57:12, 58:19, 59:15, 59:20, 59:21, 59:22, 59:24, 60:6, 60:10, 91:10, 112:10, 112:14, 112:17, 113:12
**needs-driven** [1] - 60:6
**negates** [1] - 10:20
**negative** [1] - 84:1
**nephrologist** [1] - 42:19
**nerve** [2] - 107:18, 107:19
**nerves** [4] - 107:13, 107:16, 107:21, 107:22
**nervous** [3] - 91:4, 107:7, 107:20
**neurological** [2] - 80:20, 110:8
**neurologist** [2] - 42:19, 42:20
**neuromuscular** [1] - 106:9
**neuropsychological** [3] - 86:20, 89:7, 89:8
**neuropsychology** [1] - 86:22
**neurotic** [1] - 90:8
**never** [20] - 19:2, 21:12, 50:17, 53:18, 60:23, 61:5, 64:4, 69:17, 78:19, 84:23, 88:24, 96:6, 99:8, 100:2, 100:7, 101:15, 108:10, 111:16, 116:14, 116:15
**new** [9] - 31:7, 32:19, 32:23, 44:22, 48:5, 69:2, 70:5, 70:6
**news** [1] - 110:25
**newsletter** [1] - 44:5
**next** [9] - 28:6, 31:15, 42:1, 42:2, 42:5, 45:12, 84:12, 103:20, 119:25
**nice** [1] - 125:14
**nickel** [1] - 33:20
**night** [1] - 81:9
**nights** [1] - 67:18
**nine** [2] - 69:7, 69:8
**NO** [1] - 1:2
**nobody** [2] - 19:9, 118:1
**noise** [1] - 63:25

noncatastrophic [1] - 61:9
**noncatastrophics** [2] - 60:20, 60:21
**nondisabled** [2] - 95:8, 95:9
**none** [6] - 53:23, 54:10
**None** [1] - 128:9
**nonresponsiveness** [1] - 109:8
**nonsuicidal** [1] - 113:21
**normal** [6] - 83:2, 83:5, 84:3, 85:20, 103:19
**normally** [3] - 42:25, 110:20, 110:22
**Notary** [1] - 1:19, 129:22
**note** [4] - 12:18, 125:20, 127:16, 128:6
**Notebook** [4] - 15:6, 28:1, 35:3, 35:6
**notebook** [12] - 11:24, 11:25, 14:25, 15:16, 27:19, 27:22, 27:24, 34:3, 34:6, 35:12, 50:6, 121:3
**notebooks** [1] - 33:17
**noted** [2] - 83:6, 128:21
**notes** [13] - 8:19, 9:1, 14:20, 14:22, 38:22, 38:24, 39:1, 39:6, 40:9, 41:1, 113:4, 129:7
**nothing** [15] - 33:4, 46:13, 47:25, 48:12, 48:18, 51:5, 53:19, 54:18, 84:6, 89:3, 93:24, 101:21, 106:13, 106:17, 121:10
**notice** [7] - 7:11, 31:15, 70:6, 71:6, 71:24, 124:2
**Notice** [3] - 1:12, 4:2, 7:2
**November** [7] - 1:14, 5:10, 124:17, 127:4, 127:13, 128:5, 129:19
**number** [16] - 5:8, 7:6, 9:4, 17:20, 30:14, 53:11, 59:14, 59:15, 67:3, 91:6, 93:15, 93:20, 93:21, 93:23, 111:18, 120:12

**NUMBER** [3] - 3:1, 4:1, 128:4
**numbers** [4] - 12:6, 93:10, 93:12, 94:2
**nurses** [2] - 24:11, 25:1
**nutritional** [1] - 41:11
**nutritionist** [4] - 41:13, 41:14, 44:21, 45:3

## O

**OATH** [1] - 129:14
**oath** [1] - 5:23
**object** [6] - 9:19, 50:1, 50:15, 52:16, 102:25
**objection** [12] - 11:2, 50:16, 51:1, 52:11, 52:22, 53:6, 73:24, 96:20, 99:4, 100:13, 119:18
**objectionable** [1] - 52:15
**objective** [2] - 114:12, 115:17
**observe** [1] - 14:16
**observing** [1] - 97:10
**obtain** [2] - 95:6, 111:16
**obtained** [2] - 42:7, 54:22
**obvious** [1] - 32:11
**obviously** [5] - 29:11, 39:15, 53:17, 53:19, 75:14
**occupational** [1] - 20:10
**occur** [1] - 25:21
**occurred** [2] - 84:19, 99:24
**OF** [8] - 1:1, 1:11, 129:1, 129:2, 129:3, 129:14, 129:15, 129:16
**offered** [1] - 23:8
**office** [12] - 9:15, 34:7, 42:14, 70:14, 72:1, 94:9, 114:4, 114:7, 116:19, 116:20, 125:12, 127:13
**Office** [1] - 2:1
**official** [1] - 129:19
**often** [5] - 33:6, 37:7, 38:3, 96:21, 113:10
**old** [2] - 21:10, 103:17
**older** [5] - 7:20, 95:24, 101:2, 103:24, 104:1
**once** [1] - 10:16,

16:19, 37:4, 38:10, 43:5, 65:10, 93:25, 94:1, 114:4, 116:4
**one** [73] - 8:2, 8:4, 10:10, 11:11, 11:21, 15:22, 19:6, 20:23, 22:17, 22:22, 23:16, 25:16, 28:21, 30:21, 30:24, 31:24, 32:2, 35:22, 37:16, 37:18, 38:11, 38:20, 39:8, 40:2, 43:1, 45:12, 46:17, 46:21, 51:15, 53:21, 53:24, 54:6, 61:1, 61:11, 61:20, 65:10, 65:23, 70:14, 70:16, 74:22, 75:2, 75:18, 76:23, 77:5, 77:21, 77:23, 87:8, 89:4, 89:13, 89:14, 89:15, 90:13, 93:1, 97:6, 97:21, 99:6, 99:9, 99:15, 99:17, 104:13, 107:19, 108:5, 109:19, 109:22, 112:10, 113:18, 116:20, 117:18, 119:8
**one-and-half-hour** [1] - 8:4
**one-on-one** [1] - 38:20
**one-story** [1] - 93:1
**ones** [2] - 27:10, 80:16
**ongoing** [2] - 19:20, 86:9
**onset** [18] - 25:21, 25:23, 26:1, 26:2, 83:8, 90:21, 94:19, 94:21, 95:15, 96:21, 96:23, 97:13, 99:7, 99:23, 100:2, 100:4, 102:7, 102:8
**oops** [1] - 47:8
**open** [2] - 10:17, 74:12
**opening** [1] - 9:10
**opining** [1] - 61:23
**opinion** [5] - 26:9, 82:15, 89:4, 90:13, 114:19
**opportunity** [1] - 116:18
**optimal** [1] - 57:9
**optimum** [1] - 58:16
**options** [1] - 115:17
**OR** [1] - 128:11
**order** [6] - 10:22, 30:15, 35:19, 74:2, 74:10, 99:8

**ordered** [1] - 75:1
**organization** [1] - 70:24
**organized** [1] - 56:20
**original** [6] - 7:22, 15:23, 46:15, 46:22, 70:1, 94:8
**Orlando** [1] - 6:8
**orthopedic** [1] - 101:6
**otherwise** [3] - 7:13, 48:1, 106:12
**ourselves** [2] - 8:19, 33:13
**outcome** [2] - 24:21, 85:6
**outcomes** [2] - 25:8, 85:12
**outgrowth** [1] - 97:8
**outline** [2] - 41:13, 41:16
**outlined** [5] - 29:15, 42:16, 44:12, 45:3, 66:6
**outlines** [2] - 86:24, 103:6
**outlining** [1] - 41:8
**outside** [10] - 11:16, 34:7, 34:13, 50:13, 63:2, 66:11, 84:17, 91:1, 106:16
**outstanding** [1] - 48:6
**overall** [3] - 26:8, 85:2, 92:8
**overcome** [1] - 95:21, 118:7
**overly** [2] - 53:8, 109:22
**overnight** [3] - 10:6, 12:23, 13:16
**overreporting** [4] - 79:17, 79:25, 80:8, 108:19
**oversight** [1] - 68:2
**overwhelmingly** [1] - 36:16
**Oviedo** [4] - 1:17, 6:7, 121:21, 127:8
**OVIEDO** [1] - 6:7
**own** [14] - 7:25, 49:4, 49:5, 49:7, 61:6, 66:13, 70:19, 92:16, 92:17, 93:4, 111:14, 119:23, 119:25, 125:5
**owned** [1] - 101:5

