**RHONDA WILLIAMS,**

      **Plaintiff,**

**v.**                                **Case No: 8:14-cv-1748-T-35MAP**

**MOSAIC FERTILIZER, LLC,**

      **Defendant.**

---

## ORDER

**THIS CAUSE** comes before the Court for consideration of Defendant's Motion to Exclude Proffered Testimony of Plaintiff's Proposed Expert Toxicologist, Dr. Franklin Mink (Dkt. 89), Defendant's Motion for Summary Judgment (Dkt. 92), and Plaintiff's responses in opposition thereto. (Dkts. 103, 102)

## I. BACKGROUND

This is a toxic tort action in which Plaintiff, Rhonda Williams, alleges that Defendant, Mosaic Fertilizer, has allowed unsafe amounts of emissions and fugitive dust (collectively, "emissions") from a phosphogypsum stack to travel from its Riverview, Florida facility to her home, resulting in numerous adverse health effects to her and diminution of her property values.

Plaintiff was born in 1967 and has lived her entire life at 4810 South 87th Street, Tampa, Florida 33619, which is approximately three miles from Mosaic's Riverview plant. Plaintiff alleges that Mosaic, through its manufacturing, chemical processing, and handling, processes and produces among other things, sulfuric acid, phosphoric acid,

fluoride products, ammoniate phosphates, animal feed phosphates, and other products. To produce the phosphoric acid, sulfuric acid is reacted with phosphate rock, creating a by-product called phosphogypsum. Approximately five tons of phosphogypsum are produced for every ton of phosphoric acid product produced. Phosphogypsum waste is then stockpiled into stacks. The stacks contain a high concentration of toxic and hazardous substances and radioactive isotopes that can become airborne.

One of the stacks is located in close proximity to Progress Village, the neighborhood in which Plaintiff has lived her entire life. She contends that layers of phosphogypsum-related dust and particulates blanket her neighborhood and contain dangerously elevated levels of toxic and hazardous substances that routinely contaminate the ambient air and whose fingerprint matches with the constituents in the emissions from the Riverview plant.

Both the U.S. Environmental Protection Agency ("USEPA") and the Environmental Protection Commission for Hillsborough County ("EPC") have released data demonstrating that monitoring stations near the Riverview plant report ambient air levels of sulfur dioxide at levels that exceed the National Ambient Air Quality Standard ("NAAQS") of 75 parts per billion (ppb), based on a one-hour average. The 75 ppb standard went into effect in June 2010 and was promulgated by USEPA as a result of scientific and medical literature examining the health hazards caused by sulfur dioxide emissions.

Hillsborough County has been found in violation of the 2010 sulfur dioxide NAAQS. See Technical Support Document, Florida, Area Designations for the 2010 SO2 Primary National Ambient Air Quality Standard ("TSD") (Dkt. 89-6 at 5). The State of Florida and

USEPA have identified Mosaic as the "likely major contributor," and "overwhelming source" of this violation and determined that the "violating monitor . . . is located approximately one kilometer to the southeast of the Mosaic Riverview phosphate fertilizer plant, a major source of So2 emissions." Id. In addition to violating the NAAQS for sulfur dioxide, Mosaic also has violated Florida's separate 100 ppb standard. Monitoring data obtained from USEPA's website for Florida's Air Quality Site, Identification Number 0109, located at the Riverview plant, demonstrated thirteen violations of Florida's twenty-four hour sulfur dioxide standard in 2008, two violations of the stricter federal standard in 2008, eleven violations of the Florida standard in 2009, ten violations in 2010, seven violations in 2011, nine violations in 2012, and two violations in 2013.

The EPC released Air Monitoring and Assessments Air Quality Technical Reports for 2010 and 2011/2012 (hereinafter, "the Reports"). The Reports compiled air quality data monitored at several monitoring stations, including a station named Gardinier and a station named East Bay, both of which are in close proximity to the Progress Village neighborhood and are geographically situated within or immediately next to the Riverview plant. The EPC monitored particulate matter, sulfur dioxide, and air toxics, as well as other air contaminants. Concerning sulfur dioxide, the Reports found that the NAAQS standard was exceeded at the East Bay monitoring site, which reported several periods of particulate matter presenting above the 100 ppb standard, for example, a one-hour high of 119 ppb in 2010, 105 ppb in 2011, and 146 ppb in 2012, and three-hour highs of 103 ppb in 2010 and 131 ppb in 2012. The State of Florida and USEPA have designated the Riverview plant as a major source of hazardous air pollutants and a major source of

sulfur dioxide as determined by the federal Clean Air Act and Chapter 213, of Florida's Administrative Code.

The Mosaic emissions also come in the form of respirable particulates, known as $PM_{10}$. These respirable particulates and/or their constituents are both short-term respiratory irritants and long-term serious and chronic health hazards. The EPC's Report included information on sampling results from 2001 to 2010 for $PM_{10}$/particulate matter. The maximum national standard for $PM_{10}$/particulate matter is 150 micrograms based on a one-hour average. The highest reported twenty-four hour average level in 2010 was 156 micrograms per cubic meter per hour at the Gardinier site, with no data reported from the East Bay site.

Williams contends that contaminates common to operations at the Riverview plant, including $PM_{10}$/particulate matter, sulfates, and toxic and hazardous substances, including but not limited to arsenic, cadmium, chromium, lead, manganese, nickel, phosphorous and zinc (collectively, "the constituent chemicals") are all present in the ambient air around her home and community. She alleges she has suffered chronic lifetime exposure to these constituents via inhalation, absorption, and adsorption. As a result, she contends she suffers from the following illnesses and injuries: G6PD associated pulmonary hypertension, restrictive pulmonary function consistent with long term asthma and its treatment, obstructive pulmonary disease, airway remodeling and reduced lung function, lower lung scarring, allergic reactions, side effects from therapeutic agents used to treat lung disorders, extreme fatigue, and intense abdominal pain. She contends that oxidative stress from chemical exposure to the emissions has also contributed to her diabetes.

Based on the injuries Plaintiff alleges she suffered, she has asserted claims against Mosaic for negligence (Count I), gross negligence (Count II), strict liability (Count III), strict liability failure to warn (Count IV), strict liability for discharge of pollutants pursuant to the Florida Water Quality Assurance Act of 1983, Section 376.302 *et seq.*, Florida Statutes (Count V), and medical monitoring and environmental testing (Count VI).

## II. DISCUSSION

### A. Motion to Exclude Expert Testimony

Mosaic seeks to exclude the report and testimony of Plaintiff's lone causation expert, Dr. Franklin Mink. Mosaic contends that the fatal flaw of Dr. Mink's opinions is not that he applied an unreliable methodology, but that he performed no methodology at all.

A plaintiff seeking to establish medical causation in a toxic tort case "must show both that exposure to the alleged toxic substance can cause a particular disease (general causation), and that exposure to the alleged toxic substance was a cause of his or her individual injury (specific causation)." Haller v. AstraZeneca Pharm. LP, 598 F. Supp. 2d 1271, 1275 (M.D. Fla. 2009) (citing Mary Sue Henefin, et al., Reference Guide on Epidemiology, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 444 (Federal Judicial Center, 2d ed. 2000)). Accordingly, to prevail on her claims, Plaintiff must first show that the constituents in the Mosaic emissions generally can cause the illnesses from which she suffers and then show that her exposure to the constituents was sufficient to actually cause or exacerbated her illnesses. "This type of proof requires expert testimony." McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005); see also Sutherland v. Matrixx Initiatives, Inc., 2006 WL 6617000, at *1 (N.D. Ala. Nov. 7, 2006) (it is "well understood that a claim that a defective product caused personal injury

of the 'toxic tort' variety cannot proceed to trial without an expert to demonstrate not only its toxicity, but general and specific causation").

Federal Rule of Evidence 702, which governs expert testimony, states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). "Daubert requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." McClain, 401 F.3d at 1237. "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (alterations and internal quotation marks omitted). "The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it." McClain, 401 F.3d at 1237.

