**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RHONDA WILLIAMS, a single person,
        Plaintiff,
v.

MOSAIC FERTILIZER, LLC, a Delaware     Case No. 8:14-cv-1748-T-35TGW
Corporation doing business in Florida
        Defendant.                   Half Day Hearing Requested
_____/

**PLAINTIFF'S MOTION FOR RELIEF UNDER RULE 60(b)(1) and (b)(6), FROM THIS COURT'S ORDER (DKT. 144) GRANTING MOSAIC'S MOTION TO EXCLUDE PROFFERED TESTIMONY OF PLAINTIFF'S PROPOSED TOXICOLOGIST, DR. FRANKLIN MINK (DKT. 89), AND MOSAIC'S MOTION FOR SUMMARY JUDGMENT, IN PART (DKT. 92)**

    Plaintiff, Ms. Williams, brings this Motion pursuant to Rule 60(b)(1)&(b)(6), Fed. R. Cv. Pro., seeking correction of this Court's misconstruction of the law and its misapplication of the law to the facts, and misconstruction of certain facts in this Court's Opinion(Dkt. 144).

    In the Eleventh Circuit, Rule 60(b)(1) and (b)(6), are to be given "liberal and remedial construction." See *Nisson v. Lundy,* 975 F.2d 802, 807 (11th Cir. 1992). Rule 60(b) reflects polices of basic fairness and equity; and where there is "plain misconstruction" or mistakes in the record it may mandate amendment. *Id.* at 806. Specifically, Plaintiff submits that certain dispositive errors were made by this Court *sua sponte* on issues that were not argued by Mosaic in either its Motion to Exclude Proffered Testimony of Dr. Franklin Mink ("Daubert Motion") or its Motion for Summary Judgment.[1] Plaintiff also submits that the Court mistook certain facts and actions of Dr. Mink, further confounding the error. Certain errors in the

---
[1] Specifically, Mosaic did not argue that *McClain* v. Metabolife Intern., 401 F.3d 1233 (11th Cir. 2005) precluded Dr. Mink from relying on regulatory standards.

Court's Opinion arise from reliance upon authorities directed at a U.S. Food and Drug Administration's ("FDA") *rejected draft* public health guideline, as opposed to authority addressing the U.S. Department of Environmental Protection's, ("EPA") final public health standards, as referenced extensively in Ms. Williams' Response to the Daubert Motion (Dkt. 103) (Daubert Response). The scientific purpose, foundation, scope, reliance and intended use between the two are on opposite ends of the toxicological curve; thus, making this Court's application of *McClain v. Metabolife Intern.,* 401 F.3d 1233 (11th Cir. 2005), improper. The result was a misapplication of law to the facts in this case. The error is at the heart of this Court's Opinion, which bled into each stated bases for exclusion.

The Opinion sets forth six (6) primary bases for excluding Dr. Mink's Report, and granting summary judgment as to Counts 1, 2 and 3, for lack of causation. Each are discussed herein. They are: (1) unjustifiable reliance on regulatory standards to determine dose; (2) inference of facts from studies that contradict his conclusions; (3) failure to consider background risk; (4) failure to rule out alternative potential causes; (5) speculative and conclusory opinions and (6) neglect of the dose response relationship. Opinion at p.8-9.

## ARGUMENT
I. **Dr. Mink Justifiably Relied on Regulatory Standards**
   A. **NAAQS and IRIS Assessments are clearly distinguishable *McClain*.**

The *McClain* case is a dietary supplement case. Its facts allege that the supplement Metabolife, as an unintended side effect, causes ischemic strokes and heart attacks in humans when ingested orally. *McClain* at 1237. Metabolife was a dietary supplement taken orally and voluntarily, containing ephedrine. Dietary supplements unlike prescription or over-the-

2

counter drugs, do not require pre-market review or approval by the FDA.[2]  Further, they are generally considered safe until proven otherwise, and the manufacturers are not required to submit evidence that their products are safe before marketing.[3]   In stark contrast, this case is an environmental toxic tort case involving involuntary inhalation of pollutants[4] which have no health benefits, are harmful and cause serious health effects.[5]  Further, unlike oral doses that pass through the liver before entering the general circulatory system, thereby reducing their effects at the organ and cellular level, air pollutants are inhaled and go directly into the circulatory system from the lungs without the initial liver metabolism.[6]

In addition, there are significant scientific and methodological differences between the two matters that make *McClain's* holdings inapplicable.  The science behind EPA's health based air quality standards for SO2 and COCs are so factually and scientifically different from the rejected draft FDA drug advisory at issue in *McClain* as to render *McClain* completely distinguishable.  It is the difference between a *rejected draft* regulation and a final rule health standard[7] or chemical assessment summary.[8]  It follows, that the Eleventh