## P

**P-E-N-N-A-C-H-I-O** [1]

- 124:6
**P.A** [3] - 1:16, 2:6, 127:7
**p.m** [2] - 1:15, 126:4
**page** [19] - 30:5, 30:11, 31:12, 31:14, 32:4, 33:20, 33:24, 56:4, 56:5, 58:6, 78:20, 78:21, 78:23, 93:9, 93:16, 108:15, 108:17, 128:7
**PAGE** [3] - 3:1, 4:1, 128:11
**PAGE/ERRATA** [1] - 128:1
**pages** [9] - 23:19, 28:2, 29:7, 30:8, 31:10, 90:5, 104:5, 129:6
**Pages** [1] - 1:9
**pagination** [1] - 29:24
**paid** [1] - 21:6
**pain** [32] - 40:19, 76:21, 79:10, 79:12, 80:20, 81:15, 82:21, 82:22, 83:17, 86:9, 94:6, 94:7, 96:9, 99:3, 101:3, 102:23, 103:12, 103:14, 104:25, 105:7, 105:19, 105:21, 105:25, 106:15, 107:14, 107:24, 108:6, 108:13, 110:3, 110:5, 111:9
**pain/chronic** [20] - 86:2, 86:3, 86:6, 87:2, 88:16, 90:23, 94:8, 94:17, 95:14, 95:16, 95:22, 95:25, 96:24, 99:13, 99:19, 100:24, 101:6, 103:3, 103:6, 106:5
**palsy** [2] - 25:18, 25:19
**paper** [5] - 36:24, 52:25, 53:2, 53:9, 88:24
**parameters** [2] - 65:21, 66:5
**part** [23] - 7:11, 10:17, 23:24, 32:12, 32:15, 33:2, 42:5, 42:12, 58:11, 60:24, 63:21, 66:21, 67:12, 79:13, 82:22, 83:2, 92:9, 93:5, 98:21, 105:20, 108:4, 112:22, 115:4
**part-time** [1] - 60:24
**participate** [8] - 82:25,

83:24, 85:19, 85:20, 85:21, 95:20, 108:10
**particular** [8] - 36:15, 45:7, 48:8, 50:18, 55:9, 64:17, 86:7, 100:11
**particularly** [4] - 8:10, 62:2, 62:5, 79:6
**parties** [1] - 129:9
**parties'** [1] - 129:9
**party** [1] - 62:24
**passing** [1] - 77:2
**past** [2] - 85:14, 91:14
**Patel** [1] - 15:8
**pathological** [1] - 90:14
**patient** [43] - 17:17, 20:21, 21:2, 25:6, 25:9, 25:11, 25:12, 25:14, 25:15, 25:25, 26:6, 29:2, 38:12, 38:13, 39:22, 42:25, 46:23, 55:8, 57:2, 57:7, 57:13, 58:14, 58:19, 59:21, 60:10, 60:13, 65:5, 76:13, 76:25, 77:14, 77:15, 88:17, 95:25, 98:11, 98:15, 105:19, 105:21, 106:10, 106:14, 108:5, 114:25, 115:14
**patient's** [4] - 17:15, 61:2, 79:19, 79:21
**patients** [18] - 25:17, 25:25, 60:15, 60:17, 60:19, 65:4, 66:11, 66:15, 66:17, 66:20, 67:1, 67:14, 68:6, 68:24, 87:11, 107:2, 117:18, 121:13
**PAUL** [6] - 1:11, 5:21, 128:2, 128:23, 129:6, 129:17
**Paul** [10] - 1:16, 5:9, 6:5, 9:7, 70:15, 73:17, 73:21, 126:2, 127:6, 127:7
**pay** [4] - 26:16, 44:7, 66:14, 67:6
**paying** [2] - 67:1, 110:22
**Pearson** [4] - 77:6, 77:9, 77:10
**peer** [4] - 23:21, 95:4, 112:19, 115:4
**peers** [2] - 85:17, 114:25
**penalties** [1] - 128:20
**Pennachio** [4] - 23:11,

70:21, 70:22, 124:4
**Pennachio's** [1] - 71:17
**people** [15] - 14:12, 24:25, 25:1, 25:2, 27:5, 27:11, 34:8, 56:9, 81:20, 84:1, 85:9, 85:11, 107:11, 121:11
**people's** [1] - 23:23
**per** [1] - 43:19
**perceive** [1] - 85:21
**perceived** [1] - 91:25
**perceives** [2] - 79:22, 91:9
**percent** [9] - 44:8, 44:12, 53:22, 76:7, 76:8, 76:9, 78:23
**perception** [8] - 40:23, 85:17, 85:24, 91:17, 91:21, 91:23
**perceptions** [3] - 81:1, 101:2, 105:21
**perfectly** [4] - 11:13, 12:7, 17:16, 72:24
**perform** [1] - 84:3
**performed** [1] - 118:23
**period** [6] - 19:1, 59:22, 83:7, 83:10, 99:20, 100:20
**periodically** [2] - 18:24, 19:1
**perjury** [1] - 128:20
**permission** [3] - 10:4, 33:13, 68:13
**persecution** [1] - 105:23
**person** [7] - 5:6, 12:22, 24:11, 42:8, 42:9, 56:7, 98:21
**personalities** [1] - 94:16
**Personality** [2] - 75:20, 79:15
**personality** [8] - 75:22, 76:23, 83:21, 83:22, 90:13, 94:15, 95:13, 98:20
**personally** [2] - 110:12, 129:17
**pessimism** [1] - 82:7
**Petersburg** [1] - 13:3
**Ph.D** [12] - 1:11, 5:10, 5:21, 31:25, 73:21, 86:15, 126:2, 127:6, 128:2, 128:23, 129:6, 129:17
**phase** [2] - 36:9, 36:11
**Phoenix** [1] - 106:4

**phone** [2] - 14:15, 15:11
**photocopy** [1] - 22:22
**photocopying** [1] - 33:15
**phrased** [1] - 38:19
**phrasing** [1] - 96:14
**physical** [15] - 20:6, 20:10, 20:13, 20:25, 36:8, 40:6, 57:9, 58:15, 84:25, 89:4, 89:9, 89:20, 90:19, 96:16, 118:1
**physically** [3] - 40:17, 98:2, 105:1
**physician** [12] - 16:11, 16:14, 17:10, 17:19, 18:1, 35:23, 42:10, 42:12, 45:12, 55:4, 78:2, 93:18
**physicians** [12] - 17:23, 18:7, 41:16, 41:20, 41:25, 42:10, 44:24, 44:25, 64:3, 78:1, 79:24, 84:7
**physiological** [8] - 40:16, 79:12, 82:20, 85:24, 90:18, 95:21, 99:16, 100:21
**physiologically** [1] - 104:24
**pick** [2] - 67:24, 68:6
**picked** [1] - 25:14
**picking** [1] - 33:22
**picky** [1] - 47:19
**piece** [4] - 7:18, 12:4, 52:25, 53:2
**pieces** [2] - 53:9, 111:1
**pinpoint** [2] - 83:19, 99:12
**place** [4] - 35:13, 36:9, 63:6, 90:17
**placed** [1] - 50:8
**placement** [1] - 60:20
**places** [1] - 124:21
**Plaintiff** [2] - 1:4, 2:4
**plaintiff** [7] - 5:6, 5:17, 22:25, 62:14, 63:12, 70:3, 70:4
**plaintiff's** [1] - 12:10
**plan** [40] - 9:9, 14:13, 16:5, 16:6, 17:21, 18:7, 18:9, 21:24, 22:4, 22:8, 27:14, 29:3, 30:3, 30:8, 30:16, 33:11, 36:10, 36:12, 44:10, 44:15, 44:19, 56:3, 56:5, 56:8, 56:17, 56:20,

57:1, 57:6, 58:12, 58:22, 59:11, 59:18, 59:20, 60:6, 60:7, 60:8, 68:4, 71:18, 71:20, 108:4
**planner** [8] - 16:5, 23:10, 24:10, 38:11, 58:13, 59:4, 59:9, 66:9
**Planners** [1] - 56:24
**planners** [5] - 17:25, 22:6, 24:5, 57:16, 57:22
**planning** [3] - 23:9, 56:11, 57:15
**Planning** [2] - 57:18, 70:24
**plans** [2] - 17:25, 59:15
**plant** [2] - 63:18, 63:19
**platform** [1] - 39:7
**play** [1] - 112:22
**playing** [2] - 63:24, 97:20
**pleased** [1] - 71:4
**PLLC** [1] - 2:1
**PMDA** [6] - 9:6, 46:14, 49:6, 70:5, 70:8, 70:15
**point** [19] - 18:16, 18:19, 22:24, 29:7, 32:23, 52:21, 67:15, 67:16, 68:21, 68:22, 78:10, 78:11, 94:2, 99:5, 99:12, 103:3, 116:1, 117:12
**points** [1] - 33:4
**poor** [7] - 80:20, 81:3, 109:15, 109:21, 110:1, 110:2
**populates** [1] - 39:8
**population** [1] - 101:8
**portion** [2] - 26:9, 39:22
**positive** [5] - 24:14, 81:18, 81:19, 81:25, 82:5
**possible** [5] - 33:18, 35:9, 68:2, 79:17, 80:1
**post** [13] - 25:19, 25:21, 97:1, 97:2, 97:13, 98:7, 98:10, 99:21, 100:19, 102:20, 103:8, 106:15
**post-traumatic** [9] - 97:1, 97:2, 97:13, 98:7, 98:10, 99:21,