In considering proffered expert testimony, the court should be mindful that "[t]he burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)).

The <u>Daubert</u> Court identified four factors to consider in determining if a specific methodology is reliable under Rule 702:

> (1) whether the methodology can and has been tested; (2) whether the methodology has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling operation of the methodology; and (4) whether the methodology has gained general acceptance in the scientific community.

<u>Id.</u>, 509 U.S. at 593–94. These factors are not meant to be a "definitive checklist or test." <u>Id.</u> Courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999). While the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 594–95. However, "conclusions and methodology are not entirely distinct from one another . . . [and] nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997). "Rather, the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" <u>Hendrix ex rel. G.P. v. Evenflo Co.</u>, 609 F.3d 1183, 1194 (11th Cir. 2010) (citing <u>Joiner</u>, 522 U.S. at 146).

Courts must be "particularly wary of unfounded expert opinion" when causation is at issue. <u>Reynard v. NEC Corp.</u>, 887 F. Supp. 1500, 1506 (M.D. Fla. 1995). "The uncertainty of the evidence in toxic tort cases, dependent as it is upon speculative scientific hypotheses and epidemiological studies, creates a special need for robust screening of experts and gatekeeping under Rules 403 and 703 by the court." <u>Id.</u> (internal citations, quotations marks, and alterations omitted).

Here, Plaintiff offers a single causation expert, Dr. Franklin Mink, Ph.D.[1] Dr. Mink is a toxicologist with thirty-eight years of professional experience. (Dkt. 89-1 at 2) Based on his review of several studies and his extensive education and background in the field of environmental toxicology, Dr. Mink stated the following conclusions in his expert report:

1. Rhonda Williams has been exposed to significant quantities of regulated pollutants and hazardous materials from both direct and fugitive sources as a result of Mosaic's operations including phosphogypsum mining, processing, storage, transportation and waste handling operations over her lifetime residence in Prospect [sic] Village, Florida primarily through inhalation and dermal exposures.

2. Rhonda Williams has developed significant adverse health effects as a result of these hazardous exposures including G6PD associated pulmonary hypertension and obstructive pulmonary disease, resulting in a diminished quality of life and potentially reduced life span.

3. Rhonda Williams has developed significant adverse health effects as a result of secondary effects from therapeutic agents used to treat her diseases/symptoms resulting from these exposures, further diminishing her quality of life and threatening her long-term physical and mental wellbeing.

(Id. at 2-3)

Upon review of Dr. Mink's report, the underlying studies upon which he relied, the record, and the relevant case law, the Court concludes that Dr. Mink's expert report and proposed testimony cannot survive a Daubert challenge. Critically, Dr. Mink has neglected the hallmark of the science of toxic torts – the dose response relationship. In and of itself, this is a sufficient basis for excluding his testimony. He also unjustifiably

---

[1] Mosaic also filed a motion to exclude the expert testimony of Leslie Ungers, believing that Plaintiff intended to use him as a second causation expert. However, days after filing her response to the motion to exclude Ungers, she denied that he is one of her causation experts. On January 7, 2016, Magistrate Judge Thomas G. Wilson held a hearing on Mosaic's motion to exclude as untimely a supplemental report Ungers provided to Mosaic's counsel on the morning of his deposition. At that hearing, her counsel stated: "Mr. Ungers . . . is not a causation expert. And despite Mosaic's trying to portray him as an exposure scientist, that's not what we have called him [for] and that's not his function . . . ." (Dkt. 109 at 11-12) In light of Plaintiff's representation that Ungers is not testifying as to causation and the Court's ruling on the motion to exclude Dr. Mink, the Court finds it unnecessary to address the motion to exclude Ungers.

relies on regulatory standards to determine dose, infers facts from studies that contradict his conclusions, fails to consider the background risk for Plaintiff's illnesses, fails to rule out alternative potential causes of Plaintiff's illnesses, and renders speculative and conclusory opinions about Plaintiff's exposure to Mosaic's emissions. All in all, it is clear that Dr. Mink has failed to adhere to the methodology expected of toxicologists in toxic tort cases, and he has not demonstrated a reliable basis for his opinions.

### 1. Application of Scientific Principles in Toxic Tort Cases

The Eleventh Circuit has separated toxic tort cases into two categories, "those cases in which the medical community generally recognizes the toxicity of the drug or chemical at issue" (such as asbestos, silica, and cigarette smoke), and "those cases in which the medical community does not generally recognize the agent as both toxic and causing the injury plaintiff alleges." McClain, 401 F.3d at 1239.

When the toxicity of a substance has been recognized by the medical community, an extensive Daubert analysis on the issue of general causation is unnecessary. Id. In that circumstance, the Court need only consider plaintiff-specific questions of whether the plaintiff was "exposed to enough of the toxin to cause the alleged injury and did the toxin in fact cause the injury?" Id. However, where the medical community has not recognized the toxicity of a substance, an expert's methodology must consider not only the plaintiff-specific questions of individual causation, "but also the general question of whether the drug or chemical can cause the harm plaintiff alleges." Id.

The parties dispute the proper categorization of the constituents at issue in this case. Plaintiff contends that this case falls within the first category because the scientific studies referenced in Dr. Mink's expert report and USEPA standards demonstrate that

"SO$_2$ has long been recognized by the medical and toxicology communities to cause the exact type of harm alleged by Ms. Williams." (Dkt. 102 at 13) However, as explained in detail below, the Court concludes that this case falls within the second category because Plaintiff has failed to offer any evidence of general acceptance within the medical community that sulfur dioxide and the other constituents from the Mosaic emissions cause the illnesses from which she claims she suffers.

### a. General Causation

The Eleventh Circuit has identified several types of evidence and methodologies drawn from toxicology and epidemiology that constitute reliable bases for an inference of general causation, including: "the dose-response relationship, epidemiological studies, the amount of background risk of the disease, an understanding of the physiological mechanisms involved, and clinical studies or tests." In re Denture Cream Products Liability Litigation, 795 F. Supp. 2d 1345, 1351 (S.D. Fla. 2011) (citing Michael D. Green et al., Reference Guide on Epidemiology, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 374-79 (Fed. Judicial Center 2d ed. 2000)). "A plaintiff need not provide evidence of each above-described type, but an inference of general causation that is made in the absence of any of these preferred types of evidence has been and will be deemed unreliable in this Circuit." Id.

### (1) The Dose-Response Relationship

Of all the foregoing types of evidence, the most important is the dose-response relationship. McClain, 401 F.3d at 1242. The dose-response relationship is "[a] relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change — either an increase or decrease — in risk of disease."

McClain, 401 F.3d at 1241-42 (citing Green, REFERENCE MANUAL 390). "The units of dose are typically expressed as an amount of substance per kg of body weight (mg/kg bw). Thus, if a 132 lb woman (60 kg) absorbed 60 milligrams of a chemical in a glass of contaminated water, she would have a dose of 1 mg/kg bw." In re Accutane Products Liab., 511 F. Supp. 2d 1288, 1293 (M.D. Fla. 2007) (quoting David Eaton, Scientific Judgment and Toxic Torts-A Primer in Toxicology for Judges and Lawyers, 12 J.L. & POL'Y 1, 11 (2003) (hereinafter, Eaton)).

A general principle of toxicology is that dose is critical to any evaluation of the toxicity of a drug. Id. "All substances are poisonous—there is none which is not; the dose differentiates a poison from a remedy." In re Denture Cream, 795 F. Supp. 2d at 1352 (quoting Eaton 11). Because all substances potentially can be toxic, "the relationship between dose and effect (dose-response relationship) is the hallmark of basic toxicology, and is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." Chapman v. Proctor & Gamble Distributing, LLC, 766 F.3d 1296, 1307 (11th Cir. 2014) (citations and internal quotation marks omitted).