---

[2] See the U.S. Dept. of Health & Human Services, National Institutes of Health Information Page on Dietary Supplements: *What you need to know* at:
https://ods.od.nih.gov/HealthInformation/DS_WhatYouNeedToKnow.aspx (last checked on July 28, 2016)
[3] *Id*., and American Cancer Society Article on *FDA Regulation of Drugs Verses Dietary Supplements,* *http://www.cancer.org/treatment/treatmentsandsideeffects/complementaryandalternativemedicine/dietarysupplements/dietary-supplements-fda-regulations*. (last checked on July 28, 2016).
[4] Specifically: sulfur dioxide (SO2), particulate matter and six hazardous chemicals of concern (COCs), also referred to as hazardous air pollutants or HAPs.
[5] The EPA states that HAPs are, "known as toxic air pollutants or air toxics, that are known or suspected to cause cancer or other serious health effects, such as reproductive effects, or birth defect, or adverse environmental effects." https://www.epa.gov/haps/what-are-hazardous-air-pollutants.  (last checked on July 28, 2016).  The EPA states that Particulate Matter and Sulfur Dioxide are "harmful to the public health and environment."
[6] For oral intake, there is difference between oral dose and what is in the blood stream.  The same is not true for inhalation intake.
[7] The Clean Air Act mandated U.S. EPA to promulgate standards regulating statutorily defined criteria pollutants including SO2.  Section 108 of the Act, 84 stat. 1678, 42 U.S.C. 1857c-3(a).  The Act included

3

Circuit's (and this Court's) "caution" taken from *McClain* that toxicologists "cannot rely primarily upon government regulatory standards for the purpose of determining dose" is inapplicable here as a matter of law.  The factual distinctions also negate *McClain's* second line of attack against the expert's reliance on governmental regulatory standards e.g., the scientific principles set forth in articles by Dr. David Eaton and Margaret Berger.[9] The same quotes from these articles are cited in this Court's Opinion and in *McClain*.

1. **"Public Health Guidelines" at issue in *McClain***

According to the Eleventh Circuit, Mr. McClain's causation expert:

> "placed great weight on a Food & Drug Administration (FDA) proposal to severely restrict the sale and distribution of herbal supplements containing ephedrine.  But the *FDA did not publish those rules* because… The GAO determined that FDA's methodology relied heavily on *adverse incident reports without sufficient scientific controls* … In response to this criticism, *the FDA <u>withdrew</u> the proposed rules*." (emphasis added). *McClain* at 1248.

Hence, the public health guidelines at issue were draft rules never promulgated, lacking sufficient scientific controls, withdrawn because of flaws in underlying methodology.

The significance of these so-called guidelines and how they were derived was not lost on the Eleventh Circuit.  The Court noted that the expert's use of this flawed FDA data constitutes "the type of risk assessment that a government agency follows for establishing public health guidelines" and contrasted this flawed FDA methodology to an "expert analysis

---

requirements for regulating criteria pollutants along with a timetable for promulgation.   42 U.S.C.A. § 7409 (West)

[8] The human health assessment information in the Integrated Risk Information System (IRIS) about the Chemicals of Concern used in Dr. Mink's analysis are also distinguishable from draft regulations in *McClain*. The IRIS database has been in the making since 1985 - more than thirty years.  The multiple technical reviews and public comments are encapsulated in a time line of the history of IRIS.  *See* https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system#history (last visited 7/19/2016).

[9] *McClain* quoted Dr. Eaton's 2003 journal article quoted in, *In re Accutane Products Liab*. 511 F. Supp. 2d 1288 (M.D. Fla. 2007) (hereinafter "Eaton Article"), and Margaret A. Berger's comments in "The Supreme Court's Trilogy on the Admissibility of Expert Testimony" in Ref. Manual on Scientific Evid., (Federal Judicial Center, 2d ed. 2000).

of toxicity and causation in a toxic tort case." *Id.* at 1249. From that point, *McClain* concludes that reliance on these flawed draft rules is a deficient methodology for establishing general causation in toxic tort cases, citing as authority the same quotes from the same Berger and Eaton Articles as cited by in the Opinion. From here the Court wrongly concludes that Dr. Mink cannot rely on NAAQS and the related ISAs for Sulfur Oxides and Particulate Matter and the IRIS assessments, discussed in detail in the Daubert Response at pp. 6-14.

2. **The quote from the Berger Article is inapplicable and fails to support the conclusion that Dr. Mink cannot rely on regulatory standards**

Ms. Berger's quotation[10] distinguishes the terms "proof of risk" and "proof of causation" by stating:

> "… that they [the terms] entail "somewhat different questions because risk assessment frequently calls for a <u>cost-benefit analysis</u>. The agency assessing risk may decide to bar a substance or product if the potential benefits are outweighed by the possibility of risks that are largely unquantifiable." (emphasis added). *Id*. at 1249.

Commenting on Ms. Berger's quotation, the Eleventh Circuit states "[o]bviously in a toxic tort case the court must focus on assessing causation, not on a <u>cost benefit analysis for restricting the sale and use of a drug</u>. (emphasis added) *Id*. This case is not about restricting the sale and use of a drug based on a cost benefit analysis. Nor is it about a misguided government agency attempt to rely on poor data in its rulemaking. This case is about an expert's reliance on the NAAQS for SO2 that is a **health based standard** that was promulgated under the authority of Sections 108 and 109 of the Clean Air Act[11], with no reference to a "cost benefit analysis." [12] [13]

---

[10] Opinion, p. 15
[11] "**Rulemaking:** Taking into consideration the information in the ISA, REA(s), and PA and the advice of CASAC, EPA develops and publishes a notice of proposed rulemaking that communicates the Administrator's

5

Like NAAQS, the significant COCs cited by Dr. Mink have been evaluated under the Integrated Risk Information System ("IRIS"). The process for evaluation of a chemical for IRIS **is based on dose response and** involves all the steps for promulgating a formal regulation. [14] Thus, Ms. Berger's quote distinguishing guidelines based on cost-benefit analyses fails to support this Court's conclusion that Dr. Mink cannot rely on duly promulgated regulatory standards for the purpose of determining dose resulting in clear error.