100:19, 102:20, 106:15
**posted** [2] - 8:3, 72:22
**potential** [1] - 36:11
**potentially** [3] - 10:19, 10:20, 49:23
**Practice** [1] - 16:23
**practice** [22] - 8:13, 16:13, 16:15, 16:16, 16:17, 16:21, 16:24, 17:1, 17:5, 17:9, 17:13, 18:5, 55:3, 55:6, 56:18, 66:22, 66:24, 70:7, 71:7, 78:6, 123:24, 125:9
**Practices** [3] - 16:10, 86:13, 113:11
**pre** [1] - 103:8
**precedent** [1] - 18:13
**preexist** [1] - 96:10
**preexisting** [1] - 98:14
**prefer** [2] - 14:7, 88:13
**preferably** [2] - 38:13, 59:21
**preferred** [1] - 101:10
**premise** [4] - 63:16, 63:17, 64:2, 64:5
**preoccupation** [3] - 80:19, 109:15, 109:16
**preoccupied** [2] - 81:3, 109:21
**prep** [2] - 7:25, 8:4
**preparation** [4] - 14:9, 14:11, 51:23, 52:4
**prepare** [1] - 7:16
**prepared** [1] - 29:19
**preparing** [1] - 36:25
**Present** [1] - 41:5
**PRESENT** [1] - 2:10
**presentation** [1] - 57:1
**presenting** [1] - 65:14
**president** [1] - 26:18
**pressure** [1] - 104:20
**pretty** [12] - 13:4, 37:21, 48:25, 51:18, 66:19, 75:7, 77:18, 87:12, 89:2, 102:6, 109:22, 125:17
**prevent** [2] - 57:8, 58:14
**preventing** [2] - 57:11, 58:17
**previously** [2] - 33:7, 122:12
**primarily** [3] - 17:4, 40:22, 106:6
**primary** [2] - 69:1, 116:10

**print** [2] - 22:10, 22:12
**printed** [1] - 37:12
**printing** [1] - 23:20
**priorities** [1] - 65:21
**private** [1] - 44:17
**privileged** [6] - 48:1, 48:13, 48:21, 49:23, 50:22, 122:12
**Pro** [1] - 39:7
**problem** [20] - 12:16, 13:19, 15:17, 18:18, 21:5, 54:20, 66:16, 66:21, 67:12, 77:1, 77:4, 77:20, 89:23, 89:24, 105:2, 110:17, 111:3, 114:13, 116:10, 121:14
**problems** [26] - 15:13, 61:15, 61:19, 62:13, 63:20, 63:22, 77:2, 89:6, 89:7, 89:8, 89:9, 91:3, 91:8, 107:9, 109:25, 110:6, 110:7, 110:9, 111:7, 114:22, 114:23, 114:24, 115:1, 115:18, 117:22, 117:24
**procedure** [1] - 45:7
**procedures** [2] - 45:13, 45:16
**Proceedings** [1] - 126:5
**process** [3] - 23:7, 127:13, 127:15
**processes** [1] - 105:22
**processing** [1] - 110:6
**produce** [5] - 34:7, 50:24, 63:19, 72:6, 74:1
**produced** [8] - 29:19, 47:24, 48:18, 51:10, 65:10, 122:12, 125:22
**produces** [1] - 48:13
**product** [6] - 49:10, 49:11, 49:13, 49:15, 49:16, 49:18
**production** [3] - 52:19, 63:18, 74:2
**professional** [5] - 20:24, 35:19, 67:23, 79:8, 86:17
**professionalism** [1] - 71:3
**Professionals** [1] - 57:19
**professionals** [5] -

21:15, 44:23, 75:2, 75:24
**professors** [1] - 26:23
**profile** [4] - 80:2, 81:18, 103:14, 105:19
**profiles** [1] - 106:2
**profit** [1] - 66:25
**program** [24] - 20:6, 20:16, 21:13, 23:14, 57:11, 58:17, 60:6, 60:18, 61:4, 61:22, 66:14, 67:7, 68:16, 95:20, 96:1, 101:6, 106:1, 106:4, 106:5, 106:12, 114:6, 114:9
**programs** [5] - 21:17, 23:12, 46:3, 60:22, 106:6
**progress** [2] - 95:18, 114:3
**Project** [1] - 45:5
**prominently** [1] - 9:10
**proofreader** [1] - 39:16
**properly** [1] - 14:21
**proportion** [1] - 59:2
**prostheses** [1] - 98:5
**protected** [2] - 48:1, 97:11
**protections** [1] - 72:10
**protocol** [5] - 17:8, 77:8, 79:18, 80:13, 108:24
**proud** [1] - 84:18
**proves** [1] - 88:6
**provide** [15] - 10:10, 10:22, 22:20, 24:4, 34:3, 53:12, 53:14, 57:8, 57:10, 58:15, 58:16, 58:17, 65:16, 66:15
**provided** [1] - 76:17
**provides** [5] - 10:23, 11:3, 56:20, 74:5, 75:18
**provision** [1] - 21:20
**provisions** [1] - 10:23
**psychiatric** [5] - 74:1, 74:8, 74:12, 74:18, 117:21
**psychiatrist** [13] - 74:11, 82:11, 82:12, 113:20, 113:22, 115:21, 115:23, 116:3, 116:18, 117:1, 117:7, 117:15, 120:21
**psychological** [36] -

10:2, 10:3, 14:3, 16:7, 18:12, 19:25, 21:25, 40:7, 40:16, 40:20, 74:18, 75:11, 75:13, 78:1, 79:11, 82:9, 82:19, 82:24, 83:3, 83:18, 84:20, 85:3, 86:8, 87:4, 89:4, 89:7, 89:9, 91:2, 91:4, 92:8, 96:10, 106:7, 106:18, 111:8, 117:21, 118:2
**psychologically** [5] - 85:1, 104:22, 106:17, 117:23, 118:4
**psychologist** [8] - 12:21, 16:11, 16:12, 18:13, 18:16, 86:14, 86:20, 101:7
**psychologists** [2] - 75:23, 86:21
**Psychology** [3] - 16:10, 86:13, 113:11
**psychology** [1] - 86:15
**psychopathic** [4] - 90:11, 90:12, 105:11, 105:12
**psychopharmacolog ist** [1] - 116:25
**psychotropic** [4] - 82:9, 113:17, 116:2, 116:5
**PT** [1] - 20:17
**Public** [2] - 1:19, 129:22
**public** [1] - 10:16
**public's** [1] - 10:19
**publication** [1] - 104:4
**published** [4] - 28:14, 28:16, 56:18, 77:9
**pull** [6] - 11:16, 16:20, 33:14, 100:25, 112:14
**pulled** [3] - 37:13, 75:5, 97:25
**pulling** [1] - 47:12
**pulmonary** [1] - 16:15
**Pulmonologist** [3] - 15:1, 15:2, 15:3
**punch** [1] - 39:8
**punctuation** [1] - 39:15
**purpose** [2] - 16:1, 24:21
**Pursuant** [1] - 1:12
**pursue** [2] - 67:10, 96:2

**push** [1] - 96:1
**pushed** [1] - 121:11
**pushing** [1] - 77:21
**put** [18] - 9:9, 11:15, 12:3, 33:14, 34:5, 35:18, 47:5, 88:24, 90:17, 99:8, 105:18, 107:3, 112:5, 119:14, 122:16, 125:5, 125:6
**puts** [1] - 120:17
**putting** [2] - 18:4, 24:10

## Q

**Qazi** [1] - 15:7
**qualify** [1] - 61:22
**quality** [2] - 45:6, 67:25
**quantitative** [1] - 87:23
**quarterly** [1] - 44:5
**questionnaire** [4] - 14:15, 29:4, 43:5, 53:15
**questionnaires** [4] - 14:14, 14:17, 14:23, 35:4
**questions** [29] - 8:10, 10:19, 14:20, 21:5, 21:7, 29:4, 29:15, 35:5, 37:4, 37:5, 41:8, 43:8, 43:10, 54:14, 54:25, 75:10, 76:2, 76:4, 76:7, 76:11, 76:12, 77:2, 77:3, 102:8, 109:7, 109:8, 111:3, 120:22
**quick** [4] - 12:18, 14:24, 46:8, 113:4
**quickly** [2] - 15:16, 66:19
**quite** [6] - 38:15, 71:23, 79:20, 85:24, 104:18, 117:3