Due to "individual variation, a toxic agent generally will not cause disease in every person exposed." McClain, 401 F.3d 1241. "[F]or most types of dose-response relationships following chronic (repeated) exposure, thresholds exist, such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual." Id. at 1242 (quoting Eaton 16). It is generally the case that "low dose exposures—even for many years—will have no consequence at all, since the body is often able to completely detoxify low doses before they do any damage." Id. (quoting

Green 13).  Therefore, to prove general causation, an expert must first "demonstrate the levels of exposure that are hazardous to human beings generally."  Id.

In this case, Dr. Mink opines that Plaintiff has developed and is developing "a number of adverse health effects primarily as a result of long-term repeated inhalation, dermal and ingestion exposures to significant quantities of hazardous material from the Mosaic phosphogypsum operation located near Progress Village."  (Dkt. 89-1 at 6)  He contends that Williams has a genetic G6PD deficiency[2] that has caused her respiratory and organ systems to be significantly exacerbated by her long-term repeated exposure to the constituents in the emissions from the Mosaic plant.  (Id. at 8)

However, Dr. Mink does not state in his report or his deposition testimony what dose of any of the constituents is required to cause Plaintiff's illnesses.  Dr. Mink admitted in his deposition that he did not independently determine dose in this case:

Q:  Did you perform any calculations in your report?

A:  We review calculations.  I didn't do independent calculations.

Q:  Did you – you didn't perform any independent calculations?

A:  No, we used other people's data.

(Dkt. 89-2 at 23)

Specifically, Dr. Mink testified that he relied upon dose calculations performed by USEPA, particularly IRIS assessments and health-based criteria such as NAAQS.  He

---

[2] Dr. Mink describes Glucose 6 phosphate dehydrogenase (G6PD) deficiency as "a hereditary condition in which red blood cells break down (hemolysis) when the body is exposed to certain foods, drugs, infections or stress."  (Dkt. 89-1 at 9)  He explains that "[i]ndividuals with G6PD deficiency do not display overt signs of the disease mutation unless their red blood cells are exposed to certain chemicals in food or medicine, certain bacterial or viral infections, or to stress.  Many people with this condition never experience symptoms. . . . Individuals with elevated exposures to G6PD triggers such as pollutants are susceptible to certain cancer types, cardiac arrest, chronic diseases of the lung, liver, blood (such as diabetes), and kidneys."  (Id. at 9-11)

also relied upon two studies of air pollution in the Tampa Bay area.  As demonstrated below, however, none of these sources provide a reliable basis for establishing dose in this case.

### (a)  Reliance upon Regulatory Standards

IRIS is the EPA's Integrated Risk Information System.  IRIS assessments are "the preferred source of toxicity information used by EPA" and "an important source of toxicity information used by state and local health agencies, other federal agencies, and international health organizations."  See "Basic Information about the Integrated Risk Information System" at https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system.  IRIS assessments provide the toxicity values for health effects resulting from chronic exposure to chemicals, including inhalation reference concentration (RfC), the concentration of a chemical that one can breathe every day for a lifetime that is not anticipated to cause harmful noncancer health effects.  Id.  Dr. Mink acknowledged that there are no IRIS assessments for the majority of the constituents at issue in this case.  Specifically, Dr. Mink testified there are IRIS assessments for arsenic, cadmium, chromium, lead, and nickel, but not for sulfur dioxide, carbon monoxide, nitrous oxides, aluminum, polonium, or decayed products.  (Id. at 83-84)  He could not recall whether there are IRIS values for: ammonia, manganese, phosphorous, or zinc.  (Id.)

For those substances for which there are no IRIS values, like sulfur dioxide — the substance he alleges to be primarily responsible for Plaintiff's illnesses[3] — Dr. Mink relied upon the NAAQS.

---

[3] Dr. Mink opined that Plaintiff's exposure to sulfur dioxide "has aggravated her asthma, caused it to be uncontrolled, resulting along with her G6PD, remodeling in her airways, which ultimately has caused obstructive pulmonary disease, and has a significant potential to cause her ultimate mortality early."  (Dkt. 89-2 at 68)

Q: But you did use RfC?

A: I used a health-based criteria that was used for the 75 part per billion non-attainment standard, that's a health-based standard, not a technology-based standard.

(Dkt. 89-2 at 82)[4]

Plaintiff defends Dr. Mink's reliance upon the NAAQS in establishing general causation for sulfur dioxide on the basis that the Clean Air Scientific Advisory Committee "conclusively determined that $SO_2$ levels in excess of the AAQS cause respiratory morbidity," which moots Dr. Mink's need to independently calculate a general causation dose. (Dkt. 103 at 7) However, the Eleventh Circuit has cautioned that toxicologists cannot rely primarily upon government regulatory standards for the purpose of determining dose, differentiating "the type of risk assessment that a government agency follows for establishing public health guidelines versus an expert analysis of toxicity and causation in a toxic tort case." McClain, 401 F.3d at 1249.

The Eleventh Circuit has relied upon the scientific principles set forth by Dr. Eaton, who explained:

It is important to recognize that the procedures commonly used in "risk assessment" for the purpose of establishing public health guidelines that represent "acceptable" exposure levels for large populations are often, in this author's opinion, of marginal relevance to estimating "causation" in an individual—*e.g.*, whether a particular chemical caused or contributed to a particular disease or illness in a given person. Although toxicological data—and the basic principles of toxicology outlined above—are useful for both (establishing guidelines for protection of public health and establishing "causation"), there are substantial differences in approach. . . .

_____

[4] As noted above, RfC in the "inhalation reference concentration," the concentration of a chemical that one can breathe every day for a lifetime that is not anticipated to cause harmful noncancer health effects, is a value assigned by the IRIS assessments. The 75 ppb non-attainment standard referenced by Dr. Mink in his answer is the NAAQS standard.

Because a number of protective, often "worst-case" assumptions . . . are made in estimating allowable exposures for large populations, these criteria and the resulting regulatory levels . . . generally overestimate potential toxicity levels for nearly all individuals. Furthermore, because these guidelines are intended to be protective of all individuals in a population, including the very young, the very old, and other potentially "sensitive" individuals, the theoretical risks from exposure at the guideline range level is likely to be substantially over-estimated for the large majority of individuals in the population. . . .

Exposures in a given individual that exceed a reference dose level do not signify that effects are likely to occur because of the margin of "safety" built into these Reference Doses which are intended to provide guidance for protecting even sensitive members of the population. Thus, such regulatory levels are of substantial value to public health agencies charged with ensuring the protection of the public health, but are of limited value in judging whether a particular exposure was a substantial contributing factor to a particular individual's disease or illness.

Id. (quoting Eaton, *supra*, at 34-36) (emphasis added). As the court further noted:

Proof of risk and proof of causation entail somewhat different questions because risk assessment frequently calls for a cost-benefit analysis. The agency assessing risk may decide to bar a substance or product if the potential benefits are outweighed by the possibility of risks that are largely unquantifiable because of presently unknown contingencies. Consequently, risk assessors may pay heed to any evidence that points to a need for caution, rather than assess the likelihood that a causal relationship in a specific case is more likely than not.

Id. (quoting Margaret A. Berger, The Supreme Court's Trilogy on the Admissibility of Expert Testimony, in Reference Manual on Scientific Evidence, 33 (Federal Judicial Center, 2d. ed. 2000)). In McClain, the court rejected the plaintiff's expert's attempt to establish general causation for a link between the chemicals in an herbal weight loss supplement and strokes and heart attacks by relying upon data collected by the Federal Drug Administration. Quoting Eaton and Berger, the court admonished that "[p]ublic health guidelines . . . should not be interpreted as predicting exact levels at which effects

would occur in a given individual" because "regulatory levels generally overestimate potential toxicity for nearly all individuals." Id. (quoting Eaton at 34-35). The court did not completely reject public health rules from consideration in a Daubert analysis. Id. at 1249. Rather, it said that "in ruling on methodology issues, the trial court should understand what the rule really means about causation for the specific plaintiff, not simply about protecting the public-at-large from risk of harm based on a risk-utility analysis of the drug." Id.