### B. The Eaton Article fails to support the conclusion that Dr. Mink cannot rely on regulatory standards.

The quotes from Dr. Eaton cited in the Opinion are repeated verbatim from *McClain*. They express Dr. Eaton's view that: "Acceptable exposure levels for large populations are often, in this author's opinion, of marginal relevance to estimating "causation" in an individual.*"McClain* at 1249. This is so, Dr. Eaton says:

> "Because a number of protective, often "worst case" assumptions are made in estimating allowable exposures for large populations…[these regulatory levels] overestimate potential toxicity levels for nearly all individuals" and "because these guidelines are intended to be protective of all individuals in a population, including the very young, the

---

proposed decisions regarding the review of the NAAQS…," citing from: https://www.epa.gov/criteria-air-pollutants/process-reviewing-national-ambient-air-quality-standards (last visited, July 27, 2016).

[12] See *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001). Justice Scalia held that statutory language in the Clean Air Act definitively bars U.S. EPA from considering implementation costs[12] in setting National Ambient Air Quality Standards for criteria pollutants including SO2. *Whitman* at 905. He reasoned that cost factor is *both* so indirectly related to public health *and* so full of potential for canceling the conclusions drawn from direct health effects that if Congress wanted that result, it would have expressly and unequivocally said so in the Clean Air Act and it did not. *Id*.

[13] The EPA's process of reviewing NAAQS standards, includes: planning, preparation of ISAs, Risk/Exposure Assessments, and Policy Assessments which include advice from the Clean Air Scientific Advisory Committee; all of which go into developing the NAAQS standards. See https://www.epa.gov/criteria-air-pollutants/process-reviewing-national-ambient-air-quality-standards.

[14] As taken from the EPA's website, the **IRIS Process for Developing Human Health Assessments** involves seven in-depth steps, including: draft development, agency review, interagency science consultation, public comment and external peer review (including the the EPA's Scientific Advisory Board (SAB) Chemical Assessment Advisory Committee (CAAC), revise assessment, final agency review/interagency science discussion, and final assessment. For detailed discussion as to what each step entails, see https://www.epa.gov/iris/basic-information-about-integrated-risk-information-system#process (last visited 7/22/2016). See Dkt. 103, Ex. 1, reference to USEPA 2015 IRIS.

6

> very old and <u>other potentially sensitive individuals</u>, the theoretical risks from exposure at the guideline range level is likely to be substantially over-estimated for the large majority of individuals in the population." (emphasis added)
> Opinion, p. 15.

In other words, the flaw in using regulatory levels is that they "theoretically" overestimate risks from exposure for the **Average Person** since the levels are designed to protect a class of more-sensitive-than-average persons. But Ms. Williams is part of that more sensitive class of persons as she has chronic asthma.[15] Her asthma puts her directly in the protected sensitive populations. In fact, Dr. Eaton's point favors Ms. Williams' **specific facts on the issue of causation** because regulatory levels set to protect sensitive populations **do not overestimate** exposure for sensitive individuals.

      More distinctions exist. First, the Eaton Article was commenting generally on various unspecified government "regulatory levels" in 2004, more than four years before the Integrated Science Assessment for Sulfur Oxides – Health Criteria ("ISA") was published. Due to its general nature and time of publication, the Eaton Article does not discuss the ISA specifically or review the complex, detailed methodology that study employed for setting NAAQS for sulfur dioxide. Nor does it discuss at any level of specificity the methodology for IRIS Assessments. Second, Dr. Eaton's discounting of Reference Doses (Rfd) as causation benchmarks is based on his assertion that they are usually derived from NOAELS or LOAELS in the toxicology literature and are usually determined from experimental animal studies rather than human exposures. This statement is not applicable to the COCs at issue in

---

[15] This is the benchmark used by Dr. Mink. See Dkt. 103, Ex. 5, the ISA for Sulfur Oxides.

this case that have IRIS Assessments, as each considers <u>actual human data</u>; and involve inhaled doses, applying a Reference Concentration (RfC) or unit risk dose by inhalation.[16]

Dr. Eaton's general comments about RfD are simply that – general comments. They do not apply as the IRIS Chemical Assessment Summaries for the COCs at issue specifically incorporate occupational epidemiologic studies.[17] Moreover, Dr. Eaton offers no rationale that extrapolation from animal and lab data is per se unreliable. Such imprecision was rejected, in *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *7 (S.D. Ind. Sept. 18, 2006), the court rebuffed a Daubert challenge to reliability on the basis the expert extrapolated from animal and laboratory studies.[18]

### C. *McClain permits* causation experts to rely upon regulatory standards.

The *McClain* court opined that it was **not** rejecting public health rules and explained:

> "…The court is not rejecting public health rules from consideration in a *Daubert* analysis. Rather, **in ruling on methodology issues, the trial court should understand what the rule really means about causation for the specific plaintiff, not simply about protecting the public-at-large from risk of harm based on a risk-utility analysis of the drug."**
> *McClain* at 1249 (emphasis added); partially cited by this Court at Opinion, p. 16, beginning with bold text *infra*.

---

[16] For example, the IRIS Chemical Assessment Summary for Chromium confirms that it is a known human carcinogen by the inhalation route of exposure. See the IRIS Chemical Assessment Summary, Chromium, at Dkt. 103, Ex. 8, pp. 17. "Hexavalent chromium is known to be carcinogenic in humans by the inhalation route of exposure. **Results of occupational epidemiologic studies of chromium-exposed workers** are consistent across investigators and study populations. **Dose response relationships have been established for chromium exposure and lung cancer**." *Id. (emphasis added)*. And Dkt. 103, Ex. 1, References at p. 27.