## R

**raise** [2] - 90:4, 91:9
**raised** [2] - 11:1, 79:16
**ran** [2] - 76:3, 101:7
**rapport** [1] - 19:12
**rarely** [1] - 39:15
**rate** [3] - 43:22, 43:23, 67:5
**rated** [1] - 91:15
**rather** [8] - 44:7, 44:9,

reasonably [1] - 67:11
reasons [2] - 79:5, 111:18
reboot [2] - 107:8, 107:10
rebooting [1] - 107:7
receive [3] - 12:14, 32:19, 127:15
Received [1] - 28:4
received [8] - 28:5, 32:25, 33:3, 35:1, 35:2, 35:4, 48:9, 53:18
receiving [1] - 116:1
recently [1] - 115:25
receptive [1] - 19:13
recess [1] - 73:19
recessed [1] - 126:4
recognition [2] - 56:9, 75:23
recognize [4] - 75:22, 92:7, 101:18, 104:21
recognizing [1] - 101:14
recommendation [1] - 19:3
recommendations [11] - 18:3, 18:6, 20:12, 28:24, 28:25, 29:6, 29:16, 33:2, 70:7, 70:18, 124:1
recommended [3] - 27:9, 45:2
record [17] - 6:4, 11:9, 21:23, 28:21, 31:17, 35:21, 36:3, 58:5, 73:4, 73:9, 73:18, 73:22, 73:24, 84:9, 123:21, 126:3, 129:7
Records [3] - 4:7, 28:2, 28:3
records [19] - 9:17, 27:19, 28:3, 28:5, 28:23, 28:25, 31:22, 33:9, 34:17, 34:25, 35:18, 45:9, 54:24, 71:25, 79:19, 79:23, 102:1, 122:3, 122:19
recovery [2] - 57:9, 58:16
recreate [2] - 11:25
red [5] - 42:2, 69:13, 69:15, 69:17, 124:19
reduce [1] - 69:1
reduced [1] - 67:5
reducing [2] - 89:10, 118:16
reduction [1] - 76:11
reeducation [1] - 106:9

47:17, 47:19, 49:15, 51:16, 54:10, 103:19
raw [6] - 14:1, 42:4, 74:1, 75:11, 75:13, 77:3
re [6] - 20:17, 20:18, 20:24, 36:2, 36:3, 47:10
re-evaluation [3] - 20:17, 20:18, 20:24
re-review [3] - 36:2, 36:3, 47:10
reach [3] - 67:15, 67:16, 86:25
reached [2] - 70:22, 74:25
react [2] - 104:21, 105:5
reaction [1] - 98:24
read [19] - 24:4, 24:20, 25:2, 25:8, 26:9, 26:11, 26:15, 39:12, 43:11, 58:6, 58:12, 58:24, 59:3, 59:13, 84:9, 84:10, 127:16, 128:6, 128:20
Read [2] - 3:3, 27:2
reading [6] - 24:7, 25:5, 27:7, 38:14, 124:1, 127:13
reads [2] - 27:25, 28:2
ready [6] - 19:19, 98:5, 116:23, 116:24, 117:3, 127:13
real [7] - 14:24, 24:24, 46:8, 101:5, 112:7, 113:4, 116:7
realistic [1] - 20:13
reality [2] - 91:21, 125:10
realize [3] - 59:10, 95:24, 105:20
really [29] - 8:5, 37:2, 39:1, 60:24, 62:17, 64:7, 64:9, 67:20, 71:1, 71:22, 80:9, 83:1, 84:16, 91:10, 92:1, 97:5, 98:8, 99:5, 99:13, 101:12, 103:20, 111:4, 111:5, 112:11, 113:23, 117:13, 120:1, 120:19, 125:7
realty [2] - 60:5, 86:7
REASON [1] - 128:11
reason [10] - 15:25, 25:15, 40:2, 46:16, 55:11, 60:25, 62:6, 62:9, 97:17, 100:1
reasonable [1] - 17:16

reestablish [1] - 19:19
refer [5] - 8:11, 28:19, 60:14, 60:15, 106:3
reference [2] - 92:15, 92:16
REFERENCE [2] - 127:10, 128:3
referenced [1] - 27:20
referral [2] - 15:23, 46:22
referred [4] - 39:22, 44:25, 66:12, 108:21
reflection [1] - 84:6
refreshed [1] - 8:7
refuse [1] - 77:19
refused [1] - 26:15
regard [1] - 112:15
regarding [5] - 61:24, 63:7, 72:14, 82:1, 113:5
regardless [1] - 59:22
REGENCY [1] - 127:1
Regency [1] - 5:3
region [1] - 43:21
Regional [1] - 29:9
regular [1] - 33:15
regulations [2] - 22:6, 33:16
rehab [2] - 20:9, 67:7
Rehabilitation [2] - 57:19, 65:11
rehabilitation [9] - 20:1, 20:3, 20:4, 20:6, 21:25, 65:13, 86:16, 86:18, 95:19
reinforce [1] - 99:18
reiterate [1] - 42:21
related [5] - 50:22, 51:6, 52:17, 72:17, 108:8
relates [2] - 80:25, 105:10
relation [1] - 70:20
relations [1] - 95:4
relationship [8] - 68:15, 86:10, 86:23, 86:24, 101:20, 103:12, 103:14, 105:15
relative [2] - 129:8, 129:9
relatively [4] - 40:2, 66:22, 101:25, 106:2
release [6] - 10:16, 42:1, 74:20, 74:25, 75:3, 77:15
released [2] - 63:20, 77:12
releases [1] - 75:1
releasing [1] - 74:23

reliability [1] - 24:16
reliable [1] - 85:22
relied [6] - 27:13, 36:24, 50:13, 52:8, 53:2, 54:16
relieve [1] - 44:4
rely [6] - 40:11, 53:20, 53:25, 54:11, 55:5, 55:10
remain [1] - 29:2
remainder [2] - 18:17, 95:5
remained [1] - 22:18
remaining [1] - 23:25
remains [1] - 79:23
remember [8] - 9:25, 12:19, 14:6, 47:3, 47:11, 63:5, 63:14, 103:21
reminds [1] - 7:3
removed [2] - 35:20, 77:22
repeat [5] - 6:15, 37:10, 38:3, 65:25
repetitive [1] - 107:14
replace [3] - 22:5, 34:1, 34:4
report [53] - 7:23, 9:8, 9:9, 28:15, 28:16, 29:8, 29:19, 29:21, 29:22, 29:25, 30:1, 30:2, 30:4, 30:19, 31:3, 31:4, 31:6, 31:9, 32:9, 32:10, 32:12, 32:20, 32:21, 36:25, 39:6, 39:12, 39:19, 39:21, 39:24, 40:1, 43:12, 47:13, 50:12, 50:14, 52:9, 52:18, 53:5, 59:1, 61:23, 71:17, 71:20, 74:14, 78:11, 78:14, 78:16, 90:6, 93:9, 99:23, 108:16, 129:5
Report [1] - 4:5
REPORTED [1] - 1:18
REPORTER [2] - 121:22, 129:1
reporter [6] - 13:11, 13:15, 13:21, 13:23, 34:22, 121:25
Reporter [3] - 127:21, 129:5, 129:12
Reporter's [1] - 3:5
Reporting [1] - 5:3
REPORTING [1] - 127:1
reports [9] - 27:18, 27:20, 32:20, 70:5, 72:5, 79:24, 81:17,

82:4, 84:8
represent [4] - 50:8, 76:19, 79:22, 79:25
representatives [1] - 57:17
represented [2] - 6:22, 57:23
representing [2] - 5:14, 63:11
represents [2] - 36:17, 51:13
Republic [1] - 121:13
request [3] - 48:2, 48:7, 74:2
requested [1] - 129:6
requesting [1] - 66:12
require [7] - 16:6, 17:15, 29:15, 43:22, 84:4, 99:15, 117:15
required [3] - 44:2, 116:3, 128:8
requirement [4] - 17:13, 116:6, 116:12, 117:16
requirements [4] - 23:4, 23:6, 57:2, 60:9
requires [1] - 36:9
Research [1] - 70:24
research [19] - 17:2, 17:3, 17:6, 18:5, 24:6, 24:22, 25:8, 25:12, 44:22, 45:5, 45:7, 45:12, 55:5, 55:6, 56:19, 70:19, 76:3, 123:23
researched [2] - 75:21, 76:23
resistant [1] - 108:8
resolved [5] - 89:15, 89:21, 89:22, 91:17, 91:18
resort [1] - 106:11
respect [2] - 79:7, 114:2
respond [6] - 15:4, 37:11, 43:5, 50:2, 66:7
responded [12] - 15:2, 40:7, 40:10, 40:13, 40:14, 40:23, 48:4, 48:7, 50:6, 53:13, 109:5, 109:7
responding [2] - 6:16, 54:21
responds [1] - 37:12
response [22] - 9:22, 38:4, 40:8, 40:17, 40:18, 50:25, 51:3, 54:3, 54:13, 55:16,