Dr. Mink contends that Plaintiff's G6PD makes her more sensitive and susceptible to adverse effects from Mosaic's emissions. However, he acknowledged that he has no actual knowledge about her increased sensitivity:

> Q: And you also said that you don't know how much more sensitive she is made by her G6PD condition; is that right?
>
> A: Again, I nor no other published expert knows.
>
> Q: So how could you conclude that she is much more sensitive as a result of her G6PD condition?
>
> A: Well, if you read the peer-reviewed literature, they are much more sensitive. They have episodes that can lead to fatality on low dose short-term exposures, which would not be very significant to you or I. I'm assuming you're not G6PD. You don't have that adverse health effect. I know I don't. So we know that. The literature is fairly strong on that association. It's a disease that reduces their protective mechanism in the red blood cells. And you can look at it clinically and see when they've had insults by their anemic events, their hemolytic anemia, which lead to a plethora of other diseases. So in reality they really don't have the protective mechanisms that we have and they tend to have high episodes. And if you combine that with any other disease, like asthma, then you see, like the Japanese studies, where they've already shown that, in court, it's causative evidence that sulfur oxides cause mortality — increases mortality, not just disease, but deaths significantly in populations. And she's much more sensitive than an asthmatic without G6PD.

Q: How do you know she is much more sensitive, is it just based on the literature?

A: Based on the literature. And again, no one can quantitate it because it's an extreme [sic] complex disease.

Q: All right. So you can't quantify it, correct?

A: You can't quantify how much more sensitive, correct.

Q: Okay. And consequently you've made no efforts to quantify how much more sensitive she is, correct?

A: Well, we made an effort. We looked through all the literature and tried to find if there was anything to base that on. I can't – I can't make things up, so if I don't have a methods or standards or peer-reviewed literature to rely on, then we know by that literature she's much more sensitive, but I nor no one else that has published knows how much more sensitive, so it would be a futile effort.

(Dkt. 89-2at 27-29)

The speculative nature of his assumptions about the effect of Mosaic's emissions and Plaintiff's G6PD is evident from his testimony. He does not cite with specificity which studies and peer-reviewed literature demonstrate the increased sensitivity of individuals with G6PD. Consequently, the Court cannot evaluate those sources and determine whether they are based on reliable methodologies or otherwise support his opinions.

Finally, Dr. Mink's inability to quantify the increased sensitivity of individuals with G6PD is fatal to his opinion. Eleventh Circuit authority is clear that expert opinions are properly excluded if they are "imprecise and unscientific, or [if their] factual basis is not adequately explained." Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1111 (11th Cir. 2005). Testifying that "the literature" says Plaintiff is more sensitive to Mosaic's emissions without being able to explain how much more sensitive neither assists the jury nor provides a reliable basis for the expert's opinions. As the Eleventh Circuit noted, "[a] regulatory agency such as the FDA may choose to err on the

side of caution.  Courts, however, are required under the <u>Daubert</u> trilogy to engage in objective review of evidence to determine whether it has sufficient scientific basis to be considered reliable."  <u>Rider v. Sandoz Pharm. Corp.</u>, 295 F.3d 1194, 1201 (11th Cir. 2002).

In sum, the Court finds that Dr. Mink has not established a sufficient scientific basis for using USEPA standards as the basis for establishing a general causation dose for exposure to sulfur dioxide or any of the other constituents.  The fact that USEPA has established 75 ppb as a "safe" level of exposure to sulfur dioxide for the public-at-large does not mean that any amount exceeding that standard is necessarily unsafe or toxic or, as discussed in greater detail below, that it was in fact unsafe or toxic to Plaintiff.  Dr. Mink's reliance upon that standard as his primary basis for general causation demonstrates but one of the flaws in his methodology.

### (b)  Reliance upon Other Studies

The unreliability of Dr. Mink's general causation analysis is also demonstrated by his reliance upon two studies conducted by other scientists.  In the first of those studies, Hsing-Wang Li and a team of scientists set out to assess the environmental and health effects of hazardous air pollutant (HAPs) metals emitted from four phosphate fertilizer plants in Central Florida, including Mosaic's Riverview plant.  <u>See</u> <u>Impacts of hazardous air pollutants emitted from phosphate fertilizer production plants on their ambient concentration levels in the Tampa Bay area</u>, Air Qual. Atmos. Heath 8: 453-467 (2014). The study determined that Manganese, Chromium, Nickel, and Selenium were the dominant HAPs emitted from the stacks.  The ambient concentration level of HAPs at six locations downwind of the plants revealed that the concentrations were lower than both

European Communities and USEPA standards. The study found that the "four phosphate fertilizer plants make minor contributions to the ambient loading of HAPs and to the health effects for the general population in the Tampa Bay area." Id. at 462  In fact, Li and his fellow researchers determined that the phosphate plants contributed only 1.14% of the analyzed HAPs, whereas other sources (marine, geological, limestone, power plant, vehicles, and incinerator) were responsible for the remaining 98.86% of HAPs.  The study purported to confirm the researchers' hypothesis that modern control devices employed in the phosphate plants have lowered exposure to HAPs to an acceptable level.  They concluded that their "results suggest the HAPs emission from phosphate fertilizer plants do not impose an elevated cancer risk or health effects to the general population." Id.

Dr. Mink testified that he relied upon the dose calculations included in Li's Report and he believed Li's study demonstrated that particles from the stacks at the Riverview plant can travel by air to Plaintiff's house and neighborhood.  Ultimately, however, Li concluded that the concentrations of HAPs detected in the study were below regulatory levels and did not pose health risks to the general population.  These findings undermine Dr. Mink's conclusion that the Mosaic emissions exposed Plaintiff to unsafe levels of chemicals.

Dr. Mink also testified that he relied upon a study authored by Jayajit Chakraborty. Conducting his study from an environmental justice standpoint, Chakraborty set out to determine if cancer risks from ambient exposure to various sources of HAPs were distributed inequitably with respect to race, ethnicity, and socioeconomic status. Cancer risk from exposure to hazardous air pollutants: spatial and social inequities in Tampa Bay, Florida, Int'l Journal of Envtl. Health Research, Vol. 22, No. 2, 165-183, 167 (April 2012).

Chakraborty analyzed the Tampa-St. Petersburg-Clearwater Metropolitan Statistical Area (MSA), using data from the USEPA 1999 National-Scale Air Toxics Assessment (NATA) to estimate exposure concentrations and health risks associated with the inhalation of HAPs from various sources. The study found that the air toxin contributing most substantially to cancer risk in the Tampa Bay MSA was benzene, followed by ethylene dibromide, carbon tetrachloride, butadine, and acetaldehyde. None of those HAPs are at issue in this case, and unlike Li, Chakraborty did not study emissions specifically from phosphate facilities.

Instead, Chakraborty defined four source categories: major point sources (facilities that emit 10 tons of one HAP or 25 tons of a combination of HAPs, like industrial facilities); area and other point sources (facilities with emissions below the "major" threshold levels, like dry cleaners); on-road mobile sources (cars, trucks, buses, etc.); and non-road mobile sources (trains, airplanes, lawn mowers, etc.). Chakraborty found that the lifetime cancer risk in persons per million for the HAP sources he reviewed were: (1) on-road mobile (10.388), (2) area and other point sources (7.461), (3) non-road mobile sources (2.213), and (4) major point sources (0.349). His study determined that densely populated tracts containing higher numbers of minorities were most likely to be exposed to cancer risk from all source categories, but notably, industrial facilities — presumably the source category in which the Riverview plant would be placed — contributed the least to cancer risks of the four sources.

Defendant does not challenge the methodology underlying the Li and Chakraborty reports. Significantly, however, the Court notes that both studies contradict Dr. Mink's opinions by concluding that pollution from industrial sources and phosphate plants are

responsible for a small percentage of pollution, compared to other sources, such as motor vehicles and coal-fired power plants. To the extent the studies measure concentrations of any of the constituents, they show that those concentrations fall below regulatory levels.