[17] Dr. Mink opines that SO2, manganese, chromium, nickel arsenic, cadmium, lead and PM2.5/10 are at issue. There are IRIS assessments for manganese, chromium (cited above), nickel, arsenic, cadmium and lead. SO2 and PM2.5/10 are Clean Air Act criteria pollutants with Integrated Science Assessments, not IRIS documents. **This is contrary to the Court's conclusion on p. 13, that Dr. Mink acknowledged that there are no IRIS assessments for the "majority of the constituents at issue in this case."** This statement was likely based on confusion between criteria air pollutants (SO2 and particulates) and hazardous air pollutants.

[18] The Court stated: "GM has not provided any specific argument as to the specific animal and *in vitro* studies at issue, or why extrapolation from such studies to human exposure risk assessments is unreliable. In light of this dearth of evidence, and in light of the importance of animal and in vitro studies in informing toxicological research, there is no reason to find the TEF method unreliable on this basis alone." <u>Allgood v. Gen. Motors Corp.</u>, No. 102CV1077DFHTAB, 2006 WL 2669337, at *7 (S.D. Ind. Sept. 18, 2006)

8

Ms. Williams submits that here and in her Daubert Response she has made the case for general and specific causation using the NAAQS ISAs and COCs as they apply specifically to her facts.

Importantly, the Opinion did not examine what the EPA intended by setting the NAAQS[19] and IRIS, nor did it analyze in depth how Dr. Mink used these specific regulatory health-based standards to support his opinions. Evidence of this, for example, is inferred in the Opinion's solitary reference to the ISA for Sulfur Oxides. The Opinion did not analyze nor in any way distinguish the ISA's conclusions of causal connection between the 1 hour 75 ppb SO2 standard and respiratory morbidity discussed on pages 6-8 of the Daubert Response. In place of such an analysis, the Court switched gears in the paragraph after the *McClain* quote cited above and recited *McClain's* purported "caution" that toxicologists "cannot rely primarily upon government regulatory standards for the purpose of determining dose." This "caution" however is based on facts distinguishable from the case at bar. Plaintiff submits that this repeated reliance on *McClain* resulted in clear error in both fact and law.

**II.    Dr. Mink Uses (not Infers) Facts from Studies**

This Court takes issue with Dr. Mink's reliance on the Li and Chakraborty Reports, stating its view that his methodology is suspect when it relies upon studies whose conclusions purport to contradict his opinion. Opinion, p. 21. There is a distinct difference

---

[19] Page 18 of the Opinion recites the Court's view that the NAAQS 75 ppb is a "safe level of exposure to SO2." **That is factually incorrect**. The Clean Air Scientific Advisory Committee determined that SO2 levels in excess of the 75ppb for 5 minutes in asthmatics causes respiratory morbidity. See 75 Fed. Reg.35520, 35525, Primary NAAQS for Sulfur Dioxide, Final Rule. See also, *Survival Analysis of Victims of Sulfur Oxide Air Pollution Suffering from COPD or Asthm in Yokkaichi, Japan; and* Namekata, *The Japanese Compensation system for Respiratory Disease Patients,* 1986, cited in Lee, Scheider, Grant and Verker (eds), *Aerosols,* Lewis Pub., Chelsea, MI, referenced at Dkt. 103, Ex. 9, pp. 9, 28, 68, 86-89, 96, 171.

between relying on another expert's study and using another expert's raw data included in a particular study. No case law is cited for the Court's proposition that reliance on another's data is improper methodology. And courts have found to the contrary.[20]

Dr. Mink relied upon the IRIS database, and the Li Report for specific dose response curves for the HAPs as set forth in the IRIS database.[21] Dr. Mink agreed with methods used, the raw data/results presented and the risk calculation methods. *Id.* He disagrees, however, with the Li's modeling interpretations, data set limitations and conclusions based on biased/scored/partial data sets, noting that Li's study was funded by The Phosphate Institute, which includes members of Mosaic's executive team on its advisory board. *Id.* at 64

The primary criticism of the Li Report is its narrow focus on phosphate facilities' point source emissions ("smokestacks"), while **ignoring** the air emissions from Mosaic's 800 acre, 200 foot high **phosphogypsum waste pile**. This is so because the purpose of the Li Report is to demonstrate that air pollution emission controls on process smokestacks in the phosphate manufacturing industry had reduced HAP emissions from the operating plants. Omitting an analysis of the air emissions from the larger, more concentrated phosphogypsum waste piles is the strategy that enabled Li to reach the conclusion he did - that the phosphate industry's smokestacks do not contribute "significantly" to hazardous air pollution in the area. However, when taking into consideration the phosphogypsum waste stacks, the correct interpretation of Li's modeling results is that Mosaic is actually responsible for as much as

---

[20] See *Eberli v. Cirrus Design Corp.,* 615 F.Supp.2d 1357, 1364 (S.D.Fla.2009) ("an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts") (quoting *Ohio Environmental Development Ltd. Partnership v. Envirotest Systems Corp.,* 478 F.Supp.2d 963, 976 (N.D.Ohio 2007)).
[21] See Mink Dep. Tr. at pp. 63-63, Dkt. 103, Ex. 9. This reliance also negates the Court's conclusion that Dr. Mink ignored the dose-response relationship.