62:24, 74:1, 75:19,
79:9, 80:11, 82:24,
84:2, 84:21, 84:25,
104:20
**responses** [8] - 37:13,
38:18, 40:16, 53:24,
79:21, 79:25, 91:5,
109:12
**responsibility** [1] -
44:4
**responsible** [2] - 42:9,
62:25
**responsiveness** [1] -
109:9
**rest** [7] - 39:25, 65:12,
67:4, 79:20, 80:14,
105:3, 108:24
**restate** [1] - 52:10
**restricted** [1] - 22:17
**restroom** [1] - 73:12
**result** [4] - 41:14,
79:10, 84:4, 86:9
**resulting** [1] - 82:23
**results** [2] - 44:13,
82:15
**retain** [1] - 110:22
**retained** [4] - 12:21,
50:19, 64:6, 64:8
**retainer** [1] - 46:23
**return** [1] - 18:24
**review** [14] - 23:21,
36:2, 36:3, 38:16,
38:17, 47:10, 49:23,
50:5, 50:17, 70:3,
80:6, 122:3, 122:5,
129:6
**reviewed** [9] - 7:18,
7:20, 33:9, 35:1,
50:6, 51:23, 52:1,
54:24, 70:19
**reviewing** [3] - 28:6,
38:11, 114:11
**revised** [2] - 71:20
**Revision** [2] - 12:2,
12:3
**RFP** [2] - 48:3, 51:3
**RHONDA** [3] - 1:3,
127:10, 128:3
**Rhonda** [6] - 5:5, 37:3,
63:7, 79:14, 82:8,
125:21
**Rick** [2] - 2:10, 5:1
**ring** [1] - 27:22
**risk** [9] - 26:20, 82:12,
111:11, 112:5,
115:21, 119:5,
119:24, 120:14,
120:19
**risks** [2] - 80:23,
120:17

**Rob** [1] - 116:19
**Robinson** [4] - 42:24,
43:1, 43:3, 53:22
**Rodriguez** [1] - 42:24
**role** [2] - 65:13, 66:10
**room** [2] - 77:7,
125:15
**Rosomoff** [1] - 106:4
**roughly** [2] - 69:1,
97:19
**row** [1] - 66:18
**rubber** [2] - 18:1,
18:10
**rubber-stamp** [1] -
18:1
**rubber-stamped** [1] -
18:10
**rude** [1] - 63:1
**rule** [4] - 9:21, 10:9,
11:3, 11:5
**Rule** [3] - 11:6, 29:25,
30:19, 31:6, 72:10
**rules** [1] - 10:2
**rulings** [1] - 75:7
**run** [3] - 61:13, 77:4,
108:12
**running** [1] - 114:22
**runs** [1] - 107:21
**RYAN** [1] - 2:5
**Ryan** [1] - 5:15

## S

**sac** [1] - 107:16
**sanction** [1] - 77:24
**sanctioned** [2] -
74:21, 75:5
**sanctions** [4] - 77:22,
77:23, 78:1, 78:2
**sat** [1] - 124:24
**satisfaction** [1] - 82:3
**satisfied** [1] - 17:6
**Saturday** [1] - 121:12
**saves** [1] - 34:7
**saving** [1] - 44:18
**saw** [8] - 41:11, 41:17,
43:5, 45:24, 85:14,
88:19, 92:3, 92:7
**Scale** [1] - 103:18,
104:18
**scale** [6] - 66:18,
66:21, 67:2, 67:4,
80:10, 103:20,
105:11, 105:16,
108:24, 109:11,
118:24, 119:3,
119:8, 120:1, 120:2,
120:4, 120:16
**scaled** [1] - 104:11

**scales** [11] - 79:7,
79:16, 80:2, 80:14,
105:10, 109:4,
109:11, 119:3,
119:7, 119:9, 120:4
**scary** [2] - 90:15,
90:16
**schedule** [2] - 41:17,
127:14
**schizophrenia** [1] -
105:16
**schizophrenic** [1] -
105:17
**school** [5] - 68:13,
68:15, 68:18, 85:8
**score** [1] - 85:7
**scores** [2] - 80:14,
108:24
**Scores** [1] - 79:16
**screening** [1] - 119:9
**seal** [1] - 129:19
**second** [12] - 7:10,
7:11, 9:12, 16:7,
18:12, 28:4, 45:22,
88:18, 99:9, 100:20,
107:13, 113:1
**secondary** [4] - 57:8,
58:14, 84:20, 86:4
**section** [21] - 8:23,
9:13, 9:15, 10:9,
12:5, 31:15, 39:13,
40:22, 41:6, 41:7,
42:1, 42:2, 42:5,
46:12, 46:13, 46:21,
47:13, 53:14, 76:4,
93:14
**sections** [2] - 8:25,
53:12
**secure** [2] - 33:18,
39:17
**security** [1] - 46:7
**Security** [4] - 43:24,
44:1, 46:6
**sedative** [1] - 107:6
**see** [46] - 8:2, 15:5,
16:25, 23:24, 28:9,
29:12, 30:13, 32:4,
32:7, 39:20, 40:1,
40:13, 43:2, 45:20,
46:8, 46:22, 47:22,
50:23, 52:6, 57:23,
58:19, 69:2, 77:7,
78:3, 78:25, 85:19,
88:21, 94:10, 95:7,
97:10, 100:8,
103:21, 109:3,
110:16, 111:5,
111:16, 111:18,
113:4, 116:3,
116:13, 116:16,

116:21, 117:18,
122:9, 123:19,
124:14
**seeing** [10] - 21:1,
21:2, 41:12, 41:14,
41:16, 47:21, 83:23,
94:23, 100:22,
118:11
**seek** [1] - 60:1
**seeking** [1] - 23:14
**sees** [3] - 40:17,
82:19, 109:22
**sell** [1] - 77:19
**seminar** [1] - 23:3
**send** [7] - 7:10, 10:5,
12:22, 13:20, 13:22,
34:22, 125:21
**sending** [4] - 9:8,
13:24, 107:14,
121:24
**sense** [5] - 19:7,
63:16, 63:17, 65:21,
99:10
**sensible** [1] - 57:1
**sent** [11] - 9:11, 48:7,
48:23, 49:1, 70:2,
70:3, 71:10, 71:18,
71:21, 124:2
**sentences** [1] - 39:14
**separate** [4] - 12:5,
12:11, 28:13, 119:2
**separated** [2] - 49:3,
125:1
**separately** [2] - 35:10,
40:18
**series** [1] - 108:1
**serious** [1] - 77:20
**serve** [1] - 71:2
**SERVICE** [1] - 127:1
**services** [2] - 20:5,
21:20
**serving** [1] - 70:23
**session** [1] - 19:6
**set** [6] - 9:15, 26:7,
68:14, 71:21, 114:5,
114:21
**sets** [1] - 23:16
**setting** [2] - 46:15,
61:18
**settled** [1] - 61:17
**seven** [3] - 28:13,
31:24, 107:23
**several** [5] - 14:13,
30:25, 48:4, 79:5,
102:17
**severe** [13] - 60:24,
74:9, 74:11, 83:12,
83:16, 86:18, 90:14,
90:15, 94:4, 96:25,
97:4, 97:5, 111:6

**severely** [4] - 90:16,
97:6, 97:7, 101:10
**sexual** [2] - 81:17,
82:4
**shame** [1] - 64:1
**shape** [3] - 85:23,
103:16, 103:19
**share** [1] - 46:25
**SHEET** [1] - 128:1
**Sheet** [2] - 3:4, 4:8
**sheet** [13] - 9:8, 35:3,
42:3, 53:16, 69:24,
71:14, 123:22,
124:12, 124:19,
125:4, 125:6,
127:17, 128:7
**sheets** [3] - 9:3, 34:4,
128:8
**shelf** [1] - 11:16
**shifts** [1] - 36:6
**shortly** [1] - 18:6
**should've** [2] - 54:9,
54:10
**show** [9] - 14:24, 36:8,
44:19, 59:22, 76:18,
100:20, 100:23,
111:2, 115:16
**showed** [3] - 29:10,
34:4, 44:14
**showing** [5] - 24:3,
33:3, 54:14, 103:3,
103:9
**shows** [5] - 31:19,
45:15, 82:7, 109:14,
109:21
**shuffled** [1] - 125:15
**shuts** [1] - 107:19
**shutting** [1] - 107:6
**sibling** [1] - 113:6
**sick** [1] - 101:8
**side** [4] - 11:21, 65:17,
66:7, 117:2
**sided** [2] - 11:22
**sign** [2] - 127:16,
128:7
**signals** [1] - 107:14
**SIGNATURE** [1] -
128:1
**significance** [2] -
36:13, 36:14
**significant** [18] -
36:13, 37:22, 76:11,
82:7, 86:8, 89:11,
89:24, 89:25, 90:9,
90:20, 94:19, 95:10,
95:17, 96:23, 99:11,
105:2, 108:11,
108:14
**significantly** [1] - 83:4
**signify** [2] - 35:16,