Although "Rule 702 does not necessarily mandate that the expert find a study linking the <u>exact</u> chemicals at the <u>exact</u> exposure levels with the exact illnesses at issue, it does require that the expert demonstrate a scientifically valid basis for projecting the findings of a study identifying a different chemical-illness relationship to the proffered causal theory." <u>Cavallo v. Star Enter.</u>, 892 F. Supp. 756, 766 (E.D. Va. 1995), <u>aff'd in part, rev'd in part on other grounds</u>, 100 F.3d 1150 (4th Cir. 1996).

An expert's methodology is suspect when it relies upon studies that contradict the expert's opinion. <u>See</u>, <u>e.g.</u>, <u>Joiner</u>, 522 U.S. at 144-46 (holding it was appropriate for district court to exclude expert testimony when "the studies upon which the experts relied were not sufficient, whether individually or in combination, to support their conclusions" that plaintiff's exposure to hazardous chemicals contributed to his cancer). Furthermore, "[w]hen an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study. That is, he must not draw overreaching conclusions." <u>In re Accutane Products Liability</u>, 511 F. Supp. 2d 1288, 1291 (M.D. Fla. 2007) (citing <u>McClain</u>, 401 F.3d at 1245-47). Both the Li and Chakraborty studies provide data useful to Dr. Mink's causation analysis. However, it appears that Dr. Mink used that data to reach conclusions that are at odds with the authors' conclusions. For instance, the Li report indicates that particles from the Riverview stacks have traveled to Plaintiff's neighborhood, but he concluded that those particles were unlikely to cause health risks.

Thus, there is an analytical gap between Li's findings and Dr. Mink's conclusion that Plaintiff has suffered significant adverse health effects as a result of her exposure to those particles. Although experts "commonly extrapolate from existing data . . . nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Id.

In sum, none of the sources upon which Dr. Mink relied for his dose-response assessment provides a reliable basis for his conclusions. Neither the regulatory standards nor the studies establish what level of exposure to each constituent is generally accepted to cause or contribute to Plaintiff's illnesses.

### (2) Background Risk of Disease

In addition to neglecting the dose-response relationship, Dr. Mink failed to account for the background risk of any of the illnesses suffered by Plaintiff. The background risk of disease "is the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges without exposure to the drug or chemical in question." McClain, 401 F.3d at 1243 (emphasis in original). Because the aim of toxicology is to identify "agents that are associated with an increased risk of disease, an expert must first know the background prevalence of a disease before he can determine whether the risk of that disease is increased as a result of exposure to an agent." Green, REFERENCE MANUAL at 336. Therefore, "[a] reliable methodology should take into account the background risk." McClain, 401 F.3d at 1243.

Yet, Dr. Mink testified that he was unaware of the background risk of Plaintiff's illnesses:

> Q: What is the prevalence of pulmonary hypertension in the population, the general population?

A:  I don't recall.  It's not large.

Q:  What is the prevalence of obstructive pulmonary disease in the population?

A:  I don't recall specifically, but it's significant.

(Dkt. 89-2 at 159)

Ignorance of the background risk for an illness or disease is a "serious methodological deficiency" and "substantial weakness" in an expert's general causation reasoning.  <u>Chapman</u>, 766 F.3d at 1307-08.  "Without a baseline, any incidence may be coincidence," which renders unreliable any inference that an individual's illness is caused by a particular agent.  <u>Id.</u> at 1308.  The Court thus considers Dr. Mink's failure to account for the background risk of Plaintiff's illnesses as further evidence of his flawed methodology.

In sum, the Eleventh Circuit has stated that "knowledge of dose-response, epidemiological evidence, and background risk of disease [are] methodologies this circuit has recognized as indispensable to proving the effect of [a toxic] substance."  <u>Id.</u>  Dr. Mink's failure to perform dose-response calculations for any of the constituents and lack of knowledge of the background risks of Plaintiff's diseases render his general causation opinions speculative and unreliable.  The Court concludes that his testimony must be excluded because he has failed to establish general causation in this case.

### b. Specific Causation

Without an adequate basis for establishing general causation, Dr. Mink's specific causation opinions are irrelevant.  <u>See</u> <u>Rink v. Cheminova</u>, Inc., 400 F.3d 1286, 1294 (11th Cir. 2005) (noting that, without an expert's foundational testimony that a chemical

used in a pesticide was defective, thus creating elevated levels of another toxic chemical, testimony from toxicologists regarding the congruence between plaintiffs' exposure to the chemicals and their ailments was irrelevant); Sutherland v. Matrixx Initiatives, Inc., 2006 WL 6617000, at *11 (N.D. Ala. Nov. 7, 2006) ("If a plaintiff is unable to establish general causation, the need to consider whether the plaintiff has established specific causation disappears. The first is necessary to the second."). Nevertheless, the Court believes a discussion of Dr. Mink's specific causation analysis shines further light on the flaws in his methodology and further supports the exclusion of his testimony.

"Specific causation refers to the issue of whether the plaintiff has demonstrated that the substance actually caused injury in her particular case." Chapman, 766 F.3d at 1308 (quoting Guinn v. AstraZeneca Pharm. LP, 602 F.3d 1245, 1248 n. 1 (11th Cir. 2010)). Dr. Mink opines that Williams has developed numerous adverse health effects, including G6PD associated pulmonary hypertension, asthma, and obstructive pulmonary disease, as a result of exposure to the chemicals in Mosaic's emissions. (Dkt. 89-1 at 7) As demonstrated below, however, Mink's opinions regarding the causal connection between the constituents and Plaintiff's illnesses are wholly conclusory and unreliable.

### (1) Failure to Calculate Dose

Although Dr. Mink alleges that multiple constituents have contributed to Plaintiff's illnesses, as noted previously, he focuses primarily on her exposure to sulfur dioxide, neglecting much discussion of the other constituents, with the possible exception of particulate matter. For the purpose of illustrating his lack of methodology, the Court focuses on his opinions as they relate to sulfur dioxide.

In addition to his failure to establish what level of exposure to sulfur dioxide is toxic to the general public, Dr. Mink also has failed to determine the amount of sulfur dioxide to which Plaintiff was actually exposed.

> Q:  So you performed no — no specific dose calculations for Miss Williams, correct?
>
> A:  Again, no, and it can't be done.

(Dkt. 89-2 at 27)

> Q:  Can you show me in your report what levels of $SO_2$ Miss Williams was exposed to?
>
> A:  Again, we did that by inference. We're using US EPA's data because any number I put down there you're going to argue with.

(Id. at 70)

> Q:  Okay.  But, in fact, you have no knowledge, as we sit here today, of what levels of $SO_2$ Miss Williams was exposed to; is that correct? . . .
>
> A:  Asked and answered over and over.
>
> Q:  Is the answer yes or is the answer no?
>
> A:  The answer is — it's over 75 parts per billion currently, over 140 parts per billion historically[5], and how far over I don't know.  And no measurements have been taken in her residence that I'm aware of.

(Id. 76-77)

> Q:  How much — did you perform any calculations on how much $SO_2$ Miss Williams has inhaled?
>
> A:  Over her lifetime?
>
> Q:  Over any time.

---

[5] Both of these numbers are drawn directly from the USEPA studies.  In 2010, USEPA lowered the NAAQS for sulfur dioxide from 140 ppb to the current level of 75 ppb.  Dr. Mink thus contends that Plaintiff was exposed to at least 140 ppb of sulfur dioxide prior to 2010.

> A:  No.[6]

(Id. at 80)

> Q:  And how do you know she's had a toxic effect when you didn't calculate any dose for Miss Williams?
>
> A:  Well, again, her general population already has doses calculated, and therefore she's part of that general population, a more sensitive part, therefore by inference we know — we don't think, we know that she's that — she would be impacted to a greater degree.