15-17% of the total HAP Emissions in the study area.[22] [23]  This is key, because whereas the smokestacks are the primary source of SO2, the phosphogypsum waste stacks are a major recognized source of the Particulate Matter and the COCs.[24]

Dr. Mink used the Chakraborty Report in a similar way.  Chakraborty studied alternative sources of HAPs including major voluntary mobile sources like automobiles, trains and trucks.  Fig.2 on page 174 of his article shows that major and minor point sources combined in the Progress Village area are larger than on-road mobile sources (cars, trucks) and only exceeded by non-road mobile sources. Like the Li Study, the Chakraborty Study does not look at non-point source, non-road sources such as the Mosaic phosphogypsum waste piles in reaching its conclusions ; nor is it at odds with Dr. Mink's conclusions.

### III. Dr. Mink Considered the Background Risk for Plaintiff's Illnesses

The Court concluded that Dr. Mink was "unaware" of the background risk of Ms. Williams' various diseases, citing two examples from his deposition testimony.  First, he testified to his knowledge of the prevalence of pulmonary hypertension in the general population as follows:  "I don't recall.  It's not large."  As to the prevalence of obstructive pulmonary disease in the population, he states: "I don't recall specifically, but it's significant."

---

[22] A close reading of the data in the Li Report supports Dr. Mink.  The pie chart of relative source contributions at the Tower Dairy monitoring station identifies "limestone" contributions as 15.5% of the sources of "trace metals" otherwise known as HAPs. Dkt. 103, Ex. 3, p. 11. The chart says that contribution is from "limestone." The text says "lime/gypsum" meaning phosphogypsum. *Id*, 2nd column, line 3. "Limestone" makes up 15% of all pollution sources and is the largest manmade source of pollution in the study area.

[23] This discussion is an example of the complexities of the toxicology at issue in this case and an example of why a hearing to vet these methodology issues without being bound by a page restriction would have been helpful to the Court.

[24] See Dkt. 104, Exs. 2 & 11, Ungers' Report.

11

Testimony from a witness that "I don't recall" does not mean the same as "I don't know." The phrase "I don't recall" means that "at one time I knew, but as I sit here today, the specifics escapes my memory." Such testimony calls for refreshing the witness's recollection at trial, or even follow-up questions by the examiner, which were not done here. But it does not call for concluding the witness is ignorant. This is particularly true with the qualifiers put on his testimony – "It's not large" and the words "It's significant." Those qualifiers were qualitative answers to questions about prevalence of a disease in a population. They negate the Court's conclusion that Dr. Mink was ignorant about the background risk; as does his specific testimony on causes of pulmonary hypertension and obstructive pulmonary disease.[25] Lack of certainty is not, for a qualified expert, the same thing as guesswork.[26]

Further, the Court improperly relies on *Chapman* for the proposition that "ignorance" of background risk is a serious methodological deficiency.[27] What the *Chapman* court said was that the trial judge concluded the <u>absence</u> of background risk of disease, was "a substantial weakness" in a general causation analysis. Similar to the difference between "I don't know" and "I don't recall," the term "absence" means the information is plainly not there, in contrast to Dr. Mink's qualitative estimate of background risk. But most importantly, the Court's conclusion is contrary to greater weight, e.g., Dr. Mink's testimony, his review of medical records spanning 2 decades, and the twenty plus articles on **asthma, pulmonary disease, hypertension, diabetes, COPD, airway restriction, traffic pollution**, etc.[28]

---

[25] See Dkt. 103, Ex. 9, pp. 159-160.
[26] See *Primiano v. Cook,* 2010 U.S.App. LEXIS 8859, 2010 WL 1660303, *5 (9th Cir.Apr.27, 2010).
[27] *Chapman v. Procter & Gamble Distrib.,* LLC, 766 F.3d 1296, 1308 (11th Cir. 2014), cert. denied, 135 S. Ct. 2312, 191 L. Ed. 2d 1000 (2015).
[28] See Dkt. 103, Ex. 9, Tr. at pp. 182-184, 208-209, 212-214; and Dr. Mink's Expert Report at Dkt. 103. Ex. 1, pp. 4-6, 17-27, and noting asthma preceded all, in early childhood, but exposure came before even asthma.

**IV.   Dr. Mink Has Not Failed to Rule Out Alternative Potential Causes**

On the one hand, the Court takes the position that Dr. Mink did not account for alternative explanations for Plaintiff's diseases, while on the other hand, it lists the potential causes that Dr. Mink identified and cites testimony where he explained how he eliminated alternative causes. Opinion 28.  Thus, "complete failure" is difficult to reconcile with the evidence that Dr. Mink, did in fact, identify and eliminate causes. Opinion p. 28.

It appears the Court's concern is that he did not perform a differential etiology. Opinion p. 28, fn. 7.  Dr. Mink's deposition testimony, however, expressly says he reviewed medical literature to determine probability of alternative causes and specifically applied Bradford Hill criteria (including strength of association and coherence – factors (1) and (7), as cited in footnote 8 of the Opinion) and was able to significantly minimize the potential contribution of other causes.[29]  The Opinion is silent as to why it rejected the Bradford Hill methodology as a legitimate "alternative attempt" to eliminate alternative causes.[30]  Plaintiff submits, that no finding in the Opinion or argument by Mosaic has been made as to why the Bradford Hill methodology was improper, because none exists.  In *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983 (11th Cir. 2016), (a post-*Daubert* Response case) the Eleventh Circuit stated its view on what constitutes an adequate alternatives analysis in the context of a *Daubert* challenge to expert testimony.  All that was necessary for the expert to do in *Seamon* was to "provide a reasonable explanation as to why the expert 'has concluded that [any alternative cause suggested by the defense] was not the sole cause' of the plaintiff's injury." *Id*. at 989