93:12
**signing** [1] - 127:13
**signs** [1] - 103:9
**similar** [1] - 103:9
**simple** [1] - 52:14
**simpler** [1] - 15:5
**simply** [9] - 25:24, 75:24, 84:19, 85:21, 89:18, 96:2, 100:7, 101:14
**Sincerely** [1] - 127:18
**single** [11] - 5:6, 30:11, 32:20, 52:25, 53:2, 53:13, 61:11, 69:2, 83:7, 83:11, 89:20
**sit** [4] - 36:1, 65:19, 92:1, 125:14
**sitting** [2] - 52:24, 87:15
**situation** [3] - 89:21, 98:12, 115:7
**six** [12] - 21:1, 21:6, 25:19, 25:21, 29:7, 37:24, 38:1, 77:24, 78:5, 83:8, 83:10, 107:23
**six-month** [2] - 77:24, 78:5
**skews** [1] - 10:18
**skipped** [1] - 84:14
**slack** [1] - 67:24
**slapped** [2] - 10:11, 10:12
**sleep** [3] - 81:5, 102:1
**sleeping** [1] - 101:23
**sleeve** [1] - 97:22
**sleeves** [1] - 97:22
**sliding** [4] - 66:18, 66:21, 67:2, 67:4
**slight** [1] - 38:18
**slightly** [5] - 7:4, 17:18, 57:25, 58:3
**slip** [1] - 125:12
**slow** [2] - 67:17, 67:22
**smarter** [1] - 54:9
**smiling** [1] - 125:14
**so...** [2] - 45:16, 123:18
**Social** [4] - 43:24, 44:1, 46:6
**social** [12] - 46:6, 81:2, 82:21, 83:24, 84:13, 85:9, 85:10, 85:16, 85:17, 94:24, 112:16, 112:18
**socialize** [1] - 112:20
**software** [1] - 107:9
**sole** [2] - 68:11, 97:17
**solid** [1] - 114:20
**solve** [1] - 25:10

**solving** [3] - 86:6, 114:23, 115:18
**somatic** [13] - 80:14, 81:4, 103:18, 104:17, 108:25, 109:1, 109:10, 109:14, 109:16, 109:20, 110:10, 111:25, 112:2
**Somatic** [1] - 80:19
**someone** [8] - 18:24, 44:3, 59:1, 59:17, 67:8, 86:13, 113:10, 116:18
**sometimes** [4] - 35:21, 36:5, 37:9, 124:24
**somewhat** [2] - 37:5, 87:6
**soon** [1] - 67:11
**sorry** [15] - 14:5, 17:1, 28:1, 31:5, 51:25, 52:20, 55:20, 56:24, 59:7, 63:23, 84:15, 90:25, 92:14, 92:23, 124:8
**sort** [2] - 96:18, 102:10
**sought** [2] - 55:15, 55:16
**sounds** [1] - 25:2
**source** [2] - 42:7, 70:11
**South** [3] - 2:2, 46:2, 46:4
**Southshore** [5] - 31:19, 32:2, 32:3, 32:4, 32:7
**Soviet** [1] - 68:12
**speaking** [1] - 15:12
**specialist** [1] - 42:13
**specialists** [2] - 42:11, 42:12
**specialty** [3] - 16:14, 41:12, 86:18
**specific** [9] - 8:20, 10:23, 16:21, 27:8, 43:20, 74:8, 74:11, 114:21, 115:15
**specifically** [12] - 8:24, 23:18, 29:14, 63:9, 63:10, 71:16, 74:5, 75:19, 86:2, 88:19, 100:11
**specifics** [1] - 39:20
**Spector** [2] - 2:10, 5:2
**spectrum** [1] - 87:8
**speech** [2] - 20:10, 26:24
**spell** [1] - 124:5

**spells** [1] - 44:10
**spend** [1] - 101:9
**spit** [1] - 114:13
**spoken** [1] - 64:7
**St** [1] - 13:3
**staff** [3] - 21:8, 21:9, 43:4
**staffed** [1] - 41:25
**staffing** [1] - 35:6
**stamp** [2] - 18:1, 58:8
**stamped** [1] - 18:10
**standards** [5] - 22:7, 22:18, 23:2, 23:4, 56:18
**standing** [4] - 9:6, 93:21, 99:20, 101:20
**standpoint** [6] - 16:14, 40:20, 54:7, 87:19, 106:7, 115:2
**stands** [1] - 93:23
**Staples** [3] - 33:14, 121:4
**start** [6] - 15:6, 67:22, 100:18, 100:22, 101:25, 121:8
**started** [10] - 30:17, 62:22, 70:25, 101:13, 113:25, 115:25, 121:15, 124:14, 125:3
**starting** [3] - 7:19, 99:13, 101:21
**starts** [8] - 28:9, 31:12, 41:2, 78:22, 78:24, 79:13, 116:1
**State** [2] - 1:19, 129:22
**state** [9] - 6:3, 32:11, 37:6, 52:10, 57:7, 58:14, 73:23, 74:17, 104:3
**STATE** [2] - 129:2, 129:15
**statement** [11] - 6:13, 23:18, 35:23, 36:15, 37:1, 46:6, 92:19, 111:23, 113:8, 117:25, 118:6
**statements** [1] - 101:24
**states** [3] - 25:18, 81:16, 86:2
**States** [3] - 5:4, 45:14, 106:25
**STATES** [1] - 1:1
**stating** [1] - 54:18
**statistics** [2] - 24:13, 25:12
**stay** [6] - 62:15, 63:15, 67:25, 113:5, 113:7,

125:18
**stayed** [2] - 83:9
**stenographic** [1] - 129:7
**stenographically** [1] - 129:5
**step** [1] - 77:21
**stick** [1] - 88:10
**stiff** [1] - 101:22
**still** [25] - 7:23, 28:17, 29:1, 38:10, 53:12, 53:13, 53:18, 54:22, 55:1, 60:25, 66:25, 74:20, 76:22, 77:9, 83:4, 85:8, 88:3, 90:15, 92:3, 101:3, 104:10, 108:6, 108:7, 111:2
**stop** [2] - 23:14, 97:19
**Stop** [1] - 42:3
**store** [1] - 110:21
**story** [1] - 93:1
**straighten** [1] - 107:10
**stress** [22] - 80:24, 81:6, 81:12, 91:8, 97:1, 97:2, 97:13, 98:7, 98:10, 98:22, 99:21, 100:19, 102:20, 104:20, 105:6, 106:15, 111:12, 111:22, 111:24, 112:6, 112:9, 118:16
**stresses** [2] - 91:3, 104:22
**stressful** [1] - 91:11
**stressors** [2] - 84:20, 91:7
**strict** [1] - 75:7
**strictly** [1] - 106:16
**strong** [7] - 76:17, 77:18, 79:5, 111:15, 113:13, 113:15, 118:25
**stronger** [1] - 89:1
**strongest** [1] - 76:23
**strongly** [3] - 71:1, 88:11, 120:20
**student** [1] - 23:11
**students** [1] - 59:17
**studied** [2] - 99:6, 102:6
**study** [1] - 25:6
**subject** [3] - 49:17, 50:23, 74:7
**submitted** [1] - 77:13
**subpoena** [4] - 47:25, 48:6, 48:9, 49:17
**subscribe** [1] - 128:20
**subset** [1] - 26:12

**subspecialty** [1] - 86:16
**substance** [1] - 37:18
**substantial** [1] - 76:16
**substantive** [2] - 80:14, 108:24
**success** [2] - 106:10, 108:2
**successful** [1] - 114:20
**sudden** [2] - 84:18, 96:25
**sue** [1] - 77:20
**sued** [3] - 62:16, 62:18, 63:16
**sufficient** [3] - 74:6, 74:23, 110:23
**sufficiently** [1] - 95:12
**suggest** [3] - 30:20, 80:5, 105:16
**suggesting** [3] - 81:18, 84:24, 85:25
**suggestion** [3] - 82:20, 117:10, 118:3
**suggests** [3] - 80:5, 82:10, 119:24
**suicidal** [19] - 80:23, 87:3, 111:11, 111:18, 112:6, 113:24, 118:24, 119:1, 119:2, 119:4, 119:5, 119:7, 119:8, 119:17, 119:25, 120:4, 120:5, 120:18, 120:19
**suicide** [13] - 82:12, 111:15, 111:17, 112:9, 112:13, 115:21, 116:23, 117:10, 117:11, 117:14, 118:22, 120:1, 120:3
**suite** [1] - 7:6
**Suite** [7] - 1:17, 2:2, 2:7, 7:5, 7:9, 127:2, 127:8
**summarize** [1] - 32:20
**summarized** [1] - 33:1
**summary** [17] - 7:22, 28:8, 28:9, 28:10, 28:11, 28:21, 31:9, 31:11, 31:12, 32:25, 35:24, 35:25, 36:2, 36:6, 36:12, 36:18, 37:14
**Summary** [1] - 31:14
**summit** [2] - 57:15, 57:16
**Sunday** [1] - 121:12
**supervisors** [1] -

114:15
**supplement** [3] - 48:15, 48:16, 60:1
**suppliers** [1] - 120:12
**Supplies** [1] - 41:6
**supplies** [2] - 41:15, 41:24
**support** [5] - 57:10, 58:16, 67:8, 116:9, 120:10
**supported** [5] - 26:22, 60:21, 61:22, 114:6, 114:8
**supporters** [1] - 120:13
**supposed** [3] - 36:7, 36:8, 47:16
**surgeon** [1] - 101:6
**surgical** [1] - 45:3
**surprise** [1] - 88:4
**surprised** [1] - 88:3
**surrounding** [1] - 81:13
**suspension** [2] - 77:24, 78:5
**swear** [1] - 5:18
**sworn** [2] - 5:22, 129:18
**symptomology** [3] - 100:18, 100:24, 103:5
**symptoms** [4] - 80:20, 101:20, 108:8, 110:8
**syndrome** [3] - 86:9, 97:2, 97:14
**system** [3] - 16:18, 107:7, 107:20
**systems** [1] - 21:18