(Id. at 32)

Rather than determine Plaintiff's actual exposure to sulfur dioxide, Dr. Mink infers that she has been exposed to anywhere from 75 ppb to 140 ppb of sulfur dioxide based solely on the proximity of her home to the Riverview plant and the fact that the plant historically has exceeded the EPA's ambient air quality standards.  But even if Mosaic emitted such levels of sulfur dioxide, this fact alone is not sufficient to establish Plaintiff's actual exposure.  Dr. Mink acknowledged in his deposition that the anatomy and physiology of the respiratory system diminishes the pollutant concentration of inhaled air, such that the amount of pollutant that actually enters one's body through the upper respiratory tract and lungs is less than that measured at the boundary of the body.  (Id. at 87)  Despite this acknowledgement, he made no effort to quantify Plaintiff's exposure.

"'Scientific knowledge of the harmful level of exposure to a chemical plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain plaintiff's burden in a toxic tort case.'"  McClain, 401 F.3d at 1240 (quoting Allen v. Penn. Eng'g Corp., 102 F.3d 194, 199 (5th Cir. 1996) (emphasis added)).  A toxicology expert is not required to "[g]ive precise numbers about a dose-response relationship," as

---

[6] Dr. Mink further testified that he had not quantified Plaintiff's actual exposure to any of the constituents. (Dkt. 89-2 at 144-146)

"[s]ome ambiguity about individual responses is expected." <u>McClain</u>, 401 F.3d at 1241, n. 6.  However, "[g]uesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." <u>Mitchell v. Gencorp, Inc.</u>, 165 F.3d 778, 781 (10th Cir. 1998) (citing <u>Daubert</u>, 509 U.S. at 589).

It is evident here that Dr. Mink is merely assuming Plaintiff's actual exposure to sulfur dioxide based on the Riverview plant's exceedance of the NAAQS, a fact he acknowledged in his deposition after admitting he had made no effort to learn about Plaintiff's life activities, daily routine, or other factors that may have affected her exposure to the surrounding air:

> Q: So despite having access to Miss Williams and despite having the ability to talk to her, you're relying on assumptions instead of information from Miss Williams, correct?
>
> A:  I think that's correct.

(Dkt. 89-2 at 75)

> Q: And for clarity, you did not calculate inhaled dose for Miss Williams with respect to sulfur dioxide, correct?
>
> A: No, I relied on EPA's numbers.

(<u>Id.</u> at 90)

> Q:  Did you consider Miss Williams' specific weight?
>
> A:  No, I did not.  Again, I relied on EPA.
>
> Q: Did you consider any specific activities of Miss Williams?
>
> A:  No.  Again, I replied on EPA.
>
> Q:  Did you calculate a specific inhalation rate for Miss Williams?
>
> A:  No.  Again, standard US EPA exposure factor inhalation rates.

(Id. at 92)

Put simply, Dr. Mink employed no methodology in determining Plaintiff's dose. His opinions about causation therefore are wholly speculative and unreliable.

### (2)  Failure to Account for Alternative Causes

Finally, Dr. Mink completely failed to account for any alternative explanations for Plaintiff's illnesses. For instance, Plaintiff suffers from airway remodeling. Dr. Mink identified the following potential causes of airway remodeling: trauma (such as almost drowning), chemical events, fine particulates, toxic chemicals, dust, radioactivity, asthma, bronchitis, chronic obstructive pulmonary disease (COPD), and certain medications. (Id. at 34-35)  Plaintiff also suffers from chronic asthma. Dr. Mink identified the following as potential causes or contributing factors of asthma: pollen, ragweed, toxic chemicals, obesity, allergies, secondhand smoke, and family history. (Id. at 36-37)  He testified that Plaintiff has several risk factors for pulmonary hypertension, including G6PD, asthma, chronic bronchitis, diabetes, and weight gain. (Id. at 207-08)  He acknowledged that she has a family history of asthma and a family history of hypertension.  (Id. at 208-09) Williams testified that she also was exposed to second-hand smoke for years, due to the smoking habits of her parents. (Dkt. 89-7 at 5-8)

Despite all of these potential risk factors for the diseases from which Plaintiff suffers, Dr. Mink did not perform a differential etiology[7] or otherwise attempt to eliminate any of those risk factors as potential causes of her diseases.

---

[7] Differential etiology is a well-recognized scientific method, a medical process of elimination whereby the possible causes of a condition are considered and ruled out one-by-one, leaving only one cause remaining. Hendrix, 609 F.3d at 1195. The Eleventh Circuit has held that, when applied under circumstances that ensure reliability, the differential etiology method can provide a valid basis for medical causation opinions. Id. (citing McClain, 401 F.3d at 1252).

Q:  What — what efforts, Dr. Mink, did you make to eliminate any alternative causes for Miss Williams' alleged injuries referenced in your report?

. . .

A:  I looked at in the literature the potential causes of her symptomatology and disease states, her clinical chemistries in — in medical records. I looked at the toxicity inherent in the different chemicals that we looked at her being exposed to and the levels in the literature.  And looked at the probability — that's what risk assessment is really a probability exercise to see how likely those were.  And there's always confounding factors, nothing is ever always or never, but we tried to look at the most plausible causes.

Q:  How did you —

A:  If she had been a smoker, I would have had to consider that —

Q:  Of course.

A:   — as extremely important.

Q:  How did you treat — how did you eliminate confounding factors?

A:  It's kind of the Bradford Hill criteria.[8]  Again, the strength of association, the coherence between the studies.  We looked at those that were most likely.  And then we relied on a lot of the published literature to say they were more likely than not or the potential they had to cause these effects.

Q:  So what I understand you saying, and correct me if I'm wrong, is that what you — what you really looked at were — what you really tried to do is make an effort to determine causation, but you were unable to eliminate alternative causes; is that fair?

---

[8] The Bradford Hill considerations, enunciated by Sir Austin Bradford Hill in a 1965 speech before the Royal Society of Medicine, are a collection of "nine different viewpoints" from which to "study association before we cry causation."  Hill, A.B., The Environment and Disease: Association or Causation? PROC R SOC MED 58(5):295–99 (May, 1965).  These nine "viewpoints" are as follows: (1) strength of the association; (2) consistency (whether the association has been repeatedly observed "by different persons, in different places, circumstances and times"); (3) specificity (whether there are alternative causes of a condition); (4) temporality (whether the condition followed the exposure to the agent); (5) biological gradient (whether a dose-response relationship exists); (6) plausibility (whether the association is biologically plausible); (7) coherence (whether the association "seriously conflict[s] with the generally known facts of the natural history and biology of the disease"); (8) experiment (whether the condition improves upon removal of the hypothesized causative agent); and (9) analogy.  Id.  Sir Bradford Hill additionally cautioned that "[n]one of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sina qua non*."  Id. at 299.  That is, Hill's viewpoints were not intended to be "hard-and-fast rules of evidence that must be obeyed before we accept cause and effect."  Id.

> A: Oh, I think we eliminated causes based on their probability. I mean, they were so low in comparison that — that we can eliminate them. Are they totally nonexistent, absolutely not, and I think I testified to that earlier.

(Dkt. 89-2 at 181-83)

However, nowhere in his report is there any indication that Dr. Mink attempted to rule out alternative causes of Plaintiff's illnesses. To the extent Dr. Mink says he considered the probability of various causes, he fails to discuss any of those probabilities in his report. Dr. Mink's assurance that he considered alternative causes is meaningless in the absence of any evidence or discussion of it in his report. As the United States Supreme Court noted, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Joiner, 522 U.S. at 146. Rather, the trial court is free to "conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id.

Such an analytical gap was found in Haller v. Astrazeneca Pharmaceuticals, LP, 598 F. Supp. 2d 1271 (M.D. Fla. 2009), in which the plaintiff alleged that he developed diabetes as a result of weight gain after taking the anti-psychotic drug Seroquel. Plaintiff's causation expert concluded that after taking Seroquel Plaintiff experienced a "dramatic weight gain" that caused his diabetes. Plaintiff had numerous pre-existing and concurrent factors that could have caused his diabetes, including a history of obesity, alcohol and drug abuse, hypertension, metabolic syndrome, and a 40 cigarette-a-day smoking habit. Id. at 1295. Yet, plaintiff's expert testified that he did not attempt to rule out alternative causes for Plaintiff's weight gain because he did not feel he needed to. Id. at 1278. He

also did not consider whether plaintiff's weight gain was attributable to two other psychiatric medications plaintiff was taking, id. at 1281, nor did he consider factors such as plaintiff's diet, caloric intake, lack of exercise, or any other life activities.  Id. at 1295.