---

[29] Dkt. 103, Ex. 9, Dep. Tr. at pp. 29, 89, 97-98, 181-183, 207, 212-215, and Dkt. 103, Ex. 1.
[30] See The Fed. Ref. Manual on Sci. Evd., 2d ed., (2000), at pp. 375-379, 470-472. In addition, counsel's survey of federal case law shows that Bradford Hill criteria is broadly accepted as proper and reliable methodology.

citing *Guinn v. AstraZeneca Pharm. LP,* 602 F.3d 1245, 1253 (11th Cir.2010).[31] That is precisely what Dr. Mink did. First he identified co-morbidity based on Ms. Williams' medical records, next he investigated the medical literature to determine which co-morbidity factors were plausible alternative causes for Ms. Williams' illnesses and then eliminated those factors based on their likelihood. Ultimately finding that more likely than not her injury was caused by her exposure to the SO2, particulates and HAPs. **While not required by Seamon**, this Court's requirement of ruling out "one-by-one, leaving only one cause remaining" is exactly what Dr. Mink did.

Turning to the final purported fatal flaw, that Dr. Mink failed to memorialize his alternatives analysis in his Expert Report, this issue turns on the question of whether an expert testimony at trial or in a *Daubert* hearing is limited to the four corners of the Expert Report. The rule is not intended to be so limiting, and experts may elaborate.[32] Finally, this Court's citation to *Haller v. Astrazeneca Pharmaceuticals, LP*, 598 F. Supp.2d 1271 (M.D. Fla. 2009) is not determinative. In *Haller* the expert made <u>no attempt whatsoever</u> to rule out alternative causes for weight gain because the expert "did not feel he needed or had to do that." *Id*. at 1278. There is no such testimony from Dr. Mink.[33] To the contrary, he identified and eliminated alternative potential causes for Ms. Williams' illnesses as quoted by the Court in its Opinion.

---

[31] *Chapman* at 1309 cited to *Guinn* at 1253, for the proposition that an expert "need not rule out all possible alternative causes," but that it should at least consider "other factors that could have been the sole cause."
[32] *See Thompson v. Doane Pet Care Co.*, 470 F.3d 1201 (6th Cir. 2006), where the Court said that Section 26(a)(2)(B): "does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation. The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."*Id*. at 1203.
[33] See Dkt. 103, Ex. 9 at pp. 211-213. Unlike *Haller*, Dr. Mink ruled out and testified that exposure did not cause her diabetes, weight gain, or abdominal pain; and explained that fatigue was an expected symptom of g6pd, when an oxidative stress insult occurs because of exposure.

### V. Dr. Mink Does Not Render Speculative and Conclusory Opinions

The Court takes issue with Dr. Mink's purported lack of specificity regarding studies and peer-reviewed literature that demonstrate increased sensitivity of G6PD individuals. Dr. Mink's references list no fewer than 18 primary references regarding various aspects G6PD in terms of its etiology, pathology, genetics, etc., that he reviewed as part of the preparation of his expert report.[34] Dr. Mink was not asked at his deposition to identify articles specifically addressing sensitivity to oxidative stress, which is the hallmark of why G6PD individuals are more sensitive to SO2 and other oxidative pollutants. It is unjust on that record of omission to take the position that lack of specificity amounts to speculation.

The Court likewise concludes that Dr. Mink's inability to quantify the increased sensitivity of G6PD individuals is "fatal" to his opinion. That conclusion is not rooted in law. The Court cites no precedent for its absolute requirement to quantify increased chemical sensitivity. Dr. Mink explains based on scientific studies that oxidative stress pollutants like SO2 weaken cells. So while the general population can recover from a dose of oxidative stress, it is more difficult for Ms. Williams to do so; and there are no published studies that reliably quantify the difference.[35] The critical fact is that there actually is a difference in response for G6PD individuals as shown in the medical literature. But precisely how much is not critical, let alone fatal <u>because</u> as a chronic asthmatic with <u>severe asthma</u> she falls into the sensitive subset of the population and the risks to her were considered at the 75ppb acute level. Thus, her increased sensitivity did not require quantitation as causation is proven at the levels she has been exposed to, with specific clinical evidence in her medical

---

[34] See Dr. Mink's Expert Report at Dkt. 103, Ex. 1.
[35] See Dkt. 103, Ex. 9, Dep. Tr. at pp. 27-30, 120.

records.[36]  Last, the quote from *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F3d 1092 is *dicta*, and its facts are not instructive because the expert testimony in *Cook* was excluded on the grounds of relevance, foundation and constituting a legal conclusion.

### VI.     Dr. Mink Does Not Neglect the Dose Response Relationship

IRIS and the NAAQS ISAs are dose response assessments based on human studies.[37] Neither *McClain,* or *Mitchell v. Gencorp, Inc.,* 165 F.3d 778, 781 (10th Cir. 1998) addressed either.  S02 levels in excess of the 75ppb standard causes respiratory morbidity.[38]  The NAAQS 75ppb standard is a 1-hour "average;" applying simple math, 75ppb can result from a shorter 5 minute concentration as high as 900ppb, if the remainder of the hour is at zero. This is significant as Hillsborough's Environmental Protection Commission data shows that when the revised 2010 NAAQS standard was applied retroactively to historic monitor data, there were significantly more violations than once reported.[39] [40] Ms. Williams has been exposed since birth, and at levels far greater than today's regulated SO2 levels.  And unlike *Mitchell,* where there was no medical evidence of exposure, here exposure to S02 has been clinically evidenced by the elevated MCV with macrocytosis in Ms. Williams' blood work

---

[36] See. Dkt. 103, Ex. 9 at p. 116, 185 and medical records referenced in Dkt. 103, Ex. 1, including Dr. Joseph's and Dr. Alabi's scan topography records.