## T

**tab** [12] - 8:24, 12:2, 12:5, 16:23, 27:25, 28:2, 40:25, 41:3, 49:4, 49:5, 49:7, 49:24
**table** [1] - 85:5
**tabs** [6] - 8:22, 8:24, 11:25, 34:4, 34:5, 41:2
**TAKEN** [1] - 1:12
**talks** [1] - 40:22
**Tampa** [6] - 2:3, 2:7, 5:5, 121:22, 121:23, 127:2
**TAMPA** [1] - 1:2
**tape** [7] - 55:22, 64:17, 64:20, 64:23, 65:1, 69:6, 73:12

**taught** [1] - 17:20
**teach** [1] - 24:13
**teaching** [2] - 23:3, 23:8
**team** [6] - 22:9, 22:15, 22:17, 42:9, 42:12
**team's** [1] - 20:9
**tearing** [1] - 11:19
**teen** [1] - 90:4
**telephone** [5] - 21:10, 37:17, 37:20, 38:21, 42:7
**ten** [11] - 17:3, 23:17, 65:10, 67:1, 102:24, 107:21, 107:22, 107:23, 107:25, 108:3
**tend** [1] - 90:10
**tension** [1] - 105:6
**tenth** [2] - 51:12, 51:15
**term** [6] - 21:18, 40:19, 43:9, 57:12, 58:18, 66:23
**terms** [12] - 12:14, 25:8, 37:3, 51:9, 83:5, 84:23, 85:16, 88:15, 89:3, 89:25, 94:13, 105:23
**test** [11] - 10:19, 42:4, 74:18, 75:17, 76:3, 76:21, 77:5, 88:1, 89:1, 103:23, 119:2
**Tested** [1] - 78:25
**testified** [2] - 5:23, 52:1
**testify** [1] - 50:19
**testifying** [1] - 74:11
**testing** [23] - 10:3, 10:4, 10:12, 10:21, 46:3, 75:19, 76:17, 76:22, 77:5, 77:8, 77:19, 78:12, 78:13, 80:3, 86:21, 87:21, 87:22, 88:6, 88:12, 89:3, 118:8, 119:23, 119:24
**tests** [2] - 77:9, 79:6
**Tests** [1] - 78:25
**text** [2] - 65:9, 101:2
**textbook** [1] - 23:18
**textbooks** [6] - 23:16, 23:17, 56:7, 57:25, 87:20
**texts** [2] - 23:23, 65:10
**that'll** [3] - 69:18, 121:3
**THE** [26] - 1:1, 5:1, 5:24, 48:19, 48:22, 63:24, 64:1, 64:16,

64:19, 64:21, 64:24, 64:25, 69:7, 72:8, 73:10, 73:13, 73:16, 73:20, 121:22, 122:21, 123:4, 123:9, 123:13, 123:15, 123:18, 126:1
**themselves** [4] - 5:13, 90:4, 95:19, 97:23
**therapeutic** [2] - 61:7, 108:9
**therapies** [3] - 20:5, 20:7, 20:20
**therapist** [3] - 21:2, 21:14, 101:14
**therapy** [19] - 20:6, 20:10, 20:11, 20:14, 20:16, 20:25, 21:4, 21:13, 98:11, 106:22, 106:24, 107:5, 107:12, 113:12, 113:13, 114:4, 115:14, 116:7
**thereafter** [1] - 18:6
**therefore** [5] - 10:17, 10:20, 25:24, 63:5, 79:24
**THEREUPON** [1] - 5:20
**they've** [6] - 95:2, 105:4, 108:11, 115:3, 124:25, 125:18
**thinking** [9] - 6:14, 80:25, 81:9, 88:15, 92:24, 100:2, 105:18, 116:23, 117:22
**third** [4] - 28:5, 53:23, 100:21, 107:15
**Thomas** [1] - 71:22
**thoughts** [1] - 81:1
**threat** [6] - 77:18, 112:11, 112:13, 113:24, 120:19
**threatened** [1] - 112:9
**three** [24] - 8:1, 16:25, 17:24, 18:19, 18:22, 18:25, 19:9, 19:10, 23:12, 27:22, 35:20, 37:16, 37:17, 38:1, 69:9, 70:14, 70:16, 71:21, 72:8, 99:10, 101:7, 116:4, 116:13
**three-ring** [1] - 27:22
**three-year** [1] - 18:25
**thrilled** [1] - 68:19
**throw** [1] - 7:21
**TIME** [1] - 1:15

**tired** [3] - 67:21, 75:25, 110:2
**tiresome** [1] - 69:3
**tissue** [1] - 98:1
**title** [3] - 25:2, 31:13, 65:12
**TO** [1] - 127:5
**today** [6] - 6:22, 8:15, 62:14, 63:9, 74:4, 102:17
**Today** [1] - 5:10
**today's** [7] - 7:12, 7:16, 14:10, 14:11, 51:23
**together** [4] - 105:19, 112:14, 114:8, 122:17
**tolerate** [1] - 20:20
**tomorrow** [3] - 121:4, 121:9, 121:16
**took** [7] - 8:5, 14:19, 33:13, 37:24, 38:9, 44:8, 65:19
**tools** [3] - 115:7, 118:6, 118:16
**top** [8] - 42:3, 59:4, 60:3, 65:24, 76:7, 76:8, 78:23, 99:19
**TORRES** [52] - 2:5, 5:14, 5:18, 5:25, 6:2, 11:1, 11:5, 11:7, 13:22, 14:1, 14:3, 48:2, 48:10, 48:14, 49:21, 50:16, 50:20, 51:1, 52:13, 52:20, 53:4, 53:6, 63:23, 64:18, 64:22, 65:2, 69:5, 69:8, 72:7, 72:9, 73:4, 73:9, 73:11, 73:14, 73:23, 74:15, 92:18, 100:15, 102:16, 102:19, 102:22, 122:5, 122:10, 122:14, 122:18, 122:24, 123:1, 123:5, 123:7, 125:19, 125:23, 125:25
**Torres** [5] - 3:2, 5:14, 49:2, 53:10, 75:8
**toss** [1] - 54:21
**tossed** [2] - 17:25, 35:22
**total** [7] - 31:23, 37:15, 37:18, 38:20, 44:7, 58:22, 89:11
**totality** [2] - 89:6, 99:17
**totally** [2] - 21:11,

99:18
**touch** [1] - 66:1
**touched** [1] - 62:24
**toward** [1] - 46:5
**train** [3] - 21:9, 21:15, 33:16
**trained** [4] - 21:12, 33:13, 33:19, 35:19
**training** [2] - 21:7, 24:12
**transcript** [7] - 127:12, 127:16, 128:6, 128:7, 128:20, 129:6
**transcription** [1] - 128:7
**transmittal** [3] - 9:23, 10:1, 46:22
**trauma** [1] - 98:4
**traumatic** [9] - 97:1, 97:2, 97:13, 98:7, 98:10, 99:21, 100:19, 102:20, 106:15
**traumatized** [1] - 98:6
**Traurig** [1] - 2:6
**travel** [3] - 67:13, 67:15, 67:17
**treat** [1] - 106:20
**treatable** [1] - 90:10
**treated** [2] - 17:12, 55:7
**treating** [6] - 16:11, 16:12, 18:13, 64:3, 65:6
**Treatment** [1] - 41:5
**treatment** [8] - 17:8, 17:15, 65:4, 87:11, 95:20, 106:16, 118:8, 118:9
**Tremp** [1] - 116:19
**trial** [2] - 28:18, 35:12
**trials** [2] - 29:25, 30:20
**tried** [3] - 10:10, 26:21, 122:8
**trigger** [5] - 96:17, 96:22, 96:23, 96:25, 99:1
**triggered** [1] - 99:2
**triggers** [2] - 96:18, 97:15
**trouble** [2] - 10:11, 14:24
**truck** [1] - 97:24
**true** [2] - 52:5, 129:7
**truly** [1] - 61:6
**trust** [1] - 71:3
**truth** [2] - 18:25, 39:17
**truthful** [1] - 37:23
**truthfully** [1] - 118:25

**try** [1] - 6:12, 21:16, 22:21, 34:1, 35:11, 51:18, 55:2, 60:3, 99:23, 100:25, 122:15

**trying** [18] - 19:3, 25:10, 26:14, 27:10, 28:24, 32:22, 36:3, 37:10, 39:5, 47:4, 54:25, 61:1, 61:16, 91:7, 91:8, 93:3, 95:3, 118:16

**turn** [6] - 27:24, 39:14, 59:25, 61:12, 61:13, 78:14

**turned** [2] - 68:16, 78:20

**turning** [1] - 95:24

**turnover** [1] - 21:8

**turns** [3] - 59:15, 59:16, 117:4

**twice** [7] - 19:9, 19:10, 37:4, 38:10, 46:17, 46:18, 114:5

**two** [42] - 11:11, 11:22, 16:24, 18:17, 18:19, 18:22, 18:25, 19:16, 22:22, 28:2, 28:20, 33:15, 33:16, 35:20, 36:22, 37:16, 37:19, 37:20, 37:25, 42:19, 42:22, 53:24, 64:20, 67:24, 68:9, 68:12, 70:14, 70:16, 75:6, 76:12, 94:2, 97:20, 99:10, 100:18, 107:25, 108:3, 112:21, 114:7, 121:8