The court concluded that the expert had employed a flawed methodology in reaching his specific medical causation opinions, that his opinions were impermissibly conjectural and speculative, and they required too great a leap of faith.  Id. at 1299.  The court explained, "[d]istilled to essentials, what emerges intact from [the expert's] testimony is that Haller had a number of factors that cause diabetes, that some or all of those factors could have been the cause of Haller's diabetes onset, and that it is sheer speculation to say that Seroquel was a "but for" cause of Haller's diabetes or a factor that contributed "substantially" to the disease."  Id. at 1297.  The court concluded that the expert's testimony "is sufficient only to raise the possibility that Seroquel caused Haller's diabetes," not to demonstrate actual causation.  Id. at 1299.

In another Seroquel case, the court excluded a different expert who acknowledged the plaintiff had numerous pre-existing health conditions and risk factors that could have contributed to her weight gain, but made no attempt to quantify the relative contribution of those other factors to the plaintiff's development of diabetes because "'it is not possible or practical' to do so."  Guinn v. AstraZeneca Pharmaceuticals, LP, 598 F. Supp. 2d 1239, 1247 (M.D. Fla. 2009).

"A district court is justified in excluding evidence if an expert 'utterly fails . . . to offer an explanation for why the proffered alternative cause' was ruled out."  Hendrix, 609 F.3d at 1197 (quoting Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1058 (9th Cir. 2003)).  Even though multiple factors can work in concert to cause a disease, an expert must still

provide some analysis for reaching a conclusion that, more likely than not, a specific factor substantially contributed to the disease.  Id.  An expert "cannot merely conclude that all risk factors for a disease are substantial contributing factors in its development.  The fact that exposure to a substance may be a risk factor for a disease does not make it an actual cause simply because the disease developed." Guinn, 602 F.3d at 1255 (internal citation, quotation marks, and alterations omitted).  It is clear from Dr. Mink's testimony that he has made exactly this assumption:

> A: . . . [Y]ou have 110 million tons of radioactive toxic heavy metal dust 1.8 miles downwind of Mrs. Williams' home 20 percent of the time that she's lived in for half a century.  It's clear that that material has deposited in her neighborhood and in her house.  She lives in a non-attainment zone.  She resides less than 2,000 feet from the arbitrary line of the attainment zone.  You would expect the health effects that she has.  And she developed exactly the health effects that are in the literature.  So that was our risk characterization in a nutshell trying to just boil it down simply.

(Dkt. 89-2 at 65) (emphasis added).

In sum, Dr. Mink does not know Plaintiff's actual level of exposure to any of the constituents from Mosaic's emissions, he has not determined which constituents contributed to each of her illnesses, and he has not ruled out any pre-existing conditions or other risk factors as possible causes of her illnesses.

Rather than employ accepted methodologies that would provide a reliable basis for his conclusions Dr. Mink merely inferred that because the Riverview plant has historically exceeded federal ambient air quality standards and plaintiff has lived near the plant for her entire life, to the extent she suffers from numerous health problems, those health problems must have resulted from her exposure to Mosaic's emissions.

It is entirely possible that Plaintiff has experienced long-term exposure to toxic chemicals that have caused her to suffer adverse health effects. At this point, however, this is nothing more than a hypothesis. "Hypotheses are verified by testing, not by submitting them to lay juries for a vote." Chapman, 766 F.3d at 1311 (quoting In re Denture Cream Prods. Liab. Litig., 795 F. Supp. 2d 1345, 1367 (S.D. Fla. 2014)). Nothing in the scientific literature relied upon by Dr. Mink establishes a toxic dose for any of the constituents at issue. Nothing in his methodology demonstrates that Plaintiff has been subjected to a toxic dose. Nothing ties Plaintiff's exposure to the constituents to her illnesses, other than Dr. Mink's speculative inferences. Thus, nothing has been provided that would aid a jury in resolving the question that would be presented to it: whether proximity to and potential exposure to the Riverview plant has caused Plaintiff to suffer the adverse health effects for which she has sued. For all these reasons, the Court concludes Dr. Mink's testimony must be excluded.

To the extent Dr. Mink employed flawed methodologies or failed to employ certain methodologies, Plaintiff argues that these issues go to the weight of Dr. Mink's testimony rather than its admissibility. This argument is contrary to the law of the Eleventh Circuit, which has reversed trial courts for abdicating their gatekeeping function and refusing to assess an expert's reliability. See McClain, 401 F.3d at 1238 ("A trial court, however, abuses its discretion by failing to act as a gatekeeper.").

The Court believes Dr. Mink to be an experienced toxicologist with impressive credentials. However, "[m]erely demonstrating that an expert has experience . . . does not automatically render every opinion and statement by that expert reliable." Hendrix, 609 F.3d at 1201. There is no such reliability here, where the Court has assessed Dr.

Mink's methodology and found it does not meet the scientific rigor required for admissibility. His opinions regarding causation therefore must be excluded.

### B. Motion for Summary Judgment

Plaintiff has asserted claims against Mosaic for negligence (Count I), gross negligence (Count II), strict liability (Count III), strict liability failure to warn (Count IV), strict liability for discharge of pollutants pursuant to the Florida Water Quality Assurance Act of 1983, Section 376.302 *et seq.*, Florida Statutes (Count V), and medical monitoring and environmental testing (Count VI). Mosaic contends it is entitled to summary judgment on all claims because Plaintiff cannot prove causation.

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216.

A moving party discharges its burden by showing there is an absence of evidence to support the non-moving party's case. Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts

showing there is a genuine issue for trial.  <u>Porter v. Ray</u>, 461 F.3d 1315, 1321 (11th Cir. 2006).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  <u>Evers v. Gen. Motors Corp.</u>, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").  Any such proffered evidence must be subject to being reduced to admissible evidence at trial.  <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1190 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.").  Abject hearsay cannot be offered to meet the required evidentiary showing.  If material issues of fact exist that would not allow the court to resolve an issue as a matter of law, the court must not decide them, but rather, must deny the motion and proceed to trial.

Causation is an element common to Plaintiff's negligence, gross negligence, strict liability (abnormally dangerous and/or ultra-hazardous activity), and medical monitoring and environmental testing claims.  To establish causation sufficient for a negligence claim, a plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result."  <u>Rementer v. United States</u>, 2015 WL 5934522, at *2 (M.D. Fla. Oct. 9, 2015) (quoting <u>Reaves v. Armstrong World Industries, Inc.</u>, 569 So. 2d 1307, 1309 (4th DCA 1990)).  To prove causation under a strict products liability theory, a plaintiff must prove that the product defect proximately caused her injury.  <u>Rink</u>, 400 F.3d at 1295 (citing <u>McCorvey v. Baxter Healthcare Corp.</u>, 298 F.3d 1253, 1257 (11th Cir. 2002)).  "Florida has adopted a preponderance standard for causation in both

negligence and strict liability actions; a mere possibility of causation is not enough." Hessen v. Jaguar Cars, Inc., 915 F.2d 641, 647 (11th Cir. 1990).

Because Plaintiff bears the burden of proving causation, the exclusion of Dr. Mink's testimony is fatal to her claims. See Rink, 400 F.3d at 1294-96 (affirming district court's grant of summary judgment where plaintiff's causation expert was excluded from testifying); Kilpatrick v. Breg, Inc., 2009 WL 2058384 (S.D. Fla. Jun. 25, 2009) (same). Plaintiff's counsel stated during a hearing before the magistrate judge that Dr. Mink is her sole causation expert. (Dkt. 109 at 12) She further acknowledged that "Dr. Mink's testimony is the critical bridge between Mosaic's pollution and Ms. Williams' injuries." (Dkt. 103 at 2) Consequently, without his testimony, she is unable to prove the critical element of her negligence, gross negligence, strict liability (abnormally dangerous and/or ultra-hazardous activity), and medical monitoring and environmental testing claims. Mosaic is therefore entitled to summary judgment on those claims.