[37] See Dkt. 103, Ex. 5, ISA for Sulfur Oxide; fn 40 below, and Dkt. 103, Ex. 1, reference to USEPA 2015 IRIS.

[38] See Dkt. 103, Ex. 5, ISA for Sulfur Oxide.

[39] See Dkt. 103, Ex. 6, Halprin letter and Table, demonstrating historical exposure, causative to the chronic asthma.

[40] SO2 has a direct impact on particulate matter. "High concentrations of $SO_2$ in the air generally also lead to the formation of other sulfur oxides ($SO_x$). $SO_x$ can react with other compounds in the atmosphere to form small particles. These particles contribute to particulate matter (PM) pollution: particles may penetrate deeply into sensitive parts of the lungs and cause additional health problems. See https://www.epa.gov/so2-pollution/sulfur-dioxide-basics#effects.  See also 75 Fed. Reg.35520, Dkt. 103, Ex. 5 and 6;  https://www.epa.gov/pm-pollution/particulate-matter-pm-basics#PM; and the Hillsborough County EPC Air Quality Reports for 2007, 2010 – 2013, referenced in Dkt. 103, Ex. 1, and Dkt. 103, Ex. 9, pp. 53-56.

reviewed from 1995 -2015.[41] Further, Ms. Williams' home is yards from the current modeled boundary where 75ppb standard <u>is exceeded</u>. And her daily life is in the boundary.[42] Her exposure is not a guess work, but supported by years of historical actual hard monitoring data of exceedances at or around her neighborhood. Further, Dr. Mink unequivocally testified that he relied upon IRIS, and the Li Report for the HAPs specific dose response curves.[43] And he did not neglect Particulates[44] or the HAPs. The Daubert Response discussed at length the Li Report, IRIS, and chromium by way of example.[45] Further, Dr. Mink relied on Mr. Ungers' site specific, actual data documenting HAPs at Ms. Williams' home, that were consistent with metals found in phosphogypsum rock.[46] Here the evidence of exposure is overwhelming when considering the ISAs, the IRISs, the years of historical monitor data, the medical records, and Mr. Ungers' findings. In sum, the fact that Dr. Mink cannot pinpoint the specific level of exposure is not fatal to his opinion.[47]

---

[41] See Dkt. 103, Ex. 9, Mink's Dep. Tr. at p. 116.
[42] *Id.* at 66.
[43] See Mink Dep. Tr. at pp. 63-63, Dkt. 103, Ex. 9.
[44] Like SO2, the scientific literature behind the EPA's NAAQS ISA for Particulates, as relied upon by Dr. Mink, includes mortality dose-response curves & threshold levels, based on actual human data, in 20 of the largest U.S. cities. See https://hero.epa.gov/hero/index.cfm/reference/details/reference_id/5813; citing to Daniels, MJ, et.al, *Estimating particulate matter-mortality dose-response curves and threshold levels: an analysis of daily time-series for the 20 largest US cities,* Amer. Journal of Epidemiology, V.152, Issue 5, 2000.
[45] See Daubert Response at pp.12 – 18.
[46] *Id.* at. 18.
[47] See *In re Trasylol Prods. Liab. Litig.,* 2010 U.S. Dist. LEXIS 116929(S.D. Fla. Sept. 10, 2010)(Holding that at "the 'rule out' step of the differential diagnosis, the expert 'need not rule out all possible alternatives causes,..' and noting the fact that the expert could not rule out all the factors represented nothing more than disagreement with the other side's theory of the case.)(internal cites omitted); *Louderback v. Orkin Exterminating Co.*, 26 F. Supp. 2d 1298 (D. Kan. 1998) (failure to consider threshold levels of exposure does not necessarily render expert's opinion unreliable where temporal relationship, scientific literature establishing an association between exposure and various symptoms, plaintiffs' medical records and history of disease, and exposure to or the presence of other disease-causing factors were all considered); *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 931 (8thCir.2001)(Holding that, "it was not necessary that [the plaintiff's] experts quantify the amount of [the product] to which she was exposed in order to demonstrate that she was exposed to a toxic level of [the chemical]" as "[i]t is sufficient for a plaintiff to prove that she was exposed to a quantity of toxin that 'exceeded safe levels.'"); and *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir.1999)(Holding that the expert's diagnosis was admissible because it was "clearly [ ] not a case in which the plaintiff was unable to

## VII. It is Generally Accepted Within the Medical Community that SO2 & COCs Cause Injury [48]

Sulfur dioxide has been shown to be an acute respiratory hazard since before World War II.[49] The U.S. Congress agreed with the severe health issues caused by exposure to S02 forty-six years ago when it listed SO2 as one of the only six (6) air pollutants regulated specifically by name in the Clean Air Act. The EPA has spent the subsequent five decades regulating SO2 at the federal and state level with the help of the scientific and medical communities. Medical textbooks going back decades have routinely discussed SO2's respiratory morbidity.[50] Likewise, the medical textbook "Occupational Lung Disorders" (2nd Addition 1994) discusses occupational case histories; and cites to articles published in 1975 and 1987 regarding the dose response of individuals with and without asthma to SO2 and impairment of lung function. Id. at 629. But references in medical textbooks are not the only way that SO2 hazards are known in the medical community. As noted in the Daubert Response, the 24-member Clean Air Scientific Advisory Committee for Sulfur Oxides Primary NAAQS Primary Review Panel is made up of both academic and medical experts.[51]

---

establish any substantial exposure to the allegedly defective product ... [A]lthough the physician] did not point to [the plaintiff's] exposure to a specific level ..., there was evidence of a substantial exposure.")
[48] This issue was not raised by Mosaic in its motion. Hence we address the issue as a *sua sponte* argument.
[49] (Kehoe et al. 1932 cited in Les Ungers attachment).
[50] For example, going back only thirty-two years, the 1984 2nd Edition of <u>Occupational Lung Diseases</u> published by W.B. Saunders Company included a section on SO2. The textbook states: "There is a considerable body of physiological evidence that sulfur dioxide in low concentrations acts to increase airways resistance, and it is now clear that the combination of exercise and low concentrations of sulfur dioxide (0.5 ppm or 500 ppb) may lead to an increase in airway resistance in asymptomatic asthmatics," citing a 1981 study published in the journal "American Review of Respiratory Disease," p. 627.
[51] See Dkt. 103, Ex. 5, pages xxviii-xxix; The Committee **includes four Professors of Medicine** who teach and do research at the following top level medical schools: **UC San Francisco, Johns Hopkins University, Harvard and NYU, in addition to a physician- professor at the National Jewish Medical and Research Center** in Denver, CO.

The medical community was and always has been an integral part of assessing, mitigating and treating illness and injury from exposure to SO2.

Further, HAPs by definition are those air pollutants that <u>are known</u> in both the scientific and medical community to cause cancer and/or serious health effects.[52] As discussed in this motion each HAP has an IRIS, which includes intensive external peer review by scientists and medical doctors. Last, Dr. Mink specifically testified that Ms. Williams asthma, and the aggravation other identified diseases are known causes of exposure to the SO2, particulates and HAPs.[53]

### VIII. Plaintiff requests clarification on use Mr. Ungers for Count V.

Mr. Ungers' work concerning his findings at Ms. Williams home of HAPs in exceedances of Florida's soils, that are associated with phosphogypsum stacks is critical to helping a jury understand the nature and the presence of the pollution at her residence.[54] Mr. Ungers is not a causation expert; Ms. Williams plans to call him as a witness and seeks clarification as Mosaic's motion to exclude him was terminated. (Dkt. 90 & 144).

### VII. Request for Proffer or in the alternative, a Hearing to Solicit Testimony

Plaintiff previously requested and again submits that a hearing on these complex scientific issues would be beneficial.[55] Plaintiff's experts, Dr. Mink and Mr. Ungers, were prepared to present testimony, or alternatively make a proffer of testimony at hearing on May 25-26, 2016, rescheduled for June 28, 2016, which was cancelled by the Court. Plaintiff herewith submits the affidavits of Dr. Mink and Mr. Ungers as a proffer of their previously

---

[52] See https://www.epa.gov/haps/what-are-hazardous-air-pollutants
[53] See Dkt. 103, Ex.1, Dep. Tr. pp. 10, 11, 13, 68, 69, 171, 202, 213, 214
[54] Prior to the work performed by Mr. Ungers there were no published studies that established the actual presence of phosphogypsum-related substances in structures downwind of Mosaic.
[55] See *Thompson v. Doane Pet Care Co.,* 470 F. 3d 1201, 1203 (6th Cir. 2006).

expected testimony, and where noted, their response to certain issues raised in the Opinion.[56] In the alternative, they are submitted to assist the Court with the complex matters, if accepted by the Court.  In caution, <u>Ms. Williams does not cite to the affidavits in support of this motion</u>, and makes her request on the grounds due process and fundamental fairness.

**Pursuant to Local Rule 3.01(g) Counsel represents that she communicated with counsel for Mosaic on July 4, 2016, and Mosaic opposes this Motion**.

**Wherefore**, Plaintiff requests an Order amending this Court's Opinion (Dkt. 144), Denying Mosaic's Daubert Motion (Dkt. 89), reversing Summary Judgment at to Counts 1-3, (Dkt. 144) and Denying Mosaic's Motion to Exclude Mr. Ungers (Dkt. 90), or otherwise allowing Mr. Ungers to testify.

Dated July 29, 2016.

\_\_\_\_\_/S/_____

| | |
|---|---|
| Laureen Galeoto, Esq. | Mary Ellen Hogan, Esq. |
| FBN 0194107 | FBN 0065372 |
| 100 S. Ashley Dr., Ste. 600 | 100 S. Ashley Dr., Ste. 600 |
| Tampa, FL 33602 | Tampa, FL 33602 |
| P. 813.397.3800 | P. 813.964.6515 |
| Laureen@laureenlaw.com | Maryellen@thegreencounselor.com |

William P. Walker, Jr.
135 E. Main Street
Lexington, SC 29072
P. 803.359.6194
bw@walkermorgan.com

Certificate of Service

The undersigned certifies that on July 29, 2016, that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

\_\_\_\_/S/_____
Laureen Galeoto

---

[56] See Dr. Mink's Affidavit, attached as Ex. A; and Les Ungers' Affidavit, attached as Ex. B.