**two-day** [2] - 107:25, 108:3

**two-headed** [1] - 97:20

**two-sided** [1] - 11:22

**type** [7] - 63:18, 74:8, 87:16, 90:14, 95:13, 98:20, 102:1

**typed** [1] - 7:4

**types** [4] - 21:17, 87:10, 94:15, 94:16

**typically** [1] - 95:9

## U

**U.S** [1] - 16:18

**uh-oh** [1] - 92:20

**um-hmm** [2] - 33:25, 108:20

**unable** [3] - 82:25,

83:1, 95:18

**unchanged** [1] - 19:3

**uncomfortable** [1] - 117:19

**uncontrolled** [1] - 29:11

**uncorrected** [1] - 7:22

**Under** [1] - 10:13

**under** [21] - 10:2, 10:18, 16:9, 21:6, 23:19, 29:13, 31:17, 34:25, 39:11, 46:14, 62:18, 72:9, 77:5, 77:10, 78:25, 86:13, 97:25, 113:11, 116:12, 128:20

**undergraduate** [1] - 46:3

**underlining** [1] - 33:22

**underlying** [1] - 117:21

**underreported** [1] - 80:11

**underreporting** [5] - 80:2, 80:7, 80:8, 80:9, 108:18

**undersigned** [1] - 129:17

**understood** [4] - 26:15, 38:7, 116:14, 119:15

**undertook** [1] - 99:23

**unemployment** [1] - 43:25

**Ungers** [1] - 64:13

**unharmed** [1] - 97:7

**unhealthy** [3] - 98:19, 109:23

**uniform** [1] - 87:12

**uninteresting** [1] - 15:14

**Union** [1] - 68:12

**United** [3] - 5:4, 45:14, 106:24

**UNITED** [1] - 1:1

**universe** [2] - 81:11, 81:14

**university** [3] - 26:18, 26:22, 26:23

**University** [4] - 23:13, 26:17, 46:2, 46:4

**unless** [10] - 15:24, 37:3, 43:16, 59:1, 61:6, 64:20, 74:25, 75:1, 86:21, 115:24

**unlikely** [1] - 18:22

**unnecessary** [3] - 57:11, 58:18, 62:20

**unquestionably** [1] -

92:9

**unrealistic** [2] - 19:21, 20:14

**unresponsive** [1] - 6:15

**unusual** [1] - 95:13

**unusually** [1] - 74:9

**unwilling** [1] - 95:19

**up** [52] - 8:22, 9:15, 11:17, 29:12, 29:15, 30:21, 33:22, 37:5, 38:19, 39:18, 39:21, 43:6, 43:9, 51:20, 54:3, 57:15, 59:18, 59:20, 59:22, 61:1, 64:4, 67:24, 68:6, 68:14, 70:13, 71:21, 74:12, 76:10, 76:13, 76:22, 81:9, 81:11, 84:9, 85:7, 87:20, 90:2, 93:21, 94:22, 97:24, 98:5, 98:8, 103:18, 104:23, 107:1, 108:4, 111:2, 113:23, 114:5, 116:2, 116:4, 117:17, 125:13

**update** [3] - 33:6, 33:7, 37:25

**updated** [3] - 30:21, 30:24, 73:6

**upheld** [1] - 17:21

**upset** [2] - 26:13, 120:9

**urological** [1] - 16:16

**urologist** [1] - 15:8

**urologists** [1] - 15:1

**useful** [1] - 24:18

**Utilization** [1] - 45:5

**utilize** [4] - 21:17, 24:6, 41:15, 106:22

**utilized** [2] - 45:6, 94:24

**utilizes** [1] - 106:21

**utilizing** [1] - 41:7

## V

**valid** [1] - 106:2

**validity** [5] - 10:20, 24:16, 79:16, 79:18, 109:4

**value** [4] - 24:24, 58:21, 58:22, 61:7

**variety** [4] - 22:8, 22:10, 97:14, 97:15

**various** [2] - 84:7, 89:9

**Vasudeva** [1] - 15:8

**verbal** [1] - 41:18

**verified** [2] - 45:11, 45:15

**versus** [8] - 25:20, 44:19, 70:18, 80:11, 100:17, 104:13, 106:4, 120:6

**vertebrae** [1] - 107:17

**viable** [1] - 29:3

**VIDEOGRAPHER** [9] - 5:1, 63:24, 64:21, 64:24, 69:7, 72:8, 73:16, 73:20, 126:1

**Videographer** [1] - 2:10

**videographer** [2] - 5:2, 73:11

**VIDEOTAPED** [1] - 1:11

**view** [1] - 38:14

**visit** [1] - 42:14

**vocational** [2] - 84:22, 89:25

**vocationally** [1] - 85:15

**VOLUME** [1] - 1:9

**Volume** [1] - 126:5

**volumes** [2] - 11:11, 23:19

**vomiting** [1] - 110:9

**voted** [1] - 22:14

**vs** [3] - 1:5, 127:10, 128:3

## W

**wait** [2] - 73:6, 125:20

**waiting** [2] - 67:9, 67:10

**waiver** [1] - 127:16

**wakes** [2] - 81:9, 81:11

**walking** [1] - 97:19

**wall** [2] - 61:13, 61:14

**wants** [4] - 68:9, 115:13, 122:3

**watch** [2] - 97:5, 97:6

**watching** [1] - 98:2

**ways** [3] - 28:20, 43:20, 114:17

**website** [2] - 24:2, 27:8

**week** [9] - 18:17, 19:9, 19:10, 19:16, 30:22, 107:2, 114:5, 114:9, 115:10

**weekly** [1] - 41:24

**weeks** [1] - 91:15

**welcome** [3] - 10:1,

13:9, 24:4

**well-founded** [1] - 118:1

**well-researched** [2] - 75:21, 76:23

**wheels** [1] - 97:25

**whereas** [1] - 120:11

**whole** [7] - 26:10, 36:19, 42:15, 48:19, 48:24, 69:15, 123:10

**wife** [1] - 104:6

**Wilbur** [1] - 94:12

**WILBUR** [1] - 94:12

**wild** [1] - 26:24

**WILLIAMS** [3] - 1:3, 127:10, 128:3

**Williams** [16] - 5:6, 5:17, 8:17, 16:3, 45:9, 45:18, 47:3, 60:12, 61:8, 72:19, 79:2, 82:16, 92:11, 102:11, 117:6, 118:23

**Williams's** [1] - 98:25

**Williams001782** [1] - 125:24

**willing** [2] - 18:15, 18:23

**window** [1] - 54:22

**WINDSORMERE** [1] - 6:7

**Windsormere** [5] - 1:16, 6:6, 7:5, 127:7

**wire** [1] - 63:25

**wish** [2] - 43:16, 73:2

**withholding** [1] - 43:25

**witness** [2] - 5:19, 5:22

**WITNESS** [17] - 5:24, 48:19, 48:22, 64:1, 64:16, 64:19, 64:25, 73:10, 73:13, 122:21, 123:4, 123:9, 123:13, 123:15, 123:18, 128:2, 129:19

**woman** [1] - 74:22

**wonderful** [2] - 68:16, 68:18

**wonderfully** [1] - 101:4

**word** [5] - 66:13, 96:17, 96:18, 96:22, 99:1

**Word** [1] - 39:11

**wording** [1] - 58:3

**words** [3] - 42:8, 119:14, 124:18

**wordy** [1] - 37:8

20

**works** [4] - 106:6,
107:11, 108:5
**world** [3] - 85:11,
112:3, 112:4
**worries** [2] - 111:25,
112:21
**worry** [6] - 46:14,
80:24, 88:12,
111:12, 111:22,
112:6
**worthwhile** [1] - 44:18
**would've** [4] - 44:2,
71:1, 80:10, 113:25
**wrapped** [1] - 97:23
**write** [10] - 14:5,
24:19, 40:2, 56:7,
63:4, 65:20, 66:1,
108:16, 108:17,
115:20
**writing** [1] - 36:18
**written** [3] - 94:11,
101:4
**wrote** [5] - 23:15,
26:20, 65:9, 77:16,
124:4
**www.
medicalbookstore.
com** [1] - 45:14

# Y

**year** [14] - 18:25,
20:23, 21:1, 21:6,
23:23, 30:13, 67:18,
75:6, 85:14, 87:6,
91:14, 116:4,
116:13, 117:16
**years** [18] - 8:13,
17:20, 18:19, 18:22,
19:8, 19:16, 19:18,
56:10, 78:10, 90:3,
90:4, 95:14, 98:17,
98:20, 101:8, 104:9,
108:3
**yellow** [4] - 33:22,
35:15, 35:16, 71:14
**younger** [1] - 91:19
**yourself** [2] - 97:10,
127:17

# Z

**zero** [1] - 55:1