Mosaic also seeks summary judgment on Plaintiff's strict liability claims for failure to warn and violation of statutory laws prohibiting pollutive discharges. Unlike the foregoing claims, neither of these claims requires a showing of causation.

In her strict liability failure to warn claim, Plaintiff alleges that Mosaic knew of the health risk caused by the operations at the Riverview plant but failed to warn or adequately warn her of that risk. "To establish strict liability for failure to warn under Florida law, the plaintiff must establish that the defendant (a) is a manufacturer or distributor of the product at issue, and (b) did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of the manufacture and distribution." Witt v.

<u>Stryker Corp. of Michigan</u>, 2016 WL 1583816, at *3 (11th Cir. Apr. 20, 2016) (citing <u>Griffin v. Kia Motors Corp.</u>, 843 So. 2d 336, 339 (Fla. 1st DCA 2003)).

Mosaic contends that summary judgment in its favor is warranted because there is no authority in Florida recognizing a claim for strict liability failure to warn outside of a products liability context. Mosaic argues that even if failure to warn were a viable cause of action in a toxic tort case, Plaintiff's claims would still fail because Mosaic has not manufactured or distributed and put into the stream of commerce a defective or hazardous product.

Under the rule of strict liability adopted in <u>West v. Caterpillar Tractor Co.</u>, 336 So. 2d 80 (Fla.1976), a product may be defective by virtue of a design defect, manufacturing defect, or an inadequate warning. "The rationale underpinning the general rule of strict liability is that it logically and fairly places the loss caused by a defective product on those who create the risk and reap the profit by placing such a product in the stream of commerce, with the expectation that these entities have the greatest incentive and resources to control and spread the risk of harm posed by the product." <u>Faddish v. Buffalo Pumps</u>, 881 F. Supp. 2d 1361, 1369 (S.D. Fla. 2012). It is well-settled, that "[o]n any theory of products liability, whether it be for negligent design or manufacture of the product, for breach of implied warranty, or strict liability, in order for the manufacturer to be liable the injured party must show that the manufacturer is in the business of and gains profits from the distribution and sale of the product through the stream of commerce." <u>Lane v. Int'l Paper Co.</u>, 545 So. 2d 484, 486 (Fla. 1st DCA 1989).

Here, it is clear, that Mosaic's emissions are not products placed into the stream of commerce. They are not integrated into other products, nor are they intended for use

or consumption by consumers. Because they are not generated for the purpose of sale to the public, Mosaic cannot be held liable for failing to warn the public of their hazardous nature.

Finally, Mosaic moves for summary judgment on Plaintiff's strict liability statutory claim for violation of the Water Quality Assurance Act of 1983, section 376.302 *et seq.*, Florida Statutes. Section 376.313, entitled "Nonexclusiveness of remedies and individual cause of action for damages under ss. 376.30–376.317," is "a far-reaching statutory scheme aimed at remedying, preventing, and removing the discharge of pollutants from Florida's waters and lands." Curd v. Mosaic Fertilizer, LLC, 39 So. 3d 1216, 1222 (Fla. 2010). The Act provides a "private cause of action to any person who can demonstrate damages as defined under the statute." Id. To state a plausible claim under section 376.313(3), a plaintiff must prove: (1) a prohibited discharge or other pollutive condition occurred, and (2) damages. Clark v. Ashland, Inc., 2015 WL 1470657, at *3 (M.D. Fla. Mar. 31, 2015) (citing Curd v. Mosaic Fertilizer, LLC, 39 So. 3d 1216, 1221–22 (Fla. 2010)).

In Aramark Uniform & Career Apparel, Inc. v. Easton, 894 So. 2d 20, 26 (Fla. 2004), the Florida Supreme Court held that plaintiffs asserting causes of action under section 376.313(3) are not required to prove causation. Accordingly, a defendant can be held liable without proof that it caused the pollution and the plaintiff does not have to plead or prove negligence in any form. Id. at 23-24. In light of the history of Mosaic's emissions, it is certain that Plaintiff could demonstrate a prohibited discharge or other pollutive condition occurred at the Riverview plant. The question, then, is whether she has raised a genuine issue of material fact as to damages.

"Damage," as used in chapter 376, is defined as "the documented extent of any destruction to or loss of any real or personal property, or the documented extent, pursuant to s. 376.121, of any destruction of the environment and natural resources, including all living things except human beings, as the direct result of the discharge of a pollutant." Fla. Stat. § 376.031(5).  Although a plaintiff is not required to show causation with regard to the fact of the pollution, she still "must prove damage causation, i.e., that the pollution in question caused [her] damages."[9]  Brottem v. Crescent Resources, LLC, 2006 WL 1529327, at *5 (M.D. Fla. May 24, 2006).

The Florida Second District Court of Appeal has stated that "with respect to wrongful injury to real property, there are two rules of damages: (1) the so-called 'diminution in value' rule, which is the difference between the value of real property before and after the injury; and (2) the cost of repairing or restoring the property to its condition prior to the injury, usually referred to as the 'restoration' rule."  U.S. Steel Corp. v. Benefield, 352 So. 2d 892, 894 (Fla. 2d DCA 1977).

Defendant contends that Plaintiff has not presented any evidence of any "destruction" to her home.  (Dkt. 92 at 12)  However, Plaintiff testified at her deposition, that while she has not yet attempted to sell her home (Dkt. 102-2 at 72), she would be obligated to inform any potential buyer of the toxins in and around her home and she believes no rational person would buy it with such knowledge.  (Id. at 150-51)  Thus, she contends her home is unsellable and seeks $39,562.00 — the assessed value of her home

---

[9] In her Amended Complaint, Plaintiff alleged she was seeking damages for lost wages, past and future health costs, diminished value to property, and attorney's fees, which are permissible under the statute.  In its motion to dismiss, Mosaic argued Plaintiff could not recover damages for lost wages or health costs in light of the statutory definition of "damages."  Plaintiff acknowledged in her response that she was not entitled to lost wages and past and future health care costs.  Her only basis for damages, then, is for diminished value of her property.

— in property damages.  (Dkts. 128 at 12; 102-2 at 132)  Defendant has not offered any evidence to conclusively demonstrate this testimony is false or unreliable.  In light of Plaintiff's testimony, the Court finds she has raised a genuine issue of material fact as to whether the value of her home is diminished as a result of Mosaic's discharges.  Summary judgment therefore is denied only with respect to Count V.

## IV. CONCLUSION

Based upon the foregoing, it is hereby **ORDERED** as follows:

1. Defendant's Motion to Exclude Proffered Testimony of Plaintiff's Proposed Expert Toxicologist, Dr. Franklin Mink (Dkt. 89) is **GRANTED**.

2. Defendant's Motion for Summary Judgment (Dkt. 92) is **GRANTED in part and DENIED in part**:

   a. The Motion is granted with respect to Counts I (negligence), II (gross negligence), III (strict liability), IV (strict liability failure to warn), and VI (medical monitoring and environmental testing).

   b. The motion is denied with respect to Count V (strict liability for discharge of pollutants pursuant to the Florida Water Quality Assurance Act).

3. In light of this Order, all remaining pending motions in this case are denied as moot.  The Clerk is **DIRECTED** to **TERMINATE** any pending motions.

4. The Final Pre-Trial Conference set in this matter for June 28, 2016 is **CANCELLED**.

5. This matter is placed on the November 2016 Trial Calendar, which commences on October 31, 2016.  A more definite date will be provided as the trial term approaches.

**DONE** and **ORDERED** in Tampa, Florida, this 24th day of June, 2016.

Copies furnished to:
Counsel of Record
Any Unrepresented Person

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE